| | |
|---|---|
| TIMOTHY BOND, individually and on behalf of all others similarly situated, <br><br> Plaintiff, <br><br> v. <br><br> CLOVER HEALTH INVESTMENTS, CORP., CHAMATH PALIHAPITIYA, VIVEK GARIPALLI, and ANDREW TOY, <br><br> Defendants. | Case No. <br><br> <u>CLASS ACTION</u> <br><br> COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS <br><br> <u>JURY TRIAL DEMANDED</u> |

Plaintiff Timothy Bond ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to his own acts, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), news reports, press releases issued by Defendants, and other publicly available documents, as follows:

**NATURE AND SUMMARY OF THE ACTION**

1.      This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Clover Health Investments, Corp. ("Clover" or the "Company") (formerly known as Social Capital Hedosophia Holdings Corp. III ("SCH") common stock between October 6, 2020 and February 3, 2021, inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      According to the Company's recent SEC filings, Clover purports to be "a next-generation Medicare Advantage insurer" that seeks to "leverage [its] flagship software platform, the Clover Assistant, to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers." Clover is headquartered in this jurisdiction, with its principal executive offices located at 725 Cool Springs Boulevard, Suite 320, Franklin, Tennessee 37067.

3.      On October 6, 2020, Clover issued a press release announcing plans to become a publicly traded company via a merger with SCH. SCH was setup as a special purpose acquisition company (also known as a SPAC). SCH's shares traded on the New York Stock Exchange under the ticker symbol "IPOC." Clover's October 6, 2020 release provided, in relevant part, that the transaction valued Clover at an enterprise value of approximately $3.7 billion, and the transaction was expected to deliver up to $1.2 billion in gross proceeds.

4.      On January 7, 2021, Clover and SCH announced that their anticipated business combination had been completed, and shares of Clover would begin trading on NASDAQ under the ticker symbol CLOV the next day. During the Class Period, shares of IPOC/CLOV common stock traded as high as $17.45 each.

5.      On February 4, 2021, analyst Hindenburg Research published a report entitled "Clover Health: How the 'King of SPACs' Lured Retail Investors Into a Broken Business Facing an Active, Undisclosed DOJ Investigation." In this report, Hindenburg "reveal[ed] how Clover Health and its Wall Street celebrity promoter, Chamath Palihapitiya, misled investors about critical aspects of Clover's business in the run-up to the company's SPAC go-public transaction last month." Hindenburg stated that its investigation "spanned almost 4 months and has included more than a dozen interviews with former employees, competitors, and industry experts," as well

2

as "dozens of calls to doctor's offices, and a review of thousands of pages of government reports, insurance filings, regulatory filings, and company marketing materials."

6. Hindenburg continued: "[c]ritically, Clover has not disclosed that its business model and its software offering, called the Clover Assistant, are under active investigation by the Department of Justice (DOJ), which is investigating at least 12 issues ranging from kickbacks to marketing practices to undisclosed third-party deals, according to a Civil Investigative Demand . . . we obtained." Hindenburg wrote that the DOJ's "Civil Investigative Demand and the corresponding investigation present a potential existential risk for a company that derives almost all of its revenue from Medicare, a government payor. Our research indicates that the investigation has merit."

7. On this news, shares of Clover common stock plummeted from their February 3, 2021 closing price of $13.95 per share to just $12.23 per share on February 4, 2021, representing a one day drop of approximately 12.3%. This represents a loss of approximately $700 million in market capitalization. Moreover, shares traded as low as $11.86 per share intraday on February 4, 2021.

8. Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Clover was the recipient of a Civil Investigative Demand from the DOJ; (ii) much of Clover's sales are driven by a major related party deal that Clover not only failed to disclose but took active steps to conceal; (iii) Clover's subsidiary Seek Insurance failed to disclose its relationship with Clover and misled consumers as to its purported independence; (iv) Clover's software was in fact rudimentary; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

3

## JURISDICTION AND VENUE

9.      The federal law claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, as well as under the common law.

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.      This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

12.      Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here.

13.      In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

14.      Plaintiff Timothy Bond acquired and held shares of Clover at artificially inflated prices during the class period, and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

15.      Defendant Clover Health Investments, Corp. purports to be a Medicare Advantage insurer that uses its software platform, the Clover Assistant, to provide America's seniors with PPO and HMO insurance plans. Clover common stock trades on the NASDAQ

4

stock exchange under the ticker "CLOV." The Company's headquarters are located at 725 Cool Springs Boulevard, Suite 320, Franklin, Tennessee 37067, and the Company is incorporated under the laws of the State of Delaware.

