# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| TIMOTHY BOND, individually and on behalf of all others similarly situated, | Case No. 3:21-cv-00096 |
| Plaintiff, | |
| v. | CLASS ACTION |
| CLOVER HEALTH INVESTMENTS, CORP., CHAMATH PALIHAPITIYA, VIVEK GARIPALLI, and ANDREW TOY, | |
| Defendants. | |

**CHRISTOPHER BUNTON'S MEMORANDUM OF LAW IN FUTHER SUPPORT OF HIS MOTION FOR APPOINTMENT AS LEAD PLAINTIFF AND APPROVAL OF SELECTION OF COUNSEL AND IN OPPOSITION TO COMPETING MOTIONS**

## I. INTRODUCTION

Christopher Bunton is the only Lead Plaintiff candidate who can represent the entire class in this action. Bunton suffered significant losses—$526,644.97—on both his purchases of Clover common stock and options to purchase common stock. He has the "largest financial **interest** in the relief sought by the **class"** and is otherwise adequate and typical. He is therefore the most adequate plaintiff, and his motion should be granted.

Competing movant Firas Jabri claims losses only slightly larger than Bunton's losses. Jabri lost only 3% more than Bunton (approximately $16,000). But "the plaintiff with the largest numeric loss is not automatically the plaintiff with the 'largest financial interest,'" and when movants have "functionally" or "roughly equal" losses, courts look to other factors to assess which movant is the most adequate lead plaintiff. *Garden City Emps.' Ret. Sys v. Psychiatric Solutions, Inc.*, No. 09-cv-882, 2010 WL 1790763, at *3 (M.D. Tenn. Apr. 30, 2010) (quoting *In re Moral Fin. Corp. Sec. Litig.*, 414 F.Supp.2d 398, 403 (S.D.N.Y. 2006), and *In re Pfizer. Inc. Sec. Litig.*, 233 F.R.D. 334, 338 (S.D.N.Y. 2005)). Here, Jabri only purchased Clover common stock. He has zero incentive or motivation to pursue claims on behalf of options traders, who are unquestionably included in this consolidated class action.

Plus, as discussed below, Jabri is represented here by three law firms: the Pomerantz Firm, which is to act as Lead Counsel, Bramlett Law Offices, which is to act as Liaison Counsel, and the Schall Law Firm, whose presence and role is undefined. Schall, however, is a well-known referral firm and likely directed Jabri to retain Pomerantz, in exchange for receiving 20% of the Pomerantz Firm's legal fee. Notably, Schall's co-counsel agreement—which any law firm to which he refers a client *must* accept on a take-it-or-leave-it basis—provides that "[t]he Schall Firm shall be

1

entitled, if it so requests, to be co-lead counsel[.]"[1] Yet Jabri's motion is silent as to whether (or when) Schall will exercise this right.

While there is nothing inherently improper with an attorney referral arrangement, Schall's unusual arrangement—and, in particular, Jabri's failure to disclose Schall's role and ability to exert control over this case—runs counter to the PSLRA's stated purpose: to end lawyer driven litigation and put control in the hand of the Lead Plaintiff. Schall's undisclosed co-counsel agreement with Pomerantz affords him too much control over this litigation.[2] Among other provisions, Schall's co-counsel agreement with Pomerantz gives Schall the right to represent Jabri "in any way that the Schall Firm deems appropriate and in the best interests of the Client, and the Schall firm shall be entitled to do so." Supp. Block Decl., Ex. A at ¶ 2. In other words, Jabri has either knowingly or unknowingly allowed Schall to have significant control over the prosecution of this case. The agreement gives Schall the right to direct that the litigation proceed in Jabri's—and presumably Schall's—best interests, even if those interests conflict with the best interests of the class. The proposed lead plaintiff should be in control, not an attorney, rendering Jabri an inadequate representative.

Given Jabri's lack of any incentive to represent the entire class (including options purchasers), and that he has demonstrated his inadequacy by ceding significant control to referring counsel—without disclosing that counsel's actual role to the Court—he is not the most adequate plaintiff and his motion should be denied.

Each of the other movants' financial interest in this action is less than Bunton's and some suffer from additional infirmities, discussed below.

_____

[1] Supplemental Block Decl., Ex. A, ¶ 2.
[2] Schall claims he will not agree to any changes or modifications to his agreement. Supplemental Block Decl. ¶ 3.

Accordingly, Bunton is the most adequate plaintiff and the Court should grant his motion. The Court should further approve of his choice of Lead Counsel, Block & Leviton, and liaison counsel, Branstetter, Stranch & Jennings.

