TIMOTHY BOND,

     Lead Plaintiff

and

JEAN-NICOLAS TREMBLAY,

     Named Plaintiff,

Individually and on Behalf of All Others Similarly Situated,

  v.

CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, VIVEK GARIPALLI, ANDREW TOY, JOE WAGNER, and CHAMATH PALIHAPITIYA,

     Defendants.

Case No. 3:21-cv-00096

Judge Aleta A. Trauger

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................... 1

BACKGROUND ....................................................................................................... 6

    A.    Clover's Business and Its Efforts to Deliver Better Health Outcomes for Seniors at Lower Costs ................................................................... 6

    B.    The SPAC Transaction Between Legacy Clover and SCH Is Followed by the Hindenburg Report ................................................................... 7

    C.    Plaintiffs File Suit Alleging Various Misstatements and Omissions That Rely Almost Exclusively on the Hindenburg Report's Anonymous "Sources" ................................................................................................. 9

ARGUMENT ............................................................................................................ 11

I.      APPLICABLE STANDARDS ........................................................................ 11

II.    THE SECTION 10(B) CLAIMS SHOULD BE DISMISSED BECAUSE THE COMPLAINT FAILS TO ALLEGE ACTIONABLE MISSTATEMENTS OR OMISSIONS ........................................................ 14

    A.    The Decision Not to Specifically Disclose the DOJ Inquiry Was Not a Material Omission and Did Not Render Any Statements Misleading ................. 15

          1.    None of the statements that Plaintiffs point to regarding "legal proceedings" or government investigations were misleading. ................. 15

          2.    Clover's statements that it receives subpoenas and other government inquiries from time to time are entirely accurate ................. 18

          3.    Statements unrelated to the subject of the DOJ Inquiry were not rendered misleading by the existence of the DOJ Inquiry ....................... 20

    B.    There Are No Facts Alleged to Show That Clover's Statements That It Was in Material Compliance with Applicable Law Were False or Misleading ................................................................................................... 21

          1.    Plaintiffs have failed to allege facts showing that any violation of a statute or regulation actually happened, which they are required to do .................................................................................................... 22

          2.    The challenged statements regarding "legal compliance" are only actionable if Defendants knew the statements were untrue, and there are no allegations supporting such an inference ........................... 26

          3.    Plaintiffs have not alleged facts to establish that any alleged violation of law would have been material ............................................ 27

    C.    The Alleged Misstatements Based on Allegations Related to Hiram Bermudez and B&H Assurance Are Not Actionable ......................................... 28

D. The Alleged Misstatements About the Clover Assistant Are Not Actionable ................................................................................ 30

E. Plaintiffs' Derivative Disclosure Claims Concerning Compliance with Regulation S-K Are Not Actionable ....................................... 32

III. THE SECTION 10(B) CLAIM SHOULD BE DISMISSED BECAUSE THE COMPLAINT FAILS TO PLEAD FACTS THAT GIVE RISE TO A "STRONG INFERENCE" OF SCIENTER FOR ANY DEFENDANT ............................................. 33

A. Plaintiffs Make No Attempt to Plead the *Helwig* Factors ..................................... 34

B. The Complaint Fails to Plead Facts Showing That Any Defendant Had Scienter ................................................................................... 35

1. Plaintiffs primarily rely on inappropriate "group-pleading" to support their scienter assertions ............................................... 35

2. The decision not to disclose the DOJ Inquiry does not support an inference of scienter ..................................................... 37

3. Clover's statements regarding legal compliance do not support an inference of scienter ...................................................... 37

4. Plaintiffs do not allege that any Defendant was aware of the alleged related-party transactions or acted recklessly ............................ 40

5. Plaintiffs do not allege that Defendants knew misstatements about the Clover Assistant were false ............................................ 41

C. Plaintiffs' Attempts to Bolster Their Scienter Allegations by Alleging That the Misstatements Related to Clover's "Core Operations" Fail ........................... 42

D. Plaintiffs Fail to Establish Corporate Scienter ....................................................... 43

IV. PLAINTIFFS' CLAIMS BASED ON THE EXISTENCE OF THE DOJ INQUIRY AND ALLEGED VIOLATIONS OF LAW FAIL BECAUSE PLAINTIFFS HAVE NOT PLED LOSS CAUSATION ................................................. 43

V. BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM FOR A PRIMARY VIOLATION OF SECTION 10(B), PLAINTIFFS' SECTION 20(A) CLAIM FAILS AS A MATTER OF LAW ................................................................................. 45

CONCLUSION .................................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Albert Fadem Tr. v. Am. Elec. Power Co.*,
334 F. Supp. 2d 985 (S.D. Ohio 2004) ....................................................................................20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)........................................................................................................11

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................................11

*Benzon v. Morgan Stanley Distribs., Inc.*,
420 F.3d 598 (6th Cir. 2005) .......................................................................................19

*Bondali v. Yum! Brands*,
620 F. App'x 483 (6th Cir. 2015) ..............................................................................43

*Brodsky v. Yahoo! Inc.*,
630 F. Supp. 2d 1104 (N.D. Cal. 2009) .....................................................................31

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)..........................................................................................15

*City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) ..................................................................27

*Cox v. Blackberry Ltd.*,
660 F. App'x 23 (2d Cir. 2016) ...................................................................................42

*D.E. & J. Ltd. P'ship v. Conaway*,
133 F. App'x 994 (6th Cir. 2005) ...............................................................................44

*United States ex rel. Dennis v. Health Mgmt. Assocs., Inc.*,
2013 WL 146048 (M.D. Tenn. Jan. 14, 2013).........................................................24

*Doshi v. Gen. Cable Corp.*,
2015 WL 366644 (E.D. Ky. Jan. 27, 2015) ..............................................................36

*Doshi v. Gen. Cable Corp.*,
823 F.3d 1032 (6th Cir. 2016) ......................................................................12, 24, 33, 34

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)........................................................................................................43

Case 3:21-cv-00096    Document 75    Filed 08/27/21    Page 4 of 57 PageID #: 1446

*United States ex rel. Eberhard v. Physicians Choice Lab. Servs., LLC*,
642 F. App'x 547 (6th Cir. 2016) ...................................................................................24, 25

*Fait v. Regions Fin. Corp.*,
655 F.3d 105 (2d Cir. 2011).........................................................................................33

*Gamm v. Sanderson Farms, Inc.*,
944 F.3d 455 (2d Cir. 2019).........................................................................................22

*Harris v. AmTrust Fin. Servs., Inc.*,
135 F. Supp. 3d 155 (S.D.N.Y. 2015).............................................................................3

*Helwig v. Vencor*,
251 F.3d 540 (6th Cir. 2001) ......................................................................................34

*United States ex rel. Hirt v. Walgreen Co.*,
2016 WL 815512 (M.D. Tenn. Mar. 2, 2016) ..........................................................25

*Hutchison v. Deutsche Bank Sec. Inc.*,
647 F.3d 479 (2d Cir. 2011).........................................................................................30

*In re Adien plc Sec. Litig.*,
2020 WL 1644018 (S.D.N.Y. Apr. 2, 2020).......................................................18, 26

*In re Almost Family, Inc. Sec Litig.*,
2012 WL 443461 (W.D. Ky. Feb. 10, 2012) .........................................................28, 29, 44

*In re AT&T/DirecTV Now Sec. Litig.*,
2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020)..................................................................27

*In re Comshare Inc. Sec. Litig.*,
183 F.3d 542 (6th Cir. 1999) ......................................................................................40

*In re Diebold Sec. Litig.*,
2008 WL 3927467 (N.D. Ohio Aug. 22, 2008) ....................................................34

*In re EveryWare Glob., Inc. Sec. Litig.*,
175 F. Supp. 3d 837 (S.D. Ohio 2016) ...........................................................12, 13, 23, 34

*In re Ford Motor Co. Sec. Litig.*,
381 F.3d 563 (6th Cir. 2004) ......................................................................................31

*In re Huntington Bancshares Inc. Sec. Litig.*,
674 F. Supp. 2d 951 (S.D. Ohio 2009) ...........................................................................42

*In re Keithley Instruments, Inc. Sec. Litig.*,
268 F. Supp. 2d 887 (N.D. Ohio 2002)..........................................................................34

iv

*In re Key Energy Servs., Inc. Sec. Litig.*,
166 F. Supp. 3d 822 (S.D. Tex. 2016) ...................................................................35

*In re Lions Gate Ent. Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016)..................................................................15, 18

*In re Omnicare, Inc. Sec. Litig.*,
2013 WL 1248243 (E.D. Ky. Mar. 27, 2013)..............................................37, 38, 40

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) ..................................................................... *passim*

*In re TransDigm Group, Inc. Sec. Litig.*,
440 F. Supp. 3d 740 (N.D. Ohio 2020)...................................................................45

*In re XP Inc. Sec. Litig.*,
2021 WL 861917 (E.D.N.Y. Mar. 8, 2021)............................................................15

*In re Yum! Brands, Inc. Sec. Litig.*,
73 F. Supp. 3d 846 (W.D. Ky. 2014)...........................................................30, 35, 42

*In re Zillow Grp., Inc. Sec. Litig.*,
2018 WL 4735711 (W.D. Wash. Oct. 2, 2018) ......................................................15

*Indiana State District Council of Laborers & Hod Carriers Pension & Welfare
Fund v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) ..................................................................... *passim*

*Iron Worker Loc. Union No. 405 Annuity Fund v. Dollar Gen. Corp.*,
2018 WL 10152459 (M.D. Tenn. Mar. 8, 2018) ....................................................33

*Jaroslawicz v. M&T Bank Corp.*,
2017 WL 1197716 (D. Del. Mar. 30, 2017) ..........................................................17

*Jiaxi Hu v. Chan*,
2016 WL 4269065 (S.D. Ohio Aug. 15, 2016).......................................................35

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009) ..............................................................12, 13, 34

*Labul v. XPO Logistics*,
2021 WL 1056828 (D. Conn. Mar. 19, 2021) ........................................................30

*Lau v. Opera Ltd.*,
2021 WL 964642 (S.D.N.Y. Mar. 13, 2021) ............................................................3

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005).................................................................................43

v

*Leykin v. AT&T Corp.*,
    423 F. Supp. 2d 229 (S.D.N.Y. 2006)........................................................................44

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020).............................................................3, 13, 14

*Lubbers v. Flagstar Bancorp. Inc.*,
    162 F. Supp. 3d 571 (E.D. Mich. 2016)...............................................................19, 20

*May v. Apricus Biosciences, Inc.*,
    2014 WL 4897938 (M.D. Tenn. Sept. 30, 2014)...................................................14, 15

*Meyer v. Greene*,
    710 F.3d 1189 (11th Cir. 2013) ............................................................................44

*United States ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*,
    519 F. App'x 890 (5th Cir. 2013) ...........................................................................23

*Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*,
    2021 WL 371401 (S.D.N.Y. Feb. 3, 2021)................................................................33

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)..............................................................................18, 26, 27

*Richman v. Goldman Sachs Grp., Inc.*,
    868 F. Supp. 2d 261 (S.D.N.Y. 2012).................................................................18, 19

*Sanderson v. HCA-Healthcare Co.*,
    447 F.3d 873 (6th Cir. 2006) ...........................................................................22, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................12, 33

*United States v. Miles*,
    360 F.3d 472 (5th Cir. 2004) .................................................................................23

*United States v. Walgreen Co.*,
    846 F.3d 879 (6th Cir. 2017) .................................................................................25

*USM Holdings, Inc. v. Simon*,
    2017 WL 4005939 (E.D. Mich. Sept. 12, 2017)..........................................................38

*Walker v. L Brands, Inc.*,
    2020 WL 6118467 (S.D. Ohio Oct. 16, 2020).............................................................33

*Zaluski v. United Am. Healthcare Corp.*,
    527 F.3d 564 (6th Cir. 2008) ...........................................................................17, 29

**Statutes**

15 U.S.C. § 78(c)(1)............................................................................................20, 21

15 U.S.C. § 78u-4(b).............................................................................................12, 43

**Rules**

17 C.F.R. § 210.1-02(u) ..............................................................................................29

17 C.F.R. § 229.105 ....................................................................................................33

17 C.F.R. § 229.303(b)(2)(ii)......................................................................................32

17 C.F.R. § 229.503(c)................................................................................................33

42 C.F.R. §§ 422.2260-2276.......................................................................................26

42 C.F.R. § 422.2263 ............................................................................................25, 26

Fed. R. Civ. P. 9(b) ..................................................................................11, 12, 22, 23

Fed. R. Civ. P. 11 .......................................................................................................13

Case 3:21-cv-00096    Document 75    Filed 08/27/21    Page 8 of 57 PageID #: 1450

Defendants Clover Health Investments, Corp. ("Clover" or the "Company"), Vivek Garipalli, Andrew Toy, Joe Wagner, and Chamath Palihapitiya (the "Individual Defendants" and with Clover, collectively, the "Defendants"), by and through their attorneys, respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Complaint for Violation of the Federal Securities Laws (the "Complaint").

