# Exhibit K

Case 3:21-cv-00096 Document 76-11 Filed 08/27/21 Page 1 of 10 PageID #: 1667

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## SCHEDULE 14A

**Proxy Statement Pursuant to Section 14(a) of the
Securities Exchange Act of 1934**

Filed by the Registrant ☒ Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐  Preliminary Proxy Statement

☐  **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒  Definitive Proxy Statement

☐  Definitive Additional Materials

☐  Soliciting Material Pursuant to §240.14a-12

# SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III
**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☒  No fee required.

☐  Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

    (1)  Title of each class of securities to which transaction applies:

    (2)  Aggregate number of securities to which transaction applies:

    (3)  Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (Set forth the amount on which the filing fee is calculated and state how it was determined):

    (4)  Proposed maximum aggregate value of transaction:

    (5)  Total fee paid:

☐  Fee paid previously with preliminary materials.

☐  Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the form or schedule and the date of its filing.

    (1)  Amount Previously Paid:

    (2)  Form, Schedule or Registration Statement No.:

    (3)  Filing Party:

    (4)  Date Filed:

Index to Financial Statements

- "trust account" are to the trust account established at the consummation of SCH's initial public offering at J.P. Morgan Chase Bank, N.A. and maintained by Continental, acting as trustee;
- "Trust Agreement" are to the Investment Management Trust Agreement, dated April 21, 2020, by and between SCH and Continental Stock Transfer & Trust Company, as trustee;
- "Trust Amount" are to the amount of cash available in the trust account as of the Closing, after deducting the amount required to satisfy SCH's obligations to its shareholders (if any) that exercise their rights to redeem their SCH Class A ordinary shares pursuant to the Cayman Constitutional Documents (but prior to the payment of any (i) deferred underwriting commissions being held in the trust account and (ii) transaction expenses of Clover or SCH);
- "warrants" are to the public warrants and the private placement warrants.

Unless otherwise stated in this proxy statement/prospectus or the context otherwise requires, all references in this proxy statement/prospectus to SCH Class A ordinary shares, shares of Clover Health Class A common stock, or warrants include such securities underlying the units.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS

This proxy statement/prospectus contains statements that are forward-looking and as such are not historical facts. This includes, without limitation, statements regarding the financial position, business strategy and the plans and objectives of management for future operations, including as they relate to the potential Business Combination, of Social Capital Hedosophia Holdings Corp. III. These statements constitute projections, forecasts and forward-looking statements, and are not guarantees of performance. Such statements can be identified by the fact that they do not relate strictly to historical or current facts. When used in this proxy statement/prospectus, words such as "anticipate," "believe," "continue," "could," "estimate," "expect," "intend," "may," "might," "plan," "possible," "potential," "predict," "project," "should," "strive," "would" and similar expressions may identify forward-looking statements, but the absence of these words does not mean that a statement is not forward-looking. When SCH discusses its strategies or plans, including as they relate to the potential Business Combination, it is making projections, forecasts or forward-looking statements. Such statements are based on the beliefs of, as well as assumptions made by and information currently available to, SCH's management.

Forward-looking statements in this proxy statement/prospectus and in any document incorporated by reference in this proxy statement/prospectus may include, for example, statements about:
- SCH's ability to complete the Business Combination or, if SCH does not consummate such Business Combination, any other initial business combination;
- satisfaction or waiver (if applicable) of the conditions to the Mergers, including, among other things:
  - the satisfaction or waiver of certain customary closing conditions, including, among others, (i) approval of the Business Combination and related agreements and transactions by the respective shareholders of SCH and Clover, (ii) effectiveness of the registration statement of which this proxy statement/prospectus forms a part, (iii) expiration or termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act and any other required regulatory approvals, (iv) receipt of approval for listing on Nasdaq of the shares of Clover Health Class A common stock to be issued in connection with the Mergers, (v) that Clover Health have at least $5,000,001 of net tangible assets upon Closing and (vi) the absence of any injunctions;
  - the completion of the Pre-Closing Restructuring Plan as set forth in the Merger Agreement;
  - the absence of a material adverse effect on Clover; and
  - that the Trust Amount plus the PIPE Investment Amount actually received by SCH at or prior to the Closing Date, is at least equal to the Minimum Available Cash Amount;

