|  |  |
|---|---|
| TIMOTHY BOND, <br><br>                Lead Plaintiff <br><br> and <br><br> JEAN-NICOLAS TREMBLAY <br><br>            Named Plaintiff, <br><br> individually and on behalf of all others similarly situated, <br><br>            v. <br><br> CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, VIVEK GARIPALLI, ANDREW TOY, JOE WAGNER and CHAMATH PALIHAPITIYA, <br><br>            Defendants. | Case No. 3:21-cv-00096 <br><br> Judge Aleta A. Trauger |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT ...................................................................................1

II.    STATEMENT OF FACTS ....................................................................................5

       A.    Clover is an insurance provider that depends overwhelmingly on MA premiums..................................................................................................5

       B.    Defendants claimed Clover Assistant could "disrupt" the MA market. ..................6

       C.    Defendants opt to take Clover public through a "SPAC" merger. ..........................7

       D.    The DOJ was investigating Clover for legal and regulatory investigations. ...........7

       E.    Defendants' unlawful conduct and undisclosed related-party transactions with Clover's Head of Sales drove the Company's much-touted growth. .............9

       F.    The Merger Filings were not prepared in accordance with GAAP. ......................10

       G.    Physicians were not using Clover Assistant during patient visits.........................11

       H.    Defendants hoped to capitalize on their fraud by selling massive amounts of shares after the Business Combination closed....................................................13

       I.    The truth emerged when the Hindenburg Report was published...........................13

III.   ARGUMENT..................................................................................................14

       A.    LEGAL STANDARD...............................................................................14

       B.    THE FAC'S ALLEGATIONS ARE WELL-PLEADED ......................................15

           1.    The CWs statements should be credited. ......................................................15

           2.    The Court Should Credit Allegations Based on the Hindenburg Report..............................................................................................19

       C.    THE FAC ALLEGES FALSE AND MISLEADING STATEMENTS .................21

           1.    Assurances that Clover was not under investigation were misleading. ...................................................................................21

           2.    Defendants' touts of Clover's legal compliance are actionable.................26

           3.    Defendants' misstatements concerning Clover's Growth are actionable. ...................................................................................28

           4.    Defendants' false assertions of GAAP compliance are actionable...........31

i

5. Assurances that Clover Assistant was used in patient visits were misleading. ..................................32

6. The Merger Filings were misleading because they violated SEC regulations. ..............................................34

D. THE FAC ALLEGES A STRONG INFERENCE OF SCIENTER ......................35

1. Plaintiffs' scienter allegations do not rely on group pleading. ..................36

2. Defendants admit they intentionally did not disclose the DOJ Investigation. ..........................................37

3. Defendants knowingly and recklessly asserted Clover's legal compliance. ..........................................37

4. Defendants recklessly failed to disclose that Clover's growth stemmed from related-party transactions and that the Merger Filings violated GAAP. ..............................................39

5. Defendants recklessly misrepresented use of Clover Assistant in patient visits ..........................................40

6. Defendants' motive to commit fraud. ..........................................41

7. Defendants recklessly disregarded problems in Clover's "core operations." ..........................................42

8. The FAC alleges corporate scienter for Clover ..........................................42

9. The FAC alleges Defendants' scienter for their violations of Regulation S-K. ..........................................43

E. THE FAC ALLEGES LOSS CAUSATION ..........................................43

F. THE FAC STATES §20(a) CLAIMS ..........................................44

G. LEAVE TO AMEND SHOULD BE FREELY GRANTED ..........................................45

IV. CONCLUSION ..........................................45

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020)..................................................................................28

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..............................................................................................14

*Ashland, Inc. v. Oppenheimer & Co.*,
648 F.3d 461 (6th Cir. 2011) ..........................................................................14, 36

*Beaver Cty. Emps' Ret. Fund v. Tile Shop Holdings, Inc.*,
94 F. Supp. 3d 1035 (D. Minn. 2015)....................................................................34

*Behrendsen v. Yangtze River Port & Logistics Ltd.*,
2021 WL 2646353 (E.D.N.Y. June 28, 2021) .......................................................19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..............................................................................................14

*Benzon v. Morgan Stanley Distributors, Inc.*,
420 F.3d 598 (6th Cir. 2005) ................................................................................25

*Brody v. Zix Corp.*,
2006 WL 2739352 (N.D. Tex. Sept. 26, 2006)......................................................32

*Brown v. China Integrated Energy, Inc.*,
875 F. Supp. 2d 1096 (C.D. Cal. 2012) ...........................................................20, 21

*Burges v. BancorpSouth, Inc.*,
2015 WL 4198795 (M.D. Tenn. July 10, 2015) ....................................................26

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010)....................................................15, 38, 39

*Cheung v. Keyuan Petrochemicals, Inc.*,
2012 WL 5834894 (C.D. Cal. Nov. 1, 2012).........................................................31

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*,
2020 WL 4547217 (S.D.N.Y. Aug. 6, 2020).........................................................21

*Doshi v. Gen. Cable Corp.*,
823 F.3d 1032 (6th Cir. 2016) ........................................................................15, 17

*Dougherty v. Esperion Therapeutics, Inc.*,
  905 F.3d 971 (6th Cir. 2018) ......................................................................................38

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005)......................................................................................................43

*Emps Ret. Sys. of City of St. Louis v. Jones*,
  2021 WL 1890490 (S.D. Ohio May 11, 2021) ............................................................26

*Emps' Ret. Sys. of Government of the Virgin Islands v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)........................................................................................16

*Flynn v. Exelon Corp.*,
  2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) .........................................................34, 35

*Frank v. Dana Corp.*,
  646 F.3d 954 (6th Cir. 2011) .............................................................................15, 35, 36

*Freudenberg v. E\*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010).........................................................................27

*Glazer Capital Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008) ......................................................................................24

*Halford v. AtriCure, Inc.*,
  2010 WL 8973625 (S.D. Ohio Mar. 29, 2010)........................................................15, 45

*Helwig v. Vencor, Inc.*,
  251 F.3d 540, 561 (6th Cir. 2001) ...................................................................... *passim*

*Higginbotham v. Baxter Int'l Inc.*,
  495 F.3d 753, 757 (7th Cir. 2007) ...............................................................................17

*Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012)......................................................................19, 21

*In re Almost Family, Inc. Sec. Litig.*,
  2012 WL 443461 (W.D. Ky. Feb. 10, 2012) ...........................................................30, 44

*In re Am. Serv. Grp., Inc.*,
  2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ........................................................44

*In re Aphria, Inc. Sec. Litig.*,
  2020 WL 5819548 (S.D.N.Y. Sept. 30, 2020),
  *reconsideration denied*, 2021 WL 4442818 (S.D.N.Y. Sept. 28, 2021)...................19

*In re AT&T/ DirecTV Now Sec. Litig.*,
  2020 WL 4909718 (S.D.N.Y. Aug. 18, 2020)..............................................................28

*In re BioScrip, Inc. Sec. Litig.*,
95 F. Supp. 3d 711 (S.D.N.Y. 2015)..................................................................22, 24, 25, 37

*In re Cannavest Corp. Sec. Litig.*,
307 F.Supp.3d 222 (S.D.N.Y. 2018)..................................................................31

*In re Cardinal Health, Inc. Sec. Litigs.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ..................................................................15, 33, 41

*In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*,
2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ..................................................................21

*In re China Valves Tech. Sec. Lit.*,
979 F.Supp.2d 395 (S.D.N.Y.2013)..................................................................22, 23

*In re Comshare Inc. Sec. Litig.*,
183 F.3d 542 (6th Cir. 1999) ..................................................................35

*In re Cornerstone Propane Partners, L.P.*,
355 F.Supp.2d 1069 (N.D. Cal. 2005) ..................................................................32

*In re Direct Gen. Corp. Sec. Litig.*,
398 F. Supp. 2d 888 (M.D. Tenn. 2005)..................................................................23, 28, 44

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
310 F. Supp. 2d 819 (S.D. Tex. 2004) ..................................................................38

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ..................................................................29, 30, 42

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ..................................................................20

*In re Eros Int'l PLC Sec. Litig.*,
2021 WL 1560728 (D.N.J. Apr. 20, 2021) ..................................................................19

*In re EveryWare Glob., Inc. Sec. Litig.*
175 F. Supp. 3d 837 (S.D. Ohio 2016) ..................................................................17

*In re FirstEnergy Corp. Sec. Litig.*,
316 F.Supp.2d 581 (N.D. Ohio 2004)..................................................................40

*In re Flowers Foods, Inc. Sec. Litig.*,
2018 WL 1558558 (M.D. Ga. Mar. 23, 2018)..................................................................23, 44

*In re Ford Motor Co. Sec. Litig.*,
381 F.3d 563 (6th Cir. 2004) ..................................................................33

v

*In re Glob. Brokerage, Inc.*,
2019 WL 1428395 (S.D.N.Y. Mar. 28, 2019) ........................................................33

*In re Huffy Corp. Sec. Litig.*,
577 F. Supp. 2d 968 (S.D. Ohio 2008) ...........................................................15, 40

*In re KBC Asset Mgmt. N.V.*,
572 F. App'x 356 (6th Cir. 2014) .........................................................................43

*In re Lions Gate Ent. Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) ......................................................................24

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ...................................................20, 21

*In re Merck & Co., Inc. Sec. Litig.*,
432 F.3d 261 (3d Cir. 2005).................................................................................18

*In re Miller Energy Res. Sec. Litig.*,
2014 WL 415730 (E.D. Tenn. Feb. 4, 2014) ........................................................42

*In re Nat'l Century Fin. Enterprises, Inc., Investment Litig.*,
541 F.Supp.2d 986 (S.D. Ohio 2007) ...................................................................23

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) ...........................................................26, 28, 35, 42

*In re Pivotal Sec. Litig.*,
2020 WL 4193384 (N.D. Cal. July 21, 2020)........................................................34

*In re Toronto-Dominion Bank Sec. Litig.*,
2018 WL 6381882 (D.N.J. Dec. 6, 2018)..............................................................27

*In re Urb. Outfitters, Inc. Sec. Litig.*,
103 F. Supp. 3d 635 (E.D. Pa. 2015) ..............................................................18, 38

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*,
2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021)...............................29, 35, 39, 42, 43

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016)....................................................................................34

*Institutional Invs. Grp. v. Avaya, Inc.*,
564 F.3d 242 (3d Cir. 2009)......................................................................17, 18, 38

*Jackson Cnty Emps' Ret. Sys. v. Ghosn*,
510 F. Supp. 3d 583 (M.D. Tenn. 2020)..........................................................22, 45

vi

*Jaroslawicz v. M&T Bank Corp.*,
2017 WL 1197716 (D. Del. Mar. 30, 2017) ........................................................................24

*Jaroslawicz v. M&T Bank Corp.*,
962 F.3d 701 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 1284 (2021) ....................................34

*Kelsey v. Allin*,
2016 WL 825236 (N.D. Ill. Mar. 2, 2016) ..........................................................................32

*Lewy v. SkyPeople Fruit Juice, Inc.*,
2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ...............................................................20, 21

*Lloyd v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) .............................................................................................21

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020)..................................................................................21

*Louisiana Sheriffs' Pension & Relief Fund, v. Cardinal Health, Inc.*,
2021 WL 4397946 (S.D. Ohio Sept. 27, 2021) ...................................................................33

*Lubbers v. Flagstar Bancorp. Inc.*,
162 F. Supp. 3d 571 (E.D. Mich. 2016)...............................................................................25

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ...............................................................................................37

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011).........................................................................................................15, 27

*McIntire v. China MediaExpress Holdings, Inc.*,
927 F. Supp. 2d 105 (S.D.N.Y. 2013)............................................................................19, 21

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016).............................................................22, 23, 25, 38

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ...........................................................................................44

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) .................................................................................25

*N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*,
929 F. Supp. 2d 740 (M.D. Tenn. 2013)..................................................................39, 44, 45

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
537 F.3d 35 (1st Cir. 2008)...................................................................................................17

*Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
2016 WL 4098584 (M.D. Tenn. June 16, 2016),
*rev'd on other grounds*, 877 F.3d 687 (6th Cir. 2017) ..........................................................30

*Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
877 F.3d 687 (6th Cir. 2017) ..............................................................................43, 44

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)..............................................................................................24

*Plotkin v. IP Axess Inc.*,
407 F.3d 690 (5th Cir. 2005) ................................................................................40

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ................................................................................40

*Ret. Sys. v. Sterling Fin. Corp.*,
963 F. Supp. 2d 1092 (E.D. Wash. 2013) ............................................................28

*Richman v. Goldman Sachs Grp., Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012)...................................................................24

*Rodriguez v. Providence Cmty. Corr., Inc.*,
191 F. Supp. 3d 758 (M.D. Tenn. 2016)...............................................................36

*Rudani v. Ideanomics, Inc.*,
2020 WL 5770356 (S.D.N.Y. Sept. 25, 2020).......................................................38

*Sanders Confectionery Products. Inc. v. Heller Financial, Inc.*,
973 F.2d 474 (6th Cir. 1992) ................................................................................45

