# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **TIMOTHY BOND,** | ) | |
| | ) | |
| **Lead Plaintiff** | ) | |
| | ) | |
| **and** | ) | **Case No. 3:21-cv-00096** |
| | ) | **Judge Aleta A. Trauger** |
| **JEAN-NICOLAS TREMBLAY,** | ) | |
| | ) | |
| **Named Plaintiff,** | ) | |
| | ) | |
| **Individually and on behalf of all others** | ) | |
| **similarly situated,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CLOVER HEALTH INVESTMENTS,** | ) | |
| **CORP. f/k/a SOCIAL CAPITAL** | ) | |
| **HEDOSOPHIA HOLDINGS CORP. III,** | ) | |
| **VIVEK GARIPALLI, ANDREW TOY,** | ) | |
| **JOE WAGNER, and CHAMATH** | ) | |
| **PALIHAPITIYA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM</u>

Defendants Clover Health Investments, Corp. f/k/a Social Capital Hedosophia Holdings Corp. III ("SCH"), Vivek Garipalli, Andrew Toy, Joe Wagner, and Chamath Palihapitiya have filed a Motion to Dismiss (Doc. No. 74), to which lead plaintiff Firas Jabri and named plaintiff Jean-Nicolas Tremblay filed a Response (Doc. No. 80), and the defendants have filed a Reply (Doc. No. 83). For the reasons set out herein, the motion will be denied.

# I. BACKGROUND & PROCEDURAL HISTORY[1]

## A. Introduction

United States securities laws allow the public trading of so-called "special purpose acquisition companies"—also referred to as "SPACs" or "blank check companies." A SPAC typically makes no products, provides no services, and has "no operating history, assets, revenue, or operations" of its own. Daniel S. Riemer, *Special Purpose Acquisition Companies: SPAC and Span, or Blank Check Redux?*, 85 Wash. U. L. Rev. 931, 933 (2007). Rather, a SPAC exists to become publicly traded itself and then "to buy a private company"—one that *does* actually provide a good or service but is not yet publicly traded—thereby allowing investors to "effectively [take the acquired] company public while avoiding the tradition[al] initial public offering ['IPO'] process." *Phillips v. Churchill Cap. Corp. IV*, No. 1:21-CV-00539-ACA, 2021 WL 4220358, at *1 (N.D. Ala. Sept. 16, 2021). The SPAC process, all parties to this case agree, is legal, as long as the people and companies involved comply with relevant restrictions.

SCH, which now does business as Clover,[2] was originally a SPAC. Defendant Palihapitiya—who is purportedly known as the "King of SPACs"— formed SCH as a Cayman Islands exempted company in 2019,[3] for the purpose of eventually combining with a functioning

---

[1] The facts are taken primarily from the First Amended Complaint ("Amended Complaint"). (Doc. No. 70.) Unless otherwise noted, the facts are accepted as true for the purpose of deciding the Motion to Dismiss.

[2] As explained in the Amended Complaint, there was a "Legacy Clover"—the version of Clover that existed before merging with SCH—that was succeeded by post-merger SCH, which functions as Clover now. For ease of reference, the court will use the name "Clover" to refer to whichever business is, at the relevant time, doing or expected to do substantive business as Clover Health. The mechanics of SCH and Clover's combination are complex, but the details are mostly unimportant at this stage of the case. The court will simply use the generic terms "merger" and "combination," which should not be construed as a substantive legal conclusion regarding any particular feature of the underlying process.

[3] "A Cayman Islands exempted company is a common choice for U.S. practitioners creating a foreign entity. An exempted company's operation is conducted mainly outside the Cayman Islands. A 20–year

business that wished to bypass the hurdles of a conventional IPO. On October 6, 2020, SCH announced that it would be fulfilling its mission by acquiring Clover Health Investments, Corp., which SCH described in a joint press release as a "next-generation Medicare Advantage insurance company offering best-in-class plans that combine wide access to healthcare and rich supplemental benefits with low out-of-pocket expenses[.]" (Doc. No. 70 ¶¶ 2–3, 112.) Defendants Toy and Wagner are Clover executives. Toy is the company's co-founder and was, at the relevant times, its President and Chief Technology Officer ("CTO"), and Wagner was its Chief Financial Officer ("CFO"). (*Id.* ¶¶ 37–38.) Garipalli is the original founder of Clover, as well as the company's Chief Executive Officer ("CEO") and the Chairman of its Board of Directors. (*Id.* ¶ 32.) At least part of Clover's value proposition, according to the press release announcing the planned merger, came from its development of the "Clover Assistant," a software product designed to allow Clover to "partner[] with primary care physicians . . . to deliver data-driven, personalized insights at the point of care." (*Id.* ¶ 2.)

According to the plaintiffs in this case, however, SCH's sunny picture of Clover concealed a business that, far from being the budding next-generation industry leader that SCH claimed, had achieved what limited success it had, not through innovation, but through kickbacks and cronyism, with little, if any, help from the Clover Assistant or any other promising technology. The allegations in the 150-page Amended Complaint are voluminous, but the plaintiffs identify five general categories on which the defendants "made false and/or misleading statements and/or failed to disclose" material facts between October 6, 2020 and February 3, 2021 (the "Class Period"):

---

exemption from taxation in the Cayman Islands is typically applied for." *Blum v. Comm'r*, 103 T.C.M. (CCH) 1099, 2012 WL 129801, at *3 n.3 (T.C. 2012).

<ol type="i" start="1">
<li>the Company had committed multiple legal and regulatory violations since January 1, 2018 and was and remains under investigation by the DOJ for violations of the False Claims Act;</li>
</ol>

<ol type="i" start="2">
<li>the Company's growth and positive performance stemmed from illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the [False Claims Act], and the [Centers for Medicate & Medicaid Services ("CMS") Marketing] Guidelines ("MCM Guidelines"), and unreported related party transactions;</li>
</ol>

<ol type="i" start="3">
<li>only a small fraction of the healthcare providers who had contracted with the Company were actually using the Company's Clover Assistant software platform;</li>
</ol>

<ol type="i" start="4">
<li>Clover's financial statements did not comply with [Generally Accepted Accounting Principles ("GAAP")] because they failed to disclose material agreements and transactions with related parties; and</li>
</ol>

<ol type="i" start="5">
<li>the Company's SEC filings failed to comply with . . . Regulation S-K.</li>
</ol>

(*Id.* ¶ 3 (formatting altered).)

At least according to the defendants' contemporary statements, the deal between Clover and SCH was the result of careful research and vetting on behalf of SCH and investors. During an October 6, 2020 television interview, Palihapitiya touted the "months of diligence and work" that had gone into the SCH/Clover merger. (*Id.* ¶ 120.) Similarly, on October 20, 2020, SCH filed an S-4 form with the SEC representing that SCH and Clover had discussed "typical due diligence" and that, "[f]rom August 25, 2020 to August 28, 2020," SCH, Clover, and their legal representatives "held a meeting via video teleconference to discuss certain preliminary healthcare regulatory and compliance due diligence matters, given the regulated nature of Clover's business." (*Id.* ¶ 122.) That filing further provided that, on August 27, 2020, SCH's legal counsel was "provided with access to a virtual data room of Clover and began conducting a preliminary legal due diligence review of Clover." (*Id.*)

4

However, on February 4, 2021—after SCH's successful acquisition of Clover and the combination of the two firms into a single business under the Clover name—a market research firm called Hindenburg Research released a report ("Hindenburg Report") that, according to the plaintiffs, brought the truth about Clover's flawed operations to light. (*Id.* ¶¶ 3, 20.) When news of the Hindenburg Report reached the market, the value of Clover stock fell by more than 12%, wiping out a substantial amount of value held by investors who had purchased their shares at prices set by the pre-Hindenburg Report market. (*Id.* ¶ 22.) This case arises from those losses and is supported by information from four confidential witnesses who worked for Clover, identified as CW1 through CW4, who purport to be able to corroborate much of the wrongdoing alleged in the Hindenburg Report. (*Id.* ¶¶ 44–47.)

## B. Medicare Advantage and the Risk Assessment-Based Payment Model

In 1997, "Congress created 'Medicare Part C,' sometimes referred to as Medicare Advantage ['MA']. Under Part C, beneficiaries may choose to have the government pay their private insurance premiums rather than pay for their hospital care directly." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1809 (2019). MA plans are offered by Medicare-approved private insurers and must comply with CMS rules. (Doc. No. 70 ¶ 50.) Over time, Part C has become an increasingly larger component of the overall Medicare system, with the U.S. Congressional Budget Office predicting that the share of Medicare beneficiaries enrolled in an MA plan will rise to 51% by 2030. Currently, of the 62 million Americans eligible for Medicare, about 24 million are in Medicare Advantage. (*Id.* ¶ 51.)

CMS funds Medicare Part C plans on a per-member-per-month "capitated" basis, in contrast to the traditional fee-for-service model it uses for Medicare Part B or the per-hospitalization payment structure used under Medicare Part A. A private company operating a

CMS-approved Part C plan "receive[s] in advance a monthly lump sum from CMS for every beneficiary that [it] enroll[s], without regard to the services that the beneficiaries will actually receive." *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 873 (D.C. Cir. 2021). The capitated monthly rate for each patient, however, is not necessarily the same. "CMS uses a model—called the CMS Hierarchical Condition Category, or CMS-HCC, risk-adjustment model"—that assigns each Part C beneficiary a "risk assessment score" based on a formula considering various "demographic characteristics" that are "predictive of differing costs of care." *Id.* at 874 (citing 42 U.S.C. § 1395w-23(a)(1)(C)(i)). (*See* Doc. No. 70 ¶ 52.) CMS's formula allows the agency to "determine prospectively, based on Medicare Advantage beneficiaries' actuarially relevant, known demographic and health characteristics, the per-capita payment rate that will fairly compensate th[e] Medicare Advantage insurer" for providing the beneficiary's coverage for that month. *UnitedHealthcare Ins. Co.*, 16 F. 4th at 873.

Although CMS pays Part C insurers a capitated rate based on patient demographics—not actual services that the patient ends up using—the insurers themselves "pay healthcare providers based on the services provided to beneficiaries," much in the manner of a traditional health insurance plan. *Id.* That structure is intended to incentivize Part C plan operators to find the most cost-effective way to ensure that the necessary care is provided, because the less the insurer actually has to pay to healthcare providers on behalf of the patient in any given month, the greater a portion of the capitated payment will go to the insurer's profits. *Id.*

If risk assessment scores were based solely on general, verifiable demographic traits such as age and sex, CMS's job in setting the scores would be as simple as consulting its own enrollment data and applying a simple formula to the numbers it found. In order for the risk assessment formula to be as effective as possible, however, Congress has authorized CMS to

consider any "such other factors as the Secretary determines to be appropriate, including adjustment for health status." 42 U.S.C. § 1395w-23(a)(1)(C)(1). In order to make the most of that discretion, CMS "periodically studies and improves" its model, "based on clinical information and cost data." *UnitedHealthcare Ins. Co.*, 16 F 4th at 873. The result is a somewhat more complex model that relies, among other things, on data provided by beneficiaries' healthcare providers, including with regard to "individuals' medical diagnoses." *U.S. ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 672 (9th Cir. 2018) (citing Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 74 Fed. Reg. 54,634, 54,673 (Oct. 22, 2009)).

While this additional data allows risk assessment scores to be more precise, it also introduces a vulnerability into the system. "With data for millions of people being submitted each year, CMS is unable to confirm diagnoses before calculating capitation rates." *Id.* As a result, capitated rates may be skewed upward or downward based on providers' misreporting (or non-reporting) of patient information. In order to mitigate that problem, "Medicare regulations require risk adjustment data to be produced according to certain best practices." *Id.* (citing Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 1918, 2001 (Jan. 10, 2014)).