16.     Defendant Chamath Palihapitiya has served as SCH's CEO and Chairman of SCH's Board of Directors since October 2019. Since the January 7, 2021 business combination, Defendant Palihapitiya has acted as a senior advisor to Clover's management.

17.     Defendant Vivek Garipalli co-founded Clover and has served as Clover's CEO and a member of the Company's Board of Directors since July 2014. He also previously served as Clover's President from July 2014 to March 2019.

18.     Defendant Andrew Toy has served as Clover's President since March 2019, as Clover's Chief Technology Officer since February 2018, and as a member of the Company's Board of Directors since November 2019.

19.     Defendants Palihapitiya, Garipalli, and Toy (referred to as the "Individual Defendants"), because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the issuance of these false statements or to cause them to be corrected. Because of their positions with the Company and access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being

5

concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

20.     Clover was founded in 2013 by Defendant Garipalli. The Company sells Medicare insurance and offers software to physicians that helps aggregate data on patients who are part of the Clover network.

21.     Shares of IPOC went public in April 2020, when SCH sold 72 million units at $10.00 each. SCH detailed that it was a "newly incorporated blank check company, incorporated as a Cayman Islands exempted company for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

22.      The Class Period begins on October 6, 2020, when Clover and SCH announced their plan to enter into a merger through which Clover would become a publicly-traded company. Clover described itself in this release as "a next-generation Medicare Advantage insurance company offering best-in-class plans that combine wide access to healthcare and rich supplemental benefits with low out-of-pocket expenses. A unique model in health insurance, Clover partners with primary care physicians using its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care."

23.     The proposed merger valued Clover at $3.7 billion, and noted that Clover was expected to receive up to $728 million of transaction proceeds and that up to $500 million of cash proceeds were expected to be allocated to existing Clover shareholders.

24.      In this October 6, 2020 release, Clover and SCH further provided:

6

Technology is at the core of Clover's business – the Company is a true innovator in the Medicare Advantage space, deploying its own internally-developed software to assist physicians with clinical decision-making at the point of care.

Clover's flagship platform, the Clover Assistant, aggregates millions of relevant health data points – including claims, medical charts and diagnostics, among others – and uses machine learning to synthesize that data with member-specific information. This provides physicians with actionable and personalized insights at the point of care, offering suggestions for medications and dosages as well as the need for tests or referrals, among others, to ultimately improve health outcomes. The Clover Assistant enables a virtuous growth cycle, whereby improved health outcomes lead to superior economics that the Company shares with members through lower costs and rich benefits. In turn, the Company believes its best-in-class plans will continue to deliver market-leading growth, allowing the Clover Assistant to capture and synthesize more data and ultimately drive better care.

\*       \*       \*

Today, Clover is the fastest growing Medicare Advantage insurer in the United States – among insurers with more than 50,000 members – and serves more than 57,000 members in 34 counties across 7 states. Spurred by favorable demographic tailwinds and its differentiated, technology-driven approach, Clover has captured an average of 50 percent of the net increase in membership across its established markets over the last three years. Further, the Company's software-centric approach enables efficient expansion into new markets, including to historically underserved and rural communities. The Company plans to expand into an additional 74 counties and eighth state next year and recently announced a new partnership with Walmart to make joint Clover-Walmart plans available to half a million Medicare-eligibles in eight Georgia counties.

Clover's management team, led by CEO and Co-Founder Vivek Garipalli and President and Co-Founder Andrew Toy, will continue to lead Clover following the transaction. Chamath Palihapitiya, Founder and CEO of SCH, will act as a senior advisor to the Company's management.

25.    In this October 6, 2020 press release, Defendant Toy stated: "I believe that more and more doctors are embracing the Clover Assistant because it allows them to focus on what they want to do, which is to look after patients. Importantly, the platform is empowered by a closed feedback loop, linking clinical data and physician action, which improves continuously as membership grows, allowing us to constantly evolve new ways of helping physicians and their patients."

7

26.     Also on October 6, 2020, SCH and Clover filed the Agreement and Plan of Merger as an Exhibit to a Form 425 Prospectus with the SEC. Sec. 4.30(a) ("Healthcare Compliance") of this Agreement and Plan of Merger provided, in relevant part, that "[e]ach of [Clover] and its Subsidiaries (i) in all material respects meets and complies with, and since January 1, 2018, has met and complied with, all applicable Laws, including all Health Care Laws, and other requirements for participation in, and receipt of payment from, the Medicare Advantage Program . . . ." Elsewhere in the Agreement and Plan of Merger, "Health Care Laws" is defined to include, *inter alia*, the Federal False Claims Act, the Federal Anti-Kickback Law, and many other related laws.