## II.  STATEMENT OF FACTS

### A.  Background Allegations

On October 6, 2020, the start of the Class Period, Clover announced that it was going public through a reverse merger with Social Capital Hedosohpia Corp. III ("SCH"), a blank-check special purpose acquisition company (also known as a SPAC). *Id.*, at 4. Over the last several months, SPACs have come under increasing regulatory scrutiny from the U.S. Securities and Exchange Commission. As recently as Monday, April 12, 2021, the SEC cautioned that SPACs may need to refile regulatory documents to correct accounting errors involving the classification of warrants.[3] Moreover, the SEC cautioned that companies (like Clover) that have previously submitted registration statements and subsequent SPAC filings may need to refile financial statements to "correct material errors." *Id.* This follows other recent SEC-promulgated guidance and public statements concerning SPACs over the last several weeks, including guidance involving the disclosures made in registration statements and other public materials used by companies like Clover to go public via SPACs.[4] The SEC has also suggested that SPACs, such as Clover, may not

---

[3]  https://www.sec.gov/news/public-statement/accounting-reporting-warrants-issued-spacs (last visited on April 20, 2021).

[4]  *See, e.g.,* https://www.sec.gov/news/public-statement/munter-spac-20200331 (Mar. 31, 2021, "Financial Reporting and Auditing Considerations of Companies Merging with SPACs") (last visited on April 20, 2021); https://www.sec.gov/news/public-statement/division-cf-spac-2021-03-31 (Mar. 31, 2021, "Staff Statement on Select Issues Pertaining to Special Purpose Acquisition Companies") (last visited on April 20, 2021); https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (Apr. 8, 2021, "SPACs, IPOs and Liability Risk under the Securities Laws") (last visited on Apr. 20, 2021).

be entitled to the safe harbor for forward-looking statements provided by the PSLRA.[5]

These SEC statements underscore that only Lead Plaintiff candidates who purchased Clover securities before Clover went public, on October 6, 2020, have the standing and ability to assert any such claims.

### B. Lead Plaintiff Movants

The four remaining movants,[6] in order of reported losses, are:

| Movant | Reported Losses | Proposed Counsel |
|---|---|---|
| Firas Jabri | $542,642.00 | Pomerantz LLP<br>Schall Law Firm<br>Bramlett Law Offices |
| Christopher Bunton | $526,644.97 | Block & Leviton LLP<br>Branstetter, Stranch & Jennings, PLLC |
| Dr. Mit Desai and Kenneth R. Meadows | $409,161.71 | Robbins, Geller, Rudman & Dowd, LLP, Berger Montague, P.C., Levi & Korsinsky, LLP, and Barrett, Johnston, Martin & Garrison, LLC |
| Aaron Farzan and Alejandro Handal | $297,376.37 | Glancy Prongay & Murray, LLP<br>The Swafford Law Firm, PLLC<br>The Law Offices of Frank R. Cruz |

---

[5] *Id*.

[6] Movants Lori Brennan, Prabhjot Ahluwalia, the "Clover Investor Group" (comprised of Andrew Trefonas, Nish Patel, Birgitta Edberg, Rolf Edberg, and Jeong Yeon Rhee), Dwight Metcalf, and the "Investor Group" (comprised of Mohammed Multhazim Akbar Ali and Lynn Kenneth Fuhriman), recognizing that they do not possess the largest financial interest, filed non-oppositions to the competing motions effectively withdrawing from this contest. ECF Nos. 47, 48, 49, 50, 51.

## III. ARGUMENT

### A. Bunton Is the "Most Adequate Plaintiff" Because His Losses Are Essentially the Same as Jabri's and He Is Better Suited to Represent the Entire Class

Bunton and Jabri report nearly the same financial interest in this litigation. The difference of less than $16,000 (out of over half a million dollars in losses for both movants) represents less than a 3% difference in reported losses. Courts recognize that "the plaintiff with the largest numeric loss is not automatically the plaintiff with the 'largest financial interest,'" and that when movants have "functionally" or "roughly equal" losses, courts look to other factors to assess which movant is the most adequate lead plaintiff. *Psychiatric Solutions*, 2010 WL 1790763, at *3 (citing *Doral*, 414 F. Supp. 2d at 403 (reviewing which movant "is the more adequate and preferable" where movants had "roughly equal damages" of $2.3 million and $1.9 million), and *Pfizer*, 233 F.R.D. at 338 (same where two movants had "roughly equal damages" of $22.5 million and $22.8 million)); *see also In re Opnext, Inc. Sec. Litig.*, No. 08-cv-920, 2008 WL 11383411, at *2 (D.N.J. June 30, 2008); *Police & Fire Ret. Sys. of City of Detroit v. SafeNet, Inc.*, No. 06-cv-5797, 2007 WL 7952453, at *2 (S.D.N.Y. Feb. 21, 2007) (finding a $40,000 difference to be a "very slight difference" that "cannot dictate such an important result," treating movants' "losses as roughly equal"); *Borenstein v. Finova Grp. Inc.*, No. 00-cv-619, 2000 WL 34524743, at *8 (D. Ariz. Aug. 30, 2000) ("[u]ltimately, however, the Court finds the evidence regarding the relative financial interests of the movants inconclusive. . . . Congress surely did not intend that a difference of a few thousand dollars, in either direction, in inherently speculative damages claims would be dispositive of the lead plaintiff determination. . . . Finding the plaintiffs' relative financial interests inconclusive . . . the Court will turn to the third element of the presumption: the requirements of Rule 23 of the Federal Rules of Civil Procedure").