## PRELIMINARY STATEMENT

Clover is a healthcare data and technology company that is singularly focused on creating great, sustainable healthcare to improve every life. (*See* Ex. L, Shelf Registration at 114.)[1] Currently, it focuses on enabling better clinical decision-making and affordable, high-quality care for Medicare enrollees, including those enrolled in private plans under a government program known as Medicare Advantage. *See generally id*. at 125.

Clover has differentiated itself from other Medicare Advantage organizations through its proprietary software platform, the Clover Assistant, which aggregates health data about a patient that Clover receives by virtue of its role as a payor, i.e., an entity responsible for the patient's costs of care. *See id*. at 114. The Clover Assistant then uses an expert system, leveraging clinical rules and artificial intelligence, to analyze and curate that data and deliver real-time insights and evidence-based recommendations to physicians treating Clover's members. *See id*. at 119-20. The Clover Assistant assists physicians by elevating potential clinical conditions of patients for physician review, identifying potential gaps in care, and recommending different treatment options. *See id*. Clover believes that the Clover Assistant provides Clover with a competitive advantage that results in better clinical decision-making and lower medical costs. *See id*. at 126.

---

[1] Unless otherwise specified, "Ex. __" refers to exhibits to the Declaration of Gary A. Crosby II, dated August 27, 2021, filed herewith. "¶ __" refers to paragraphs in the Complaint.

1

As an early stage company, Clover has been on a rapid growth trajectory. Previously a private company ("Legacy Clover"), the current public company is the product of a series of transactions, announced in October 2020, through which Legacy Clover merged with and into a public "special purpose acquisition company" (or "SPAC") called Social Capital Hedosophia Holdings Corp. III ("SCH"). Upon completion of that business combination in early January 2021 (the "SPAC Transaction"), SCH changed its name to Clover Health Investments, Corp., i.e., Clover.

In February 2021, roughly a month after the closing of the SPAC Transaction, Hindenburg Research LLC ("Hindenburg") published a report about Clover (the "Hindenburg Report"). Hindenburg describes itself as a "short-seller" and its report on Clover is one of dozens that it has published in recent years. The Hindenburg Report made a number of allegations regarding Clover, following which Clover's stock price dropped by approximately 12%. Days later, a shareholder filed this action based on the accusations in the Hindenburg Report.

The Complaint draws heavily on hearsay statements in the Hindenburg Report purportedly made by unidentified "former employees" of Clover. As explained below, none of these statements count as well-pled factual allegations. The Hindenburg Report is unreliable on its face. Beyond not being subject to Rule 11 or other legal safeguards, Hindenburg Research explicitly disclaimed any responsibility for the "accuracy, timeliness, or completeness" of any information stated therein. (Ex. H, Hindenburg Report at 53.) Under Sixth Circuit law, such anonymous hearsay, absent particularized, corroborative allegations, cannot be the basis for a securities fraud complaint. And, indeed, many securities actions that relied on short-seller reports as the basis for

their claims have been dismissed at the pleading stage,[2] as should be the case here.

The Hindenburg Report's headline—and the Complaint's focus—was that Clover received an inquiry from the United States Department of Justice (the "DOJ Inquiry") in 2019. These types of inquiries are common in the Medicare Advantage industry,[3] which is among the most highly regulated sectors of the generally highly regulated health insurance market. Notably, neither Hindenburg nor the Plaintiffs here allege: (1) that the DOJ Inquiry has resulted in any charges or other adverse findings against Clover since Clover allegedly first received the inquiry; (2) that Clover has ever determined that it has engaged in any wrongdoing; or (3) that Clover has experienced any adverse business impact as a result of the inquiry. In any event, Clover's shareholders cannot seriously argue that they were unaware that Clover was subject to investigations like the DOJ Inquiry because Clover expressly disclosed that ***"we are and may be subject to . . . investigations . . . from, various federal and state agencies***" and that it "***receive[s] and may receive subpoenas and other requests for information***" from those same agencies. (¶ 243.) Companies have no generalized duty to disclose every government inquiry that they receive. The decision not to specifically call out the DOJ Inquiry to stockholders is not securities fraud.

---

[2] *See, e.g., Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 809 (S.D.N.Y. 2020) (dismissing with prejudice Section 10(b), Rule 10b-5, and Section 20(a) claims); *Lau v. Opera Ltd.*, 2021 WL 964642, at *15 (S.D.N.Y. Mar. 13, 2021) (dismissing Section 10(b), Rule 10b-5, and Section 20(a) claims following which plaintiffs did not file an appeal); *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 160 (S.D.N.Y. 2015) (dismissing Section 10(b), Rule 10b-5, and Section 20(a) claims), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).

[3] (*See, e.g.*, Ex. A, Notice of the United States Declining to Intervene, *United States ex rel. Cutler v. Cigna Corp., et al.*, No. 7:17-cv-07515-KMK-JCM (S.D.N.Y. Aug. 6, 2020), ECF No. 13 (declining to intervene in *qui tam* action against Cigna and other defendants following government investigation of certain alleged FCA violations); Ex. B, Br. in Supp. of the United States' Mot. to Dismiss at 1, *United States ex rel. SMSF, LLC v. Biogen, Inc., et al.*, No. 1:16-cv-11379-IT, (D. Mass. Dec. 17, 2018), ECF No. 52 (moving to dismiss all claims in *qui tam* action following the government's "thorough investigation" into "sweeping allegations" against defendants).)

Plaintiffs' other theories also fail because Plaintiffs have not pled an actionable misstatement. First, Plaintiffs allege that Defendants' statements regarding Clover's material compliance with applicable law was misleading because Clover allegedly violated the Anti-Kickback Statute ("AKS"), the False Claims Act ("FCA"), and Medicare regulations. But stripped of the unsourced and speculative assertions of the Hindenburg Report—which are not well-pleaded facts—Plaintiffs' allegations amount to one discrete event:  a single person allegedly distributing $250 in gift cards to the staff of a single provider's office, and an alleged subsequent investigation by Clover's compliance department of that conduct. That bare accusation does not come close to stating a violation of any law. But even if it did, Plaintiffs would need to show that (i) the violation was a material violation of the law, (ii) Defendants knew of the conduct, and (iii) Defendants believed that the conduct constituted a material violation of law (because the statement that Plaintiffs challenge is an opinion). Plaintiffs do not and cannot plead any of these elements.

Plaintiffs next allege that Defendants have misrepresented the reasons for Clover's growth. According to Plaintiffs, Clover's sales growth was attributable to the fact that Clover's head of sales, Hiram Bermudez, had a financial interest in B&H Assurance ("B&H"), an insurance brokerage firm that placed business with Clover through another intermediary. But there are no facts alleged that suggest Bermudez's interest in B&H had anything at all to do with Clover's rate of growth. And while the Complaint itself alleges that, following the Hindenburg Report, Bermudez has agreed to divest his ownership interest in B&H (¶ 338), Plaintiffs do not and cannot allege that his divestiture has had even an iota of impact on Clover's rate of customer acquisition. In short, there is no basis to claim that Clover has misrepresented the reasons for Clover's growth.

Plaintiffs' final theory relates to the Clover Assistant. Plaintiffs allege that Defendants' statements in late 2020 and early 2021 regarding the use of the Clover Assistant by certain

physicians that treat Clover's Medicare Advantage members were misleading because, Plaintiffs claim, the statements communicated that the "overwhelming majority of Clover's physicians" used the Clover Assistant and did so "during patient visits." (*See, e.g.,* ¶ 274.) But the statements Plaintiffs challenge did no such thing, and some did not even address these subject matters. Rather, Plaintiffs simply read into Clover's statements words that are not there. Accordingly, all of Plaintiffs' theories fail because Plaintiffs have not alleged facts sufficient to show a single materially misleading statement, as is required.

But even if Plaintiffs had pled a misstatement, the Complaint should be dismissed because Plaintiffs have not met their burden, required by law, to plead a "strong inference" of scienter against any of the Defendants. Under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a plaintiff has a heavy burden to establish that defendants made false statements with scienter, i.e., with actual knowledge of falsity or recklessness. That requires a plaintiff to come forward with allegations such that an inference of scienter is "cogent" and "at least as compelling" as non-fraudulent inferences. Here, the Complaint offers nothing of the kind. None of the Confidential Witnesses ("CWs") (all of whom, Plaintiffs admit, left Clover by the middle of 2019) could identify any information that was known to any of the Individual Defendants that was inconsistent with the statements that Clover made in late 2020 and early 2021. The most logical inference is that the Individual Defendants believed that Clover's business will prosper and grow as Clover continues to provide significant benefits to physicians and Clover's insureds.

For these reasons, and those described in greater detail below, the Complaint should be dismissed with prejudice for failure to state a claim.

5

<h1 style="text-align:center">BACKGROUND[4]</h1>

**A.      Clover's Business and Its Efforts to Deliver Better Health Outcomes for Seniors at Lower Costs**

Clover is a health care data and technology company that offers Medicare Advantage insurance plans, among other services.  Clover's business model aims to use its proprietary software platform, the Clover Assistant, to provide high quality broad network Medicare Advantage plans at lower costs.  (Ex. C, Final Prospectus at 114.)

The Clover Assistant is designed to gather information about individual patients from the myriad sources to which Clover—as payor—has access, curate that information, and provide it to physicians caring for Clover's members at the point of care.  *Id*.  The Clover Assistant empowers physicians with data-driven, personalized insights about their patients in order to enhance care outcomes through improved clinical decision-making.  *Id*.  By way of example, a physician may learn from the Clover Assistant that a new patient has previously been diagnosed by another doctor with diabetes.  That physician may see what medications were previously prescribed to the patient and then see updated clinical recommendations on potential changes to the prescription.  By pulling in data from that visit as well as claims data from other sources, the Clover Assistant can then inform the physician at a subsequent visit whether the patient ever picked up the prescription as well as any hospitalizations or other lab tests ordered by other physicians.  *See generally id*.  Through empowering physicians to make better, more informed clinical decisions and thereby decrease medical costs, Clover strives to offer market-leading benefits and more affordable out-of-pocket costs to members.  *See id*. at 115.

Medicare Advantage is a program administered by the Centers for Medicare & Medicaid

---

[4] Defendants accept as true the allegations in the Complaint solely for the purposes of this Motion.

6

Services ("CMS"), an agency of the United States Department of Health and Human Services, as an alternative to traditional Medicare. *Id.* at 81. As a Medicare Advantage insurer, Clover contracts with CMS to provide health insurance benefits for Medicare-eligible beneficiaries in plans in exchange for monthly payments directly from CMS. *Id.*

CMS establishes premium payment amounts based on the plans' approved bids at the beginning of the calendar year. *Id.* at 12. CMS then adjusts premium levels on two separate occasions during the year on a retroactive basis to take into account additional member risk data (i.e., the health risks for a particular plan's members). *Id.* This is part of CMS's risk adjustment payment system, which is designed to improve the accuracy of anticipated payments to cover the costs of care for a plan's insured population and to appropriately compensate plans that enroll less healthy Medicare beneficiaries. *Id.* at 11.

The Complaint seeks to sully the Clover Assistant as a means solely to "identify opportunities to assign higher Medicare risk adjustments so that Clover can obtain larger reimbursements from Medicare." (¶ 67.) But even the Complaint's own allegations characterize the risk adjustment impact as a secondary benefit of the Clover Assistant, explaining that when the Clover Assistant was "talked about internally, it was both that hopefully [the Clover Assistant] provides better care but also that it has this additional effect that it gives [Clover] more revenue." (¶ 70 (alterations in original).) In any event, there is nothing improper about relying on more comprehensive information about patients to submit accurate data to CMS and obtain higher Medicare reimbursements for the anticipated costs of caring for sicker patients as a result.