Index to Financial Statements

- the occurrence of any other event, change or other circumstances that could give rise to the termination of the Merger Agreement;
- the projected financial information, anticipated growth rate, and market opportunity of Clover Health;
- the ability to obtain or maintain the listing of Clover Health Class A common stock and Clover Health warrants on Nasdaq following the Business Combination;
- our public securities' potential liquidity and trading;
- our ability to raise financing in the future;
- our success in retaining or recruiting, or changes required in, our officers, key employees or directors following the completion of the Business Combination;
- SCH officers and directors allocating their time to other businesses and potentially having conflicts of interest with SCH's business or in approving the Business Combination;
- the use of proceeds not held in the trust account or available to us from interest income on the trust account balance;
- the impact of the regulatory environment and complexities with compliance related to such environment;
- factors relating to the business, operations and financial performance of Clover and its subsidiaries, including:
  - the effect of uncertainties related to the global COVID-19 pandemic on its business, results of operations, and financial condition;
  - the ability of Clover to maintain an effective system of internal controls over financial reporting;
  - the ability of Clover to grow market share in its existing markets or any new markets it may enter;
  - the ability of Clover to respond to general economic conditions;
  - the ability of Clover to manage its growth effectively and its expectations regarding the development and expansion of its business;
  - the ability of Clover to achieve and maintain profitability in the future;
  - the success of strategic relationships with third parties;
  - the anticipated benefits associated with the use of the Clover Assistant platform, including its ability to utilize the platform to manage medical costs of its members;
  - its ability to successfully enter new service markets and manage its operations;
  - its ability to expand its member base and provider network;
  - its ability to increase adoption and use of the Clover Assistant;
  - its ability to develop new features and functionality that meet market needs and achieve market acceptance;
  - its ability to retain and hire necessary employees and staff our operations appropriately;
  - its ability to maintain, protect and enhance our intellectual property; and
- other factors detailed under the section entitled "*Risk Factors.*"

The forward-looking statements contained in this proxy statement/prospectus and in any document incorporated by reference in this proxy statement/prospectus are based on current expectations and beliefs concerning future developments and their potential effects on us or Clover. There can be no assurance that future

Table of Contents

Index to Financial Statements

developments affecting us or Clover will be those that SCH or Clover have anticipated. These forward-looking statements involve a number of risks, uncertainties (some of which are beyond SCH's control or the control of Clover) or other assumptions that may cause actual results or performance to be materially different from those expressed or implied by these forward-looking statements. These risks and uncertainties include, but are not limited to, those factors described under the section entitled "*Risk Factors*" beginning on page 39 of this proxy statement/prospectus. Should one or more of these risks or uncertainties materialize, or should any of our assumptions prove incorrect, actual results may vary in material respects from those projected in these forward-looking statements. SCH and Clover undertake no obligation to update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

Before any SCH shareholder grants its proxy or instructs how its vote should be cast or votes on the proposals to be put to the extraordinary general meeting, such stockholder should be aware that the occurrence of the events described in the "*Risk Factors*" section and elsewhere in this proxy statement/prospectus may adversely affect us.

## QUESTIONS AND ANSWERS FOR SHAREHOLDERS OF SCH

*The questions and answers below highlight only selected information from this document and only briefly address some commonly asked questions about the proposals to be presented at the extraordinary general meeting, including with respect to the proposed Business Combination. The following questions and answers do not include all the information that is important to SCH's shareholders. SCH urges shareholders to read this proxy statement/prospectus, including the Annexes and the other documents referred to herein, carefully and in their entirety to fully understand the proposed Business Combination and the voting procedures for the extraordinary general meeting, which will be held at 12:00 p.m., Eastern Time, on January 6, 2021, at 525 University Ave, Palo Alto, California 94301, or virtually via live webcast. To participate virtually in the special meeting, visit https://www.cstproxy.com/socialcapitalhedosophiaholdingsiii/sm2021 and enter the 12 digit control number included on your proxy card. You may register for the meeting as early as 5:00 p.m. on December 31, 2020. If you hold your shares through a bank, broker or other nominee, you will need to take additional steps to participate in the meeting, as described in this proxy statement.*