*Shenk v. Mallinckrodt
plc*, 2019 WL 3491485, at *18 (D.D.C. July 30, 2019)........................................32

*Shenwick v. Twitter, Inc.*,
282 F. Supp. 3d 1115 (N.D. Cal. 2017) ................................................................32

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889, at *16 (S.D.N.Y. Nov. 26, 2018)............................................40

*Simon v. Abiomed, Inc.*,
37 F. Supp. 3d 499 (D. Mass. 2014) .....................................................................18

*Snellink v. Gulf Res., Inc.*,
870 F. Supp. 2d 930 (C.D. Cal. 2012) ..............................................................19, 31

*Stein v. U.S. Xpress Enterprises, Inc.*,
2020 WL 3584800 (E.D. Tenn. June 30, 2020).....................................................18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)...................................................................................22, 35, 41

*U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*,
   519 Fed. Appx. 890 (5th Cir. 2013).......................................................................27

*U.S. ex rel. Parikh v. Citizens Med. Ctr.*,
   977 F. Supp. 2d 654 (S.D. Tex. 2013) ...................................................................27

*United States ex rel. Bledsoe v. Cmty. Health Sys.*,
   342 F.3d 634 (6th Cir. 2003) .................................................................................45

*United Union Roofers, Waterproofers & Allied Workers Loc. Union No. 8 v.
   Great Lakes Dredge & Dock Corp.*,
   2014 WL 12780549 (N.D. Ill. Oct. 21, 2014).......................................................18

*Wilkof v. Caraco Pharm. Lab., Ltd.*,
   2010 WL 4184465 (E.D. Mich. Oct. 21, 2010) .....................................................44

*Yannes v. SCWorx Corp.*,
   2021 WL 2555437 (S.D.N.Y. June 21, 2021) .......................................................19

**Statutes**

15 U.S.C. §78u-4(b)(1)(B)..........................................................................................14

Anti-Kickback Statute...................................................................................................2

False Claims Act ................................................................................................ *passim*

The Private Securities Litigation Reform Act of 1995 ........................................14, 15

Securities Exchange Act of 1934 Sections 10(b) and 20(a) ..............................1, 18, 44

**Rules**

Rule 9(b) ......................................................................................................................14

Rule 11 .........................................................................................................................21

Rule 15 .........................................................................................................................45

Lead Plaintiff Firas Jabri and Named Plaintiff Jean-Nicolas Tremblay ("Plaintiffs), by and through their attorneys, respectfully submit this memorandum in opposition to Defendants' Motion to Dismiss the First Amended Complaint (ECF No. 75 ("Motion" or "Mot.")).

## I.     PRELIMINARY STATEMENT

This is a securities class action on behalf of investors in Clover Health Investments Corp., ("Clover" or the "Company") from October 6, 2020, through February 3, 2021 (the "Class Period"). The FAC[1] asserts violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934. Defendants are Clover, its CEO, Vivek Garipalli ("Garipalli"), CTO, Andrew Toy ("Toy"), CFO, Joe Wagner ("Wagner"), and Chamath Palihapitiya ("Palihapitiya"), who operated the publicly traded blank check company, or "SPAC," with which Clover formally merged in January 2021 to become a public company. Plaintiffs seek to recover losses incurred from numerous false and misleading statements by Defendants in connection with Clover's merger with Palihapitiya's SPAC (the "Business Combination").

Clover is a health insurance company whose revenues overwhelmingly come from premiums paid by the U.S. government through its Medicare Advantage ("MA") program. Although Clover had been exploring an initial public offering ("IPO"), on October 6, 2020, Defendants announced that Clover would go public by merging with a Palihapitiya SPAC. The popularity of SPAC mergers, where private companies avoid the IPO process by merging with a public shell company, has skyrocketed in recent years because they have led to huge capital infusions and in part because of Palihapitiya, who has been anointed the "King of SPACs."

Defendants claimed Clover was a technology company that could "disrupt" MA with its software, Clover Assistant, which purportedly used "machine learning" to recommend care to

---

[1] "FAC" refers to Plaintiffs' First Amended Complaint for Violations of the Federal Securities Laws. ECF No. 70. Capitalized terms not defined herein have the meanings assigned in FAC.

HCPs during patient visits. According to former employees who spoke to Plaintiffs ("CWs")[2] or were quoted in the Hindenburg Report, however, Clover Assistant was engineered to elevate patients' "risk levels" so that Clover could collect higher premiums and reap outsized profits.

Defendants had a powerful motive to close the Business Combination "come hell or high water." If the merger successfully closed, Palihapitiya stood to realize *$220 million* from a *$25,000* investment. In addition, Garipalli, Toy, and Wagner could cash in shares worth *hundreds of millions* of dollars—or over a *billion* dollars in Garipalli's case—if the merger closed and Clover's share price held until they could legally sell their shares.

To convince investors to approve the merger or invest in Clover, Defendants needed to assuage concerns and validate to investors that Clover could "disrupt" MA. Medicare is strictly regulated by federal laws, including the Anti-Kickback Statute ("AKS") and False Claims Act ("FCA"), and CMS regulations ("MCM Regulations"). These laws prohibit, *inter alia*, giving items of value, like gift cards, to HCPs or staff for referrals. Violators of the AKS, FCA, or MCM Regulations can be barred from offering MA plans or receiving premiums. This was an existential risk for Clover because *over 98%* of its revenues were from MA premiums, and both Garipalli and Clover had a history of regulatory violations. In fact, CMS previously had fined Clover improper marketing practices and ignoring CMS warnings.

Recognizing investors' concerns about these risks, Defendants categorically stated that "there are *no* pending or, to the knowledge of the Company, threatened . . . [material] investigations" into Clover and that "since January 1, 2018," Clover "has met and complied with, *all applicable Laws*." These and other similar assurances were false and misleading. Unbeknownst to investors, the DOJ was (and still is) investigating improper marketing

---

[2] Former employees who spoke to Plaintiffs are referred to herein and the in FAC as confidential witnesses or "CWs." CWs are assigned feminine pronouns to preserve their anonymity.

practices at Clover, including payments and gift cards for HCP staff (the "DOJ Investigation"). CWs and the Hindenburg Report also confirmed extensive misconduct at Clover. CW3, for example, related that Clover Chief Development Officer ("CDO"), Ethan Lipkind ("Lipkind"), ordered gift cards distributed to HCP staff. Clover's compliance group investigated these gifts, but Defendants *promoted* Lipkind, eventually *fired* CW3's supervisor, who alerted compliance as to the violations, and never warned Clover employees against gift card use.

Defendants also repeatedly attributed Clover's growth to its MA "plan design" and Clover Assistant. Multiple CWs and the Hindenburg Report, however, explained that Clover's growth was generated by the above illegal marketing practices and transactions with insurance brokers owned by Clover's head of sales, Hiram Bermudez ("Bermudez"). In fact, the Hindenburg Report estimated that *68%* of Clover's members came from those brokers. Not only did Defendants misattribute Clover's growth, but they violated Generally Accepted Accounting Principles ("GAAP") by never disclosing these related-party transactions.

Clover's investment thesis also depended on HCPs using Clover Assistant at the "point of care." In fact, Garipalli touted that "what we believe is truly our differentiation [is that we] provide actionable data to physicians at the point of care to assist them *while they are seeing Clover members*." Defendants thus emphasized that "onboarded physicians are highly engaged, using the Clover Assistant for *92% of their member visits in 2019*." CW2, however, explained that Defendants knew this statement was false because the Company's data showed that at least *50%* of HCPs were not using Clover Assistant during patient visits.

Defendants' drive to reap windfall profits at investors' expense was stopped *just* short of the goal line. On February 4, 2021, after the merger had closed, and as Garipalli, Toy, and Wagner prepared to sell shares, the Hindenburg Report disclosed, among other things, the DOJ

Investigation, Clover's use of gift cards, undisclosed related-party transactions, and use of Clover Assistant by a small minority of HPCs. Clover's stock price plummeted.

Desperate to stanch the bleeding, Defendants responded to the Hindenburg Report the next morning in an article *that confirmed the bulk of the report* (the "Response Article"). For example, Defendants admitted they knew of the DOJ Investigation and that they *intentionally did not disclose it*. Defendants also denied illicit payments to doctors and nurses, but, tellingly, did not deny gift cards or payments to *staff*. Defendants confirmed that at least 14% of Clover's members came from one Bermudez broker but insisted that Bermudez had not received any compensation for those members. This denial was false, however, as weeks later Defendants admitted that Bermudez had pocketed approximately $500,000 for those members. Defendants even confirmed that only 22% of Clover's primary care physicians ("PCPs") (and only 4% of all Clover physicians) could use Clover Assistant *at all*, let alone in patient visits. In the wake of the Hindenburg Report, the SEC has opened an investigation into Clover. ¶333.

Defendants primarily ask the Court to dismiss the FAC because (i) the CWs and the Hindenburg Report cannot be credited; (ii) the DOJ Investigation was not material; (iii) Clover did nothing illegal; (iv) Bermudez's brokers did not drive Clover's growth and the transactions were not material; (v) statements about Clover Assistant use were regarding use in October 2020 and were literally true; and (vi) Defendants lacked scienter. These arguments fail.

*First*, the FAC alleges a basis for the CWs' knowledge and facts corroborating the Hindenburg Report, including Defendants' own admissions, thus their allegations must be accepted as true. *Second*, the DOJ Investigation was material because it threatened 98% of Clover's revenues and the Company previously had been fined for misconduct. *Third*, CWs detail multiple illegal acts by Clover. *Fourth*, the FAC alleges that up to 68% of Clover's

4

"members" are the result of Bermudez's brokers, and even Defendants admit that a material amount—at least 14%—of members came from those brokers. *Fifth*, Defendants' statements about Clover Assistant referred *to 2019*, and literally true statements are false and misleading when, as here, they are misleading. *Sixth*, Defendants' scienter can be inferred from their intentional failure to disclose the investigation and the FAC's copious allegations, including CW accounts of how Defendants knew or recklessly disregarded material, non-disclosed facts that contradicted their public statements; the core operations doctrine; and Defendants' motive to reap hundreds of millions in profits at investors' expense. The Motion should be denied.

## II. STATEMENT OF FACTS

### A. Clover is an insurance provider that depends overwhelmingly on MA premiums.

Founded in 2013 by Garipalli, Clover is a provider of Medicare Advantage ("MA") health insurance plans. ¶56.[3] MA is the private-plan alternative to traditional Medicare. ¶50. While traditional Medicare operates a "pay for service" model, CMS pays MA plan providers (like Clover) a per-member-per-month flat rate for each "member" Clover insures. ¶52. Clover profits if it pays less in claims than it receives from CMS, but if Clover pays more, it absorbs the loss. *See id.* Sicker or riskier patients cost more to insure, so CMS pegs payments to a patient's "risk assessment score." *Id.* The higher the score, the higher the CMS premium. ¶52.

According to SEC filings in connection with the Business Combination (the "Merger Filings"),[4] 98.6% of Clover's 2018 revenues and 98.8% of its 2019 revenues were from MA

---

[3] Unless otherwise noted, "¶" to paragraphs of the FAC.

[4] The "Merger Filings" are Clover's (1) 10/20/2020 S-4 registration statement ("S-4"); (2) 11/20/2020 S-4/A ("First Amended S-4"); (3) 12/9/2020 S-4/A ("Second Amended S-4"); (4) 12/10/2020 S-4/A ("Third Amended S-4"); (5) 12/14/2020 prospectus ("December 14 Prospectus"); (6) 12/14/2020 proxy statement ("Proxy Statement"); and (7) 1/13/2021 S-1 and January 29, 2021 prospectus ("Shelf Registration"). ¶36.

premiums, a trend the Company expected to continue. ¶¶58–59. In addition, Over 97% of Clover's members are in New Jersey. ¶154. To offer MA plans, Clover must comply with the AKS which forbids offering or making any payment, directly or indirectly, for the referral of a patient. ¶¶91–95. AKS violations are also *per se* violations of the FCA. ¶¶96–99. Clover must also follow MCM Regulations, which prohibit payments to HCPs or their staff for marketing plans. ¶106. Violators can be barred from receiving premiums. ¶93.

**B. Defendants claimed Clover Assistant could "disrupt" the MA market.**

Throughout its existence, Clover has served a miniscule share of the MA market. ¶60. Nevertheless, Defendants claimed that Clover's proprietary software, "Clover Assistant," could "disrupt" the MA market and enable the Company to reap massive profits. ¶¶60–62. Clover Assistant purportedly aggregates "millions" of relevant health data points—including claims, medical charts, and diagnostics—and uses "machine learning" to synthesize that data with data entered by physicians *during patient visits*. ¶66. Using that data, Clover Assistant purportedly provides physicians with suggestions that lower costs and improve care. *Id.* In reality, Clover Assistant is designed to generate "upward risk adjustments" so that Clover can receive bigger MA premiums. ¶¶67, 69, 70–76. Since premiums for higher levels can be much larger, Clover pays HCPs *$200 per visit* to use the software, or *twice* the average MA reimbursement. ¶69.