While those regulations may have had some success in combating data reporting errors—particularly inadvertent ones—they have not been able to wholly eradicate the practice of intentional overreporting of risk factors or, as it has come to be known, "risk adjustment fraud." (Doc. No. 70 ¶ 53.) Because risk factors are reported by healthcare providers, but the inflation of a patient's risk score benefits only the insurer, there is no inherent incentive to commit the fraud—at least as long as those parties are kept at an arm's length from each other. However, if a

7

Part C plan operator can find a way to induce, encourage, or trick healthcare providers into over-reporting a beneficiary's risk factors without actually implementing a more expensive course of treatment, the insurer can receive a higher capitated payment for that beneficiary without actually having to pay for more services. (*Id.* ¶ 55.)

### C. Clover's Business Model and the Clover Assistant

Garipalli founded Clover in 2013 for the purpose of providing Medicare Advantage plans. (*Id.* ¶ 56.) Because Clover's business is focused on the MA market, the company's revenues have come "almost entirely . . . from premiums paid by CMS." (*Id.* ¶ 58.) Indeed, on October 20, 2020, Clover filed an S-4 form—a type of mandatory disclosure associated with a merger or acquisition—revealing that Medicare Advantage premiums had accounted for over 98.5% of the company's revenues in the preceding years. Clover's health—if not its outright reason for being—was therefore dependent on its good standing with CMS and its ability to continue to operate as an approved provider of plans in the Part C market. (*Id.* ¶ 59.)

Historically, the Part C/Medicare Advantage market has largely been concentrated among a handful of large insurers with patient bases far greater than Clover's. For example, UnitedHealth occupies about 26% of the Medicare Advantage market, which amounts to over 6 million beneficiaries. In contrast, Clover, as of March 31, 2021, served fewer than 70,000 beneficiaries, and those beneficiaries had historically been overwhelmingly concentrated in one state, New Jersey. (*Id.* ¶ 60, 154.) Clover's potential to be anything more than a bit player in the Medicare Advantage field, therefore, was largely speculative—not based on its existing customer base, but rather its supposed ability to appeal to more customers in the future.

In its public statements, Clover acknowledged that the Medicare Advantage market already had some large legacy firms with impressive market shares, but Clover characterized the

field as, in the words of a press release that accompanied the SCH/Clover deal, "ripe for disruption" after having "seen little innovation" for years. (*Id.* ¶ 61.) According to that press release, Clover was poised to provide that disruption with its "unique model," through which it "partner[ed] with primary care physicians using its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care." (*Id.* ¶ 63.)

Clover described the Clover Assistant as its "flagship software platform . . . to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers." (*Id.* ¶ 66.) According to Clover, the Assistant used "machine learning" to analyze "millions" of data points in order to provide "actionable and personalized insights at the point of care." (*Id.* ¶ 66.) According to the plaintiffs, however, the purpose of the Clover Assistant was far simpler: it was "designed to identify opportunities to assign higher Medicare risk adjustments so that Clover can obtain larger reimbursements from Medicare." (*Id.* ¶ 67.) It did this by automatically seeking out information and suggesting treatment decisions that, based on the Medicare risk assessment formula, were likely to result in upward revisions of the patient's risk assessment score. Those upward revisions made Clover's deals with Medicare more profitable and, supposedly, therefore allowed Clover to offer more attractive plans—which it referred to as its "obvious" plans, because their appeal to beneficiaries was, according to Clover's pitch to investors, obvious. (*Id.* ¶¶ 57, 67–69.)

CW2 has stated that, within the company, it was "no grand secret" that the Clover Assistant was intended to drive upward revisions of risk assessments. "In fact," explained CW2, "it was the opposite. It was the rallying cry for the company: 'This is what we think the model of the future's going to be.'" (*Id.* ¶ 71.) According to CW2, what the Assistant offered was, in effect, simply an automated version of the practice, already adopted by many Medicare

Advantage insurers, of scouring patient data to try to find opportunities to code risk assessments upward. (*Id.* ¶ 72.) By inserting itself into the patient-provider interaction itself, however, the Assistant allowed Clover not only to look for that information in existing documentation but to encourage the physician to *create* reimbursement-maximizing data when otherwise none would have been available. (*Id.* ¶ 73.)

The ability of the Clover Assistant to drive upward revisions of risk assessments was enabled, in part, by changes to Medicare's risk assessment scoring that accompanied the 2015 adoption of the 10th revision of the International Statistical Classification of Diseases and Related Health Problems ("ICD-10"). According to the plaintiffs, "under ICD-10, a patient who previously would have been diagnosed using separate, individual codes for conditions like kidney disease, diabetes and acute hypertension would instead be classified using a 'high complexity code' that factored in all three conditions." (*Id.* ¶ 76.) That change created an incentive for insurers to collect as many diagnoses as possible to affix to each Medicare Advantage patient. In the past, merely heaping more and more diagnoses onto a patient—when none of the additional diagnoses was actually particularly high-risk or complex—would have been unlikely to actually increase the payout from Medicare associated with that patient. Under ICD-10, however, the plan operator could, in essence, build a complex, ostensibly high-risk diagnosis out of a handful of individual, lower-risk diagnoses. (*Id.*) As one Clover employee was quoted saying in the Hindenburg Report, "If you make this patient look really, really sick, you are going to get more money from the government." (*Id.* ¶ 80.)

The Amended Complaint includes an example, based on statements by CW3, of how the Clover Assistant process would work to identify opportunities to increase risk assessment scores based on the ICD-10 system:

> CW3 stated that after a physician input a current diagnosis, Clover Assistant "would highlight which [diagnoses] could go together to put together a high-complexity code." Clover Assistant would then ask providers, "Do you agree?" They would then hit "yes" or "no." CW3 stated that on the backend Clover Assistant would produce an amendment to the member's original "medical note," and the resulting amendment (or addendum) would be sent to CMS. "Whichever [diagnoses] could go together—whichever high-complexity codes the system would flag that were pertinent—it would ask the doctor if it wanted to add those," she said. "The whole thing is designed to be checkboxes, binary questions." CW3 said "Clover's system does a check to make sure high-complexity codes [are being shown to physicians], and if not, they promote them. Those are the pop-ups that come up in the system."

(*Id.* ¶ 73.)

The plaintiffs do not suggest that the Clover Assistant instructed doctors to diagnose patients falsely or inserted false diagnoses on its own. Rather, the Assistant would, in the words of one employee quoted in the Hindenburg report, provide a "nudge to the doctor to identify these potential chronic conditions you have." (*Id.* ¶ 81.) Those nudges, however, depended on the quality of the information retained by the Clover Assistant itself, and one doctor interviewed for the Hindenburg Report estimated that Clover Assistant's patient records were inaccurate 10–25% of the time. (*Id.* ¶ 82.)

According to CW3, the Clover Assistant, if used appropriately by a qualified physician, could admittedly result in "more accurate coding." (*Id.* ¶ 75.) If, however, the physician delegated the relevant aspects of the coding and record-keeping to support staff—as was often the case—the staff would, in effect, be adding diagnostic information themselves, without the expertise to do so, in a way that could cause the CMS formula to yield higher risk classifications without an appropriate clinical process of diagnosis. (*Id.*)

The Assistant also had a problem of suggesting "old or stale diagnoses that were no longer relevant," resulting in risk assessment scores based on diagnoses that were accurate at one

11

time but were no longer so. (*Id.* ¶ 74.) The Amended Complaint quotes an explanation of this problem by CW3:

> "The system wasn't really removing anything as much as it was trying to consolidate to the higher-complexity codes," she said. She explained that if a patient came in with cold symptoms and was diagnosed with a flu, four months later, Clover Assistant might still show the flu as a diagnosis even though "the flu is a short-term virus."

(*Id.* ¶ 74.)

Of course, for the Clover Assistant to work the way that Clover intended, physicians would actually have to *use* the tool—despite the fact that it, in practice, primarily benefited Clover, not the physician. According to the plaintiffs, Clover recognized this limitation and undertook a strategy of identifying and targeting "potentially manipulable physicians," such as those with small practices struggling to stay afloat and those with poor patient reviews. (*Id.* ¶ 78.) Clover would then "pay[ the] doctors $200 per visit to use Clover Assistant, or *twice* the average Medicare reimbursement rate for a standard visit. (*Id.* ¶ 69.) According to CW3, the result was that Clover recruited "doctors that just want to cheat the system" and be paid as much as possible (*Id.* ¶ 78.) From Clover's perspective, the exorbitant payment to the physician was merely a "loss leader." (*Id.* ¶ 85.) As one former employee explained, "If you are paying doctors $200 for a click but you are able to increase the severity of patients that you've diagnosed, it's worth it because you are drawing down thousands of dollars (from Medicare) for a couple of clicks." (*Id.* ¶ 83.) Outside of the limited success obtained by such inducements, however, the challenge of getting physicians to actually use the Clover Assistant was a persistent one—an especially vexing proposition, given that, without the supposedly revolutionary advantages enabled by the Clover Assistant, Clover was just a small, mostly regional Part C provider. (*Id.* ¶ 197.)

12

**D. The Defendants' Alleged Fraudulent Scheme**

The defendants have helpfully provided an appendix compiling what they construe, from the Amended Complaint, to be all of the statements during the Class Period on which the plaintiffs are premising their fraud claims. (Doc. No. 75-1.) Many of the statements are largely, if not wholly, duplicative of each other, as Clover and its executives made various versions of the same allegedly false or misleading statements about the same core facts over time. At this stage, the court will not parse or restate every individual statement. Rather, the court will identify a sufficient set of exemplary statements and omissions in the key issue areas and explain, in context, why those statements and omissions were supposedly false and/or misleading.

1. Clover's Technology

In public statements, Clover and its executives repeatedly emphasized the centrality of technology—and the Clover Assistant in particular—to its business. The press release associated with the combination of SCH and Clover, for example, stated that "[t]echnology is at the core of Clover's business—the Company is a true innovator in the Medicare Advantage space, deploying its own internally-developed software to assist physicians with clinical decision-making at the point of care." (*Id.* ¶ 63.) At a November 20, 2020 Analyst Day, Garipalli told attendees that "our strategy is[,] on its surface, very simple. It's scale Clover Assistant, drive more value through Clover Assistant, giving meaningful amount of that value back to consumers and the government. And then just keep repeating one through three." (*Id.* ¶ 64.) Garipalli emphasized that the Clover Assistant was "what allows [Clover's] plans to be economically affordable" compared to competitors' plans. (*Id.* ¶ 65.)

On October 6, 2020—the day that the planned SCH/Clover deal was announced—Palihapitiya was interviewed about Clover's business on the television program "Squawk Box."

Palihapitiya described Clover as "a business that's actually delivering the promise of technology-improving, better outcomes and lower cost health care." (*Id.* ¶ 119.) He explained:

> [W]hen you go to Clover Health and you sign up for one of their plans, what they also do is go to your doctor and give them very powerful software. That software is a combination of machine learning that takes all of this heterogeneous data, clinical data, drug data, your lab results, your blood results, your genetic information, merges it together and allows them to give actionable insights and recommendations every time you see your doctor.

(*Id.* ¶ 121.) Palihapitiya expressly denied that Clover was engaged in "upcoding" to improperly characterize claims as entitling Clover to greater reimbursement than the facts supported. Palihapitiya said, of Clover, "They create transparency. They don't play games. They don't motivate doctors to upcode or do all kinds of things in order to get paid." (*Id.* ¶ 119.)