27.     Sec. 4.30(d) of the Agreement and Plan of Merger provided, in relevant part, that "[s]ince January 1, 2018 . . . (iii) each of [Clover] and its Subsidiaries has implemented and maintained a compliance program, including policies, procedures and training, intended to ensure compliance with all applicable Health Care Laws . . . ."

28.     Also on October 6, 2020, Defendant Palihapitiya appeared on CNBC in an interview announcing the Clover-SCH transaction. Defendant Palihapitiya stated that Clover was not engaged in the practice of "upcoding," or inputting inaccurate medical information to increase reimbursement from government payors such as Medicare. He said of Clover, in relevant part: "They create transparency. They don't play games. They don't motivate doctors to upcode or do all kinds of things in order to get paid." Defendant Palihapitiya also said during this interview that SCH was "really excited after months of diligence and work to announce [the] merger between IPOC and Clover Health to take Clover Health public."

29.     On October 20, 2020, SCH filed a Form S-4 Registration Statement with the SEC. In this document, SCH and Clover represented that they had discussed "typical due diligence,"

and that "[f]rom August 25, 2020 to August 28, 2020," SCH, Clover, and their legal representatives "held a meeting via video teleconference to discuss certain preliminary healthcare regulatory and compliance due diligence matters, given the regulated nature of Clover's business." This document further provided that on August 27, 2020, SCH's legal counsel was "provided with access to a virtual data room of Clover and began conducting a preliminary legal due diligence review of Clover." The document further provided that representatives of SCH and Clover met several other times to discuss, *inter alia*, due diligence review and matters associated therewith.

30.     This October 20, 2020 Form S-4 Registration Statement further provided that, in reaching its recommendation to pursue the business combination with Clover, its Board:

> [C]onsidered the scope of the due diligence conducted by SCH's senior management and outside advisors and evaluated the results thereof and information available to it related to Clover, including: (a) extensive virtual meetings and calls with Clover's management team regarding its operations, projections and the proposed transaction; and (b) review of materials related to Clover and its business, made available by Clover, including financial statements, material contracts, key metrics and performance indicators, benefit plans, employee compensation and labor matters, intellectual property matters, real property matters, information technology, privacy and personal data, litigation information, healthcare matters and other regulatory and compliance matters and other legal and business diligence.

31.     In the October 20, 2020 Form S-4 Registration Statement, Clover also represented that "[w]e work diligently to ensure compliance with all applicable laws and regulations." Clover repeated this same sentence in several other public SEC filings during the Class Period, including in at least the January 13, 2021 Form S-1 Registration Statement and the January 29, 2021 Form 424B3 Prospectus.

32.     On November 19, 2020, SPH filed a presentation with the SEC entitled "Clover Health: A Deeper Dive." This presentation lauded Clover's "Virtuous Growth Cycle." The presentation further asserted that "Physicians Value the Clover Assistant," and that "[i]n ~2 years

9

since product launch, we've built a broad base of engaged physicians. Given our software-driven approach, we believe we can scale these results rapidly within existing and new markets." In this presentation, Clover further stated that physicians were "[i]ncentivized to use [Clover's] highly delightful tech platform . . . that suggests personalized care recommendations at the point of care" and that the platform was "[d]esigned to work with any PCP and remove financial concerns from clinical decision-making."

33.	On January 6, 2021, SCH announced that its shareholders voted to approve of the proposed business combination with Clover, and that the transaction was expected to close the next day.

34.	On January 7, 2021, Clover and SCH announced the completion of the business combination. Defendant Garipalli said in this release: "[a]s a public company, we will continue to pioneer a fundamentally different approach in the Medicare Advantage and Medicare space – investing in technology and partnering closely with physicians to help them make critical decisions for their patients at the point of care – with an overarching commitment to creating value for all stakeholders."