5

The Court should not find that Jabri has the "largest financial **interest** in the relief sought by the class" merely because he claims a negligibly higher loss due to his purchases of Clover common stock. Instead, Bunton is, by far, the more adequate and preferable Lead Plaintiff because—in addition to the serious adequacy issues that plague Jabri, given Schall's undisclosed control over the case—only Bunton has a substantial interest in asserting claims on behalf of purchasers of all Clover securities: common stock *and* options. Bunton purchased both securities and lost money on trading in both during the class period. Only Bunton has the motivation to pursue claims on behalf of the entire class – common stock and options traders. *See Isaacs v. Musk*, No. 18-CV-04865, 2018 WL 6182753, at *4 (N.D. Cal. Nov. 27, 2018) (lead plaintiff applicant with smaller losses than others was "most adequate" because, among other reasons, he "held interests that cover most of the persons/entities likely to be in the class – i.e., long positions in common stock, long positions in options, and short positions in options – and thus can most adequately represent the class (in light of the differing damages analysis that might apply to each class of investors)."). Jabri, by contrast, lost money only on Clover common stock purchases and has no motivation to aggressively pursue claims on behalf of the *entire* class. *In re Elan Corp. Sec. Litig.*, No. 1:08-CV-08761, 2009 WL 1321167, at *2 (S.D.N.Y. May 11, 2009) ("Unlike Tyne & Wear, Kleinman traded exclusively in call options, not common stock or ADRs. … Kleinman is thus an atypical and inadequate plaintiff[.]"); *Musk*, 2018 WL 6182753, at *2 ("the Court has concerns regarding the adequacy or typicality of Tempus/OUF because it is a short seller only (i.e., it did not also have a long position in common stock and it did not also trade in options)").

Every movant asked the Court to consolidate all four actions on file, which the Court has now done. ECF No. 42. Two of the four consolidated cases (*Kaul*, No. 3:21-cv-00101 and *Tremblay*, No. 3:21-cv-00138) alleged a class of all who purchased "publicly traded Clover

securities," which by definition includes purchasers of Clover common stock **and** options.[7] Both of Jabri's counsel, Schall and Pomerantz, issued notices to the class in the form of press releases directed to *all Clover securities purchasers*; they did not limit themselves only to those who purchased Clover's common stock.[8] And the Court is required under the PSLRA to analyze a movant's interest based on the "relief sought by the class," 15 U.S.C. 78u4(a)(3)(B)(iii)(I). That class here includes those who purchased Clover options.

Clover options purchasers are unquestionably part of the now consolidated putative class. As the movant who suffered significant losses in *both* common stock and options, Bunton is far more adequate and well-suited than Jabri to represent the entire class in this action. The fact that Jabri's reported losses are a mere 3% higher does not prevent the Court from finding that Bunton has the "largest financial **interest** in the relief sought by the class."

### B. Jabri's Retention of the Schall And Pomerantz Firms, and the Undisclosed Agreement Between Schall and Pomerantz, Would Improperly Place Schall in Control of the Litigation and Renders Jabri Inadequate

Even if the Court were inclined to determine that Jabri has the largest financial interest, he is an inadequate lead plaintiff and the presumption of his adequacy is rebutted. Jabri has either knowingly, or unknowingly, turned over significant control of this litigation to Schall.

---

[7] *See* Kaul Complaint, Case No. 3:21-cv-00101, ECF No. 1 at ¶ 1; *Tremblay* Complaint, Case No. 3:21-cv-00138, ECF No. 1 at ¶ 1 ("acquired Clover securities").

[8] See Press Release, *Pomerantz Law Firm Announces the Filing of a Class Action against Clover Health Investments, Corp.*, March 24, 2021 (PR Newswire) (The case is "on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Clover securities…") available at https://www.prnewswire.com/news-releases/pomerantz-law-firm-announces-the-filing-of-a-class-action-against-clover-health-investments-corp-fka-social-capital-hedosophia-holdings-corp-iii-and-certain-officers-and-directors--clov-clovw-ipocu-ipoc-ipoc-ws-301255455.html; Press Release, *INVESTOR ACTION ALERT: The Schall Law Firm Announces That a Class Action Lawsuit Has Been Filed Against Clover Health Investments, Corp.*, March 31, 2021 (Accesswire) ("Investors who purchased or otherwise acquired publicly traded Clover securities . . . are encouraged to contact the firm.") (available at https://finance.yahoo.com/news/investor-action-alert-schall-law-044000463.html).

Jabri's brief contains just a single sentence noting his request to include Schall as "additional counsel" in this litigation. *See* Jabri Memo., ECF No. 41 at 11. Similarly, in his Declaration, Jabri merely notes that "[i]n addition to Pomerantz, I am also represented by The Schall Law Firm" and that he "attended a conference call with an attorney from Pomerantz and Schall to discuss this litigation . . . .". ECF No. 41-5 at ¶¶ 1, 3. Tellingly, Jabri fails to provide any explanation or disclosure as to what Schall's role will be in this litigation.