**B.     The SPAC Transaction Between Legacy Clover and SCH Is Followed by the Hindenburg Report**

For several years, Clover's business operated as a private company. During that period, Clover grew its business from less than $300 million in total revenues in 2018 to over $670 million

in 2020.  (*E.g.*, Ex. D, October 20, 2020 S-4 at 3; Ex. E, March 1, 2021 Form 8-K at 3.)  Also, since its launch in July 2018, Clover has continuously improved and updated the Clover Assistant in order to improve its functionality and effectiveness and increase its use by physicians.  (Ex. F, December 14 Prospectus at 245, 257.)

On October 5, 2020, Legacy Clover agreed to merge with and into a public SPAC called SCH.[5]  On October 6, 2020, Legacy Clover and SCH announced the merger.  That merger closed on January 6, 2021, and the next day, Clover—now a public company—began trading on the Nasdaq Global Select Market.  (Ex. G, January 7, 2021 Press Release.)

On February 4, 2021, Hindenburg published the Hindenburg Report, which focused on the DOJ Inquiry, although it also made accusations concerning Clover's sales practices, growth, and the Clover Assistant.[6]  (Ex. H, Hindenburg Report at 1.)  The Hindenburg Report's accusations, none of which were subject to judicial review or the safeguards of Rule 11, relied heavily on the purported statements of supposed unnamed and unidentified alleged "former employees."  The Hindenburg Report provided no information as to how these anonymous sources acquired their knowledge, or if they were actually former employees, their roles at Clover, or even the period during which they were employed by Clover.  Hindenburg expressly stated that it made "no representation, express or implied, as to the accuracy, timeliness, or completeness of any" information in the report.  *Id*. at 53.  Following the Hindenburg Report, Clover's share price fell approximately 12.33%. (¶ 22.)

The Hindenburg Report concluded with "18 Questions for Clover's Management That We

---

[5] SPACs are public companies that are funded by investors who pool their money with the stated purpose of looking for private companies with which to merge, and then take public.

[6] Contrary to Plaintiffs' assertion (*see* ¶¶ 141-43, 313, 315, 322-23), Clover has not received any subpoenas from the DOJ.  (Ex. I, Hindenburg Response at 4-5.)  What Clover received was a voluntary ***request for information*** from the DOJ.  *Id*.

Think Investors Deserve the Answers To." (Ex. H, Hindenburg Report at 50.) The next day, on February 5, 2021, Clover answered those questions publicly (the "<u>Hindenburg Response</u>"). (¶ 332; Ex. I, Hindenburg Response at 1.) The Hindenburg Response stated that the "alleged 'report' is rife with ad-hominem attacks, sweeping inaccuracies and gross mischaracterizations" about Clover. *Id*. at 2. For instance, in response to the Hindenburg Report's suggestion that Clover purportedly concealed the DOJ Inquiry from SCH, the Hindenburg Response stated that "[c]onsistent with the views of Clover's outside counsel, [SCH's] outside counsel, and independently retained outside counsel of third parties, including IPO underwriters' counsel, we concluded that the fact of the DOJ's request for information was not material and was not required to be specifically disclosed in our SEC filings." *Id*. at 3. The Hindenburg Response went on to explain that "Clover does not believe it is, or has been, in violation of any rules or regulations related to the inquiry." *Id*.

### C. Plaintiffs File Suit Alleging Various Misstatements and Omissions That Rely Almost Exclusively on the Hindenburg Report's Anonymous "Sources"

Following the Hindenburg Report, litigation began almost immediately, leading to the appointment of the Lead Plaintiff here, who filed the Complaint on June 28, 2021. (*See* ¶¶ 29-30.) Plaintiffs' allegations here fall into four general categories.

*First*, Plaintiffs allege that Clover's statements concerning its pending litigation and regulatory compliance were misleading. Plaintiffs allege that even though Clover disclosed that it was subject to numerous federal, state, and local inquiries and investigations as part of its business, Clover committed a fraud by failing to specifically disclose the DOJ Inquiry. (¶¶ 230-44.)

*Second*, Plaintiffs assert that Clover's statements about complying with applicable laws and regulations were false and misleading because of alleged illegal kickbacks and gifts to physicians or their employees. (¶ 236.)

9

*Third*, Plaintiffs allege that Clover's statements about the growth of its Medicare Advantage plans being attributable to its superior business model were misleading and that the growth (which Plaintiffs acknowledge) was instead the result of illegal conduct and the fact that Clover's head of sales, Hiram Bermudez, had an undisclosed interest in B&H, an insurance brokerage firm that directed customers to Clover. (¶¶ 245-73.)

*Finally*, Plaintiffs claim that Clover misrepresented the extent to which physicians were using the Clover Assistant. (¶¶ 274-301.)[7]

Plaintiffs rely heavily on the Hindenburg Report despite its express disclaimer about the "accuracy" of its contents, and the lack of information about the identity of its sources. Beyond that, Plaintiffs have come forward with alleged statements from four purported CWs. (*See, e.g.*, ¶¶ 44-47.) None of the CW statements contain sufficient detail to support a claim of securities fraud. None of the CWs is alleged to have had a conversation with any Defendant regarding any of the subjects of Plaintiffs' claims. None of the CWs is alleged to have held a position within Clover that would allow them to know whether Clover was engaged in illegal conduct.[8] And while the Complaint alleges that Clover made false statements about the adoption by physicians of the Clover Assistant (which was continuously updated throughout the period) starting in the fourth quarter of 2020, all of the CWs are alleged to have left Legacy Clover by no later than August 2019, ***more than fourteen months before the time period that is the subject matter of the***

---

[7] Based on the above allegations, Plaintiffs also assert that Clover's statements that its financial statements were in accordance with generally accepted accounting principles were false, and that Clover also violated Items 303 and 503 of Regulation S-K by failing to disclose material issues concerning "known trends or uncertainties" and "speculative or risky" investments in certain of its SEC filings. (¶¶ 302-19.)

[8] Although Clover accepts as true—for this motion only—the allegations regarding the job titles, descriptions, and dates of employment for the CWs, ***those job titles, descriptions, and dates of employment do not match up to any Clover employee***.

*statements alleged to be false*. (*See id.*)

**ARGUMENT**

**I.      APPLICABLE STANDARDS**

Plaintiffs' Complaint is premised, in large part, on the Hindenburg Report. As explained below, the Court should disregard those allegations entirely because the Hindenburg Report offers no indicia of reliability: it does not provide any information regarding the sources upon which it claims to rely, was not filed in any court under obligations similar to those imposed by Rule 11, and to top it all, explicitly disclaims reliability. Plaintiffs' other allegations are sourced by CWs who purport to be Legacy Clover employees who left the Company more than a year before any of the statements challenged as misleading were made, and the Complaint does not offer facts showing that the CWs were in a position to support Plaintiffs' theories. These allegations should be discounted accordingly as well.

To state a claim under Section 10(b) of the Exchange Act, a plaintiff must adequately allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014) ("*Omnicare III*"). To survive a motion to dismiss based on a failure to state a claim, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court need not credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[C]onclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Omnicare III*, 769 F.3d at 469.

Plaintiffs' claims are also subject to the heightened pleading standards, discussed below, set forth by Federal Rule of Civil Procedure 9(b) and the PSLRA, including the requirement that

11

Plaintiffs plead particularized facts providing for a "strong inference" of scienter. *See, e.g.*, Fed. R. Civ. P. 9(b); 15 U.S.C. § 78u-4(b)(1), (2). A "strong inference" of scienter requires an intent to "deceive, manipulate, or defraud" on behalf of each defendant. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). And it "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* As discussed below, Plaintiffs fail to meet these standards.

Under Sixth Circuit law, a plaintiff cannot base a claim of securities fraud on unsubstantiated allegations by anonymous third parties. *See Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1037 n.2 (6th Cir. 2016) (citing *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 757 (7th Cir. 2007)). Allegations based on the anonymous statements of purported witnesses are to be carefully scrutinized and appropriately discounted. *E.g.*, *Konkol v. Diebold, Inc.*, 590 F.3d 390, 399 (6th Cir. 2009) (citing with approval *Higginbotham* for the proposition that allegations of CWs should be steeply discounted), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1323-25 (2011).

When plaintiffs rely on anonymous sources (as Plaintiffs purport to do here), the Complaint must "plead facts with sufficient particularity to support the probability that a person in the [CW's] position would possess the information alleged." *Doshi*, 823 F.3d at 1037. As one district court, in an opinion affirmed by the Sixth Circuit, explained, "[t]he complaint must allege that the [CWs] were in a position to establish their basis of knowledge of the alleged misconduct ('what, when, where, and how')." *In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 852 (S.D. Ohio 2016), *aff'd sub nom. IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017). Then, in addition to pleading facts to support the CW's access to the information, the complaint must also plead facts from the CW to establish that each of "the defendants were

aware of the misconduct." *Id*.

Under these standards, Plaintiffs cannot base their claim on the contents of the Hindenburg Report. For starters, the Hindenburg Report explicitly disclaims any reliability of its contents. (Ex. H, Hindenburg Report at 53 (disclaiming any "representation, express or implied, as to the accuracy, timeliness, or completeness of any" information in the report).) And to the extent that the Hindenburg Report references anonymous sources for its claims, the Hindenburg Report does not provide the corroborating information that the Sixth Circuit requires. For example, the Complaint relies on the Hindenburg Report to try to plead both falsity and scienter. But the Complaint does not provide facts (1) to indicate why any of the sources would have access to the information establishing a fraud, or (2) to show that the defendants were aware of such information. Without such allegations, Sixth Circuit law does not permit the Hindenburg Report to be a basis for pleading a securities fraud complaint. *See, e.g.*, *Konkol*, 590 F.3d at 399 (discounting CW allegations where complaint failed to "provide any details" about "which Defendants interacted with them"). Further, the Hindenburg Report was not created under the reasonable investigation requirement of Rule 11, and Plaintiffs have provided no reason to believe that its claims have been verified or that its anonymous sources are in a position to provide facts to support a claim. *See* Fed. R. Civ. P. 11; *see also Long Miao*, 442 F. Supp. 3d at 809 (finding that anonymous interviewees' "allegations [in a short-seller report]—where neither investigated nor corroborated [by plaintiff's counsel]—sit, at best, uneasily with the requirements of Rule 11"). As one district court put it, "[a]llowing counsel to rely on [CW] statements recounted in a separate document whose authors had significant motive and opportunity to misuse or mischaracterize confidential witness statements would provide the Court little assurance that the factual

contentions have any evidentiary support." *Id.* at 804. Accordingly, the Hindenburg Report does not contain allegations that can be considered by this Court.

Nor do the allegations included in the Complaint about the alleged CWs provide the necessary details. For example, Plaintiffs rely on CW1 to support allegations that the Clover Assistant was not widely adopted by physicians. (¶ 198.) But even setting aside the staleness of her information (discussed above), Plaintiffs admit that "she was not a point of contact for physicians about Clover Assistant," and only "occasionally communicate[d] with physicians while making calls to physicians' offices to collect data." (¶ 44.) Plaintiffs similarly rely on CW2 to support the claim that the Clover Assistant was not widely adopted. (*E.g.*, ¶ 205.) But there are no allegations showing that CW2 was in a position to know about the adoption of the Clover Assistant, other than a one-off conversation with Clover's Chief Medical Officer about data from the first or second quarter of 2019. *Id*. CW3 was assigned to a very limited market, outside of Clover's main areas of operation. (*See* ¶ 46.) CW4 is not even identified by title. (¶ 47.) Accordingly, the Court should also discount the CW allegations.

## II. THE SECTION 10(b) CLAIMS SHOULD BE DISMISSED BECAUSE THE COMPLAINT FAILS TO ALLEGE ACTIONABLE MISSTATEMENTS OR OMISSIONS[9]

To state a claim under Section 10(b), a plaintiff must adequately allege an actionable misstatement or omission. *Omnicare III*, 769 F.3d at 470. An actionable misstatement or omission is one "of a material fact that [a] defendant had a duty to disclose." *May v. Apricus Biosciences, Inc.*, 2014 WL 4897938, at *5 (M.D. Tenn. Sept. 30, 2014), *aff'd*, 650 F. App'x 893 (6th Cir.

---

[9] Each alleged misstatement in the Complaint is inactionable for one or more of the reasons set forth below. Due to the length of the Complaint, however, Defendants do not attempt to address each misstatement individually herein. Rather, the alleged misstatements are treated on a categorical basis. For the Court's benefit, Defendants have appended to this memorandum a chart with each and every alleged misstatement identified in the Complaint and the reason(s) why it is not actionable, but without additional argument.