**Q:    Why am I receiving this proxy statement/prospectus?**

A:    SCH shareholders are being asked to consider and vote upon, among other proposals, a proposal to approve and adopt the Merger Agreement and approve the Business Combination. The Merger Agreement provides for, among other things, the mergers of (x) Merger Sub with and into Clover, with Clover surviving the merger as a wholly owned subsidiary of SCH, and (y) the Company with and into SCH, with SCH surviving the merger, in each case, in accordance with the terms and subject to the conditions of the Merger Agreement as more fully described elsewhere in this proxy statement/prospectus. See the section entitled "*BCA Proposal*" for more detail.

A copy of the Merger Agreement is attached to this proxy statement/prospectus as Annex A and you are encouraged to read it in its entirety.

As a condition to the Mergers, SCH will change its jurisdiction of incorporation by effecting a deregistration under the Cayman Islands Companies Law and a domestication under Section 388 of the DGCL, pursuant to which SCH's jurisdiction of incorporation will be changed from the Cayman Islands to the State of Delaware. As a result of and upon the effective time of the Domestication, (1) each of the then issued and outstanding SCH Class A ordinary shares will convert automatically, on a one-for-one basis, into a share of the Clover Health Class A common stock; (2) each of the then issued and outstanding SCH Class B ordinary shares will convert automatically, on a one-for-one basis, into a share of Clover Health Class A common stock; (3) each of the then issued and outstanding SCH warrant will convert automatically into a Clover

Case 3:21-cv-00096    Document 76-11    Filed 08/27/21    Page 5 of 10 PageID #: 1671

**Table of Contents**

**Index to Financial Statements**

**SUMMARY OF THE PROXY STATEMENT/PROSPECTUS**

*This summary highlights selected information from this proxy statement/prospectus and does not contain all of the information that is important to you. To better understand the proposals to be submitted for a vote at the extraordinary general meeting, including the Business Combination, you should read this proxy statement/prospectus, including the Annexes and other documents referred to herein, carefully and in their entirety. The Merger Agreement is the primary legal document that governs the Business Combination and the other transactions that will be undertaken in connection with the Business Combination. The Merger Agreement is also described in detail in this proxy statement/prospectus in the section entitled "BCA Proposal—The Merger Agreement."*

*Unless otherwise specified, all share calculations (1) assume no exercise of redemption rights by the public shareholders in connection with the Business Combination and (2) do not include any shares issuable upon the exercise of the warrants.*

**Combined Business Summary**

At Clover Health, we are singularly focused on creating great, sustainable healthcare to improve every life. We have centered our strategy on building and deploying technology that we believe will enable us to solve a significant data problem while avoiding the limitations of legacy approaches. Currently, as a next-generation Medicare Advantage insurer, we leverage our flagship software platform, the Clover Assistant, to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers. We call our plans "Obvious" because we believe they are highly affordable—offering most of our members the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets—and provide peace of mind with wide network access and the same cost-sharing (co-pays and deductibles) for physicians who are in- and out-of-network. By empowering physicians with data-driven, personalized insights at the point of care through our software platform, we believe we can improve clinical decision-making and viably offer these "Obvious" plans at scale, through an asset-light approach. Today, we have the highest membership growth rate among Medicare Advantage plans in the United States with over 50,000 members, based on CMS enrollment data, and reach a broad array of consumers, including traditionally underserved populations. We believe our growth potential in existing and future markets is high.

Like successful technology innovators in other sectors, we are seeking to disrupt our industry from within by building a technology-centric ecosystem, enabling rapid software iteration and dramatic value creation. Our internally-developed technology platform could have been built only because we operate it ourselves, within our own MA plan. This approach uniquely positions us to close the healthcare feedback loop with technology, linking clinical data and physician action.