For Clover Assistant to work properly, HCPs had to use it during patient visits. ¶¶187–92. According to Clover, using data entered by physicians during the patient visit, Clover Assistant returns "real-time, data-rich insights [that] *inform physicians' decision-making at the moment that they are interacting with and treating their patients*." ¶187. In was also essential that HCPs, not staff, use the tool because it created MA premium adjustments. ¶¶210. Accordingly, Clover made using the software during patient visits a contract term (¶212) and tracked entry times to determine if the tool was not being used during patient visits. ¶¶205–06.

6

### C. Defendants opt to take Clover public through a "SPAC" merger.

On the morning of October 6, 2020, Social Capital Hedosophia Holdings Corp. III ("SCH") a publicly traded special purpose acquisition company ("SPAC") formed by Palihapitiya, announced that it was taking Legacy Clover[5] public via a merger. ¶113–15. Although merging with SCH meant Legacy Clover could go public without an IPO, Defendants took pains to emphasize the extent of the parties' due diligence. ¶111, 119–20. During a CNBC interview the day of the merger announcement, Palihapitiya touted that he and SCH "found this company, and this is why we are really excited after *months of diligence and work* to announce" the Business Combination. ¶¶119–20. Later that day, on an investor call, Palihapitiya again touted his diligence, stating "what I have seen through the diligence is that this is the first technology company who is having a meaningful impact in disrupting healthcare." ¶250. The Merger Filings also touted this diligence, including meetings from "August 25, 2020, to August 28, 2020" to discuss regulatory and compliance matters and access to a virtual data room. ¶122.

### D. The DOJ was investigating Clover for legal and regulatory investigations.

Although during the Class Period Defendants consistently assured investors that Clover had complied with all its legal obligations since January 1, 2018, and that they were not aware of any material government investigations, Defendants knew that the Department of Justice for the Eastern District of Pennsylvania (the "DOJ") was investigating illegal conduct at Clover (the "DOJ Investigation"). ¶¶139–43. In fact, that investigation remains ongoing. ¶145.

In addition, CW3, Clover's former Provider Engagement Manager, and CW4, who worked in Clover's Network Expansion and Growth department, described widespread illegal

---

[5] Although Clover was formally a different company prior to the Business Combination (*i.e.*, "Legacy Clover"), references herein (and in the FAC) to "Clover" are to both "Legacy Clover" and the surviving entity post-Business Combination. unless otherwise indicated.

practices at Clover. ¶¶129–34. CW3 stated that on multiple occasions beginning in 2018, CDO Lipkind, who reported directly to Garipalli, instructed her to buy $250 worth of gift cards and deliver them to office staff at an HCP and to make sure the office knew the gift cards were from Clover. ¶129. When CW3 resisted, Lipkind threatened to fire her, so she bought and delivered them. *Id.* Lipkind also instructed CW3 to deliver gift cards to staff at a different HCP, but CW3 alerted her supervisor, Zoe Farrell, who instructed her not to deliver the cards. ¶130.

This use of gift cards was not limited to CW3. CW3 described how her peer in Texas, Olivia Istrate, was instructed by Lipkind to deliver gift cards to HCPs and staff. ¶132. CW4 corroborated the use of gift cards, stating that she learned while working in the Network Expansion and Growth department that Lipkind was having gift cards given to HCP staff. ¶133. According to CW3, Farrell complained to Clover's compliance department about Lipkind, and CW3 was interviewed in the ensuing investigation. ¶131. Defendants never disclosed the investigation's results internally, or even warned employees not to give cards to HCP staff. ¶134. Instead, Defendants *promoted* Lipkind, signaling that they approved of the misconduct, and fired Farrell in 2019, prompting a wrongful termination lawsuit. *Id.* The Hindenburg Report also corroborated Clover's use of gift cards and quoted a former employee as saying Clover distributed gift cards—because they were untraceable—"all over the freaking map" to spur referrals. ¶135. The report also stated Clover paid HCP staff to be "Clover Ambassadors" and recruit members. ¶136.

These gifts and payments were prohibited by the AKS, FCA, and MCM Guidelines. By early 2019, the DOJ had opened an investigation into Clover. ¶139. The DOJ contacted CW3 in approximately October 2020 as part of its investigation and told her that the investigation had been underway for "months," that Clover had been notified of the investigation "right away,"

and that she was not the first Clover employee interviewed. *Id.* CW3 disclosed Lipkind's use of gift cards to the DOJ. ¶140. The Hindenburg Report corroborated CW3's account of the DOJ Investigation and included a copy of a civil investigative demand ("Demand") served on a former Clover employee in late October 2020, *i.e.*, *before* CW3 spoke to the DOJ, in connection with that investigation. ¶141. The Demand focused on Clover's gifts or payments to HCPs or staff and sought testimony on, among other things, payments, gift cards, and Clover Ambassadors. ¶143.

The DOJ Investigation and the underlying violations presented an existential risk to Clover because it derived "substantially all" revenues from MA premiums, and penalties for AKS or FCA violations included being barred from receiving premiums. ¶¶92–93. In addition, the investigation was important because Clover and Garipalli have a history of regulatory violations. ¶¶33–35, 107–09. Nevertheless, Defendants failed to disclose the DOJ Investigation and disclaimed its existence.

### E. Defendants' unlawful conduct and undisclosed related-party transactions with Clover's Head of Sales drove the Company's much-touted growth.

On the first day of the Class Period, October 6, 2020, Palihapitiya tweeted to his million-plus Twitter followers that "Clover Health's *proposition of better outcomes and lower costs* has resulted in strong initial growth." ¶246. Later that day, on an investor call, Palihapitiya reiterated that, "Clover Assistant and Clover *deliver[] better outcomes at a lower cost*, grabbing share from incumbents, predictably growing by 25% to 30% compounding." ¶250. The Merger Filings also attributed the Company's growth to its MA plans, stating that "[a]s a result of our 'Obvious' plans, we have achieved significant organic membership growth. Our membership has expanded from 30,677 as of January 1, 2018, to 57,503 as of September 30, 2020." ¶152; *see also* ¶¶245–73.

As described above, however, Defendants use of illicit payments, gift cards, and Clover Ambassadors drove this growth. ¶¶130–44. In addition, a material contributor to this growth were extensive undisclosed related party transactions with brokers owned by Clover's Head of Sales, Bermudez. ¶¶154–81. According to CW2, Clover's former Senior Manager of Partnerships and Development, and CW3, Bermudez was one of the very first employees at Clover and was "well-connected" with insurance brokers in New Jersey. ¶¶156–57. CW2 described Bermudez as "an old-school union boss" (¶156) and CW3 stated that she learned in training at Clover and from Bermundez directly that he owned multiple brokers in New Jersey and Pennsylvania and had a "strong hold" on the insurance market across the Northeast (¶157). CW3 saw first-hand that Bermudez was still active with his brokers, including B&H Assurance ("B&H"). CW3 saw Bermudez manage B&H remotely while working for Clover. ¶159. CW3 said that a majority of Clover's business in New Jersey came from B&H or one of Bermudez's many organizations. ¶160. Clover had also Bermudez use his connections to develop markets outside of New Jersey. *Id.*

The Hindenburg Report also cited multiple employees who confirmed Bermudez's role in growing Clover. ¶162. One former employee estimated that Bermudez was responsible for approximately *68% of Clover's total sales*. A former employee also said Bermudez was recruited to Clover *specifically to use his brokerage business to grow Clover's sales*. ¶164.

**F. The Merger Filings were not prepared in accordance with GAAP.**

Defendants not only misled investors about Clover's growth by concealing these related-party transactions with Bermudez, but they also violated GAAP. ¶¶175–80. Under GAAP, a company must disclose "[i]nformation about transactions with related parties," including companies owned and operated by members of management, "that would make a difference in decision making shall be disclosed so that users of the financial statements can evaluate their

10

significance." ¶¶177–78, 82. Although the Merger Filings stated that Clover's "consolidated financial statements are prepared in accordance with GAAP," and purported to disclose other related party agreements, they *never* disclosed related party transactions with Bermudez. ¶302–05.

### G. Physicians were not using Clover Assistant during patient visits.

The core of Clover's investor thesis was that HCPs reacted during patient visits to Clover Assistant treatment recommendations based on patient data. ¶¶187–90. For example, at a November 20, 2020, Analyst Day, Garipalli said, "what we believe is truly our differentiation [is that we] provide actionable data to HCPs at the point of care to assist them *while they are seeing Clover members*." ¶189. Two months later, at a January 2021 healthcare conference, Garipalli called HCP use of Clover Assistant "*the most important part*" of Clover. ¶297.

After ensuring investors understood use of Clover Assistant during patient visits was the Company's core investor thesis, Defendants emphasized that HCPs who used Clover Assistant used the tool in the vast majority of those visits. In the Merger Filings, during investors calls, and at conferences, Defendants touted that "onboarded physicians are highly engaged, using the Clover Assistant for *92% of their member visits in 2019*." ¶¶279, 281, 293, 295, 299. In addition, on investor calls, in presentations, and at conferences, Defendants claimed that over 2,000 PCPs had "signed up" or "contracted" to use Clover Assistant, and that the Company's "engagement rate" was 90%. ¶¶275, 289, 299.

Unbeknownst to investors, however, only 22% of the Clover's in-network PCPs, or only 4% of the Company's total in-network physicians, had contracted and been "onboarded" to use Clover Assistant. ¶217. Moreover, in 2019, nowhere close to 92% of patient visits were conducted by an "onboarded" PCP using the software. ¶193. CW1 was a Clover Clinical Data Operations Specialist from June 2018 to July 2019 responsible for gathering clinical data from

HCPs to be loaded into Clover Assistant. ¶44. CW1 observed, based on the "thousands of calls" a year her team made to HCPs, that "*less than 10%*" of "onboarded" doctors were using Clover Assistant, and of those 10%, "not many of those were actively using it." ¶198.

CW3 also saw first-hand that HCPs did not use the software during patient visits. CW3 regularly visited HCPs in Georgia, North Carolina, and South Carolina, spoke with staff about the tool it, and learned that staff were *the only HCP employees trained to use Clover Assistant*. ¶¶212–13. CW3 also saw that HCPs in New Jersey did not use Clover Assistant because Clover had her "ride along" with colleagues visiting New Jersey HCPs. ¶214. CW3 said that her peer in Texas, Istrate, told her that Texas HCPs had staff enter patient information into Clover Assistant. *Id.* CW3 notified Clover's leadership of this via email and in meetings, and she also emailed Clover's Compliance department, which never responded. ¶¶214–16.

CW2 said that Clover data showed that in 2019 *half of the PCPs* who used Clover Assistant *did not use it during patient visits*. ¶¶205–07. Instead, HCPs had assistants update the tool long after appointments or copy entries from HCPs records. ¶¶206, 214. The data was based on a "timestamp" in Clover Assistant and was stored in Clover's data warehouse. ¶206.

CW2 learned of the data from both Clover's Vice President of Development and Clover's CMO, who told her about the data in the first or second quarter of 2019 and knew about the data because the CMO was making roadshow presentations of Clover Assistant. ¶205. This failure to use the software properly was so problematic, CW2 said, that Clover explored changing its reimbursement methodology. ¶209. CW2 said Garipalli and Toy knew of the data because they could access "dashboards" that displayed it. ¶¶206–09. CW3 corroborated CW2's account and said that the data would have come from a "standard reporting table" generated using a system called Mode. ¶207.

12

**H. Defendants hoped to capitalize on their fraud by selling massive amounts of shares after the Business Combination closed.**

In reliance on Defendants' misrepresentations about Clover, SCH's shareholders approved the Business Combination on January 6, 2021, and the merger closed the next day. ¶220. Clover's shares skyrocketed. ¶223. Although Defendants could not trade their shares immediately, Garipalli, Toy, and Wagner promptly registered over 85 million shares so that they could liquidate them as soon as they were able. ¶225. Their registration repeated the bulk of the misrepresentations included in the other Merger Filings. ¶226.

**I. The truth emerged when the Hindenburg Report was published.**

Before Defendants could sell their shares, however, the Hindenburg Report was published on February 4, 2021. ¶320. The report disclosed the DOJ Investigation, Clover's payments and gift cards for HCPs and their staff, the use of staff as Clover Ambassadors, the Company's related-party transactions with brokers owned by Bermudez, and that very few HCPs used Clover Assistant. ¶¶323–27. Clover's stock price plummeted $1.72 per share, or 12.33%, on unusually high volume, a decline of *$700 million* in market capitalization. ¶331.

Defendants commenced damage control and published a response to the Hindenburg Report from Garipalli and Toy, which Palihapitiya endorsed in a tweet, the following morning on the website Medium.com (the "Response Article"), which *confirmed the bulk of the report*. ¶332–34. For example, the article confirmed that Defendants had intentionally not disclosed the DOJ Investigation prior to the Business Combination even though the investigation and underlying issues had "received extensive focus and attention" from Defendants during the pre-combination diligence process. ¶¶145, 333. The article also carefully stated that "Clover does not provide gift cards to doctors and nurses to generate patient leads," but tellingly did not deny providing gift cards or payments to staff. ¶145. The article went on to confirm that

13

Bermudez owned B&H—but insisted that he was not compensated for Clover members—and disclosed that B&H was responsible for 8,200, or 14% of Clover's *current* members. ¶335. The response did not, however, deny Bermudez owned other insurance brokers doing business with Clover. *See* ¶335. Finally, the article confirmed that only 22% of in-network PCPs and 4% of total in-network physicians could use Clover Assistant, let alone use it in patient visits. ¶336.