Many of Clover's representations made it sound like the Clover Assistant was widely used by providers in its network. For example, during the October 6, 2020 deal announcement call, Palihapitiya, Garipalli and Toy used a slide presentation that included the representation that "92% of eligible member visits utilize Clover Assistant." (*Id.* ¶ 193.) Toy stated, "Over 2,000 [primary care physicians] are contracted to use the Clover Assistant. And what that means is over 60% of our membership goes to one of these doctors. Our engagement rate is an impressive 90%." (*Id.*) During a November 2020 event for investors, Wagner stated that "all the physicians that are participating with us have to use Clover Assistant as part of their contract." (*Id.* ¶ 194.) The next day, during an Analyst Day, Toy stated, "The Clover Assistant is a web application and a physician uses it [for] every visit they have with one of our members . . . ." (*Id.* ¶ 195.)

According to the plaintiffs, however, "the overwhelming majority of physicians treating Clover members did not use Clover Assistant at all." (*Id.* ¶ 197.) Moreover, of the handful of physicians who actually did "use" the Assistant, many did not do so in the manner that Clover claimed—at the point of service, with the physician him- or herself actually operating the

14

software and inputting diagnoses rendered pursuant to the physician's expertise. Rather, the physician consulted the Assistant at some later point after the patient visit or, as was often the case, merely had support staff who were not qualified to make medical diagnoses handle the Assistant on their behalf. (*Id.* ¶ 197.) The Amended Complaint states that, according to CW1, who was a Clinical Data Operations Specialist, "during her time at Clover, 'less than 10%' of 'onboarded' doctors were using Clover Assistant," and, "within the 10% who were using Clover Assistant, 'not many of those were'" using it "actively" (*Id.* ¶ 198 (emphasis omitted).) CW2, who had been a Senior Manager of Partnerships and Development for Clover, confirmed that it was apparent, from timestamps in the data collected by Clover, that the Assistant was frequently being used only long after the patient visit itself.[4] (*Id.* ¶¶ 45, 206.) CW3, a onetime Provider Engagement Manager, stated that she learned, as early as 2018, that physicians were frequently relying on staff to use the Assistant, because the physicians and staff themselves told her so. (*Id.* ¶¶ 46, 213.) She reported that knowledge to both company leadership and its Compliance Department. (*Id.* ¶ 215.)

The Hindenburg Report shed some light on how Clover was able to get such high supposed usage numbers for the Clover Assistant, despite the fact that most doctors in its network were not using it much, if at all. Clover's network of primary care providers actually included two tiers—"Clover Preferred" physicians and physicians who were not "Clover Preferred"—and only the Clover Preferred physicians actually used the Assistant. For example, a former employee told Hindenburg that, in New Jersey, Clover had been able to enroll about 70% to 80% of the state's primary care physicians in the Clover Network, but that meant merely that they accepted Clover insurance. Only the significantly smaller number of physicians who had

---

[4] For example, a physician's office would record "a bunch" of visits at 8 p.m. at night, rather than doing so on a rolling basis during ordinary hours for seeing patients, as Clover's instructed method for using the Assistant would call for. (Doc. No. 70 ¶ 206.)

15

agreed to become "Clover Preferred" physicians used the Assistant. (*Id.* ¶ 200.) In Morris County, New Jersey, for example, only 25% of doctors in Clover's network were Clover Preferred. (*Id.*) Hindenburg performed its own telephone survey of 22 physician's practices listed in Clover's 2019 Provider Directory, and only 4 practices confirmed that they used the Assistant, while 14 responded that they did not and the rest responded that they were not sure. (*Id.* ¶ 201.)

Hindenburg spoke to individual doctors who did use the Assistant, and their remarks confirmed that it was perceived as an unattractive tool. One physician called it a "waste of time" and stated, "I know that all the doctors in my office, basically, they just feel annoyed by it. We just try to check it and get it closed as quickly as possible so that we get paid and move on to actual patient care." Another doctor complained of being "[s]ick and tired of yet another website, another log in, another system we are responsible for updating for some big data; another care consideration to respond to." That doctor complained, "We no longer have time to take care of our patients. Someone thinks this system will—what? It is not something that helps family doctors take care of their patients." (*Id.* ¶ 202.)

After the Hindenburg Report was released, Clover conceded that only 4% of its total in-network physicians were even fully signed up, trained, and prepared to use the Clover Assistant. (*Id.* ¶ 217.) Even then, however, Clover offered no information regarding how many of those physicians actually used the Assistant and whether they were using it properly. (*Id.*)

2. Lawfulness of Clover's Practices

The plaintiffs also assert that the defendants made false and misleading statements regarding Clover's compliance with federal laws, including, in particular, the federal Anti-Kickback Statute ("AKS"), which makes it unlawful to

knowingly and willfully offer[] or pay[] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in

16

kind to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or . . . to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program . . . .

42 U.S.C. § 1320a-7b(b)(2). "In short, a kickback violation entails 1) remuneration to a person or entity in a position to refer Federal health care program patients 2) that could reasonably induce the person or entity to refer such patients." *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394, 401 (6th Cir. 2015) (citing OIG Supplemental Compliance Program Guidance for Hospitals, 70 Fed. Reg. at 4864). "Federal health care program" includes Medicare, 42 U.S.C. § 1320a-7b(f), and the prohibition is not limited to referrals for care itself, but rather for "any item or service" paid under Medicare, 42 U.S.C. § 1320a-7b(b)(2), such as a Part C plan. The purpose of the AKS's prohibitions is to "protect federal health care programs from 'increased costs and abusive practices resulting from provider decisions that are based on self-interest rather than cost, quality of care or necessity of services.'" *United States ex rel. Suarez v. AbbVie, Inc.*, 503 F. Supp. 3d 711, 723 (N.D. Ill. 2020) (quoting *United States v. Patel*, 778 F.3d 607, 612 (7th Cir. 2015)).

The AKS "is a criminal statute" that imposes potentially severe penalties on violators. *United States ex rel. Arnstein v. Teva Pharm. USA, Inc.*, No. 13 CIV. 3702 (CM), 2019 WL 1245656, at *5 (S.D.N.Y. Feb. 27, 2019) (citing *Donovan v. Rothman*, 106 F. Supp. 2d 513, 516 (S.D.N.Y. 2000)). Moreover, AKS violations frequently form the basis for civil claims under the False Claims Act ("FCA"), which may be initiated either by the federal government itself or a private *qui tam* whistleblower. See *id.* at *5 (citing 42 U.S.C. § 1320a-7b(g)). Clover acknowledged, in its SEC filings, that, because it operated under the Medicare program, it was

17

required to comply with the AKS and other federal anti-fraud laws, including the FCA, and could face enforcement and/or litigation based on any violations. (Doc. No. 70 ¶¶ 100–02)

In addition to the AKS and FCA, Clover was subject to the passel of regulations applied specifically to operators of Medicare Advantage plans. (*Id.* ¶ 103.) For example, "CMS regulates marketing of products by" Medicare Advantage plan operators, including by dictating what the company may or "may not do in conducting communication activities." *Hepstall v. Humana Health Plan, Inc.*, No. CV 18-0163-JB-MU, 2018 WL 6588555, at *5 (S.D. Ala. Nov. 26, 2018), *report and recommendation adopted*, No. CV 18-0163-JB-MU, 2018 WL 6588552 (S.D. Ala. Dec. 6, 2018). The marketing regulations in effect at the relevant times forbade Clover from "[p]rovid[ing] cash or other monetary rebates as an inducement for enrollment or otherwise." (Doc. No. 70 ¶ 105.)

CMS also regulates Medicare Advantage plan operators' imposition of "plan-initiated activities" on healthcare providers. "CMS defines plan-initiated activities as those activities where either a Plan . . . requests contracted providers to perform a task or the provider is acting on behalf of the Plan . . . ." CMS Pub 100-18 60.2 Pursuant to CMS's regulation of plan-initiated activities, a plan cannot allow the healthcare providers with which it does business to:

- Accept/collect scope of appointment forms;

- Accept Medicare enrollment applications;

- Make phone calls or direct, urge, or attempt to persuade their patients to enroll in a specific plan based on financial or any other interests of the provider;

- Mail marketing materials on behalf of Plans/Part D sponsors;

- Offer inducements to persuade their patients to enroll in a particular plan or organization;

- Conduct health screenings as a marketing activity;

18

• Distribute marketing materials/applications in areas where care is being delivered;

• Offer anything of value to induce enrollees to select them as their provider; or

• Accept compensation from the plan for any marketing or enrollment activities.

*Id.*

In 2016, CMS fined Clover a bit over $100,000 for "engag[ing] in marketing activities during the Contract Year (CY) 2016 Annual Election Period (AEP) that misled or confused potential enrollees about their ability to always receive covered services from any out-of-network (OON) provider." (Doc. No. 70 ¶ 107.) According to CMS, "Clover's materials incorrectly stated that OON providers and facilities participating in Medicare are obligated to accept Clover enrollees." (*Id.* ¶ 108.) CMS chastised Clover for having "failed to correct the misleading statements after repeated notifications from CMS." (*Id.* ¶ 107.) A CMS undercover "secret shopper" operation documented Clover brokers/agents making similar false representations. (*Id.* ¶ 108) CMS found a number of additional marketing-related violations as well, involving issues such as Clover's characterization of an industry award on its website. (*Id.* ¶ 109.) According to the Hindenburg Report, however, the result of CMS's findings and fine was not to chasten Clover, but to embolden it, because the monetary consequences of its actions were so small. According to the Report, Garipalli took the relatively modest fine as a sign that the company could and should "push the envelope further." (*Id.* ¶ 110.)

Nevertheless, as the Hindenburg Report pointed out, Clover executives were aware that, if the company engaged in sufficiently severe wrongdoing, it potentially faced a consequence far more severe than any fine. As a Medicare Advantage plan provider, Clover had to stay at least somewhat in CMS's good graces merely to function, let alone turn a profit. A former Clover employee told Hindenburg that Clover executives understood that, if a Part C plan provider

19

"bite[s] the hand that feeds"—that is, if it sufficiently antagonizes the Medicare program—then that company "could get . . . banned from [the Part C] marketplace quickly." (*Id.*) For a business like Clover, built almost entirely around participation in Part C, such a ban could be disastrous.

The plaintiffs allege that, throughout the Class Period, Clover and its executives "represented to investors and SCH's shareholders that the Company had complied with all its legal obligations over the prior two-and-a-half years and was not aware of any government investigation or other legal proceeding that could have a material impact on its performance." (*Id.* ¶ 123.) For example, on October 6, 2021, the defendants filed a copy of a Merger Agreement with the SEC that included a representation that, to Clover's knowledge, there were no material pending or threatened "lawsuits, actions, suits, judgments, claims, proceedings or any other Actions . . . by any Governmental Authority." Another section of the agreement represented that "[e]ach of [Clover] and its Subsidiaries . . . in all material respects meets and complies with, and since January 1, 2018, has met and complied with, all applicable Laws."[5] (*Id.* ¶ 124.)

The plaintiffs argue that those representations were false because Clover had, in fact, engaged in numerous violations of the AKS, the FCA, and Medicare guidelines, particularly with regard to using unlawful inducements to encourage physicians to contract with Clover. For example, CW3 claims that, on multiple occasions, she was instructed by Clover Chief Development Officer Ethan Lipkind to purchase gift cards and give those gift cards to healthcare providers and their staffs to "get buy-in" from them. CW3 resisted the request and warned Lipkind that such a strategy "isn't compliant" with the governing law. Lipkind allegedly threatened to fire her unless she followed his instructions, and she did so, providing the gift cards

---

[5] When the merger agreement was filed with the SEC, it was apparently accompanied by a disclaimer cautioning the reader not to rely on its claims as "characterizations of the actual state of facts" about Clover. (*See* Doc. No. 75 at 17 n.10.) However, "[c]ourts have long held that general disclaimers of accuracy do not shield sellers who knowingly make false statements." *In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*, 541 F. Supp. 2d 986, 1005 (S.D. Ohio 2007) (discussing cases).