35.	The statements described above were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. As discussed below, the Defendants misled investors by misrepresenting and/or failing to disclose that: (i) Clover was the recipient of a Civil Investigative Demand from the DOJ; (ii) much of Clover's sales are driven by a major related party deal that Clover not only failed to disclose but took active steps to conceal; (iii) Clover's subsidiary Seek Insurance failed to disclose its relationship with Clover and misled consumers as to its purported independence; (iv) Clover's

10

software was in fact rudimentary; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

36.     The statements described in ¶¶ 22, 24-32, and 34 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.

## THE TRUTH EMERGES

37.     On February 4, 2021, analyst Hindenburg Research published a report entitled "Clover Health: How the 'King of SPACs' Lured Retail Investors Into a Broken Business Facing an Active, Undisclosed DOJ Investigation." In this report, Hindenburg "reveal[ed] how Clover Health and its Wall Street celebrity promoted, Chamath Palihapitiya, misled investors about critical aspects of Clover's business in the run-up to the company's SPAC go-public transaction last month." Hindenburg stated that its investigation "spanned almost 4 months and has included more than a dozen interviews with former employees, competitors, and industry experts," as well as "dozens of calls to doctor's offices, and a review of thousands of pages of government reports, insurance filings, regulatory filings, and company marketing materials."

38.     Hindenburg continued: "[c]ritically, Clover has not disclosed that its business model and its software offering, called the Clover Assistant, are under active investigation by the Department of Justice (DOJ), which is investigating at least 12 issues ranging from kickbacks to marketing practices to undisclosed third-party deals, according to a Civil Investigative Demand . . . we obtained." Hindenburg wrote that the DOJ's "Civil Investigative Demand and the corresponding investigation present a potential existential risk for a company that derives almost all of its revenue from Medicare, a government payor. Our research indicates that the investigation has merit."

11

39. In its report, Hindenburg provided a link to a partially-redacted version of the Civil Investigative Demand that Hindenburg had obtained. The Civil Investigative Demand provided that the DOJ was engaged in "a False Claims Act investigation" that "generally concerns whether Clover Health Investment Corporation and/or related entities improperly induced patient referrals for services paid for by Federal agencies." Among the 12 specific topics that the DOJ sought information from Clover on where: (a) Clover's payments to healthcare providers to induce those providers to recruit patients to Clover's Medicare Advantage plans; (b) Clover's activities intended to encourage providers to refuse to accept patients with non-Clover coverage; (c) Clover's payments to providers' staff and employees . . . for conveying any information relating to Clover plans to patients in providers' offices; (d) payments related to Clover Assistant; (e) Clover's patient recruitment efforts; (f) Clover's activities relating to matching patients with Medicare Advantage plans; and (g) the "Seek Medicare" online platform.

40. Hindenburg continued that "Clover claims that its best-in-class technology fuels its sales growth. We found that much of Clover's sales are driven by a major undisclosed related party deal and misleading marketing targeting the elderly. These practices should not come as a surprise, given that in 2016, Clover was fined for misleading marketing practices by the Centers for Medicare & Medicaid Services (CMS). The fine was issued after Clover's repeated failure to amend misleading statements about its plan offerings. A former employee told us the fine was so small it just emboldened Clover to push the envelope further."

41. In its report, Hindenburg further flagged Clover's "thinly-disclosed subsidiary called 'Seek Insurance.'" Hindenburg noted that "Seek makes no mention of its relationship with Clover on its website yet misleading advertises to seniors that it offers 'independent' and 'unbiased' advice on selecting Medicare plans. [Seek] claims, 'We don't work for insurance

companies. We work for you', despite literally being owned by Clover, an insurance company. [Seek's] activities are also under investigation by the DOJ."

42.     Hindenburg further noted that "[m]ultiple former employees explained that much of Clover's sales are fueled by a major undisclosed relationship between Clover and an outside brokerage firm controlled by Clover's Head of Sales, Hiram Bermudez. One former employee estimated Bermudez drove ~68% of Clover's total sales, though was unclear on the amount coming from the undisclosed relationship. One of the former employees [interviewed by Hindenburg] explained that Clover's Head of Sales took efforts to conceal the relationship by putting it in his wife's name 'for compliance purposes'. Insurance filings confirm this. The Clover contract was quietly put into his wife's name in the weeks after Clover's go-public announcement."

43.     According to Hindenburg, "[i]n a CNBC interview announcing the Clover transaction, Chamath proclaimed, unprompted, 'they create transparency . . . they don't motivate doctors to upcode or do all kinds of things to get paid". A former employee explained to us that the DOJ is *specifically* asking about upcoding, or the practice of overbilling Medicare." Indeed, "[m]uliple former employees explained" to Hindenburg "that Clover's software is primarily a tool to help the company increase coding reimbursement."