The Schall Law firm is a well-known "referral" firm. It issues press releases when securities class actions are filed and, if a client retains Schall, Schall refers the client to another law firm that helps litigate the case. Schall refers clients only to law firms that agree to his take-it-or-leave-it "Fee and Co-Counsel Agreement." *See* Supplemental Declaration of Jeffrey C. Block, at ¶ 2, Ex. A. In return for referring the client, Schall is paid 20% of any attorneys' fee awarded, Ex. A at ¶ 1, but, as discussed below, Schall's agreement also requires the firm to whom he refers a client to give Schall significant control over the litigation, including giving Schall an unfettered "entitle[ment]" to a co-lead counsel role and the right to control all communications between the client (here, Jabri) and the other attorneys (here, Pomerantz), who are supposed to be "Lead Counsel." *Id.* ¶ 2.

While there is nothing improper or untoward with one attorney referring a client to another, Schall's role and the unusual terms of the Fee and Co-Counsel Agreement that give him *de facto* control cannot be squared with the PSLRA, in which Congress unquestionably sought to prevent "lawyer-driven" litigation. *See, e.g.*, *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 307 (S.D. Ohio Jan. 26, 2005) ("a stated goal of Congress in passing the PSLRA was to prevent lawyer-driven litigation"); *Blitz v. AgFeed Indus., Inc.*, No. 11-cv-992, 2012 WL 1192814, at *3-4 (M.D. Tenn. Apr. 10, 2012).

The Schall Agreement is a "take it or leave it" agreement that Schall requires every law firm that works with him to sign and to which no modifications are permitted. Block Supp. Decl. ¶ 3. The agreement contains a number of highly unusual terms that make Schall *de facto* lead counsel.

*First*, the Schall Agreement provides that the firm accepting the referral can only maintain communications "with the Client(s), to the extent the Schall Firm deems reasonable and appropriate." Supp. Block Decl., Ex. A at ¶ 2. Schall can therefore presumably limit or outright prevent any direct communications between Jabri and Pomerantz.

*Second*, the agreement gives Schall the unfettered discretion to participate in the litigation in whatever way it deems appropriate: "Nothing in this Agreement or otherwise shall prevent the Schall Firm from representing a Client or participating in the Matter *in any way that the Schall Firm deems appropriate* and *in the best interests of the Client, and the Schall firm shall be entitled to do so*." Supp. Block Decl., Ex. A at ¶ 2. Schall therefore has the contractual right to "participate" in the case as he "deems appropriate." This makes him a *de facto* Lead Counsel and gives him an outsized ability to interfere with the case's prosecution. And he can act "in the best interests of" Jabri even where Jabri's personal interests may conflict with the best interests of the class.

*Third*, Schall's agreement gives him an "entitle[ment]" to become *de jure* lead counsel at any time he chooses: "The Schall Firm shall be entitled, if it so requests, to be co-lead counsel and to have its firm name on any pleadings for the Matter." Supp. Block Decl., Ex. A at ¶ 2.

*Finally*, Schall's agreement requires Pomerantz "to promptly provide the Schall Firm with any documents or information reasonably requested by the Schall Firm with respect to the Matter and Client(s), and to promptly inform the Schall Firm of any substantive or significant

9

developments, motions, settlement efforts or other activity in the Matter, as well as all developments specifically relating to the Client(s)." Supp. Block Decl., Ex. A at ¶ 2.

Moreover, Jabri signed his PSLRA certification on April 5, 2021, ECF No. 41-3, and also participated in a conference call with Schall and Pomerantz on April 5, 2021, ECF 41-5. Prior to April 5, 2021, the Pomerantz firm not only filed a lawsuit in this action on behalf of another client,[9] but it issued 16 different PSLRA notices beginning on February 4, 2021. Although Jabri says "I selected Pomerantz to serve as Lead Counsel", ECF 41-5 at ¶ 10, what is more likely is that Jabri retained Schall, and Schall then directed Jabri to select Pomerantz because Pomerantz would agree to pay Schall his 20% retainer and agree to Schall's co-counsel terms. If Jabri truly believed Pomerantz was the proper Lead Counsel choice, he could have easily contacted Pomerantz directly without any need for Schall's involvement or control. Jabri appears to have ceded effective control over this litigation to Schall. In enacting the PSLRA, Congress sought "to empower investors so that they—not their lawyers—exercise primary control over private securities litigation." S. Rep. No. 104-98, at 4 (1995), *reprinted in* 1995 U.S.C.C.A.N. 679, 683.

Again, there is nothing inherently problematic about referral arrangements in general, and if this were not a PSLRA case, Schall's Fee and Co-Counsel Agreement might be perfectly appropriate. The issue here, however, is that this case is governed by the PSLRA and the specific terms of the agreement between Schall and Pomerantz run counter to the goals of the PSLRA. The Court lacks any information about Schall's role, including whether Schall directed Jabri to Pomerantz because Pomerantz was willing to pay Schall a 20% referral fee and agree to Schall's control terms. Schall's Fee and Co-Counsel Agreement potentially places him in conflict with Jabri and the Class.