2016).  An omission is not actionable absent a duty to disclose the information—even if the information would be material to the investing public.  *Id.*  Plaintiffs challenge four categories of statements as misleading: statements regarding (1) Clover being the subject of government investigations; (2) Clover's material compliance with applicable law; (3) the reasons for Clover's growth; and (4) the use of the Clover Assistant.  As explained below, none of the challenged statements are actionable.

### A. The Decision Not to Specifically Disclose the DOJ Inquiry Was Not a Material Omission and Did Not Render Any Statements Misleading

A "government investigation, without more, does not trigger a generalized duty to disclose." *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016); *In re XP Inc. Sec. Litig.*, 2021 WL 861917, at *9 (E.D.N.Y. Mar. 8, 2021) (same); *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("As we have explained, disclosure is not a rite of confession, and companies do not have a duty to disclose uncharged, unadjudicated wrongdoing."); *In re Zillow Grp., Inc. Sec. Litig.*, 2018 WL 4735711, at *10 (W.D. Wash. Oct. 2, 2018) ("[F]ederal securities laws do not require corporations to disclose the initiation of a government investigation.").

Here, Plaintiffs tacitly acknowledge that Clover had no affirmative obligation to disclose the DOJ Inquiry.  (*See, e.g.*, ¶ 234.)  Instead, Plaintiffs claim that Clover's decision not to specifically disclose the DOJ Inquiry rendered statements that Clover did make false or misleading.  As explained below, however, Plaintiffs' arguments fail.

#### 1. None of the statements that Plaintiffs point to regarding "legal proceedings" or government investigations were misleading.

In the Merger Agreement, Legacy Clover represented to SCH that:

[T]here are no pending or, to the knowledge of the Company, threatened, lawsuits, actions, suits, judgments, claims, proceedings or any other Actions (including any investigations or inquiries initiated, pending or threatened) by any Governmental

15

> Authority . . . against the Company . . . except . . . as would not be, or would not reasonably be expected to be, ***material to the business of the Company and its Subsidiaries, taken as a whole.***

(¶ 233; Ex. J, Merger Agreement at 44 (emphasis added).)

Plaintiffs contend that this statement was rendered false by Clover's decision not to specifically disclose the DOJ Inquiry. (*See* ¶ 234.) But the challenged representation does not imply that Clover was not subject to any investigations at all. To the contrary, it implies that there may be investigations, but says that there are no investigations "except" as "would not be, or would not reasonably be expected to be material to the business of [Clover] and its Subsidiaries, taken as a whole." (¶ 233.)

Plaintiffs could only establish the falsity of this representation by pleading facts to establish that the DOJ Inquiry ***was material*** at the time of the representation. The Complaint fails to do so. Although the DOJ Inquiry is alleged to have begun in 2019, roughly two years ago (¶ 16), Plaintiffs do not (and cannot) allege (i) that the inquiry has resulted in any charges or adverse findings against Clover, (ii) that Clover has itself determined that it engaged in wrongdoing, or (iii) that the DOJ Inquiry has resulted in any changes to Clover's business practices.

Given the lack of alleged impact to date from the DOJ Inquiry, Plaintiffs must be alleging that the DOJ Inquiry will have some unspecified material impact in the future. But Plaintiffs cannot base a claim on Clover's failure to predict a future, adverse action, particularly when Plaintiffs have not even alleged that Clover believes it has engaged in wrongful conduct.

The Sixth Circuit has held that securities fraud claims cannot be premised on a failure to disclose predictions about the future actions of a prosecutor or regulator with respect to alleged wrongful acts. As the Sixth Circuit explained in *Indiana State District Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.* ("*Omnicare I*"), a securities fraud claim will not lie where "the materiality of the alleged omission derives solely from predictions regarding the

actions of third parties, particularly whether fines or other sanctions would be brought based on findings of regulatory violations." 583 F.3d 935, 947 (6th Cir. 2009) (holding that, despite a company's "generalized claim of 'legal compliance,'" it had no duty to disclose "allegedly 'illegal' activities"). As the Sixth Circuit held in an earlier case, "the potential consequences of [alleged improper conduct] are the type of predictions and soft information that do not give rise to a duty of disclosure." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 574 (6th Cir. 2008).[10]

The second statement to which Plaintiffs point is the following representation in Clover's Registration & Proxy Statements:[11]

> We are not presently involved in any legal proceeding the outcome of which, ***we believe***, if determined adversely to us, would individually or taken together have a ***material adverse effect*** on our business, operating results, cash flows or financial condition.

(¶ 237; Ex. C, Final Prospectus at 131 (emphasis added).)

Like the earlier statement, this one is not actionable because Plaintiffs have not pled any facts showing that Clover did not believe the DOJ Inquiry would not have a material adverse effect

---

[10] In any event, this representation was made, not to investors, but to SCH as part of the merger process. And when the Merger Agreement that contained the representation was disclosed, it was accompanied by disclaimers making clear that the "no person should rely on the representations and warranties in the Merger Agreement or the summaries thereof in this proxy statement/prospectus as characterizations of the actual state of facts about" Legacy Clover. (*E.g.*, Ex. D, S-4 at 101; Ex. K, Proxy Statement at 107.) Accordingly, the representations made in the Merger Agreement cannot be the basis for a securities fraud claim. *See Jaroslawicz v. M&T Bank Corp.*, 2017 WL 1197716, at *5 (D. Del. Mar. 30, 2017) (a representation accompanied by a substantially similar disclaimer was not actionable because "[n]o reasonable shareholder would look at this disclaimer and then rely on the representations and warranties contained in [the relevant section of the merger agreement] to understand the actual condition of" the issuer).

[11] Unless otherwise indicated, "Registration & Proxy Statements" refer to the following eight SEC filings: (1) 10/20/2020 Initial Registration Statement ("S-4"); (2) 11/20/2020 S-4 ("First Amended S-4"); (3) 12/09/2020 S-4 ("Second Amended S-4"); (4) 12/10/2020 S-4 ("Third Amended S-4"); (5) 12/14/2020 Rule 424(B)(3) Prospectus ("December 14 Prospectus"); (6) 12/14/2020 Sched. 14A Definitive Proxy Statement ("Proxy Statement"); (7) 01/13/2021 S-1 ("Shelf Registration"); and (8) 01/29/2021 Rule 424(b)(3) Prospectus ("Final Prospectus").

on Clover.  This disclosure explicitly states Clover's belief, and thus is an opinion.  *See In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *17 (S.D.N.Y. Apr. 2, 2020) (explaining that statements about what defendants "'believe' . . . are inactionable statements of opinion or belief").  As explained in more detail in Section II.B.2, *infra*, such an opinion statement can only be misleading if the opinion was not actually held, or if some material facts about the basis for the opinion have been omitted.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015).  But there are no facts alleged in the Complaint showing that anyone held an opinion different than the opinion expressed.  Nor are there allegations regarding facts forming the basis of the opinion that should have been included.  Consequently, there are no facts alleged to show that this statement was false.

This statement fails to provide the basis for a claim for the additional reason that the DOJ Inquiry is not a "legal proceeding" within the established legal meaning of that term.  *E.g.*, *In re Lions Gate*, 165 F. Supp. at 19 (holding that an SEC investigation is not a legal proceeding where "the SEC itself has not yet determined whether or not to bring a case"); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 272 (S.D.N.Y. 2012) ("An investigation on its own is not a 'pending legal proceeding' until it reaches a stage when the agency or prosecutorial authority makes known that it is contemplating filing suit or bringing charges.").

### 2. Clover's statements that it receives subpoenas and other government inquiries from time to time are entirely accurate

Plaintiffs next assert that Clover's statements that "from time to time we receive subpoenas and other requests for information from[] federal and state supervisory and enforcement agencies," (¶ 241) and "from time to time, we are and may be subject" to governmental investigations and "we receive and may receive subpoenas and other requests for information" were misleading in light of the DOJ Inquiry.  (¶ 243.)  To make this argument, Plaintiffs contend that use of the phrase

"from time to time" concerning governmental investigations implied to the reader that there were no ongoing inquiries. (*See, e.g.*, ¶¶ 241-42, 244.)

But Plaintiffs are wrong. When a speaker says that something happens "from time to time," that statement does not imply that it is not happening at the time the statement was made. And here, Clover's public filings could not possibly have been so misconstrued. Clover informed investors that it did receive these types of requests from time to time. (Ex. L, Shelf Registration at 32 (stating that "from time to time . . . we receive and may receive subpoenas and other requests for information from . . . federal and international governmental authorities").) And the "Risk Factors" section in Clover's public filings explicitly discussed that litigation or investigations "are" and "may be" conducted by governmental agencies, including the DOJ. (¶ 243.) Nothing in Clover's statements purported to be a complete list of "past or ongoing regulatory investigations." *See, e.g.*, *Richman*, 868 F. Supp. 2d at 273-74 (nondisclosure of Wells Notices did not make general disclosures about ongoing government investigations misleading); *Lubbers v. Flagstar Bancorp. Inc.*, 162 F. Supp. 3d 571, 579-80 (E.D. Mich. 2016) (holding that defendants had no duty to disclose a specific investigation).

*Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 612 (6th Cir. 2005), is instructive. There, the Sixth Circuit considered a plaintiff's contention that the statement that "[s]ales personnel *may* receive different compensation for selling each Class of share," was misleading because those "brokers *do* earn more for the sale of" certain classes of shares. *Id*. The Sixth Circuit characterized that argument as a "semantic quibble," holding that the statement "served to put prospective investors on notice that there was a possibility that brokers were being compensated more highly for the sale of certain class shares than others." *Id.* So too, here, Clover's statement put prospective investors on notice that there was a possibility of legal or

19

regulatory investigations. *See Lubbers*, 162 F. Supp. 3d at 579-80 (holding that a "from time to time" disclosure "was broad enough to encompass the possibility" of an ongoing investigation).

### 3. Statements unrelated to the subject of the DOJ Inquiry were not rendered misleading by the existence of the DOJ Inquiry

Plaintiffs also challenge the statements that: (1) "we plan to seek opportunities to create differentiated and enhanced plans for Medicare-eligible beneficiaries across the United States, including underpenetrated and traditionally underserved markets"; and (2) "[w]e also intend to increase spending for new market development and expansion of our sales channels and in-person or remote clinical care capabilities." (¶ 239.) Plaintiffs do not allege that these statements were false. Rather, they allege that the existence of the DOJ Inquiry somehow rendered these statements—which are unrelated to the subject matter of the DOJ Inquiry—misleading. But Plaintiffs' theory fails as a matter of logic.

The DOJ Inquiry has nothing to do with "opportunities to create differentiated and enhanced plans," or intentions to "increase spending for new market development and expansion." (¶ 239.) Such irrelevant statements that have nothing to do with legal or regulatory proceedings cannot be made false by the existence of an investigation. *See Albert Fadem Tr. v. Am. Elec. Power Co.*, 334 F. Supp. 2d 985, 1028 (S.D. Ohio 2004) (dismissing claims in part because "plaintiffs have merely put together a mosaic of unrelated pieces attempting to create a picture of 'fraud by hindsight'"); *see also Lubbers*, 162 F. Supp. 3d at 580 ("To constitute an omission there must be a relationship between the omission and the statement itself, because it would be untenable not to have limits on the scopes of subjects.") (citation omitted).

Moreover, each of these supposed misrepresentations, which relate to Clover's future plans or intentions, is a "forward-looking" statement, protected by the PSLRA's safe harbor. 15 U.S.C.

20

§ 78(c)(1)(A).[12]  As such, to establish that the statement was capable of being actionable, Plaintiffs would have to allege that the Defendants had "actual knowledge . . . that the statement was false or misleading."  15 U.S.C. § 78(c)(1)(B).  And Plaintiffs have not even attempted to allege facts to that effect here.

> **B.  There Are No Facts Alleged to Show That Clover's Statements That It Was in Material Compliance with Applicable Law Were False or Misleading**

In Section 4.30(a) of the Merger Agreement, Legacy Clover represented that "[e]ach of [Clover] and its Subsidiaries (i) in all material respects meets and complies with, and since January 1, 2018, has met and complied with, all applicable Laws, including all Health Care Laws, and other requirements for participation in, and receipt of payment from, the Medicare Advantage Program."  (¶ 235.)[13]  And in the Proxy Statement, Clover stated that it "believe[s] that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse."  (¶ 243; Ex. K, Proxy Statement at 63.)