The Clover Assistant enables us to succeed via a scalable technology-driven virtuous growth cycle:
- We broadly disseminate the Clover Assistant free-of-charge to primary care physicians ("PCPs") who use it at the point of care while treating our members.
- The Clover Assistant provides essential information and personalized care recommendations to PCPs, driving real-time, data-driven decision-making, which results in better care for our members and strong plan performance. Powered by its closed feedback loop, our platform continuously improves as we collect more data from growth in engagement and continue to iterate.
- We invest our improved plan economics into lowering our members' out-of-pocket costs while improving their benefits, including broad freedom of choice in selecting their physicians.
- We invest our improved plan economics into lowering our members' out-of-pocket costs while improving their benefits, including broad freedom of choice in selecting their physicians.

1

**Table of Contents**

**Index to Financial Statements**

> • We drive strong, industry-leading organic membership growth, as compared to other MA plans with over 50,000 members, as consumers select our "Obvious" plans and receive care from physicians on the Clover Assistant, generating broader usage of the platform and thus restarting the cycle.
>
> We have succeeded with this approach in our established markets and seek to replicate it in all markets that we enter.
>
> We drive adoption and use of the Clover Assistant across our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding. As of September 30, 2020, over 2,300 PCPs, who already treat our members and are responsible for caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members' care. In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020. The Clover Assistant's NPS is comparable to those of leading consumer technology platforms, such as Netflix and Amazon, and stands in stark contrast to the average negative NPS of -44 of legacy medical record software products, including EHRs such as athenahealth, Epic or NextGen, in 2016. Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.
>
> High PCP engagement with the Clover Assistant enables real-time, data-driven decision-making for our members at the point of care and drives rapid software iteration: the more that physicians use the Clover Assistant, the more it learns and furthers the precision of personalized data-driven recommendations. We combine our payor data with physician-generated data and use this powerful closed feedback loop to continuously tune our clinical rules and machine learning models, as well as to select and prioritize future software capabilities. On average, we have released an updated version once every three weeks since the launch of the Clover Assistant in July 2018. The use and continuous improvement of the Clover Assistant has resulted in not only improved clinical decision-making but also strong plan performance, which is evident in improvements to our MCR, a measure defined as our total net medical claims expenses incurred divided by premiums earned. We use MCR to assess gross profit for our plans and reduce medical expenses through the use of the Clover Assistant. For the three and twelve months ended March 31, 2020, our MCR for returning members with a PCP who used the Clover Assistant was 82.0% and 85.6%, respectively, which was on average, 1,100 and 730 basis points lower, respectively, than the MCR for returning members with a PCP who did not use the Clover Assistant. These MCRs already take into account our attractive plan design, so if we were to offer narrow-network plans at competitor benefits, we believe our MCR would be significantly better. The platform also facilitates identifying and engaging with our most at-risk members for our many clinical programs designed to provide additional targeted care support, which further drives better plan performance. For example, since the inception of our in-home complex care program on May 1, 2017, until March 31, 2020, inpatient admissions and the MCR of the 1,061 program enrollees were 12% and 1,900 basis points lower, respectively, than the admissions and MCR of 716 people in a matched control group.
>
> As the improved care made possible by the Clover Assistant results in improved plan economics, we are able to return a material portion of our savings to members through our "Obvious" plans. We strive to continuously lower our members' out-of-pocket costs and provide them with market-leading benefits. Most of our members are enrolled in plans that offer the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in their markets while also providing peace of mind with broad network access and with the same in- and out-of-network costs for physician visits. For example, based on a company analysis that assumes a lifetime of seven years on Medicare, Clover estimates that its highest enrolled plan offers a 17% average lifetime cost savings compared to the highest enrolled MA competitor plan in Clover's five largest markets. Likewise, based on a similar company analysis, Clover estimates that its highest enrolled plan offers a 41% average lifetime cost savings compared to Original Medicare, taking into account the Kaiser Family Foundation's reported average Original Medicare enrollee's out-of-pocket spending on medical and long-term care services in 2016.