Two months later, on March 29, 2021, Defendants acknowledged in an 8-K that, contrary to the Response Article, Bermudez had received *at least $500,000* in undisclosed payments from Clover through B&H. ¶338. While the 8-K stated that Bermudez "has agreed to divest himself from all interests in B&H," it said nothing about his other brokers. ¶338. Defendants have never publicly disclosed when (or if) Bermudez divested himself from B&H. ¶339. In addition, Defendants' annual SEC filings now disclose the DOJ Investigation. ¶146.

### III.    ARGUMENT

#### A.  LEGAL STANDARD

To state a claim, a request for relief need only be "plausible," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007),[6] *i.e.*, "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). In assessing the FAC's sufficiency, the Court must "construe the complaint in the light most favorable to the plaintiff" and "accept all well-pleaded factual allegations as true." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 467 (6th Cir. 2011).

Under Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), plaintiffs also must plead falsity with particularity, "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." 15 U.S.C. §78u-

---

[6] In case citations, internal quotes and citations are omitted and emphasis added unless indicated otherwise.

4(b)(1)(B). The PSLRA also requires that plaintiffs "state with particularity facts giving rise to a strong inference that defendants acted with the required state of mind. *Frank v. Dana Corp.*, 646 F.3d 954, 958 (6th Cir. 2011).

The elements of a securities fraud claim are: (1) a material misrepresentation or omission (*i.e.*, "falsity"); (2) made with scienter; (3) in connection with a purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). The Motion asserts that the FAC fails to allege (1), (2), and (6). Since the FAC alleges the "who, what, when, where and how" of Defendants' misrepresentations and scienter, and the cause of Plaintiffs' losses, *see In re Cardinal Health, Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 742 (S.D. Ohio 2006), the Motion should be denied.

## B. THE FAC'S ALLEGATIONS ARE WELL-PLEADED

### 1. The CWs statements should be credited.

The FAC's allegations from CWs should be accepted as true because the FAC "plead[s] facts with sufficient particularity to support the probability that a person in the [CW's] position would possess the information alleged." *See Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1037 (6th Cir. 2016). Facts establishing a CW's knowledge can include duration of employment, period in which they acquired information, and how each CW had access to information. *See Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 704 (E.D. Mich. 2010). Courts also consider job descriptions, detail of the information, and whether corroboration. *In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 993 (S.D. Ohio 2008).

The FAC alleges each CW's period of employment, job location, supervisors, and responsibilities. ¶¶44–47. In addition, the FAC details how each CW came to possess the information described—usually first-hand while performing their job responsibilities. *See Halford v. AtriCure, Inc.*, 2010 WL 8973625, at *6–7 (S.D. Ohio Mar. 29, 2010) (crediting

15

allegations from first-hand knowledge acquired in course of employment). For example, CW3 described how Lipkind instructed her to provide gift cards to HCP staff. ¶¶128–34. Similarly, CW3 described how she learned as a Provider Engagement Manager and through interactions with Bermudez how his brokers drove Clover's growth. ¶¶157–60, 181. Further, CW1 learned that *less than 10% of onboarded doctors* were using Clover Assistant in 2019, and only a fraction of those actively used it, because she called HCPs to request the data that they were supposed to enter in the tool during patient visits. ¶198.

The FAC also alleges that the CWs' statements were mutually corroborative and corroborated by the Hindenburg Report, and Defendants' admissions. *E.g., Emps' Ret. Sys. of Government of the Virgin Islands v. Blanford*, 794 F.3d 297 (2d Cir. 2015) (crediting CW allegations corroborated by other witnesses' accounts and a short-seller report). For example, CW3's account of being ordered to bribe staff at HCP offices was corroborated by CW4, who said that she learned of Lipkind's scheme while working in Clover's Network Expansion and Growth department. ¶133. It was also corroborated by the Hindenburg Report, which quoted a former employee that Clover distributed gift cards "all over the freaking map" (¶135), and the Demand, which sought testimony regarding "distribution of gift cards" (¶143). Defendants all but admitted using gift cards when they only denied payments to "doctors and nurses." ¶145.

CW3's account of Clover's extensive reliance on transactions with Bermudez's brokers was confirmed by CW2, who compared Bermudez to an "old-school union boss" (¶156), and the Hindenburg Report, in which former employees estimated that Bermudez drove 68% of Clover's total sales and documented Bermudez's ownership of B&H Assurance (¶¶162–67). Defendants confirmed that B&H was responsible for at least 14% of the Clover's members and that the Company had routed over $500,000 to Bermudez through B&H. ¶¶170, 180, 337.

16

CW2 confirmed CW1's account that only a vanishingly small number of HCPs actually used Clover Assistant during office visits because she learned from Clover's Vice President of Development and the Company's Chief Medical Officer that the Company had data showing that half the HCPs using Clover Assistant were not using it during patient visits. ¶209. CW3 corroborated these accounts by relating how she learned from HCPs that they were not using the software during visits and heard from a colleague that HCPs were not using Clover Assistant in visits in Texas, either. ¶212–14. The Hindenburg Report corroborated these statements in interviews with former Clover employees and surveys of HCPs in New Jersey, Texas, and Arizona. ¶¶200–04. Defendants admitted in the Response Article that *only 22% of Clover PCPs* could use Clover Assistant at all, let alone use it during patient visits. ¶217.

Defendants nevertheless assert that the CWs' statements must be "steeply discounted" as a matter of law. *See* Mot. at 12 (citing *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 757 (7th Cir. 2007)). But Defendants appear to conflate "anonymous statements" with "confidential witnesses." The Sixth Circuit held that "[w]hile courts often discount information provided by *anonymous sources*, *see Higginbotham*, 495 F.3d, at 756-57, plaintiffs may rely on *confidential witnesses* if," like the FAC, the allegations are well-pleaded. *See Doshi*, 823 F.3d at 1037, fn. 2. Indeed, Courts of Appeal uniformly hold that it is improper to discount well-pleaded CWs.[7]

Defendants also obfuscate the Sixth Circuit's standard for CWs by asserting that the FAC "must *also* plead facts from the CW to establish that each of the defendants were aware of the misconduct." Mot. at 12–13. (citing *In re EveryWare Glob., Inc. Sec. Litig.* 175 F. Supp. 3d 837, 852 (S.D. Ohio 2016). *EveryWare* only referenced "actual knowledge" in the context of *forward-looking statements*. *See id.* There is no rule in the Sixth Circuit—or anywhere

---

[7] *E.g.*, *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 263 (3d Cir. 2009); *N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 51 (1st Cir. 2008).

else—requiring a CW to demonstrate a defendant's actual knowledge for their allegations to be credited. *See Avaya*, 564 F.3d at 268 (crediting CWs who did not show defendants knew statements were false); *Stein v. U.S. Xpress Enterprises, Inc.*, 2020 WL 3584800, at *40 (E.D. Tenn. June 30, 2020) (crediting CWs who "provide essentially no direct information as to what the Exchange Act Defendants might have known and when").

Defendants also emphasize that the CWs cannot be credited because they did not work at Clover during the Class Period. *See* Mot. at 10–11. But a CW "need not have been at the company for entire, *or indeed any*, of an asserted class period to have probative information" where, as here, their information is "partly corroborated by other sources," "sufficiently detailed," and "plausible."[8] *Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 515 (D. Mass. 2014). Pre-class period information can "confirm what a defendant should have known during the class period, [since] any information that sheds light on whether class period statements were false or materially misleading is relevant." *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 272 (3d Cir. 2005). As set forth above, the CWs should be credited because they are corroborated by the Hindenburg Report and Defendants' own admissions.

Further, the CWs' statements should be credited because Defendants' Class Period misstatements concern conduct at Clover when the CWs worked there. Defendants assured investors that Clover had complied with all applicable laws *since January 1, 2018*. ¶235. Since the CWs describe illegal conduct when they worked at Clover post-January 1, 2018, their statements demonstrate falsity. ¶¶44–47, 128–34. Likewise, Defendants attributed Clover's pre-Class Period growth was attributable to the effectiveness of its plans and technology

---

[8] Courts routinely hold that allegations from CWs prior to a class period demonstrate falsity or scienter. *E.g.*, *United Union Roofers, Waterproofers & Allied Workers Loc. Union No. 8 v. Great Lakes Dredge & Dock Corp.*, 2014 WL 12780549, at *2 (N.D. Ill. Oct. 21, 2014); *In re Urb. Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 649 (E.D. Pa. 2015).

(¶¶262–272). The CWs' statements are relevant because they describe how at this time Clover's business grew from illegal gifts and undisclosed related party transactions. ¶¶44–47, 128–34, 262, 272. Defendants also represented that over 92% of onboarded physicians used Clover Assistant *in 2019*, when the CWs worked at Clover. ¶¶44–47, 196, 279–81, 293–99.

Finally, Defendants ignore substantial portions of the CWs' allegations. For example, Defendants emphasize that CW1 was not a point of contact for HCPs, Mot. at 14, but ignore her *thousands* of interactions with HCP staff. ¶198. Defendants also ignore the copious details of how CW2 learned about data on Clover Assistant, including how Clover's CMO knew about the data, and the data's source, collection, and storage. ¶¶205–06. Defendants also ignore that CW3's knowledge stemmed from her peers, interactions with Bermudez, and "ridealongs" in New Jersey. ¶¶214–16. Finally, since CW4's tenure, department, location, supervisor, and responsibilities are alleged with particularity, her specific title is irrelevant. ¶47.

### 2. The Court Should Credit Allegations Based on the Hindenburg Report.

Courts regularly credit reports by firms like Hindenburg, which are based on interviews with former employees of a defendant and the authors' own investigation. *E.g.*, *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 123–24 (S.D.N.Y. 2013) (short seller reports "do[] not implicate the same skepticism as a 'traditional' anonymous source"); *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012). In fact, multiple courts have credited Hindenburg's reports in securities fraud lawsuits.[9]

---

[9] *E.g.*, *Behrendsen v. Yangtze River Port & Logistics Ltd.*, 2021 WL 2646353, at *15 (E.D.N.Y. June 28, 2021); *Yannes v. SCWorx Corp.*, 2021 WL 2555437, at *2 (S.D.N.Y. June 21, 2021); *In re Eros Int'l PLC Sec. Litig.*, 2021 WL 1560728, at *9 (D.N.J. Apr. 20, 2021); *In re Aphria, Inc. Sec. Litig.*, 2020 WL 5819548, at *3 (S.D.N.Y. Sept. 30, 2020), *reconsideration denied*, 2021 WL 4442818 (S.D.N.Y. Sept. 28, 2021)

19

This Court should credit the Hindenburg Report because, as set forth in Section III.B.1 *supra*, its findings are corroborated by the CWs and Defendants' admissions. *See In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at \*2 (S.D.N.Y. Jan. 27, 2014) (crediting corroborated short seller report); *Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at \*4–5 (S.D.N.Y. Sept. 10, 2012) (same). In addition, the report "showed its work" by detailing its methodology and identifying documentary sources. *Compare* Crosby Decl. Ex. I *with Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1110 (C.D. Cal. 2012) (crediting report where authors disclosed methodology). Notably, Defendants do not dispute the accuracy of *any* documentary evidence. ¶¶141–43, 107–110, 165–68; Crosby Decl. Ex. I at 12, 18, 20–24.

Defendants largely object that the Hindenburg Report does not name the former employees it quotes. *See* Mot. at 13. But courts credit unnamed sources in reports. *See, e.g.*, *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1235–36 (N.D. Ga. 2019). In *Equifax*, for example, Judge Thrash credited allegations from unnamed sources where the "article cites two independent sources, with direct knowledge, who corroborate each other's assertions."[10] *Id.* The Hindenburg Report quotes multiple employees whose statements corroborate each other and are corroborated by CWs. ¶¶79, 135, 141, 162. The Response Article also confirmed much of the report, including the DOJ Investigation, related-party transactions, and limited use of Clover Assistant. ¶¶145, 169, 217. In fact, while Defendants initially denied the report's assertions that Bermudez had received payments through B&H, they had to retract that denial. ¶170. If anything, it is *Defendants'* credibility that is dubious, not Hindenburg's.

---

[10] While *Equifax* is on point, Defendants' case, *Konkol*, is irrelevant as *Konkol* solely concerned allegations from confidential witnesses quoted by the plaintiffs, not unnamed sources in public reports whose accounts are confirmed by other allegations in a complaint. *See* 590 F.3d at 399.