20

to a medical practice in Georgia. When Lipkind asked CW3 to do the same with another practice, CW3 complained to her direct supervisor, Director of Network Engagement Zoe Farrell, who confirmed that the practice was, in her view, fraudulent. (*Id.* ¶¶ 128–30.) Farrell referred CW3's complaint to Clover's compliance department. (*Id.* ¶ 131.) Nevertheless, Lipkind was promoted a few months later, and Farrell was fired. (*Id.* ¶ 134.)

There is, moreover, evidence that Lipkind's requests to CW3 were not isolated incidents. According to the Amended Complaint, CW4 "said that she recalled hearing during her time at Clover in the Network Expansion and Growth department that Clover was giving gift cards to front office staff at providers' offices, which struck her as illegal. CW4 said that what she heard made it sound like something Lipkind was doing." (*Id.* ¶ 133.) One employee was quoted in the Hindenburg Report as saying that Clover distributed gift cards "all over the freaking map " and that it was doing so specifically to encourage providers to direct their patients to Clover. (*Id.* ¶ 135.) And CW3 herself was told by another employee—this one based in Texas—that Lipkind had also instructed her to employ the gift card tactic. (*Id.* ¶ 133.)

The Hindenburg Report also stated that Clover had a "confidential program" through which it paid staff in physicians' offices to refer patients to Clover without disclosing that they were paid "Clover Ambassadors." (*Id.* ¶ 136.) As a former employee described it, "The receptionist would notice that a patient checking in was enrolled in, say, United Healthcare, and would mention to the patient that there was another plan that might meet their needs better—'Do you want more information? No problem. I'll have them give you a call.'" (*Id.* ¶ 136.)

The plaintiffs assert that both the giving out of gift cards and the paid "ambassador" program violated the AKS and Medicare guidelines because they amounted to payments for referrals. (*Id.* ¶ 137.) The federal government's interest in such allegations, moreover, was not

merely hypothetical. By early 2019 at the latest, the U.S. Department of Justice ("DOJ") had opened an FCA investigation of Clover based on its practices related to referrals. As part of its investigation, it contacted some Clover employees, including CW3. According to CW3, the DOJ told her that Clover had been informed of the investigation. (*Id.* ¶ 139.)

The Hindenburg Report confirmed the investigation's existence and that a former Clover employee had been served with a civil investigative demand ("CID") from the DOJ in late October 2020.[6] The CID was issued pursuant to 31 U.S.C. § 3733, which requires that the demand be made in connection with a "false claims law investigation." 31 U.S.C. § 3733(a). The CID stated that the underlying investigation "generally concerns whether Clover Health Investment Corporation and/or related entities improperly induced patient referrals for services paid for by Federal Agencies." (Doc. No. 70 ¶ 142.) It listed a number of topics on which DOJ sought information, including Clover's use of gift cards and Clover Ambassadors. (*Id.* ¶ 143.) The Hindenburg Report stated that DOJ was also questioning employees about the Clover Assistant and whether it could be connected to upcoding. (*Id.* ¶ 142.)

Although the defendants, as the court has already discussed, made statements attesting to Clover's general compliance with the law, several SEC filings from during the Class Period included the following language:

> Our operations, current and past business practices, contracts and accounts and other books and records are subject to routine, regular and special investigations, audits, examinations and review by, and from time to time we receive subpoenas and other requests for information from, federal and state supervisory and enforcement agencies, attorneys general and other state, federal and international governmental authorities and legislators.

---

[6] The Amended Complaint states that a CID was served on Clover, not merely a former employee. (*See* Doc. No. 70. ¶ 141.) That does not appear to be the case. (*See* Doc. No. 76-8 at 6.) Clover, however, has conceded that, prior to the close of the Class Period, it received a DOJ "request for information" regarding what appears to be the same general subject matter. (Doc. No. 76-9 at 5.)

(*Id.* ¶ 241.) Clover often used similar general language, acknowledging "audits, investigations and reviews," but it did not specifically disclose that it was aware of a DOJ investigation involving kickbacks until after the Class Period had closed. (*Id.* ¶ 243)

Eventually, the Hindenburg Report revealed the extent of Clover's potential exposure in the DOJ investigation. The Report stated: "Clover has not disclosed that its business model and its software offering, called the Clover Assistant, are under active investigation by the [DOJ], which is investigating at least 12 issues ranging from kickbacks to marketing practices to undisclosed third-party deals . . . ." (*Id.* ¶ 322.) The report included a redacted version of the CID itself. (*Id.* ¶ 323.) On February 5, 2021, Clover Director of Corporate Communications Andrew Still-Baxter issued a response to the Hindenburg Report[7] entitled "In Response to Short Seller Firm's Questions," which addressed, among other things, that investigation. The response, which purported to be from Garipalli and Toy, explained that both Clover and Palihapitiya had been "fully aware of the DOJ inquiry" but had concluded, based on the advice of counsel, that "the fact of DOJ's request for information was not material and was not required to be specifically disclosed in our SEC filings." (*Id.* ¶ 145.)

### 3. Causes of Clover's Membership Growth

The plaintiffs argue that Clover's reliance on kickbacks to drive member recruitment is relevant to the company's value for reasons beyond merely the risk of AKS enforcement. Throughout the Class Period, Clover touted its impressive membership growth, which was particularly important given that it would need aggressive growth to actually compete with the much larger market share of established Medicare Advantage plan providers. For example, on October 6, 2020, Palihapitiya wrote on Twitter that "Clover Health is the fastest growing MA plan in the US." (*Id.* ¶ 149.) Clover and its executives routinely attributed this growth to the

---

[7] The response was issued through the online platform Medium.

attractiveness of its plans, which, they claimed, were able to be inexpensive due, in part, to the benefits of the Clover Assistant. (*Id.* ¶¶ 272–73.) If, however, Clover's growth was not based on the quality of its services and products, but rather simply represented the fruit of kickbacks and/or other improper methods of stimulating growth, then it would not reflect as positively—if positively at all—on Clover's ability to compete with larger insurers.

Numerous SEC filings included similar language regarding Clover's growth, including ones explicitly attributing Clover's past growth and its future expected growth to specific features of the business. For example, several filings claimed that "[t]he SCH board of directors believes that Clover's best-in-class plans will continue to deliver market-leading growth" and that "[t]he Clover Assistant allows Clover to generate positive margins while maintaining significant growth." (*Id.* ¶ 151.) Some filings even specifically referred to the growth in membership as "organic" and directly attributable to features of Clover's plans. (*Id.* ¶ 152.) The plaintiffs suggest that such claims implicitly—if not, in at least a few instances, explicitly— suggested that the growth was not being driven by kickbacks or any other unlawful or otherwise unsustainable practice, but rather the actual value of Clover's plans—which, the plaintiffs suggest, was false. (*Id.*)

Kickbacks were not the only factor allegedly driving artificial, unsustainable growth of Clover's business; there was also the issue of whether Clover's ostensibly organic growth was actually simply the result of leveraging the preexisting connections of a single employee in one geographically limited market. As of December 31, 2019, over 97% of Clover's business was in New Jersey, where Clover's own Head of Sales, Hiram Bermudez, happened to own and operate a number of successful insurance brokerages, including B&H Assurance ("B&H"). According to CW2, "everyone knew that Hiram was well-connected with brokers in New Jersey. Sort of like

an old-school union boss. He was buddies with these guys. He could bring in a lot of brokers." (*Id.* ¶ 156.) CW3 stated that most of Clover's New Jersey business came through companies affiliated with Bermudez, but the results of its attempted expansions into other markets were tepid, at least in part because, without his New Jersey network of connections, Bermudez was not an effective salesman. (*Id.* ¶ 160.) Clover's SEC filings acknowledged its geographically limited customer bases, but not Bermudez's dual role. (*Id.* ¶ 154.) Bermudez allegedly sought to conceal this relationship by putting related documents in his wife's name rather than his own. (*Id.* ¶ 162)

As with the DOJ investigation, the Hindenburg Report revealed the supposed truth, informing the public that "[m]ultiple former employees explained that much of Clover's sales are fueled by a major undisclosed relationship between Clover and an outside brokerage firm controlled by . . . Bermudez." (*Id.* ¶ 162.) The Hindenburg Report concluded, "Clover's Head of Sales appears to operate a large, separate insurance brokerage firm that does significant undisclosed business with Clover, through his wife's name. Clover then claims in the very first pages of its go-public prospectus to be generating its business organically due to its amazing software." (*Id.* ¶ 168.) Following the Hindenburg Report, Clover confirmed aspects of the reports regarding Bermudez, although it took issue with many details and did not concede any wrongfulness. (*Id.* ¶¶ 169–72.) The plaintiffs, however, maintain that Bermudez's relationships, like Clover's kickbacks, was another method of creating artificial growth that the company could then falsely attribute to the Clover Assistant, fueling the market's perception of Clover as a technology-driven innovator.

### 4. Financial Statements, GAAP, and Related-Party Disclosures

"'Generally accepted accounting principles'"—typically referred to as "GAAP"—"are the basic postulates and broad principles of accounting pertaining to business enterprises,

approved by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants ('AICPA')" and its successor entities. *S.E.C. v. Price Waterhouse*, 797 F. Supp. 1217, 1223 n.17 (S.D.N.Y. 1992) (citing *S.E.C. v. Arthur Young & Co.*, 590 F.2d 785, 788 (9th Cir. 1979)); *see also James v. Antarctic Mech. Servs., Inc.*, No. 3:18-CV-678, 2021 WL 4999012, at *3 n.1 (S.D. Miss. Oct. 27, 2021) (discussing AICPA's "successor groups") (citation omitted). "SEC regulations dictate that where financial statements are not prepared in compliance with GAAP, they are presumed to be misleading." *DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp. 3d 187, 207 (S.D.N.Y. 2019) (citing 17 C.F.R. § 210.4–01(a)(1); *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016)). During the Class Period, SCH/Clover made numerous SEC filings that included representations that Clover's "consolidated financial statements are prepared in accordance with GAAP." (Doc. No. 70 ¶ 176.)

In order to comply with GAAP, however, an entity's financial statements must disclose whether they reflect any material "related party transactions," such as "those between a parent company and its subsidiaries, subsidiaries of a common parent, an entity and its principal owners, management, or members of their immediate families, and affiliates." *In re LexinFintech Holdings Ltd. Sec. Litig.*, No. 3:20-CV-1562-SI, 2021 WL 5530949, at *9 n.9 (D. Or. Nov. 24, 2021). This rule is codified in SEC Regulation S-X, Rule 4-08(k)(1), which requires that any related party transaction that affected a financial statement filed with the SEC "should be identified," including the underlying amounts attributable to those transactions. See 17 C.F.R. § 210.4-08(k). (Doc. No. 70 ¶ 178.) The plaintiffs allege that, because Bermudez, a key Clover executive, owned at least 50% of B&H, Clover's use of B&H to sell thousands of policies making up a considerable percentage of its business should have been disclosed. As Clover

26

eventually disclosed after the end of the Class Period, B&H received over $1.3 million in payments for Clover-related products from 2017 to the present. (*Id.* ¶ 180.) The plaintiffs estimate that Bermudez's businesses accounted for at least 14%—and likely significantly more—of Clover's customers. (*Id.* ¶ 182.)