44.     Furthermore, Hindenburg wrote that "according to doctors and former employees we interviewed," physicians use Clover's software "because Clover pays them extra to use it. Physicians are paid $200 per visit to use the software, twice the normal reimbursement rate for a Medicare visit." Rather than being "delight[ed]" by Clover's technology, "[d]octors at key Clover providers described the software as 'embarrassingly rudimentary', 'a waste of my time' and as just another administrative hassle to deal with."

13

45.     Hindenburg also noted that Palihapitiya's firm, Social Capital Hedosophia Holdings, invested just $25,000 and agreed that Palihapitiya would promote the Clover Health SPAC in exchange for an eventual 20.5 million in "founders shares" (worth approximately $290 million today).

46.     On this news, shares of Clover common stock plummeted from their February 3, 2021 closing price of $13.95 per share to just $12.23 per share on February 4, 2021, representing a one day drop of approximately 12.3%. This represents a loss of approximately $700 million in market capitalization. Moreover, shares traded as low as $11.86 per share intraday on February 4, 2021.

47.     On February 5, 2021, Clover issued two press releases in which the Company announced, *inter alia*, that : (1) that Clover had received a letter from the SEC "indicating that [the SEC] is conducting an investigation and requested document and data preservation for the period from January 1, 2020, to the present, relating to certain matters that are referenced in the article; and (2) Defendant Palihapitiya and Clover "were fully aware of the DOJ inquiry," but made the affirmative decision to not publicly disclose this information.

## CLASS ACTION ALLEGATIONS

48.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class of all persons and entities who purchased or otherwise acquired Clover common stock between October 6, 2020 and February 3, 2021, inclusive. Excluded from the Class are Defendants, directors and officers of the Company, as well as their families and affiliates.

49.     The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

50.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.  Whether Defendants violated the Exchange Act;

b.  Whether Defendants omitted and/or misrepresented material facts;

c.  Whether Defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

d.  Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.  Whether the price of the Company's stock was artificially inflated; and

f.  The extent of damage sustained by Class members and the appropriate measure of damages.

51.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

52.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

53.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FRAUD ON THE MARKET

54.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

a.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.  The omissions and misrepresentations were material;

15

c. The Company's common stock traded in efficient markets;

d. The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e. Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

55. At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

56. The statutory safe harbor provided for forward-looking statements under certain conditions does not apply to any of the allegedly false statements pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

57. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

# LOSS CAUSATION

58.     On February 4, 2021, Hindenburg published the research report detailed herein. On this news, shares of Clover common stock plummeted from their February 3, 2021 closing price of $13.95 per share to just $12.23 per share on February 4, 2021, representing a one day drop of approximately 12.3%. This represents a loss of approximately $700 million in market capitalization. Moreover, shares traded as low as $11.86 per share intraday on February 4, 2021.

59.     These revelations contradicted statements made by Defendants during the Class Period and were a causal element of the concurrent decline in the Company's share price.

### Count One
### Violations of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

60.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

61.     During the Class Period, Clover and the Individual Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

62.     Clover and the Individual Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the class period.

17

63. Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**Count Two**
**Violation of § 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

64. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

65. The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided with or had unlimited access to the documents described above that contained statements alleged by Plaintiff to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a) determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

(b)    awarding compensatory and punitive damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

(c)    awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

(d)    awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

19

Dated: February 5, 2021                        Respectfully submitted,

                                               */s/ J. Gerard Stranch, IV*
                                               J. Gerard Stranch, IV, Esq. (BPR #23045)
                                               Benjamin A Gastel, Esq. (BPR #28699)
                                               **BRANSTETTER, STRANCH
                                                 & JENNINGS, PLLC**
                                               223 Rosa L Parks Avenue, Suite 200
                                               Nashville, Tennessee 37203
                                               615-254-8801 (phone)
                                               615-255-5419 (fax)
                                               gerards@bsjfirm.com
                                               beng@bjsfirm.com

                                               Jeffrey C. Block (*pro hac vice* forthcoming)
                                               Jacob A. Walker (*pro hac vice* forthcoming)
                                               Stephen J. Teti (*pro hac vice* forthcoming)
                                               **BLOCK & LEVITON LLP**
                                               260 Franklin Street, Suite 1860
                                               Boston, MA 02110
                                               (617) 398-5600 (phone)
                                               (617) 507-6020 (fax)
                                               jeff@blockleviton.com
                                               jake@blockleviton.com
                                               steti@blockleviton.com

                                               *Attorneys for Plaintiff and Proposed Lead
                                               Counsel*