---

[9] *Tremblay*, Case No. 3:21-cv-00138.

Courts in PSLRA cases are critical when lawyers applying for Lead Counsel appointment fail to inform a Court of the roles and agreements with "additional" counsel. For example, last September, the United States District Court for the Southern District of New York denied a motion by Pomerantz seeking appointment as class counsel in *In re Allergan PLC Sec. Litig.*, No. 18-cv-12089, 2020 WL 5796763 (S.D.N.Y. Sep. 29, 2020). There, at the lead plaintiff stage, the court had given "an explicit instruction that there was to be one and only one law firm serving as lead counsel" and Pomerantz's client had selected Pomerantz as that firm. *Id.* at *6. Yet—without any disclosure to the court—Pomerantz and its referring counsel entered into an "undisclosed arrangement" in which the referring firm was to receive a nearly equal fee split and continued to "effectively play[] the role of co-lead counsel." *Id.* at *6. Based on these facts, the court terminated Pomerantz's client as the PSLRA lead plaintiff. *Id.* at *9.

Last month, the United States District Court for the Eastern District of Pennsylvania denied a lead plaintiff motion finding the clients and counsel could not fairly and adequately represent a putative class because of its failure to adequately disclose the role played by additional law firms that were working on the matter. *See Halman Aldubi Provident & Pension Funds Ltd. v. Teva Pharm. Indus Ltd.*, No. 20-cv-4660, 2021 WL 1217395, at *10-13 (E.D. Pa. Mar. 26, 2021). The *Teva* court found that the law firm's (again, Pomerantz's) failure to make adequate disclosures about its co-counsel and referral relationship was particularly troubling, given that firm's involvement in *Allergan*, noting that "[a]fter such a rebuke, this Court would expect Pomerantz to understand the importance of complete transparency and full disclosure of any and all arrangements with law firms 'jointly prosecuting' a matter. Yet, until the Court requested a copy of the retainer agreements, the Court had no knowledge of the involvement of the two Israeli firms. There was no convincing explanation for this failure to disclose." *Id.* at *13.

Here, there is no dispute that Schall's involvement as an attorney in the case has been disclosed. But the underlying (and critical) *details* of Schall's agreement with Pomerantz have not. And as the *Teva* court recognized, "[i]t is incumbent upon the parties seeking approval of their chosen counsel to provide the Court with the information necessary to evaluate whether counsel will properly serve the interests of the class." *Id.* at *12.[10]

Finally, courts have repeatedly noted that the use of multiple counsel "often serves to delay than to expedite the just and efficient administration of justice" and "tend[] to increase costs." *Khunt v. Alibaba Grp. Holding Ltd.*, 102 F. Supp. 3d 523, 540 (S.D.N.Y. 2015); *see also Schriver v. Impac Mortg. Holdings, Inc.*, No. 06-cv-31, 2006 WL 6886020, at *8 (C.D. Cal. May 2, 2006) ("it is not apparent why the Impac/IMH Group needs to retain two law firms to represent it, either of which would appear to be sufficient in itself. The Court is concerned that this multiplicity of counsel could impede the progress of the litigation, complicate discovery and communication among the parties, and increase the potential for conflict among the plaintiff class. In sum, the Impac/IMH Group is not entitled to the presumption that it is the most adequate plaintiff because it has not made the required preliminary showing that it would adequately represent the class"); *Friedman v. Rayovac Corp.*, 219 F.R.D. 603, 605 (W.D. Wis. 2002) (motion to appoint multiple counsel denied where plaintiffs failed to explain why one law firm was insufficient or describe the lines of authority among proposed co-counsel, responsibilities and duties of each, and efforts to avoid problems such as loss of direction of the litigation, duplication of effort, lack of coordination and increase in costs); *In re Milestone Sci. Sec. Litig.*, 187 F.R.D. 165, 177 (D.N.J. 1999) (rejecting proposed multiple counsel structure, writing that "where several lead counsel are appointed, there

---

[10] The Court concluded that the "failure to disclose the involvement of" Pomerantz's co-counsel "who have been engaged to 'jointly prosecute' and will receive '22.5% of the net fees awarded to Pomerantz in this action' causes the Court great concern." *Id.* at *12.

is the potential they may ultimately seize control of the litigation, an occurrence the PSLRA intended to foreclose. . . . Accordingly, those seeking the appointment of several lead counsel must demonstrate the lead plaintiff will be able to withstand any limitation on, or usurpation of, control, and effectively supervise the several law firms" in the case).

For all of these reasons, Jabri is an inadequate Lead Plaintiff. He has presumably allowed Schall to direct who he should retain as Lead Counsel—while giving Schall an open-ended option to seek a lead counsel role for itself whenever it so desires—and either knowingly or unknowingly put Schall in the position of exerting effective control over the prosecution of this case. Ceding this much control to Schall renders Jabri inadequate to be a Lead Plaintiff.