Plaintiffs assert that these statements were false or misleading because Clover allegedly "had a practice of giving gift cards to healthcare professionals and administrative staff," which Plaintiffs claim was a violation of the AKS, FCA, and the Medicare Communications Marketing Guidelines ("MCMG").  (¶ 15.)  Plaintiffs also base their claim on the alleged existence of the

---

[12] The challenged forward-looking statements were accompanied by meaningful cautionary language.  (Ex. K, Proxy Statement at vi-viii.)

[13] As discussed above, the representations in the Merger Agreement are not actionable because they were accompanied by a specific disclaimer.

21

"Clover Ambassador" program, through which, they allege, "Clover paid physicians' front desk staff for patient referrals." (¶ 314.)

As discussed below, Plaintiffs have not adequately alleged that Clover misrepresented its compliance with applicable laws. Plaintiffs fail to allege: (1) a violation of any law with the required particularity; (2) knowledge of a violation of any law; or (3) that any such violation was material.

> **1.** **Plaintiffs have failed to allege facts showing that any violation of a statute or regulation actually happened, which they are required to do.**

"[W]hen a complaint claims that statements were rendered false or misleading through the non-disclosure of illegal activity, the facts of the underlying illegal acts must also be pleaded with particularity, in accordance with the heightened pleading requirement of Rule 9(b) and the PSLRA." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019). In *Sanderson v. HCA-Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (citations omitted), the Sixth Circuit wrote: "At a minimum, Rule 9(b) requires that the plaintiff specify the 'who, what, when, where, and how' of the alleged fraud."

Against that background, Plaintiffs have a heavy burden—one that is rarely, if ever, met in the absence of governmental charges or company admissions of illegal conduct—to come forward with specific facts that would support their claim of undisclosed illegal conduct. Plaintiffs do not come close to meeting that burden.

> **a.** **There is no AKS violation**

The AKS requires a showing that a person "knowingly and willfully offers or pays remuneration . . . directly or indirectly . . . to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program." (¶ 92

22

(quoting 42 U.S.C. § 1320a-7b(b)).)[14]  Put differently, the required elements to show an AKS

violation are "that a defendant: (1) knowingly and willfully made a payment or offer of payment,

(2) as an inducement to the payee, (3) to refer an individual, (4) to another for the furnishing of an

item or service that could be paid for by a federal health care program." *United States v. Miles*,

360 F.3d 472, 479-80 (5th Cir. 2004).

With respect to the gift cards, the only concrete facts alleged are that ***one person*** provided

gift cards to ***one physicians' office***, ***one time***.  And importantly, Plaintiffs allege that when this

one incident came to the attention of a supervisor, the one person was immediately told to stop.

(*See* ¶ 130 (CW3's supervisor "immediately" told her, "You can't do that.").)[15]

The Complaint contains no facts to support the allegation that Clover made payments to

healthcare providers and their office staff for patient referrals, and certainly not with the

particularity required under Rule 9(b), providing the "'who, what, when, where, and how' of the

alleged fraud." *Sanderson*, 447 F.3d at 877; *see also United States ex rel. Nunnally v. W. Calcasieu

Cameron Hosp.*, 519 F. App'x 890, 894 (5th Cir. 2013) (affirming dismissal where complaint

alleged no "particular details of any actual referral by a physician").  Plaintiffs' theory here rests

entirely on the Hindenburg Report's statements attributed to an unidentified purported "former

employee." (*See, e.g.*, ¶¶ 136, 314, 324; Ex. H, Hindenburg Report at 24.)  That is insufficient for

---

[14] Plaintiffs' allegation that Clover violated the FCA and MCMG is dependent upon there being an actual violation of the AKS.  (*E.g.*, ¶ 137.)

[15] The Complaint alleges that "CW4 corroborates" CW3's statements because "CW4 said she that she [sic] recalled hearing during her time at Clover in the Network Expansion and Growth department that Clover was giving gift cards to front office staff at providers, which struck her as illegal."  (¶ 133).  But no facts are alleged to meet the Sixth Circuit requirements for CW statements. (*See supra* Section I.)  For example, the Complaint does not allege who CW4 recalled as the source of the supposed information, when she learned the information, how the source of the information would have had access to it,  or any other details that would be required.  As such, it must be completely discounted.  *In re EveryWare*, 175 F. Supp. 3d at 852.

the reasons discussed above.

In addition, to establish an AKS violation, Plaintiffs would have to plead facts to establish that Clover made gifts "knowingly and willfully" as an inducement to refer an individual. There are no such allegations. Indeed, the Complaint does not even contain any allegations of actual referrals. In short, Plaintiffs fail to allege with sufficient particularity any of the elements necessary to establish an AKS violation.[16]

### b.      There is no FCA violation

As an initial matter, Plaintiffs are predicating their assertions of an FCA violation on a violation of the AKS. (*See* ¶ 137.) And because Plaintiffs have not adequately pled an AKS violation, the FCA theory necessarily fails. *See, e.g.*, *United States ex rel. Dennis v. Health Mgmt. Assocs., Inc.*, 2013 WL 146048, at *13-14 (M.D. Tenn. Jan. 14, 2013) (finding that FCA claims based on alleged AKS violations failed where relator did not plead an AKS violation). But Plaintiffs' FCA theory fails for separate reasons as well.

An FCA violation requires that (i) the defendant presented a claim of payment to the government, (ii) the claim was false or fraudulent, and (iii) the defendant knew it was false or fraudulent. *United States ex rel. Eberhard v. Physicians Choice Lab'y Servs., LLC*, 642 F. App'x 547, 550 (6th Cir. 2016). The FCA "attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the 'claim for payment.'" *Id.* at 552 (quoting *Sanderson*, 447 F.3d at 877-78).

---

[16] And try as they might, Plaintiffs cannot seek refuge in the Hindenburg Report to support their claim that Clover allowed contracted providers to accept compensation for referring potential members (*see* ¶ 136); those allegations are based entirely on unnamed and unidentified alleged sources and cannot be the basis of a securities fraud claim. *See Doshi*, 823 F.3d at 1037. With respect to the "Clover Ambassador" program, Plaintiffs again rely entirely on unsubstantiated allegations made by unidentified "former employees" in the Hindenburg Report. (*See, e.g.*, ¶¶ 136, 314, 324.) Tellingly, none of the CWs in the Complaint mention this program at all.

Here, Plaintiffs do not allege that Clover submitted any false claim for payment to the government—an indispensable element of an FCA violation. *See United States ex rel. Hirt v. Walgreen Co.*, 2016 WL 815512, at *8 (M.D. Tenn. Mar. 2, 2016) (dismissing complaint that did not identify any specific claims that were submitted to the United States), *report and recommendation adopted*, 2016 WL 1367182 (M.D. Tenn. Apr. 5, 2016), *aff'd sub nom. United States v. Walgreen Co.*, 846 F.3d 879 (6th Cir. 2017); *see also Eberhard*, 642 F. App'x at 551 (affirming dismissal of claims based on FCA violation where the complaint "was completely void of any specific claim or false certification of compliance presented to the government").

Nor do Plaintiffs allege that Clover knew that any claim submitted to the government was false. *See Walgreen Co.*, 846 F.3d at 880 ("The [FCA] imposes civil liability for knowingly presenting a false or fraudulent claim to the government for payment or approval.") (internal quotation marks omitted).

### c. There are no violations of the Medicare Communications Marketing Guidelines

Finally, Plaintiffs do not plead with particularity how Clover violated the MCMG. Medicare Advantage organizations are prohibited from "provid[ing] cash or other monetary rebates as an inducement for enrollment or otherwise" and "offer[ing] gifts to potential enrollees, unless the gifts are of nominal (as defined in the [MCMG]) value, are offered to all potential enrollees without regard to whether or not the beneficiary enrolls, and are not in the form of cash or other monetary rebates." (¶ 105; *see, e.g.*, 42 C.F.R. § 422.2263(b)(1)-(2) (2021); Ex. N, MCMG at 10.)[17] The complaint offers no facts showing that Clover either (i) provided cash or other monetary rebates as an ***inducement*** for enrollment or otherwise, or (ii) offered gifts to

---

[17] Plaintiffs quote and cite to 42 C.F.R § 422.2268, effective June 15, 2018 to March 21, 2021. (*See* ¶¶ 104-05.)

*potential enrollees*, let alone gifts worth more than the nominal value permitted under the MCMG. *See generally* 42 C.F.R. §§ 422.2260–2276.

The only particularized gift card allegation in the Complaint—that CW3 was instructed to purchase approximately $250 worth of gift cards one time and deliver them to doctors and their staff at one location (¶ 128)—underscores the inadequacy of the Complaint. Plaintiffs do not allege that the gift cards or payments were provided to patients, that they were intended to be provided to patients, or that Clover instructed the doctors and staff to give them to patients. These failures establish the deficiency of the Complaint, even putting aside the *de minimis,* one-time nature of the allegation of gift cards totaling $250.

**2. The challenged statements regarding "legal compliance" are only actionable if Defendants knew the statements were untrue, and there are no allegations supporting such an inference**

The claims based on the Proxy Statement's statement that Clover "believe[s] that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws . . . [but] the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse" also fail because it is an inactionable statement of opinion. (¶ 243.) *See In re Adient plc Sec. Litig.*, 2020 WL 1644018, at *17 ("Defendants' statements about what they 'think,' 'believe,' and 'expect' . . . are inactionable statements of opinion or belief.").

There are two ways to plead a securities claim based on an opinion statement: (i) allege facts showing that the opinion was subjectively false (i.e., not honestly held); or (ii) allege that the opinion omits material facts about the basis for the opinion, such that the statement would mislead a reasonable investor about said basis. *Omnicare,* 575 U.S. at 183-84. Plaintiffs have alleged no particularized facts satisfying either prong of *Omnicare*.

26

The Complaint is devoid of any facts showing that the Defendants, or anyone else at Clover, did not believe its statement about compliance with applicable law. For example, there is no allegation that (i) any of the practices alleged in the Complaint to have violated the law were ongoing at the time of the statement, and (ii) even if they were, that any Defendant knew that those practices violated the law, and (iii) any such violations were material. All of those facts would be required to plead that this opinion was not truly held, and none of them are in the Complaint. Nor does the Complaint allege that Clover had to change any of its business practices.

Indeed, a claim that an omission resulted in a misleading opinion statement "must identify particular (and material) facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194. The Complaint does not even attempt to allege facts to satisfy the *Omnicare* standard. Accordingly, the claim based on Clover's belief about compliance with applicable laws must be dismissed.

### 3. Plaintiffs have not alleged facts to establish that any alleged violation of law would have been material

Even setting aside Plaintiffs' failure to plead an actionable violation of law, Plaintiffs' argument fails because Plaintiffs have failed to meet their burden to plead facts establishing that any non-compliance with law was material. Allegations about a single isolated instance of $250 in gift cards used by a lower-level employee, even if true, would not be sufficient to support a claim of securities fraud. *See, e.g.*, *In re AT&T/DirecTV Now Sec. Litig.*, 2020 WL 4909718, at *527 (S.D.N.Y. Aug. 18, 2020) ("[F]ailure to disclose anecdotal incidents of improper sales tactics or *other isolated employee misconduct is not material*.") (emphasis added); *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1127 (E.D. Wash. 2013) (plaintiff did "not allege that the practices identified by CW1 were anything other than *a local, isolated*

*practice*, or how CW1 would have personal knowledge of whether the alleged practices were widespread or a matter of corporate policy") (emphasis added), *aff'd*, 691 F. App'x 393 (9th Cir. 2017).

    **C.**    **The Alleged Misstatements Based on Allegations Related to Hiram Bermudez and B&H Assurance Are Not Actionable**

Plaintiffs allege that Clover's statements concerning the Company's growth were rendered false or misleading because of Hiram Bermudez's undisclosed interest in B&H, which played a role in placing Clover's plans with some insureds. (*See, e.g.*, ¶¶ 149, 153, 245-47, 250-51, 256-57.) Plaintiffs allege as follows: "the Company's growth was not the result of its 'obvious' plans or the value of [the] Clover Assistant, it was the result of Bermudez exploiting his contacts, which resulted in money being funneled to Bermudez himself." (¶ 161.)

But Plaintiffs offer no facts to support their claim that Clover's growth had anything to do with Bermudez having an interest in B&H. As a Clover salesperson, Bermudez was motivated to generate sales for Clover whether or not he had an interest in B&H. And there are no allegations to suggest that B&H would have placed any fewer insureds with Clover in the absence of Bermudez's ownership interest.