2

***We may require additional capital to support business growth, and this capital might not be available on acceptable terms, if at all.***

Historically, we have financed our operations and capital expenditures primarily through sales of our capital stock and debt securities that are convertible into our capital stock. In the future, we may raise additional capital through additional debt or equity financings to support our business growth, to respond to business opportunities, challenges, or unforeseen circumstances, or for other reasons. On an ongoing basis, we are evaluating sources of financing and may raise additional capital in the future. Our ability to obtain additional capital will depend on our development efforts, business plans, investor demand, operating performance, the condition of the capital markets, and other factors. We cannot assure you that additional financing will be available to us on favorable terms when required, or at all. If we raise additional funds through the issuance of equity, equity-linked, or debt securities, those securities may have rights, preferences, or privileges senior to the rights of existing stockholders, and existing stockholders may experience dilution. Further, if we are unable to obtain additional capital when required or are unable to obtain additional capital on satisfactory terms, our ability to continue to support our business growth or to respond to business opportunities, challenges, or unforeseen circumstances would be adversely affected.

***If our estimates or judgments relating to our critical accounting policies prove to be incorrect, our results of operations could be adversely affected.***

The preparation of financial statements in conformity with GAAP and our key metrics require management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes and amounts reported in our key metrics. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances, as provided in the section titled "*Clover's Management's Discussion and Analysis of Financial Condition and Results of Operations.*" The results of these estimates form the basis for making judgments about the carrying values of assets, liabilities and equity and the amount of revenue and expenses that are not readily apparent from other sources. Significant assumptions and estimates used in preparing our consolidated financial statements include those related to the amounts of IBNR claims, recoveries from third parties for coordination of benefits, and final determination of medical cost adjustment pools. Our results of operations may be adversely affected if our assumptions change or if actual circumstances differ from those in our assumptions, which could cause our results of operations to fall below the expectations of securities analysts and investors, resulting in a decline in the trading price of our common stock.

***From time to time we are and may be subject to litigation or investigations, which could be costly and time-consuming to defend.***

From time to time we are and may be subject to legal proceedings and claims that arise in the ordinary course of business, such as claims brought by providers, facilities, consultants, and vendors in connection with commercial disputes, or employment claims made by our current or former associates. In addition, from time to time, we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other state, federal and international governmental authorities. In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights. The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims Act (the "FCA"), in particular, and there have been a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also

62

periodically perform risk adjustment data validation ("RADV") audits of selected Medicare Advantage health plans to validate the coding practices of and supporting documentation maintained by health care providers. Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.

We also may be subject to lawsuits (including qui tam or "whistleblower" actions) under the FCA and comparable state laws for submitting allegedly fraudulent or otherwise inappropriate claims for payments for services under the Medicare program. In recent years, government oversight and law enforcement agencies, as well as private party relators, have become increasingly active and aggressive in investigating and taking legal action against potential fraud and abuse. These lawsuits, which may be initiated by government authorities or the relator alone, can involve significant monetary exposure under the FCA, which provides for treble damages and significant mandatory minimum penalties for each false claim or statement. Healthcare plans and providers thus often seek to resolve these types of allegations through settlement for significant and material amounts, including in circumstances where they do not acknowledge or admit liability, to avoid the uncertainty of treble damages that may be awarded in litigation proceedings. Such settlements often contain additional compliance and reporting requirements as part of a consent decree or settlement agreement, including, for example, corporate integrity agreements.

There has been increased government scrutiny and litigation involving MA plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti-Kickback Statute. While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse. See the section entitled "*Risk factors—Risks Related to Governmental Regulation—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity.*"

Litigation and audits, investigations or reviews by governmental authorities or relators may result in substantial costs and may divert management's attention and resources, which may substantially harm our business, financial condition, and results of operations. Insurance may not cover such claims, may not provide sufficient payments to cover all of the costs to resolve one or more such claims and may not continue to be available on terms acceptable to us. Resolution of some of these types of matters against us may result in our having to pay significant fines, judgments, or settlements, which, if uninsured, or if the fines, judgments, and settlements exceed insured levels, could adversely affect our results of operations and cash flows, thereby harming our business.