Defendants further assert that the report was not created under the requirements of Rule 11 and Plaintiffs have not verified its claims. *See* Mot. at 13. But Plaintiffs' counsel is subject to Rule 11, which assuages any concerns about sanctions. *See Brown*, 875 F. Supp. 2d at 1113 n.65 (rejecting argument that report cannot be credited because authors not subject to Rule 11). And Plaintiffs retained an investigator who interviewed witnesses, and examined Clover's filings, conference calls and announcements, and reviewing analyst reports.[11] FAC at 1; *Longwei*, 2014 WL 285103, at *3 (crediting report where plaintiffs corroborated findings).

Finally, Defendants' claim that the report "explicitly disclaims the reliability of its contents" is easily rejected. The disclaimer is boilerplate, and courts credit reports with such disclaimers. *Compare* Crosby Decl. at 54 *with Lewy*, 2012 WL 3957916, at *13 (report credible despite disclaimers); *see also In re China Mobile Games & Ent. Grp., Ltd Sec. Litig.*, 2016 WL 922711, at *4 (S.D.N.Y. Mar. 7, 2016) ("[d]efendants do not explain why the report's boilerplate disclaimers would apply to a simple fact"). At bottom, Defendants argue that the report is not true.[12] But "the truth of [short reports] is a factual dispute not appropriate for resolution at this stage." *McIntire*, 927 F. Supp. 2d at 124; *Ho*, 887 F. Supp. 2d at 564.

## C. THE FAC ALLEGES FALSE AND MISLEADING STATEMENTS

### 1. Assurances that Clover was not under investigation were misleading.

Once Defendants chose to state that Clover was not subject to a material investigation by a governmental entity (¶¶233, 237, 241, 243), they were required to "provide complete and

---

[11] Defendants' reliance on *Long Miao* is misplaced. *See* Mot. at 13 (citing *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 809 (S.D.N.Y. 2020). In that case, the court refused to credit a short-seller report where, unlike here, the plaintiffs "neither investigated nor corroborated" allegations.

[12] Defendants also appear to object that the Hindenburg Report contains hearsay. *See* Mot. at 2. But even if this were true, hearsay can defeat a motion to dismiss. *See Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (hearsay can be accepted as true); *City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 2020 WL 4547217, at *5 (S.D.N.Y. Aug. 6, 2020).

non-misleading information with respect to the subjects on which [they] undertake[] to speak.'" *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308 (2007). "Once a company has chosen to speak on an issue—even an issue it had no independent obligation to address—it cannot omit material facts related to that issue so as to make its disclosure misleading" *Jackson Cnty Emps' Ret. Sys. v. Ghosn*, 510 F. Supp. 3d 583, 611 (M.D. Tenn. 2020).

Statements effectively denying a government investigation are misleading if they omit an ongoing material regulatory investigation. *E.g.*, *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 584 (S.D.N.Y. 2016) ("suggesting that the company was not facing an investigation that could have a material impact on its business, [was misleading] when, in fact, it was facing such an investigation"); *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 722 (S.D.N.Y. 2015) ("[e]ven assuming" denials of investigations "were not literally false" statements are actionable for failing to disclose investigation); *In re China Valves Tech. Sec. Lit.*, 979 F.Supp.2d 395, 409 (S.D.N.Y.2013) (failure to disclose investigation material).

Here, Defendants categorically denied the existence of any material investigation. ¶¶233, 237. In addition, while the Merger Filings advised that Clover may be investigated "from time to time," they did not acknowledge—or even suggest—that the Company was *currently* under investigation. ¶¶241, 243; *see Menaldi*, 164 F. Supp. 3d at 574 ("[f]rom time to time, the Company is involved in litigation and claims incidental to the conduct of the Company's business"); *BioScrip*, 95 F. Supp. 3d at 727 ("[f]rom time to time, the Company responds to subpoenas and requests for information from Governmental agencies"). Defendants' misstatements regarding the DOJ Investigation thus are actionable.

Defendants respond that the investigation was not material. Mot. at 16. Materiality, however, should not be resolved on a motion to dismiss. *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 896 (M.D. Tenn. 2005) ("whether the information withheld was material [is a] question[] which must be determined by the trier of fact"). Regardless, the investigation was material since it threatened "substantially all" Clover's revenues, the Company had been previously fined for improper marketing practices, and this was yet another investigation into a Garipalli-owned company. ¶¶33–35, 58, 107–09.

Defendants' materiality arguments also fail on their own terms because an investigation can be material absent charges. *Menaldi*, 164 F. Supp. 3d at 574 ("[t]o date, the details of the Investigation are not public and neither agency has filed suit against Och-Ziff"); *China Valves*, 979 F.Supp.2d at 402 (failure to disclose actionable even though "the FCPA investigation did not result in any financial penalties for China Valves"). And Clover's failure to change any practices is meaningless because Defendants cannot evade liability by not admitting misconduct. *See In re Flowers Foods, Inc. Sec. Litig.*, 2018 WL 1558558, at *20 (M.D. Ga. Mar. 23, 2018) ("[d]efendants cannot escape liability . . . simply by not admitting the fraud").

Defendants next assert that the FAC alleges the investigation "will have some unspecified material impact in the future." Mot. at 16. This is a strawman. The FAC alleges that the investigation, regardless of outcome, needed to be disclosed to make Defendants' denials not misleading. ¶¶230–44.

Defendants also assert that their categorical denials of an investigation in the Business Combination merger agreement are not actionable because the Merger Filings included a disclaimer. Mot. at 17 n. 10. But general cautionary language does not excuse a failure to reveal known material adverse facts. *See In re Nat'l Century Fin. Enterprises, Inc., Investment*

*Litig.*, 541 F.Supp.2d 986, 1005 (S.D. Ohio 2007) ("Courts have long held that general disclaimers of accuracy do not shield sellers who knowingly make false statements."). This is especially true here, where the Merger Filings instructed investors to "read this proxy statement/prospectus, including the Annexes and other documents referred to herein [*i.e.*, the Merger Agreement], *carefully and in their entirety*" (¶232) and confirmed the agreements' representation that Clover was not under investigation (*compare* ¶233 *with* ¶237). In addition, courts have held that investors may rely on statements made in the "representations and warranties section of a private merger agreement directed solely to [a third party]."[13] *See Glazer Capital Mgmt., LP v. Magistri*, 549 F.3d 736 (9th Cir. 2008).

Defendants also assert that one of their denials is a statement of opinion under *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015).[14] The FAC alleges that after CMS fined Clover for improper marketing practices, the DOJ opened a new inquiry into Clover's marketing that identified improper conduct that the Company knew had occurred and which threatened "substantially all" of Clover's revenues. ¶¶58–59. This alleges that Defendants did not genuinely believe their "opinion." *BioScrip*, 95 F. Supp. 3d at 729–30 ("BioScrip could not have believed the veracity of its legal compliance

---

[13] Defendants' case, *Jaroslawicz v. M&T Bank Corp.*, 2017 WL 1197716, at *5 (D. Del. Mar. 30, 2017), is distinguishable. There, the disclaimer stated that the representations "were made solely for the benefit of the parties to the merger agreement" and there is no similar representation in the Merger Filings. *Id.* at *5. In addition, *Jaroslawicz* found statements in a proxy misleading because, as here, they falsely assured investors regarding legal compliance. *Id.* at *5–6.

[14] Defendants also contend that references to "legal proceedings" are inactionable because a government investigation is not a legal proceeding. Mot. at 18. But Defendants specifically referenced investigations in the merger agreement and Merger Filings. ¶¶233, 243. In addition, neither *In re Lions Gate* nor *Richman v. Goldman Sachs* held that *all* references to "legal proceedings" are not references to investigations. *See* Mot. at 18. Those cases only considered duties to disclose "legal proceedings" pursuant to Item 103 of Regulation S-K. *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 19 (S.D.N.Y. 2016); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 272 (S.D.N.Y. 2012). The FAC does not allege violations of Item 103.

statements"). These facts also "conflict with what a reasonable investor would have taken from [Defendants'] statement." *Id.* at 730; *Menaldi*, 164 F. Supp. 3d at 584.

Defendants also argue that their statements that Clover responded to government inquiries "from time to time" were literally true. Mot. at 18–20. This argument was squarely rejected in *Menaldi* and *Bioscrip*. *Menaldi*, 164 F. Supp. 3d at 574; *BioScrip*, 95 F. Supp. 3d at 727. In addition, Defendant's authorities are inapposite. The allegedly misleading statement in *Lubbers v. Flagstar Bancorp. Inc.*, 162 F. Supp. 3d 571, 578 (E.D. Mich. 2016), confirmed the existence and subject matter of "ongoing investigations." This is precisely what Defendants did not do. In fact, the "from time to time" statements at issue here *expressly disclosed CMS audits* but omitted the investigation ¶243. If Defendants had disclosed the investigation as they did audits, this case would be more akin to *Lubbers*. *Benzon v. Morgan Stanley Distributors, Inc.*, 420 F.3d 598, 612 (6th Cir. 2005), did not concern an investigation threating a company's existence, and that court focused on how clients could access the omitted information if they so desired. *Id.* Here, investors had no choice but to rely on Defendants' misleading assurances.

Finally, Defendants' statements regarding market development (¶239) gave investors the misleading impression that Defendants had an unobstructed path to expanding into new markets when the DOJ was investigating Defendants' illegal expansion tactics. ¶¶128–35 *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1012 (N.D. Cal. 2020) (omissions actionable where "affirmatively create an impression of a state of affairs that differs in a material way from the one that actually exists"). In addition, even if construed as forward-looking, these statements are misleading because Defendants' cautionary language point to did not reference an existing DOJ investigation, *Helwig*, 251 F.3d at 558–59, and Defendants emphasized that they had actual knowledge of the investigation and its subject matter (¶145).

25

### 2. Defendants' touts of Clover's legal compliance are actionable.

It is well-established that assurances that a company complies with all applicable laws are misleading if the Company has been violating those laws. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 480–81 (6th Cir. 2014) (statements of material compliance actionable where the company had evidence showing material violations); *Burges v. BancorpSouth, Inc.*, 2015 WL 4198795, at *5 (M.D. Tenn. July 10, 2015) (same). To state a claim, plaintiffs must plead the contents of the law and the violative conduct, not a finding of wrongdoing, admission, or conviction. *Emps Ret. Sys. of City of St. Louis v. Jones*, 2021 WL 1890490, at *10 (S.D. Ohio May 11, 2021) (plaintiff need only allege the basic underlying elements of a violation to plead unlawful conduct). The FAC alleges Defendants repeatedly touted Clover's compliance with all applicable laws knowing that they had a practice of providing gift cards to staff, making payments to HCPs and staff, and using staff as "Clover Ambassadors." ¶¶128–36. These actions violated the AKS, FCA, and CMS regulations, which prohibit such activity. Defendants' statements are thus actionable.

Defendants object that Plaintiffs' claims fail because they "rest entirely on the Hindenburg Report." Mot. at 23. As set forth above, the Hindenburg Report should be credited. Section III.B.2 *supra*. In addition, the FAC cites a first-hand account from CW3 of how CDO Lipkind instructed her to deliver gift cards to HCP staff. ¶¶128–32. CW3 also stated that her peer in Texas was also required to distribute gift cards (¶132), CW4 corroborated these allegations (¶133), and CW3 detailed an internal investigation after which Lipkind was promoted and CW3's supervisor, who initiated the investigation, was fired. ¶134. The Hindenburg Report quoted employees describing payments to HCPs and staff and the use of "Clover Ambassadors." ¶135. Defendants' carefully worded response to the Hindenburg Article did not deny gift cards or payments to staff or "Clover Ambassadors." ¶145.

26

Defendants next argue that these allegations only describe a single instance of improper conduct. Mot. at 23. But as set forth above, the FAC alleges multiple instances of the use of gift cards (¶¶128–36) that came from Clover's global CDO, who reported to Garipalli, the CEO, not from some local middle manager. ¶128. In addition, Plaintiffs are not required to survey all of a company's employees or allege the day, date, and amount of bribe to establish illegal conduct. *In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at \*5 (D.N.J. Dec. 6, 2018) ("It seems Defendants would only find these statements "particular" if all the alleged bad actors stepped forward and provided statements concerning the specific date, location, and product that was improperly sold to a specific customer. That is not required"); *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 197 (S.D.N.Y. 2010). And the Supreme Court has held that *one* adverse event can be material. *Matrixx*, 563 U.S. at 44 ("statistically significant" adverse events are not required).

Defendants also claim the FAC fails to allege violations of the AKS and FCA. Mot. at 23–24. But CW3 was forced to provide gift cards after Lipkind threatened to fire her when she cautioned that the cards were illegal. ¶129. It is difficult to imagine a more "knowing" and "willful" violation. The FAC further alleges that such acts were widespread at Clover. ¶¶128–36. Since AKS violations are *per se* FCA violations, an FCA violation is alleged as well. ¶98. Defendants argue the FAC fails to allege AKS violations by not identifying a specific patient in exchange for gift cards, but "the AKS does not require actual inducement."[15] *U.S. ex rel. Parikh v. Citizens Med. Ctr.*, 977 F. Supp. 2d 654, 664 (S.D. Tex. 2013).