Many of the defendants' filings did include express disclosures of some related-party transactions, such as Clover's dealings with CarePoint Health System, which was "ultimately held and controlled by" Garipalli. (*Id.* ¶ 305.) Those disclosures, however, omitted any mention of Bermudez and his control of insurance brokerages that accounted for a substantial amount of Clover's success in the one geographic market where that success had occurred. (*Id.*) An ordinary investor reading those filings, the plaintiffs argue, would have reasonably assumed that Clover recognized its obligation to disclose material related party transactions and that, because it did not disclose any such transaction that could account for the company's success in New Jersey, then such success was the organic result of arm's-length transactions. (*Id.* ¶ 306.)

### 5. Regulation S-K

The plaintiffs argue that the defendants' failure to disclose the flaws at the heart of Clover's business was fraudulent, not only in light of the defendants' allegedly misleading statements concealing those flaws, but also in light of the SEC's rules for required disclosures in filings with the agency, particularly Items 303 and 105 of Regulation S-K. "Item 303 of Regulation S–K requires the disclosure of, among other things, . . . 'any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.'" *In re Thornburg Mortg., Inc. Sec. Litig.*, 824 F. Supp. 2d 1214, 1249 (D.N.M. 2011) (quoting 17 C.F.R. § 229.303(a)). "Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105,

requires that an issuer [of an SEC filing] 'disclose the most significant factors that make an investment in the registrant or offering speculative or risky.'" *In re HEXO Corp. Sec. Litig.*, 524 F. Supp. 3d 283, 302 (S.D.N.Y. 2021) (quoting *In re Proshares Trust II Sec. Litig.*, No. 19 Civ. 886, 2020 WL 71007, at *9 (S.D.N.Y. Jan. 3, 2020)). The plaintiffs allege that Clover/SCH violated Regulation S-K by failing to disclose that it was subject to a DOJ investigation, that it had relied on related-party transactions to build its customer base, or that its internal data showed that few physicians were using the Clover Assistant as intended. (Doc. No. 70 ¶ 310.)

**E. This Case**

On February 5, 2021, Timothy Bond filed a Complaint against Clover, Palihapitiya, Garipalli, and Toy, stating claims under § 10(b) of the Exchange Act against all defendants and § 20(a) of the Exchange Act against the individual defendants. (Doc. No. 1.) A few other plaintiffs filed similar cases, which were consolidated with the original. (Doc. No. 42.)

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that, "[n]ot later than 20 days after the date on which [a private securities fraud class action complaint] is filed, the plaintiff or plaintiffs shall cause to be published . . . a notice" informing other potential class members of the complaint. 15 U.S.C. §78u-4(a)(3)(A)(i). Then,

> [n]ot later than 90 days after the date on which [the] notice is published . . . , the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members . . . .

15 U.S.C. §78u-4(a)(3)(B)(i). The court followed that procedure and, after considering a number of motions from aspiring lead plaintiffs, selected Firas Jabri for the role. (Doc. No. 58 at 9.) The

court also approved Pomerantz LLP as lead counsel and Bramlett Law Firm as liaison counsel. (*Id.*)

On June 28, 2021, Jabri—joined by Tremblay, who shares the same counsel—filed the Amended Complaint, which names Clover, Garipalli, Toy, Wagner, and Palihapitiya as defendants. (Doc. No. 70.) Like the original Complaint, it states claims under § 10(b) of the Exchange Act against all defendants and § 20(a) of the Exchange Act against the individual defendants. (*Id.* ¶¶ 367–382.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff" and "accept its allegations as true." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Unless additional pleading requirements specific to the plaintiff's claims say otherwise, the Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the

plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

In addition to those requirements, plaintiffs stating securities fraud claims must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b). *Frank v. Dana Corp.*, 547 F.3d 564, 569–70 (6th Cir. 2008). Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud." The Sixth Circuit has explained that, while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is to serve the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citations and quotation marks omitted). "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.*

"Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *United States ex*

*rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)). Nevertheless, "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put [the opposing party] on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

Finally, in addition to the requirements of Rule 9(b), the PSLRA imposes particular heightened pleading requirements for certain elements of the plaintiffs' claims, which the court will discuss in connection with those elements. If a plaintiff fails to satisfy the pleading requirements of the PSLRA, his securities fraud claims should be dismissed, even if he otherwise satisfied the pleading standards applicable to other fraud claims under the Federal Rules. *See In re Comshare Inc. Sec. Litig.*, 183 F.3d 542, 549 (6th Cir. 1999) (observing that the PSLRA "changed what a plaintiff must plead in his complaint in order to survive a motion to dismiss") (citation omitted).

## III. ANALYSIS

### A. Nature of the Alleged Fraud

"Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder prohibit 'fraudulent, material misstatements or omissions in connection with the sale or purchase of a security.'" *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (quoting *Frank*, 547 F.3d at 569). "To state a securities fraud claim under Section 10(b), a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 468 (6th Cir. 2011) (quoting *Frank*, 547 F.3d at 569). Section 20(a) extends that liability to

31

"[e]very person who, directly or indirectly, controls" the person or entity that committed the fraud. 15 U.S.C.A. § 78t(a).

In a conventional securities fraud case involving sales of securities on the private market, the court typically must scrutinize the effect of the defendants' statements and/or omissions on the decisions of individual investors to determine whether the statements affected, and ultimately harmed, each plaintiff. *See Chelsea Assocs. v. Rapanos*, 527 F.2d 1266, 1271 (6th Cir. 1975) ("In the usual fraud case or case brought for misrepresentation in violation of Rule 10b-5, proof of reliance upon the misstated or false fact is required.") (citing *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2nd Cir. 1974), *cert. denied*, 421 U.S. 976 (1975)). However, "modern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases." *Basic Inc. v. Levinson*, 485 U.S. 224, 243–44 (1988). As the Supreme Court has explained:

> In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.

*Id.* at 244 (quoting *In re LTV Secs. Litig.*, 88 F.R.D. 134, 143 (N.D. Tex. 1980)). If, for example, an executive of a company makes a false statement affecting the market price of the company's stock, and a buyer purchases the stock at that market price, the buyer has, as a practical matter, relied on the executive's false statement in deciding what price to pay for his shares—even if the buyer was personally unaware of the statement. This theory—known as the "fraud-on-the-market" theory of reliance—acknowledges that a modern investor acting on an open and

efficient securities exchange is relying on the market itself to be his eyes and ears with regard to publicly available information. *Id.*

This is one such fraud-on-the-market case. The plaintiffs allege that, throughout the process leading to the merger of SCH and Clover and until the release of the Hindenburg Report, the defendants successfully deceived the market into thinking Clover was a much more valuable *asset* than it was, by creating the illusion that it was a much more promising *company* than it was. The plaintiffs have identified a number of ways that the defendants' statements were allegedly fraudulent, although all of the underlying falsehoods were, in a sense, part of the same basic scheme. In short, Clover and its backers allegedly set out to boost its valuation by casting the company as a paradigm-disrupting tech firm, rather than just a small provider of Medicare Advantage plans. To do so, the defendants made repeated statements attributing the company's growth to a software product, the Clover Assistant, and the supposedly high-quality plans enabled by that tool. In reality, though, Clover's growth had been driven by kickbacks and undisclosed related-party transactions that had little hope of helping the company anywhere outside of New Jersey without running afoul of the AKS and FCA. In order to keep the charade going, the plaintiffs allege, Clover and its executives misrepresented the success—and particularly the adoption rate—of the Clover Assistant and concealed the extent of the company's potential exposure for regulatory violations, including by failing to disclose that it was subject to a significant DOJ investigation.

The defendants dispute every significant aspect of that characterization, as well as the bare adequacy of the plaintiffs' pleadings. Specifically, the defendants argue that the court should dismiss the plaintiffs' claims because (1) they have failed to plead the existence of false or misleading statements or omissions on which a reasonable investor could have relied, (2) they

33

have failed to adequately plead a strong inference of scienter, and (3) they have failed to plead loss causation.

## B. The Plaintiffs' Reliance on Confidential Witnesses and the Hindenburg Report

As a preliminary matter, the defendants argue that, before the court applies the substantive law of securities fraud to the plaintiffs' allegations, the court should first remove from its consideration certain facts that, although pleaded in the Amended Complaint, supposedly lack sufficient foundation to be considered. First, the defendants argue that the court should disregard the allegations pleaded by the plaintiffs stemming from facts revealed in the Hindenburg Report, because that Report lacks "indicia of reliability." (Doc. No. 75 at 11.) Similarly, the defendants argue that the court should disregard allegations by the CWs because the Amended Complaint "does not offer facts showing that the CWs were in a position to support Plaintiffs' theories." (*Id.*) Although arguments such as those would typically not be appropriate in support of a motion to dismiss because they call on the court to weigh the value of evidence, the defendants suggest that the court can venture into such an inquiry because the plaintiffs' claims are subject to the heightened pleading standards of the PSLRA. (*See id.* at 13.)

The fact that a claim is subject to the PSLRA, however, does not override the principle that, when a court considers a Rule 12(b)(6) motion, it must "accept plaintiff's allegations as true and construe the complaint in its favor." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014) (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)); *see also See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true."). The PSLRA's heightened pleading standards are still *pleading* standards—not evidentiary

ones—and they should not be misconstrued as an invitation for defendants to "finess[e] the evidentiary limits of a 12(b)(6) motion." *Union Asset Mgmt. Holding AG v. Sandisk LLC*, 227 F. Supp. 3d 1098, 1100 (N.D. Cal. 2017).

There is, moreover, nothing inherently objectionable about relying on the CWs or the Hindenburg Report. No provision in the Exchange Act, the PSLRA, or the Federal Rules requires a securities fraud plaintiff to plead fraud only based on his own direct knowledge. Indeed, the PSLRA acknowledges that complaints will often have to be pleaded based on acquired information, requiring only that, "if an allegation . . . is made on information and belief, the complaint [must] state with particularity all facts on which the belief is formed." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 569 (6th Cir. 2004) (quoting 15 U.S.C. § 78u–4(b)(1)). Consistently with that rule, "plaintiffs may rely on confidential witnesses if they plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1037 n.2 (6th Cir. 2016) (citing *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 305 (2d Cir. 2015); *Ricker v. Zoo Ent., Inc.*, 534 F. App'x 495, 496 n.2 (6th Cir. 2013)).

The plaintiffs have provided the types of information that courts have typically required in concluding that pleadings based on CW statements were sufficient, such as the CWs' job descriptions and periods of employment, as well as specific allegations regarding how the CWs came to possess the information that they did. *See, e.g.*, *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 704 (E.D. Mich. 2010*); In re Huffy Corp. Sec. Litig.*, 577 F. Supp. 2d 968, 993 (S.D. Ohio 2008). That is sufficient to allow the court to consider the allegations in the Amended Complaint attributed to those sources.

35

Admittedly, there are details about the CWs' statements that bear on the extent to which the plaintiffs can rely on them to establish plausible grounds for relief for the purposes of Rule 12(b)(6). For example, while the CWs allegedly worked at Clover during the time period of some of the events *referred to* in the allegedly actionable statements—such as Clover's early growth—it does not appear that the CWs worked at Clover during the Class Period itself. Accordingly, while the CWs can speak directly to the accuracy of backwards-looking statements from the Class Period, their reliability with regard to the precise status quo within the company during the Class Period is more limited. That does not mean, however, that the CWs' statements are useless for those purposes; information about a company's immediate past may well be helpful in understanding its present. *See Simon v. Abiomed, Inc.*, 37 F. Supp. 3d 499, 515 (D. Mass. 2014) ("A witness need not have been at the company for entire, or indeed any, of an asserted class period to have probative information."). Moreover, many of the CWs' statements describing problems at Clover were echoed by the Hindenburg Report, which corroborated that the trends that these CWs witnessed continued into the Class Period.