### C. Bunton Is the Presumptive Lead Plaintiff and this Presumption Cannot Be Rebutted

Bunton is the only movant that satisfies *all* of the PSLRA's requirements to trigger the most adequate plaintiff presumption. He lost $526,644.97 on both common stock and options purchases and is motivated to represent the entire class. He demonstrated his adequacy with a substantive Declaration and a proper PSLRA certification. Bunton's Declaration sets forth his ability and willingness to serve as a lead plaintiff, describes his investing experience, employment history, and explains his understanding and desire to fulfill the obligations of lead plaintiff. *See* ECF No. 32-4. Bunton's choice of counsel—a single, highly qualified law firm to act as Lead Counsel, Block & Leviton, and a single law highly qualified law firm to act as Liaison counsel, Branstetter, Stranch & Jennings—demonstrates that Bunton is more than adequate. He has not involved multiple law firms that will undoubtedly create duplication, inefficiency, and increased expenses, and that will deplete any potential recovery for the class.

Bunton is the exact type of diligent investor that the PSLRA envisioned would serve as lead plaintiff. The other movants cannot make any legitimate argument against Bunton's appointment as lead plaintiff in this case. The Court should therefore grant Bunton's motion.

### D. The Court Should Deny the Motions of the Remaining Movants.

The Court therefore need not proceed to assessing any of the competing movants with smaller losses than Bunton. *See, e.g.*, *In re Cendant Corp. Litig.*, 264 F.3d 201, 268 (3d Cir. 2001). Nonetheless, several of these movants are inadequate and/or atypical for the reasons discussed below.

#### 1. The Robbins/Korsinsky/Berger/Barrett Group Is a Lawyer-Driven Amalgamation Proposing an Unnecessary and Wasteful Counsel Structure

Even when their losses are combined, Meadows and Desai (the "Robbins/Korsinsky/Berger/Barrett Group") lost over $100,000 less than Bunton. *Compare* Bunton Loss Chart (ECF No. 32-3) *and* Robbins/Korsinsky/Berger/Barrett Group Loss Chart (ECF No. 39-3).[11]

In addition to their smaller financial interest in this litigation, the members of the Robbins/Korsinsky/Berger/Barrett Group represent the exact kind of lawyer-driven amalgamation of unrelated persons seeking to aggregate their losses for the purpose of being appointed lead plaintiff that the PSLRA was expressly designed to eliminate. Importantly, "[a] proposed plaintiff group has the burden of showing that aggregation is appropriate." *Nakamura v. BRF S.A.*, No. 18-

---

[11] Like Jabri, the Robbins/Korsinsky/Berger/Barrett Group also lack any motivation to protect the interests of class members who purchased options during the Class Period. In addition, neither of the Robbins/Korsinsky/Berger/Barrett Group's movants purchased shares prior to the completion of the de-SPAC transaction. This may limit their ability to bring additional claims in an amended complaint that those who did hold through the transaction could, such as claims under Section 14(a) of the Exchange Act. *See* https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (Apr. 8, 2021, "SPACs, IPOs and Liability Risk under the Securities Laws") (last visited on Apr. 20, 2021).

cv-2213, 2018 WL 3217412, at *3 (S.D.N.Y. July 2, 2018).[12] The Robbins/Korsinsky/Berger/ Barrett Group fails to meet that burden.

While "[t]he PSLRA does allow more than one person to serve as the lead plaintiff, it would be inconsistent with the PSLRA's facial disapproval of multiple *plaintiffs*, and its persistent use of the singular terms person and plaintiff, however, to allow a mélange of unrelated persons to serve as the lead plaintiff, ***especially if multiple law firms are to represent their interests***. Such a 'group' would be a 'lead plaintiff' in name only; in substance, those individuals would essentially constitute a collection of lead plaintiffs, unbound by any allegiance to one another and unlikely to function as a unified whole." *In re Telxon Corp. Sec. Litig.*, 67 F. Supp. 2d 803, 813 (N.D. Ohio 1999) (emphasis added). In *Telxon*, the Court further rejected the bloated structure of multiple law firms proposed by the group movant, writing that "it is clear that the model envisioned by the PSLRA – one strong plaintiff with one counsel who will speak on its behalf – is not what the . . . group proposes." *Id.* at 817. "Courts confronting this issue refer to the PSLRA's purpose, namely to combat abuse of the class action machinery in securities fraud cases by ensuring that these class actions are not controlled, not by law firms, but by reasonably sophisticated plaintiffs . . . ." *Atkinson v. Morgan Asset Mgmt.*, No. 07-cv-2784, 2008 WL 11319683, at *10 (W.D. Tenn. Sep. 23, 2008). "The aggregation of disparate investors solely for the purpose of establishing a plaintiff group is contrary to the purposes of the PSLRA, and has been strongly disfavored by courts." *The*

---

[12] *See also Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 392 (S.D.N.Y. 2008) ("a proposed group must proffer an evidentiary showing that unrelated members of a group will be able to function cohesively and to effectively manage the litigation apart from their lawyers before its members will be designated as presumptive lead plaintiff").