Plaintiffs acknowledge that "Bermudez has agreed to divest himself from all interests in B&H Assurance." (¶ 338). Tellingly, however, there are no allegations that this has had any effect on B&H's conduct or on Clover's growth rate. Plaintiffs cannot convert a technical issue regarding disclosure of a supposed related-party transaction into a fraud claim simply by stating, without factual support, that the Bermudez relationship with B&H was the reason for Clover's growth. *In re Almost Family, Inc. Securities Litigation*, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012), is instructive. There, the company's CEO made remarks about the company's strategy and "attributed the company's success to strong senior management." *Id*. at *6. The plaintiffs argued

28

that the CEO's statements were material misrepresentations because the company's "growth was substantially due to its scheme to manipulate Medicare's reimbursement system, rather than the explanations offered by [the CEO]." *Id*. at *7. In rejecting that argument, the court held that, "[a]bsent specifically alleging that the statements made by [the CEO] were false, Plaintiffs cannot successfully assert them to be material misrepresentations." *Id*.

As in *Almost Family*, Plaintiffs have not made any specific factual allegations showing that Clover misrepresented the reasons for its growth as being "lowering [Clover's] members' out-of-pocket costs while improving their benefits, including broad freedom of choice in selecting their physicians." (Ex. K, Proxy Statement at 1.) Absent such factual allegations, Plaintiffs' claim based on the misrepresentations concerning the reasons for Clover's growth must be dismissed.

Nor can Plaintiffs save their claim related to the Bermudez relationship with B&H by characterizing it as a violation of generally accepted accounting principles ("GAAP") or other accounting rules. Even accepting that Bermudez and/or B&H were "related parties," which Plaintiffs have not adequately pled,[18] the "failure to follow GAAP is, by itself, insufficient to state a securities fraud claim[;] Plaintiffs must show that . . . such a violation was material." *Zaluski*,

---

[18] Plaintiffs' premise that Bermudez and B&H were "related-parties" of Clover under Rule 4-08(k)(1) of SEC Regulation S-X is wrong. Plaintiffs merely point to certain requirements for disclosure of material "related-party" transactions under Rule 4-08(k)(1) and the Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") 850 without any explanation as to how Bermudez or B&H fall within the definition of "related-parties." (¶¶ 177-78); *see also* 17 C.F.R. § 210.1-02(u) ("The term related parties is used as that term is defined in the FASB ASC Master Glossary."). ASC 850, in relevant part, defines "related parties" as "[a]ffiliates of the entity," and "[m]anagement of the entity and members of their immediate families." (Ex. O, ASC 850-10-20 at 4.) However, the Complaint contains no facts allowing the Court to draw an inference that Bermudez or B&H meets any of these definitions, and none apply here. Rather, the only allegation is that Bermudez is the "Head of Sales" for Clover. (*See, e.g.*, ¶¶ 179, 303, 306.) But that title, without more, provides no basis for concluding that Bermudez is a "related-party," and it says nothing about B&H—the entity with which the transactions actually occurred.

29

527 F.3d at 576. The only allegation as to why this purported GAAP violation was material is that Clover later disclosed the relationship between Bermudez and B&H in a March 29, 2021, Form 8-K. (*See, e.g.*, ¶¶ 180, 306-07.) But just because something is disclosed in a Form 8-K does not make it material. *See In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 862 (W.D. Ky. 2014) (holding that statements in Forms 8-K did not concern material fact), *aff'd sub nom. Bondali v. Yum! Brands, Inc.,* 620 F. App'x 483 (6th Cir. 2015). At bottom, what Plaintiffs criticize is that Bermudez was, allegedly, receiving more compensation than just his salary. But the Complaint never provides any facts showing why a change in Bermudez's compensation (which was never disclosed to investors, in any event) would be material to a reasonable investor.[19]

### D. The Alleged Misstatements About the Clover Assistant Are Not Actionable

Plaintiffs claim that Clover made various misstatements regarding the Clover Assistant by "communicating . . . that the overwhelming majority of Clover's physicians" (i) "actually used [the] Clover Assistant" and (ii) did so "during patient visits." (¶ 276; *see also* ¶¶ 275, 277-301.) Plaintiffs' theory fails for a number of reasons.

First, Plaintiffs' theory is built entirely on the statements of the CWs. But while the allegedly false statements described the state of the Clover Assistant in October 2020 and

---

[19] Finally, even if Bermudez and/or B&H were related parties, the failure to disclose the transactions that are the subject of the Complaint still would not be a "material" omission, as these transactions were immaterial as a matter of law. The only transactions that Clover is alleged to have engaged in directly with Bermudez or his affiliates resulted in $160,000 in payments from 2017 to present, *or less than $40,000 per year*. (¶ 170.) Plaintiffs also allege that "[t]he March 29, 2021 8-K disclosed that B&H had received approximately $1.36 million in payments for Clover-related products from *2017 to present* . . . ." *Id*. (emphasis added). In 2019, Clover had over $90 million in general and administrative expense. (Ex. D, S-4 at 24.) The $40,000 payment represents less than .05% of the general and administrative expense, and the $1.36 million payments represent less than 1.5% of the general and administrative expense. Courts routinely dismiss claims based on such immaterial amounts. *See, e.g.*, *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 485 (2d Cir. 2011); *Labul v. XPO Logistics*, 2021 WL 1056828, at *9 (D. Conn. Mar. 19, 2021).

afterwards (*see, e.g.*, ¶¶ 227, 274), none of the CWs were employed by Clover any later than August 2019. (*See, e.g.*, ¶¶ 44-47.) Clover was continuously changing and improving the Clover Assistant throughout the fourteen-month period after the last of the CWs left the Company. (*See* Ex. C, Final Prospectus at 115 ("[W]e have released an updated version of the Clover Assistant, on average, once every three weeks since its launch in July 2018, with a focus on driving more personalized and effective clinical decision-making in each release.").) And Clover was working to increase use of the Clover Assistant by physicians over that same period. Information possessed by CWs in August 2019 and earlier about such physician use provides no basis to assess the extent to which physicians were using the Clover Assistant more than fourteen months later. *See Brodsky v. Yahoo! Inc.*, 630 F. Supp. 2d 1104, 1115 (N.D. Cal. 2009) ("[B]ecause CW 3 and CW 5 were not Yahoo! employees for most of the Class Period, the Court cannot rely on their statements to support claims of false revenue reporting for the entire Class Period.").[20]

Plaintiffs' claims based on use of the Clover Assistant also fail because many of the challenged statements refer to the percentage of onboarded physicians using the Clover Assistant, which Plaintiffs then claim to be false based on data about the percentage of all physicians (***both onboarded and not onboarded***) using the Clover Assistant. (*See, e.g.*, ¶¶ 275, 279-82, 293, 295,

---

[20] Many of Plaintiffs' alleged misstatements regarding the Clover Assistant qualify as puffery and corporate optimism as to Clover's business plans. (*See, e.g.*, ¶¶ 275-300.) To take a few examples, Clover stated that: (1) "We broadly disseminate the Clover Assistant free-of-charge to primary care physicians ('PCPs') who use it at the point of care while treating our members"; and (2) "We have succeeded with this approach in our established markets and seek to replicate it in all markets that we enter." (¶ 277.) For the reasons stated above, Plaintiffs have not pled facts to support the falsity of any of the alleged misstatements in the Complaint. But these alleged misrepresentation claims should fail for the additional reason that they are, at most, non-actionable expressions of corporate optimism. *See In re Ford Motor Co. Sec. Litig.,* 381 F.3d 563, 570 (6th Cir. 2004) ("[M]ere corporate puffery or hyperbole that a reasonable investor would not view as significantly changing the general gist of available information . . . are not material, even if they were misleading.") (citation omitted).

31

Case 3:21-cv-00096   Document 75   Filed 08/27/21   Page 39 of 57 PageID #: 1481

299.) For example, Plaintiffs point to Clover's statements that "onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019." (¶ 275.) Plaintiffs claim that statement and substantially similar statements were misleading because they "communicat[ed] to investors that the overwhelming majority of Clover's physicians actually used Clover Assistant" (¶¶ 280, 290, 292, 298, 301). But Clover was clear that not all physicians were onboarded.[21] As a result, investors could not have reasonably read statements about the percentage of onboarded physicians using the Clover Assistant to be the same as the percentage of all physicians using the Clover Assistant. Plaintiffs' interpretation would render the qualifier "onboarded" meaningless.[22]

### E. Plaintiffs' Derivative Disclosure Claims Concerning Compliance with Regulation S-K Are Not Actionable

Based on many of the same theories discussed above, Plaintiffs also allege violations of Items 303 and 503 of Regulation S-K. (*See, e.g.*, ¶¶ 303, 310.) Item 303 of Regulation S-K requires certain SEC filings to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Item 503

---

[21] (*See, e.g.*, Ex. F, December 14 Prospectus at 245 ("Our plans don't require physicians to adopt [Clover Assistant], but the physicians that do so use it for 80% of their interactions with our members."); Ex. M, November 20, 2020, Analyst Call Presentation, slide 41 (Clover's "Projected Financial Results" estimated 64% "Clover Assistant Penetration" in 2021).)

[22] It is unclear if Plaintiffs allege that Defendant Garipalli's statement that the number of participants in Clover's Medicare Direct Contracting program was 200,000 is a misstatement. (*See, e.g.*, ¶¶ 88-90.) The Complaint does not include it in the "Defendants' Materially False and Misleading Statements During the Class Period" section. (*See, e.g.*, ¶¶ 227-319.) To the extent Plaintiffs allege that it is a misstatement, it is not actionable because it is forward-looking and concerns predictions about Clover's business. (*See* ¶ 88 ("To date, we already have contracts with physicians through which approximately 200,000 lives *may be* aligned with our [Direct Contracting Entity] under the program.").) In any event, as explained below, this misrepresentation cannot be the basis of a claim because any alleged falsity in the statement was corrected after the alleged drop in share price.

32

Case 3:21-cv-00096    Document 75    Filed 08/27/21    Page 40 of 57 PageID #: 1482

requires that certain filings "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c).[23]

But Plaintiffs do not allege any additional facts to support their claims, and invocation of Regulation S-K does not alter the standard for pleading a misstatement under Section 10(b). *See Iron Worker Loc. Union No. 405 Annuity Fund v. Dollar Gen. Corp.*, 2018 WL 10152459, at *15 (M.D. Tenn. Mar. 8, 2018) (for a violation of the disclosure requirements under Item 303 to be actionable under Rule 10b-5, "the omission must still satisfy the requirements of Section 10(b)"); *see also Walker v. L Brands, Inc.,* 2020 WL 6118467, at *15 (S.D. Ohio Oct. 16, 2020) (collecting cases) ("The few courts that have examined Item 503 have generally found such violations to track Rule [10b-5] violations. . . ."). Where, as here, such claims are essentially "derivative" of insufficient "primary allegations," such claims must also fail. *E.g.*, *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 113 (2d Cir. 2011).

## III. THE SECTION 10(B) CLAIM SHOULD BE DISMISSED BECAUSE THE COMPLAINT FAILS TO PLEAD FACTS THAT GIVE RISE TO A "STRONG INFERENCE" OF SCIENTER FOR ANY DEFENDANT

As explained above, Plaintiffs were required to plead particularized facts for each alleged misstatement that create a strong inference of scienter for each Defendant. A strong inference of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. "[S]cienter includes a 'knowing and deliberate intent to manipulate, deceive or defraud, and recklessness.'" *Doshi*, 823 F.3d at 1039 (citations omitted). Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Id*. (citation omitted).

---

[23] Plaintiffs refer to Items 105 and 503. (¶ 308.) "Effective May 2, 2019, the SEC relocated former Item 503(c), then-codified at 17 C.F.R. § 229.503(c), to Item 105, now codified at 17 C.F.R. § 229.105." *Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*, 2021 WL 371401, at *8 (S.D.N.Y. Feb. 3, 2021).

33

"Recklessness requires more than negligence and is 'akin to conscious disregard.'" *Id*. (citation omitted). A Section 10(b) claim must be dismissed when the "who, what, when, where, and how" of a defendant's knowledge is not alleged. *In re Keithley Instruments, Inc. Sec. Litig.*, 268 F. Supp. 2d 887, 900 (N.D. Ohio 2002) (dismissing fraud claim where plaintiffs alleged that "known operational problems" and "internal information" contradicted public statements but failed to allege "the *particulars* of 'what the defendants knew'").