The regulations and contractual requirements applicable to us and other market participants are complex and subject to change, making it necessary for us to invest significant resources in complying with our regulatory and contractual requirements. Ongoing vigorous legal enforcement and the highly technical regulatory scheme mean that our compliance efforts in this area will continue to require significant resources, and we may not always be successful in ensuring appropriate compliance by our Company, employees, consultants, or vendors, for whose compliance or lack thereof we may be held responsible and liable for. Regular and special governmental audits, investigations and reviews could result in changes to our business practices, and also could result in significant or material premium refunds, fines, penalties, civil liabilities, criminal liabilities or other sanctions, including marketing and enrollment sanctions, suspension or exclusion from participation in government programs, and

63

**BCA PROPOSAL**

SCH is asking its shareholders to approve by ordinary resolution and adopt the Merger Agreement. SCH shareholders should read carefully this proxy statement/prospectus in its entirety for more detailed information concerning the Merger Agreement, a copy of which is attached as Annex A to this proxy statement/prospectus. Please see the subsection entitled "*The Merger Agreement*" below for additional information and a summary of certain terms of the Merger Agreement. You are urged to read carefully the Merger Agreement in its entirety before voting on this proposal.

Because SCH is holding a shareholder vote on the Mergers, SCH may consummate the Mergers only if they are approved by the affirmative vote of the holders of a majority of ordinary shares that are voted at the extraordinary general meeting.

**The Merger Agreement**

*This subsection of the proxy statement/prospectus describes the material provisions of the Merger Agreement, but does not purport to describe all of the terms of the Merger Agreement. The following summary is qualified in its entirety by reference to the complete text of the Merger Agreement, a copy of which is attached as Annex A to this proxy statement/prospectus. You are urged to read the Merger Agreement in its entirety because it is the primary legal document that governs the Mergers.*

*The Merger Agreement contains representations, warranties and covenants that the respective parties made to each other as of the date of the Merger Agreement or other specific dates. The assertions embodied in those representations, warranties and covenants were made for purposes of the contract among the respective parties and are subject to important qualifications and limitations agreed to by the parties in connection with negotiating the Merger Agreement. The representations, warranties and covenants in the Merger Agreement are also modified in part by the underlying disclosure letters (the "disclosure letters"), which are not filed publicly and which are subject to a contractual standard of materiality different from that generally applicable to shareholders and were used for the purpose of allocating risk among the parties rather than establishing matters as facts. We do not believe that the disclosure letters contain information that is material to an investment decision. Additionally, the representations and warranties of the parties to the Merger Agreement may or may not have been accurate as of any specific date and do not purport to be accurate as of the date of this proxy statement/prospectus. Accordingly, no person should rely on the representations and warranties in the Merger Agreement or the summaries thereof in this proxy statement/prospectus as characterizations of the actual state of facts about SCH, Clover or any other matter.*

*Structure of the Mergers*

On October 5, 2020, SCH entered into the Merger Agreement with Merger Sub and Clover, pursuant to which, among other things, following the Domestication, (i) Merger Sub will merge with and into Clover, the separate corporate existence of Merger Sub will cease and Clover will be the surviving corporation and a wholly owned subsidiary of SCH, (ii) Clover will merge with and into SCH, the separate corporate existence of Clover will cease and SCH will be the surviving corporation, and (iii) SCH will change its name to "Clover Health Investments, Corp."

Prior to and as a condition of the Mergers, pursuant to the Domestication, SCH will change its jurisdiction of incorporation by effecting a deregistration under the Cayman Islands Companies Law and a domestication under Section 388 of the DGCL, pursuant to which SCH's jurisdiction of incorporation will be changed from the Cayman Islands to the State of Delaware. For more information, see the section entitled "*The Domestication Proposal*."

Pursuant to the Merger Agreement, Clover shall take all actions, prior to the effective time of the First Merger, and subject to the terms and conditions of the Merger Agreement, necessary to effect the Pre-Closing