---

[15] Defendants cite *U.S. ex rel. Nunnally v. W. Calcasieu Cameron Hosp.*, 519 Fed. Appx. 890 (5th Cir. 2013) for an "actual inducement" requirement, but that decision is not precedential, multiple Fifth Circuit courts have refused to follow it, and one observed that requiring actual inducement "turns out to be at odds with *Nunnally* itself." *Parikh*, 977 F. Supp. 2d at 665.

27

Defendants next assert that the FAC does not allege a violation of the MCM Guidelines because it does not allege that gifts cards or other compensation were given to potential enrollees. Mot. at 25–26. But Defendants overlook that the FAC alleges that Clover violated Guideline 60.2, which prohibits Clover from allowing an *HCP* to "[a]ccept compensation from [Clover] for any marketing or enrollment activities." ¶106.

Defendants further assert that their false compliance statements were inactionable opinions. But Defendants' *categorical* assertion of compliance since January 1, 2018, is not an opinion. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020). In addition, the Sixth Circuit has held that simply "appending 'we believe' to the beginning of the sentence and recognizing that the government might have a different view" does not insulate a company from. *Omnicare*, 769 F.3d at 479. Finally, even if the Court construes these statements as opinions—which it should *not*—they are actionable because the FAC alleges Defendants did not believe them and omitted facts going to their basis. Section III.C.1 *supra*.

Finally, while Defendants claim the violations are not material, materiality should not be resolved on a motion to dismiss. *Direct Gen.*, 398 F. Supp. 2d at 896. In any event, the violations were material because they threatened "substantially all" of Clover's revenues and implicated improper marketing practices when Clover had been previously fined for improper marketing and for ignoring CMS directives.[16] ¶¶58, 107–09.

### 3. Defendants' misstatements concerning Clover's Growth are actionable.

Defendants repeatedly asserted that Clover's growth was the result of its plan quality (¶¶252, 262, 270, 272), superior technology, *i.e.*, Clover Assistant (¶¶248, 254, 258, 260, 264,

---

[16] Defendants' cases are inapposite because they do not concern federal violations by a repeat offender that present an existential threat to its business. *In re AT&T/ DirecTV Now Sec. Litig.*, 2020 WL 4909718, at *527 (S.D.N.Y. Aug. 18, 2020) (sales fraud); *City of Roseville Emps.' Ret. Sys. v. Sterling Fin. Corp.*, 963 F. Supp. 2d 1092, 1127 (E.D. Wash. 2013) (improper loan).

266), and ability to provide better outcomes at lower costs (¶¶246, 250, 256). These statements were misleading because they omitted that the Company's growth was driven by illegal conduct and undisclosed related-party transactions. ¶¶245–73.

Defendants acknowledge the FAC alleges these statements are misleading for failing to disclose that Clover's growth was fueled by illegal conduct (Mot. at 10), but the Motion does not address these claims. *See* Mot. at 22–28; 4, 28–30. The Court thus should sustain the claims and disregard any arguments for dismissal in Defendants' reply. *See Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *4 (M.D. Tenn. Apr. 8, 2021) ("Defendants did not specifically challenge Plaintiffs' claims of scheme liability" thus the court "will not address Defendants' belated arguments related thereto, which are deemed waived").

These statements are also misleading for failing to disclose that related-party transactions drove Clover's growth. Statements regarding drivers of growth are materially misleading if they failed to disclose an illicit significant contributor to that growth. *See In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *10 (M.D. Tenn. Nov. 19, 2019) (omitting "that out-of-network billing was a significant factor contributing to . . . growth"); *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28, 2018) ("attributing EpiPen's strength to 'favorable pricing and volume'" misleading).

The FAC alleges that undisclosed related-party transactions with insurance brokers owned by Bermudez drove Clover's growth because (i) Bermudez was hired as one of Clover's first employees specifically so that Clover could exploit Bermudez's insurance brokers (¶¶156–57, 164) (ii) Bermudez owned multiple brokers and had "strong hold" on the insurance market across the Northeast (¶157) (iii) 97.6% of Clover's members are in New Jersey, where Bermudez operates (¶154–56), (iv) up to 68% of Clover's members came from Bermudez's

brokers (¶¶160–62), (v) Bermudez managed his independent brokers while at Clover (¶¶158–59), and (vi) Defendants admit that Bermudez's broker B&H was responsible for 14% of Clover's members (¶169) and that Bermudez received at least $500,000 through B&H (¶170).

Investors inferred from Defendants' statements that Clover's growth came from their plans and technology, not that Clover had bought customers from an "old school union boss," thus those statements are actionable.[17] *See Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 2016 WL 4098584, at *12 (M.D. Tenn. June 16, 2016), *rev'd on other grounds*, 877 F.3d 687 (6th Cir. 2017) (defendants misleadingly "attributed their growth success to ED initiatives, but did so without disclosing a potential serious flaw with the very reason for that success").

Defendants assert that the FAC does not connect Clover's growth to "Bermudez having an interest in B&H." Mot. at 28. But Defendants admit that 14% of Clover's members came from B&H and that Bermudez Clover paid B&H $1.36 million for them (of which at least $500,000 went to Bermudez). In addition, CW3 and the Hindenburg Report attribute the majority of Clover's members to Bermudez. ¶¶160–62. Defendants claim that the FAC does not allege that Clover's growth has declined since Bermudez agreed to divest himself from B&H, but Clover has not disclosed *whether* (let alone *when*) Bermudez divested himself, thus Clover likely has not even begun to operate without related-party transactions with Bermudez.

---

[17] Defendants' reliance on *In re Almost Family, Inc. Sec. Litig.*, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012), is misplaced. In that case, the plaintiffs alleged that off-the-cuff statements were misleading, whereas here, Defendants' misstatements were made in SEC filings or scripted calls or interviews. *See Envision*, 2019 WL 6168254, at *12 (distinguishing *Almost Family*). In addition, *Almost Family* only considered whether the statements were objectively false and did not consider whether they were misleading. *Id*. Finally, the information allegedly omitted in *Almost Family* had largely been disclosed, while here investors had no idea of Bermudez's role in Clover's growth. *Almost Family*, 2012 WL 443461, *2, 13.

### 4.  Defendants' false assertions of GAAP compliance are actionable.

Defendants' Merger Filings were also false and misleading because they asserted that they were prepared in accordance with GAAP when they failed to disclose material related-party transactions in violation of GAAP. ¶¶302–06. *E.g.*, *In re Cannavest Corp. Sec. Litig.*, 307 F.Supp.3d 222, 240 (S.D.N.Y. 2018) (failure to disclose related-party transactions actionable); *Cheung v. Keyuan Petrochemicals, Inc.*, 2012 WL 5834894, at *8–9 (C.D. Cal. Nov. 1, 2012) (same). Defendants do not dispute that the filings represented GAAP compliance and did not disclose any related-party transactions with Bermudez or one of his brokers.

Instead, Defendants claim that B&H was not a related party. Mot. at 29 n.18. But B&H's status is an issue of fact inappropriate for resolution at this stage. *Snellink*, 870 F. Supp. 2d at 939 (related party status is issue of fact). Regardless, the FAC alleges that B&H and Clover are related parties. The glossary attached to the Motion states related parties include "management" or parties "that have an ownership interest in one of the transacting parties and can significantly influence the other." Crosby Decl. Ex. O at 4. Bermudez controlled B&H, and his role at Clover was to negotiate with brokers like B&H. ¶¶164–65. Bermudez thus could influence the management of the transacting parties. Defendants' glossary also defines "management" to include "vice presidents in charge of principal business functions (such as sales[)]" and notes that "[p]ersons without formal titles may also be members of management." Crosby Decl. Ex. O at 4. Bermudez was management because he was Clover's head of sales.

Defendants also assert that Clover's transactions with Bermudez and B&H were not material because Clover disclosed them on an 8-K. Mot. at 30. But the FAC alleges that it was the number of transactions were material—Bermudez's brokers accounted for up to 68% of Clover's members and B&H accounted for 14% of Clover's members—not the form of the disclosure. ¶¶162, 169. Likewise, that Bermudez's compensation may not have been material

31

to Clover is irrelevant because the FAC does not allege materiality based on compensation. In any event, the materiality of a related party transaction is an irresolvable issue of fact. *In re Cornerstone Propane Partners, L.P.*, 355 F.Supp.2d 1069, 1086 (N.D. Cal. 2005).

### 5. Assurances that Clover Assistant was used in patient visits were misleading.

It is well-established that "a plaintiff can state a 10(b) claim based on a failure to provide 'context' where that failure "affirmatively create[s] an impression of a state of affairs that differs in a material way from the one that actually exists." *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1136 (N.D. Cal. 2017); *Kelsey v. Allin*, 2016 WL 825236, at *4 (N.D. Ill. Mar. 2, 2016). Accordingly, statements that exaggerate or distort user adoption of a product are actionable. *Shenk v. Mallinckrodt plc*, 2019 WL 3491485, at *18 (D.D.C. July 30, 2019) (reimbursement approvals misleading for omitting that approvals were for limited treatments); *Brody v. Zix Corp.*, 2006 WL 2739352, at *4 (N.D. Tex. Sept. 26, 2006) (overstating number of prescription drug ordering devices deployed, installed, and used by HCPs).

Defendants repeatedly emphasized that 92% of "onboarded" PCPs in 2019 were using Clover Assistant during patient visits. *E.g.*, ¶¶279, 281, 293, 295, 299. In addition, Defendants assured investors that PCPs used Clover Assistant "while treating our members" (¶277), PCPs adopting Clover Assistant "had grown by more than 500%" (¶¶283, 285), and that the Company's "engagement rate" with the over 2,000 PCPs that had "adopted," "signed up," or "contracted" to use Clover Assistant was 90% (¶¶275, 289, 299). Read together, these statements communicated to investors that the overwhelming majority of PCPs were using Clover Assistant during patient visits. These statements were false, however, because, as detailed by CW1, CW2, and CW3, and confirmed by the Hindenburg Report, only a small fraction of PCPs used Clover Assistant at all, and even those using the software did not use it

32

during patient visits (¶¶198, 205–16), and Defendants belatedly confirmed that only *22%* of Clover's PCPs (or 4% of its total in-network HCPs), had agreed to use Clover Assistant at all.

Defendants incorrectly assert that the CWs' allegations are irrelevant because the alleged misstatements referred only to October 2020 or later. Mot. at 30. This overlooks that most of Defendants' misstatements *expressly applied to 2019* (¶¶279, 281, 293, 295, 299). Defendants further claim that the statements were not misleading because they referred to only to "onboarded" PCPs. But Defendants used undefined terms interchangeably throughout the Class Period to describe use of Clover Assistant. ¶¶275–99. It was not until the Response Article that investors understood that only a small minority of HCPs used Clover Assistant. Even if Defendants' terminology is somehow literally true, it is actionable because "literally true statements that create a materially misleading impression . . . support claims for securities fraud." *In re Glob. Brokerage, Inc.*, 2019 WL 1428395, at \*9 (S.D.N.Y. Mar. 28, 2019)

Finally, these misstatements are *not* puffery. Mot. at 31 n. 20. Defendants flatly stated that PCPs "use [Clover Assistant] at the point of care" (¶277) in the same Merger Filings touting that "onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019." Defendants focused on the importance of using Clover Assistant in patient visits, thus these assurances are not puffery.[18] *Louisiana Sheriffs' Pension & Relief Fund, v. Cardinal Health, Inc.*, 2021 WL 4397946, at \*7 (S.D. Ohio Sept. 27, 2021) (statements to "reassure investors about the success of the acquisition and integration . . . which was of importance to investors" not puffery).

---

[18] Defendants cited hard data solely in their possession, thus their statements were different from those generally proclaiming a commitment to quality in Defendants' case, *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004). *See Cardinal*, 426 F. Supp. 2d at 749 n.70 (distinguishing *Ford* where there were detailed facts that related to defendants' statements).

### 6. The Merger Filings were misleading because they violated SEC regulations.

The Merger Filings were required to comply with SEC Regulation S–K. ¶308; 17 C.F.R. § 229.10. Item 303 of Regulation S-K required disclosure of any "known trends or uncertainties" concerning Clover's revenues, and Item 105 required disclosure of "the most significant factors that make an investment in [Clover] or offering speculative or risky."[19] ¶¶226, 308–10; *Flynn v. Exelon Corp.*, 2021 WL 1561712, at *8 (N.D. Ill. Apr. 21, 2021).

The Merger Filings violated Item 303 by failing to disclose known trends, including the DOJ Investigation, Defendants' illegal marketing practices, undisclosed related party transactions, and HCPs' failure to use Clover Assistant during patient visits. ¶310. *See, e.g.*, *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016) (investigation that threatening "a significant amount of its revenue"); *Flynn*, 2021 WL 1561712, at *8 (illicit payments and regulatory noncompliance); *Beaver Cty. Emps' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1047 (D. Minn. 2015) (related-party transactions).

Likewise, the Merger Filings violated Item 105 because they omitted substantial risks to Clover's business caused by the investigation, illegal marketing, related party agreements, and use of Clover Assistant. *See, e.g.*, *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 715 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 1284 (2021) (investigation); *Flynn*, 2021 WL 1561712, at *8 (illicit payments and regulatory noncompliance).