Of course, the defendants ask the court to disregard the Hindenburg Report as well. Other courts, however, have found that so-called "short seller reports" like the Hindenburg Report, if pleaded with sufficient context attesting to their credibility, can appropriately be relied upon in a complaint. *See, e.g.*, *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 123–24 (S.D.N.Y. 2013) ("The majority of courts that have addressed the issue have held that a short-seller report . . . 'does not implicate the same skepticism as a traditional" anonymous source.'") (quoting *Ho v. Duoyuan Global Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012)); *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012) ("It is permissible for Plaintiffs to rely on a short seller report . . . to allege falsity at the pleading stage."). Indeed, even

the defendants ultimately admit, in their Reply, that a plaintiff may rely on short-seller reports and still comply with the PSLRA. (*See* Doc. No. 83 at 3.)

The plaintiffs have explained with particularity what the Hindenburg Report was and why it is sufficiently credible to be discussed in the Complaint. It appears that the market itself agreed, reacting negatively to the Report in a way that would not make sense if the Report had lacked credibility in the eyes of reasonable, knowledgeable investors. The general reliability of the Report, moreover, is corroborated by the CWs and even by the defendants' own response conceding (but placing a positive spin on) aspects of the Report. Although the defendants would prefer for the court to pick specific parts out of the Report—such as its reliance on confidential sources—and dismiss them as lacking credibility, doing so in the face of this much corroboration and supportive context, on a Rule 12(b)(6) motion, would significantly overstep the court's role.

## C. Falsity/Materiality

"General allegations of [falsity and materiality] are not enough" to satisfy Rule 9(b) or the PSLRA. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d at 470. Rather, "[t]he PSLRA mandates that," in order to survive a motion to dismiss, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which the belief is formed." *In re Ford*, 381 F.3d at 569 (quoting 15 U.S.C. § 78u-4(b)(1)). Moreover, a finding of fraud under Section 10(b) cannot be premised on a statement that is "too vague to qualify as material," such as a claim that is so "soft" that it "escapes 'objective verification.'" *Ashland, Inc.,* 648 F.3d at 468 (quoting *In re Ford*, 381 F.3d at 570).

The requirement to plead the broader circumstances establishing fraud is particularly important when pleading an allegedly fraudulent omission, because "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5" or Section 10(b). *In re Ford*, 381 F.3d at 569 (quoting *Basic, Inc.*, 485 U.S. at 239 n.17). As a result, a plaintiff alleging fraud by omission must plead, not only what the plaintiff thinks the defendants should have disclosed, but also what circumstances actually made that disclosure required. A duty to disclose may come from an affirmative rule requiring a company to divulge certain information at a specific juncture—such as, for example, the rules requiring inclusion of particular information in SEC-mandated reports. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (discussing 17 C.F.R. § 229.303(a)(3)(ii)). The plaintiffs' reliance on Regulation S-K, for example, implicates that type of uniformly required disclosure.

However, federal securities law also recognizes that a party may assume additional disclosure obligations by its statements or actions. In particular, when a company or executive chooses to make public statements on a topic material to a securities transaction, that party "assume[s] a duty to speak fully and truthfully on [the] subject[]" at hand. *In re Ford*, 381 F.3d at 569 (quoting *Helwig v. Vencor*, Inc., 251 F.3d 540, 561 (6th Cir. 2001)) (alteration in original). Once that duty arises, a party may commit fraud by remaining silent regarding a fact that it otherwise would have had no duty to reveal. In such a case, the original statement and the misleading omission are effectively the same lie seen from different angles; the statement misled because of what was omitted, and the omission misled because of what was said. Such allegations must be evaluated in their entirety, without becoming too bogged down by the statement/omission distinction; after all, "every misrepresentation involves an omission of the true information," and a plaintiff may, "[t]hrough word games, . . . style his or her complaint as a

38

material misrepresentations [case] *or* [an] omissions case" without any change in the substance. *Simpson v. Specialty Retail Concepts*, 823 F. Supp. 353, 356 n.7 (M.D.N.C. 1993) (emphasis added).

While the caselaw governing securities fraud claims is complex, and the statutory requirements of the PSLRA complicate matters even further, the court's inquiry into falsity and materiality is still, at its heart, the same basic inquiry that has animated fraud cases for decades, if not centuries. The court must look at the statements made, as well as their context, to develop a sufficient understanding of what the statements meant and how they reasonably would have been construed. Then, the court must determine whether the statements were false and/or misleading and, if so, whether the statements' flaws reasonably bore on the underlying transactions. If those inquiries support a conclusion that the relevant statements and/or omissions were materially false and/or misleading, the court can look to the issues of scienter and loss causation to determine whether fraud occurred.

### 1. Causes of Clover's Growth/Success of the Clover Assistant

The plaintiffs have pleaded numerous instances in which Clover and its executives alleged that Clover's growth was a result of the quality of its plans and the benefits of the Clover Assistant. Those statements, according the plaintiffs, were false—or at least actionably misleading—because the growth was actually simply the result of kickbacks and exploiting Bermudez's preestablished connections in the New Jersey insurance market. The defendants dispute the plaintiffs' account of what drove Clover's growth. Even aside from the question of whether Clover may have reaped some benefits from kickbacks or Bermudez's connections, however, defendants argue that their general statements attributing Clover's growth to the quality of its products were simply too anodyne and vague to be materially misleading. No reasonable

39

investor, the defendants argue, would be affected by a company's unremarkable claim that its growth was attributable to the quality of its products.

It is true that a company's general boasts of quality are often insufficient to establish liability under Section 10(b), because many such statements "lack[] a standard against which a reasonable investor could expect them to be pegged." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671–72 (6th Cir. 2005). The caselaw of this circuit, however, recognizes that even superficially broad statements of corporate self-praise must be evaluated in context to determine if they convey more than just a generalized optimism. *See id.* at 671–72 (citing *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175–76 (D.R.I. 2003)). "[O]pinion or puffery . . . in particular contexts when it is both factual and material . . . may be actionable." *Id.* at 671–72 (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999)) (emphasis omitted).

If the plaintiffs had premised their fraud claims solely on boasts that Clover offered high-quality Medicare Advantage plans, then it might well be the case that such claims would be appropriate for dismissal on the ground that no reasonable investor would have been deceived. The defendants' assertions about the causes of Clover's growth, however, were built around a core contention that was factual and definite in nature: the claim that the Clover Assistant *actually worked*—and did so on a scale that was capable of translating into more attractive Medicare Advantage plans. The defendants then claimed that those software-enabled successes were, as a factual matter, the driver of Clover's growth—an objective statement of cause and effect plainly distinguishable from a simple claim of quality. The plaintiffs have pleaded, in detail, that those statements were false and that the Clover Assistant was, for the most part, merely a nuisance that physicians rarely used as designed, while other, objectively identifiable

factors caused the growth. The proposition that the Clover Assistant worked well and drove growth was the core of Clover's pitch to investors, and there is no reason for the court to assume that a reasonable investor would have ignored it simply because it also resembled, on some superficial level, empty corporate self-praise.

Nevertheless, the defendants argue that this court should adopt the reasoning of the District Court for the Western District of Kentucky in *In re Almost Fam., Inc. Sec. Litig.*, No. 3:10-CV-00520-H, 2012 WL 443461, at *6 (W.D. Ky. Feb. 10, 2012), in which the court dismissed securities fraud claims based on, among other things, a statement "attribut[ing] the [underlying] company's success to strong senior management." *Id.* at *6. That court, however, did not suggest that a claim attributing a company's growth to a particular factor was incapable of being fraudulent. To the contrary, the court, if anything, explicitly acknowledged that such a statement *can* be fraudulent, holding only that, "[t]o establish these statements as material misrepresentations, [a plaintiff] must allege facts showing them to be false, not merely incomplete, information." *Id.* at *7. The court did dismiss the claims, but it did so because the plaintiffs did not "specifically alleg[e] that the statements made by [the executive] were false." *Id.* In this case, however, the plaintiffs have pleaded, with detail and specificity, that the claims attributing Clover's growth to the Clover Assistant were false and/or misleading because they were premised on an inaccurate picture of the Clover Assistant's effectiveness.

In any event, the plaintiffs' assertion that the defendants misstated the positive reasons for Clover's growth cannot be cleanly separated from the allegation that the real, more troubling causes of that growth—that is, the kickbacks and Bermudez's undisclosed role as an ostensibly independent broker of Part C plans in New Jersey—were being concealed. The plaintiffs do not merely assert that the Clover Assistant failed to drive growth; they have offered a specific,

41

detailed, and plausible account of what *did* drive the growth and why it was important to the defendants to conceal the truth. This is, therefore, not simply a case of vague boasting, but rather an affirmative attempt to substitute a false but favorable narrative in the place of a true but damaging one.

With regard to Bermudez, the defendants argue that the plaintiffs "offer no facts to support their claim that Clover's growth had anything to do with Bermudez having an interest in B&H." (Doc. No. 75 at 28.) The defendants' argument once again veers close to substituting the PSLRA's pleading standard with an evidentiary one. Even if one accepts the defendants' framing, however, it is simply not true that the allegations about Bermudez lack particularity or support. Indeed, for all of the defendants' objections, it does not appear that anyone disputes Bermudez's role with B&H. Moreover, it does not take much imagination or speculation to see how one's ownership of insurance brokerages could be used to drive sales toward one vendor; the power to direct customers in one direction or another is inherent in the broker's role. There is no requirement that the plaintiffs identify each individual beneficiary who bought a Clover plan through B&H and explain why that purchase would have been unlikely absent Bermudez's undisclosed dual status. It is enough to say that he, as the undisclosed owner of brokerages on which Clover relied while also on Clover's payroll as an executive, used those brokerages to direct business to Clover, in the manner that any such brokerage could prefer any insurer, and that he did so in such volume that it was a major contributor to Clover's growth.

The defendants next argue that the plaintiffs have not sufficiently pleaded that the Clover Assistant had a low rate of adoption or use as intended. Specifically, the defendants suggest that the plaintiffs' reliance on the CWs, who left Clover before the Class Period, fails to account for Clover's "changing and improving the Clover Assistant throughout the fourteen-month period

42

after the last of the CWs left the Company." (Doc. No. 75 at 31.) The allegations regarding Clover's low adoption rate, however, were confirmed by the Hindenburg Report, both anecdotally and through the actual polling of physicians in Clover's network, and the Hindenburg Report did not suffer from the CWs' time limitations. (*See* Doc. No. 70 ¶ 200.)

Finally, the defendants deny that any of the statistics they gave the investing public about Clover Assistant were actually false, even if they did not actually depict the widespread adoption of the tool that some may have assumed they did. (*See* Doc. 75 at 32.) But even if it is somehow true that the defendants' numbers reflected merely creative definitions and parameters, rather than outright lies, it is well-settled that "statements that are technically true can still be misleading." *Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 878 (N.D. Ill. 2011) (citation omitted). If Congress wanted to adopt a "literal falsehood" requirement for securities fraud claims, it could have, but it has not. Of course, a district court considering an allegation of securities fraud should not "attribute to investors a child-like simplicity." *In re Omnicare*, 769 F.3d at 471–72. Under the law as it currently exists, however, there is a point at which a speaker's use of elision and obfuscation becomes actionable, even if he has in his back pocket an anticipated defense that nothing he said was technically untrue. The plaintiffs have pleaded, with particularity, that the statements about the Clover Assistant's adoption were at least misleading, which, in light of the Assistant's stated centrality to Clover's business, is all that is required to prevail on the elements of falsity and materiality.

## 2. Compliance

The defendants argue that none of their statements attesting to Clover's compliance with the law was materially false or misleading and that it was, in particular, not a material omission

to fail to disclose the DOJ investigation. They point out that Clover regularly acknowledged that it, as a Part C plan provider, was subject to audits and investigations. The defendants also highlight the fact that, while a former employee had received a CID, Clover itself did not; rather, it received a request for the voluntary production of information,[8] and it was not informed that any criminal charge or civil enforcement action was imminent.