*Ezra Charitable Tr. v. Rent-Way, Inc.*, 136 F. Supp. 3d 435, 444-45 (W.D. Pa. 2001) (citing cases).[13]

Without explanation, the Robbins/Korsinsky/Berger/Barrett Group asks that the Court appoint *three* law firms to serve as co-lead counsel in this matter (Robbins, Korsinsky, and Berger) and appoint a fourth, Barrett Johnston Martin & Garrison, LLC, to serve as local counsel even though Robbins has an office in this District and attorneys admitted to practice before this Court. *See* ECF Nos 37-39; Robbins Geller's Website (*available at* https://www.rgrdlaw.com/contact.html).

Although the Robbins/Korsinsky/Berger/Barrett Group members claim they "have instructed counsel to conduct the litigation in an efficient manner [and] to avoid the duplication of efforts and costs where practicable," they offer absolutely no reason why they need so many different law firms to lead this case.[14] They offer no reason because there is no good reason. The

---

[13] Bunton does not assert that all group movants are impermissible. Rather, under these circumstances, the proposed Robbins/Korsinsky/Berger/Barrett Group is inappropriate because they were obviously cobbled together by their four law firms in an attempt to aggregate the largest financial interest (which, regardless, they failed to do). Courts nationwide concur. *See, e.g.*, *Tan v. NIO Inc.*, No. 19-cv-1424, 2020 WL 1031489, at *4 & n.5 (E.D.N.Y. Mar. 3, 2020) (rejecting a group where the movants' declaration "does not provide any information regarding how these apparent strangers from different states . . . found each other" and where "the law firms introduced the members to one another after each inquired separately, which would also explain how [multiple] law firms came to be involved"); *In re Stitch Fix, Inc. Sec. Litig.*, 393 F. Supp. 3d 833, 835-36 (N.D. Cal. 2019) (referencing "the clear consensus in our district . . . that a group of investors who had no pre-existing relationship with one another, and whose relationship and group status were forged only by a lawyer, is not appropriate to be lead plaintiff based on their aggregated losses," and finding that "[n]othing in the two joint declarations submitted by the group demonstrates that it is the group members, and not the lawyers, who are driving their lead plaintiff application").

[14] This problem is further reinforced by the fact that one of the Group's proposed lead counsel firms, Robbins Geller, filed one of the four now-consolidated actions involving Clover *without* Levi & Korsinsky or Berger Montague. *See Yaniv v. Clover Health Investments, Corp.*, No. 3:21-cv-00109, ECF No. 1. This demonstrates that the grouping of Meadows and Desai is an attempt by counsel to aggregate losses for the purpose of securing leadership over this action.

more likely scenario is that the lawyers got together, agreed that they would each have a role in the case, and the clients simply went along. This is the very concern the PSLRA was designed to curtail – putting the lawyers and not the clients in control.

The Robbins/Korsinsky/Berger/Barrett Group members also fail to explain how they came to decide to move for appointment as lead plaintiff together. Indeed, their nebulous description of their pre-motion conversations with each other (which fails to specify the medium for communication (phone, email, etc.) as well as who was present on such communication) reflects the "vague discussions of general communication protocols and status reports hashed out over preliminary conference calls . . . [and] boilerplate plans for cooperation" that numerous courts have held are insufficient to "establish [the] that proposed group would work effectively and cohesively as lead plaintiff." *NIO*, 2020 WL 1031489, at *4 (collecting cases); *Stitch Fix*, 393 F. Supp. 3d at 836 ("[t]he declaration allegations are conclusory and cursory, and indicate only that the group members . . . have exchanged a few calls and emails with each other since being introduced by their common lawyer"); Meadows and Desai Joint Decl., ECF No. 39-4 at ¶ 5.[15]

The Robbins/Korsinsky/Berger/Barrett Group's lack of a pre-existing relationship, coupled with the four law firms involved in its motion, leaves little doubt as to how the group was formed or who cobbled it together. *See generally Chao Sun*, No. 15-cv-703, 2015 WL 2364937,

---

[15] *See also Markette v. XOMA Corp.*, No. 15-cv-3425, 2016 WL 2902286, at *8 (N.D. Cal. May 13, 2016) (finding group's statements, such as "their collective commitment to take an 'active role' in the case and to 'communicate regularly with counsel and each other regarding major litigation events,'" to be inadequate generalities); *Crihfield v. CytRx Corp.*, No. 16-cv-5519, 2016 WL 10587938, at *4 (C.D. Cal. Oct. 26, 2016) (denying group's motion because record did not "'contain any credible explanation for the group's creation'"); *Int'l Union of Operating Eng'rs Local No. 478 Pension Fund v. FXCM Inc.*, No. 15-cv-3599, 2015 WL 7018024, at *4 (S.D.N.Y. Nov. 12, 2015) (finding statement that group would "'confer via phone and/or email as necessary'" to be "conclusory assurances" that "are precisely the types of statements that courts in this District have rejected as insufficient proof that a group of unrelated investors will be able to effectively manage the litigation").