Here, Plaintiffs come nowhere close to alleging particularized facts that show Clover or any of the Individual Defendants exhibited an intent to deceive or reckless conduct. (*E.g.*, ¶¶ 341-57.)

## A.      Plaintiffs Make No Attempt to Plead the *Helwig* Factors

In assessing whether a plaintiff has adequately pled scienter, courts in the Sixth Circuit pay attention to whether or not the complaint alleges facts satisfying the nine factors set out in *Helwig v. Vencor*, 251 F.3d 540, 547-48 (6th Cir. 2001) (en banc), *abrogated on other grounds by Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), known as the "*Helwig* factors."[24] In the Sixth Circuit, "the absence of [the *Helwig*] factors indicates the absence of scienter." *In re Diebold Sec. Litig.*, 2008 WL 3927467, at *7 (N.D. Ohio Aug. 22, 2008), *aff'd sub nom. Konkol v. Diebold, Inc.*, 590 F.3d 390 (6th Cir. 2009). Here, the Complaint makes no attempt to plead the *Helwig* factors. *See In re EveryWare*, 175 F. Supp. 3d at 859-61 (holding that "the absence of allegations under the *Helwig* factors" buttresses a finding of no scienter); *see also Doshi*, 823 F.3d at 1041-42

---

[24] The *Helwig* factors are: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *Helwig*, 251 F.3d at 552.

(holding that defendant did not act with scienter where only two of the nine *Helwig* factors supported inferring scienter).

**B.    The Complaint Fails to Plead Facts Showing That Any Defendant Had Scienter**

**1.    Plaintiffs primarily rely on inappropriate "group-pleading" to support their scienter assertions**

Conclusory allegations that do not differentiate between defendants are insufficient to satisfy Plaintiffs' burden of pleading scienter. *See Jiaxi Hu v. Chan*, 2016 WL 4269065, at *6 (S.D. Ohio Aug. 15, 2016) ("Plaintiffs cannot rely on group pleading to satisfy the PSLRA's requirement to plead facts demonstrating a strong inference of scienter."); *cf. Omnicare III*, 769 F.3d at 482 ("The Complaint never alleges that Person A did Act B at Time C, which is required by the PSLRA."). Plaintiffs' limited attempts to make individualized allegations totally fail.

First, Plaintiffs identify Defendants Garipalli, Toy, and Wagner as executive officers of Legacy Clover and allege that, by virtue of their positions, these individuals must have known the truth of the allegedly concealed facts discussed in the Complaint. (*See, e.g.*, ¶¶ 346-50.) This is wholly insufficient. *See, e.g.*, *In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 870 (S.D. Tex. 2016) ("Not only may Plaintiffs not use group pleading allegations to create an inference of scienter as to individual defendants, but conclusory allegations that they must have known of the alleged fraud due to their positions and/or ability to access information are insufficient to state a claim."); *Yum! Brands,* 73 F. Supp. 3d at 868 ("Regarding the availability of test results on STAR, which served as an auditing system for all of Yum!'s suppliers, the Individual Defendants' fraudulent intent or recklessness cannot be presumed merely from their high-level positions and alleged access to information. The Complaint must do more than point out access and opportunity. It must allege specific facts showing that the Individual Defendants actually

35

reviewed the STAR records or failed to review the records when a reasonable person would have done so.").

Plaintiffs' scienter theory concerning Mr. Palihapitiya is also misplaced. Plaintiffs concede that Mr. Palihapitiya had no role at Legacy Clover, but rather was the head of SCH.[25] Plaintiffs seek to establish Mr. Palihapitiya's scienter by touting the due diligence performed by SCH, and conclusorily asserting that Mr. Palihapitiya must have known that the statements at issue were false as a result of that due diligence. (*See* ¶¶ 341(f), 351.) But nowhere do Plaintiffs identify any information provided to Mr. Palihapitiya that revealed any of the statements at issue were false or misleading.[26] Indeed, the Complaint actually alleges the opposite—that SCH received representations and warranties that there were no legal proceedings or regulatory actions that could have a material impact on the business. (*See* ¶ 115.) In any event, bare allegations of access to information are insufficient as a matter of law. *See, e.g., Doshi v. Gen. Cable Corp.*, 2015 WL 366644, at \*6 (E.D. Ky. Jan. 27, 2015) (rejecting "access to information" argument when plaintiffs "d[id] not specify any instance where [d]efendants gained relevant knowledge through these channels and disregarded it"), *aff'd*, 823 F.3d 1032 (6th Cir. 2016).

Second, Plaintiffs point to allegations regarding the stock that the Individual Defendants received in connection with the SPAC Transaction through which Clover went public. (*See* ¶ 344.) There are no allegations in the Complaint that any of the Individual Defendants sold any of their shares during the Class Period (and many of the Defendants' shares were subject to a "lock-up" agreement that prevented the Defendants from selling shares during the Class Period). Indeed,

---

[25] Plaintiffs repeatedly seek to conflate SCH and Legacy Clover when to their perceived advantage. (*See, e.g.*, ¶ 342 (referring to the "Individual Defendants' high-level positions with Clover"); ¶ 372 ("As senior managers and/or directors of Clover, the Individual Defendants had knowledge of the details of Clover's internal affairs.").)

[26] And none of the CWs say anything about Mr. Palihapitiya.

36

Plaintiffs ask the Court to infer that Mr. Palihapitiya caused SCH to enter into a transaction with Legacy Clover while knowing that it was encumbered by undisclosed material issues that were at odds with the representations that Legacy Clover provided to SCH, and that, in Plaintiffs' view, materially impacted the value of Legacy Clover. The much more compelling inference is that Mr. Palihapitiya believed that Clover was a good investment, and that he and the other Individual Defendants believed that the challenged statements were true and correct.

### 2. The decision not to disclose the DOJ Inquiry does not support an inference of scienter

Plaintiffs make much of the allegation that the "Defendants" were aware of the DOJ Inquiry and chose not to disclose it. (¶ 341.a.) But, as discussed above, there is no general obligation to disclose a governmental investigation. Rather, that obligation only arises if its existence renders other statements false. Here, the statements on which Plaintiffs' focus relate to whether an inquiry or legal proceeding could have a material impact on Clover. But Plaintiffs completely fail to allege facts that could support a strong inference of scienter as to such a theory of falsity. There are no facts showing that any Individual Defendant believed then, or believes today, that the DOJ Inquiry was anything other than a type of investigation that many Medicare Advantage organizations face, performed by one of the government agencies charged with oversight of the highly regulated industry in which Clover operates. In fact, there are no facts alleged at all that the DOJ Inquiry has had any impact on the way Clover runs its business or has resulted in any changes to Clover's business practices. The far more compelling inference, as discussed just above, is that none of the Defendants believed that the DOJ Inquiry was material to the Company.

### 3. Clover's statements regarding legal compliance do not support an inference of scienter

The claims based on the alleged "legal compliance" misrepresentations are "soft information," i.e., information that is not objectively verifiable, historical fact. *In re Omnicare,*

*Inc. Sec. Litig.*, 2013 WL 1248243, at *1, *7 n.4 (E.D. Ky. Mar. 27, 2013) ("*Omnicare II*"), *aff'd*, 769 F.3d 455 (6th Cir. 2014).  As such, these alleged misrepresentations are actionable only if a defendant "knew the statements were untruthful."  *Id*. at *1 ("The Sixth Circuit has explicitly held that statements about 'legal compliance' are 'soft information' that are not actionable unless the defendants knew the statements were untruthful.").  The Sixth Circuit has made clear that in pleading scienter for these types of statements, recklessness is not sufficient.  Rather, "when plaintiffs accuse defendants of misrepresenting or omitting soft information . . . plaintiffs must plead facts showing that the defendants knowingly misrepresented or omitted facts to deceive, manipulate, or defraud the public." *Omnicare III*, 769 F.3d at 472; *USM Holdings, Inc. v. Simon*, 2017 WL 4005939, at *3 (E.D. Mich. Sept. 12, 2017) ("[M]isrepresentations that concern soft information must satisfy a heightened scienter requirement: knowledge, rather than mere recklessness.").

In *Omnicare III*, the plaintiffs asserted that certain "soft information" statements regarding Omnicare's legal and regulatory compliance were false, and that the plaintiffs had adequately pled scienter against individuals because they alleged that someone had shared with one of the defendants an audit that allegedly "revealed pervasive ongoing fraud that had not been disclosed to the investing public." *Id.* at 482.  The Sixth Circuit held that these allegations were not enough because the complaint "never offer[ed] concrete details, other than to say generally that the audit revealed fraud and compliance issues, that would allow [the court] to determine whether [defendant] knew that the Form 10-K statements were false." *Id*.  Similarly, the Sixth Circuit agreed that an allegation that Omnicare's chief compliance officer had confirmed that someone "had brought compliance related concerns to the attention of [defendant] and other Omnicare executives" was still insufficient because the complaint failed to "provide any specifics regarding

38

the timing of this conversation." *Id.* at 482-83.

Applying the same analysis here, Plaintiffs needed to plead facts showing that Defendants (i) were aware of the alleged practice of providing gift cards to physicians or of payments to physicians' staff for referrals, and (ii) knew that these practices made their statements of legal compliance false. Plaintiffs' allegations here do not even come close to the specificity that the Sixth Circuit said was *insufficient* in *Omnicare III*. Rather, Plaintiffs' allegations are conclusory. For example, Plaintiffs generally allege that the Individual Defendants were "privy to all material information concerning Clover's compliance with applicable regulatory laws, regulations and guidance, [and] Clover's practice of providing illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the" AKS, FCA, and MCMG. (¶¶ 351-54.) But Plaintiffs do not allege any facts supporting those assertions. The closest Plaintiffs come is the allegation from CW3 that "Clover's compliance group and in-house attorneys conducted an investigation into Chief Development Officer Lipkind's illicit payment of gift cards to healthcare practitioners and/or office staff." (¶ 341.c.) But neither Plaintiffs nor CW3 allege what that alleged investigation concluded, who was told about its conclusions, and when. Thus, there is no basis to infer that the investigation revealed any problems. And the more logical inference from Plaintiffs' failure to disclose what happened as a result of the alleged investigation is that the investigation did not reveal any material issues with Clover's compliance with applicable laws.

Plaintiffs plead no facts to show that any of the Defendants believed that Clover was violating the law. Without those allegations, the non-compliance with laws theory of the Complaint must be dismissed for failure to plead scienter. *See Omnicare I*, 583 F.3d at 946 (affirming dismissal where allegations failed to establish that defendants were aware of the wrongdoing, or when the wrongdoing was occurring).

But even if the Plaintiffs had pled facts showing that this alleged conduct occurred—and they have not—that would not be enough. Plaintiffs would also have to plead specific facts showing that Defendants had actual knowledge that this practice made Clover's statements about legal compliance false, which would require a showing that these Defendants knew the conduct was illegal. *See Omnicare II*, 2013 WL 1248243, at *1, *6-13. Again, there are simply no facts alleged from which anyone could draw an inference that the Defendants actually knew any of those things at the time these compliance statements were made.

### 4. Plaintiffs do not allege that any Defendant was aware of the alleged related-party transactions or acted recklessly

Nowhere in the Complaint is there any fact alleged that any Individual Defendant was aware of the relationship between Bermudez and B&H. While Plaintiffs allege that Clover had "conflict of interest policies requiring employees to disclose any existing or potential conflicts of interest" (¶ 341.b), nowhere do they allege that Bermudez actually disclosed this relationship (or that he did, and that this was brought to the attention of any Individual Defendant).

Plaintiffs' assertion that the failure to disclose the transactions allegedly resulted in a GAAP violation does not save their claim. The Sixth Circuit has made clear that "[f]ailure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999). The facts establishing scienter still must be pled with particularity. *Id.* Here, they are totally lacking. Plaintiffs have not offered any facts showing that, even if a GAAP error existed, the Defendants knew of the error, or, at a bare minimum, were reckless in not knowing that the error existed. *Id.* ("While Plaintiffs claim Defendants 'were aware of, or were recklessly indifferent to' the revenue recognition errors, they allege no facts to show that Defendants knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did.").