Defendants do not dispute that Item 105 or 303 violations are actionable as securities fraud. *See* Mot. at 32–33. Nor do they contest that the DOJ Investigation, illegal conduct,

---

[19] The FAC inadvertently references Item 503 of Regulation S-K in addition to Item 105. *E.g.*, ¶¶3, 226–28, 310, As Defendants recognize, *see* Mot. at 33 n.23, references to Item 503 are to Item 105. *See In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *8 (N.D. Cal. July 21, 2020) ("For the purposes of this motion, and given the language the CAC uses to form this allegation, the Court evaluates Plaintiffs' Item 503 claim as an Item 105 claim").

34

related-party transactions, and lack of use of Clover Assistant during patient visits constitute undisclosed known trends or substantial risks.[20] *See id.* Instead, Defendants assert Plaintiffs' claims fail because the FAC fails to allege a Section 10(b) violation. But, as described above, the FAC alleges that the Merger Filings were misleading because they violated Items 105 and 303. *See Flynn*, 2021 WL 1561712, at *8 (Items 105 and 303 support fraud claim).

### D. THE FAC ALLEGES A STRONG INFERENCE OF SCIENTER

To plead scienter, a defendant must have acted with at least recklessness in making the misleading representation or omission. *Omnicare*, 769 F.3d at 472 . Such "recklessness [is] highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable [person] would have known of it." *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 550 (6th Cir. 1999). "The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Dana*, 646 F.3d at 959 (quoting *Tellabs,* 551 U.S. 308, 322-23 (2007). The requisite inference need not be the "most plausible", nor does it need to be "irrefutable, *i.e.*, of the 'smoking gun' genre." *Tellabs,* 551 U.S at 324. Rather, the inference need only be "*at least as* plausible as any other non-culpable inference." *Dana*, 646 F.3d at 975. Thus, if the inferences for and against scienter are equal, the complaint survives. *Tellabs*, 551 U.S. at 331.

While the Sixth Circuit has identified nine non-exhaustive factors of scienter[21] ("the *Helwig* factors"), it "eschew[s] *Helwig*'s checklist approach in favor of *Tellabs's* and *Matrixx's*

---

[20] These issues are waived. *AAC Holdings*, 2021 WL 1316705, at *4.

[21] The *Helwig* factors are: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of

entirely collective assessment." *Ashland*, 648 F.3d at 469. This is because *Helwig* sets forth "a *non-exhaustive* list of factors that do not necessarily establish scienter, but are usually relevant to its analysis." *Dana*, 646 F.3d at 961. Indeed, *Helwig* recognized assessing scienter "necessarily involves a sifting of allegations in the complaint. . . . [R]ecklessness in securities fraud is an untidy, case-by-case concept." *Helwig*, 251 F.3d at 551. As set forth below, the FAC pleads facts, including facts addressing *Helwig* factors, that establish a strong inference of knowing or reckless behavior by Defendants at least as compelling as any innocent inference.

### 1. Plaintiffs' scienter allegations do not rely on group pleading.

Defendants' incorrectly assert that the FAC employs "group pleading." Mot. at 35. As an initial matter, "[t]he fact that [Plaintiffs] 'lump' Defendants together at [] points in the Complaint does not negate or undermine the numerous specific allegations." *Rodriguez v. Providence Cmty. Corr., Inc.*, 191 F. Supp. 3d 758, 773 (M.D. Tenn. 2016).

In addition, the FAC alleges facts concerning each Defendant's position, statements, basis for knowledge, and motive, and thus does not employ group pleading. For example, Garipalli, Toy, and Palihapitiya confirmed they knew of the DOJ Investigation and emphasized their "extensive focus and attention" to the inquiry and subject matter. ¶145; Crosby Decl. Ex. I at 4. Garipalli and Toy also insisted (in the Response Article, which Palihapitiya endorsed) that Bermudez had not received any payments from Clover through B&H, a representation they later retracted. ¶170. Each Individual Defendant also stood to benefit massively by selling shares after the lock-up period. *See* Section III.D.9 *infra*.

---

accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *Helwig*, 251 F.3d at 552.

### 2. Defendants admit they intentionally did not disclose the DOJ Investigation.

Defendants do not dispute that they knew of the DOJ Investigation, which presented an existential threat to their business, and intentionally did not disclose it. *See* Mot. at 37. At a minimum, this constitutes a divergence between internal reports and external statements and a disregard of current information. ¶145; *see Helwig*, 251 F.3d at 552. In addition, knowing denials or half-truths regarding receipt of a government inquiry "supply the strong inference of scienter needed to surpass a motion to dismiss." *BioScrip*, 95 F. Supp. 3d at 733.

Defendants respond that the FAC fails to disprove a negative, *i.e.*, does not allege that they did not act in good faith. *See* Mot. at 37. But the FAC alleges facts demonstrating that omitting the investigation was at least extremely reckless given that it threatened "substantially all" Clover's revenue, the Company previously was fined for marketing violations, and a different Garipalli company had settled state Medicaid fraud claims. ¶¶107–09.

Moreover, Defendants' innocent explanation—that the Court should assume they would *never* intentionally commit securities fraud—is one every securities fraud defendant could make in every case, which is likely why Defendants cite no authority for their inference. The stronger inference is that Defendants hoped that they could cash in by the time the public learned about the investigation. *See Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008) (defendants "frequently attempt to conceal[] bad news in the hope that it will be overtaken by good news . . . like embezzling in the hope [of] winning at the track").

### 3. Defendants knowingly and recklessly asserted Clover's legal compliance.

CW3 described how Lipkind's orders to distribute gift cards to HCP staff led to an internal investigation during which CW3 detailed Lipkind's gift card campaign. ¶¶130-31. Rather than discipline Lipkind, or even caution employees against payments to HCP staff, Defendants fired the employee who initiated the investigation and promoted Lipkind. ¶134. In

37

addition, Defendants touted their "*months* of diligence and work" on Clover that gave the subject matter of the DOJ Investigation "extensive focus and attention," and met on specific dates to discuss "healthcare regulatory compliance and due diligence matters, given the regulated nature of Clover's business." ¶¶122, 145, 318; *see Rudani v. Ideanomics, Inc.*, 2020 WL 5770356, at *7 (S.D.N.Y. Sept. 25, 2020) (access to information in diligence process contradicting representations supports inference of scienter).

The divergence between internal reports and defendants' statements, *de facto* validation of a bribery campaign by a top official, and disregard of evidence support a strong inference of scienter. *See Helwig*, 251 F.3d at 552. This is especially so because divergence is a "key factor" in finding a strong inference scienter, and allegations of intentional illegal conduct support a strong inference as well. *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 981 (6th Cir. 2018); *Chamberlain*, 757 F. Supp. 2d at 710 ("Allegations that a defendant engaged in "deliberately illegal behavior" can give rise to a strong inference of scienter"). Further, Defendants' evasive denials of payments to physicians and nurses, which did *not* deny payments and gift cards to *staff*, evidences their scienter because it was made to placate investors. *Urb. Outfitters*, 103 F. Supp. 3d at 653 (evasive responses supports scienter); *see Avaya*, 564 F.3d at 269 (misleading denials are "the most powerful evidence of scienter").

Defendants respond that Lipkind's gift card campaign was not illegal. Mot. at 39. This raises a fact issue not resolveable at this stage. *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 310 F. Supp. 2d 819, 835 (S.D. Tex. 2004) (whether transactions were illegal is an issue of fact). In addition, the FAC alleges the relevant laws, misconduct, and DOJ and SEC investigations and thus alleges the campaign's illegality. *Menaldi*, 164 F. Supp. 3d at 574.

Defendants also respond that their assurances were "soft information," and the FAC fails to allege they *knew* their statements were false. Mot. at 39. Defendants' representation in the merger agreement, however, is hard information because it categorically stated that Clover had not materially violated any applicable law since January 1, 2018. ¶235; *N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 780 (M.D. Tenn. 2013) ("[h]ard information 'is typically historical information or other factual information that is objectively verifiable.' Such information is to be contrasted with 'soft' information which includes predictions and matters of opinion and are not actionable"). In any event, given Defendants' emphasis on the timing, content, and extent of their legal diligence, their telling failure to deny payments to staff, it is implausible that Defendants did not have actual knowledge of the illegal gift card campaign.[22] *Chamberlain*, 757 F. Supp. 2d at 708.

### 4. Defendants recklessly failed to disclose that Clover's growth stemmed from related-party transactions and that the Merger Filings violated GAAP.[23]

The FAC also alleges that Defendants recklessly misrepresented Clover's growth based their actual knowledge of Bermudez's brokers, records that conflicted with their public statements, and their disregard of the most current information. *Helwig*, 251 F.3d at 552. Defendants knew that Bermudez owned insurance brokers because that was why they hired him. ¶164. CW3 also described a portal showing Bermudez's relationship to various brokers.

---

[22] Defendants rely on *Omnicare* to assert that the FAC fails to allege scienter, but *Omnicare* is distinguishable. Mot. at 37–39. Here, unlike *Omnicare*, Defendants repeatedly emphasized their diligence, *i.e.*, their investigation into Clover's legal compliance. *Compare* ¶¶119–20, 145, 250, 318, 341 with *Omnicare*, 769 F.3d at 481–82. In addition, CW3 describes the evidence she presented to Clover's compliance department, while the witness in Omnicare did not describe the contents of an audit. *Compare* ¶131 *with Omnicare*, 769 F.3d at 482–83.

[23] Defendants do not address whether the FAC alleged scienter for their statements misattributing Clover's growth to the quality of Clover's MA plans and technology. Regardless, Plaintiffs set forth the reasons why the FAC alleges Defendants' knowing or reckless disregard of illegal activity at Clover in Section III.D.3 *supra*. *AAC Holdings*, 2021 WL 1316705, at *4.

39

¶157. Multiple CWs described how Bermudez's broker connections were known throughout Clover. ¶156–60. Further, Palihapitiya said his diligence showed him that Clover "is the first technology company who is having a meaningful impact in disrupting healthcare . . . allowing them to do is quickly capture share from slower incumbents that are non-technology centric," communicating his investigation of the material sources of Clover's growth. ¶¶250, ¶303, 318.

Moreover, the FAC alleges that Defendants disregarded the most current factual information before making their statements and then *later admitted to doing so*. *See Helwig*, 251 F.3d at 552. After initially denying that Bermudez was compensated through B&H, Defendants admitted that their denial was false. ¶336. Defendants were plainly reckless because they merely needed to review their records or ask Bermudez to learn the truth, but denied payments to Bermudez specifically to stop Clover's share price from sliding further. ¶¶331–32; *see Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698-99 (5th Cir. 2005) ("later-emerging facts can . . . provide warrant for inferences about an earlier situation"); *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at \*16 (S.D.N.Y. Nov. 26, 2018) (placating concerns supports scienter). Finally, Defendants' GAAP violation is a *Helwig* factor supporting their scienter, and the above allegations of Defendants' actual knowledge and disregard of Clover's related-party transactions with B&H supports a strong inference of scienter for their false assurances of GAAP compliance as well. *In re FirstEnergy Corp. Sec. Litig.*, 316 F.Supp.2d 581, 598 (N.D. Ohio 2004); *see Huffy*, 577 F. Supp. 2d at 998.

**5. Defendants recklessly misrepresented use of Clover Assistant in patient visits**

The FAC alleges that Defendants intentionally, or at the very least recklessly, misrepresented the use of Clover Assistant during patient visits by citing records diverging from Defendants' statements and Defendants' disregard of the current information. *Helwig*, 251 F.3d at 552. For example, multiple CWs described an internal database showing how and

40

when Clover Assistant was used, to which Defendants had access. ¶¶205–08. CW2 alleged that this data demonstrated that in 2019 only *half* the PCPs using the software used it during patient visits. ¶205. Defendants knew this because they debated altering compensation address this misuse, and Garipalli emphasized that Clover tracked Clover Assistant use. ¶¶209, 293. Defendants also ignored the red flags that CW3 repeatedly raised about Clover Assistant use. ¶¶215–16. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 686–87 (6th Cir. 2004).

Defendants assert that these allegations are insufficient because "challenged statements . . . *all* relate to use of Clover Assistant in 2020" and the CWs worked for Clover during 2019. Mot. at 41–42. Defendants overlook, however, that most of the challenged statements referred use of Clover Assistant *in 2019*, and thus the CWs' observations are directly relevant to those statements. ¶¶279, 281, 293, 295, 299. In addition, Defendants clearly data showing that only a fraction of PCPs were using the Clover Assistant in 2020 at all, let alone in patient visits, because Garipalli touted how the Company tracked the data (¶341) and it took Garipalli and Toy under 24 hours to disclose data in response to the Hindenburg Report (¶¶280, 332, 336).