The general premise of Clover's argument is plausible. "[A] government investigation, without more, does not trigger a . . . duty to disclose"—at least not categorically so. *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) (citations omitted). It is, moreover, at least conceivable that a company like Clover could receive government inquiries that, although they might signal cause for concern to less heavily government-entwined businesses, would simply be par for the course for a Part C provider and not require a specific disclosure, particularly if the company had already acknowledged that some such routine inquiries were common.

A defendant's raising of a plausible defense, however, does not entitle it to dismissal of the claims against it—under the PSLRA or otherwise—unless that defense is actually fatal to the claims as pleaded on the face of the pleadings. Clover's statements during the Class Period acknowledged that it was subject to government inquiries, but only those that, in the words of the merger agreement filed with the SEC, "would not be, or would not reasonably be expected to be, material to the business of the Company and its Subsidiaries, taken as a whole." (*See* Doc. No. 75 at 15–16.) Implicit in that framing is the assumption that some investigations are, in fact,

---

[8] This particular aspect of the defendants' argument is not as persuasive as the defendants suggest. Even if the request that Clover received was technically one for the "voluntary" production of information, it was still a request from the *United States Department of Justice* to a company whose entire business model was contingent on remaining in the good graces of the federal government. The defendants notably do not claim that Clover—or any reputable, publicly traded healthcare entity—actually ignores such requests on the ground that they are voluntary and therefore have nothing to worry about.

44

important enough to be material to the business of the company and appropriate for disclosure. "[S]uggesting that [a] company was not facing an investigation that could have a material impact on its business, when, in fact, it was facing such an investigation" is facially false, regardless of how heavily regulated the industry at issue is. *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 584 (S.D.N.Y. 2016). What matters for the purposes of the present motion is whether the plaintiffs have sufficiently pleaded facts establishing that, in light of the full context provided in the Amended Complaint, *this* DOJ investigation was one that should have been disclosed and *these* attestations of general compliance were misleading.

As the Sixth Circuit noted in another securities fraud case involving a healthcare corporation's allegedly fraudulent assurances of compliance, "context matters." *In re Omnicare*, 769 F.3d at 478 (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011); *City of Monroe*, 399 F.3d at 672). In that case, the defendant healthcare corporation's annual reports stated, "We believe that our billing practices materially comply with applicable state and federal requirements," and "[W]e believe that we are in compliance in all material respects with federal, state and local laws." *Id.* The Sixth Circuit noted that "one might be skeptical of whether a reasonable investor would put much stock in Omnicare's statements regarding legal compliance." *Id.* Moreover, the "vague language" that the defendant had used left it "a great amount of wiggle room." *Id.* Nevertheless, the court concluded that a reasonable jury, looking at the full context of the defendant's statements could conclude that the statements were materially false. *Id.* at 479.

The plaintiffs have pleaded, plausibly and in detail, that the DOJ investigation was not, in context, simply a run-of-the-mill matter that investors had no reason to expect disclosure about. In particular, the plaintiffs have alleged that the investigation was well-founded, broad in scope,

and likely to uncover wrongdoing and flaws that would have revealed the lie at the heart of Clover's posture as a revolutionary tech company. Clover will have ample opportunity to argue that that characterization was false. The court, however, is required, at this stage, to accept the plaintiffs' particularized, well-pleaded allegations as true for the purposes of the motion to dismiss.

The defendants argue next that their statements about Clover's compliance were mere statements of opinion and therefore cannot be actionable. But Clover itself concedes that "opinion statement[s] can . . . be misleading if the opinion was not actually held." (Doc. No. 75 at 18.) *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015). There is no reasonable dispute that, if an executive said "I believe my company not to be under investigation," but he knew that to be false, the statement could be fraudulent; the word "believe" is no shield when the profession of belief itself is a lie. The determinative question with regard to this aspect of the defendants' argument is therefore scienter, which the court will discuss later in this opinion. *See In re Omnicare*, 769 F.3d at 471 (adopting approach that limits the "material-misrepresentation prong" to the "two objective inquiries" of falsity and materiality and "save[s] all subjective inquiries for the scienter analysis").

Finally, the defendants argue that the plaintiffs have failed to plead, with particularity, that Clover actually violated the AKS, FCA, or MCM Guidelines. This aspect of the defendants' arguments, however, relies largely on Clover's contention that the court should disregard the CWs and the revelations of the Hindenburg Report, which, the court has already held, it will not do. The plaintiffs have alleged that Clover personnel gave out valuable gift cards as an inducement for referrals to its AKS-covered Part C business. They have alleged that Clover paid doctor's office staff "Ambassadors" to refer patients to Clover, in violation of the AKS. (*See*

Doc. No. 75 at 24 n.16.) Those are allegations of actual wrongdoing, pleaded with particularity. All of the flaws that the defendants claim to have found are simply factual or evidentiary infirmities that they anticipate—or at least hope—will pose a problem for the plaintiffs as the case proceeds. They are not, however, grounds for dismissal.

### 3. Regulation S-K ad GAAP

The plaintiffs' allegations regarding Regulation S-K and GAAP are derivative of the ones that the court has already discussed, and the plaintiffs' pleading of those allegations is adequate for the same reasons. Regulation S-K required Clover to disclose the "material factors that ma[de] an investment in [Clover] speculative or risky." 17 C.F.R. § 229.105. As the court has already concluded, the plaintiffs have pleaded with particularity that investment in Clover was speculative and/or risky due to both its history of legal wrongdoing and the unproven ability of the Clover Assistant to provide the results intended. The plaintiffs have adequately alleged that the defendants should have disclosed those risks regardless of Regulation S-K, because their affirmative misstatements gave rise to a duty of corrective disclosure. Regulation S-K, however, provides another basis for finding a similar duty to disclose the same facts. This aspect of the plaintiffs' allegations will therefore survive the motion to dismiss, just like the broader allegations from which it is derived.

Similarly, for a financial statement to comply with GAAP, it must disclose related-party transactions. The plaintiffs have identified reasons why, in context, the defendants may have had a duty to disclose Clover's reliance on related-party transactions to fuel its growth regardless of any additional obligations pursuant to GAAP. Nevertheless, Clover's assertions that it complied with GAAP provide an additional, alternative ground for finding fraud, particularly in connection with the undisclosed reliance on related-party transactions involving Bermudez. *See In re*

47

*Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 240 (S.D.N.Y. 2018) ("Plaintiffs' allegation—that defendants represented that their financial statements had been compiled in compliance with GAAP when, in fact, defendants failed to comply with GAAP in several, significant respects—identifies an untrue statement of material fact.") (quoting *In re CitiGroup Inc. Bond Litig.*, 723 F. Supp. 2d 568, 594 (S.D.N.Y. 2010)).

## D. Scienter

"[T]he [PSLRA] imposes '[e]xacting . . . requirements for pleading scienter.'" *Ashland, Inc.*, 648 F.3d at 469 (quoting *Frank*, 547 F.3d at 570). The plaintiff must, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "To qualify as 'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Ashland, Inc.*, 648 F.3d at 469 (quoting *Tellabs, Inc.*, 551 U.S. at 314). "'Strong inferences' . . . involve deductive reasoning; their strength depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact." *City of Monroe*, 399 F.3d at 683 (quoting *Helwig*, 251 F.3d at 563).

"In examining scienter, [the court] must decide whether all of the facts alleged, *taken collectively*, meet the PSLRA's requirements." *Ashland, Inc.*, 648 F.3d at 469 (quoting *Tellabs, Inc.*, 551 U.S. at 322–23). "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc.*, 551 U.S. at 326. The court "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* Before the court can answer in the affirmative, it "must compare [the inference of scienter] with other competing

48

possibilities, allowing the complaint to go forward 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *In re Omnicare*, 769 F.3d at 473 (quoting *Tellabs, Inc.*, 551 U.S. at 324).

"In the securities-fraud context, scienter includes [1] knowing and deliberate intent to manipulate, deceive, or defraud, and [2] recklessness.'" *Doshi*, 823 F.3d at 1039 (quoting *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008)). "Recklessness is defined as 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it.'" *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 681 (6th Cir. 2004)). The Sixth Circuit has suggested that, where an actionable statement involves a matter of opinion, the subjective nature of the statement effectively "rais[es] the bar for alleging scienter" to a requirement of actual knowledge. *In re Omnicare*, 769 F.3d at 471.

Although the Sixth Circuit has instructed courts to consider the issue of scienter holistically, it has also set forth a non-exhaustive list of nine factors—known as the *Helwig* factors—that have been specifically identified as relevant to determining scienter:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Doshi*, 823 F.3d at 1039–40 (quoting *Helwig*, 251 F.3d at 552). When it comes to corporate defendants, the court's inquiry looks to

> the state of mind of . . . "[1] The individual agent who uttered or issued the misrepresentation; [2] Any individual agent who authorized, requested, commanded, furnished information for, prepared (including suggesting or contributing language for inclusion therein or omission therefrom), reviewed, or approved the statement in which the misrepresentation was made before its utterance or issuance; [or 3] Any high managerial agent or member of the board of directors who ratified, recklessly disregarded, or tolerated the misrepresentation after its utterance [or] issuance . . . ."

*Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 493 (6th Cir. 2015) (quoting *Omnicare*, 769 F.3d at 476). Because the individual defendants in this case were high-ranking executives acting in their official capacities to discuss Clover, their individual scienter is sufficient to establish Clover's.

The defendants argue that the Amended Complaint is deficient because the plaintiffs "ma[de] no attempt to plead the *Helwig* factors." (Doc. No. 75 at 34.) While that may, in a sense, be a fair characterization of the Amended Complaint—in that the Amended Complaint is not explicitly structured around those factors—it is also beside the point. The *Helwig* factors are an analytical tool for courts, not a pleading requirement. Certainly, a plaintiff can choose to acknowledge those factors explicitly if he would like. There is, however, nothing wrong with choosing not to. The *Helwig* factors, moreover, are not a checklist. They are, rather, merely a "non-exhaustive list of factors that do not necessarily establish scienter, but are 'usually relevant'" to that inquiry. *Frank*, 646 F.3d at 959 n.2 (quoting *Helwig*, 251 F.3d at 552). Indeed, treating the *Helwig* factors as an ironclad set of requirements would not only be unsupported by the caselaw, but would make little, if any, sense, given that at least some of the factors are wholly irrelevant to many fraudulent schemes. There is, for example, no defensible rationale in

support of penalizing a plaintiff for failing to plead evidence of bribery in connection with a fraudulent scheme in which bribery played no role in the first place. What does it matter, to an investor who lost millions based on, for example, a knowingly false financial statement, that no one was bribed?

The court's analysis, therefore, must focus on what would support a strong inference of scienter in the context of the particular wrongdoing alleged.[9] When securities fraud allegations involve the concealment of risks facing a company, the court looks, *inter alia*, at whether "the plaintiffs sufficiently explained *why or how* the defendants knew about" the danger. *Ashland, Inc.*, 648 F.3d at 470 (citing *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09-MD-2030, 2011 WL 1330847, at *2 (S.D.N.Y. March 30, 2011)). To that end, the plaintiffs note that all of the Class Period statements were being made closely in time to the merger between Clover and SCH, meaning that Clover was, as a matter of ordinary practice, put through substantial due diligence in connection with the transaction. Defendants, moreover, explicitly boasted about the extensive nature of that due diligence.