17

at *3-4 (D.N.J. May 14, 2015) (noting that the declarations "fail to indicate a pre-existing relationship" or that the individuals "even know each other" and stating that the court "takes issue with" whether "the group was created by the efforts of lawyers for the purpose of obtaining lead plaintiff status"). There is no explanation as to what role each of the four law firms played in the formation of the group. In fact, a less top-heavy structure, which involved four law firms, with one acting as lead counsel, one as liaison counsel and two serving on an executive committee, was rejected by this Court as "[t]his arrangement is likely to result in lawyer-led litigation in contravention of the purpose of the PSLRA" *See Atkinson*, 2008 WL 11319683, at *12. Here, the structure is not one lead counsel – but **three** – lead counsel.

Beyond having a combined financial interest that is smaller than Bunton's, the Robbins/Korsinsky/Berger/Barrett Group is an improper and inadequate amalgamation of unrelated investors who appear to have ceded control to their attorneys and have failed to satisfy their burden of showing the proprietary of aggregation. The Court should deny their motion.

## IV. CONCLUSION

Bunton is the most adequate plaintiff. He has the incentive and financial motivation to represent the entire class, has selected one qualified lead and liaison counsel to represent him and the class. His motion should be granted.

Dated: April 20, 2021                         Respectfully submitted,

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV, Esq. (BPR #23045)
Benjamin A. Gastel, Esq. (BPR #28699)
**BRANSTETTER, STRANCH
      & JENNINGS, PLLC**
223 Rosa L. Parks Avenue Suite 200
Nashville, Tennessee 37203
(615) 254-8801 (phone)
(615) 255-5419 (fax)

18

gerards@bsjfirm.com
beng@bsjfirm.com

*Counsel for Bunton and Proposed Liaison Counsel
for the Class*

Jeffrey C. Block (admitted *pro hac vice*)
Jacob A. Walker (admitted *pro hac vice*)
Stephen J. Teti (admitted *pro hac vice*)
**BLOCK & LEVITON LLP**
260 Franklin St., Suite 1860
Boston, MA 02110
(617) 398-5600 (phone)
(617) 507-6020 (fax)
jeff@blockleviton.com
jake@blockleviton.com
steti@blockleviton.com

*Counsel for Bunton and
Proposed Lead Counsel for the Class*

19

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on April 20, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses of all counsel of record listed below.

Laurence M. Rosen
Phillip Kim
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
Email: lrosen@rosenlegal.com
Email: pkim@rosenlegal.com

Paul Kent Bramlett
Robert P. Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
Email: pknashlaw@aol.com
Email:robert@bramlettlawoffices.com

Christopher M. Wood
Robbins Geller Rudman & Dowd LLP
414 Union Street
Suite 900
Nashville, TN 37219
Email: cwood@rgrdlaw.com

Mark S. Reich
Mary K. Blasy
Samuel H. Rudman
Robbins Geller Rudman & Dowd LLP
58 S Service Road
Suite 200
Melville, NY 11747
Email: mreich@rgrdlaw.com
Email: mblasy@rgrdlaw.com
Email: srudman@rgrdlaw.com

Jerry E. Martin
Barrett Johnston Martin & Garrison, LLC

Philips Plaza
414 Union Street
Suite 900
Nashville, TN 37219
Email: jmartin@barrettjohnston.com

Corey D. Holzer
Holzer & Holzer, LLC
1200 Ashwood Parkway
Suite 410
Atlanta, GA 30338
Email: cholzer@holzerlaw.com

J. Alexander Hood, II
Jeremy A. Lieberman
Pomerantz LLP
600 Third Avenue
20th Floor New York, NY 10016
Email: ahood@pomlaw.com
Email: jalieberman@pomlaw.com

Patrick V. Dahlstrom
Pomerantz LLP
10 S LaSalle Street
Suite 3505
Chicago, IL 60603
Email: pdahlstrom@pomlaw.com

Larry Russell Belk , Jr.
Sutherland & Belk, PLC
2505 21st Avenue South
Suite 400
Nashville, TN 37212
Email: russell@sbinjurylaw.com

James A. Holifield , Jr.
Holifield Janich Rachal & Associates, PLLC
11907 Kingston Pike
Suite 201

Knoxville, TN 37934
Email: aholifield@holifieldlaw.com

John Tate Spragens
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
Email: john@spragenslaw.com

Saul C. Belz
Glankler Brown, PLLC
6000 Poplar Avenue
Suite 400
Memphis, TN 38119
Email: sbelz@glankler.com

Tara L. Swafford
The Swafford Law Firm, PLLC

207 Third Avenue North
Franklin, TN 37064
Email: tara@swaffordlawfirm.com

Charles F. Barrett
Neal & Harwell, PLC
1201 Demonbreun Street
Suite 1000
Nashville, TN 37203
Email: cbarrett@nealharwell.com

Britt K. Latham
Bass, Berry & Sims
150 Third Avenue South
Suite 2800
Nashville, TN 37201
Email: blatham@bassberry.com

*/s/ J. Gerard Stranch, IV*
J. Gerard Stranch, IV