40

**5.     Plaintiffs do not allege that Defendants knew misstatements about the Clover Assistant were false**

There are no facts showing that Clover or any Individual Defendant believed that statements about the Clover Assistant were false.  As discussed above (*see supra* Section II.D), many of the challenged statements are not alleged to be false at all, rely on "apples-to-oranges" comparisons in an attempt to make the statements misleading, or include vague, positive puffery and corporate optimism as to Clover's business plans.  Plaintiffs solely rely on conclusory allegations that Clover and the Individual Defendants should have known the alleged misstatements were false, and similarly do not meet their pleading burden with a general, unsupported allegation that Defendants were "privy to all material information concerning . . . physicians' widespread failure to use the Clover Assistant during patient visits."  (¶¶ 351-54.)

Nor can Plaintiffs rescue their claim through the statements of the CWs.  Plaintiffs rely on CW1 for the allegation that "during her time at Clover" fewer than 10% of "onboarded" doctors were using the Clover assistant.  (¶ 198.)  Similarly, CW2 states that, "as early as 2019, Clover had data showing that half of the providers who actually used Clover Assistant were not using it during patient visits."  (¶ 205.)  And CW3 alleges that "she reported the widespread failure to use the Clover Assistant during patient visits to Clover's inhouse compliance group."  (¶ 341.c.)

But all of these CW statements—none of which meet Plaintiffs' heavy burden on scienter—were made by employees who had left Clover by the middle of 2019.  And thus, any information they had about the use of the Clover Assistant, or about what an Individual Defendant knew about the use of the Clover Assistant, is totally irrelevant to the challenged statements, which all relate to the use of the Clover Assistant in 2020.

Clover is a rapidly growing and maturing company.  It would not be surprising if by early or mid-2019—less than a year after it was first launched in July 2018 (¶ 283)—the Clover Assistant

had not yet been widely adopted.  But the challenged statements were not made in 2019.  And Clover did not go public in 2019.  (*See* ¶ 220.)  The challenged statements were made in 2020 and described the state of the Clover Assistant in 2020 or later, which, for a growth company like Clover, is a significant amount of time later.

Beyond the CWs, Plaintiffs rely almost exclusively on the fact that Clover's Hindenburg Response disclosed that only "22% of all in network Primary Care Physicians" were "ready to use" the Clover Assistant or "onboarded" to allege Clover's and the Individual Defendants' knowledge that prior related statements were misleading.  (¶ 217.)  However, the statement that Plaintiffs attack—that "92% of eligible member visits utilize Clover Assistant" (¶ 275)—referred to the percentage of member visits for which an "onboarded" physician used the Clover Assistant, not the total number of physicians who were onboarded.  They are describing different things.

C.      **Plaintiffs' Attempts to Bolster Their Scienter Allegations by Alleging That the Misstatements Related to Clover's "Core Operations" Fail**

Plaintiffs cannot avoid the Complaint's deficiencies by resorting to allegations about issues relating to Clover's "core operations."  (*See* ¶¶ 346, 356-57.)  This technique for pleading scienter has been routinely rejected where underlying particulars are missing, as they are here.  *See, e.g.*, *Yum! Brands,* 73 F. Supp. 3d at 867-68  (rejecting "core operations" allegation because "fraudulent intent or recklessness cannot be presumed merely from . . . high-level positions and alleged access to information"); *In re Huntington Bancshares Inc. Sec. Litig.*, 674 F. Supp. 2d 951, 958 (S.D. Ohio 2009) (rejecting "core operations" allegations unsupported by particularized facts); *Cox v. Blackberry Ltd.*, 660 F. App'x 23, 25 (2d Cir. 2016) ("The fact that defendants . . . occupied high-ranking positions at BlackBerry and had an incentive for the company to succeed is insufficient to establish scienter.").  "The Complaint must do more than point out access and opportunity." *Yum! Brands*, 73 F. Supp. 3d at 868.

### D. Plaintiffs Fail to Establish Corporate Scienter

As explained above, the Complaint contains no specific allegations that the Individual Defendants acted with scienter. Accordingly, Plaintiffs cannot establish scienter for Clover because the Complaint does not allege that additional agents, falling within the *Omnicare III* categories, acted with knowledge or recklessness concerning the alleged illegal conduct. *See Bondali*, 620 F. App'x at 493 (citing *Omnicare III*, 769 F.3d at 476).[27] The Complaint contains absolutely no facts "giving rise to a strong inference that [any such person] acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). Consequently, Plaintiffs have not pled scienter for Clover because there are no facts establishing scienter for any Individual Defendant or agent whose scienter would be imputed to Clover.

### IV. PLAINTIFFS' CLAIMS BASED ON THE EXISTENCE OF THE DOJ INQUIRY AND ALLEGED VIOLATIONS OF LAW FAIL BECAUSE PLAINTIFFS HAVE NOT PLED LOSS CAUSATION

To state a claim under Section 10(b), a Complaint must adequately plead loss causation, i.e., the "causal connection between the material misrepresentation and the loss" asserted. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005). To plead loss causation under a corrective disclosure theory, as Plaintiffs assert here, the Complaint must allege that "the market reacted negatively to a corrective disclosure." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173-75 (2d Cir. 2005). A statement does not qualify as a "corrective disclosure" simply because it announces bad news and is followed by a drop in stock price; it must actually reveal a prior statement's false

---

[27] Corporate scienter is determined by looking to the scienter of (1) "the individual agent who uttered or issued the misrepresentation"; (2) "[a]ny individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance"; or (3) "[a]ny high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance or issuance." *Omnicare III*, 769 F.3d at 476.

or fraudulent nature. *See Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 244-45 (S.D.N.Y. 2006); *D.E. & J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 1000-01 (6th Cir. 2005) (plaintiffs failed to plead loss causation by alleging only "that a loss occurred as a result of" a public disclosure and not "from the market's acknowledgment of prior misrepresentations made by the corporation").

Plaintiffs allege that Clover's stock price dropped after the Hindenburg Report disclosed alleged violations and the DOJ Inquiry. (¶¶ 322, 331.) But "[t]he announcement of an investigation reveals just that—an investigation—and nothing more." *Meyer v. Greene*, 710 F.3d 1189, 1201 & n.13 (11th Cir. 2013) (holding that disclosures of two SEC investigations did not qualify as corrective disclosures because "standing alone and without any subsequent disclosure of actual wrongdoing[] does not reveal to the market the pertinent truth of anything" (citation omitted)). Indeed, "[n]umerous federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure." *In re Almost Fam., Inc. Sec. Litig.*, 2012 WL 443461, at *13. That is the case here. The Hindenburg Report's disclosure of alleged violations and the DOJ Inquiry was not a corrective disclosure because it did not include any actual revelation of fraud, illegal conduct, or an admission of wrongdoing by Clover. Accordingly, Plaintiffs' claims fail to the extent they are premised on the DOJ Inquiry.

Similarly, the Complaint fails to plead any facts showing that any alleged illegal conduct occurred. Without such facts, no "corrective disclosure" regarding Clover's statements of legal compliance exists.[28]

---

[28] As noted above, (*see supra* Section II.D n.22), Plaintiffs do not specifically allege that Defendant Garipalli's statement that "[t]o date, we already have contracts with physicians through which approximately 200,000 lives may be aligned with our [Direct Contracting Entity] under the program," was false or misleading. To the extent they do, not only is that incorrect, but any claim fails because, according to Plaintiffs, any alleged correction of that statement occurred on May 17, 2021, and there is no allegation of any impact on the stock price. *See Omnicare I*, 583 F.3d at 944.

**V. BECAUSE PLAINTIFFS FAIL TO STATE A CLAIM FOR A PRIMARY VIOLATION OF SECTION 10(B), PLAINTIFFS' SECTION 20(A) CLAIM FAILS AS A MATTER OF LAW**

Plaintiffs' Section 20(a) claim should be dismissed for three reasons. *First*, as against the Individual Defendants, the Complaint fails to allege a primary violation of the Exchange Act, as discussed above, which is a prerequisite to a Section 20(a) claim. *See Omnicare I*, 583 F.3d at 947 (affirming dismissal of "controlling persons" claim where no primary violation was shown). *Second*, the Complaint's "control" allegations are conclusory as to the Individual Defendants. (*See, e.g.*, ¶¶ 380-81.) *Finally*, Plaintiffs fail to allege facts demonstrating that Defendants Toy and Wagner "controlled" another person who committed an alleged Section 10(b) violation. *In re TransDigm Group, Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 773 (N.D. Ohio 2020) ("In order to plead a violation of § 20(a) for control person liability, a plaintiff must allege facts demonstrating that the defendant 'controlled' another person who committed an underlying violation of the Act, *and* that the defendant 'culpably participated' in that underlying violation." (citation omitted)).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

45

Dated:   August 27, 2021

Respectfully submitted,

BASS BERRY & SIMS PLC

*/s/ Britt K. Latham*
Britt K. Latham (BPR #023149)
150 Third Avenue South, Suite 2800
Nashville, TN 37201
Tel.: (615) 742-6200
blatham@bassberry.com

MILBANK LLP

Scott A. Edelman (admitted *pro hac vice*)
Jed M. Schwartz (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001
Tel.: 212-530-5000
sedelman@milbank.com
jschwartz@milbank.com

*Counsel for Defendants Clover Health Investments, Corp. f/k/a Social Capital Hedosophia Holdings Corp. III, Vivek Garipalli, Andrew Toy, Joe Wagner, and Chamath Palihapitiya*

46

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing was filed electronically on August 27, 2021. Notice of this filing will be sent to all electronically registered parties by operation of the Court's electronic filing system. The names of the attorneys for other parties who are registered to receive notices of filings through the Court's system are:

Benjamin A. Gastel
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Email: beng@bsjfirm.com

Jacob A. Walker
Jeffrey C. Block
Stephen J. Teti
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Email: jake@blockleviton.com
Email: jeff@blockleviton.com
Email: steti@blockleviton.com

James Gerard Stranch, IV
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
Email: gerards@bsjfirm.com

Larry Russell Belk, Jr.
Sutherland & Belk, PLC
2505 21st Avenue South
Suite 400
Nashville, TN 37212
(615) 846-6200
Email: russell@sbinjurylaw.com

Brian Peter Calandra
Pomerantz LLP
600 Third Avenue
20th Floor
New York, NY 10016
(646) 581-9958
Email: bcalandra@pomlaw.com

Brian Schall
Rina Restaino
Schall Law Firm
2049 Century Park East
Suite 2460
Los Angeles, CA 90067
(310) 301-3335
Email: brian@schallfirm.com
Email: rina@schallfirm.com

Paul Kent Bramlett
Robert P. Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Email: pknashlaw@aol.com
Email: robert@bramlettlawoffices.com

Laurence M. Rosen
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: lrosen@rosenlegal.com

47

James A. Holifield, Jr.
Holifield Janich Rachal & Associates, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
(865) 566-0115
Email: aholifield@holifieldlaw.com

Christopher M. Wood
Robbins Geller Rudman & Dowd LLP
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2203
Email: cwood@rgrdlaw.com

Mark S. Reich
Mary K. Blasy
Samuel H. Rudman
Robbins Geller Rudman & Dowd LLP
58 S Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Email: mreich@rgrdlaw.com
Email: mblasy@rgrdlaw.com
Email: srudman@rgrdlaw.com

J. Alexander Hood II
Jeremy A. Lieberman
Pomerantz LLP
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Email: ahood@pomlaw.com
Email: jalieberman@pomlaw.com

Patrick V. Dahlstrom
Pomerantz LLP
10 S LaSalle Street, Suite 3505
Chicago, IL 60603
(312) 377-1181
Email: pdahlstrom@pomlaw.com

Phillip Kim
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: pkim@rosenlegal.com

Jerry E. Martin
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2202
Email: jmartin@barrettjohnston.com

Corey D. Holzer
Holzer & Holzer, LLC
1200 Ashwood Parkway
Suite 410
Atlanta, GA 30338
(770) 392-0090
Email: cholzer@holzerlaw.com

Charles F. Barrett
Neal & Harwell, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
(615) 244-1713
Email: cbarrett@nealharwell.com

John Tate Spragens
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
(615) 983-8900
Email: john@spragenslaw.com

48

Saul C. Belz
Glankler Brown, PLLC
6000 Poplar Avenue, Suite 400
Memphis, TN 38119
(901) 576-1741
Email: sbelz@glankler.com

Tara L. Swafford
The Swafford Law Firm, PLLC
207 Third Avenue North
Franklin, TN 37064
(615) 599-8406
Email: tara@swaffordlawfirm.com

*/s/ Britt K. Latham*
Britt K. Latham

49