### 6. Defendants' motive to commit fraud.

The "magnitude of a defendant's compensation package, together with other factors, may provide a heightened showing of motive to commit fraud." *Cardinal*, 426 F.Supp.2d at 737–38; *see Tellabs*, 551 U.S. at 325 (pecuniary "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference"). The FAC alleges that Palihapitiya held founder shares worth nearly *$220 million* that presented him with a jaw-dropping 879,900% return on his initial $25,000 investment. ¶343. In addition, within days of the merger, Garipalli, Toy, and Wagner filed the Shelf Registration so they could sell shares. *See* Mot. at 36. When the registration was filed, Palihapitiya's shares were worth *$294 million*, Garipalli's *$1.2 billion*, Toy's *$182 million*, and Wagner's *$9 million*.

41

Although Defendants did not sell their shares during the Class Period because they were subject to a "lock-up" agreement (Mot. at 36), the outsized compensation awaiting them still supports a powerful inference of their scienter. *See In re Miller Energy Res. Sec. Litig.*, 2014 WL 415730, at *20 (E.D. Tenn. Feb. 4, 2014) (finding scienter from lucrative compensation even though "Defendants did not sell any stock during the Class Period").

### 7. Defendants recklessly disregarded problems in Clover's "core operations."

"Courts may presume that high-level executives are aware of matters related to their business's operations where the misrepresentations and omissions pertain to central, day-to-day operational matters, particularly for facts critical to a business's core management." *Envision*, 2019 WL 6168254, at *22. Here, Defendants were the CEOs, CFO, and CTO of their companies, were directly involved in the Business Combination, and touted their diligence. ¶¶32–39, 119–22, 145, 250, 318, 341. Moreover, Defendants' misrepresentations involved matters central to Clover's operations because they concerned threats to substantially all of Clover's revenue (¶¶58–59),Clover's highly regulated business environment (¶¶100–02), the source of the majority of the Company's patients (¶¶156–62), and use of Clover Assistant (¶118). These allegations are more than sufficient to allege scienter. *E.g.*, *AAC Holdings*, 2021 WL 1316705, at *19 (allegations that Defendants "held out AAC's sales and marketing practices as 'core operations' of the company" support inference of scienter).

### 8. The FAC alleges corporate scienter for Clover

Since the FAC alleges scienter for each Individual Defendant, per Sections III.D.1–7 *supra*, their scienter should be imputed to corporate defendant Clover. *See Omnicare*, 769 F.3d at 483. Plaintiffs also can allege Clover's scienter by alleging scienter for any "high managerial agent" who "recklessly disregarded or tolerated" a misrepresentation. 769 F.3d at 476. To that end, the FAC alleges scienter for Lipkind, who directed a campaign to provide gift cards to

HCP staff, ignored repeated warnings about PCPs improperly using Clover Assistant, and tolerated misrepresentations about the Company's legal compliance and use of Clover Assistant. ¶¶128–34, 230–44. The FAC also alleges scienter for Clover's CMO, who knew only half of physicians using Clover Assistant used the tool during patient visits. ¶¶205, 279–81. Finally, the FAC alleges Bermudez's scienter, as he had direct knowledge of related-party transactions with his brokers, and either failed to report them as required by Clover's policies or permitted the Company to conceal them. ¶¶158–59, 302–06, 337, 341.

### 9. The FAC alleges Defendants' scienter for their violations of Regulation S-K.

As set forth in Sections III.D.1–8 *supra*, the FAC's allegations also support a strong inference that Defendants recklessly disregarded known trends and omitted serious risks in violation of Items 303 and 105 of Regulation S-K, respectively.[24]

### E. THE FAC ALLEGES LOSS CAUSATION

To plead loss causation, a plaintiff need only furnish the defendant with "some indication" of the causal connection between misrepresentation and loss. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). Loss causation is "easiest to show when a corrective disclosure reveals the fraud to the public and the [company's share] price subsequently drops." *In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014). A corrective disclosure is by a price drop immediately after a disclosure reveals material information that a company had concealed. *Norfolk Cty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017).

The FAC alleges that the Hindenburg Report disclosed Defendants had been concealing both the existence of a DOJ Investigation and that Clover had been violating the AKS, FCA,

---

[24] Defendants do not address whether the FAC alleges scienter for their violations of Regulation S-K. These arguments are waived. *AAC Holdings*, 2021 WL 1316705, at *4

43

and MCM Guidelines.[25] This is a textbook corrective disclosure.[26] *See, e.g., Norfolk*, 877 F.3d at 697 (6th Cir. 2017) (disclosure in public report); *In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *62 (M.D. Tenn. Mar. 31, 2009) (disclosure in New York times article).

Defendants assert that the Hindenburg Report is not a corrective disclosure because it did not reveal fraud, illegal conduct, or admit wrongdoing. Mot. at 44. But the Hindenburg Report revealed misconduct (*e.g.*, the use of gift cards). ¶¶128–35. And a corrective disclosure does not require an admission of wrongdoing. *Flowers Foods*, 2018 WL 1558558, at *20 ("[d]efendants cannot escape liability for fraud simply by not admitting the fraud").

## F.  THE FAC STATES §20(a) CLAIMS

As set forth above, Plaintiffs have sufficiently pled a predicated Section 10(b) claim, thus their Section 20(a) claim stands. *See Wilkof v. Caraco Pharm. Lab., Ltd.*, 2010 WL 4184465, at *9 (E.D. Mich. Oct. 21, 2010). In addition, "[a]llegations of control are not averments of fraud and therefore need not be pleaded with particularity.'" *Fushi*, 929 F. Supp. 2d at 789. Accordingly, contrary to the Motion, the FAC alleges Individual Defendants' control by alleging they "possessed the power and authority to control the contents of Clover's SEC filings, press releases, and other communications" (¶41), received with copies of the allegedly misleading Merger Filings or other misstatements "prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected" (*id.*), were culpable participants in the fraud (¶357), and caused the Company to engage in misconduct (¶¶380–81). *See Direct Gen.*, 398 F. Supp. 2d at 898. Further, contrary to the Motion, while "[w]hether a

---

[25] Tellingly, the Motion contests loss causation *only* as to misstatements concerning the DOJ Investigation and assurances of legal compliance, not as to any other claims. Mot. at 44.

[26] Defendants' cases are inapposite. The disclosures in those cases did not reveal illegal conduct and only disclosed the existence an investigation, not that an investigation was *concealed*. *Meyer v. Greene*, 710 F.3d 1189, 1201 (11th Cir. 2013); *Almost Family*, 2012 WL 443461, at *13.

person is a controlling person is normally a question of fact that cannot be determined at the pleading stage," *Sanders Confectionery Products. Inc. v. Heller Financial, Inc.*, 973 F.2d 474, 485 (6th Cir. 1992), the FAC nevertheless alleges Toy and Wagner's control because they were officers, made false statements while representing Clover , and participated in all matters impacting Clover's financial health (¶353–55).[27] *Fushi*, 929 F. Supp. 2d at 788-89.

### G.  LEAVE TO AMEND SHOULD BE FREELY GRANTED

If any part of the Motion is granted, Plaintiffs request permission to amend the FAC or the opportunity to move for leave to amend pursuant to Rule 15. "[W]here a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *United States ex rel. Bledsoe v. Cmty. Health Sys.*, 342 F.3d 634, 644 (6th Cir. 2003).

### IV.    <u>CONCLUSION</u>

For the reasons stated above, Defendants' Motion to Dismiss should be denied.

Dated: November 2, 2021

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Brian Calandra*
Jeremy A. Lieberman
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
          bcalandra@pomlaw.com

---

[27] Although this also sufficiently alleges Wagner and Toy's "culpable participation," the Sixth Circuit has not held that "culpable participation" is an element of a Section 20(a) claim and courts in this circuit have refused to require culpable participation. *Ghosn*, 2021 WL 2400301, at *4 (M.D. Tenn. June 11, 2021); *Halford*, 2010 WL 8973625, at *19.

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

*Lead Counsel and Attorneys for Plaintiffs*

**BRAMLETT LAW OFFICES**
Paul Kent Bramlett TN #7387/MS #4291
Robert Preston Bramlett TN #25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
Telephone: (615) 248-2828
Facsimile: (866) 816-4116
Email: PKNASHLAW@aol.com
         Robert@BramlettLawOffices.com

*Liaison Counsel*

**THE SCHALL LAW FIRM**

Brian Schall (pro hac vice)
Rina Restaino (pro hac vice)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
Facsimile: (877) 590-0482
brian@schallfirm.com
rina@schallfirm.com

*Additional Counsel for Plaintiff Firas Jabri*

**HOLZER & HOLZER, LLC**
Corey D. Holzer
Marshall P. Dees
1200 Ashwood Parkway
Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com

46

mdees@holzerlaw.com

***Additional Counsel for Named Plaintiff
Jean-Nicolas Tremblay***

47

## CERTIFICATE OF SERVICE

This is to certify that I have filed the above and foregoing Opposition to Defendants' motion to dismiss on the Court's CM/ECF filing system, which will serve all counsel of record as follows:

Benjamin A. Gastel
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Fax: (615) 255-5419
Email: beng@bsjfirm.com


Jacob A. Walker
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: jake@blockleviton.com


James Gerard Stranch , IV
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Fax: (615) 255-5419
Email: gerards@bsjfirm.com


Jeffrey C. Block
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: jeff@blockleviton.com

Stephen J. Teti
Block & Leviton LLP
260 Franklin Street

48

Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: steti@blockleviton.com


Larry Russell Belk , Jr.
Sutherland & Belk, PLC
2505 21st Avenue South
Suite 400
Nashville, TN 37212
(615) 846-6200
Fax: (615) 208-2255
Email: russell@sbinjurylaw.com


James A. Holifield , Jr.
Holifield Janich Rachal & Associates, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
(865) 566-0115
Fax: (865) 566-0119
Email: aholifield@holifieldlaw.com


Brian Peter Calandra
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(646) 581-9958
Email: bcalandra@pomlaw.com


Brian Schall
Schall Law Firm
2049 Century Park East
Suite 2460
Los Angeles, CA 90067
(310) 301-3335
Email: brian@schallfirm.com


Paul Kent Bramlett

49

Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: pknashlaw@aol.com


Laurence M. Rosen
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: lrosen@rosenlegal.com


Phillip Kim
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: pkim@rosenlegal.com


Robert P. Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: robert@bramlettlawoffices.com



Christopher M. Wood
Robbins Geller Rudman & Dowd LLP (Nashville Office)
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2203

Fax: (615) 252-3798
Email: cwood@rgrdlaw.com


Jerry E. Martin
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2202
Fax: (615) 252-3798
Email: jmartin@barrettjohnston.com


Mark S. Reich
Robbins Geller Rudman & Dowd LLP (New York Office)
58 S Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Fax: (631) 367-1173
Email: mreich@rgrdlaw.com


Mary K. Blasy
Robbins Geller Rudman & Dowd LLP (New York Office)
58 S Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Fax: (631) 367-1173
Email: mblasy@rgrdlaw.com


Samuel H. Rudman
Robbins Geller Rudman & Dowd LLP (New York Office)
58 S Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Fax: (631) 367-1173
Email: srudman@rgrdlaw.com


Corey D. Holzer

51

Holzer & Holzer, LLC
1200 Ashwood Parkway
Suite 410
Atlanta, GA 30338
(770) 392-0090
Fax: (770) 392-0029
Email: cholzer@holzerlaw.com


J. Alexander Hood , II
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Fax: (212) 661-8665
Email: ahood@pomlaw.com


Jeremy A. Lieberman
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com


Patrick V. Dahlstrom
Pomerantz LLP (Chicago Office)
10 S LaSalle Street
Suite 3505
Chicago, IL 60603
(312) 377-1181
Fax: (312) 377-1184
Email: pdahlstrom@pomlaw.com


Britt K. Latham
Bass, Berry & Sims (Nashville Office)
150 Third Avenue South
Suite 2800
Nashville, TN 37201
(615) 742-6200
Email: blatham@bassberry.com

52

Jed M. Schwartz
Milbank LLP
53 Hudson Yards
New York, NY 10001
(212) 530-5000
Email: jschwartz@milbank.com


Scott A. Edelman
Milbank LLP
53 Hudson Yards
New York, NY 10001
(212) 530-5000
Email: sedelman@milbank.com


John Tate Spragens
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
(615) 983-8900
Fax: (615) 682-8533
Email: john@spragenslaw.com


Saul C. Belz
Glankler Brown, PLLC
6000 Poplar Avenue
Suite 400
Memphis, TN 38119
(901) 576-1741
Fax: (901) 576-2389
Email: sbelz@glankler.com


Tara L. Swafford
The Swafford Law Firm, PLLC
207 Third Avenue North
Franklin, TN 37064
(615) 599-8406
Fax: (615) 807-2355
Email: tara@swaffordlawfirm.com

53

Case 3:21-cv-00096   Document 79   Filed 11/02/21   Page 63 of 64 PageID #: 1782

Charles F. Barrett
Neal & Harwell, PLC
1201 Demonbreun Street
Suite 1000
Nashville, TN 37203
(615) 244-1713
Fax: (615) 726-0573
Email: cbarrett@nealharwell.com

SO CERTIFIED this 2nd day of NOVEMBER 2021

/s/ **Paul Kent Bramlett**
Paul Kent Bramlett

54