Of course, the mere presence of a due diligence process does not mean that every flaw lurking within a company will come to light. As the plaintiffs point out, however, the faults at issue in this case—particularly regarding the Clover Assistant—involved a matter core to Clover's business model and specifically important to its value to investors. Moreover, insofar as Clover's alleged AKS violations can be separated from the issues with the Clover Assistant,

[9] Although the court does not find the *Helwig* factors to be the most helpful tool in this instance, the court does note that some of the most persuasive of those factors are present. First, the plaintiffs have pleaded "divergence between internal reports and external statements on the same subject," including the DOJ investigation and the company's internal understanding of the Clover Assistant's level of adoption. Second, the plaintiffs have alleged a "disregard of the most current factual information before making statements" on the same topics. Finally, the confusing numbers that the defendants gave the public about the adoption rate of the Clover Assistant were an example of producing data in "such a way that its negative implications could only be understood by someone with a high degree of sophistication."

those violations were neither obscure nor ancillary to the considerations typically involved in performing due diligence for the acquisition of a healthcare company. To the contrary, as any district court can likely attest, the AKS is among the most heavily litigated and consequential statutes in the healthcare field. That is especially true for any company that is entirely dependent on federal healthcare programs for its business model, as a Part C provider inherently is. Any suggestion that SPAC investors going into a deal like this would not make substantial inquiries into AKS compliance would be implausible, to say the least. Moreover, even if the defendants had initially been ignorant of the potential AKS violations, they admit that they were aware of the DOJ investigation during the Class Period and engaged in a considered process of determining whether to disclose it. That process, if it was as serious as the defendants themselves suggest, would have involved making inquiries into whether AKS violations had occurred.

As the defendants note, the Sixth Circuit has held that "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information." *PR Diamonds, Inc.*, 364 F.3d at 688. That rule, however, is designed to account for the fact that executives may not know about, for example, "accounting issues [that are] relatively arcane in nature and scope" and that do not "pertain[] to central, day-to-day operational matters." *Id.* The Sixth Circuit has acknowledged, however, that "high-level executives *can* be presumed to be aware of matters central to their business's operation." *Id.* (citing *In re Complete Mgmt., Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-36 (S.D.N.Y. 2001)) (emphasis added).

The defendants are correct that, if Clover's only problem was a few isolated instances of handing out gift cards, then there would be no basis for a strong inference that any of the individual defendants was aware of those isolated violations. What matters for the purposes of the motion to dismiss, however, is whether the defendants would have been aware of the far

more extensive and consequential wrongdoing alleged in the Amended Complaint. The plaintiffs have adequately pleaded that it would be highly implausible for Palihapitiya or the individual Clover executives to have remained in the dark about so widespread an issue.

With regard to many of the allegations at issue in this case, the facts supporting scienter are so clear that they go beyond merely supporting a "strong inference." For example, the defendants' own position is that they were aware of the DOJ investigation and affirmatively chose not to disclose it. (*See* Doc. No. 75 at 37.) The only argument that a finding of scienter would be unsupported for that aspect of the plaintiffs' claims is simply a reiteration of the same argument that the court has already rejected with regard to whether the investigation triggered a disclosure obligation—specifically, that the defendants had no basis for believing that the investigation was anything but a routine inquiry. The plaintiffs have persuasively pleaded that it was clear, in context, that that was not the case. The plaintiffs' argument regarding the investigation is therefore no more persuasive on the issue of scienter than it was on materiality.

The defendants object that, although they admitted to some knowledge of the DOJ investigation, they have not admitted to having known, at the relevant times, about Bermudez's conflicts of interest and their role in the company's growth. Bermudez's interests in B&H and the other companies, however, were hard facts, not opinions, meaning that liability can be based on the defendants' recklessness—that is, their conscious disregard for the truth of Bermudez's role, even if they lacked knowledge of the details. The defendants argue that the Amended Complaint does not sufficiently plead any "red flags" that would have spurred a reasonable executive to look into what was going on with Bermudez. *See Doshi*, 823 F.3d at 1037 ("Before drawing an inference of recklessness, courts typically require 'multiple, obvious red flags' . . . .") (quoting *PR Diamonds, Inc.*, 364 F.3d at 686–87). The Amended Complaint, however, makes

clear that Clover's inability to expand effectively outside of the New Jersey market was both glaring and known within the company. (Doc. No. 70 ¶¶ 152–54.) CW2, moreover, confirmed that high-ranking executives other than these defendants knew and understood that that fact was specifically related to Bermudez's being "well-connected" among insurance brokers in New Jersey but not outside that region. By all accounts, Clover's mission was not to simply dominate the Plan C market in one state; it is difficult to imagine a more substantial red flag, alerting a company's leaders to look into an issue, than the company's outright inability to perform in the markets it wished to pursue. These facts are sufficient to support a strong inference at least of recklessness with regard to the defendants' failure to look into Bermudez's situation—if the defendants did not, in fact, know what was going on the entire time.

The defendants argue next that, even if the Amended Complaint pleads facts that would support a strong inference that some Clover/SCH executives knew about the underlying issues raised in this case, the plaintiffs have improperly relied on group pleading to allege collective culpability by the individual defendants, rather than specifically explaining the basis for inferring each individual defendant's scienter. *See In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 870 (S.D. Tex. 2016) (observing that a plaintiff "may . . . not use group pleading allegations to create an inference of scienter as to individual defendants"). The defendants appear to concede that this argument would not apply to Palihapitiya himself, given that, as the Amended Complaint makes clear, Palihapitiya, who had no role in Clover prior to its acquisition, played a unique role in overseeing the merger process and ushering the company to market.[10] The issue of group pleading, rather, is primarily a concern with regard to Garipalli, Toy, and

---

[10] The defendants still argue that the plaintiffs failed to plead a strong inference of scienter with regard to Palihapitiya, although those arguments fail for the reasons that the court has already discussed. The acknowledged unique nature of Palihapitiya's role among the defendants, however, renders the group pleading issue largely inapposite as to him.

Wagner, all of whom were Clover executives beforehand and therefore were the subjects—not the orchestrators—of the due diligence process.

The plaintiffs, however, have pleaded details attributable to each defendant's position that support a strong inference of scienter. For example, the Amended Complaint alleges that Garipalli and Toy expressly signed off on the written response to the Hindenburg Report, which confirmed many aspects of that Report and simply spun the revelations as untroubling, run-of-the-mill facts and circumstances of which Clover and its executives were already aware. In other words, Garipalli and Toy themselves represented to the public that they had kept abreast of the underlying matters. (*Id.* ¶¶ 332–34.) While Wagner did not formally join that response, the Amended Complaint notes that, as CFO, he was in a position to be aware of some of the key matters relevant to the fraud, particularly regarding accounting practices and financial disclosures of related transactions. (*See id.* ¶¶ 350, 354 –55.) Moreover, the Amended Complaint notes that, prior to Clover's decision to rely on a SPAC, the company began the process of preparing for a conventional initial public offering. (*Id.* ¶ 111.) That fact supports an inference that the high-level-executives, particularly Wagner, likely engaged in a process of close scrutiny of the company's internal operations not dissimilar to the due diligence performed by Palihapitiya. Finally, it is simply implausible that Garipalli, Toy, and Wagner would have been in the dark about what the due diligence process revealed. The due diligence process was characterized as collaborative—as it undoubtedly had to be, given that Clover was a private company—meaning that the executives within Clover would have had their own role in Palihapitiya's process of exploring the company's vulnerabilities.

There is nothing improper about noting that one fact or rationale—such as the content of the Hindenburg Report response, the presence of the due diligence process, or the centrality of

the Clover Assistant to the company's business model—supports an inference of scienter with regard to two or more different individual defendants. To act otherwise would be to elevate the generally disfavored status of group pleading into a nonsensical use-it-then-lose-it rule whereby any piece of evidence can only be used to support *one* inference of scienter with regard to *one* defendant, then must be discarded and forgotten in favor of different evidence relevant to the next defendant, regardless of whether such a distinction would make logical or factual sense. The plaintiffs have alleged sufficient reasons for concluding that each of these individual defendants had knowledge of at least many of the key facts rendering the relevant statements actionable. Indeed, some of the individual defendants even openly admitted to that knowledge as a manner of deflecting responsibility after the Hindenburg Report was released. The fact that some of the evidence relevant to the individual defendants overlaps does not mean that the plaintiffs have engaged in impermissible group pleading. The court accordingly finds a strong inference of scienter with regard to Clover and each of the individual defendants.

### E. Loss Causation

A Section 10(b) plaintiff must plead facts showing a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)). The notion of causation in the securities fraud context, however, takes account of the fact that it is not usually the defendant's false statement or omission, in and of itself, that "cause[s] a security to drop in value, but rather, 'the underlying circumstance that [was] concealed or misstated'" *Id.* (quoting *Lentell*, 396 F.3d at 173). The event revealing the truth is typically referred to as a "corrective disclosure." *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 656–57 (S.D. Ohio 2017). Sometimes a corrective disclosure

is actually a disclosure in the traditional sense—that is, a statement by the defendant admitting to the truth. Other times, the corrective "disclosure" comes from a third party's uncovering the truth and informing the market. And, in some cases, it is, in essence, the passage of time itself that does the disclosing, when the truth comes to light, not through any person's statement, but through the real-world materialization of a risk that had been concealed. *See Ohio Pub. Employees Ret. Sys.*, 830 F.3d at 385 (discussing "materialization of risk" corrective disclosures).

The corrective disclosure providing the basis for loss causation in this case was the Hindenburg Report. It was the Hindenburg Report, the plaintiffs allege, that clued the market in to the existence of the DOJ investigation, the problems bedeviling the Clover Assistant, and the questionable drivers of Clover's past growth. There does not appear to be any meaningful basis for disputing that, at least according to the plaintiffs' allegations, the Hindenburg Report did, in fact, reveal those things and that investors experienced losses as a result. Nevertheless, the defendants argue that the Hindenburg Report cannot serve as a corrective disclosure, at least with regard to the DOJ investigation, because "federal district courts have held that a disclosure of an investigation, absent an actual revelation of fraud, is not a corrective disclosure." (Doc. No. 75 at 44 (quoting *In re Almost Fam., Inc. Sec. Litig.*, 2012 WL 443461, at *13).) This argument is wholly without merit. The caselaw to which the defendants cite stands for the proposition that the disclosure of an investigation does not necessarily serve as a corrective disclosure of the *wrongdoing under investigation*. The plaintiffs in this case, however, have alleged that the Hindenburg Report's revelation of the DOJ investigation was corrective of the defendants' statements allegedly denying that such an investigation existed. Admittedly, the plaintiffs have also alleged that the Hindenburg Report revealed the underlying wrongdoing, but not simply by

pointing to the fact that the investigation existed; the Report revealed the wrongdoing by describing the wrongdoing itself. What it revealed by mentioning the investigation was the investigation.

When a person claims that something important—like an investigation—does not exist, and then a later report or event reveals that that very thing did exist, it is, of course, a corrective disclosure. That is just what a corrective disclosure *is*—correcting a misstatement by disclosing the truth. The defendants, as the court has already discussed, deny that they ever misled the market about whether the company faced a serious DOJ investigation. That argument, though, goes to falsity and materiality, not loss causation, and the court has already held that, at least at the pleading stage, the defendants' argument in that regard fails because the plaintiffs pleaded, with particularity, that the DOJ investigation was a sufficiently significant risk that it rendered the defendants' statements about routine inquiries false and/or misleading.

On the issue of loss causation, the facts, as pleaded, show that the Hindenburg Report revealed a number of material threats to Clover's business that had previously been concealed, including the DOJ investigation, and that the result was a loss in the value of Clover stock. *See In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014) ("Loss causation is 'easiest to show when a corrective disclosure reveals the fraud to the public and the [company's share] price subsequently drops.'") (quoting *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009)). The plaintiffs therefore sufficiently pleaded loss causation.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss (Doc. No. 74) will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge