## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

|  |  |
|---|---|
| TIMOTHY BOND,<br><br>       Lead Plaintiff<br><br>and<br><br>JEAN-NICOLAS TREMBLAY,<br><br>       Named Plaintiff,<br><br>Individually and on Behalf of All Others Similarly Situated,<br><br>   v.<br><br>CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, VIVEK GARIPALLI, ANDREW TOY, JOE WAGNER, and CHAMATH PALIHAPITIYA,<br><br>       Defendants. | Case No. 3:21-cv-00096<br><br>Judge Aleta A. Trauger |

## ANSWER OF DEFENDANTS TO THE FIRST AMENDED COMPLAINT

Defendants Clover Health Investments, Corp. ("Clover"), Vivek Garipalli, Andrew Toy, Joe Wagner, and Chamath Palihapitiya (the "Individual Defendants" and with Clover, collectively, the "Defendants"), by and through their undersigned counsel, answer Lead Plaintiff Timothy Bond and Named Plaintiff Jean-Nicolas Tremblay (together, "Plaintiffs")'s *First Amended Complaint for Violation of the Federal Securities Laws* (Doc. No. 70) (the "Complaint") as follows:

## INTRODUCTION

In responding to Plaintiffs' allegations, Defendants: (i) specifically deny all allegations set forth in the Complaint not expressly admitted herein; (ii) incorporate into each response a denial of any allegations in the Complaint (including those outside of the knowledge or information of

1

Defendants) to the extent such allegations assert or suggest that Defendants made any untrue statement of material fact, or omitted to state a material fact necessary to make statements made not misleading; and (iii) to the extent that any response is required, deny any allegations in the headings and subheadings of the Complaint. All answers to allegations in a particular paragraph of the Complaint should be construed to apply equally to the allegations in the footnote or subpart, if any, accompanying or comprising such paragraph of the Complaint. To the extent any allegation is not specifically admitted, it is denied. To the extent an allegation in the Complaint is admitted herein, that is not an admission that any Defendant knew a particular fact at the time of the securities offering at issue in this action. Defendants reserve all rights to amend this answer.

Defendants further respond to the specific allegations set forth in the Complaint as follows:

## INTRODUCTORY PARAGRAPH

Lead Plaintiff Firas Jabri and Named Plaintiff Jean-Nicolas Tremblay (together, "Plaintiffs"), individually and on behalf of all others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' First Amended Complaint (the "Complaint") against Defendants, alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Clover Health Investments, Corp. f/k/a Social Capital Hedosophia Holdings Corp. III ("SCH," "Clover", or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the Introductory Paragraph.

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Clover securities between October 6, 2020 and February 3, 2021, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and

Rule 10b-5 promulgated thereunder, against the Company, certain of its current and former officers.

**RESPONSE:** The allegations in Paragraph 1 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 1, except admit that Plaintiffs have asserted claims under Sections 10(b) and 20(a) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder against Defendants, and that Plaintiffs seek to represent a class of all persons and entities other than Defendants that purchased or otherwise acquired Clover securities between October 6, 2020, and February 3, 2021, both dates inclusive.

2. Social Capital Hedosophia Holdings Corp. III ("SCH") was a publicly traded blank check company, also known as a special purpose acquisition company ("SPAC"), formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses. On October 6, 2020, SCH and a private health insurance company, Clover Health Investments, Corp. ("Legacy Clover"), issued a press release (the "Announcement Release") announcing their plan to bring Legacy Clover public via a merger between SCH and Legacy Clover (the "Business Combination"). That press release described Legacy Clover (and thus Clover)[1] as "a next-generation Medicare Advantage insurance company offering best-in-class plans that combine wide access to healthcare and rich supplemental benefits with low out-of-pocket expenses[.]" It further stated that "Clover partners with primary care physicians ***using its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care***." The Announcement Release continued, "***Technology is at the core of Clover's business***."[2]

[1]    Unless otherwise indicated, all references to Clover are to Clover and Legacy Clover, the latter of which merged into SCH and became Clover when the Business Combination was completed.

[2]    All emphasis in this Complaint is added unless otherwise indicated.

**RESPONSE:** Defendants deny the allegations in Paragraph 2, except admit that Social Capital Hedosophia Holdings Corp. III ("SCH") was a publicly traded special purpose acquisition company and that on October 6, 2020, Clover and SCH issued a press release, respectfully refer to that press release for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

3. Plaintiffs allege claims under the Exchange Act for fraud against Clover, certain of

Clover's officers, and Chamath Palihapitiya, the "King of SPACS," who was the Company's CEO and Chairman at all relevant times prior to the Business Combination. Specifically, the Defendants made false and/or misleading statements and/or failed to disclose that (i) the Company had committed multiple legal and regulatory violations since January 1, 2018 and was and remains under investigation by the DOJ for violations of the False Claims Act; (ii) the Company's growth and positive performance stemmed from illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines, and unreported related party transactions; (iii) only a small fraction of the healthcare providers who had contracted with the Company were actually using the Company's Clover Assistant software platform; (iv) Clover's financial statements did not comply with GAAP because they failed to disclose material agreements and transactions with related parties; and (v) the Company's SEC filings failed to comply with Items 303 and 503 of Regulation S-K. When the truth about Defendants' false and misleading statements emerged through a report issued by the research firm Hindenburg Research ("Hindenburg") after the Business Combination had closed, Clover's stock plummeted, significantly harming investors.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 3, except admit that Plaintiffs assert claims under the Exchange Act against Defendants. Defendants deny the remaining allegations in Paragraph 3.

4. Medicare is the United States federal government's health insurance program for Americans aged 65 or older, and Medicare Advantage is the private-plan alternative to traditional Medicare. The popularity of Medicare Advantage plans is exploding. The Kaiser Family Foundation estimates that approximately 24.1 million seniors are "members" of Medicare Advantage, *i.e.*, are enrolled in such plans, out of the 62 million people eligible for Medicare,

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 4, except admit that Medicare is a federal health insurance program that is available to certain Americans aged 65 or older, among others, and that Medicare Advantage ("MA") is a program through which Medicare-eligible individuals can obtain Medicare benefits through a private MA plan.

5. The U.S. government's Centers for Medicare and Medicaid Services ("CMS") operates both traditional Medicare and Medicare Advantage programs. In contrast to traditional Medicare, which operates a "pay for service" model, CMS pays Medicare Advantage insurers a per-member-per-month rate to manage each Medicare Advantage member's care. Since Medicare Advantage plans set a limit on what plan participants, or "members," have to pay out-of-pocket each year for covered services, Medicare Advantage is designed to incentivize insurers to find ways to lower the cost of care.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

4

the truth of the allegations in the first sentence of Paragraph 5, except admit that the Centers for Medicare & Medicaid Services ("CMS") oversees the Medicare program, including both traditional Medicare and MA. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 5, except admit that (1) under traditional Medicare, healthcare providers and facilities typically bill CMS under a fee-for-service model, and (2) under MA, CMS makes monthly capitated payments to Medicare Advantage Organizations ("MAOs") for each beneficiary enrolled in the MAO's MA plans. Defendants deny knowledge or information sufficient to form a belief as to the truth of the third sentence of Paragraph 5.

6. Recognizing that sicker patients are likely to cost more to insure, however, CMS increases its monthly payments depending on a patient's "risk assessment score." The higher the risk assessment score, the higher the monthly payment from CMS. The most profitable patients for a Medicare Advantage insurer are thus patients with the highest risk assessment scores that use the least treatment. It is thus potentially in a Medicare Advantage insurance plan provider's interest to make its patients look as sick as possible, thereby earning higher reimbursement.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 6, except admit that CMS determines and adjusts the per beneficiary capitation amount it pays MAOs based on factors including the medical diagnoses, age, and sex of the beneficiaries enrolled in the MAO's MA plans.

7. Defendants touted to investors that they had identified an enormous growth opportunity in the Medicare Advantage market. The Announcement Release, for example, stated that "Medicare Advantage is one of the largest and fastest growing markets in the U.S. healthcare system—but it is one that has seen little innovation and *remains ripe for disruption*. Worth $270 billion today and with an estimated value of $590 billion by 2025, the Medicare Advantage market provides a *tremendous opportunity for growth*."

**RESPONSE:** Defendants deny the allegations in Paragraph 7, except admit that Paragraph 7 contains partial quotations of the press release filed as an exhibit to the Form 8-K filed by SCH with the U.S. Securities and Exchange Commission ("SEC") on October 6, 2020, respectfully refer to the press release for its complete and accurate contents, and otherwise deny any allegations

5

inconsistent therewith.

8.      Like countless technology entrepreneurs before them, Defendants claimed that the way that Clover could disrupt the Medicare Advantage market, dramatically increase the number of plan members Clover served, and tap into the enormous revenues waiting to be realized was through software. Namely, Clover's proprietary software tool: Clover Assistant.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 8.

9.      Defendants claimed that Clover Assistant used "next generation machine learning technology" that could maximize payments from Medicare. Clover Assistant purportedly "aggregate[ed] millions of relevant health data points per day—including, among others, claims data, medication data, diagnostics data and EHR-generated data—and uses machine learning to synthesize that data with member-specific information." According to Defendants, "[t]his provides physicians with actionable and personalized insights at the point of care to ultimately improve care for members."

**RESPONSE:** Defendants deny the allegations in Paragraph 9, except admit that Paragraph 9 contains partial quotations of certain of Clover's public filings, including the Form S-4 filed by SCH with the SEC on October 20, 2020, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

10.      In plain language, Clover Assistant is a tool designed to identify opportunities to assign higher Medicare risk assessment scores so that Clover can obtain larger reimbursements from Medicare. Clover Assistant uses a checkbox interface to gather data on a patient during a patient visit and also proposes courses of treatment that physicians are supposed to interact with— *e.g.*, accept or decline—during patients' visits. The clicks an individual makes in Clover Assistant not only record diagnoses and treatments for a Clover member, they also can revise a patient's risk assessment level. If a risk assessment level is revised upward, the result is larger payments to Clover. Given that Medicare payments for higher risk assessment levels can be much larger, a patient visit that leads to a higher risk assessment can be extremely valuable to Clover.

**RESPONSE:** Defendants deny the allegations in the first two sentences of Paragraph 10, except admit that the Clover Assistant ("CA") (1) is designed to provide information to healthcare providers to help inform their decision-making in providing care to their patients; and (2) that such information may include information regarding patients' potential undiagnosed conditions and/or potential medication or treatment regimens.  Defendants deny the last two sentences of Paragraph

6

10, except admit that (1) CA is designed to allow healthcare providers to record certain conditions with which they diagnose their patients; and (2) CMS determines and adjusts the per beneficiary capitation amount it pays MAOs based on factors including the medical diagnoses, age, and sex of the beneficiaries enrolled in the MAO's MA plans.

11. It was thus essential that a physician use Clover Assistant during sessions with patients because Clover hoped the physician would follow the recommendations or suggestions that appeared in Clover Assistant, which could include higher risk assessments that would benefit Clover's bottom line. Accordingly, to incentivize physicians to use Clover Assistant, Clover pays doctors $200 per visit to use Clover Assistant, or *twice* the average Medicare reimbursement rate for a standard visit.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 11. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 11, except admit that Clover pays certain healthcare providers $200 per visit for certain visits with Clover MA plan members in connection with which the provider uses CA.

12. Defendants even claimed that Clover Assistant made its plans cheaper. For example, at a virtual "Analyst Day" during the Class Period, on November 20, 2020, Defendant Garipalli was asked, "I guess in the example you gave about market share over time, you got to 20% market share in the market before 2018, I guess, before Clover Assistant actually was kind of fully launched out. Can you just talk a little bit about how you were able to do that?" Defendant Garipalli responded, "We have the lowest co-pays, most supp benefits, and then also not just widest choice, but the out of network cost sharing for primary care and specialists is equivalent to what it is in network. And so that combined is what has driven a lot of the attractiveness and growth. ***The Clover Assistant is what allows those plans to be economically affordable***."

**RESPONSE:** Defendants deny the allegations in Paragraph 12, except admit that Paragraph 12 contains partial quotations from the Analyst Day transcript, respectfully refer to that transcript for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

13. Defendants also pointed to Clover's recent growth in the number of patient "members" it had recruited as evidence that its business model—using Clover Assistant to identify and propose diagnoses and treatments that could lead to higher and more profitable risk assessment levels—was working. For example, on the day the Business Combination was announced

Defendant Palihapitiya tweeted to his over one million twitter followers that "Clover Health's proposition of better outcomes and lower costs ***has resulted in strong initial growth***, and "***Clover Health is the fastest growing MA plan in the US***." Later that day, during a segment on CNBC's "Squawk Box Segment," Defendant Palihapitiya told viewers, "***when you're a technology business that's cheaper, faster and better than all of your incumbent competitors*** in a market this dynamic, what happens is ***you start to grow really fast, and this is exactly what's happening with Clover***. Clover is already growing two to three times faster than their next nine nearest competitors."

**RESPONSE:** Defendants deny the allegations in Paragraph 13, except admit that Paragraph 13 purports to quote from several sources, respectfully refer to those sources for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

14. After announcing the Business Combination on the first day of the Class Period, Defendants then spent the months leading up to the Business Combination touting Clover's growth in the months leading up to the Business Combination and attributing that growth to Clover's superior Medicare Advantage plans and Clover Assistant. Defendants took pains to emphasize that physicians were using Clover Assistant *in sessions with patients*. Defendants also assured investors that Clover had not violated any health laws in the prior three years and that its financial statements were prepared in accordance with GAAP.

**RESPONSE:** Defendants deny the allegations in Paragraph 14.

15. Unbeknownst to investors, however, all these claims were false or misleading. For example, the [sic] numerous federal and state laws and regulations restrict Clover's ability to adopt certain practices in the sales and marketing of and billing for Clover Assistant, including the Federal Anti-Kickback Statute, False Claims Act, and various regulations and guidelines promulgated by CMS. Among other many things, these rules strictly prohibit making payments or giving things of value to healthcare providers or their office staff for patient referrals. According to former employees who spoke to Plaintiffs, however, Clover had a practice of giving gift cards to healthcare professionals and administrative staff. Specifically, one former employee said that Chief Development Officer Ethan Lipkind, who reported to Defendant Garipalli, instructed her on multiple occasions to purchase approximately $250 in gift cards and deliver them to healthcare providers and staff. Lipkind's directive was reported by the former employee's supervisor to Clover's compliance department, which conducted an internal investigation. According to the former employee, the Company never issued a ban on giving gifts cards; instead, Clover promoted Lipkind and later fired the employee who had made the report to compliance. Defendants never disclosed this illegal conduct; indeed, they assured investors throughout the Class Period that Clover had not committed any legal violations.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 15. The second and third sentences of Paragraph 15 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in the second and

third sentences of Paragraph 15, except admit that the sentences refer to federal statutes, regulations, and guidelines, respectfully refer to those authorities for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth through seventh sentences of Paragraph 15. Defendants deny the allegation in the eighth sentence of Paragraph 15.

16. In addition, the former employee told Plaintiffs that at least by early 2019 the DOJ had opened an investigation into Clover in connection with violations of the False Claims Act. According to the former employee, the DOJ had contacted her in or about October 2020 as part of its investigation of Clover. The DOJ told her that they had obtained her contact information from documents provided by Clover in response to the DOJ's pending investigation, and that Clover had been notified of the investigation "right away." The DOJ told the former employee that the investigation "originated from some complaints made by physicians in the Pennsylvania area," and "the physicians felt that Clover was trying to entice providers to refer patients to Clover." The DOJ investigation has remained pending throughout the Class Period. Defendants also never disclosed the investigation, which threatened the Company's ability to continue to offer Medicare Advantage plans. The investigation was especially material to investors given that Clover previously had been sanctioned by CMS, a second company operated by Defendant Garipalli, Clover's founder, had previously settled claims with the New Jersey State Department of Medicare, and Clover Assistant had been designed to identify upward risk adjustments, which created a risk of risk assessment fraud. Rather than apprise investors of the investigation, Defendants expressly denied the existence of any such investigations.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first through fourth sentences of Paragraph 16. Defendants deny the allegations in the fifth sentence of Paragraph 16, except admit that an inquiry from the United States Department of Justice (the "DOJ Inquiry") was ongoing during the Class Period. Defendants deny the remaining allegations in Paragraph 16.

17. Further, Defendants not only failed to disclose that the growth in Clover's business that they touted throughout the Class Period was driven by illegal conduct, but also failed to disclose that the growth was the result of agreements and transactions with third-party entities owned and operated by their Head of Sales, Hiram Bermudez. Indeed, according to a former employee, Bermudez boasted about the money he was reaping from these agreements. Rather than disclose the existence of these agreements and transactions, as required by applicable accounting principles, Defendants concealed them and assured investors that Clover's financial statements had been prepared in accordance with GAAP.

9

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 17. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 17. The third sentence of Paragraph 17 consists of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in the third sentence of Paragraph 17.

18. Finally, although it was essential to Clover's business model that physicians use Clover Assistant during patient visits, multiple former employees told Plaintiffs that only a small fraction of physicians used Clover Assistant *at all*, and of those that claimed to use it, most were having their front office staff code the visits long after they occurred. Defendants knew from tracking reports and internal complaints to Clover's compliance department that physicians were not using Clover Assistant during patient visits, which not only defeated the purpose of the technology's supposedly disruptive features, but also created a major risk of a "diagnosis" (*i.e.*, upward risk assessment) being communicated to CMS that was not made by a physician. Instead of disclosing this, however, Defendants touted to investors that physicians used Clover Assistant during the overwhelming majority of patient visits.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 18. Defendants deny the remaining allegations in Paragraph 18.

19. Unaware of the false and misleading statements Defendants had fed them throughout the Class Period, shareholders approved the Business Combination, which successfully closed on January 7, 2021. In the weeks following trading, the Clover's share price soared well above the price used in the Business Combination, and the Individual Defendants prepared to capitalize on their false and misleading statements by reaping hundreds of millions of dollars in profits after selling large blocks of Clover shares to unsuspecting investors via a shelf registration. The shelf registration repeated many of the same false and misleading statements that Defendants issued prior to the closing of the Business Combination.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 19, except admit that the business combination was approved on January 6, 2021 and closed on January 7, 2021. Defendants deny the remaining allegations in Paragraph 19.

20. A week after Defendants filed the shelf registration, however, the truth underlying their false and misleading statements emerged. On February 4, 2021, Hindenburg issued a report on Clover entitled "Clover Health: How the 'King of SPACs' Lured Retail Investors Into a Broken Business Facing an Active, Undisclosed DOJ Investigation" (the "Hindenburg Report"). Citing "more than a dozen interviews with former employees, competitors, and industry experts, dozens

of calls to doctor's offices, and a review of thousands of pages of government reports, insurance filings, regulatory filings, and company marketing materials," Hindenburg claimed that "Clover Health and its Wall Street celebrity promoter, Chamath Palihapitiya, misled investors about critical aspects of Clover's business in the run-up to the company's SPAC go-public transaction last month."

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 20. Defendants deny the remaining allegations in Paragraph 20, except admit that on February 4, 2021, Hindenburg Research LLC published a document titled "*Clover Health: How the 'King of SPACs' Lured Retail Investors Into a BrokenBusiness Facing an Active, Undisclosed DOJ Investigation*" (the "Hindenburg Report"), and that Paragraph 20 purports to quote from that document.

21. Among many other things, the Hindenburg Report disclosed that Clover Assistant was designed to encourage higher risk assessments, Clover's use of illicit payments and gifts to healthcare providers and their staffs, how the Company's growth was driven by illegal conduct and related party transactions with Hiram Bermudez, and that only a minority of physicians were actually using Clover Assistant.

**RESPONSE:** Defendants deny the allegations in Paragraph 21, except admit that Paragraph 21 purports to paraphrase the Hindenburg Report.

22. On this news, Clover's stock price fell $1.72 per share, or 12.33%, to close at $12.23 per share on February 4, 2021, representing a loss of approximately $700 million in market capitalization. Moreover, shares traded as low as $11.86 per share intraday on February 4, 2021. Additionally, Clover warrants fell $0.18 per warrant, or 5.04%, to close at $3.39 per warrant on February 4, 2021.

**RESPONSE:** Defendants deny the allegations in Paragraph 22, except admit that Clover's stock price closed at $12.23 per share on February 4, 2021, which was $1.72 per share lower than the previous close, that the shares traded as low as $11.86 on February 4, 2021, and that Clover's warrants traded at $3.39 per warrant on February 4, 2021, $0.18 lower than the previous close.

23. The next day, February 5, 2021, Defendants responded to the Hindenburg Report. Far from debunking the report, Defendants, perhaps inadvertently, *confirmed* its contents. Defendants admitted that they had known all along about the DOJ investigation and affirmatively decided not to disclose it. In addition, Defendants acknowledged that Clover had obtained at least 14% of its members through undisclosed related party transactions involving businesses owned and/or operated by the Company's Head of Sales, and that only 22% of primary care physicians, and only 4% of physicians overall, who had agreed to treat Clover members used Clover Assistant.

11

**RESPONSE:** Defendants deny the allegations in Paragraph 23, except admit that, on February 5, 2021, Clover, Defendant Garipalli, and Defendant Toy provided a response to the Hindenburg Report, respectfully refer to that response for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

24. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**RESPONSE:** Defendants deny the allegations in Paragraph 24.

## II. JURISDICTION AND VENUE

25. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

**RESPONSE:** Paragraph 25 consists of legal conclusions to which no response is required.

26. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

**RESPONSE:** Paragraph 26 consists of legal conclusions to which no response is required.

27. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act, *id.*, and 28 U.S.C. § 1391(b). Clover is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

**RESPONSE:** Paragraph 27 consists of legal conclusions to which no response is required. Defendants admit that Clover is headquartered in Franklin, Tennessee.

28. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

**RESPONSE:** Defendants deny the allegations in Paragraph 28.

## III. PARTIES

29. Lead Plaintiff Firas Jabri, as set forth in his previously filed Certification (Dkt. No. 39-3), acquired Clover securities at artificially inflated prices during the Class Period and was

damaged upon the revelation of the alleged corrective disclosures.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 29.

30.     Named Plaintiff Jean-Nicolas Tremblay, as set forth in his previously filed Certification, Exs. 2 & 3 to Compl. *Tremblay v. Clover Health Investments, Corp. et al.*, No. 3:21-cv-00096 (AT) (M.D. Tenn. Feb. 22, 2021), Dkt. Nos. 1-2 & 1-3, acquired Clover securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective events.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 30.

31.     Defendant Clover is a Delaware corporation with principal executive offices located at 725 Cool Springs Boulevard, Suite 320, Franklin, Tennessee 37067. The Company's securities trade in an efficient market on the Nasdaq Stock Market ("NASDAQ") under the ticker symbols "CLOV" and "CLOVW". Prior to the Business Combination, the Company (*i.e.*, SCH) was a Cayman Islands corporation with principal executive offices located at 317 University Avenue, Suite 200, Palo Alto, California 94301, and its securities traded on the New York Stock Exchange ("NYSE") under the ticker symbols "IPOC.U", "IPOC", and "IPOC WS."

**RESPONSE:** Defendants admit that Clover is a Delaware corporation, and that Clover's principal executive offices were located at 725 Cool Springs Boulevard, Suite 320, Franklin, Tennessee 37067 during the Class Period. Defendants deny the allegations in the second sentence of Paragraph 31, except admit that CLOV and CLOVW traded on the NASDAQ during the Class Period. Defendants admit the allegations in the third sentence of Paragraph 31, and that SCH was located at 317 University Avenue, Suite 200, Palo Alto, California 94301 during the Class Period.

32.     Defendant Vivek Garipalli ("Garipalli") is, and at all relevant times was Clover's co-founder, Chief Executive Officer ("CEO") and Chairman of the Board of Directors (the "Board").

**RESPONSE:** Defendants deny the allegations in Paragraph 32, except admit that Defendant Vivek Garipalli currently serves as Clover's Chief Executive Officer and Chairman of the Board of Directors.

33.     Prior to founding Clover, Defendant Garipalli owned three New Jersey hospitals

13

through a company called CarePoint Health ("CarePoint"). CarePoint was accused of price-gouging; its hospital charged the highest prices for emergency room treatment in the entire country. For example, a local New York City television station, NBC4, reported in August 2014 that a CarePoint hospital in Bayonne, New Jersey, had charged a teacher $9,000 for a bandaged finger and a tetanus shot, and that "The New Jersey Association of Health Plans, a trade association representing insurance companies, has argued CarePoint is effectively using a consumer protection law to price gouge emergency room patients." According to the article, after the New Jersey consumer protection law was passed in the wake of Hurricane Sandy, which devastated the region in 2012, insurers were required to pay for emergency room visits whether or not the insurer had a relationship with the hospital. CarePoint then either forced insurers to enter in exorbitant reimbursement agreements with hospitals or, if the insurers refused, sent the insurers stratospheric bills that the insurers were required by law to pay. The practice was still in place a year later, when, in December 2015, NBC4 reported that CarePoint had charged $17,000 for 5-6 stiches on a cut hand.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 33, except admit that Defendant Garipalli had an indirect ownership interest in three New Jersey hospitals. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 33.

34.     Also in December 2015, Defendant Garipalli allegedly made a secret $1 million donation to the Jersey City Mayor through a shell entity set up for the express purpose of making the donation. Defendant Garipalli's identity as the donor was not revealed until three years later, in January 2019, when the New Jersey Star-Ledger reported how a non-profit had successfully sued to reveal Garipalli's identity. In 2020, New Jersey legislators accused Garipalli of siphoning over $157 million from his hospital network through a series of LLC shell entities. The transactions left the hospitals financially crippled, leading to layoffs and a liquidating sale process to new owners. The state's investigation into CarePoint's finances and use of shell companies that concealed debt and enabled the siphoning of $157 million prompted the passage of 3 state laws aimed at monitoring the suitability of any management fees, along with improved transparency.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 34. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 34. Defendants deny the remaining allegations in Paragraph 34, except Defendant Garipalli admits that the State of New Jersey Commission of Investigation issued a report on or about March 19, 2019, respectfully refer to that report for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

35.     In February 2019, CarePoint disclosed to the New Jersey Medicaid Fraud Division

three categories of billing claims that apparently lacked sufficient documentation, for claims made between 2015 and 2017. CarePoint then settled with the New Jersey Medicaid Fraud Division, agreeing to pay almost $1 million, representing the total of the overpayments from Medicaid.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35.

36.     Defendant Garipalli reviewed, contributed to, authored, approved, and disseminated the initial S-4 registration statement for the Business Combination, which Defendants filed with the SEC on October 20, 2020 (the "S-4"), the First Amended S-4 registration statement, which Defendants filed with the SEC on November 20, 2020 (the "First Amended S-4"), the Second Amended S-4, which Defendants filed with the SEC on December 9, 2020 (the "Second Amended S-4"), the Third Amended S-4, which Defendants filed with the SEC on December 10, 2020 (the "Third Amended S-4"), the prospectus pursuant to Rule 424(B)(3), which Defendants filed with the SEC on December 14, 2020 (the "December 14 Prospectus"), the Definitive Proxy Statement on Schedule 14A, which Defendants filed with the SEC on December 14, 2020 (the "Proxy Statement"), and the shelf registration statement on Form S-1, which Defendants filed with the SEC on January 13, 2021, which became effective on January 27, 2021 and was formally filed as a Rule 424(b)(3) prospectus on January 29, 2021 (together, the "Shelf Registration"). Defendant Garipalli also signed the Shelf Registration.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 36. Defendants admit the allegations in the second sentence of Paragraph 36.

37.     Defendant Andrew Toy ("Toy") is, and was at all relevant times, Clover's co-founder, the President, the Chief Technology Officer ("CTO") and a member of the Board. Defendant Toy reviewed, contributed to, authored, approved, and disseminated the S-4, the First Amended S-4, the Second Amended S-4, the Third Amended S-4, the December 14 Prospectus, the Proxy Statement, and the Shelf Registration. Defendant Toy also signed the Shelf Registration.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 37, except admit that Defendant Toy currently serves as Clover's President and is a member of the Board of Directors.  Defendants deny the allegations in the second sentence of Paragraph 37.  Defendants admit the allegations in the third sentence of Paragraph 37.

38.     Defendant Joseph Wagner ("Wagner") is, and was at all relevant times, Clover's Chief Financial Officer ("CFO"). Defendant Wagner reviewed, contributed to, authored, approved, and disseminated the S-4, the First Amended S-4, the Second Amended S-4, the Third Amended S-4, the December 14 Prospectus, the Proxy Statement, and the Shelf Registration. Defendant Wagner also signed the Shelf Registration.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 38, except

15

admit that Defendant Wagner served as Clover's Chief Financial Officer during the Class Period. Defendants deny the allegations in the second sentence of Paragraph 38. Defendants admit the allegations in the third sentence of Paragraph 38.

39.     Defendant Chamath Palihapitiya ("Palihapitiya") served as the Company's CEO and Chairman at all relevant times prior to the Business Combination. Defendant Palihapitiya owned and/or operated SCH Sponsor III LLC the "Sponsor" of the business combination. Defendant Palihapitiya reviewed, contributed to, authored, approved, and disseminated the S-4, the First Amended S-4, the Second Amended S-4, the Third Amended S-4, the December 14 Prospectus, the Proxy Statement, and the Shelf Registration.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 39, except admit that Defendant Palihapitiya served as the Chairman and CEO of SCH during a portion of the Class Period. Defendants deny the allegations in the second sentence of Paragraph 39, except admit that Defendant Palihapitiya held an indirect ownership interest in SCH Sponsor III LLC. Defendants deny the allegations in the third sentence of Paragraph 39.

40.     Defendants Garipalli, Toy, Wagner and Palihapitiya are sometimes referred to herein as the "Individual Defendants."

**RESPONSE:** Defendants admit the allegations in Paragraph 40.

41.     The Individual Defendants possessed the power and authority to control the contents of Clover's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Clover's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Clover, andtheir access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were beingconcealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissionspleaded herein.

**RESPONSE:** The first sentence of Paragraph 41 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in the first sentence of Paragraph 41. Defendants deny the allegations in the second and third sentences of Paragraph 41. The fourth sentence of Paragraph 41 consists of legal conclusions to

16

which no response is required. To the extent that a response is required, Defendants deny the allegations in the fourth sentence of Paragraph 41.

42. Clover and the Individual Defendants are collectively referred to herein as "Defendants."

**RESPONSE:** Defendants admit the allegations in Paragraph 42.

43. Defendants are liable for: (i) making false statements; (ii) failing to disclose adverse facts known to them about Clover; and (iii) engaging in a scheme to defraud. Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Clover's securities was a success, as it: (i) deceived the investing public regarding the truth about Clover's business operations and financial prospects; (ii) artificially inflated the prices of Clover Securities; and (iii) caused plaintiff and other members of the Class to purchase Clover's securities at inflated prices.

**RESPONSE:** Defendants deny the allegations in Paragraph 43.

### IV. <u>CONFIDENTIAL WITNESSES</u>

44. CW1 was a Clinical Data Operations Specialist for Clover from June 2018 to July 2019. CW1 worked out of Clover's offices in San Francisco, California. She reported to Clinical Data Operations Manager Katie Dahl, who reported to a Vice President of Clinical Data. CW1 worked with Clover's Clinical Data team to gather clinical data from physicians' offices, hospitals, and lab test companies that partnered with Clover and accepted Clover's insurance plans. CW1 managed relationships with vendors; queried, visualized and analyzed clinical data; and processed clinical data for members and providers into Clover's internal database. One of CW1's main responsibilities was to help Clover gather clinical data from physicians' offices, hospitals and lab test companies that accepted Clover's health insurance. CW1 stated that although she was not a point of contact for physicians about Clover Assistant issues, she did occasionally communicate with physicians while making calls to physicians' offices to collect patient data.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 44.

45. CW2 was the Senior Manager of Partnerships and Development for Clover from August 2016 to May 2019. CW2 worked out of Clover's offices in San Francisco, California. She reported to Chief Development Officer Ethan Lipkind, who reported to Defendant Garipalli. As Senior Manager of Partnerships and Development, CW2 worked in the Operations part of Clover. She was initially responsible for managing vendors that Clover contracted with to process claims and collect premiums. CW2 said her role expanded fairly quickly. Over the course of three years, she wound up being responsible for overseeing all of Clover's third-party relationships, working with vendors, partnerships and on many of the company's pilot programs. The job involved a lot of contract negotiations and project management, she said. CW2 also said that her supervisor, Lipkind, was overseeing the rollout of Clover Assistant to providers as part of the company's

17

network expansion plan outside of New Jersey.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 45.

46. CW3 worked for Clover Health from November 2017 to June 2019 as a Provider Engagement Manager. CW3 worked from Savannah, Georgia. She reported to several individuals, including Director of Network Engagement Zoe Farrell, Vice President of Network Management and Operations Carl Rathjen, and Vice President of Provider Alignment and Network Engagement Ankit Patel. Those individuals reported to Chief Development Officer Lipkind, who reported to Defendant Garipalli. CW3 was the main person hired to handle the company's expansion in the Southeast, namely into the Savannah, Georgia and Chatham County market. CW3 said, "I was the sole employee stationed down there to build out our initial market offering, as well as strategy and growth of the market in the Southeast." CW3 worked directly with providers and their offices to get physicians to sign contracts to use Clover Assistant. she was also part of the initial team that built alpha and beta versions of Clover Assistant.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 46.

47. CW4 worked for Clover Health from April 2018 to August 2019 in the company's Network Expansion and Growth department, a role that involved evaluating new markets for Clover's expansion and introducing Clover Assistant to providers in the new markets. CW4 said that Clover's actuarial team studied member and economic data and suggested areas where Clover might have success. As part of this process, CW4 conducted research into the healthcare provider landscape in various areas, which helped inform Clover's bids in new markets. CW4 said much of her role changed once the company rolled out the initial version of Clover Assistant. At that point, Clover halted expansion into new markets and expanded only around existing markets. CW4 said she essentially took on a "sales operations" role focused on rolling out Clover Assistant. CW4 worked out of Clover's offices in Jersey City, New Jersey. She reported at various times to Vice President of Network Management and Operations Carl Rathjen and Chief Development Officer Ethan Lipkind, who reported to Defendant Garipalli. Rathjen reported to Lipkind, as well as to Defendant Garipalli.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 47.

## V. SUBSTANTIVE ALLEGATIONS

### A. Background

#### 1. *Medicare, Medicare Advantage, and Direct Contracting*

48. Medicare is the United States federal government's health insurance program for

18

Americans aged 65 or older. Approximately 62 million people were enrolled in Medicare in 2019.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 48, except admit that Medicare is a federal health insurance program that is available to certain Americans aged 65 or older, and that, upon information and belief, approximately 62 million people were enrolled in Medicare in 2019.

49.     When an individual becomes eligible for Medicare, she can enroll directly with the federal government in a traditional Medicare program. Participants in traditional Medicare programs generally are required to pay premiums to the U.S. government and out-of-pocket deductibles and coinsurance to healthcare providers.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 49, except admit that when Medicare-eligible individuals become eligible for Medicare, they can enroll in traditional Medicare with the federal government, and that under traditional Medicare, beneficiaries may owe premiums to the U.S. government and out-of-pocket deductibles and coinsurance to healthcare providers.

50.     An individual who is eligible for Medicare can also elect to enroll in a "Medicare Advantage" plan, which are private-plan alternatives to traditional Medicare. Medicare Advantage plans, sometimes called "Part C" or "MA Plans," are offered by Medicare-approved private companies that must follow rules set by CMS. Medicare Advantage plans set a limit on what plan participants, or "members" have to pay out-of-pocket each year for covered services. Some plans also offer out-of-network coverage, often at a higher cost.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 50, except admit that MA is a program through which Medicare-eligible individuals can obtain Medicare benefits through a private MA plan, that MA may sometimes be referred to as Medicare Part C, and that CMS oversees the MA program. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth sentence of Paragraph 50.

51.     According to a Kaiser Family Foundation ("KFF") analysis,[3] the popularity of Medicare Advantage plans is exploding. "Between 2019 and 2020, total Medicare Advantage enrollment grew by about 2.1 million beneficiaries, or 9 percent – nearly the same growth rate as

the prior year." The U.S. Congressional Budget Office projects that the share of all Medicare beneficiaries enrolled in Medicare Advantage plans will rise to about 51 percent by 2030. KFF estimates that approximately 24.1 million seniors are "members" of Medicare Advantage, *i.e.*, are enrolled in such plans, out of the 62 million people eligible for Medicare.

[3]     Freed, Meredith, et al., *A Dozen Facts About Medicare Advantage in 2020*, KFF.org, Jan. 13, 2021, https://www.kff.org/medicare/issue-brief/a-dozen-facts-about-medicare-advantage-in-2020/.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 51, except admit that the quotation in the second sentence of Paragraph 51 is a partial quotation of the Kaiser Family Foundation analysis *A Dozen Facts About Medicare Advantage in 2020* concerning the subject, respectfully refer to that document for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

52.     The U.S. government's Centers for Medicare and Medicaid Services ("CMS") operates both traditional Medicare and Medicare Advantage programs. Medicare Advantage is designed to incentivize insurers to find ways to lower the cost of care. Accordingly, in contrast to traditional Medicare, which operates a "pay for service" model, CMS pays Medicare Advantage insurers a per-member-per-month rate to manage each Medicare Advantage member's care. Recognizing that sicker patients are likely to cost more to insure, CMS increases these monthly payments depending on a patient's "risk assessment score." The higher the risk assessment score, the higher the monthly payment from CMS. The most profitable patients for a Medicare Advantage insurer are thus patients with the highest risk assessment scores that use the least treatment.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 52, except admit that (1) CMS oversees the Medicare program, including both traditional Medicare and MA; (2) under traditional Medicare, healthcare providers and facilities typically bill CMS under a fee-for-service model; (3) under MA, CMS makes monthly capitated payments to MAOs for each beneficiary enrolled in the MAO's MA plans; and (4) CMS determines and adjusts the per beneficiary capitation amount it pays MAOs based on factors including the medical diagnoses, age, and sex of the beneficiaries enrolled in the MAO's MA plans.

53.     It is thus potentially in a Medicare Advantage insurance plan provider's interest to make its patients look as sick as possible, thereby earning higher reimbursement. When a plan provider does this fraudulently, it is called "risk adjustment fraud."

20

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 53.

54.     Risk adjustment fraud occurs when Medicare Advantage insurers, among others, seek to game the healthcare system by inflating the risk profile of patients to take advantage of the higher payments that come with inflated risk profiles. The practice of inputting inaccurate medical information to increase reimbursement from CMS or other government payors is called "upcoding."

**RESPONSE:** Paragraph 54 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 54. Defendants deny the allegations in the second sentence of Paragraph 54.

55.     Unscrupulous Medicare Advantage plan providers can engage in upcoding in a variety of ways. For example, insurers can "make it up," *i.e.*, submit claims for payment when the patient does not have, or was not treated for the condition. Insurers can also exaggerate the severity of the patient's condition by using assessment codes that risk adjust at a higher rate. They can also claim current treatment of a condition rather than history of treatment. They can submit claims based on improper provider or service type (*e.g.*, laboratory or radiology) in violation of CMS's requirement that diagnoses codes must be supported by a record that reflects a face-to-face encounter with an eligible provider type. Insurers can also infer diagnoses from unacceptable medical record documentation without evidence the condition required or affected the patient's care, treatment, or management on the visit in question, including coding from problem lists, patient history, or prescription drugs. Finally, insurers can improperly link complications or conditions without sufficient evidence the complications or additional conditions stem from the underlying diagnosis where doing so results in a higher reimbursement.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 55.

### 2. Clover's History and Business

56.     Defendant Garipalli founded Clover in 2013. Since its time as Legacy Clover, prior to the Business Combination, through the Business Combination and continuing today, Clover has been a provider of Medicare Advantage insurance plans.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 56. Defendants admit the allegations in the second sentence of Paragraph 56.

57.     Clover characterizes the Medicare Advantage healthcare plans it offers its members

as "obvious" plans. Clover's SEC filings uniformly state that "We call our plans 'Obvious' because we believe they are highly affordable—offering most of our members the lowest average out-of-pocket costs for PCP co-pays, specialist co-pays, drug deductibles and drug costs in theirmarkets—and provide peace of mind with wide network access and the same cost-sharing (co- pays and deductibles) for physicians who are in- and out-of-network."

**RESPONSE:** Defendants deny the allegations in Paragraph 57, except admit that Paragraph 57 contains partial quotations of certain of Clover's public filings, including the Definitive Proxy Statement filed with the SEC on December 14, 2020, respectfully refer to those filings for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

58.     Clover's revenues almost entirely came from premiums paid by CMS for healthcare of Clover plan members. The Company's SEC filings state that Clover "derive[s] substantially all of [its] total revenues from Medicare Advantage premiums now and expect to continue to derive a substantial portion of our total revenues in the future from Medicare Advantage premiums."

**RESPONSE:** Defendants deny the allegations in Paragraph 58, except admit that it partially quotes certain of Clover's public filings, including the Definitive Proxy Statement filed with the SEC on December 14, 2020, respectfully refer to those filings for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

59.     This almost total reliance on Medicare Advantage premiums is readily apparent in the financial statements included in the filings. For example, the S-4[4] the Company filed in connection with the Business Combination on October 20, 2020 included financial results for Clover as of December 31, 2018 and 2019 and June 30, 2019 and 2020. The S-4 stated that 98.6% of the Company's revenues in 2018 and 98.8% of the Company's revenues in 2019 were from Medicare Advantage premiums. The S-4 also disclosed that 99.4% of the Company's revenues in the first six months of 2019 and 98.9% of the revenues in the first six months of 2020 were from Medicare Advantage premiums. The S-4 elaborated, "[i]n advance of each plan year, we enter into contracts with CMS under which it pays us fixed monthly premiums per member based on our actuarial bid and the CMS risk-adjustment model." In short, during the Class Period investors understood that virtually all of Clover's past and future revenues came from payments directly paid by the federal government, not individual plan participants.

[4]     An SEC Form S-4 is filed by a publicly traded company with the Securities and Exchange Commission (SEC). The form is required to register, among other things, any material information related to a merger or acquisition. Kenton, Will, *SEC Form S-4 Defined*, Investopedia.com, Jun. 25, 2020, https://www.investopedia.com/terms/s/sec-form-s-

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 59. Defendants admit the allegations in the second sentence of Paragraph 59, except state that Footnote 4 of Paragraph 59 consists of legal conclusions to which no response is required. Defendants admit that the third through fifth sentences of Paragraph 59 contain partial quotations of Form S-4, respectfully refer to that document for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the sixth sentence of Paragraph 59.

60. Medicare Advantage enrollment is highly concentrated among a small number Medicare insurance plan providers. UnitedHealth holds 26% of the market share, or approximately 6.3 million, followed by Humana at 18%, or approximately 4.34 million. CVS Health purchased Aetna in 2018 and had the third largest growth in Medicare Advantage enrollment in 2020, increasing by about 396,000 beneficiaries between March 2019 and March 2020 alone. By comparison, as of September 30, 2020, Clover had only 57,503 total members, and as of March 31, 2021, Clover had only 66,348 members.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first through third sentences of Paragraph 60. Defendants admit the allegations in the fourth sentence of Paragraph 60.

61. Despite its small market share, Defendants emphasized to investors that the Medicare Advantage market Clover was in position to reap outsized revenues by focusing on and increasing its share of the enormous Medicare Advantage market. For example, on October 6, 2020, Defendants issued a press release announcing the Business Combination (the "Announcement Release"). The Announcement Release specified that, "Medicare Advantage is one of the largest and fastest growing markets in the U.S. healthcare system—but it is one that has seen little innovation and remains ripe for disruption. ***Worth $270 billion today and with an estimated value of $590 billion by 2025, the Medicare Advantage market provides a tremendous opportunity for growth***."

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 61. Defendants admit the allegations in the second sentence of Paragraph 61. Defendants admit the third and fourth sentences of Paragraph 61 contain partial quotations of the press release filed as

23

an exhibit to Form 8-K with the SEC on October 6, 2020, respectfully refer to the press release for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

62.     According to Defendants, the way that Clover could disrupt the Medicare Advantage market, dramatically increase the number of plan members it served and realize the enormous revenues waiting to be gained in the Medicare Advantage market was through its proprietary software tool: Clover Assistant.

**RESPONSE:** Defendants deny the allegations in Paragraph 62.

63.     For example, the Announcement Release stated that "A unique model in health insurance, Clover partners with primary care physicians *using its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care.*" The Announcement Release continued, "Technology is at the core of Clover's business—the Company is a true innovator in the Medicare Advantage space, *deploying its own internally-developed software [i.e., Clover Assistant] to assist physicians with clinical decision-making at the point of care.*"

**RESPONSE:** Defendants admit Paragraph 63 contains partial quotations of the press release filed as an exhibit to Form 8-K with the SEC on October 6, 2020, respectfully refer to the press release for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

64.     Defendants also emphasized to investors that Clover Assistant was specifically designed to support Medicare health plans. For example, at a virtual "Analyst Day" during the Class Period, on November 20, 2020 (the "Analyst Day"), Defendant Garipalli told attendees that "we chose to be an [Medicare Advantage] insurer in part, *because of the breadth and depth of data we have access to, including claims, lab results, EHR data, and pharmacy data.* By starting an MA plan, we focused on centralizing and synthesizing these distinct data sets so that we could create personalized views of our members, including predictive models." Defendant Garipalli also told Analyst Day attendees, "our strategy is on its surface, very simple. It's *scale Clover Assistant, drive more value through Clover Assistant*, giving meaningful amount of that value back to consumers and the government. And then just keep repeating one through three."

**RESPONSE:** Defendants deny the allegations in Paragraph 64, except admit that Paragraph 64 contains partial quotations of the Analyst Day transcript, respectfully refer to that transcript for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

65.     Later at the Analyst Day, Defendant Garipalli left no doubt as to the centrality of Clover Assistant and that tool's functionality to Clover's prospects. When asked, "I guess in the

example you gave about market share over time, you got to 20% market share in the market before 2018, I guess, before Clover Assistant actually was kind of fully launched out. Can you just talk a little bit about how you were able to do that?" Defendant Garipalli responded, "We have the lowest co-pays, most supp benefits, and then also not just widest choice, but the out of network cost sharing for primary care and specialists is equivalent to what it is in network. And so that combined is what has driven a lot of the attractiveness and growth. ***The Clover Assistant is what allows those plans to be economically affordable***."

**RESPONSE:** Defendants deny the allegations in Paragraph 65, except admit that Paragraph 65 contains partial quotations of the Analyst Day transcript, respectfully refer to that transcript for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

### 3. Clover Assistant

66.     According to Defendants, Clover Assistant is Clover's "flagship software platform . . . to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers."[5] Clover Assistant purportedly aggregates "millions" of relevant health data points—including claims, medical charts, and diagnostics—and uses "machine learning" to synthesize that data with the entries that physicians make during patient visits. Defendants claim that, using this data, Clover Assistant provides physicians with "actionable and personalized insights at the point of care," *i.e.*, offers suggestions for medications and dosages as well as the need for, among other things, tests or referrals.

[5]      A Preferred Provider Organization, or "PPO" is a type of health plan that "contracts with medical providers, such as hospitals and doctors, to create a network of participating providers." A patient pays less if the patient uses providers in PPO network, but must pay an additional cost to use providers outside the network. *Preferred Provider Organization (PPO)*, Healthcare.gov, https://www.healthcare.gov/glossary/preferred-provider-organization-ppo/. Conversely, a HealthMaintenance Organization, or HMO, is generally a type of health plan "that limits coverage to care from doctors who work for or contract with the HMO." An HMO generally will not cover out-of-network care except in an emergency, may require patients to live or work in a service area, and "integrated care and focus on prevention and wellness." *Health Maintenance Organization (HMO)*, Healthcare.gov, https://www.healthcare.gov/glossary/health-maintenance-organization-hmo/.

**RESPONSE:** Defendants deny the allegations in Paragraph 66, except admit that Paragraph 66 contains partial quotations of the Form S-1 filed by Clover with the SEC on January 13, 2021, and the press release filed as an exhibit to the Form 8-K filed by SCH with the SEC on October 6, 2020, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith. Defendants deny knowledge or

information sufficient to form a belief as to the truth of the allegations in Footnote 5 of Paragraph 66.

67.     In reality, Clover Assistant is a tool designed to identify opportunities to assign higher Medicare risk adjustments so that Clover can obtain larger reimbursements from Medicare. Clover Assistant uses a checkbox interface to gather data on a patient during a patient visit, as reflected in the following screen capture from a presentation of Clover Assistant available on YouTube:



**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 67. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 67.

68.     Clover Assistant also proposes courses of treatment that physicians are supposed to interact with—accept or decline—during patients visits, as shown in the screen capture below:

26



**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 68.

69.     The clicks an individual makes in Clover Assistant not only record diagnoses and treatments for a Clover member, they also can revise a patient's risk assessment level. If the risk assessment level is revised upward, the result is larger payments to Clover. Given that Medicare payments for higher risk assessment levels can be much larger, a patient visit that leads to an upward risk adjustment can be extremely valuable to Clover. Accordingly, to incentivize physicians to use Clover Assistant, Clover pays doctors $200 per visit to use Clover Assistant, or *twice* the average Medicare reimbursement rate for a standard visit. In addition, Clover has physicians sign contracts agreeing to use Clover Assistant, which state that Clover Assistant is to be used by the physician during patient visits.

**RESPONSE:** Defendants deny the allegations in the first through third sentences of Paragraph 69, except admit that: (1) under MA, CMS makes monthly capitated payments to MAOs for each beneficiary enrolled in the MAO's MA plans; (2) CMS determines and adjusts the per beneficiary capitation amount it pays MAOs based on factors including the medical diagnoses, age, and sex of the beneficiaries enrolled in the MAO's MA plans; and (3) CA is designed to allow healthcare providers to record certain conditions with which they diagnose their patients.

Defendants deny the allegations in the fourth and fifth sentences of Paragraph 69, except admit that Clover pays certain healthcare providers $200 per visit for certain visits with Clover MA plan members in connection with which the provider uses CA, and that such payments are made pursuant to contracts with such providers; Defendants respectfully refer to these contracts for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

70. CW2 confirmed that it was important that a physician use Clover Assistant during sessions with patients because Clover hoped the physician would follow the recommendations or suggestions that appeared in Clover Assistant, which could include upward risk adjustments that would benefit Clover's bottom line. CW2 said, "That really was the model or the philosophy of Clover Assistant. "When it was talked about internally, it was both that hopefully [Clover Assistant] provides better care but also that it has this additional effect that it gives us more revenue."

RESPONSE: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 70.

71. CW2 said that Defendants Garipalli and Toy said on multiple occasions that Clover was "willing to pay doctors twice as much to do this because [of the] increased revenue [for Clover]." "It was no grand secret," CW2 said. "In fact, it was the opposite. It was the rallying cry for the company: 'This is what we think the model of the future's going to be.'" CW2 said that "[t]here was a lot of talk internally about driving higher reimbursement or driving higher revenue . . . . For people who understood the business of Medicare Advantage [like CW2], that was one of the express benefits of the technology."

RESPONSE: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 71.

72. According to CW2, all health insurance companies like Clover are incentivized to "upcode" in order to maximize their profits. To do this, platforms like Clover Assistant are designed to sift through past claims "and find anything that has a risk adjustment benefit," referring to the value or risk score assigned to patients based on their health conditions. Higher risk adjustment ratings meant Clover was entitled to larger payments from the government through Medicare, CW2 said.

RESPONSE: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 72.

73. CW3 corroborated CW2's account of how Clover Assistant was designed to identify potential higher risk adjustments. CW3 stated that after a physician input a current

28

diagnosis, Clover Assistant "would highlight which [diagnoses] could go together to put together a high-complexity code." Clover Assistant would then ask providers, "Do you agree?" They would then hit "yes" or "no." CW3 stated that on the backend Clover Assistant would produce an amendment to the member's original "medical note," and the resulting amendment (or addendum) would be sent to CMS. "Whichever [diagnoses] could go together—whichever high-complexity codes the system would flag that were pertinent—it would ask the doctor if it wanted to add those," she said. "The whole thing is designed to be checkboxes, binary questions." CW3 said "Clover's system does a check to make sure high-complexity codes [are being shown to physicians], and if not, they promote them. Those are the pop-ups that come up in the system."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 73.

74. CW3 said some of the diagnoses suggested or put forward by Clover Assistant could be old or stale diagnoses that were no longer relevant. "The system wasn't really removing anything as much as it was trying to consolidate to the higher-complexity codes," she said. She explained that if a patient came in with cold symptoms and was diagnosed with a flu, four months later, Clover Assistant might still show the flu as a diagnosis even though "the flu is a short-term virus." CW3 also said that on January 1 of each year, the entire Clover Assistant system would reset. "The doctor has to go back and do all this stuff all over again," she said. "Clover Assistant would in a sense reset, but it would promote the codes again if it doesn't see them on the doctor's chart the next time in that calendar year."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 74.

75. CW3 said this can result in "more accurate coding. That's good—when it's a physician doing it, it's a great opportunity to have more accurate coding." According to CW3, CMS then reviews "the original note and then sees the amendment signed by the doctor [stating], 'I've made these changes." There is a problem, CW3 said, if the physicians do not use the platform themselves but instead delegate the work office staff. "They're not clinically trained," CW3 said, "They're not licensed to diagnose anything."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 75.

76. CW3 said that Clover's ability to generate more lucrative patient diagnoses was influenced by the United States' adoption in 2015 of the 10th revision of the International Statistical Classification of Diseases and Related Health Problems ("ICD-10"). The revised system bundled together separate diagnoses to create more complex diagnoses that allowed Clover to bill the government for higher amounts. For example, under ICD-10, a patient who previously would have been diagnosed using separate, individual codes for conditions like kidney disease, diabetes and acute hypertension would instead be classified using a "high complexity code" that factored in all three conditions. Clover Assistant "is built to identify all codes identified by all claims Clover

29

has access to," CW3 said. The company's strategy then shifted to getting as many providers as possible to use Clover Assistant.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 76.

77. Defendants also approached certain types of potentially manipulable physicians as they rolled out Clover Assistant. CW3 said Clover had employees target independent doctors who were not affiliated with larger physician groups and who were "interested in the monetary compensation model." "They were looking for doctors that were struggling to get a little extra money to stay afloat," she said. "They wanted independent doctors because they would be able to influence them more." Doctors affiliated with larger health systems "don't have the same business decision power" as unaffiliated doctors, CW3 explained.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 77. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 77.

78. CW3 further explained that physicians who signed contracts to use Clover Assistant were typically "lower-rated doctors" and doctors whose "biggest concern was how much money we could give them or how much money they could make." CW3 said these doctors had low ratings on CMS's website. Any positive reviews about the doctors stated something like, "This doctor gets me on my Adderall all the time and doesn't even ask questions," CW3 said. "We keepgetting these . . . doctors that just want to cheat the system," CW3 recalled thinking. "Unfortunately, they kind of forced [Clover Assistant] forward to drive revenue. They incentivizeddoctors to use it, but they didn't care what kind of doctor [used it] . . . They didn't put any checksand balances in place."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 78.

79. CW2 and CW3's characterization of Clover Assistant as a tool designed to push the Company's Medicare Advantage members into higher risk assessment levels was also corroborated by former employees who spoke to Hindenburg in connection with the Hindenburg Report. Specifically, the report stated that, "Multiple former employees explained that Clover's software *is primarily a tool to help the company increase coding reimbursement*. We provide detail on how the software captures and retains irrelevant diagnoses, which we believe deceives the healthcare system, and poses a significant regulatory risk."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 79. Defendants deny the remaining allegations in Paragraph 79, except admit that Paragraph 79 contains a partial quotation of the

Hindenburg Report.

80.     The Hindenburg Report further stated that, "While Clover claims its software tool, Clover Assistant, is aimed at helping doctors improve patient care, former employees told us that it was first and foremost a coding tool. According to one former employee: 'The core feature of the platform is *it increases revenue by identifying chronic conditions that people have and CMS will pay that . . .* That's the core business proposition.'" Another employee told Hindenburg, "*If you make this patient look really, really sick, you are going to get more money from the government*."

**RESPONSE:** Defendants deny the allegations in Paragraph 80, except admit that

Paragraph 80 contains partial quotations of the Hindenburg Report.

81.     A former employee told Hindenburg that, "What [Clover Assistant is] doing is saying [that Clover has] your claims and in your claims at some point some doctor diagnosed your hypertension. The doctor that's sitting in front of you right now, we want them to say that you have hypertension. The doctor can say 'yes' or 'no' based on their findings. But it's a sort of a nudge to the doctor to identify these potential chronic conditions you have." According to another former employee who spoke to Hindenburg, "If you make this patient look really, really sick, you are going to get more money from the government I think the government may say it's not bad if a patient really is that sick. It gets dicey when you have a program that you are paying doctors straight up crazy amount of money to log in to and do this for you."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 81, except admit that Paragraph 81 contains partial

quotations of the Hindenburg Report.

82.     According to doctors interviewed by Hindenburg, Clover Assistant retains old and often irrelevant diagnoses. One doctor who works at an New Jersey practice that has dozens of doctors using Clover Assistant related, "[Clover] is like constantly throwing those codes back in our face for everything that's ever come up when they are irrelevant now." Another doctor who spoke to Hindenburg estimated that Clover Assistant's patient records were inaccurate between 10% and 25% of the time. That doctor told Hindenburg, "Let's say somebody came in with diabetes. They lost a bunch of weight. They exercise. They don't have diabetes anymore. That diabetes is still on the record." Other doctors who spoke to Hindenburg then explained that Clover Assistant limits their ability to remove an inapplicable diagnosis.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 82, except admit that Paragraph 82 contains partial

quotations of the Hindenburg Report.

83.     A former employee who spoke to Hindenburg also characterized the elevated

payments Clover made to physicians to use Clover Assistant as an investment for Clover." According to the former employee, "If you are paying doctors $200 for a click but you are able to increase the severity of patients that you've diagnosed, it's worth it because you are drawing down thousands of dollars (from Medicare) for a couple of clicks. To me that's why they have this."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 83, except admit that Paragraph 83 contains partial quotations of the Hindenburg Report.

84. During the Class Period, Defendant Wagner effectively acknowledged the truth of the characterization of Clover Assistant by the CWs who spoke to plaintiffs and the former employees who spoke to Hindenburg. At Analyst Day, Defendant Wagner pointedly observed that CMS paid Clover more for sicker members and that the dynamic "leads to one interesting factor to keep in mind, and that's the differential between returning and new members." Wagner elaborated, "new members tend to have worse margin profiles than returning members, *in part because of the lack of information about new member disease burden*."

**RESPONSE:** Defendants deny the allegations in Paragraph 84, except admit that Paragraph 84 contains a partial quotation of Defendant Wagner's statement in the Analyst Day transcript, respectfully refer to that transcript for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

85. In other words, new members had lower margins because they were reimbursed at a lower rate. The reason new members were reimbursed at a lower rate, Defendant Wagner suggested, was because physicians had not entered—after being prompted to enter—any diagnoses or treatments into Clover Assistant that could be used to support upward risk adjustments. Once a physician, using Clover Assistant, was able to add "information," *e.g.*, additional diagnoses and courses of treatment, using the tool's radio buttons, that additional "information" that could lead to higher risk assessments. Clover then passed those adjustments on to CMS, which then reimbursed Clover at a higher rate for the member, which increased a member's profitability. Since the increase in payment from CMS for a patient with a higher risk assessment was far greater than the $200 Clover had paid the physician, the physician was nothing more than a "loss leader" or "cost of doing business." Clover was thus more than willing to pay physicians $200 per visit in the hopes that those visits and uses of Clover Assistant would lead to higher and more profitable risk assessments.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 85. Defendants deny the remaining allegations in Paragraph 85, except admit that (1) under MA, CMS makes monthly capitated

payments to MAOs for each beneficiary enrolled in the MAO's MA plans; (2) CMS determines

and adjusts the per beneficiary capitation amount it pays MAOs based on factors including the

medical diagnoses, age, and sex of the beneficiaries enrolled in the MAO's MA plans; (3) CA is

designed to allow healthcare providers to record certain conditions with which they diagnose their

patients; (4) Clover submits to CMS certain information corresponding to certain conditions with

which healthcare providers diagnose Clover MA members, including certain information

corresponding to certain conditions recorded through CA; and (5) Clover pays certain healthcare

providers $200 per visit for certain visits with Clover MA plan members in connection with which

the provider uses CA.

### 4. Clover's Plans to Participate in Medicare "Direct Contracting"

86.     The U.S. government has also recently begun offering new Medicare plans as part
of the government's "Direct Contracting" program. The goal of Direct Contracting is to move
members of traditional Medicare plans to plans similar to Medicare Advantage plans. The program
is to run for at least five years.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 86.

Defendants deny knowledge or information sufficient to form a belief as to the truth of the

remaining allegations in Paragraph 86.

87.     Defendants made it clear during the Class Period that Clover planned to participate
in the new Medicare Direct Contracting program. For example, on a call with investors to
announce the Business Combination, Defendant Palihapitiya told attendees, "Under this second
phase of growth [*i.e.*, Direct Contracting], *the business already has 200,000 lives under contract*
for 2021, and they have estimated and forecasted 450,000 lives by 2023."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in the first sentence of Paragraph 87. Defendants deny the remaining

allegations in Paragraph 87, except admit that Paragraph 87 contains a partial quotation of

Defendant Palihapitiya's statement during a call with investors on October 5, 2020, respectfully

refer to the transcript of that call filed on Form 425 with the SEC on October 7, 2020, for its

complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

88. Defendants would repeat this representation about lives under contract for the Direct Contracting program throughout the Class Period. For example, the S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration stated that "A member becomes aligned to our Direct Contracting Entity ("DCE") when CMS's attribution model attributes them to (or they voluntarily elect to designate) a PCP with whom Clover has contracted as a "DC Participant" provider. To date, we already have contracts with physicians through which approximately 200,000 lives may be aligned with our DCE under the program."

RESPONSE: Defendants deny the allegations in the first sentence of Paragraph 88. Defendants deny the remaining allegations in Paragraph 88, except admit that Paragraph 88 contains partial quotations of Form S-1 filed with the SEC on January 13, 2021, respectfully refer to that document for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

89. In addition, during a virtual "Fireside Chat" with investors and analysts on November 19, 2020, Defendant Garipalli was asked by Justin Lake of Wolfe Research, "So can you repeat, walk us through that growth that you expect to have from 20 to 21, and then to 2022 . . . I think the number you had thrown out there was about 250,000 members in direct contracting." Defendant Garipalli responded "Yeah. 200,000 next year in direct contracting, but yeah." Lake then followed up, "And the 200,000 members, I think what I was . . . I apologize if you answered this, but what I was asking is, how many of those members do you feel like you have visibility to right now? You've signed up the doc, you know what the panel is the relative to what you expect to do through the year. Like if today, you started today, how many members would that add?" Defendant Garipalli responded, "Wait, we have two thirds direct visibility just from a . . . limit and then a third. And this is just a general ratio, a third in terms of when you think about the waterfall, what would it formally come through the claims alignment process." After Defendant Garipalli was done speaking, Lake followed up "Got it. So that's what you were saying by two thirds and one third. So you signed up the docs to get you 200,000, a third of that's going to be needed to be done by pitching it to the member. Right. And get them to sign. It makes perfect sense. So, you would expect to start the year, let's say 130,000 members from one, one, and then grow through the year with those signatures up at 200,000."

RESPONSE: Defendants deny the allegations in Paragraph 89, except admit that Paragraph 89 contains partial quotations of Defendant Garipalli's statements during a virtual "Fireside Chat," respectfully refer to the transcript filed on Form 425 with the SEC on November 20, 2020, for its complete and accurate contents, and otherwise deny any allegations inconsistent

therewith.

90.     Neither Defendant Palihapitiya nor Defendant Garipalli were being truthful in their representations of the Direct Contracting lives Clover already had under contract for 2021. In fact, on May 17, 2021, after the end of the Class Period, Defendants Garipalli and Wagner admitted on an earnings call that Clover would only have *between 70,000 and 100,000* lives under contract by the end of 2021, far less than the 130,000 to 200,000 they claimed were already under contract in October and November 2020. These misleading statements were characteristic of Defendants throughout the Class Period. As set forth in detail below, Defendants made dozens of false and misleading statements that, when the truth emerged, severely harmed investors.

**RESPONSE:** Defendants deny the allegations in Paragraph 90, respectfully refer to the May 17, 2021 earnings call transcript for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

### 5. *Medicare Regulatory Environment*

91.     Numerous federal and state laws and regulations, as well as industry ethical guidelines, restrict Clover's ability to adopt certain practices in the sales and marketing of and billing for Clover Assistant and its "obvious" plans. While some of these sales and marketing practices may be commonly accepted and legal in many types of businesses, healthcare is unique because Medicare depends on physicians and healthcare professionals to exercise independent judgment in the best interests of the patient. Thus, as explained by the Office of the Inspector General ("OIG"), the purpose of these laws and regulations is "to protect patients and federal healthcare programs from fraud and abuse by curtailing the corrupting influence of money on health care decisions."

**RESPONSE:** The first sentence of Paragraph 91 consists of legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the first sentence of Paragraph 91, except admit that there are multiple laws and regulations pertaining to the marketing of MA plans and enrollment of Medicare beneficiaries into such plans, and to payments made by MAOs to healthcare providers.  Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 91.

92.     Specifically, in 1972, Congress enacted the Federal Anti-Kickback Statute to address concerns regarding conflicts of interest and unfair competition, which lead to abuses of federal health care programs (the "Anti-Kickback Statute"). The Anti-Kickback Statute provides, in pertinent part:

> "Whoever knowingly and willfully offers or pays any remuneration

(including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such

person—(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both."

42 U.S.C. § 1320a-7b(b).

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 92. Defendants admit that Paragraph 92 contains partial quotations of 42 U.S.C. § 1320a-7b(b), respectfully refer to that statute for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

93. In addition to criminal and civil fines and penalties, including up to five years in prison, violation of the Anti-Kickback Statute can also result in exclusion from participating in and receiving reimbursement from state and federal healthcare programs.

**RESPONSE:** Paragraph 93 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 93, except admit that a violation of 42 U.S.C. § 1320a-7b(b) carries certain fines and penalties, respectfully refer to that statute for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

94. This is particularly relevant to Clover given that throughout its entire existence, including the Class Period, the overwhelming majority of Clover's revenues have come from its Medicare Advantage policies.

**RESPONSE:** Defendants deny the allegations in Paragraph 94, except admit that the majority of Clover's revenues have come from its Medicare Advantage policies throughout the Class Period.

95. Speaking about the Anti-Kickback Statute, the OIG has warned that, with respect to "business courtesies and other gratuities," entertainment, recreation, travel, meals, gifts, gratuities, and other business courtesies implicate the Anti-Kickback Statute if given to physicians in a position to make or influence referrals or if any one purpose is to generate business for the company.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 95.

96. Furthermore, under the Federal False Claims Act, the government may recover losses due to fraud and abuse by persons seeking payment from the United States. See S. Rep. No. 345, 99 Cong., 2d Sess. at 2 (1986), reprinted in 1986 U.S.C.C.A.N 5266. The False Claims Act makes it unlawful for any person to knowingly present a false or fraudulent claim, record or statement to the government for payment or approval. See 31 U.S.C. § 3729. With respect to Medicare, claims may be false if they claim reimbursement for services or costs that either are not reimbursable or were not rendered as claimed. Medicare and Medicaid coverage is also limited to medical goods and services that are "reasonable and necessary" for the diagnosis and treatment of a patient. *See* 42 U.S.C. § 1395y(a)(1)(A).

**RESPONSE:** Paragraph 96 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that Paragraph 96 purports to paraphrase 1986 U.S.C.C.A.N 5266, 31 U.S.C. § 3729, and 42 U.S.C. § 1395y(a)(1)(A), respectfully refer to those authorities for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

97. Regulatory scrutiny of the medical industry also increased with the enactment of the Physician Payments Sunshine Act of 2009 and the Patient Protection and Affordable Care Act in 2010 ("PPACA"). These laws broaden the scope of the Anti-Kickback Statute and False Claims Act and require companies to report all transfers of value to physicians to the U.S. Department of Health and Human Services on an annual basis beginning March 31, 2013.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 97. The remaining allegations in Paragraph 97 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that the remaining allegations in Paragraph 97 purport to paraphrase the Physician Payments Sunshine Act and the Patient Protection and Affordable Care Act, respectfully refer to those laws for their complete and accurate contents, and otherwise deny

any allegations inconsistent therewith.

98. In addition, with the enactment of the PPACA in 2010, violations of the Anti-Kickback Statute are per se violations of the False Claims Act. Specifically, the PPACA changed the language of the Anti-Kickback Statute to provide that claims submitted in violation of the statute automatically constitute false claims for purposes of the False Claims Act.

**RESPONSE:** Paragraph 98 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that Paragraph 98 purports to paraphrase the Patient Protection and Affordable Care Act, the Anti-Kickback Statute, and the False Claims Act, respectfully refer to those laws for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

99. Congress also added a new section that eliminates the requirement that a person have actual knowledge of the law or specific intent to commit a violation of the statute. See 42 U.S.C. §1320a-7b(h). Under the PPACA, even an unwitting and non-benefitting party within the stream of a reimbursement claim to Medicare or Medicare is liable for fraud if unlawful kickbacks taint any part of the claim.

**RESPONSE:** Paragraph 99 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that Paragraph 99 purports to paraphrase 42 U.S.C. §1320a-7b(h) and the Patient Protection and Affordable Care Act, respectfully refer to those laws for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

100. As stated in Clover's Class Period SEC filings, Defendants understood that they were subject to these and other laws, stating that:

> As an institution that contracts with the federal government, we are subject to federal laws and regulations relating to the award, administration and performance of U.S. government contracts, including laws aimed at preventing fraud, waste and abuse. Fraud, waste and abuse prohibitions encompass a wide range of activities, including kickbacks or other inducements for referral of members or for the coverage of products by a plan, billing for unnecessary medical services by a healthcare provider, improper marketing and beneficiary inducements, and violations of patient privacy rights. Companies involved in federal and state health care programs such as Medicare are required to maintain compliance programs to detect

38

and deter fraud, waste and abuse, and are often the subject of fraud, waste and abuse investigations and audits.

**RESPONSE:** Defendants deny the allegations in Paragraph 100, except admit that Paragraph 100 contains partial quotations of certain of Clover's SEC filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

101. Defendants also demonstrated their awareness and understanding of applicable regulations by explaining in their SEC filings that:

> The federal Anti-Kickback Statute and related regulations have been interpreted to prohibit the knowing and willful payment, solicitation, offering or receipt of any form of remuneration (including kickbacks, bribes and rebates) in return for the referral of federal healthcare program patients or any item or service that is reimbursed, in whole or in part, by any federal healthcare program. A person or entity does not need to have actual knowledge of the statute or specific intent to violate it to have committed a violation. In some of our markets, states have adopted similar anti-kickback provisions, which apply regardless of the source of reimbursement. We have attempted to structure our relationships with providers and other entities to ensure compliance with the Anti-Kickback Statute and relevant safe harbors. It is, however, possible that regulatory authorities may challenge our approach to provider contracting and incentives, or other operations, and there can be no assurance that authorities will determine that our arrangements do not violate the federal Anti-Kickback Statute. Penalties for violations of the federal Anti-Kickback Statute include criminal penalties and civil sanctions, including fines, imprisonment and possible exclusion from Medicare, Medicaid and other federal healthcare programs.
>
> We are subject to federal and state laws and regulations that apply to the submission of information and claims to various government agencies. For example, the False Claims Act ("FCA"), provides, in part, that the federal government may bring a lawsuit against any person or entity who the government believes has knowingly presented, or caused to be presented, a false or fraudulent request for payment from the federal government, or who has made a false statement or used a false record to get a claim approved. There also is FCA liability for knowingly or improperly avoiding repayment of an overpayment received from the government and/or failing to promptly report and return any such overpayment. The federal government, whistleblowers and some courts have taken the

39

position that claims presented in violation of other statutes, for example, where a claim includes items or services resulting from a violation of the federal Anti-Kickback Statute, may be considered a violation of the FCA. Violations of the FCA are punishable by treble damages and civil monetary penalties of up to a specified dollar amount per false claim. In addition, a special provision under the

FCA allows a private person (for example, a "whistleblower," such as a disgruntled current or former competitor, member, or employee) to bring an action under the FCA on behalf of the government alleging that a company has defrauded the federal government and permits the private person to share in any settlement of, or judgment entered in, the lawsuit. A number of states, including states in which we operate, have adopted their own false claims acts and whistleblower provisions that are similar to the FCA.Companies in the health and related benefits industry, including ours, frequently are subject to actions brought under the FCA or similar state laws.

**RESPONSE:** Defendants deny the allegations in Paragraph 101, except admit that Paragraph 101 contains partial quotations of certain of Clover's SEC filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

102. Indeed, the above disclosure expressly acknowledged Defendants' understanding throughout the Class Period that a violation of the U.S. federal Anti-Kickback Statute constitutes a false or fraudulent claim for purposes of the False Claims Act when it states that:

> [t]he federal government, whistleblowers and some courts have taken the position that claims presented in violation of other statutes, for example, where a claim includes items or services resulting from a violation of the federal Anti-Kickback Statute, may be considered a violation of the FCA.

**RESPONSE:** Defendants deny the allegations in Paragraph 102, except admit that Paragraph 102 contains partial quotations of certain of Clover's SEC filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

103. Clover is also subject various specific regulations and interpretive guidance promulgated by CMS. For example, Clover is an "MA organization" under 42 C.F.R. § 422.2 because it is a "private entity organized and licensed by a State as a risk-bearing entity . . . that is

certified by CMS as meeting the MA contract requirements." Clover acknowledges this in its SEC filings, which state that the Company is "licensed as a risk-bearing entity in 45 states and the District of Columbia, and as a health maintenance organization in New Jersey and Texas." As an "MA organization." [sic]

**RESPONSE:** Paragraph 103 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that Paragraph 103 contains partial quotations of 42 C.F.R. § 422.2, respectfully refer to that regulation for its complete and accurate contents, and otherwise deny any allegation inconsistent therewith.

104. For example, CMS regulations delineate seven specific restrictions on "communication activities"[6] by MA organizations, *i.e.*, Clover (the "Communication Restrictions"). 42 C.F.R. § 422.2268(a). The Communication Restrictions prohibit Clover from, among other things, "[p]rovid[ing] information that is inaccurate or misleading" or "[e]ngag[ing] in activities that could mislead or confuse Medicare beneficiaries, or misrepresent the MA organization." 42 C.F.R. § 422.2268(a).

[6] Communication activities are defined by the Code of Federal Regulations to be "means activities and use of materials created or administered by the MA organization or any downstream entity to provide information to current and prospective enrollees." 42 C.F.R. 422.2260.

**RESPONSE:** Paragraph 104 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that Paragraph 104 contains partial quotations of 42 C.F.R. § 422.2268, effective June 15, 2018 to March 21, 2021, and 42 C.F.R. § 422.2260, respectfully refer to those regulations for their complete and accurate contents, and otherwise deny any allegation inconsistent therewith.

105. In addition, the Communication Restrictions also delineate 15 specific "Marketing Restrictions." Marketing is a "subset of communications," 42 C.F.R § 422.2260, and "means communications materials and activities that meet both the following standards for intent and content," namely that they are intended to "Draw a beneficiary's attention to a MA plan or plans," "Influence a beneficiary's decision-making process when making a MA plan selection," or "Influence a beneficiary's decision to stay enrolled in a plan (that is, retention-based marketing)" and "Include or address content regarding The plan's benefits, benefits structure, premiums, or cost sharing." Under the Marketing Restrictions, Clover may not, among other things, "Provide cash or other monetary rebates as an inducement for enrollment or otherwise," "Offer gifts to potential enrollees, unless the gifts are of nominal (as defined in the CMS Marketing Guidelines ["MCM Guidelines"])[7] value, are offered to all potential enrollees without regard to whether or not the beneficiary enrolls, and are not in the form of cash or other monetary rebates." 42 C.F.R. 422.2268(b).

7    The MCM Guidelines define "nominal" as "$15 or less, $75 aggregate, per person, per year" for "beneficiaries" for marketing purposes, "provided the gift is given regardless of whether they enroll, and without discrimination." *See* Medicare Communications and Marketing Guidelines, Sep. 5, 2018, https://www.cms.gov/Medicare/Health-Plans/ManagedCareMarketing/Downloads/CY2019-Medicare-Communications-and-Marketing-Guidelines_Updated-090518.pdf.

**RESPONSE:** Paragraph 105 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that Paragraph 105 contains partial quotations of 42 C.F.R. § 422.2268, effective June 15, 2018 to March 21, 2021, 42 C.F.R. § 422.2260, and the Medicare Communications and Marketing Guidelines ("MCMG"), respectfully refer to those regulations for their complete and accurate contents, and otherwise deny any allegation inconsistent therewith.

106. The MCM Guidelines also provide guidance on marketing and communication rules for Medicare Advantage, among other Medicare plans. Section 60 of the MCM Guidelines is entitled "Activities in a Healthcare Setting" Guideline 60.2 "Plan-Initiated Provider Activities in the Healthcare Setting," which construes 42 C.F.R. §§ 422.2260, 422.2268(b)(7), 423.2260, and 423.2268(b)(7), states that "CMS defines plan-initiated activities as those activities where either a Plan/Part D sponsor requests contracted providers to perform a task or the provider is action on behalf of the Plan/Part D sponsor. For the purpose of plan-initiated activities, the Plan/Part D sponsor must ensure compliance with requirements applicable to communication and marketing." Specifically, Guideline 60.2 states that:

Plans/Part D sponsors may not allow contracted providers to:

- Accept/collect scope of appointment forms;

- Accept Medicare enrollment applications;

- Make phone calls or direct, urge, or attempt to persuade theirpatients to enroll in a specific plan based on financial or any other interests of the provider;

- Mail marketing materials on behalf of Plans/Part D sponsors;

- Offer inducements to persuade their patients to enroll in a particular plan or organization;

- Conduct health screenings as a marketing activity;

- Distribute marketing materials/applications in areas where care is being delivered;

- Offer anything of value to induce enrollees to select them as their provider; or

- Accept compensation from the plan for any marketing or enrollment activities.

**RESPONSE:** Paragraph 106 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that Paragraph 106 contains partial quotations of the MCMG, respectfully refer to those guidelines for their complete and accurate contents, and otherwise deny any allegation inconsistent therewith.

### 6. Clover's Prior Regulatory Violations

107. In 2016, CMS fined Clover $106,095 for "engag[ing] in marketing activities during the Contract Year (CY) 2016 Annual Election Period (AEP) that misled or confused potential enrollees about their ability to always receive covered services from any out-of-network (OON) provider, and that Clover failed to correct the misleading statements after repeated notifications from CMS." In other words, the federal government had fined Clover for misleading its customers into believing the company covered out-of-network services that it did not, in fact, cover, which led to customer complaints about denials of service.

**RESPONSE:** Defendants deny the allegations in Paragraph 107, except admit that Paragraph 107 contains a partial quotation of the May 26, 2016 CMS letter to Defendant Garipalli with the subject "*Notice of Imposition of Civil Money Penalty for Medicare Advantage-Prescription Drug Contract Number: H5141*," respectfully refer to that letter for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

108. Specifically, in a Notice of Imposition of Civil Money Penalty dated May 26, 2016, the CMS Medicare Parts C and D Oversight and Enforcement Group stated that:

> Clover's materials incorrectly stated that OON providers and facilities participating in Medicare are obligated to accept Clover enrollees. CMS initially notified Clover executives of the misleading language issue during a telephone conversation on November 12, 2015. Clover acknowledged CMS' concerns and stated that appropriate actions would be taken to resolve the issues. CMS subsequently determined that Clover had not updated its materials, so it sent a letter to Clover on November 23, 2015 warning that CMS would consider imposing an enforcement action if the materials were not immediately updated. The letter instructed

43

Clover to make a clear distinction between in-network and OON providers and facilities in all of its member materials and communications, including its member identification cards, all advertising, website content, directories, and customer service scripts. On November 24, 2015, Clover notified CMS that it had corrected its member identification cards, online directories, and customer service scripts.

CMS conducted a secret shopper operation on December 5, 2015 at an insurance event where Clover brokers/agents told the secret shopper that, under Medicare law, an OON provider must accept any beneficiary who is enrolled in Clover's plan. The agents/brokers also distributed sample member identification cards displaying the misleading OON provider statement that Clover had previously stated it had corrected.

CMS subsequently reviewed Clover's website and discovered similar misleading references and additional marketing violations, such as, failing to include a disclaimer that an industry award was not given and/or endorsed by Medicare, failing to display CMS' Star Rating of the plan, failing to notify users that they were leaving Clover's website when clicking on links to external articles embedded within the site, and inappropriately modifying a standardized document. As a result, CMS sent a letter to Clover on December 9, 2015 requiring it to immediately correct the manner in which its plan network was being portrayed and the other violations discovered on Clover's website. Clover did not resolve the deficiencies until December 18, 2015, which was 10 days after the AEP closed.

CMS received a high volume of complaints in January and February 2016 from new Clover enrollees who were denied services by OON providers after being told by Clover that they could see any provider they wished. CMS provided the enrollees who filed the complaints with a Special Election Period, and required Clover to inform all of its enrollees that OON providers are under no obligation to accept Clover's Medicare Advantage coverage.

**RESPONSE:** Defendants admit that Paragraph 108 contains partial quotations of the referenced notice, respectfully refer to that document for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

109. The notice then went on to specifically find that, as a result of these actions:

- Clover continued to engage in marketing activities that misled or

confused beneficiaries about the plan's OON benefit after repeatedly being told by CMS to correct the issues. As a result, Clover's new enrollees were misled (or substantially likely to have been misled) about the extent of Clover's benefits for CY 2016. These issues violate 42 C.F.R. §§ 422.2264(d), 422.2268(e), 423.2264(d) and 423.2268(e); see also IOM Pub. 100-16, Medicare Managed Care Manual, Chapter 3, Section 40.4.

- Clover's website did not include a disclaimer indicating that an industry award was not given and/or endorsed by Medicare, state Clover's official CMS Star Rating, and give equal prominence to the CMS Star Rating relative to other awards mentioned. These issues violate 42 C.F.R. §§ 422.2264(a)(4), 422.2268(e), 423.2264(a)(3), and 423.2268(e); see also IOM Pub. 100-16, Medicare Managed Care Manual, Chapter 3, Section 40.3.

- Clover inappropriately modified the standardized CMS Multi-Language Insert. This issue violates 42 C.F.R. §§ 422.2262(c), 422.2264(a)(4) and (e), 423.2262(c), and 423.2264(a)(3) and (e); see also IOM Pub. 100-16, Medicare Managed Care Manual, Chapter 3, Section 30.5.1.

- Clover did not notify individuals that they were leaving Clover's website when clicking on links to different websites. This issue violates 42 C.F.R. §§ 422.2264(d), 422.2268(e) and (o), 423.2264(d), 423.2268(e) and (o); see also IOM Pub. 100-16, Medicare Managed Care Manual, Chapter 3, Section 100.1.

**RESPONSE:** Defendants admit that Paragraph 109 contains partial quotations of the referenced notice, respectfully refer to that document for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

110. According to the Hindenburg Report, CMS's fine had the ironic effect of emboldening Defendant Garipalli and Clover to "push the envelope further," *i.e.*, engage in potentially illegal conduct. Specifically, the employee told Hindenburg, "when I got there the thought process was 'well the penalty was so small we're not worried about it.'" The employee continued, "the one thing you never want to be with healthcare is on the CMS radar because that's the number one payor in the country. No one pays more than CMS, so don't bite the hand that feeds and put yourself in a bad spot like that could get you banned from that marketplace quickly.".

**RESPONSE:** Defendants deny the allegations in Paragraph 110, except admit that Paragraph 110 contains partial quotations of the Hindenburg Report.

45

### 7. The Business Combination

111. During the summer of 2020, a few years the settlement of CMS's claims, Legacy Clover began the process of going public. It prepared for one of two scenarios: a traditional initial public offering ("IPO") or a merger with an already publicly traded "blank-check" company, or SPAC. While an IPO would require filing a detailed registration statement with the SEC with detailed disclosures and undergoing a probing "due diligence" investigation by investment bankers, in the latter, Clover would simply "take over" an existing publicly traded common stock listing.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 111, except admit that the private company, Clover Health Investments, Corp. ("Legacy Clover"), was preparing for a potential IPO or transaction with a public company during the summer of 2020. The second sentence of Paragraph 111 contains legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in the second sentence of Paragraph 111.

112. SCH was a publicly traded blank check company, also known as a special-purpose acquisition company, or "SPAC." SCH was incorporated by Defendant Palihapitiya as a Cayman Islands exempted company on October 18, 2019. It was formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses.

**RESPONSE:** Defendants admit the allegations in Paragraph 112.

113. The registration statements for SCH's Initial Public Offering ("SCH IPO") became effective on April 21, 2020. SCH consummated the SCH IPO of 82,800,000 "units" on April 24, 2020. As part of the SCH IPO, SCH sold 72 million units comprised of one Class A ordinary share and one-third of one redeemable warrant to purchase a share of its Class A common stock for $10 each, raising $720 million in proceeds. Each whole warrant entitled the holder thereof to purchase one Class A ordinary share at a price of $11.50 per share, and only whole warrants were exercisable. In all, SCH obtained $828,000,000 in net proceeds of the sale of the units in the SCH IPO, which was placed in a trust account located in the United States. The SCH units sold in the IPO were listed on the New York Stock Exchange ("NYSE") under the ticker symbol IPOC.U. The SCH Class A ordinary shares were listed on the NYSE under the ticker symbol IPOC and the SCH warrants were listed on the NYSE under the ticker symbol IPOC WS. Following the IPO, which was upsized,[8] there were 82.8 million shares of SCH ordinary shares issued and outstanding.

---

[8]      In an "upsized" IPO, the issuer increases the price per share and/or number of shares issued, so long as the aggregate size of the revised offering does not exceed 120% of the amount shown in the registration statement at the time the registration statement become effective. *See*

Instructionto Rule 430A(a), 17 C.F.R. § 230.430A.

**RESPONSE:** Defendants admit the allegations in the first, second, and sixth sentences of Paragraph 113, and otherwise deny the allegations in Paragraph 113, except admit that Paragraph 113 contains information set forth in part in the Form 8-K filed by SCH with the SEC on April 24, 2020, and respectfully refer to that Form 8-K for its complete and accurate contents. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Footnote 8 of Paragraph 113.

114. As of September 30, 2020, SCH had not commenced any operations. All its activity from October 18, 2019 through September 30, 2020 related to the formation of the SCH, the SCH IPO, and SCH's search for a business with which it could merge or combine. SCH's only income was non-operating income in the form of interest from the proceeds of the SCH IPO.

**RESPONSE:** Defendants admit the allegations in Paragraph 114.

115. By the end of September 2020 Legacy Clover was well on its way to commencing a traditional IPO. On October 5, 2020, however, the Company suddenly decided instead to merge with a SPAC, *i.e.*, SCH. On that day, SCH entered into an Agreement and Plan of Merger (the "Merger Agreement") with Asclepius Merger Sub Inc. (the "Merger Sub"), a wholly owned Delaware subsidiary of the Company that had been incorporated in Delaware on October 1, 2020, and Legacy Clover. The Merger Agreement contemplated a series of transactions by which the Merger Sub would merge with and into Legacy Clover, with Legacy Clover surviving the merger and as a wholly owned subsidiary of the SCH (the "First Merger"). Legacy Clover would then merge with and into the SCH, with Clover emerging as the surviving entity (the "Second Merger"). The First and Second Mergers are referred to herein as the "Business Combination." The Merger Agreement represented that Legacy Clover (and thus Clover) had not committed any material legalor regulatory violations since January 1, 2018 and was not currently undergoing any legal proceeding or regulatory action that could have a material impact on its future prospects.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 115. Defendants deny the remaining allegations in Paragraph 115, except admit that SCH, Legacy Clover, and Asclepius Merger Sub Inc. entered into an Agreement and Plan of Merger on October 5, 2020 ("Merger Agreement"), respectfully refer to the Merger Agreement for its complete and accurate contents, including the mechanics of the merger, and otherwise deny any allegations inconsistent therewith.

47

116. The Business Combination also included transactions entailing a $1.2 billion investment by SCH into Clover, including a $400 million public investment in private equity ("PIPE"), from investors including Fidelity Management & Research Co, Jennison, Sen. Investment Group LP, Casdin and Perceptive Advisors. In addition to the $400 million PIPE, Clover received the $828 million of cash held in SCH's trust account from the SCH IPO.

**RESPONSE:** Defendants deny the allegations in Paragraph 116.

117. Defendants announced the Business Combination on October 6, 2020 at 8:48 AM, before the markets opened, when Defendant Palihapitiya tweeted "$IPOC is merging with @Clover_Health to help bring better healthcare across America." Defendant Palihapitiya's tweet included a one-page list of bullet points on Clover entitled "Investment Thesis for Clover Health – Disrupting Healthcare by Delivery Better Outcomes at Lower Cost" (the "Clover Thesis").

**RESPONSE:** Defendants admit that Paragraph 117 contains a partial quotation of a Tweet by Defendant Palihapitiya, respectfully refer to that communication for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

118. The Clover Thesis stated, among other things, that "Clover Health has also built powerful software (Clover Assistant) that Doctors use to manage your healthcare when you become a Clover Member Clover Assistant uses machine learning, large pools of data as well as your specific health data to customize how the Physician can help deliver you better care." The Clover Thesis went on to state that:

- Clover Health's initial market is Medicare Advantage (private Medicare for people over 65 years old) ("MA") because they are the most frequent users of healthcare and it's where improvements in outcomes are most urgently needed.

    o MA is a $270 billion market in 2020 and is expected to grow to $590 billion by 2025

- Clover Health's proposition of better outcomes and lower costs has resulted in strong initial growth

    o Clover Health is the fastest growing MA plan in the US

    o They typically take over 50% of the net membership growth in each of their established markets

**RESPONSE:** Defendants admit that Paragraph 118 contains a partial quotation of the document attached to a Tweet by Defendant Palihapitiya, respectfully refer to that communication for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

48

119. That same day, October 6, 2020, Defendant Palihapitiya was interviewed on the CNBC program "Squawk Box" (the "Squawk Box Segment"), wherein he touted Clover and the Business Combination, representing, in relevant part, that "[w]hat we have is a business that's actually delivering the promise of technology-improving, better outcomes and lower cost health care," and that "[t]his is one of the most straightforward investments I've ever made," while also indicating that by 2023 the Company would have overall profitability. Defendant Palihapitiya further stated that Clover was not engaged in the practice of "upcoding," or inputting inaccurate medical information to increase reimbursement from government payors such as Medicare. Specifically, with respect to Clover, Defendant Palihapitiya stated, in relevant part: "They create transparency. They don't play games. They don't motivate doctors to upcode or do all kinds of things in order to get paid." Additionally, Defendant Palihapitiya stated that SCH was "really excited after months of diligence and work to announce [the] merger between IPOC and [Clover] to take [Clover] public."

**RESPONSE:** Defendants deny the allegations in Paragraph 119, except admit that Defendant Palihapitiya appeared on CNBC's "Squawk Box" program and that Paragraph 119 contains partial quotations of Defendant Palihapitiya's statements during that program, respectfully refer to the transcript of that program for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

120. Defendant Palihapitiya also used the Squawk Box Segment to emphasize the amount of diligence that he and SCH had done before entering into the Merger Agreement. At the start of the segment, Defendant Palihapitiya emphasized the care SCH had exercised in selecting Clover, which he had purportedly focused on because of concerns he developed over the United States healthcare system during the COVID-19 pandemic. Defendant Palihapitiya told Sorkin, "we found this company, and this is why we are really excited *after months of diligence and work* to announce a merger between IPOC and Clover Health to take Clover Health public."

**RESPONSE:** Defendants deny the allegations in Paragraph 120, except admit that Defendant Palihapitiya appeared on CNBC's "Squawk Box" program and that Paragraph 120 contains partial quotations of Defendant Palihapitiya's statements during that program, respectfully refer to the transcript of that program for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

121. Defendant Palihapitiya also emphasized to Sorkin during the Squawk Box Segment that Clover was a *software company*, "when you go to Clover Health and you sign up for one of their plans, what they also do is go to your doctor and give them very powerful software. That software is a combination of machine learning that takes all of this heterogeneous data, clinical data, drug data, your lab results, your blood results, your genetic information, merges it together

49

and allows them to give actionable insights and recommendations every time you see your doctor."

**RESPONSE:** Defendants deny the allegations in Paragraph 121, except admit that Defendant Palihapitiya appeared on "Squawk Box" and that Paragraph 121 contains partial quotations of Defendant Palihapitiya's statements during that program, respectfully refer to the transcript of that program for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

122. On October 20, 2020, SCH filed the with the SEC in connection with the Business Combination. In the S-4, SCH and Clover represented that they had discussed "typical due diligence," and that "[f]rom August 25, 2020 to August 28, 2020," SCH, Clover, and their legal representatives "held a meeting via video teleconference to discuss certain preliminary healthcare regulatory and compliance due diligence matters, given the regulated nature of Clover's business." This document further provided that on August 27, 2020, SCH's legal counsel was "provided with access to a virtual data room of Clover and began conducting a preliminary legal due diligence review of Clover." The S-4 further provided that representatives of SCH and Clover met several other times to discuss, *inter alia*, due diligence review and matters associated therewith.

**RESPONSE:** Defendants deny the allegations in Paragraph 122, except admit that SCH filed Form S-4 with the SEC on October 20, 2020, and that Paragraph 122 contains partial quotations from Form S-4, respectfully refer to the S-4 for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

## B. Clover Made Illicit Gifts and Payments to Healthcare Providers and/or Staff and Was Under DOJ Investigation During the Class Period

123. Immediately upon announcing the Business Combination, and then throughout the Class Period, Defendants represented to investors and SCH's shareholders that the Company had complied with all its legal obligations over the prior two-and-a-half years and was not aware of any government investigation or other legal proceeding that could have a material impact on its performance.

**RESPONSE:** Defendants deny the allegations in Paragraph 123.

124. For example, on October 6, 2021, the first day of the Class Period, Defendants filed a copy of the Merger Agreement, which was signed by Defendants Palihapitiya and Garipalli with the SEC. Section 4.10 ("Litigation and Proceedings") of the Merger Agreement expressly represented that, to Clover's knowledge, there were no material pending or threatened "lawsuits, actions, suits, judgments, claims, proceedings or any other Actions . . . by any Governmental Authority." Similarly, Section 4.30(a) ("Healthcare Compliance") of the agreement provided that

50

"[e]ach of [Clover] and its Subsidiaries . . . in all material respects meets and complies with, and since January 1, 2018, has met and complied with, all applicable Laws."

**RESPONSE:** Defendants deny the allegations in Paragraph 124, except admit that Paragraph 124 contains partial quotations of the Merger Agreement, respectfully refer to the Merger Agreement for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

125. Moreover, the SEC filings made in connection with the Business Combination throughout the Class Period also communicated to SCH shareholders and investors that Defendants did not know of any current investigation into the Company that could materially affectits business. For example, the S-4, the First Amended S-4, the Second Amended S-4, the Third Amended S-4, the December 14 Prospectus, and the Proxy Statement each assured investors that Clover was not "presently involved in any legal proceeding the outcome of which, we believe, if determined adversely to us, would individually or taken together have a material adverse effect onour business, operating results, cash flows or financial condition."

**RESPONSE:** Defendants deny the allegations in Paragraph 125, except admit that SCH and/or Defendant Clover filed the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

126. These representations were material to investors because by the Company's own admission, it derived "substantially all" of its total revenues from Medicare Advantage premiums and expected to derive a substantial portion of its total revenues in the future from Medicare Advantage premiums, and regulatory action against the Company could cut off or severely inhibit its ability to offer Medicare plans or receive Medicare Advantage premiums. In addition, any investigation by the DOJ or other regulator or government entity was particularly material to investors given that Clover had been previously disciplined by CMS and another healthcare company owned by Defendant Garipalli had settled claims of violations brought by the New Jersey Medicaid Fraud Division.

**RESPONSE:** The allegations in Paragraph 126 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 126.

127. These representations were also false and misleading because Clover had violated the Anti-Kickback Statute, FCA, and MCM Guidelines by engaging in a practice of making illegal payments to physicians. In addition, the Civil Division of the United States Department of Justice

51

for the Eastern District of Pennsylvania (the "DOJ") had opened an investigation into Clover of violations of the Anti-Kickback Statute and FCA, among other things, prior to the announcement of the Business Combination and which was pending throughout the Class Period and is still ongoing today.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 127. Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the remaining sentences of Paragraph 127, except admit that Clover or a subsidiary thereof received an inquiry from DOJ prior to the announcement of the Business Combination and that this DOJ Inquiry was ongoing during the Class Period.

128.    CW3 stated that on multiple occasions, Chief Development Officer Ethan Lipkind, who reported to Defendant Garipalli, instructed her to purchase approximately $250 worth of gift cards and deliver them to healthcare providers and their staff.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 128.

129.    The first time Lipkind issued this instruction was in 2018. He told CW3 to purchase about $250 worth of gift cards and deliver them to office staff at SouthCoast Health in Savannah, Georgia, and to make sure the office knew the gift cards were from Clover. CW3 said that she resisted because she knew that Clover had no intention of reporting the gift card receipts to the government, telling Lipkind, "This isn't compliant. We shouldn't do this." CW3 said that when she spoke to Lipkind on the phone, he threatened to fire her, so she bought the gift cards using a Clover corporate card and delivered them to SouthCoast Health. "I took them directly there [to SouthCoast Health]," she said. "[Lipkind] wanted to know once it was done." CW3 further stated that threats of firing were Lipkind's "go-to for a lot of things," adding that Lipkind threatened to fire her about five times during her tenure with Clover. "'If you don't do X, that will be the last time you do that,' or, 'This will be the last time you are on any of these calls or with the company.'"

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 129.

130.    CW3 said Lipkind also instructed her to deliver gift cards to office staff at BCG Medical Group, which was "another major practice that [Lipkind] was trying to get buy-in from." CW3 said she never delivered the gift cards to BCG, because after delivering the cards to SouthCoast Health, she emailed her supervisor, Director of Network Engagement Zoe Farrell, about the incident. After CW3 emailed Farrell about the directive from Lipkind, "Zoe called me immediately [and said], 'You can't do that. It's fraud,'" CW3 said.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 130.

131.     CW3 said that within two days of the incident, Farrell filed a complaint about the matter with Clover's Compliance department, forwarding the initial email CW3 had sent her about the matter. CW3 said she spent a week answering questions from Clover's internal lawyers, such as, "Did [Lipkind] tell you to do this?" and "Can someone corroborate this?" CW3 told the investigators that Lipkind had instructed her to carry out the gift card operation—adding that Lipkind had threatened to fire her—and that yes, Farrell could corroborate the events because CW3 communicated them to her as they happened.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 131.

132.     CW3 said that she knew Lipkind's instruction to illicitly give gift cards to healthcare providers and their staff was not limited to her because her colleague in Texas, Olivia Istrate, who had the same role as CW3, told CW3 that Lipkind had also instructed Istrate to deliver gift cards to healthcare providers and staff in Texas.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 132.

133.     CW4 corroborates CW3's account. CW4 said she that she recalled hearing during her time at Clover in the Network Expansion and Growth department that Clover was giving gift cards to front office staff at providers' offices, which struck her as illegal. CW4 said that what she heard made it sound like something Lipkind was doing. CW4 also said that Lipkind had "cozied up to" Defendant Garipalli and was known to be close to Garipalli.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 133.

134.     CW3 said that Clover never "d[id] a formal PSA to the organization" or send out any official notice to employees about giving gift cards or making other illicit payments to healthcare providers. CW3 said that within a few months of the incident, Lipkind was *promoted*, which CW3 said was evidence that CEO Garipalli and CTO Toy knew about the gift card operation. "I can't see a world where they didn't get notified of it," CW3 said. "They had a senior leader [Lipkind] do this, and then less than a few months later, he's promoted to the executive team. That would be something that must have come up on her review of when they were talking about bringing him on board." In addition, CW3 said that rather than rewarding Farrell for reporting the illicit payments, Clover fired Farrell in 2019, prompting her to file a wrongful termination lawsuit.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 134.

135.    The Hindenburg Report corroborated CW3 and CW4's descriptions of Clover's practice of giving gift cards, *i.e.*, making payments to healthcare providers. The report stated that "In addition to soliciting potential members through brokers and websites with undisclosed conflicts, Clover also skirted regulations by recruiting members through physicians' practices, according to a former employee." The report then quoted that employee as saying that Clover distributed gift cards "all over the freaking map" to encourage providers to direct their patients toward Clover's plans, including "Dunkin Donuts, Panera, Amazon." The former employee told Hindenburg that gift cards were used because they were untraceable.

**RESPONSE:** Defendants deny the allegations in Paragraph 135, except admit that the Hindenburg Report purports to contain statements from former Clover employees.

136.    The Hindenburg Report further disclosed that Clover had paid staff in physicians' offices for referrals of potential Clover members. According to the Hindenburg Report, the former employee stated that "It's a confidential program," and that these "Clover Ambassadors" were not supposed to disclose to patients that they were working for Clover. According to the former employee, "The receptionist would notice that a patient checking in was enrolled in, say, United Healthcare, and would mention to the patient that there was another plan that might meet their needs better – 'Do you want more information? No problem. I'll have them give you a call.'"

**RESPONSE:** Defendants deny the allegations in Paragraph 136, except admit that the Hindenburg Report purports to contain statements from former Clover employees.

137.    Clover's practice of making these gifts and payments plainly violated the Anti-Kickback Statue, the FCA, and MCM Guidelines. For example, the express language of the Anti-Kickback statute forbids "knowingly and willfully offer[ing] or pay[ing] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person" to induce a Medicare referral. *See* 42 U.S.C. § 1320a-7b(b). In addition, the OIG has expressly warned that, with respect to "business courtesies and other gratuities," entertainment, recreation, travel, meals, gifts, gratuities, and other business courtesies implicate the Anti-Kickback Statute if given to physicians in a position to make or influence referrals or if any one purpose is to generate business for the company. Further, with the enactment of the PPACA in 2010, violations of the Anti-Kickback Statute are per se violations of the FCA. Further, the MCM Guidelines prohibit entities like Clover from giving healthcare providers "compensation from the plan for any marketing or enrollment activities." Accordingly, Clover's provision of gift cards to healthcare providers violated the Anti-Kickback Statute, FCA, and MCM guidelines.

**RESPONSE:** The allegations in Paragraph 137 consist of legal conclusions to which no response is required.  To the extent a response is required, Defendants deny the allegations in Paragraph 137, except admit that Paragraph 137 purports to quote portions of the Anti-Kickback Statute and MCMG, respectfully refer to those authorities for their complete and accurate contents,

54

and otherwise deny any allegations inconsistent therewith.

138. In spite of this, Defendants never disclosed the violations to investors, and in fact Defendants expressly disclaimed the existence of violations to investors throughout the Class Period. In addition, Defendants touted Clover's growth throughout the Class Period, without disclosing that the growth was driven by illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines.

RESPONSE: Defendants deny the allegations in Paragraph 138.

139. In addition, at least by early 2019, the DOJ had opened an investigation into Clover in connection with violations of the FCA. According to CW3, the DOJ contacted her in about October 2020 as part of its investigation of Clover. The DOJ told CW3 that she was not the first Clover employee contacted as part of the investigation, and that the office had been working on the investigation for "months." The DOJ also told CW3 that they had obtained her contact information from documents provided by Clover in response to the investigation, and that Clover had been notified of the investigation "right away." The DOJ told CW3 that the investigation "originated from some complaints made by physicians in the Pennsylvania area," she said, and "that the physicians felt that Clover was trying to entice providers to refer patients to Clover."

RESPONSE: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 139, except admit that Clover or a subsidiary thereof had received an inquiry from DOJ in 2019, and that this DOJ Inquiry was ongoing during the Class Period.

140. CW3 said that in November 2020 she participated in a phone interview with a DOJ representative and answered questions about Clover while accompanied by her lawyer. CW3 said that "[t]hey were asking about Clover's actions in getting doctors to sign on to their networks and what means they would go to do so." CW3 said she told the DOJ that Lipkind had instructed her to purchase about $200–$250 worth of gift cards and deliver them to office staff at SouthCoast Health in Savannah, GA, and to make sure the office knew the gift cards were from Clover.

RESPONSE: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 140.

141. The DOJ investigation into Clover is also corroborated by the Hindenburg Report. According to that report, in late October 2020 the DOJ served Clover with a civil investigative demand for oral testimony (the "Demand"). The Demand was issued pursuant to the FCA, 31 U.S.C. §§3729–3733, "in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. §3729."

RESPONSE: Defendants deny the allegations in Paragraph 141, except admit that the

Hindenburg Report refers to a civil investigative demand purportedly issued to a former employee and Paragraph 141 contains partial quotations of said demand.

142. The Demand went on to state that "[t]he False Claims Act investigation generally concerns whether Clover Health Investment Corporation and/or related entities improperly induced patient referrals for services paid for by Federal Agencies." According to a former employee quoted in the Hindenburg Report, and who had given Hindenburg the copy of the Demand, upcoding is "a key issue that has drawn the attention of the Department of Justice." According to the report, the former employee told Hindenburg that "they were questioned about 'this tool (Clover Assistant) and its practice of promoting higher level coding by the physician so that way the insurance can bill CMS.'" The report further stated that the former employee "explained to [Hindenburg] that the DOJ is specifically asking about upcoding, or the practice of overbilling Medicare."

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 142. Defendants deny the remaining allegations in Paragraph 142, except admit that Paragraph 142 contains partial quotations of the Hindenburg Report.

143. Hindenburg posted a redacted version of the Demand on the Internet. The Demand stated that Clover was required to "give oral testimony under oath, commencing within 20 days of service" at the office of the United States Attorney for the Eastern District of Pennsylvania in Philadelphia, Pennsylvania, before FCA investigator Viveca D. Parker. The Demand further stated that:

> The general purpose for which this Civil Investigative Demand is issued is to discover your knowledge concerning the topics below. Herein, "Clover" means Clover Health Investment Corporation, Clover Health LLC, Clover Health Corp., Clover Insurance Company, and Clover Health Holdings, Inc., including their affiliates, subsidiaries, predecessors, and successors.

- ***Clover's payments to healthcare providers to induce those providers to recruit patients to Clover's Medicare Advantage plans***;

- Clover's activities intended to encourage providers to refuse to accept patients with non-Clover coverage;

- ***Clover's payments to providers' staff and employees (receptionists, office managers) for conveying any information relating to Clover plans to patients in providers' offices***;

- ***Clover's payments to providers' staff and employees for generating prospective patient leads for Clover plans***;

56

- "Clover ambassadors;"

- Clover's payments of $5 per referral of a prospective patient not already covered by a Clover plan;

- ***Clover's distribution of gift cards to retail merchants for referral of prospective patients not already covered by a Clover plan***;

- Clover's payments to providers for services rendered to patients and/or to Clover;

- Payments related to "Clover Assistant;"

- Clover's patient recruitment efforts;

- Clover's activities relating to matching patients with Medicare Advantage plans;

- An online platform known as "Seek Medicare."

The DOJ Investigation was thus plainly focused on Clover's practice of making illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the FCA, as well as the Anti-Kickback Statute and the MCM Guidelines, as described by CW3 and CW4, among many other things.

**RESPONSE:** Defendants deny the allegations in the first and second sentences of Paragraph 143. Defendants deny the allegations in the third sentence through the final bullet point under Paragraph 143, except admit that Paragraph 143 contains partial quotations of the document that the Complaint refers to as the "Demand." Defendants deny the remaining allegations in Paragraph 143.

144. The investigation was clearly material to Clover because, by the Company's own admission, it derived "substantially all" of its total revenues from Medicare Advantage premiums and expected to derive a substantial portion of its total revenues in the future from Medicare Advantage premiums, and regulatory action against the Company could cut off or severely inhibit its ability to offer Medicare plans or receive Medicare Advantage premiums. In addition, any investigation by the DOJ or other regulator or government entity was particularly material to investors given that Clover had been previously disciplined by CMS and another healthcare company owned by Defendant Garipalli had settled claims of violations brought by the New Jersey Medicaid Fraud Division, including claims that involved upcoding. Further, the fact that the investigation was also concerned with whether Clover Assistant engaged in upcoding, and was examining whether the Company's $200 payments to physicians to use Clover Assistant were legal, was particularly material given the concern that Medicare Advantage's structure incentivized plan providers to upcode, Clover Assistant was specifically designed to obtain upward risk adjustments and thus to enable Clover to receive larger reimbursements from Medicare,

Defendants' were driving use of Clover Assistant by making payments to physicians, and by Defendants' own admission the tool was at the core of the Company's investment thesis and was what made Clover's "obvious" plans profitable and differentiated it from its competitors.

**RESPONSE:** The allegations in Paragraph 144 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 144.

145. After the Class Period, Defendants came clean and admitted that they had known all along about the DOJ investigation, but intentionally decided not to disclose it. On February 5, 2021, before the market opened, Andrew Still-Baxter, Clover's Director of Corporate Communications, posted an article entitled "In Response to Short Seller Firm's Questions" for the express purpose of responding to the Hindenburg Report (the "Response Article"). The Response Article stated that it was "From" Defendants Garipalli and Toy. In the Response Article, Defendants stated that "Chamath [Defendant Palihapitiya] and Clover were fully aware of the DOJ inquiry," and that Defendants "went through both an IPO and de-SPAC due diligence process, and this subject received extensive focus and attention. Consistent with the views of Clover's outside counsel, Social Capital's outside counsel, and independently retained outside counsel of third parties, including IPO underwriters' counsel, we concluded that the fact of DOJ's request for information was not material and was not required to be specifically disclosed in our SEC filings." The Medium Post also confirmed that, as described by CW3, the Company received a request for information from the DOJ and had responded, *i.e.*, produced documents. The article falsely, or at least misleadingly, denied giving gift cards to healthcare professionals, stating "Clover does not provide gift cards to doctors and nurses to generate patient leads."

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 145. Defendants deny the allegations in the second through sixth sentences of Paragraph 145, except admit that Clover's response to the Hindenburg Report (the "Hindenburg Response") was posted to Medium.com on February 5, 2021, and that Paragraph 145 contains partial quotations of the Hindenburg Response, respectfully refer to Clover's Form 8-K filed on February 5, 2021 to which the Hindenburg Response is annexed as Exhibit 99.1 for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith. Defendants deny the remaining allegations in Paragraph 145.

146. Clover's subsequent SEC filings also evidenced the materiality of the DOJ investigation to investors. Although Clover had not disclosed the investigation in any of its filings during the Class Period, the annual report on Form 10-K that it filed with the SEC on March 31,

58

2021 disclosed "an ongoing inquiry by the U.S. Attorney's Office for the Eastern District of Pennsylvania relating to, among other things, certain of our arrangements with providers participating in our network and programs and the Clover Assistant." This disclosure appeared in a section of the 10-K that advised, "From time to time, in the normal course of business, we are subject to various legal proceedings, investigations (both formal and informal), and claims incidental to the conduct of a highly regulated business. Such proceedings can be costly, time consuming, and unpredictable. Therefore, *no assurance can be given on the outcome of any proceeding or the potential impact on our financial condition or results of operation.*" Clover's 10-K also referenced the Response Article, which had been filed with the SEC on Form 8-K and described the nature of the Investigation in detail.

**RESPONSE:** Defendants deny the allegations in Paragraph 146, except admit that Clover's Form 10-K for the fiscal year ending on December 31, 2020 was filed on March 31, 2021 and that Paragraph 146 contains partial quotations from that Form 10-K, respectfully refer to Form 10-K for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

147. In spite of this, Defendants never disclosed the investigation to investors during the Class Period; indeed, Defendants expressly disclaimed the existence of any investigation to investors throughout the Class Period.

**RESPONSE:** Defendants deny the allegations in Paragraph 147.

**C. <u>Clover's Member Growth Resulted From the Illicit Gifts and Payments to Healthcare Providers and/or Staff and Agreements or Transactions with Third-Party Brokers Owned By Clover's Head of Sales</u>**

148. Immediately upon announcing the Business Combination, and then throughout the Class Period, Defendants touted to investors that Clover's striking membership growth was proof of the strength of the Company's "obvious" Medicare Advantage plans and the technological advantage the Company possessed in Clover Assistant.

**RESPONSE:** Defendants deny the allegations in Paragraph 148.

149. For example, on the first day of the Class Period, October 6, 2020, Defendant Palihapitiya tweeted the Clover Thesis to his over one million twitter followers that "Clover Health's proposition of better outcomes and lower costs *has resulted in strong initial growth*, and "*Clover Health is the fastest growing MA plan in the US*."

**RESPONSE:** Defendants deny the allegations in Paragraph 149, except admit that Paragraph 149 contains a partial quotation from a Tweet by Defendant Palihapitiya, respectfully

59

refer to that communication for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

150. Later that day, during the Squawk Box Segment, Defendant Palihapitiya told interviewer Andrew Ross Sorkin that, "***when you're a technology business that's cheaper, faster and better than all of your incumbent competitors*** in a market this dynamic, what happens is ***you start to grow really fast, and this is exactly what's happening with Clover***. Clover is already growing two to three times faster than their next nine nearest competitors."

**RESPONSE:** Defendants deny the allegation in Paragraph 150, except admit that Defendant Palihapitiya appeared on CNBC's "Squawk Box" program and that Paragraph 150 contains partial quotations of Defendant Palihapitiya's statements during that program, respectfully refer to the transcript of that program for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

151. The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, and Proxy Statement also stated that the SCH Board was recommending the Business Combination based on the strength of Clover's Medicare Advantage plans. Specifically, these filings stated that "***[t]he SCH board of directors believes that Clover's best-in-class plans will continue to deliver market-leading growth, allowing Clover Assistant to capture and synthesize more data and ultimately drive better care***." These filings further stated that "***The Clover Assistant allows Clover to generate positive margins while maintaining significant growth***—over the past three annually recurring election periods, Clover has grown its membership at a 27% CAGR, with Clover's growth reaching 34% in the 2020 annual enrollment period," and "Clover's ***membership growth has largely been driven by its nation-leading established market take rate***, which has averaged more than 50% over the past three years in its established markets, or markets with over 500 members as of the end of the prior year. Further, the SCH board of directors believes that ***Clover's software-centric approach enables efficient expansion into new markets***, including to traditionally underserved markets."

**RESPONSE:** Defendants deny the allegations in Paragraph 151, except admit that Paragraph 151 contains partial quotations of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

152. The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration attributed the Company's growth to the quality of its plans, stating that "[a]s a result of our "Obvious" plans, we have achieved significant organic membership growth. Our membership has expanded from 30,677 as of January

60

1, 2018, to 57,503 as of September 30, 2020." The filings further stated that "[t]his expansion has largely been driven by our nation-leading established market take rate, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period," as well as that:

> [t]his rapid growth generated a 59.1% increase in our total revenues from $290.6 million for the year ended December 31, 2018, to
>
> $462.3 million for the year ended December 31, 2019, and our gross premiums earned, before the impact of premiums ceded to third party reinsurers under reinsurance agreements, grew 29.4%, from
>
> $353.9 million to $457.8 million over the same period. For the nine months ended September 30, 2020, our total revenues were $506.7 million and gross premiums earned were $501.5 million as compared to $347.0 million in total revenues and $344.3 million in gross premiums earned for the nine months ended September 30, 2019, in each case, representing a 46% increase.

**RESPONSE:** Defendants deny the allegations in Paragraph 152, except admit that Paragraph 152 contains partial quotations of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

153. By attributing the Company's growth and performance to the quality of its plans and Clover assistant, Defendants had an obligation to disclose all the material reasons for that growth, including that the growth had been enabled by illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines, as alleged in Section V.B, *supra*, as well as transactions and agreements with third-party brokers founded, owned and operated by Clover's own head of sales, Hiram Bermudez.

**RESPONSE:** Paragraph 153 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 153.

154. As Defendants freely admit, the overwhelming majority of Clover's MA plans are concentrated in nine counties within New Jersey. For example, according to the First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus and Proxy Statement, membership in its New Jersey plans was 97.6% as of December 31, 2019.

**RESPONSE:** Defendants deny the allegations in Paragraph 154, except admit that

Paragraph 154 contains partial quotations of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

155. The reason for this concentration of the Company's members, according to former employees, is that Clover's Head of Sales, Hiram Bermudez, owns multiple brokers that recruit members for Clover's plans. Defendants never disclosed that a material amount of its membership growth was driven by related party transactions with Bermudez's companies.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 155. The remaining allegations in Paragraph 155 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in the second sentence of Paragraph 155.

156. CW2 said that Clover's Regional Vice President and General Manager Jeff Ross or Vice President of Growth and Strategy Operations Chris Watson told her that Bermudez was "well-connected" with insurance brokers in New Jersey. CW2 said that she learned from Ross and Watson because CW2 was "involved in Clover's initial expansion outside of New Jersey, [and] I got to have a bit more exposure to how sales worked and stuff like that." CW2 further said that "From the beginning, everyone knew that Hiram was well-connected with brokers in New Jersey. Sort of like an old-school union boss. He was buddies with these guys. He could bring in a lot of brokers." CW2 also said that Bermudez "was one of those people, he had been at Clover from the beginning, which was by the time I was there fairly rare."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 156.

157. CW3 corroborated CW2's statements about Bermudez. CW3 said that Bermundez owned multiple brokers that spread into Pennsylvania and he had a "strong hold" on the insurance market across the Northeast. CW3 recalled a sales training session she attended in 2017 during which a colleague explained that Bermudez had a brokerage firm himself. CW3 said, "[the colleague] pulled up a portal where all the insurance licensures live—the business organizations . . . and it showed the difference between someone that was tied directly to Clover as a captive sales agent versus someone that was directly under a field marketing organization," adding that the colleague also highlighted an FMO belonging to Bermudez. CW3 said she also learned that Bermudez was one of the first five or so employees at Clover, and that Bermudez's "huge footprint of sales agents on the ground" elevated Clover's name. CW3 further said that more than half of the sales managers employed at Clover came from Bermudez's organization.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 157.

158.    CW3 said that she and Bermudez worked together in 2017 when CW3 started at Clover. By 2018, the two had worked together enough that Bermudez "started sharing stuff about the early days of Clover." Although CW3 did not know how much money Bermudez made from Clover, Bermudez himself "always touted it was a great sum" to CW3. CW3 said that Bermudez "didn't care much for his stock options. He wanted hard money now. He always talked about his multiple houses."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 158.

159.    CW3 said it was also clear that Bermudez was still active with his insurance broker companies, including B&H Assurance ("B&H"). CW3 said she was frequently around Bermudez when Bermudez would be on business calls with his partner at B&H. CW3 said that Bermudez would "get off the phone and say, 'That was my business partner.'" CW3 said that "was the way [Bermudez] would manage that business remotely, especially when Clover had him traveling to other markets."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 159.

160.    CW3 said that a majority of Clover's business in New Jersey came from B&H or from Bermudez's agents or agents working one of his many field marketing organizations. CW3 further said that when Clover expanded to other markets, such as the Savannah, Georgia, area, Bermudez would visit the markets and attempt to engage providers. CW3 said that Clover was not making money in its expansion markets, in part because the company wasn't "adjusting the playbook" to the individual markets. Instead, CW3 said, Clover relied on the "New Jersey playbook," *i.e.*, using Bermudez's connections.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 160.

161.    In other words, the Company's growth was not the result of its "obvious" plans or the value of Clover Assistant, it was the result of Bermudez exploiting his contacts, which resulted in money being funneled to Bermudez himself.

**RESPONSE:** Defendants deny the allegations in Paragraph 161.

162.    The Hindenburg Report corroborates CW2 and CW3's statements. According to the report, "[m]ultiple former employees explained that much of Clover's sales are fueled by a major undisclosed relationship between Clover and an outside brokerage firm controlled by Clover's Head of Sales, Hiram Bermudez." Hindenburg reported that "[o]ne former employee estimated Bermudez drove ~68% of Clover's total sales, though was unclear on the amount coming

from the undisclosed relationship"; that "[o]ne of the former employees [interviewed by Hindenburg] explained that Clover's Head of Sales took efforts to conceal the relationship by putting it in his wife's name 'for compliance purposes'"; that "[i]nsurance filings confirm this"; and that "[t]he Clover contract was quietly put into his wife's name in the weeks after Clover's go-public announcement."

**RESPONSE:** Defendants deny the allegations in Paragraph 162, except admit that Paragraph 162 contains partial quotations of the Hindenburg Report.

163. Also as described in the Hindenburg Report, Bermudez's LinkedIn profile shows that prior to joining Clover in 2012, he worked at brokerage firm B&H Assurance, where he held the title of VP of Sales Operations. The report indicated that his profile indicates he left the role in 2012 upon joining Clover. New Jersey corporate records, however, dated November 20, 2020, indicate that Bermudez is not only still active with B&H, which stands for Bermudez & Henson, but is listed as the sole agent of the firm, as well as one of two principals.

**RESPONSE:** Defendants deny the allegations in Paragraph 163, except admit that Paragraph 163 purports to paraphrase the Hindenburg Report.

164. The Hindenburg Report highlighted that, according to Bermudez's LinkedIn profile, his responsibilities at Clover include negotiating "aggressive contracts with FMOs." B&H itself, Hindenburg noted, is a Field Marketing Organization, or "FMO". FMOs act as a middleman between insurance companies and brokers, negotiating sales deals with the insurance companies that a network of agents can then offer and sell to customers. The Hindenburg Report quoted an unnamed former employee as stating that Bermudez never left B&H, but rather was recruited to Clover *specifically to use his brokerage business to grow Clover's sales*. According to the unnamed former employee, Bermudez "was brought into Clover since early on, like day one, and because he had such a large ground force of sales agents, he was key and instrumental in getting Clover started. He's got both feet in those waters; one is he's head of sales at Clover and the other one is that he owns and manages this massive sales market foundation in the Northeast under his FMO." B&H's website indicates that Clover is one of its "Insurance Partners."

**RESPONSE:** Defendants deny the allegations in Paragraph 164, except admit that Paragraph 164 contains partial quotations of the Hindenburg Report.

165. As the Hindenburg Report noted, these sources suggest that Bermudez works for Clover, where he negotiates "aggressive contracts with FMOs," *i.e.*, B&H, his own FMO. As the Hindenburg Report asked, "Does he play hardball with himself?"

**RESPONSE:** Defendants deny the allegations in Paragraph 165, except admit that Paragraph 165 contains partial quotations of the Hindenburg Report.

166. The Hindenburg Report also revealed that Bermudez had tried to conceal the

64

relationship between Clover and B&H. For example, the report quoted a former employee as stating that Bermudez "had to hand his business over to a partner, then he'd remove his name on it for compliance reasons." According to the former employee, [h]is wife is listed as the co-partner with his business partner. He had to get his name off of it, but you know like there's gonna be a check from Clover going to that business every year. It's going to be a large amount—he makes good money at Clover. He makes the majority of money from the sales that his business makes from Clover."

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 166. Defendants deny the remaining allegations in Paragraph 166, except admit that Paragraph 166 contains partial quotations of the Hindenburg Report.

167.    The Hindenburg Report then identified considerable evidence corroborating the employee's statements. For example, the report states that the National Association of Insurance Commissioners ("NAIC") web page for B&H listed B&H's formal relationships with 17 major insurance companies in New Jersey but did not list a relationship with Clover. In addition, NAIC records showed that B&H identified one affiliate relationship with a "Yesenia Rivera," *i.e.*, Bermudez's wife. The NAIC site indicates that Rivera is only affiliated with one insurance company: Clover. In addition, the affiliation between Rivera and Clover was established on October 28, 2020, or three weeks after the announcement of the Business Combination.



**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 167. Defendants deny the remaining allegations in Paragraph 167, except admit that Paragraph 167 contains partial quotations of and purports to paraphrase the Hindenburg Report and purports to

contain a screenshot from the website of the National Association of Insurance Commissioners.

168.    The Hindenburg Report concluded, "Clover's Head of Sales appears to operate a large, separate insurance brokerage firm that does significant undisclosed business with Clover, through his wife's name. Clover then claims in the very first pages of its go-public prospectus to be generating its business organically due to its amazing software."

**RESPONSE:** Defendants deny the allegations in Paragraph 168, except admit that Paragraph 168 contains a partial quotation of the Hindenburg Report.

169.    After the Class Period, Defendants posted the Response Article to Medium.com, which admitted to at least part of the significant relationship between Bermudez's companies and Clover, as well as that Bermudez had, in fact, received additional compensation from Clover either directly from B&H or, potentially, through an intermediary. In the Response Article, Defendants purported that "Clover has paid approximately $160k directly to B&H since 2017," Bermudez "does not receive any compensation, direct or indirect, from B&H Assurance for any work related to Clover," but "maintains a 50% ownership interest in B&H Assurance, which he has owned since before he joined Clover." Defendants then disclosed that "[a]pproximately 8,200 of our current members were referred by B&H Assurance to Clover." Since Clover had over 57,000 members at the time, this represented at least 14% of Clover's membership, *i.e.*, a material amount. Although these statements confirmed the bulk of the Hindenburg Report's reporting, Defendants asserted that Bermudez has not attempted to conceal his interest in B&H by transferring it to his wife.

**RESPONSE:** Defendants deny the allegations in the first through third and fifth sentences of Paragraph 169, except admit that the Hindenburg Response was posted to Medium.com and that Paragraph 169 contains partial quotations of the Hindenburg Response. The fourth sentence of Paragraph 169 contains a legal conclusion to which no response is required. To the extent a response is required, Defendants deny the allegations in the fourth sentence of Paragraph 169.

170.    On March 29, 2021, however, Defendants filed an 8-K that disclosed that multiple disclosures in the Medium post were, in fact, incomplete or inaccurate ("March 2021 8-K"). The March 29, 2021 8-K disclosed that B&H had received ***approximately $1.36 million in payments*** for Clover-related products from 2017 to present and Bermudez himself had personally netted over $500,000 from B&H during that time as well. Defendants disclosed that B&H had received $160,000 in payments directly from Clover from 2017 to present but had also received approximately $1.2 million in payments for Clover-related products from 2017 to 2020. Finally, the 8-K disclosed that Bermudez reported an average of roughly $170,000 a year in net income from B&H during this period. Defendants also disclosed in the 8-K that Bermudez had "agreed to" divest himself of his interest in B&H, although it did not confirm that he had, in fact, divested himself of that interest or whether he maintained any interest in other insurance brokers working for Clover.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 170. Defendants deny the remaining allegations in Paragraph 170, except admit that the referenced public filing was filed on March 29, 2021, and that Paragraph 170 contains a partial quotation of the referenced public filing, respectfully refer to that document for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

171. Defendants' disclosures corroborated significant portions of statements by CW2 and CW3, as well as the Hindenburg report, but were strictly limited to Bermudez's relationship with B&H, and thus did not address whether Bermudez had other insurance brokerages selling for Clover, through which he was receiving additional compensation.

**RESPONSE:** Defendants deny the allegations in Paragraph 171.

172. By attributing the Company's growth and performance to the quality of its plans and Clover assistant, Defendants had an obligation to disclose all the material reasons for that growth, including that the growth had been enabled by their practice of making illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines, as alleged in Section V.B supra, as well as transactions and agreements with third-party brokers founded, owned, and operated by Bermudez.

**RESPONSE:** Paragraph 172 consists of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in Paragraph 172.

173. In spite of this, Defendants never disclosed that its growth had been driven by illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines or transaction or agreements with third-party brokers owned by a Clover insider. Indeed, rather than disclose this, Defendants repeatedly attributed its growth to investors during the Class Period to the Company's "obvious" plans and to Clover Assistant.

**RESPONSE:** Defendants deny the allegations in Paragraph 173.

174. In addition to their statements during the Class Period regarding the Company's purported growth and success that were misleading for failure to disclose related party transactions and agreements with entities owned and/or operated by Hiram Bermudez, Defendants also misrepresented Clover's compliance with established accounting principles by failing to disclose those agreements and transactions.

**RESPONSE:** Defendants deny the allegations in Paragraph 174.

175. SEC regulations require that public company financial statements be prepared in conformity with Generally Accepted Accounting Principles ("GAAP").[9] GAAP and SEC

regulations provide that a public company and its management must make certain disclosures regarding related party transactions in financial statements that purport to be prepared in accordance with GAAP and that are filed with the SEC.

[9] The entity responsible for promulgating and maintaining GAAP is the Financial Accounting Standards Board ("FASB"). Beginning with the year 2009, the FASB codified the existing accounting standards into a framework referenced by the acronym ASC, which stands for "Accounting Standards Codification."

**RESPONSE:** Paragraph 175 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants admit the allegations in Paragraph 175.

176. During the Class Period, Defendants repeatedly caused Clover to file financial statements with the SEC, including on the Initial S-4, the First Amended S-4, the Second Amended S-4, the Third Amended S-4, the December 14 Prospectus, the Proxy Statement, and Shelf Registration. Each of these filings averred that Clover's "consolidated financial statements are prepared in accordance with GAAP."

**RESPONSE:** Defendants deny the allegations in Paragraph 176, except admit that the referenced public filings were filed with the SEC, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

177. GAAP, however, requires disclosure of agreements and transactions with related parties, and ASC 850, *Related Party Disclosures,* provides guidance on, and requirements for, the disclosure of such transactions. ASC 850-10-50-1 provides that financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. The disclosures shall include, inter alia:

- The nature of the relationship(s) involved;

- A description of the transactions, including transactions to which no amounts or nominal amounts were ascribed for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

- The dollar amounts of the transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and

- Amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

68

**RESPONSE:** Paragraph 177 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 177, and refer to ASC 850 for its complete and accurate contents.

178. For SEC Registrants, such as Clover, SEC Regulation S-X, Rule 4-08(k)(1) sets forth the following additional requirements with respect to financial statements required to be filed with the SEC:

> (k) Related party transactions which affect the financial statements.
>
> > (1) Related party transactions should be identified and the amounts stated on the face of the balance sheet, income statement, or statement of cash flows.

**RESPONSE:** Paragraph 178 consists of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 178, and refer to the referenced regulation for its complete and accurate contents.

179. Throughout his employment as Clover's Head of Sales, Hiram Bermudez, owned at least a 50% interest in B&H, an insurance brokerage firm he co-founded with a partner. From 2017 to the present, *at least* 8,200 of Clover's members were recruited pursuant to agreements and transactions with or involving B&H. Since the Company reported that it had 56,815 members as of June 30, 2020, and 57,503 members as of September 30, 2020, at least 14% of Clover's members were the result of agreements and transactions with a related party, *i.e.*, a company controlled by Bermudez. Accordingly, a substantial portion of Clover's revenues from 2017 to present, emanating from payments from Medicare for services provided to Clover's members, was the result of related party agreements and transactions via Bermudez and B&H. Disclosing these agreements and transactions was particularly important for investors, because should Bermudez leave Clover, it would threaten Clover's ability to recruit members with the same success and/or result in a material number of members leaving Clover for other plans promoted by Bermudez's brokers.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first and second sentences of Paragraph 179. The remaining allegations consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the remaining allegations in Paragraph 179.

180. These agreements and transactions were plainly material, as the Company eventually disclosed, after the close of the Class Period, in a March 29, 2021 8-K ("March 2021 8-K") that B&H received approximately $1.36 million in payments for Clover-related products from 2017 to present and Bermudez himself had personally netted over $500,000 from B&H

69

during that time as well. For example, the March 2021 8-K disclosed that B&& [sic] Assurance received $160,000 in payments directly from Clover from 2017 to present. In addition, the 8-K disclosed that B&H received approximately $1.2 million in payments for Clover-related products from 2017 to 2020. Finally, the 8-K disclosed that Bermudez reported an average of roughly $170,000 a year in net income from B&H during this period. Although GAAP required disclosure of this information, Defendants *never* disclosed these facts during the Class Period.

**RESPONSE:** The allegations in the first and last sentences of Paragraph 180 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in the first and last sentences of Paragraph 180. Defendants deny the remaining allegations in Paragraph 180, except admit that Paragraph 180 purports to paraphrase the referenced Form 8-K filed on March 29, 2021, respectfully refer to that document for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

181. The disclosures in the March 2021 8-K also likely understate the total amounts of agreements and transactions with insurance brokerages founded, owned, and/or operated by Bermudez in the lead-up to the Business Combination. As described by CW3, Defendants knew that Bermudez owned multiple insurance brokerage firms, and had been recruited to Clover because of his contacts in the insurance business, particularly in New Jersey. Since Clover disclosed in multiple SEC filings during the Class Period that over 97% of its members were located in New Jersey, and to date has disclosed only *one* relationship with a Bermudez brokerage, it is likely that many more than 14% of Clover's members were obtained as a result of agreements and transactions with entities owned and operated by Bermudez, and that Bermudez has received payments for those transactions.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 181. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations of Paragraph 181.

182. In that Clover obtained at least 14%, and likely a much larger, percentage of its members from insurance brokers controlled by a single insider, such transactions, and the relationship with B&H, was material to investors. Indeed, GAAP provides that transactions involving related parties cannot be presumed to be carried out on an arm's-length basis, as the requisite conditions of competitive, free-market dealings may not exist. ASC 850-10-50-5. As generally accepting auditing standards, specifically AU § 334.12, explain, "it will generally not be possible to determine whether a particular transaction would have taken place if the parties had not been related, or assuming it would have taken place, what the terms and manner of settlement would have been." It is precisely because related party transactions lend themselves to favorable terms and/or fraudulent conduct that might not exist in transactions between unrelated parties that GAAP requires disclosure of material related party transactions. GAAP therefore asserts that

70

"[i]nformation about transactions with related parties that would make a difference in decision making shall be disclosed so that users of the financial statements can evaluate their significance." ASC 850-10-05-10.

**RESPONSE:** The allegations in the first sentence of Paragraph 182 consists of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in the first sentence of Paragraph 182. The remaining allegations in Paragraph 182 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that Paragraph 182 contains partial quotations of the ASC 850 and AU § 334.12, and respectfully refer to those documents for their contents.

183. Related parties may enter into transactions that give the appearance of having been conducted on an arm's-length basis in order to misrepresent the actual risks for, or inherent to, the enterprise. As such, the potential for fraud is significant because related party transactions provide an excellent opportunity to hide malfeasance. By failing to record related party transactions or reveal their related party nature, insiders can easily use these transactions as vehicles for disguising compensation, misappropriating assets, inflating growth measures, obfuscating credit concentrations, and/or misstating financial statements. Even if misrepresentation is not intended, the nature of related party transactions is such that their terms may be more favorable than those attainable by an outside party. As a consequence, the economic reality of a particular business event may not be apparent without complete disclosure. Jack W. Paul, Ph.D., CPA,7 Accounting Rules and Disclosures Portfolio 5148-2nd: Related Party Transactions Portfolio Description at 2 (BNA). Furthermore, whether nefarious in nature or not, GAAP, in ASC 850, is black and white regarding the nature, contents, and extent of required disclosures in the face of all of the foregoing risks.

**RESPONSE:** The allegations in Paragraph 183 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 183.

184. Indeed, one concern about related party transactions is the possibility that the parties are committing fraud. *Id.* at 9. The auditing interpretation to Statements on the Auditing Standards No. 45 (AU § 334) states that the "risk associated with management's assertions about related party transactions is often assessed as higher than for many other types of transactions because of the possibility that the parties to the transaction are motivated by reasons other than those that exist for most business transactions." *Id.*

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 184, except admit that it cites to Auditing Standards No.

45, and respectfully refer to that standard for its contents.

185. Defendants failed to disclose material related party agreements and transactions and, as a result, Clover's financial statements the Defendants filed during the Class Period were not compliant with GAAP and thus materially false and misleading.

**RESPONSE:** The allegations in Paragraph 185 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 185.

**D.** **Physicians Largely Did Not Use Clover Assistant and/or Use Clover Assistant During Patient Visits**

186. When announcing the Business Combination, and throughout the Class Period, Defendants emphasized to investors that the value of Clover Assistant was its ability to gather and process data in real time and make care recommendations *during patient visits*. A physician was supposed to act on the information presented by Clover Assistant during those visits, *e.g.*, by making or confirming diagnoses and prescribing care, which could result in upward risk adjustments and thus increased payments from CMS to Clover.

**RESPONSE:** Defendants deny the allegations in Paragraph 186, except admit that certain public statements in the Class Period discussed the use of the Clover Assistant, and respectfully refer to those statements for their complete and accurate contents.

187. For example, the S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus and Proxy Statement all emphasized that the "key and differentiated features of the Clover Assistant technology platform are" that the tool "aggregates and structures millions of data points per day, derived from a variety of data sets, such as claims data, medical charts, medication data, diagnostic data and EHR-generated data, . . . [and] connects this data with up-to-date, evidence-based protocols and member-specific plan information to drive real-time, personalized, and actionable insights to PCPs *at the point of care*." In addition, "[t]hese real-time, data-rich insights *inform physicians' decision-making at the moment that they are interacting with and treating their patients*." The filings further touted that "We broadly disseminate the Clover Assistant free-of-charge to primary care physicians ("PCPs") *who use it at the point of care while treating our members*" and "*We have succeeded with this approach in our established markets and seek to replicate it in all markets that we enter.*"

**RESPONSE:** Defendants deny the allegations in Paragraph 187, except admit that Paragraph 187 contains partial quotations of the referenced public filings, respectfully refer to those documents for the complete and accurate contents, and otherwise deny any allegations

72

inconsistent therewith.

188. Similarly, the S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus and Proxy Statement also emphasized that "[w]e capture real-time data *via live physician engagement and feedback* through the Clover Assistant. This highly engaged, bi-directional data sharing construct creates a closed feedback loop, allowing us to continuously measure the results of our platform's recommendations in real-time as well as iterate and improve our platform."

**RESPONSE:** Defendants deny the allegations in Paragraph 188, except admit that

Paragraph 188 contains partial quotations of the referenced public filings, respectfully refer to

those documents for the complete and accurate contents, and otherwise deny any allegations

inconsistent therewith.

189. In addition, on November 20, 2020, Defendants held a virtual "Analyst Day" with investors to promote the Business Combination. During Analyst Day, Defendant Garipalli told investors, "what we believe is truly our differentiation [is that we] provide actionable data *to physicians at the point of care to assist them while they are seeing Clover members*." Defendant Garipalli also emphasized that this interaction was Clover's competitive advantage, saying "we're not the only ones pulling together patient data What we believe is our moat is our ability to drive action and insight based on the data and our ability to do this with any provider in the ecosystem *The key here is that this information is surfaced to physicians at the point of* care so that they can develop care plans to actually treat these conditions."

**RESPONSE:** Defendants deny the allegations in Paragraph 189, except admit that

Paragraph 189 contains partial quotations from the Analyst Day transcript, respectfully refer to

that transcript for its complete and accurate contents, and otherwise deny any allegations

inconsistent therewith.

190. Finally, during Analyst Day Defendant Garipalli unscored the centrality of physician use of Clover Assistant to Clover by telling attendees that, "our virtuous growth cycle, step one is capturing and synthesizing the broad set of data that's available to us as an MA insurer. Step two is leveraging this data and using our technology to drive personalized insights on how to improve the delivery of evidence-based care. *Step three, which is possibly the most important step, is getting a broad base of physicians to actually use our platform and make more informed clinical decisions*."

**RESPONSE:** Defendants deny the allegations in Paragraph 190, except admit that

Paragraph 190 contains partial quotations from the Analyst Day transcript, respectfully refer to

that transcript for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

191. Defendant Garipalli later made the same point at the January 12, 2021 J.P. Morgan Healthcare Conference (the "JPM Conference"), telling attendees, "So now that you have a bit of intuition of what [Clover Assistant] does. *Let's discuss the most important part, physician usage*."

**RESPONSE:** Defendants deny the allegations in Paragraph 191, except admit that Paragraph 191 contains a partial quotation from the J.P. Morgan Healthcare Conference transcript, respectfully refer to that transcript for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

192. Since the "most important" part of Clover's Business, *i.e.*, the value proposition of investing in Clover, depended on extensive and consistent physician interaction with Clover Assistant, it is no surprise that Defendants repeatedly during the Class Period touted that the overwhelming majority of its physicians actually used Clover Assistant during patient visits.

**RESPONSE:** Defendants deny the allegations in Paragraph 192.

193. For example, during a call announcing the Business Combination to investors on October 6, 2020 (the "Announcement Call"), Defendants Palihapitiya, Garipalli and Toy used a slide presentation to introduce the Business Combination and investment thesis for Clover to attendees. Slide 21 of the presentation represented that "*92% of eligible member visits utilize Clover Assistant*." During the call itself, Defendant Toy stated that, "*Over 2,000 PCPs are contracted to use the Clover Assistant*. And what that means is over 60% of our membership goes to one of these doctors. *Our engagement rate is an impressive 90%*."

**RESPONSE:** Defendants deny the allegations in Paragraph 193, except admit that Paragraph 193 contains partial quotations of the referenced call and presentation, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

194. During a virtual "Fireside Chat" with investors on November 19, 2020 (the "Fireside Chat"), Defendant Wagner assured investors that physicians were contractually bound to use Clover Assistant, stating that "And the great thing about the technology and the way that we've designed the program is *all the physicians that are participating with us have to use Clover Assistant as part of their contract*." Defendant Toy reaffirmed this later in the Fireside Chat, telling attendees that "As you can see here, stats, we're very proud of our engagement, our engagement rate's 90% above, above 90%, *which means that for people, doctors, who have signed up to use Clover Assistant, they're using Clover Assistant above 90% at the time when*

74

*one of our members comes in for an office visit*.”

**RESPONSE:** Defendants deny the allegations in Paragraph 194, except admit that Paragraph 194 contains partial quotations of the referenced “Fireside Chat,” respectfully refer to the transcript of that “Fireside Chat” for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

195. During Analyst Day the following day, Defendants began their presentation to investors with a video. During the video, Defendant Toy stated that “The Clover Assistant is a web application and *a physician uses it every visit they have with one of our members* and it’s tuned to show them clinically useful, personalized relevant information that helps them give better care during that visit.”

**RESPONSE:** Defendants deny the allegations in Paragraph 195, except admit that Paragraph 195 contains partial quotations of the referenced video, respectfully refer to the transcript of that video for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

196. Defendants also quantified this widespread use of Clover Assistant by physicians in SEC filings during the Class Period related to the Business Combination. For example, the First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus and Proxy Statement also all represented that “over 2,300 PCPs, who already treat our members and are responsible for caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members’ care. In addition, the Clover Assistant delights physicians, asevidenced by our positive NPS of 59 for the six months ended September 30, 2020 . . . . Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019.”

**RESPONSE:** Defendants deny the allegations in Paragraph 196, except admit that Paragraph 196 contains partial quotations of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

197. These and other representations by Defendants during the Class Period were false and misleading, however, because the overwhelming majority of physicians treating Clover members did not use Clover Assistant *at all*. In addition, of the minority of physicians that did use Clover Assistant, many of them did not use it during visits with patients and/or had their front office staff complete Clover Assistant long after the visit had ended and then have the staff submit

75

the Clover Assistant entries *instead of the physician*. In other words, not only were physicians not using the Clover Assistant during patient visits, the submissions through Clover Assistant—and thus the risk adjustments submitted to CMS—were being made by administrative staff, *not the physicians themselves*.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 197. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 197.

198.   CW1 was a Clinical Data Operations Specialist for Clover. One of her main responsibilities was to help Clover gather clinical data from physicians' offices, hospitals and lab test companies that accepted Clover's insurance plans to be loaded into Clover Assistant. CW1 stated that during her time at Clover, "*less than 10%*" of "onboarded" doctors were using Clover Assistant. In addition, within the 10% who were using Clover Assistant, "not many of those were actively using it," she said. CW1 stated that said her estimate of "less than 10%" was based on her work contacting physicians' offices to help collect patient data. CW1 and her teammates would call "thousands of offices" every year, she said. CW1 also said she knew whether physicians were using Clover Assistant because those who used the application would send patient data to Clover via Clover Assistant. Additionally, some physicians asked questions about Clover Assistant while on the phone with CW1 during her calls to collect patient data.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 198.

199.   CW4 stated that Defendants would have known the number and identities of physicians who were not using Clover Assistant because Clover's Data Science Team would have built reports using data stored in the Company's data warehouse. The reports then would have been exported into Google Docs for delivery to Clover's Operations team. According to CW4, these reports would "break it down – how many [physicians] were signed up and didn't use it, how many used it once and didn't use it again."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 199.

200.   The Hindenburg Report corroborated CW1's description of how the overwhelming majority of doctors who treat Clover patients do not use Clover Assistant. Two former employees explained to Hindenburg that only "Clover Preferred" doctors were using the Clover Assistant. Hindenburg then reported that, according to Clover's own database, for example, only approximately 45% of all in-network doctors in Passaic County, New Jersey, are defined as "Clover Preferred." Similarly, in Morris County, New Jersey, only approximately 25% of all in-network doctors are "Clover Preferred" providers. A former employee told Hindenburg that while Clover was able to enroll about 70% to 80% of all the primary care doctors in New Jersey into its network, *i.e.*, convince those doctors to treat patients with Clover insurance, that didn't translate

into a high percentage of Clover Assistant users, because while "[t]hey had a good portion of doctors in the state but not a great portion of doctors were using it if they enrolled."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 200. Defendants deny the remaining allegations in Paragraph 200, except admit that Paragraph 200 contains a partial quotation of the Hindenburg Report.

201. Hindenburg also conducted its own surveys of doctors in New Jersey and confirmed that the majority did not use Clover Assistant. For example, according to the Hindenburg Report, in mid-January 2021, Hindenburg phoned 22 physician's practices in New Jersey listed in Clover's 2019 Provider Directory. All offices confirmed that they accepted Clover's insurance, but 14 (64%) said they did not use Clover Assistant, four did not know, and only four (18%) confirmed that they did use Clover Assistant.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 201, except admit that Paragraph 201 purports to paraphrase portions of the Hindenburg Report.

202. Hindenburg also stated that it had spoken with two doctors at Summit Medical Group in New Jersey, Clover's largest preferred provider. (According to Hindenburg, out of about 900 Clover Preferred doctors in northern New Jersey, Clover's largest market, 100 work at Summit Medical Group.) The first doctor who spoke to Hindenburg labeled Clover "a waste of time," and said that "I know that all the doctors in my office, basically, they just feel annoyed by it. We just try to check it and get it closed as quickly as possible so that we get paid and move on to actual patient care." The second doctor said, "Sick and tired of yet another website, another log in, another system we are responsible for updating for some big data; another care consideration to respond to. We no longer have time to take care of our patients. Someone thinks this system will—what? It is not something that helps family doctors take care of their patients."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 202, except admit that Paragraph 202 contains partial quotations of the Hindenburg Report.

203. The Hindenburg Report also stated that, according to doctors and Clover former employees interviewed by Hindenburg, the main reason why doctors were not using Clover Assistant was because Clover had not developed a way to connect Clover Assistant with physicians' own Electric Medical Record (EMR) systems. This meant that healthcare providers had to run through two software programs—their own EMR and Clover Assistant—with every patient. CW2 corroborated this account, stating that Clover Assistant's value was limited because

Clover had made no attempt to integrate Clover Assistant with physicians' EMR systems. CW2 said that she and other Clover employees like her who had worked in the healthcare industry knew that "of course providers are going to have trouble using [Clover Assistant]. *It's a worthless system* if it can't connect to their system of records."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 203, except admit that Paragraph 203 contains a partial quotation of the Hindenburg Report.

204. Outside of New Jersey, according to the Hindenburg Report, only a fraction of doctors are "Clover Preferred," *i.e.*, actually use Clover Assistant. In El Paso, Texas, for example, the Hindenburg stated that the Clover directory lists 110 doctors in Clover's network, but only identifies eight (7%) as Clover Preferred. Moreover, according to Hindenburg, there were 220 primary care doctors in Tennessee and 206 doctors in Arizona, but *none* of these 426 doctors were Clover Preferred.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 204, except admit that Paragraph 204 purports to paraphrase the Hindenburg Report.

205. Defendants also categorially misrepresented the number of physicians using Clover Assistant during sessions with patients. CW2 stated that as early as 2019, Clover had data showing that *half of the providers* who actually used Clover Assistant were not using it during patient visits. Instead, these doctors had their assistants either update the tool long after the appointments ended or copy notes from the physicians' Electric Medical Record systems into Clover Assistant after the visit had ended. CW2 said that she learned about the data from Clover's Vice President of Development, who reported to Chief Development Officer Lipkind. CW2 also said that Chief Medical Officer Mark Spektor told her about the data in the first or second quarter of 2019. CW2 said that Spektor knew of the data because Spektor was "doing all of the roadshows" to promote Clover Assistant.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 205. Defendants deny knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 205.

206. CW2 said the data was based on a "timestamp for when the visits were recorded in Clover Assistant. And there were a bunch that might occur at 8 p.m., and you know that they're most likely not seeing patients at that time and they're doing some transcription after." Clover thus knew that patient information/data was just getting copied into Clover Assistant because of the timestamps. CW2 said that this data was stored in Clover's central data warehouse.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 206.

207. CW3 corroborated CW2's description of the data warehouse and said that the data would have come from a "standard reporting table" generated using a system called Mode, which is a SQL reporting database that allowed Clover to pull data from all different tables within its database warehouse.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 207.

208. CW4 corroborated that the Company could match the submission of data by a healthcare provider's office with when patients visit actually occurred and identify whether Clover Assistant was being used at the "point of care," *i.e.*, as Defendants emphasized to investors it was being used, or at another time.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 208.

209. The failure to use Clover Assistant during office visits, as Defendants were telling investors it was being used, was so problematic, CW2 said, that Clover explored changing its reimbursement methodology to make sure providers were using Clover Assistant during patient visits. During this time, CW2 said, Clover executives falsely were "touting that the vast majority [of providers] were using [Clover Assistant] during the visit." When asked if Defendants Garipalli and Toy knew of the data, CW2 said they had access to "dashboards" that could be used to view data and that "I'm sure they would have been familiar with the trends and utilization of [Clover Assistant]."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 209.

210. CW2 also confirmed that it was essential for Clover's business model that doctors use Clover Assistant during sessions with patients because Clover hoped that doctors would follow the recommendations or suggestions that appeared in Clover Assistant, which could include risk adjustments that would benefit Clover's bottom line. CW2 said, "That really was the model or the philosophy of Clover Assistant. "When it was talked about internally, it was both that hopefully [Clover Assistant] provides better care but also that it has this additional effect that it gives us more revenue." CW2 said that Defendants Garipalli and Toy said on multiple occasions that Clover was "willing to pay doctors twice as much to do this because [of the] increased revenue [for Clover]."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 210.

211.    CW3 corroborated CW2's account of a significant number of contracted and "onboarded" doctors not using Clover Assistant during visits with patients. CW3 stated that Clover signed contracts with physicians who assigned non-licensed staff the task of entering patient information in Clover Assistant. CW3 said that the non-licensed staff would then sign off on the entries as if they were the doctor.

RESPONSE: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 211.

212.    CW3 said that physicians having their administrative staff sign off on entries constituted a breach of contract and "fraud" because "in the[ir] contract, it states that the doctor or a licensed medical professional has to complete the visit . . . . At the very least, it needs to be signed off by the doctor." CW3 said that she knew of doctors in Georgia, New Jersey, North Carolina, South Carolina and Texas who used Clover Assistant in this manner.

RESPONSE: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 212.

213.    CW3 said that she first learned of physicians having their staff make the entries into Clover Assistant in the second half of 2018. CW3 said physicians did not want to take on the extra work of entering patient information. CW3 said she knew that physicians in Georgia, North Carolina, and South Carolina were having their staff make the entries because that was her market, and she regularly visited physicians' offices and spoke with staff about how they used Clover Assistant. CW3 said, "I on a regular basis was in physician offices engaging with them, making sure the plan was supporting them  They would report and show me their process when using it. They were like, 'Yeah, I don't have time for it. I just give it to whoever is up front.'" CW3 found that in many cases, the non-licensed staff were *the only ones in the office trained to use Clover Assistant*. The non-licensed staff told CW3 that they would log into Clover Assistant at the end of the day, review which patients were using Clover and then sign an electronic signature foreach patient as if they were the physician. The information entered by non-licensed medical staff was "a medical note that's being completed in Clover's system" and then submitted by Clover to CMS, CW3 said.

RESPONSE: Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 213.

214.    CW3 knew that physicians in New Jersey were having their assistants complete and submit Clover Assistant entries because whenever she was in New Jersey, Clover would have her work on the New Jersey markets because the company was shorthanded. CW3 said she went on "ridealongs" with colleagues during which they visited physicians' offices in New Jersey. CW3 said that the physicians would say, "Suzy Q up front will take care of [entering information into Clover Assistant]. I have no problems about this." CW3 said that Olivia Istrate, a Clover employee who held the same role as CW3 in Texas, told her that providers in Texas were also having non-licensed staff enter patient information into Clover Assistant. Istrate told CW3 that she had

80

reported it internally at Clover, but there was no action taken by Clover.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 214.

215. CW3 said that she reported physicians' fraudulent use of Clover Assistant both via email and during meetings, to the Company's leadership and Clover's Compliance department. "I needed the doctors to sign these contracts," she said, "But they were committing to commit fraud. So, to keep myself clear of it, I made sure to report it to my leadership and Compliance." On a "couple dozen" occasions, she raised the issue via email to Vice President of Network Management and Operations Carl Rathjen and Chief Development Officer Lipkind. Each email was also sent to Clover's Compliance department via a generic compliance email address, she said. Clover's Compliance department never addressed CW3's concerns, she said.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 215.

216. CW3 said that Lipkind did not care about physicians not using Clover Assistant during visits, "He was like, 'I don't care. Every doctor needs to sign this and be on [Clover Assistant].'" Lipkind made such statements in both emails and via phone. CW3 explained that Lipkind is "an attorney by education" and typically communicated via phone, but he "must have gotten tired of repeating himself on the phone" and "he slipped up" a few times by putting such information in emails. CW3 said she also raised the issue during department meetings ran by Rathjen in which Lipkind also participated. When CW3 raised the issue, Lipkind "would want to talk offline about it." CW3 said she also raised her concerns during meetings of the Network Engagement department, which were attended by Lipkind and Vice President of Provider Alignment and Network Engagement Ankit Patel. She also recalled raising her concerns with colleagues, including Provider Alignment Associate Justus Ruff and Manager – Network Development Sammy Gershon.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 216.

217. After the end of the Class Period, Clover came clean in the Response Article and admitted that only a small minority of its physicians used Clover Assistant. In the Response Article, Defendants stated that "onboarding" meant "[w]here the physicians have received their initial training and have created their accounts, and we have answered their questions. Basically, they're ready to use the software. We also refer to the physicians as the 'Live' physicians We typically have a pipeline of Contracted physicians waiting to be onboarded at any given time, and our goal is to go from Contracted to Live within 60 days." In other words, the time spent between a physician being "contracted" and "onboarded" was very small and thus references to contracted and onboarded physicians were essentially synonymous. Defendants then disclosed, for the first time, "***currently 22% of all in-network Primary Care Physicians are Live***. This correlates to ***4%***

81

*of the total in-network physicians* (including PCPs, specialists, etc.).” In other words, only a small minority of physicians treating Clover Patients had even agreed to use Clover Assistant, let alone were using Clover Assistant. Notably, Defendants said nothing about how many of these physicians actually used Clover Assistant during patient visits.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 217, except admit that the first sentence of Paragraph 217 purports to paraphrase the Hindenburg Response. Defendants deny the remaining allegations in Paragraph 217, except admit that Paragraph 217 contains partial quotations of the Hindenburg Response.

218. Defendants' consistent and misleading touting of how the overwhelming majority of its physicians used Clover Assistant during patient visits was material because, by Defendants' own admission, the "most important" part of Clover's Business, *i.e.*, the value proposition of investing in Clover, was extensive and consistent physician interaction with Clover Assistant during patient visits. As set forth above, Defendants knew that this interaction was largely not occurring.

**RESPONSE:** Defendants deny the allegations in Paragraph 218.

219. In spite of this, Defendants never disclosed that the vast majority of its physicians were not interacting with Clover Assistant at all, and that the minority of physicians who were purporting to use Clover Assistant were actually having their administrative staff enter and submit data to Clover—and thus CMS—long after the visits were completed. Indeed, rather than disclose this, Defendants repeatedly communicated to investors during the Class Period that Clover Assistant was widely being used during patient visits.

**RESPONSE:** Defendants deny the allegations in Paragraph 219.

**E.    The Business Combination Closes**

220. On January 6, 2021, and in reliance on the misrepresentations Defendants made throughout the Class Period, the shareholders of SCH voted to approve the Business Combination. After SCH's shareholders voted to approve the Business Combination, the Business Combination closed on January 7, 2021.

**RESPONSE:** Defendants deny the allegations in Paragraph 220, except admit that on January 6, 2021, the shareholders of SCH voted to approve the referenced business combination, which closed on January 7, 2021.

221. On January 7, 2021, the Company announced the completion of the Business Combination. Defendant Garipalli stated in this release:

As a public company, we will continue to pioneer a fundamentally different approach in the Medicare Advantage and Medicare space – investing in technology and partnering closely with physicians to help them make critical decisions for their patients at the point of care – with an overarching commitment to creating value for all stakeholders.

**RESPONSE:** Defendants deny the allegations in Paragraph 221, except admit the that it partially quotes the referenced press release, and respectfully refer to that release for its complete and accurate contents.

222. As part of the Business Combination, Defendant Palihapitiya's firm received over 20 million "founders shares" (worth approximately $290 million) in exchange for $25,000 and for promoting the Clover Health SPAC.

**RESPONSE:** Defendants deny the allegations in Paragraph 222.

223. Following completion of the business combination with SCH, Clover began trading publicly on January 8, 2021. As a result of Defendants' false and misleading statements and omissions about the Company's management, business operations and financial prospects during the Class Period, the price of Clover's securities traded at artificially inflated prices, with the Class A common stock alone reaching $17.24 per share after the Business Combination on January 8, 2021. By comparison, on the date the Business Combination was announced, October 6, 2020, SCH's shares were trading as low as $10.70 per share.

**RESPONSE:** Defendants admit the allegations in the first sentence of Paragraph 223. Defendants deny the allegations in the second sentence of Paragraph 223, except admit that Clover Class A common stock traded at $17.24 per share on January 8, 2021. Defendants admit the allegations in the third sentence of Paragraph 223.

224. With the price of Clover's securities trading at fraud-inflated prices based on their false and misleading statements, Clover's senior officers and directors, including all but one of the defendants named herein, along with certain other venture capital financiers, took steps to cash-in, filing a Shelf Registration on January 13, 2021 that would register for resale and permit them to sell hundreds of millions dollars of their personally held Clover Securities at fraud-inflated prices.

**RESPONSE:** Defendants deny the allegations in Paragraph 224.

225. The Shelf Registration disclosed that Defendant Garipalli had registered 83,584,543 shares of Clover's Class A Common Stock, Defendant Toy had registered 12,790,323 shares of Clover's Class A Common Stock, and Defendant Wagner had registered 642,514 shares of Clover's Class A Common Stock.

83

**RESPONSE:** Defendants deny the allegations in Paragraph 225, except admit that immediately following the Business Combination, Defendant Garipalli owned 83,584,543 shares of Clover's Common Stock, Defendant Toy owned 12,790,323 shares of Clover's Common Stock, and Defendant Wagner owned 642,514 shares of Clover's Common Stock.

226.    Like the S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, the Shelf Registration, which was filed with the SEC to permit the insiders and venture capital financiers to cash out their shares, omitted facts required to make its other statements not misleading and failed to comply with Items 105 and 303 of Regulation S-K.

**RESPONSE:** Defendants deny the allegations in Paragraph 226.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

227.    Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. These statements included assertions that (i) Clover had met and complied with all applicable laws since January 1, 2018 and was not presently involved in any legal proceeding that could have a material adverse effect on the Company's business; (ii) Clover's growth and positive performance was the result of the quality of its healthcare plans and Clover Assistant, its proprietary patient management application, (iii) the vast majority of PCPs under contract with Clover were using the Clover Assistant tool, (iv) Clover's financial statements were prepared in accordance with GAAP, and (v) Clover's SEC filings in connection with the Business Combination failed to comply with Items 303 and 503 of Regulation S-K.

**RESPONSE:** Defendants deny the allegations in Paragraph 227.

228.   These statements, as set forth in detail below, were false and misleading because (i) the Company had committed multiple legal and regulatory violations since January 1, 2018 and was and remains under investigation by the DOJ for violations of the FCA; (ii) the Company's growth and positive performance stemmed from illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines, and unreported related party transactions; (iii) only a small fraction of the healthcare providers who had contracted with the Company were actually using the Company's Clover Assistant software platform; (iv) Clover's financial statements did not comply with GAAP because they failed to disclose material agreements and transactions with related parties; and (v) the Company's SEC filings failed to comply with Items 303 and 503 of Regulation S-K.

**RESPONSE:** Defendants deny the allegations in Paragraph 228.

229.   When the truth underlying each of the misleading statements set forth below was

revealed to investors, the price of Clover's securities plummeted.

**RESPONSE:** Defendants deny the allegations in Paragraph 229.

A.      <u>**False and Misleading Statements Regarding the DOJ Investigation**</u>

230.    During the Class Period, Defendants misrepresented to investors that the Company had complied with all its legal obligations over the prior two-and-a-half years and was not aware of any government investigation or other legal proceeding that could have a material impact on its performance. These statements were false and misleading because Defendants knew, but never disclosed, that the Company had a practice of making illegal payments to healthcare providers and had been and still was under investigation by the DOJ. throughout the Class Period.

**RESPONSE:** Defendants deny the allegations in Paragraph 230.

231.    October 6, 2020, SCH and Clover filed with the SEC the Agreement and Plan of Merger for the Business Combination (the "Merger Agreement") as an Exhibit to a Form 425 Prospectus. The Agreement was signed by Defendants Palihapitiya and Garipalli.

**RESPONSE:** Defendants admit the allegations in the first sentence of Paragraph 231, and deny the remaining allegations in Paragraph 231, except state that Defendant Palihapitiya signed the Merger Agreement on behalf of SCH and Asclepius Merger Sub Inc., and Defendant Garipalli signed the Merger Agreement on behalf of Clover Health Investments, Corp.

232.    The Merger Agreement was attached as an exhibit to and/or included in the S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration, which Defendants filed with the SEC. In addition, each of the S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, and Proxy Statement emphasized that investors should review the Merger Agreement, stating, "[t]o better understand the proposals to be submitted for a vote at the extraordinary general meeting, including the Business Combination, ***you should read this proxy statement/prospectus, including the Annexes and other documents referred to herein, carefully and in their entirety***. ***The Merger Agreement is the primary legal document*** that governs the Business Combination and the other transactions that will be undertaken in connection with the Business Combination."

**RESPONSE:** Defendants admit the allegations in the first sentence of Paragraph 232. Defendants deny the allegations in the second sentence of Paragraph 232, except admit that it partially quotes the referenced documents, respectfully refer to the referenced documents for their complete and accurate contents, and deny any allegations inconsistent therewith.

233.    Section 4.10 ("Litigation and Proceedings") of the Merger Agreement provided, in

relevant part, that:

> as of the date hereof, (a) ***there are no pending or, to the knowledge of the Company, threatened, lawsuits, actions, suits, judgments, claims, proceedings or any other Actions (including any investigations or inquiries initiated, pending or threatened) by any Governmental Authority, or other proceedings at law or in equity (collectively, "Legal Proceedings"), against the Company or any of the Company's Subsidiaries or their respective properties or assets***; and (b) there is no outstanding Governmental Order imposed upon the Company or any of the Company's Subsidiaries; nor are any properties or assets of the Company or any of the Company's Subsidiaries' respective businesses bound or subject to any Governmental Order, except in the case of each of clauses (a) and (b), as would not be, or would not reasonably be expected to be, material to the business of the Company and its Subsidiaries, taken as a whole.

**RESPONSE:** Defendants deny the allegations in Paragraph 233, except admit that

Paragraph 233 contains a partial quotation of Section 4.10 of the Merger Agreement.

234. The statements in paragraph 233 above communicated to or gave investors the impression that the Company had disclosed all material information in its possession related to past or ongoing regulatory investigations. As such, the statements referenced above in paragraph 233 were materially false and misleading when made because they failed to disclose that the Company was currently under a DOJ investigation for violations of the FCA that could have a material effect on Clover's business because, by the Company's own admission, it derived "substantially all" of its total revenues from Medicare Advantage premiums and expected to derive a substantial portion of its total revenues in the future from Medicare Advantage premiums. The DOJ investigation was particularly material to investors given that Clover had been previously disciplined by CMS for violations and another healthcare company owned by Defendant Garipalli had settled claims of violations brought by the New Jersey Medicaid Fraud Division.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 234, except

admit that Clover's disclosures in the Class Period disclosed all material information in its

possession relating to past or ongoing regulatory investigations that was required to be disclosed.

Defendants deny the remaining allegations in Paragraph 234.

235. Section 4.30(a) ("Healthcare Compliance") of the Merger Agreement provided, in relevant part, that "[e]ach of [Clover] and its Subsidiaries (i) in all material respects meets and complies with, and ***since January 1, 2018, has met and complied with, all applicable Laws, including all Health Care Laws, and other requirements for participation in, and receipt of payment from, the Medicare Advantage Program.***" Elsewhere in the Agreement and Plan of

Merger, "Health Care Laws" is defined to include, inter alia, the Federal False Claims Act, the Federal Anti-Kickback Statute, and many other related laws.

**RESPONSE:** Defendants deny the allegations in Paragraph 235, except admit that Paragraph 235 contains a partial quotation of the Merger Agreement, respectfully refer to that document for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

236. The statements in paragraph 235 above were false and misleading because as described by CW2, CW3 and CW4, the Company had engaged in a practice of making illegal gifts and payments to healthcare providers and/or office staff in violation of the Anti-Kickback Statute, FCA, and MCM Guidelines. The Company's use of these illegal practices was material to investors because, by the Company's own admission, it derived "substantially all" of its total revenues from Medicare Advantage premiums and expected to derive a substantial portion of its total revenues in the future from Medicare Advantage premiums. The DOJ investigation was particularly materialto investors given that Clover had been previously disciplined by CMS for violations and another healthcare company owned by Defendant Garipalli had settled claims of violations brought by the New Jersey Medicaid Fraud Division.

**RESPONSE:** Defendants deny the allegations in Paragraph 236.

237. The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration, all stated that:

> From time to time, we are involved in various legal proceedings arising from the normal course of business activities. ***We are not presently involved in any legal proceeding the outcome of which, we believe, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, cash flows or financial condition.*** Defending such proceedings is costly and can impose a significant burden on management and employees, we may receive unfavorable preliminary or interim rulings in the course of legal proceedings, and there can be no assurances that favorable final outcomes will be obtained.

**RESPONSE:** Defendants deny the allegations in Paragraph 237, except admit that Paragraph 237 contains a partial quotation of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

238. The statements in paragraph 237 above communicated to or gave investors the impression that the Company had disclosed all material information in its possession related to past or ongoing regulatory or legal investigations and actions. As such, the statements referenced above in paragraph 237 were materially false and misleading when made because they failed to disclose that the Company was currently under a DOJ investigation for violations of the FCA that could have a material effect on Clover's business because, by the Company's own admission, it derived "substantially all" of its total revenues from Medicare Advantage premiums and expected to derive a substantial portion of its total revenues in the future from Medicare Advantage premiums. The DOJ investigation was particularly material to investors given that Clover had been previously disciplined by CMS for violations and another healthcare company owned by Defendant Garipalli had settled claims of violations brought by the New Jersey Medicaid Fraud Division.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 238, except admit that Clover's disclosures in the Class Period adequately disclosed all material information in its possession related to past or ongoing regulatory or legal investigations and actions that was required to be disclosed. Defendants deny the remaining allegations in Paragraph 238.

239. The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration, all stated that:

> We plan to leverage our rapidly scalable business model to enter into new markets nationally in order to offer our "Obvious" plans to a greater percentage of the over 60 million Medicare-eligible beneficiaries. Accordingly, *we plan to seek opportunities to create differentiated and enhanced plans for Medicare-eligible beneficiaries across the United States, including underpenetrated and traditionally underserved markets*. For example, we recently announced a new partnership with Walmart to make co-branded Clover-Walmart plans available in eight Georgia counties that represented over 370,000 Medicare eligible beneficiaries in 2019. We also *intend to increase spending for new market development and expansion of our sales channels and in-person or remote clinical care capabilities*.

**RESPONSE:** Defendants deny the allegations in Paragraph 239, except admit that Paragraph 239 contains a partial quotation of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

240.    The statements in paragraph 239 above communicated to or gave investors the impression that the Company was not currently experiencing any legal or regulatory investigations or actions that would substantially interfere with its substantial new market development and sales channel expansion and ongoing ability to offer Medicare plans. As such, the statements referenced above in paragraph 239 were materially false and misleading when made because they failed to disclose that the Company was currently under a DOJ investigation for violations of the FCA that could have a material effect on Clover's business because, by the Company's own admission, it derived "substantially all" of its total revenues from Medicare Advantage premiums and expected to derive a substantial portion of its total revenues in the future from Medicare Advantage premiums. The DOJ investigation was particularly material to investors given that Clover had been previously disciplined by CMS for violations and another healthcare company owned by Defendant Garipalli had settled claims of violations brought by the New Jersey Medicaid Fraud Division.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 240, except admit that Clover's disclosures in the Class Period adequately disclosed all material information in its possession related to past or ongoing regulatory or legal investigations and actions that was required to be disclosed.  Defendants deny the remaining allegations in Paragraph 240.

241.    The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration all stated that:

> Our operations, current and past business practices, contracts and accounts and other books and records are subject to routine, regular and special investigations, audits, examinations and review by, ***and from time to time we receive subpoenas and other requests for information from, federal and state supervisory and enforcement agencies, attorneys general and other state, federal and international governmental authorities and legislators***.

**RESPONSE:** Defendants deny the allegations in Paragraph 241, except admit that Paragraph 241 contains a partial quotation of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

242.    The statements in paragraph 241 above communicated to or gave investors the impression that the Company was not currently experiencing any legal or regulatory investigations or actions that would substantially interfere with its substantial new market development and sales channel expansion and ongoing ability to offer Medicare plans. As such, the statements referenced

89

above in paragraph 241 were materially false and misleading when made because they failed to disclose that the Company was currently under a DOJ investigation for violations of the FCA that could have a material effect on Clover's business because, by the Company's own admission, it derived "substantially all" of its total revenues from Medicare Advantage premiums and expected to derive a substantial portion of its total revenues in the future from Medicare Advantage premiums. The DOJ investigation was particularly material to investors given that Clover had been previously disciplined by CMS for violations and another healthcare company owned by Defendant Garipalli had settled claims of violations brought by the New Jersey Medicaid Fraud Division.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 242, except admit that Clover's disclosures in the Class Period adequately disclosed all material information in its possession related to past or ongoing regulatory or legal investigations and actions that was required to be disclosed. Defendants deny the remaining allegations in Paragraph 242.

243. The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration all stated that "***From time to time we are and may be subject to litigation or investigations, which could be costly and time-consuming to defend***." The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration all then went on to state that:

> *from time to time, we are and may be subject to regular and special governmental market conduct and other audits, investigations and reviews by, and we receive and may receive subpoenas and other requests for information from, various federal and state agencies, regulatory authorities, attorneys general, committees, subcommittees and members of the U.S. Congress and other state, federal and international governmental authorities*. In the United States, federal and state governments have made investigating and prosecuting health care and other insurance fraud, waste, and abuse a priority. Fraud, waste, and abuse prohibitions encompass a wide range of activities, including kickbacks for referral of members, fraudulent coding practices, billing for unnecessary medical and/or other covered services, improper marketing and violations of patient privacy rights. The U.S. Department of Justice ("DOJ") and the Department of Health and Human Services Office of Inspector General (the "OIG"), have recently increased their scrutiny of healthcare payers and providers, and Medicare Advantage insurers, under the federal False Claims Act (the "FCA"), in particular, and there have been a number of investigations, prosecutions, convictions and settlements in the healthcare industry. CMS and the OIG also periodically perform risk adjustment data validation

("RADV") audits of selected Medicare Advantage health plans to validate the coding practices of and supporting documentation maintained by health care providers. ***Certain of our plans have been selected for such audits, which have in the past resulted and could in the future result in retrospective adjustments to payments made to our health plans, fines, corrective action plans or other adverse action by CMS.***

\*\*\*

There has been increased government scrutiny and litigation involving MA plans under the FCA related to diagnosis coding and risk adjustment practices. In some proceedings involving MA plans, there have been allegations that certain financial arrangements with providers violate other laws governing fraud and abuse, such as the Anti-Kickback Statute. We perform ongoing monitoring of our compliance with CMS risk adjustment requirements and applicable laws, which includes review of the Clover Assistant features that may be relevant to patient risk assessments and the submission of risk adjustment data to CMS. We also monitor our physician payment practices to ensure compliance with applicable laws, such as the Anti-Kickback Statute. ***While we believe that our risk adjustment data collection efforts and relationships with providers, including those related to the Clover Assistant, comply with applicable laws, we are and may be subject to audits, reviews and investigation of our practices and arrangements, and the federal government might conclude that they violate the FCA, the Anti-Kickback Statute and/or other federal and state laws governing fraud and abuse***. See the section entitled "Risk factors— Risks Related to Governmental Regulation—Our business activities are highly regulated and new and proposed government regulation or legislative reforms could increase our cost of doing business and reduce our membership, profitability and liquidity."

**RESPONSE:** Defendants deny the allegations in Paragraph 243, except admit that Paragraph 243 contains a partial quotation of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

244. The statements in paragraph 243 above communicated to or gave investors the impression that the Company had disclosed all material information in its possession related to

past or ongoing regulatory investigations, particularly since they *took pains to highlight the recent occurrence of audits of Clover plans by CMS*. As such, the statements referenced above in paragraph 243 were materially false and misleading when made because they failed to disclose that the Company was currently under a DOJ investigation for violations of the FCA that could have a material effect on Clover's business because, by the Company's own admission, it derived "substantially all" of its total revenues from Medicare Advantage premiums and expected to derive a substantial portion of its total revenues in the future from Medicare Advantage premiums. The DOJ investigation was particularly material to investors given that Clover had been previously disciplined by CMS for violations and another healthcare company owned by Defendant Garipalli had settled claims of violations brought by the New Jersey Medicaid Fraud Division.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 244, except admit that Clover's disclosures in the Class Period adequately disclosed all material information in its possession related to past or ongoing regulatory investigations and actions that was required to be disclosed. Defendants deny the remaining allegations in Paragraph 244.

**B.     <u>False and Misleading Statements Regarding Clover's Growth</u>**

245.    During the Class Period, Defendants misrepresented to investors that the Company's growth was the result of its "obvious plans," its proposition of better outcomes and lower costs, and Clover Assistant. These statements materially misleading, however, because Defendants knew, but never disclosed, that its growth was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines and undisclosed related party agreements and transactions involving third-party entities owned by its Head of Sales, Hiram Bermudez.

**RESPONSE:** Defendants deny the allegations in Paragraph 245.

246.    At 8:48 AM on October 6, 2020, Defendant Palihapitiya tweeted an announcement of the merger between SCH and Legal Clover. The announcement included an image of a bulleted list entitled, "Investment Thesis for Clover Health – Disrupting Healthcare by Delivering Better Outcomes at Lower Cost." The bulleted list stated that:

> Clover Health's ***proposition of better outcomes and lower costs has results in strong initial growth*,**" and "Clover Health is the fastest growing MA plan in the US. They typically take over 50% of the net membership growth in each of their established markets.

**RESPONSE:** Defendants admit the allegations in the first sentence of Paragraph 246. Defendants deny the remaining allegations in Paragraph 246, except admit that Paragraph 246 contains a partial quotation of the referenced Tweet, respectfully refer to the Tweet for its complete

and accurate contents, and otherwise deny any allegations inconsistent therewith.

247. By attributing Clover Health's "strong initial growth" to "better outcomes and lower costs" in the statements in paragraph 246 above, Defendants had an obligation to disclose the entire truth about the reasons for its growth. Defendants violated this duty, however, by failing to disclose that Clover Health's growth was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines and undisclosed related party agreements and transactions.

**RESPONSE:** The allegations in Paragraph 247 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 247.

248. Later on October 6, 2021, during the Squawk Box Segment, Defendant Palihapitiya told interviewer Andrew Ross Sorkin that, "when you're a technology business that's cheaper, faster and better than all of your incumbent competitors in a market this dynamic, what happens is you start to grow really fast, and this is exactly what's happening with Clover. Clover is already growing two to three times faster than their next nine nearest competitors." Later in the Squawk Box Segment, Defendant Palihapitiya touted Clover Health's ability to compete with other Medicare Advantage plan providers like Humana and United Health, saying "what's great is [Clover's] gross margins start better because they're a technology business, and we think it's going to get better and better over time, and the reason why is because they create transparency. They don't play games. They don't motivate doctors to up code or do all kinds of things in order to get paid. They've created an extremely transparent and efficient business."

**RESPONSE:** Defendants deny the allegations in Paragraph 248, except admit that Paragraph 248 contains partial quotations of Defendant Palihapitiya's statements during CNBC's "Squawk Box" program, respectfully refer to the transcript of that program for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

249. By attributing Clover Health's growth to Clover being "cheaper, faster, and better" "technology business" in the statements in paragraph 248 above, Defendants had an obligation to disclose the entire truth about the reasons for its growth. Defendants violated this duty, however, by failing to disclose that Clover Health's growth was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines and undisclosed related party agreements and transactions.

**RESPONSE:** The allegations in Paragraph 249 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 249.

250. On October 6, 2021, Defendants Palihapitiya, Garipalli, and Toy held a call with investors to introduce the merger and Business Combination. During that call, Defendant Palihapitiya stated that:

> Already, ***Clover is the fastest growing Medicare Advantage plan in the United States. It's growing two to three times faster than their next nine competitors. It is also a business that not only is doing very well in new markets when it launches, but in existing markets where it already has share***. In fact, just like many other best-in-class software and technology companies, what you see here is a characteristic that we call land and expand, or negative churn.

***

> We have this incredible first beachhead market called Medicare Advantage, ***proving the value day in day out that Clover Assistant and Clover delivers better outcomes at a lower cost, grabbing share*** from incumbents, predictably growing by 25% to 30% compounding. And then this technology platform allows us to embrace and become a first mover in these very disruptive new forms of growth like direct contracting***.***

***

> ***what I have seen through the diligence is that this is the first technology company who is having a meaningful impact in disrupting healthcare. The reason is because they have built software that allows them to improve outcomes and lower costs***. ***What that is allowing them to do is quickly capture share from slower incumbents that are non-technology centric, and it is differentiated in a way that I believe will make it very hard for these legacy businesses to copy. And because it's technological, it has the ability to embrace new forms of growth that can supercharge the business and create low-cost acquisition channels to scale the value that they provide people***. And the great thing is that it has started in a part of a market, in a sector of the economy, that is just growing incredibly fast."

**RESPONSE:** Defendants admit the allegations in the first sentence of Paragraph 250.

Defendants deny the remaining allegations in Paragraph 250, except admit that Paragraph 250

contains a partial quotation of the referenced call's transcript, respectfully refer to that transcript

for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

251. By attributing Clover Health's growth to Clover Assistant in the statements in paragraph 250 above, Defendants had an obligation to disclose the entire truth about the reasons for its growth. Defendants violated this duty, however, by failing to disclose that Clover Health's growth was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines and undisclosed related party agreements and transactions.

**RESPONSE:** Paragraph 251 consists of legal conclusions to which no response is required.

To the extent that a response is required, Defendants deny the allegations in Paragraph 251.

252. Later in the announcement call, Defendant Garipalli stated that, "***So, why do consumers choose Clover? Put simply, we have designed our plans to be obviously attractive to consumers, Medicare eligibles, which is why we call it obvious what we did at Clover was take the best of both and we offer wide network choice, with low-cost plans***." Garipalli then wenton to say that, "we remove friction for consumers to see their primary care physician, with zero dollar primary care co-pays and an extremely low cost to see their specialists. And then when you compare us against other options, we provide significant savings relative to original Medicare. We estimate 41% lower and 17% lower than the top other plans in the market."

**RESPONSE:** Defendants deny the allegations in Paragraph 252, except admit that

Paragraph 252 contains a partial quotation of the referenced call's transcript, respectfully refer to

that transcript for its complete and accurate contents, and otherwise deny any allegations

inconsistent therewith.

253. By claiming that consumers choose Clover because of its plan design in the statements in paragraph 252 above, Defendants had an obligation to disclose the entire truth about the reasons for those choices. Defendants violated this duty, however, by failing to disclose that Clover Health's growth was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines and undisclosed related party agreements and transactions

**RESPONSE:** The allegations in Paragraph 253 consist of legal conclusions to which no

response is required. To the extent that a response is required, Defendants deny the allegations in

Paragraph 253.

254. On October 6, 2020, Clover also issued a press release announcing the merger and business combination. The press release stated that, "Today, Clover is the ***fastest growing Medicare Advantage insurer in the United States*** – among insurers with more than 50,000

members – and serves more than 57,000 members in 34 counties across 7 states. ***Spurred by favorable demographic tailwinds and its differentiated, technology-driven approach,*** Clover has captured an average of 50 percent of the net increase in membership across its established markets over the last three years. Further, the Company's software-centric approach enables efficient expansion into new markets, including to historically underserved and rural communities." The press release further quoted Palihapitiya as saying, "The Company's rapid growth is a testament to the effectiveness of its tech-enabled approach, which resonates powerfully with consumers and physicians alike."

**RESPONSE:** Defendants deny the allegations in Paragraph 254, except admit that Paragraph 254 contains a partial quotation of the referenced press release, respectfully refer to that document for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

255.    By attributing Clover's success to "favorable demographic tailwinds and its differentiated, technology-driven approach" and/or Clover's "tech-enabled approach" in the statements in paragraph 254 above, Defendants had an obligation to disclose the entire truth about the reasons for its growth. Defendants violated this duty, however, by failing to disclose that Clover Health's growth was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines and undisclosed related party agreements and transactions.

**RESPONSE:** The allegations in Paragraph 255 consist of legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations in Paragraph 255.

256.    On October 7, 2020 the Company filed a letter to Clover employees on Form 425, which was signed by Defendants Garipalli and Toy. The letter represented to employees, as well as investors that Clover's "product gets smarter every day, improving recommendations to providers, which leads to better outcomes for members and, thus, improved provider and member satisfaction. This, ***in turn, further drives member growth***."

**RESPONSE:** Defendants deny the allegations in Paragraph 256, except admit that Paragraph 256 contains a partial quotation of the referenced letter, respectfully refer to that letter for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

257.    By attributing Clover Health's "member growth" to the fact that Clover Assistant "gets smarter every day" in the statements in paragraph 256 above, Defendants had an obligation to disclose the entire truth about the reasons for its growth. Defendants violated this duty, however, by failing to disclose that Clover Health's growth was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and

96

the MCM Guidelines and undisclosed related party agreements and transactions.

**RESPONSE:** The allegations in Paragraph 257 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 257.

258. The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration informed investors that Clover was "Our internally-developed technology platform could have been built only because we operate it ourselves, within our own MA plan. This approach uniquely positions us to close the healthcare feedback loop with technology, linking clinical data and physician action," and that "***The Clover Assistant enables us to succeed via a scalable technology-driven virtuous growth cycle.***"

**RESPONSE:** Defendants deny the allegations in Paragraph 258, except admit that Paragraph 258 contains a partial quotation of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

259. By attributing Clover Health's success to Clover Assistant in the statements in paragraph 258 above, Defendants had an obligation to disclose the entire truth about its success. Defendants violated this duty, however, by failing to disclose that Clover Health's growth was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines and undisclosed related party agreements and transactions.

**RESPONSE:** The allegations in Paragraph 259 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 259.

260. The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration also stated that the Company had "***succeeded with this approach in our established markets and seek to replicate it in all markets that we enter.***" The "approach" Defendants were referring to was "disseminat[ing] the Clover Assistant free-of-charge to primary care physicians ("PCPs") who use it at the point of care while treating our members," and "Clover Assistant['s ability to] provide[] essential information and personalized care recommendations to PCPs, driving real-time, data-driven decision-making, which results in better care for our members and strong plan performance."

**RESPONSE:** Defendants deny the allegations in Paragraph 260, except admit that Paragraph 260 contains partial quotations of the referenced public filings, respectfully refer to

97

those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

261. By attributing Clover Health's success to Clover Assistant in the statements in paragraph 260 above, Defendants had an obligation to disclose the entire truth about the reasons for its success. Defendants violated this duty, however, by failing to disclose that Clover Health's growth was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines and undisclosed related party agreements and transactions.

**RESPONSE:** The allegations in Paragraph 261 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 261.

262. The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration also stated that:

> ***As a result of our "Obvious" plans, we have achieved significant organic membership growth***. Our membership has expanded from 30,677 as of January 1, 2018, to 56,815 as of June 30, 2020, representing 25% share of the individual, non-SNP MA market in our established markets, which we define as markets where an insurer has over 500 members. ***This expansion has largely been driven by our nation-leading established market take rate***, which has averaged more than 50% over the past three years across a group of counties in New Jersey that grew from eight to 13 over the period.

**RESPONSE:** Defendants deny the allegations in Paragraph 262, except admit that Paragraph 262 contains partial quotations of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

263. By attributing Clover Health's growth to its insurance plans' features and "established market take rate" in the statements in paragraph 262 above, Defendants had an obligation to disclose the entire truth about the reasons for its growth. Defendants violated this duty, however, by failing to disclose that Clover Health's growth was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines and undisclosed related party agreements and transactions.

**RESPONSE:** The allegations in Paragraph 263 consist of legal conclusions to which no

response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 263.

264. The First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration also stated that "Because we drive this clinical improvement with technology, we believe we can scale in virtually any market, including traditionally underserved markets that are generally not viable for others, as demonstrated by the fact that we had 25% more low-income members and nearly twice the number of minority members as a percentage of our plan population than are generally served in [Medicare Advantage] as of September 30, 2020."

**RESPONSE:** Defendants deny the allegations in Paragraph 264, except admit that Paragraph 264 contains a partial quotation of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

265. By stating in paragraph 264 above that "we drive this clinical improvement with technology" Defendants communicated to investors that the Clover Assistant was the reason the Company had acquired "25% more low-income members and nearly twice the number of minority members as a percentage of our plan population" As such, this statement was false and misleading, however, because the Company's growth was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines and undisclosed related party agreements and transactions.

**RESPONSE:** The allegations in Paragraph 265 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 265.

266. The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration also stated that Clover "currently offer[s] [Medicare Advantage] plans in 34 markets in the United States, and we are launching in 74 additional [Medicare Advantage] markets in 2021. *We principally scale by deploying the Clover Assistant software to PCPs. We contract with providers simply to use the Clover Assistant at the point of care for a flat fee rather than, for example, negotiating contracts involving risk-sharing arrangements under which the provider assumes financial responsibilities for patient care.*"

**RESPONSE:** Defendants deny the allegations in Paragraph 266, except admit that Paragraph 266 contains a partial quotation of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations

inconsistent therewith.

267.    By describing Clover Health's process of acquiring new members and entering new markets in the statements in paragraph 266 above, Defendants had an obligation to disclose the entire truth about these subjects. Defendants violated this duty, however, by failing to disclose that Clover Health's method of "scaling" included illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines and undisclosed related party agreements and transactions.

**RESPONSE:** The allegations in Paragraph 267 consist of legal conclusions to which no

response is required.  To the extent that a response is required, Defendants deny the allegations in

Paragraph 267.

268.    The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration advised investors that Clover marketed its plans:

> through direct marketing activities and an extensive network of insurance brokers and field marketing organizations. We also enter into co-branding arrangements with physicians and other provider institutions. We market or may market our plans through a number of channels including, but not limited to, direct mail, marketing materials in provider's offices, the Internet, telesales and free marketing channels provided by the U.S. government, such as the Medicare Plan Finder. Commissions paid to employed sales representatives and independent brokers and agents are based on a per unit commission structure, regulated in structure and amount by CMS.

**RESPONSE:** Defendants deny the allegations in Paragraph 268, except admit that

Paragraph 268 contains a partial quotation of the referenced public filings, respectfully refer to

those documents for their complete and accurate contents, and otherwise deny any allegations

inconsistent therewith.

269.    The statements in paragraph 268 above communicated to or gave investors the impression that the Company had disclosed all material information in its possession related to its use of insurance brokers and field marketing organizations in recruiting members. As such, the statements referenced above in paragraph 268 were materially false and misleading when made because they failed to disclose that at least 14% of the Company's members came from undisclosed related party agreements and transactions with brokers founded, owned, and/or operated by the Company's Head of Sales, Hiram Bermudez.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 269, except

admit that Clover's disclosures in the Class Period adequately disclosed any information required to be disclosed regarding insurance brokers and field marketing organizations in recruiting members.  Defendants deny the remaining allegations in Paragraph 269.

270.    During a "Fireside Chat" with investors held on November 19, 2021, Defendant Garipalli was asked, "You guys, very strong growth in New Jersey, Vivek. You branched out to a few new markets. When you talk about that 30% growth rate for the next few years, are you talking about the existing four or five markets that you have today, and how much of that comes from New Jersey versus the new markets that you've entered into." Defendant Garipalli responded, "A majority of that growth will still come from our established markets, which is all the counties in New Jersey and adjacent ones beyond that and then a minority of growth from some of the newer markets. So when we look at our capital deployment, historically, very, very little of our capital deployment went to anything growth related. ***So our growth is essentially, not due to clever marketing, but really just due to attractive plan design as we call our obvious plan design***."

**RESPONSE:** Defendants deny the allegations in Paragraph 270, except admit that Paragraph 270 contains a partial quotation of the referenced "Fireside Chat," respectfully refer to the transcript of that "Fireside Chat" for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

271.    By attributing Clover's "growth" to the design of its insurance plans in the statements in paragraph 270 above, Defendants had an obligation to disclose the entire truth about the reasons for its growth. Defendants violated this duty, however, by failing to disclose that Clover Health's growth was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines and undisclosed related party agreements and transactions.

**RESPONSE:** The allegations in Paragraph 271 consist of legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations in Paragraph 271.

272.    On November 20, 2020, Defendants Garipalli, Toy, and Wagner participated in Analyst Day. During the Q&A portion, an analyst asked, "in the example you gave about market share over time, you got to 20% market share in the market before 2018, I guess, before Clover Assistant actually was kind of fully launched out. Can you just talk a little bit about how you were able to do that, and how you think about other dynamics that can help you drive market share, outside of Clover Assistant?" Defendant Garipalli responded, "the historical growth in our markets has been driven by the plan design attractiveness. So from a perspective of low copays, max supplemental benefits, again relative to the competition, and then wide physician choice We have the lowest co-pays, most supp benefits, and then also not just widest choice, but the out of network cost sharing for primary care and specialists is equivalent to what it is in network. And sothat

combined is what has driven a lot of the attractiveness and growth. The Clover Assistant is what allows those plans to be economically affordable."

**RESPONSE:** Defendants deny the allegations in Paragraph 272, except admit that Paragraph 272 contains a partial quotation from the Analyst Day transcript, respectfully refer to that transcript for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

273. By attributing Clover's "growth" to the design of its insurance plans and the Clover Assistant in the statements in paragraph 272 above, Defendants had an obligation to disclose the entire truth about the reasons for its growth. Defendants violated this duty, however, by failing to disclose that Clover Health's growth was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines and undisclosed related party agreements and transactions.

**RESPONSE:** The allegations Paragraph 273 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 273.

### C. False and Misleading Statements Regarding Physician Use of Clover Assistant

274. During the Class Period, Defendants misrepresented to investors that the overwhelming majority of its physicians used Clover Assistant during patient visits. These statements were false and misleading, however, because Defendants knew, but never disclosed, a fraction of healthcare providers used Clover Assistant *at all*, and those "uses" were largely physicians' assistants and front office staff using the tool long after the visit had ended, not physicians.

**RESPONSE:** Defendants deny the allegations in Paragraph 274.

275. During the Announcement Call on October 6, 2020, Defendants Palihapitiya, Garipalli and Toy used a slide presentation to introduce the Business Combination and investment thesis for Clover to attendees. Slide 21 of the presentation represented that "***92% of eligible member visits utilize Clover Assistant***." During the call itself, Defendant Toy stated that, "***Over 2,000 PCPs are contracted to use the Clover Assistant***. And what that means is over 60% of our membership goes to one of these doctors. ***Our engagement rate is an impressive 90%*** and our net promoter score as of Q2 2020 is in the positive 60 range, and we are really happy with that."

**RESPONSE:** Defendants deny the allegations in Paragraph 275, except admit that Paragraph 275 contains partial quotations of the referenced slide presentation and Announcement Call, respectfully refer to that slide presentation and transcript of the Announcement Call for their

complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

276. By stating that "92% of eligible member visits utilize Clover Assistant" and "Our engagement rate is an impressive 90%" in the statements in paragraph 275 above, Defendants were communicating to investors that the overwhelming majority of Clover's physicians actually used Clover Assistant during patient visits. As such, this statement was false and misleading because, as demonstrated by CW2, CW3 and CW4, as well as the Hindenburg Report only a fraction of healthcare providers used Clover Assistant *at all*, and those "uses" were largely physicians' assistants and front office staff using the tool long after the visit had ended, not physicians. Defendants effectively confirmed that this was true on February 5, 2021, when they disclosed, for the first time, that only **22%** of their PCPs were "trained and ready to use Clover Assistant," and that those physicians represented only **4%** of the Company's total in-network physicians.

**RESPONSE:** Defendants deny the allegations in Paragraph 276.

277. The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration all stated that "We broadly disseminate the Clover Assistant free-of-charge to primary care physicians ("PCPs") *who use it at the point of care while treating our members*" and "*We have succeeded with this approach in our established markets and seek to replicate it in all markets that we enter*."

**RESPONSE:** Defendants deny the allegations in Paragraph 277, except admit that Paragraph 277 contains a partial quotation of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

278. By attributing its success in "our established markets" to PCPs who used Clover Assistant at the point of care in the statements in paragraph 277 above, Defendants had an obligation to disclose the full truth about physician use of Clover Assistant, including that physicians were not using Clover Assistant during patient visits. Defendants breached this duty by failing to disclose that, as demonstrated by CW2, CW3 and CW4, as well as the Hindenburg Report only a fraction of healthcare providers used Clover Assistant *at all*, and those "uses" were largely physicians' assistants and front office staff using the tool long after the visit had ended, not physicians. Defendants effectively confirmed that this was true on February 5, 2021, when they disclosed, for the first time, that only **22%** of their PCPs were "trained and ready to use Clover Assistant," and that those physicians represented only **4%** of the Company's total in-network physicians.

**RESPONSE:** The allegations in Paragraph 278 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 278.

279. The S-4 also stated that, "We drive adoption and use of the Clover Assistant across

103

our PCP network by focusing on continuously improving its user-centric design, highly actionable and real-time clinical content, enhanced and rapid payment for Clover Assistant visits and simple onboarding. *As of June 30, 2020, over 2,100 PCPs, who already treat our members and are responsible for caring for 61% of our total membership, had contracted to use the Clover Assistant to manage our members' care*. In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 64 for the three months ended June 30, 2020 . . . . *Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019*."

**RESPONSE:** Defendants deny the allegations in Paragraph 279, except admit that Paragraph 279 contains a partial quotation of the referenced public filing, respectfully refer to that document for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

280. By stating that 2,100 PCPs caring for 61% of Clover's total membership had contracted to use Clover Assistant and that onboarded physicians are "highly engaged" and use the tool for 92% of their member visits in the statements in paragraph 279 above, Defendants were communicating to investors that the overwhelming majority of Clover's physicians actually used Clover Assistant. As such, this statement was false and misleading because, as demonstrated by CW2, CW3 and CW4, as well as the Hindenburg Report only a fraction of healthcare providers used Clover Assistant *at all*, and those "uses" were largely physicians' assistants and front office staff using the tool long after the visit had ended, not physicians. Defendants effectively confirmed that this was true on February 5, 2021, when they disclosed, for the first time, that only *22%* of their PCPs were "trained and ready to use Clover Assistant," and that those physicians represented only *4%* of the Company's total in-network physicians.

**RESPONSE:** Defendants deny the allegations in Paragraph 280.

281. The First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration revised the above disclosure in the S-4 to stated that "As of September 30, 2020, *over 2,300 PCPs, who already treat our members and are responsible for caring for 65% of our total membership, had contracted to use the Clover Assistant to manage our members' care*. In addition, the Clover Assistant delights physicians, as evidenced by our positive NPS of 59 for the six months ended September 30, 2020 . . . . *Additionally, onboarded physicians are highly engaged, using the Clover Assistant for 92% of their member visits in 2019*."

**RESPONSE:** Defendants deny the allegations in Paragraph 281, except admit that Paragraph 281 contains a partial quotation of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

282. By stating that 2,300 PCPs caring for 65% of Clover's total membership had contracted to use Clover Assistant and that onboarded physicians are "highly engaged" and use the tool for 92% of their member visits in the statements in paragraph 281 above, Defendants were communicating to investors that the overwhelming majority of Clover's physicians used Clover Assistant. As such, this statement was false and misleading because, as demonstrated by CW2, CW3 and CW4, as well as the Hindenburg Report only a fraction of healthcare providers used Clover Assistant *at all*, and those "uses" were largely physicians' assistants and front office staff using the tool long after the visit had ended, not physicians. Defendants effectively confirmed that this was true on February 5, 2021, when they disclosed, for the first time, that only *22%* of their PCPs were "trained and ready to use Clover Assistant," and that those physicians represented only *4%* of the Company's total in-network physicians.

**RESPONSE:** Defendants deny the allegations in Paragraph 282.

283. The S-4 also stated that "We have designed our platform to be easy to adopt and use, *resulting in rapid adoption of the Clover Assistant since its launch in July 2018*. In particular, *the number of PCPs who have adopted our Clover Assistant platform has grown by more than 500% from January 1, 2019, to June 30, 2020*."

**RESPONSE:** Defendants deny the allegations in Paragraph 283, except admit that

Paragraph 283 contains a partial quotation of the referenced public filing, respectfully refer to that

document for its complete and accurate contents, and otherwise deny any allegations inconsistent

therewith.

284. By stating there had been "rapid adoption" of Clover Assistant and a 500% increase in "the number of PCPs who have adopted Clover Assistant" in the statements in paragraph 283 above, Defendants were communicating to investors that the overwhelming majority of Clover's physicians used Clover Assistant. As such, this statement was false and misleading because, as demonstrated by CW2, CW3 and CW4, as well as the Hindenburg Report only a fraction of healthcare providers used Clover Assistant *at all*, and those "uses" were largely physicians' assistants and front office staff using the tool long after the visit had ended, not physicians. Defendants effectively confirmed that this was true on February 5, 2021, when they disclosed, for the first time, that only *22%* of their PCPs were "trained and ready to use Clover Assistant," and that those physicians represented only *4%* of the Company's total in-network physicians.

**RESPONSE:** Defendants deny the allegations in Paragraph 284.

285. The First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration revised the above disclosure in the S-4 to state that "We have designed our platform to be easy to adopt and use, *resulting in rapid adoption of the Clover Assistant since its launch in July 2018*. In particular, *the number of PCPs contracted to use the Clover Assistant that care for our members has grown by more than 500% from January 1, 2019, to September 30, 2020*."

**RESPONSE:** Defendants deny the allegations in Paragraph 285, except admit that

Paragraph 285 contains a partial quotation of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

286. By stating there had been "rapid adoption" of Clover Assistant and a 500% increase in "the number of PCPs who have adopted Clover Assistant" in the statements in paragraph 285 above, Defendants were communicating to investors that the overwhelming majority of Clover's physicians used Clover Assistant. As such, this statement was false and misleading because, as demonstrated by CW2, CW3 and CW4, as well as the Hindenburg Report only a fraction of healthcare providers used Clover Assistant *at all*, and those "uses" were largely physicians' assistants and front office staff using the tool long after the visit had ended, not physicians. Defendants effectively confirmed that this was true on February 5, 2021, when they disclosed, for the first time, that only *22%* of their PCPs were "trained and ready to use Clover Assistant," and that those physicians represented only *4%* of the Company's total in-network physicians.

**RESPONSE:** Defendants deny the allegations in Paragraph 286.

287. During the virtual Fireside Chat with investors on November 19, 2020, Defendant Wagner said,

> And so we believe there's a tremendous opportunity, upwards of 1500 basis points of savings, that are available out there in the Medicare fee for service system. We're not saying we're going to get all of those and capture all of those next year by any stretch of the imagination, but we think there's a lot out there that we can capture through the use of software, partnering with our physicians. ***And the great thing about the technology and the way that we've designed the program is all the physicians that are participating with us have to use Clover Assistant as part of their contract***. And so that's going to allow us to achieve these medex savings that will allow . . . . Again, we're not going to comment on exactly what we believe the margins could be because the economics are still moving, but there is, at the gross margin line, there was a tremendous opportunity out there that we believe we can capture."

**RESPONSE:** Defendants deny the allegations in Paragraph 287, except admit that Paragraph 287 contains partial quotations of the referenced "Fireside Chat," respectfully refer to the transcript of that "Fireside Chat" for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

288. Defendants' statement that "all the physicians that are participating with us have to use Clover Assistant as part of their contract" in the statements in paragraph 287 above, communicated to investors that the overwhelming majority of Clover's physicians used Clover

Assistant. As such, this statement was false and misleading because, as demonstrated by CW2, CW3 and CW4, as well as the Hindenburg Report only a fraction of healthcare providers used Clover Assistant *at all*, and those "uses" were largely physicians' assistants and front office staff using the tool long after the visit had ended, not physicians. Defendants effectively confirmed that this was true on February 5, 2021, when they disclosed, for the first time, that only *22%* of their PCPs were "trained and ready to use Clover Assistant," and that those physicians represented only *4%* of the Company's total in-network physicians.

**RESPONSE:** Defendants deny the allegations in Paragraph 288.

289. Later in the November 19, 2019 Fireside Chat, Defendant Toy said, "Clover Assistant is our platform, and just reminder, we use Clover Assistant for Medicare Advantage and we're going to use it for direct contracting, right  As you can see here, stats, we're very proud of our engagement, our engagement rate's 90% above, above 90%, *which means that for people, doctors, who have signed up to use Clover Assistant, they're using Clover Assistant above 90% at the time when one of our members comes in for an office visit*." Defendant Toy then went on to say that "We are able to cover a wide range of physicians ranging from independent practitioners, all the way to large health systems, and not just the most technologically savvy, either. 11% of our CA physicians don't even have an EHR. *Clover Assistant is the actual first technology tool that they're using, and we're really proud of that*."

**RESPONSE:** Defendants deny the allegations in Paragraph 289, except admit that

Paragraph 289 contains partial quotations of the referenced "Fireside Chat," respectfully refer to

the transcript of that "Fireside Chat" for its complete and accurate contents, and otherwise deny

any allegations inconsistent therewith.

290. By stating that "for people, doctors, who have signed up to use Clover Assistant, they're using Clover Assistant above 90% at the time when one of our members comes in for an office visit" in the statements in paragraph 289 above, Defendants were communicating to investors that the overwhelming majority of Clover's physicians actually used Clover Assistant during patient visits. As such, this statement was false and misleading because, as demonstrated by CW2, CW3 and CW4, as well as the Hindenburg Report only a fraction of healthcare providers used Clover Assistant *at all*, and those "uses" were largely physicians' assistants and front office staff using the tool long after the visit had ended, not physicians. Defendants effectively confirmed that this was true on February 5, 2021, when they disclosed, for the first time, that only *22%* of their PCPs were "trained and ready to use Clover Assistant," and that those physicians represented only *4%* of the Company's total in-network physicians.

**RESPONSE:** Defendants deny the allegations in Paragraph 290.

291. On November 20, 2020, Defendants held a virtual "Analyst Day," which began with a video in which Defendant Toy stated that "The Clover Assistant is a web application and *a physician uses it every visit they have with one of our members* and it's tuned to show them clinically useful, personalized relevant information that *helps them give better care during that visit*." Defendant Toy went on, "And now for *every PCP visit, every doctor visit that PCP* is seeing

exactly the information they need and technology is powering all of that."

**RESPONSE:** Defendants deny the allegations in Paragraph 291, except admit that Paragraph 291 contains a partial quotation from the Analyst Day transcript, respectfully refer to that transcript for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

292.    By stating that "a physician uses Clover Assistant every visit they have with one of our members" and "for every PCP visit, every doctor visit that PCP is seeing exactly the information they need" in the statements in paragraph 291 above, Defendants were communicating to investors that the overwhelming majority of Clover's physicians actually used Clover Assistant during patient visits. As such, this statement was false and misleading because, as demonstrated by CW2, CW3 and CW4, as well as the Hindenburg Report only a fraction of healthcare providers used Clover Assistant *at all*, and those "uses" were largely physicians' assistants and front office staff using the tool long after the visit had ended, not physicians. Defendants effectively confirmed that this was true on February 5, 2021, when they disclosed, for the first time, that only *22%* of their PCPs were "trained and ready to use Clover Assistant," and that those physicians represented only *4%* of the Company's total in-network physicians.

**RESPONSE:** Defendants deny the allegations in Paragraph 292.

293.    During Analyst Day, Defendant Garipalli also made specific representations about physician use of Clover Assistant. For example, Garipalli said that Clover had "been able to scale [Clover Assistant] broadly and rapidly with contracts with over 2,000 primary care physicians, a myriad of different practice types across all 34 of our current markets. What you see here is a small representation of the statistics we track for the Clover Assistant . . . . *So 92% is, is the percentage of visits where onboarded PCPs used the Clover Assistant for eligible visits in 2019*."

**RESPONSE:** Defendants deny the allegations in Paragraph 293, except admit that Paragraph 293 contains a partial quotation from the Analyst Day transcript, respectfully refer to that transcript for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

294.    Later during Analyst Day, Defendant Garipalli was asked, "what's the process of going back, I guess in maybe your more core markets, in terms of the interaction with the physicians that are not utilizing the platform? What are those discussions and is there any type of conversion rate that you can talk about people that are not using it and then they end up switching over?" Defendant Garipalli replied, "for physicians that have 10 or more Clover members, we're at *about a 90 plus percent conversion rate*. If they're not on Clover Assistant, we can bring them onto Clover Assistant. Even physicians that are not on Clover Assistant that have less than 10 Clover members, *we're still at about a 50% close rate on getting them to agree to use the Clover Assistant*.

**RESPONSE:** Defendants deny the allegations in Paragraph 294, except admit that Paragraph 294 contains a partial quotation from the Analyst Day transcript, respectfully refer to that transcript for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

295. Defendants also used a presentation at the 2020 Analyst Day entitled "Clover Health: A Deeper Dive." Slide 14 of that presentation, which was titled Step 3: Physicians Value The Clover Assistant," stated that "In ~2 years since product launch, *we've built a broad base of engaged physicians*. *Given our software-driven approach, we believe we can scale these results rapidly within existing and new markets*." Slide 14 also stated that "*92% -- Onboarded PCPs used the CA for 92% of eligible visits in 2019*."

**RESPONSE:** Defendants deny the allegations in Paragraph 295, except admit that Paragraph 295 contains a partial quotation from the Analyst Day presentation, respectfully refer to that presentation for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

296. The statements in paragraphs 293–95 above communicated to investors that the overwhelming majority of Clover's physicians actually used Clover Assistant during patient visits. As such, these statements were false and misleading because, as demonstrated by CW2, CW3 and CW4, as well as the Hindenburg Report only a fraction of healthcare providers used Clover Assistant *at all*, and those "uses" were largely physicians' assistants and front office staff using the tool long after the visit had ended, not physicians. Defendants effectively confirmed that this was true on February 5, 2021, when they disclosed, for the first time, that only *22%* of their PCPs were "trained and ready to use Clover Assistant," and that those physicians represented only *4%* of the Company's total in-network physicians.

**RESPONSE:** Defendants deny the allegations in Paragraph 296.

297. Defendants Garipalli, Toy and Wagner also gave a presentation to investors on January 21, 2021 at the J.P. Morgan Healthcare Conference. During that presentation, Defendant Garipalli said,

> So now that you have a bit of intuition of what the platform does. *Let's discuss the most important part, physician usage*. We believe that the Clover Assistant is a compelling platform for physicians for a few reasons. Number one, it's a standalone platform outside of the low NPS, EHRs that we believe is easy to use and provides clinically useful content as we just discussed. Two, we pay providers an enhanced rate that we estimate is about two times the fee-for-service Medicare rate, we make that payment extremely rapidly These two reasons serve as the activation energy to get physicians excitedto

109

contract with us and ***engage with the platform on an ongoing basis***.
***Because of that, we've been able to scale the Clover Assistant
platform broadly and rapidly with contracts with over 2,000
primary care physicians in a myriad of different practice types
across various markets***.

**RESPONSE:** Defendants deny the allegations in Paragraph 297, except admit that

Paragraph 297 contains a partial quotation from the J.P. Morgan Healthcare Conference transcript,

respectfully refer to that transcript for its complete and accurate contents, and otherwise deny any

allegations inconsistent therewith.

298.    By telling investors that physicians engage with Clover assistant "on an ongoing basis" and "we've been able to scale the Clover Assistant platform broadly and rapidly with contracts with over 2,000 primary care physicians in a myriad of different practice types across various markets" in the statements in paragraph 297 above, Defendants were communicating to investors that the overwhelming majority of Clover's physicians actually using Clover Assistant. As such, this statement was false and misleading because, as demonstrated by CW2, CW3 and CW4, as well as the Hindenburg Report only a fraction of healthcare providers used Clover Assistant *at all*, and those "uses" were largely physicians' assistants and front office staff using the tool long after the visit had ended, not physicians. Defendants effectively confirmed that this was true on February 5, 2021, when they disclosed, for the first time, that only ***22%*** of their PCPs were "trained and ready to use Clover Assistant," and that those physicians represented only ***4%*** of the Company's total in-network physicians.

**RESPONSE:** Defendants deny the allegations in Paragraph 298.

299.    After Defendant Garipalli turned over the January 21, 2021 presentation to Defendant Toy, Defendant Toy again emphasized to investors, "Firstly, they have broad engagement. ***Onboarded PCPs used the CA for 92% of eligible visits in 2019***." In addition, During a question-and-answer session at the January 21, 2021 Presentation, Defendants were asked, "How would you want investors think about what's most differentiated about Clover Assistant?" Defendant Toy responded,

the thing that I think is truly differentiated is what we've delivered,
where Vivek and myself have discussed is, how do we drive action
by a primary care physician to improve the care plan, consider a care
plan where they didn't before in a novel way and I get some stats
about that, right, where we are showing interesting information that
drives different decision-making via PCP and that is not speculation
and it's not me saying I'm a tech person, I think my platform can do
this. Because we're in a payer, I'm in a payer, we can actually deploy
that software ***and immediately see the results for a payer . . .*** . We
can iterate really fast on that, so when we get feedback from a
physician, when we see different behaviors in the physician
community what we can launch it ML model and we see that it's got

a certain level of engagement.

Defendant Wagner then immediately followed up, "***So we have not seen anything else scale in healthcare 2,000 plus providers across a myriad of different practice types, myriad of different markets with over 90% utilization rate*** and a positive 59 NPS score, and most EHRs have a negative NPS."

**RESPONSE:** Defendants deny the allegations in Paragraph 299, except admit that Paragraph 299 contains a partial quotation from the J.P. Morgan Healthcare Conference transcript, respectfully refer to that transcript for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

300. Later in the January 21, 2021 presentation, an attendee expressed concern that, "why are the star ratings lower than you'd like them to be right now? What's your confidence in bringing those up over what time period?" Defendant Toy responded, "I think, we have a lot of content that loaded to Clover Assistant that will help close that adherence gaps and (inaudible) care gap, these are things that—how that star ratings are based upon. We do think that as we launch those, we have high confidence because as Vivek said, ***it's a very high engagement by a PCP with CA will naturally bring those up***."

**RESPONSE:** Defendants deny the allegations in Paragraph 300, except admit that Paragraph 300 contains a partial quotation from the J.P. Morgan Healthcare Conference transcript, respectfully refer to that transcript for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

301. The statements in paragraphs 299–300 above communicated to investors that the overwhelming majority of Clover's physicians actually used Clover Assistant during patient visits. As such, these statements were false and misleading because, as demonstrated by CW2, CW3 and CW4, as well as the Hindenburg Report only a fraction of healthcare providers used Clover Assistant *at all*, and those "uses" were largely physicians' assistants and front office staff using the tool long after the visit had ended, not physicians. Defendants effectively confirmed that this was true on February 5, 2021, when they disclosed, for the first time, that only ***22%*** of their PCPs were "trained and ready to use Clover Assistant," and that those physicians represented only ***4%*** of the Company's total in-network physicians.

**RESPONSE:** Defendants deny the allegations in Paragraph 301.

**D.      False and Misleading Statements Regarding Compliance with GAAP**

302. The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, the Proxy Statement, and Shelf Registration each stated that "Our [*i.e.*, Clover's] consolidated financial statements ***are prepared in accordance with GAAP***."

**RESPONSE:** Defendants admit the allegations in Paragraph 302.

303. The statement in paragraph 302 above was materially false and misleading, however, because Clover's consolidated financial statements violated GAAP by failing to disclose that at least 8,200, or over 14% of the Company's insurance plan members, and likely many more, were the result of agreements and transactions with B&H, a third-party entity owned by Clover's Head of Sales, Hiram Bermudez, and that B&H received $160,000 in payments directly from Clover from 2017 to present, B&H received approximately $1.2 million in payments for Clover-related products from 2017 to 2020, and Bermudez reported an average of roughly $170,000 a year in net income from B&H. These disclosures were further misleading because Bermudez owned, had a material interest in, or operated additional insurance brokers that received payments either directly from Clover or for Clover-related products for a material number of additional members of Clover's insurance plans, none of which was disclosed in the subject financial statements, in violation of GAAP.

**RESPONSE:** The allegations Paragraph 303 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 303.

304. In addition, the S-4, the First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus and the Proxy Statement made the following Related Party disclosures, all while failing to mention B&H and/or the role of Bermudez in facilitating these related-party transactions:

**7. Related party transactions**

***Related party agreements***

The Corporation has various contracts with IJKG Opco LLC (d/b/a CarePoint Health—Bayonne Medical Center), Hudson Hospital Opco LLC (d/b/a CarePoint Health—Christ Hospital) and Hoboken University Medical Center ("HUMC") Opco LLC (d/b/a CarePoint Health—Hoboken University Medical Center), which collectively do business as the CarePoint Health System ("CarePoint Health") and are in-network Clover providers in New Jersey. CarePoint Health is ultimately held and controlled by Mr. Vivek Garipalli, the Chief Executive Officer and stockholder of the Corporation. The Corporation has entered into contracts, similar to those with many of its other hospitals, with CarePoint Health for the provision of inpatient and hospital-based outpatient services. Expenses and fees incurred related to these contracts, recorded in net medical claims incurred, were $12.6 million and $9.7 million for the years ended December 31, 2018 and 2019, respectively.

Securities payable to related parties

The Corporation has entered into various securities payable with certain related parties as further discussed in Note 12 "Notes and securities payable".

**RESPONSE:** Defendants deny the allegations in Paragraph 304, except admit that Paragraph 304 contains partial quotations of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

305. The S-4, the First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus and the Proxy Statement further disclosed that:

### 7. Related party transactions

#### *Related party agreements*

The Corporation has various contracts with IJKG Opco LLC (d/b/a CarePoint Health—Bayonne Medical Center), Hudson Hospital Opco LLC (d/b/a CarePoint Health—Christ Hospital) and Hoboken University Medical Center ("HUMC") Opco LLC (d/b/a CarePoint Health—Hoboken University Medical Center), which collectively do business as the CarePoint Health System ("CarePoint Health"). CarePoint Health is ultimately held and controlled by Mr. Vivek Garipalli, the Chief Executive Officer and stockholder of the Corporation. The Corporation contracts with CarePoint Health for the provision of inpatient and hospital-based outpatient services. Expenses and fees incurred related to these contracts, recorded in net medical claims incurred were $9.4 million and $5.3 million for the nine month periods ended September 30, 2019 and 2020, respectively.

#### *Securities payable to related parties*

The Corporation has entered into various securities payable with certain related parties as further discussed in Note 10 "Notes and securities payable".

**RESPONSE:** Defendants deny the allegations in Paragraph 305, except admit that Paragraph 305 contains partial quotations of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

306.     The disclosures in paragraphs 304–05 above were materially false and misleading, however, because they failed to disclose related party transactions that were required to be disclosed under GAAP, including that at least 14% of the Company's insurance plan members, and likely many more, were the result of agreements and transactions with B&H, a third-party entity owned by Clover's Head of Sales, Hiram Bermudez, and that B&H received $160,000 in payments directly from Clover from 2017 to present, B&H received approximately $1.2 million in payments for Clover-related products from 2017 to 2020, as well as that Bermudez separately reported an average of roughly $170,000 a year in net income from B&H. These disclosures were further misleading because Bermudez owned, had a material interest in, or operated additional insurance brokers that received payments either directly from Clover or for Clover-relatedproducts for a material number of additional members of Clover's insurance plans.

**RESPONSE:** The allegations Paragraph 306 consist of legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations in Paragraph 306.

307.     On January 12, 2021, SCH and Clover filed with the SEC an 8-K and numerous attachments. One of these attachments was a press release containing "unaudited pro forma condensed combined financial information of SCH and Clover as of September 30, 2020 and for the year ended December 31, 2019 and the nine months ended September 30, 2020 is set forth in Exhibit 99.1 hereto and is incorporated herein by reference." unaudited pro forma condensed combined financial information of SCH and Clover as of September 30, 2020 and for the year ended December 31, 2019 and the nine months ended September 30, 2020 is set forth in Exhibit 99.1 hereto and is incorporated herein by reference.

**RESPONSE:** Defendants deny the allegations in Paragraph 307, except admit that on January 12, 2021, SCH and Clover filed with the SEC an 8-K with attachments, which included unaudited financial information, refer to those documents for their complete and accurate contents, and deny any allegations inconsistent therewith.

**E.     <u>Defendants' Violations of Items 105 and 303 of Regulation S-K</u>**

308.     Clover used a Form S-4 and a Definitive Proxy in the Business Combination. In addition, Clover used a Form S-1 for the Shelf Registration. Form S-1, Form S-4, and the Definitive Proxy each require compliance with Items 105 and 303 of Regulation S-K.

**RESPONSE:** Defendants admit the allegations in the first sentence of Paragraph 308. The remaining allegations in Paragraph 308 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in the second

sentence of Paragraph 308.

309. Compliance with Item 303, 17 CFR § 229.303, requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

**RESPONSE:** The allegations in Paragraph 309 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants admit Paragraph 309 contains a partial quotation of the referenced regulation, respectfully refer to the regulation for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

310. Compliance with Item 105, 17 CFR § 229.105, requires "a discussion of the material factors that make an investment in the registrant or offering speculative or risky." The Form S-1, Form S-4 (and subsequent amendments), and Definitive Proxy used to complete the SPAC transaction omitted facts required to make its other statements not misleading and failed to comply with Items 303 and 503 of Regulation S-K. Specifically, these filings failed to disclose that Clover was subject to an ongoing investigation by the U.S. Department of Justice ("DOJ"), including its software "Clover Assistant" purportedly designed to serve "low-income and often overlooked communities," as well as kickbacks, marketing practices, and undisclosed third-party deals. In addition, these filings failed to disclose the known trend of physicians not using Clover Assistant during patient visits.

**RESPONSE:** The allegations in the first and second sentences of Paragraph 310 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants admit that the first and second sentences of Paragraph 310 contain a partial quotation of the referenced regulation, respectfully refer to the regulation for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith. Defendants deny the remaining allegations in Paragraph 310.

311. In addition, by affirmatively raising these topics, Defendants assumed a duty to be complete and truthful about such topics. Defendants violated that duty by failing to disclose the material information described herein.

**RESPONSE:** The allegations in Paragraph 311 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 311.

312. According CW2 and CW3 and the Hindenburg Report, Clover also gave gift cards to healthcare providers to generate patient leads. According to a former employee quoted in the report, Clover distributed gift cards "all over the freaking map" to encourage providers to direct their patients toward Clover's plans, including "Dunkin Donuts, Panera, Amazon." The former employee said that gift cards were used because they were untraceable.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 312, except admit that Paragraph 312 contains partial quotations of the Hindenburg Report.

313. The Demand sought testimony related to such payments. Specifically, the Demand stated that it wanted to discover Clover's knowledge concerning "Clover's payments to healthcare providers to induce those providers to recruit patients to Clover's Medicare Advantage plans."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 313, except admit that Paragraph 313 contains a partial quotation of the document the Complaint refers to as the "Demand."

314. The Hindenburg Report also quoted a former Clover employee as describing how Clover paid physicians' front desk staff for patient referrals. The former employee stated that these individuals were "Clover Ambassadors," and added that "It's a confidential program," meaning that ambassadors weren't supposed to let patients know they were working for Clover. The employee said that "The receptionist would notice that a patient checking in was enrolled in, say, United Healthcare, and would mention to the patient that there was another plan that might meet their needs better."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 314, except admit that Paragraph 314 contains partial quotations of the Hindenburg Report.

315. The Demand sought testimony related to the use of Clover Ambassadors as well. Specifically, the Demand stated that it wanted to discover Clover's knowledge concerning "payments to providers' staff and employees (receptionists, office managers) for conveying any information relating to Clover plans to patients in providers' offices"; "Clover's payments to providers' staff and employees for generating prospective patient leads for Clover plans"; "Clover ambassadors"; "Clover's payments of $5 per referral of a prospective patient not already covered by a Clover plan"; "Clover's distribution of gift cards to retail merchants for referral of prospective patients not already covered by a Clover plan."

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to

the truth of the allegations in Paragraph 315, except admit that Paragraph 315 contains partial quotations of the document the Complaint refers to as the "Demand."

316. Defendants confirmed that they knew of, but did not disclose, the DOJ investigation and demand during the Class Period and intentionally did not disclose it.

**RESPONSE:** Defendants deny the allegations in Paragraph 316, respectfully refer to the Hindenburg Response for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

317. CW2 and CW3 described how a significant number of contracted and "onboarded" doctors not using Clover Assistant during visits with patients. In addition, CW1, CW2, CW3 and the Hindenburg Report all described how only a small number of physicians used Clover Assistant at all. Defendants knew of this trend based on internal tracking systems and reports to Clover's Compliance department.

**RESPONSE:** Defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations in the first through second sentences of Paragraph 317. Defendants deny the remaining allegations in Paragraph 317.

318. The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, and December 14 Prospectus further provided that, in reaching its recommendation to pursue the Business Combination with Clover, the Company's Board of Directors:

> [C]onsidered the scope of the due diligence conducted by SCH's senior management and outside advisors and evaluated the results thereof and information available to it related to [Legacy] Clover, including: (a) extensive virtual meetings and calls with [Legacy] Clover's management team regarding its operations, projections and the proposed transaction; and (b) review of materials related to [Legacy] Clover and its business, made available by [Legacy] Clover, including financial statements, material contracts, key metrics and performance indicators, benefit plans, employee compensation and labor matters, intellectual property matters, real property matters, information technology, privacy and personal data, litigation information, healthcare matters and other regulatory and compliance matters and other legal and business diligence.

**RESPONSE:** Defendants deny the allegations in Paragraph 318, except admit that Paragraph 318 contains a partial quotation of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations

inconsistent therewith.

319. Additionally, The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, and Proxy Statement all falsely represented that "[w]e work diligently to ensure compliance with all applicable laws and regulations." The Company repeated this same sentence in several other public SEC filings during the Class Period, including in the Shelf Registration on Form S-1.

**RESPONSE:** Defendants deny the allegations in Paragraph 319, except admit that Paragraph 319 contains a partial quotation of the referenced public filings, respectfully refer to those documents for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

## VII. THE TRUTH EMERGES

320. Before Defendants could make any sales of shares pursuant to the Shelf Registration, Hindenburg published the Hindenburg Report on Clover on February 4, 2021. Citing "more than a dozen interviews with former employees, competitors, and industry experts, dozens of calls to doctor's offices, and a review of thousands of pages of government reports, insurance filings, regulatory filings, and company marketing materials," Hindenburg claimed that "Clover Health and its Wall Street celebrity promoter, Chamath Palihapitiya, misled investors about critical aspects of Clover's business in the run-up to the company's SPAC go-public transaction last month."

**RESPONSE:** Defendants deny the allegations in Paragraph 320, except admit that the Hindenburg Report was published on February 4, 2021, and that Paragraph 320 contains partial quotations of the Hindenburg Report.

321. For example, the Hindenburg Report communicated how Clover Assistant was designed to drive upward risk adjustments in patients. The report stated that, "While Clover claims its software tool, Clover Assistant, is aimed at helping doctors improve patient care, former employees told us that it was first and foremost a coding tool. According to one former employee: 'The core feature of the platform is *it increases revenue by identifying chronic conditions that people have and CMS will pay that* . . . That's the core business proposition.'" Another employee told Hindenburg, "If you make this patient look really, really sick, you are going to get more money from the government."

**RESPONSE:** Defendants deny the allegations in Paragraph 321, except admit that Paragraph 321 contains a partial quotation of the Hindenburg Report.

322. The Hindenburg Report also disclosed for the first time the existence and subject

matter of the DOJ investigation of Clover. The Hindenburg Report stated that "Clover has not disclosed that its business model and its software offering, called the Clover Assistant, are under active investigation by the [DOJ], which is investigating at least 12 issues ranging from kickbacks to marketing practices to undisclosed third-party deals, according to a Civil Investigative Demand . . . we obtained." The DOJ's "Civil Investigative Demand and the corresponding investigation," Hindenburg wrote, present a potential existential risk for a company that derives almost all of its revenue from Medicare, a government payor."

**RESPONSE:** Defendants deny the allegations in Paragraph 322, except admit that

Paragraph 322 contains partial quotations of the Hindenburg Report.

323. The Hindenburg Report linked to a partially redacted version of the Demand, which stated that the DOJ was engaged in an FCA investigation that "generally concerns whether Clover Health Investment Corporation and/or related entities improperly induced patient referrals for services paid for by Federal agencies." Among the twelve specific topics that the DOJ sought information from Clover on were (i) "Clover's payments to healthcare providers to induce those providers to recruit patients to Clover's Medicare Advantage plans"; (ii) "Clover's activities intended to encourage providers to refuse to accept patients with non-Clover coverage"; (iii) "Clover's payments to providers' staff and employees (receptionists, office managers) for conveying any information relating to Clover plans to patients in providers' offices"; (iv) "Clover's payments to providers' staff and employees for generating prospective patient leads for Clover plans"; (v) "Clover's distribution of gift cards to retail merchants for referral of prospective patients not already covered by a Clover plan"; (vi) "Clover's payments to providers for services rendered to patients and/or to Clover"; (vii) "Payments related to "Clover Assistant"; (viii) "Clover ambassadors"; and (viii) "Clover's patient recruitment efforts." Referencing its interviews with physicians and former employees, Hindenburg stated, "Our research indicates that the investigation has merit."

**RESPONSE:** Defendants deny the allegations in Paragraph 323, except admit that

Paragraph 323 contains partial quotations of the document the Complaint refers to as the

"Demand."

324. The Hindenburg Report further disclosed that Clover had paid staff in physicians' offices for referrals of potential Clover members. According to the Hindenburg Report, the former employee stated that "It's a confidential program," and that these "Clover Ambassadors" were not supposed to disclose to patients that they were working for Clover. According to the former employee, "The receptionist would notice that a patient checking in was enrolled in, say, United Healthcare, and would mention to the patient that there was another plan that might meet their needs better – 'Do you want more information? No problem. I'll have them give you a call.'"

**RESPONSE:** Defendants deny the allegations in Paragraph 324, except admit that

Paragraph 324 contains partial quotations of the Hindenburg Report.

325. The Hindenburg Report also disclosed for the first time Clover's use of gift cards for healthcare professionals to drive recruitment of new members and, accordingly, member growth. The report stated that, "In addition to soliciting potential members through brokers and websites with undisclosed conflicts, Clover also skirted regulations by recruiting members through physicians' practices, according to a former employee." The report then quoted that employee as saying that Clover distributed gift cards "all over the freaking map" to encourage providers to direct their patients toward Clover's plans, including "Dunkin Donuts, Panera, Amazon." The former employee told Hindenburg that gift cards were used because they were untraceable.

**RESPONSE:** Defendants deny the allegations in Paragraph 325, except admit that Paragraph 325 contains partial quotations of the Hindenburg Report.

326. The Hindenburg Report also disclosed for the first time that Clover's growth was the result of previously undisclosed related party transactions with third-party brokers owned by Clover's Head of Sales, Hiram Bermudez. The report stated that:

> Multiple former employees explained that much of Clover's sales are fueled by a major undisclosed relationship between Clover and an outside brokerage firm controlled by Clover's Head of Sales, Hiram Bermudez. One former employee estimated Bermudez drove ~68% of Clover's total sales, though was unclear on the amount coming from the undisclosed relationship. One of the former employees explained that Clover's Head of Sales took efforts to conceal the relationship by putting it in his wife's name "for compliance purposes". Insurance filings confirm this. The Clover contract was quietly put into his wife's name in the weeks after Clover's go-public announcement.

**RESPONSE:** Defendants deny the allegations in Paragraph 326, except admit that Paragraph 326 contains partial quotations of the Hindenburg Report.

327. The Hindenburg Report also detailed, for the first time, how a small minority of physicians treating Clover members actually used Clover Assistant. The report stated that two former Clover employees explained that only "Clover Preferred" doctors were using the Clover Assistant, and according to Clover's own database, only approximately 45% of all in-network doctors in Passaic County, New Jersey, are defined as "Clover Preferred." Similarly, in Morris County, New Jersey, only approximately 25% of all in-network doctors are "Clover Preferred" providers. A former employee had also told Hindenburg that while Clover was able to enroll about 70% to 80% of all the primary care doctors in New Jersey into its network, *i.e.*, convince those doctors to treat patients with Clover insurance, that didn't translate into a high percentage of Clover Assistant users, because while "[t]hey had a good portion of doctors in the state but not a great portion of doctors were using it if they enrolled."

**RESPONSE:** Defendants deny the allegations in Paragraph 327, except admit that Paragraph 327 contains partial quotations of the Hindenburg Report.

328. The Hindenburg Report even stated that Hindenburg had conducted its own surveys of doctors in New Jersey and confirmed that the majority did not use Clover Assistant. For example, the surveys indicated that, in mid-January 2021, Hindenburg phoned 22 physician's practices in New Jersey listed in Clover's 2019 Provider Directory. All offices confirmed that they accepted Clover's insurance, but 14 (64%) said they did not use Clover Assistant, four did not know, and only four (18%) confirmed that they did use Clover Assistant.

**RESPONSE:** Defendants deny the allegations in Paragraph 328, except admit that Paragraph 328 purports to paraphrase the Hindenburg Report.

329. In addition, outside of New Jersey, to the Hindenburg Report disclosed, only a fraction of doctors is "Clover Preferred," *i.e.*, actually use Clover Assistant. In El Paso, Texas, for example, the Hindenburg stated that the Clover directory lists 110 doctors in Clover's network, but only identifies eight (7%) as Clover Preferred. Moreover, according to Hindenburg, there were 220 primary care doctors in Tennessee and 206 doctors in Arizona, but *none* of these 426 doctors were Clover Preferred.

**RESPONSE:** Defendants deny the allegations in Paragraph 329, except admit that Paragraph 329 purports to paraphrase the Hindenburg Report.

330. Finally, the Hindenburg Report disclosed the stunning profits Defendant Palihapitiya stood to reap as a result of the Business Combination. According to the report, Defendant Palihapitiya's company, SCH, had invested just $25,000 and agreed that Palihapitiya would promote the Clover SPAC in exchange for an eventual 20.5 million in "founders shares." The report then observed that those shares were worth approximately $290 million.

**RESPONSE:** Defendants deny the allegations in Paragraph 330, except admit that Paragraph 330 purports to paraphrase the Hindenburg Report.

331. On this news, Clover's stock price plummeted $1.72 per share, or 12.33%, to close at $12.23 per share on February 4, 2021, on unusually high trading volume of more than 67.6 million shares trading, or more than 5 times the average daily volume over the preceding 30 trading days. The decline represented a loss of approximately $700 million in market capitalization. Moreover, the shares traded as low as $11.86 per share intraday on February 4, 2021. Additionally, Clover warrants fell $0.18 per warrant, or 5.04%, to close at $3.39 per warrant on February 4, 2021.

**RESPONSE:** Defendants deny the allegations in Paragraph 331, except admit that Clover's stock price closed at $12.23 per share on February 4, 2021, which was $1.72 per share lower than the previous close, that the shares traded as low as $11.86 on February 4, 2021, and that Clover's warrants traded at $3.39 per warrant on February 4, 2021, $0.18 lower than the previous close.

332.    On February 5, 2021, before the market opened, Defendants posted the Response Article in response to the Hindenburg Report. Clover filed the Response Article with the SEC as an exhibit to a Form 8-K that same day.

**RESPONSE:** Defendants admit the allegations in Paragraph 332.

333.    The Response Article stated in no uncertain terms that all Defendants were completely aware of the DOJ investigation prior to the Business Combination and had intentionally and knowingly elected not disclose it. The Response Article expressly stated that Defendants had affirmatively decided not to disclose it because they did not consider it to be "material" on the advice of outside counsel. "Clover does not believe it is, or has been, in violation of any rules or regulations related to the inquiry," Defendants Garipalli and Toy wrote. Defendants Garipalli and Toy acknowledged that Clover had received an inquiry from the SEC that they believed was a result of the Hindenburg report, and that the SEC was conducting an "investigation and requesting document and data preservation for the period from January 1, 2020, to the present, relating to certain matters that are referenced in the [Hindenburg report]."

**RESPONSE:** Defendants deny the allegations in Paragraph 333, except admit that

Paragraph 333 contains partial quotations of the Hindenburg Response.

334.    In addition, at 3:41 PM on February 5, 2021, Defendant Palihapitiya posted a message to his Twitter account @chamath in response to the Hindenburg Report effectively confirming that Defendant Palihapitiya had known about the DOJ investigation. Palihapitiya wrote:

> I think Clover is building something important in healthcare that ties together value and care – otherwise costs will continue to escalate and outcomes will continue to decline. *As explained by Clover, in forging new ground and being a part of a regulated industry, they expect to receive requests for information from governmental entities and respond in the ordinary course*. For Hindenburg to take such a request or information and use it to paint a case of malfeasance and fraud is spurious.
>
> While I may have my own views on short-sellers, I do believe they should remain a part of the capital markets and recognize the perspective that in some cases they can identify real anomalies. That is not the case here.
>
> I wish that Hindenburg had contacted me or Clover. We would have been happy to sit down with them so they could have gotten to the truth and evaluated things firsthand. Instead, they chose to take the cheap path of screaming into the ether.
>
> I will let Clover's long-term goals and performance speak for themselves going forward.

That is what I underwrote, and still stand behind.

**RESPONSE:** Defendants deny the allegations in Paragraph 334, except admit that Defendant Palihapitiya posted the referenced Tweet, respectfully refer to the Tweet for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

335. The Response Article also confirmed the substance of the Hindenburg Report's disclosure of Hiram Bermudez's interest in B&H, stating that "Clover has paid approximately $160k directly to B&H since 2017," Bermudez "does not receive any compensation, direct or indirect, from B&H for any work related to Clover," but "maintains a 50% ownership interest in B&H, which he has owned since before he joined Clover." Defendants then disclosed that "[a]pproximately 8,200 of our current members were referred by B&H to Clover." Since Clover had over 57,000 members at the time, this represented at least 14% of Clover's membership, *i.e.*, a material amount. These statements confirmed the bulk of the Hindenburg Report's reporting.

**RESPONSE:** Defendants deny the allegations in Paragraph 335, except admit that Paragraph 335 contains partial quotations of the Hindenburg Response. The allegations in the third sentence of Paragraph 335 consist of legal conclusions to which no response is required. To the extent a response is required, Defendants deny the allegations in the third sentence of Paragraph 335.

336. The Response Article also confirmed that only a fraction of physicians treating Clover members actually used Clover Assistant. The Response Article stated that "onboarding" meant "[w]here the physicians have received their initial training and have created their accounts, and we have answered their questions. Basically, they're ready to use the software. We also refer to the physicians as the 'Live' physicians . . . . We typically have a pipeline of Contracted physicians waiting to be onboarded at any given time, and our goal is to go from Contracted to Live within 60 days." In other words, the time spent between a physician being "contracted" and "onboarded" was very small and thus references to contracted and onboarded physicians were essentially synonymous. Defendants then disclosed, for the first time, "***currently 22% of all in-network Primary Care Physicians are Live***. This correlates to ***4% of the total in-network physicians*** (including PCPs, specialists, etc.)." In other words, only a small minority of physicians treating Clover Patients had even agreed to use Clover Assistant, let alone were using Clover Assistant. Notably, Defendants said nothing about how many of these physicians actually used Clover Assistant during patient visits.

**RESPONSE:** Defendants deny the allegations in Paragraph 336, except admit that Paragraph 336 contains partial quotations of the Hindenburg Response.

337. After the conclusion of the Class Period, Defendants admitted that their statements

in the Response Article regarding agreements and transactions with Hiram Bermudez's insurance brokerage firm, B&H, had been inaccurate, and that in fact Bermudez's firm had received ***at least $1.36 million*** for selling Clover insurance plans. Specifically, on March 29, 2021, Defendants filed an 8-K with the SEC that disclosed that:

> As described in the Original Post, Clover directly contracts with a Field Marketing Organization (FMO) named Ritter Insurance Marketing. B&H Assurance is one of many "downline" agencies from Ritter, which means that B&H and its agents sell Clover plans through Ritter, as well as other non-Clover Medicare Advantage plans. ***We understand from Ritter that, from 2017 through 2020, B&H Assurance received from Ritter roughly $400,000 a year for Clover-related products***. As noted in the Original Post, from the period 2017 to present, ***Clover has paid roughly $160,000 directly to B&H Assurance*** ($125,000 of which is an incentive payment made in 2021 for hitting a preset enrollment bonus pursuant to an incentive plan in which other agencies also participate). ***We understand from Mr. Bermudez that, over the last several years, he reported an average of roughly $170,000 a year in net income from B&H Assurance***. The Company has concluded that the income received by Mr. Bermudez as a result of his work for Clover is compliant with applicable CMS rules and regulations.

**RESPONSE:** Defendants deny the allegations in Paragraph 337, except admit that Paragraph 337 contains a partial quotation of the referenced Form 8-K, and respectfully refer to that Form 8-K for its complete and accurate contents.

338. Defendants' March 29, 2021 8-K also effectively acknowledged that Bermudez's undisclosed interest and receipt of payments from B&H had been improper. Defendants stated that "[b]ased on discussions with the Company, Mr. Bermudez ***has agreed to divest himself from all interests in B&H Assurance*** to avoid any potential conflict of interest."

**RESPONSE:** Defendants deny the allegations in Paragraph 338, except admit that Paragraph 338 contains a partial quotation of the referenced Form 8-K, and respectfully refer to that Form 8-K for its complete and accurate contents.

339. In addition, also after the conclusion of the Class Period, Defendants admitted that their prior statements about direct customers under contract were not accurate. On May 17, 2021 Clover held an earnings call with investors and analysts to discuss Clover's performance in the first quarter of 2021. On that call, Defendant Wagner disclosed that, by the end of the year, the Company was projecting to have only between 70,000 and 100,000 lives managed under Medicare's new Direct Contracting program. This was shockingly inconsistent with Defendant Palihapitiya claim when announcing that the Company had 200,000 lives already under contract

124

as part of the Direct Contracting program, and Defendant Garipalli's claim during the Fireside Chat that the Company already had commitments for approximately 130,000 lives. Analysts quickly recognized the inconsistency in Defendants' statements. For example, later that day, MedCity News published an article entitled, "*In analyst call, Clover reveals it doesn't have the customers it said it did during IPO.*"

**RESPONSE:** Defendants deny the allegations in Paragraph 339, respectfully refer to the

transcripts of the referenced "Fireside Chat" and "earnings call" for their complete and accurate

contents, and otherwise deny any allegations inconsistent therewith.

340. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**RESPONSE:** Defendants deny the allegations in Paragraph 440.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

341. As set forth above, Defendants each had scienter as to the false and misleading nature of their statements because they each knew or, at a minimum, recklessly disregarded the facts described above for the following reasons.

a. The Response Article made several important admissions that demonstrated Defendants' scienter, including that Defendants knew of the DOJ investigation before and throughout the Class Period and elected *not* to disclose it and that only a minority of the physicians treating Clover members used Clover Assistant.

b. Since the Response Article further acknowledged that Clover knew or should have known about payments to B&H and Bermudez's interest in B&H, as it stated that "Clover has conflict of interest policies requiring employees to disclose any existing or potential conflicts of interest. Clover follows SEC rules and regulations regarding the public disclosure of these relationships."

c. As described by CW3, Clover's compliance group and in-house attorneys conducted an investigation into Chief Development Officer Lipkind's illicit payments of gift cards to healthcare practitioners and/or office staff. In addition, as described by CW3, she reported the widespread failure to use Clover Assistant during patient visits to Clover's inhouse compliancegroup.

d. During Analyst Day, on November 20, 2020, Defendant Garipalli emphasized to investors that the Company tracked physician usage of Clover Assistant, stating, "is a small representation of the statistics we track for the Clover Assistant," thus Defendants could and did track which physicians were using Clover Assistant and whether those physicians were

using Clover Assistant during patient visits.

e.  The Individual Defendants' scienter is supported by the mammoth amounts of Class B shares they were awarded and/or held in connection with the Business Combination.

f.  During the Squawk Box Segment, Defendant Palihapitiya attested to the amount of diligence he had performed on Clover, including that, "we found this company, and this is why we are really excited ***after months of diligence and work*** to announce a merger between IPOC and Clover Health to take Clover Health public.

g.  The S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, and the Proxy Statement all stated that, in connection with the Business Combination, SCH and Clover represented that they had discussed "typical due diligence," and that "[f]rom August 25, 2020 to August 28, 2020," SCH, Clover, and their legal representatives "held a meeting via video teleconference to discuss certain preliminary healthcare regulatory and compliance due diligence matters, given the regulated nature of [Legacy] Clover's business." This document further provided that on August 27, 2020, SCH's legal counsel was "provided with access to a virtual data room of [Legacy] Clover and began conducting a preliminary legal due diligence review of [Legacy] Clover." The S-4 further provided that representatives of SCH and Clover met several other times to discuss, inter alia, due diligence review and matters associated therewith. This extensive diligence review gave Defendants actual knowledge of the Clover's regulatory violations, the related party transactions, the limited physician use of Clover Assistant, and the GAAP violations in the financial statements included in the S-4, First Amended S-4, Second Amended S-4, Third Amended S-4, December 14 Prospectus, andthe Proxy Statement.

**RESPONSE:** Defendants deny the allegations in Paragraph 341, respectfully refer to the referenced documents and, where applicable, transcripts for their complete and accurate contents, and otherwise deny any allegations inconsistent therewith.

342.  In addition to the above allegations, which on their own create a strong inference of scienter additional factors support a strong inference of the Individual Defendants' scienter, including: (i) the outsized profits each Individual Defendant stood to reap from the Shelf Registration, (ii) Individual Defendants' high-level positions within Clover, (ii) that the misstatements and omissions of material facts concern the Company's core operations, about which the Individual Defendants were repeatedly questioned and spoke; and (iii) corporate scienter.

**RESPONSE:** The allegations in Paragraph 342 consist of legal conclusions to which no

Case 3:21-cv-00096   Document 94   Filed 04/11/22   Page 126 of 147 PageID #: 2122

response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 342.

343. Defendant Palihapitiya's scienter is also evident from the shockingly large profits he stood to make after the Business Combination. For example, in advance of the business combination, the Sponsor, *i.e.*, Defendant Palihapitiya, purchased 17,250,000 SCH Class B ordinary shares for an aggregate purchase price of only *twenty-five thousand dollars* ($25,000), or approximately $0.001 per share (after a subsequent share capitalization on April 21, 2020) (the "founder shares"). After transferring a relatively small number of the founder shares to two of SCH's independent directors, in March 2020, on April 21, 2020, SCH effected a pro rata share capitalization resulting in an increase in the total number of founder shares outstanding from 17,250,000 to 20,700,000. The founder shares were automatically converted to Class A common stock of Clover when Clover was incorporated in Delaware during the Class Period. After the Business Combination closed on January 6, 2021, Defendant Palihapitiya's founder shares were worth over *$220 million*. In other words, in exchange for a $25,000 investment, Defendant Palihapitiya stood to receive an astonishing return of *879,900%*.

**RESPONSE:** The allegations in the first sentence of Paragraph 343 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in the first sentence of Paragraph 343. Defendants deny the allegations in the second sentence of Paragraph 343, respectfully refer to Clover's January 13, 2021 Form S-1 for its complete and accurate contents, and otherwise deny any allegations inconsistent therewith. Defendants deny the remaining allegations in Paragraph 343, except admit that: (i) on April 21, 2020, SCH effected a pro rata share capitalization resulting in an increase in the total number of Founder Shares outstanding from 17,250,000 to 20,700,000; (ii) the founder shares were automatically converted to Class A common stock when the Business Combination closed; (iii) 100,000 founder shares were transferred to each of Dr. James Ryans and Jacqueline D. Reses; and (iv) the SCH shareholders approved the business combination on January 6, 2021, and the business combination transaction closed on January 7, 2021.

344. Similarly, Defendants Garipalli, Toy, and Wagner had a powerful motive to inflate the Company's share price because they had massive amounts of Clover stock. Defendant Garipalli had at least 83,584,543 shares of Clover's Class A Common Stock, which were worth *$902 million* after the Business Combination. For their part, after the Business Combination Defendant Toy had 12,790,323 shares of Clover's Class A Common Stock worth *$138 million* and Defendant Wagner

had 642,514 shares of Clover's Class A Common Stock worth nearly *$7 million*.

**RESPONSE:** Defendants deny the allegations in Paragraph 344, except admit that immediately following the Business Combination, Defendant Garipalli owned 83,584,543 shares of Clover's Common Stock, Defendant Toy owned 12,790,323 shares of Clover's Common Stock, and Defendant Wagner owned 642,514 shares of Clover's Common Stock.

345.    The Shelf Registration indicated that Defendants Palihapitiya, Garipalli, Toy, and Wagner had registered all the above shares. When Shelf Registration became effective on January 27, 2021, Clover's share price closed at $14.25, up approximately $3.50 per share since the Business Combination. Accordingly, Defendant Palihapitiya's shares were now worth approximately *$294 million*, Garipalli's shares were now worth *$1.2 billion*, Defendant Toy's shares were now worth *$182 million*, and Defendant Wagner's shares were now worth over *$9 million*.

**RESPONSE:** Defendants deny the allegations in Paragraph 345.

### A.  Individual Defendants' High-Level Positions Within SCH and Clover

346.    Defendants Palihapitiya, Garipalli, Toy, and Wagner each knew of the false and misleading nature of the statements discussed above, or at a minimum was reckless for not knowing these matters.

**RESPONSE:** The allegations in Paragraph 346 consist of legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations in Paragraph 346.

347.    Defendant Palihapitiya served as SCH's CEO and Chairman at all relevant times prior to the Business Combination and owned and/or operated SCH at all relevant times.

**RESPONSE:** Defendants deny the allegations in Paragraph 347, except admit that Defendant Palihapitiya served as the Chairman and CEO of SCH during a portion of the Class Period.

348.    Defendant Garipalli was the CEO of the Company at all relevant times. Clover identified Garipalli as an "Executive Officer" of the Company during the Class Period.

**RESPONSE:** Defendants deny the allegations in Paragraph 348, except admit except admit that Defendant Vivek Garipalli currently serves as Clover's Chief Executive Officer.

349. Defendant Toy was President and CTO of the Company at all relevant times. Clover identified Toy as an "Executive Officer" of the Company during the Class Period.

**RESPONSE:** Defendants deny the allegations in Paragraph 349, except admit that Defendant Toy currently serves as Clover's President.

350. Defendant Wagner was the CFO of the Company at all relevant times. Clover identified Wagner as an "Executive Officer" of the Company during the Class Period.

**RESPONSE:** Defendants deny the allegations in Paragraph 350, except admit that Defendant Wagner served as Clover's Chief Financial Officer during the Class Period.

351. As SCH's CEO and Chairman Defendant Palihapitiya, as a result of the extensive diligence he and SCH conducted into Clover, was privy to all material information concerning the Clover's compliance with applicable regulatory laws, regulations and guidance, Clover's practice of providing illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines, as well as Clover's payments to entities run by the Companies Head of Sales, Hiram Bermudez, physicians widespread failure to use Clover Assistant during patient visits, and the Company's failure to report related party agreements and transactions in accordance with GAAP. Moreover, Defendant Palihapitiya had actual knowledge of the DOJ investigation because his actual knowledge was confirmed in a post on Medium.com on February 5, 2021.

**RESPONSE:** The allegations in the first sentence of Paragraph 351 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in the first sentence of Paragraph 351. Defendants deny the remaining allegations in Paragraph 351, and respectfully refer to the February 5, 2021 post on Medium.com for its complete and accurate contents.

352. As CEO, Defendant Garipalli was the head of Clover's management and operations teams. Garipalli, by virtue of his responsibilities and activities as CEO, was privy to all material information concerning Clover's compliance with applicable regulatory laws, regulations and guidance, Clover's practice of providing illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines, as well as Clover's payments to entities run by the Companies Head of Sales, Hiram Bermudez, physicians widespread failure to use Clover Assistant during patient visits, and the Company's failure to report related party agreements and transactions in accordance with GAAP. Moreover, Defendant Garipalli had actual knowledge of the DOJ investigation because he confirmed his actual knowledge in a post on Medium.com on February 5, 2021.

**RESPONSE:** Defendants deny the allegations in the first sentence of Paragraph 352, except

admit that Garipalli is the CEO of Clover. The allegations in the second sentence of Paragraph 352 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in the second sentence of Paragraph 352. Defendants deny the remaining allegations in Paragraph 352, and respectfully refer to the February 5, 2021 post on Medium.com for its complete and accurate contents.

353. Defendant Toy, as President and CTO of Clover, was privy to all material information concerning Clover's compliance with applicable regulatory laws, regulations and guidance, Clover's practice of providing illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines, as well as Clover's payments to entities run by the Companies Head of Sales, Hiram Bermudez, physicians widespread failure to use Clover Assistant during patient visits, and the Company's failure to report related party agreements and transactions in accordance with GAAP. Moreover, Defendant Toy had actual knowledge of the DOJ investigation because he confirmed his actual knowledge in a post on Medium.com on February 5, 2021.

**RESPONSE:** The allegations in the first sentence of Paragraph 353 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in the first sentence of Paragraph 353. Defendants deny the remaining allegations in Paragraph 353, and respectfully refer to the February 5, 2021 post on Medium.com for its complete and accurate contents.

354. Defendant Wagner, as CFO, was privy to, and participated in, all matters directly impacting the financial health of Clover, including the Clover's compliance with applicable regulatory laws, regulations and guidance, Clover's practice of providing illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines, as well as Clover's payments to entities run by the Companies Head of Sales, Hiram Bermudez, physicians widespread failure to use Clover Assistant during patient visits, and the Company's failure to report related party agreements and transactions in accordance with GAAP.

**RESPONSE:** Defendants deny the allegations in Paragraph 354.

355. The statements of CW3 likewise make clear that Defendants Garipalli, Toy, and Wagner knew of Clover's failure to comply with applicable regulatory laws, regulations and guidance and practice of providing was the result of illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the FCA, and the MCM Guidelines, as well as of physicians' widespread failure to use Clover Assistant during patient visits. CW3 raised these issues to Clover's management, and those issues were presented to

Defendants Garipalli, Toy, and Wagner.

**RESPONSE:** Defendants deny the allegations in Paragraph 355.

### B. <u>Core Operations</u>

356. The fraud alleged herein relates to the core business and operations of Clover so knowledge of the fraud may be imputed to Defendants. As explained in above, Clover's revenues overwhelmingly came from Medicare reimbursements, up to 68% of Clover's members were from transactions and agreements with brokers owned and operated by Hiram Bermudez and the "most important thing" to Clover was physician use of Clover Assistant. Accordingly, it is appropriate to presume that Defendants were apprised of, had access to, or had actual knowledge of all material information related to Clover during the Class Period, including the material information that was improperly withheld and/or misrepresented to investors.

**RESPONSE:** Defendants deny the allegations in Paragraph 356.

357. Further, by virtue of their receipt of information reflecting the true facts regarding Clover's operations and its marketplace, as well as their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning Clover, the Individual Defendants were active and culpable participants in the fraudulent scheme alleged herein. The Individual Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public. The fraud as described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

**RESPONSE:** Defendants deny the allegations in Paragraph 357.

### C. <u>Corporate Scienter</u>

1. The allegations above also establish a strong inference that Clover as an entity acted with corporate scienter throughout the Class Period, as its officers, management, and agents, including, but not limited to, the Individual Defendants, had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Clover's true operating condition and present and expected financial performance from the investing public. By concealing these material facts from investors, Clover maintained and/or increased its artificially inflated common stock prices throughout the Class Period.

**RESPONSE:** Defendants deny the allegations in subsection C, Paragraph 1 *[sic]*.

358.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Clover securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

**RESPONSE:** The allegations in Paragraph 358 consist of legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations in Paragraph 358, except admit that Plaintiffs purport to bring this class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of all those who purchased or otherwiseacquired Clover securities during the Class Period (the "Class"), with certain members excluded.

359.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Clover securities were actively traded on the NASDAQ and NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Clover or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

**RESPONSE:** The allegations in Paragraph 359 consist of legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations in Paragraph 359, except admit that during portions of the Class Period, Clover stock was traded on the NASDAQ and NYSE.

360.     Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

**RESPONSE:** The allegations in Paragraph 360 consist of legal conclusions to which no response is required.  To the extent that a response is required, Defendants deny the allegations in

Paragraph 360.

361. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

**RESPONSE:** The allegations in Paragraph 361 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 361.

362. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Clover;

- whether the Individual Defendants caused Clover to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Clover securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

**RESPONSE:** The allegations in Paragraph 362 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 362.

363. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**RESPONSE:** The allegations in Paragraph 363 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 363.

364. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Clover securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Clover securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

**RESPONSE:** The allegations in Paragraph 364 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 364.

365. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

**RESPONSE:** The allegations in Paragraph 365 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 365.

366. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in

their Class Period statements in violation of a duty to disclose such information, as detailed above.

**RESPONSE:** The allegations in Paragraph 366 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 366.

## X.  COUNT I

### (VIOLATIONS OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS)

367. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

**RESPONSE:** Defendants incorporate by reference their responses to Paragraphs 1 – 366.

368. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

**RESPONSE:** Defendants admit that Count I of the Complaint purports to be based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

369. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Clover securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Clover securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

**RESPONSE:** The allegations in Paragraph 369 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 369.

370. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the

135

Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Clover securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Clover's finances and business prospects.

**RESPONSE:** The allegations in Paragraph 370 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 370.

371. By virtue of their positions at Clover, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

**RESPONSE:** The allegations in Paragraph 371 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 371.

372. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Clover, the Individual Defendants had knowledge of the details of Clover's internal affairs.

**RESPONSE:** Defendants deny the allegations in Paragraph 372.

373. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Clover. As officers and/or directors of a publicly held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Clover's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Clover securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Clover's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Clover securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants and were damaged thereby.

136

**RESPONSE:** The allegations in Paragraph 373 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 373.

374. During the Class Period, Clover securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Clover securities at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Clover securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Clover securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

**RESPONSE:** The allegations in Paragraph 374 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 374.

375. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

**RESPONSE:** The allegations in Paragraph 375 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 375.

376. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

**RESPONSE:** The allegations in Paragraph 376 consist of legal conclusions to which no response is required. To the extent that a response is required, Defendants deny the allegations in Paragraph 376.

137

# XI.     COUNT II

## (VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS)

377.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

**RESPONSE:** Individual Defendants incorporate by reference their responses to Paragraphs 1 – 376.  Paragraph 377 is not alleged against Defendant Clover, and therefore no response is required by Defendant Clover.

378.     During the Class Period, the Individual Defendants participated in the operation and management of Clover, and conducted and participated, directly and indirectly, in the conduct of Clover's business affairs. Because of their senior positions, they knew the adverse non-public information about Clover's misstatement of income and expenses and false financial statements.

**RESPONSE:** Individual Defendants deny the allegations in Paragraph 378.  Paragraph 378 is not alleged against Defendant Clover, and therefore no response is required by Defendant Clover.  To the extent a response is required, Clover denies the allegations in Paragraph 378.

379.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Clover's financial condition and results of operations, and to correct promptly any public statements issued by Clover which had become materially false or misleading.

**RESPONSE:** The allegations in Paragraph 379 consist of legal conclusions to which no response is required.  To the extent that a response is required, Individual Defendants deny the allegations in Paragraph 379.  Paragraph 379 is not alleged against Defendant Clover, and therefore no response is required by Defendant Clover.  To the extent a response is required, Clover denies the allegations in Paragraph 379.

380.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Clover disseminated in the marketplace during the Class Period concerning Clover's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Clover to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Clover within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which

artificially inflated the market price of Clover securities.

**RESPONSE:** The allegations in Paragraph 380 consist of legal conclusions to which no response is required.  To the extent that a response is required, Individual Defendants deny the allegations in Paragraph 380.  Paragraph 380 is not alleged against Defendant Clover, and therefore no response is required by Defendant Clover.  To the extent a response is required, Clover denies the allegations in Paragraph 380.

381.    Each of the Individual Defendants, therefore, acted as a controlling person of Clover. By reason of their senior management positions and/or being directors of Clover, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Clover to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Clover and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

**RESPONSE:** The allegations in Paragraph 381 consist of legal conclusions to which no response is required.  To the extent that a response is required, Individual Defendants deny the allegations in Paragraph 381.  Paragraph 381 is not alleged against Defendant Clover, and therefore no response is required by Defendant Clover.  To the extent a response is required, Clover denies the allegations in Paragraph 381.

382.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Clover.

**RESPONSE:** The allegations in Paragraph 382 consist of legal conclusions to which no response is required.  To the extent that a response is required, Individual Defendants deny the allegations in Paragraph 382.  Paragraph 382 is not alleged against Defendant Clover, and therefore no response is required by Defendant Clover.  To the extent a response is required, Clover denies the allegations in Paragraph 382.

### XII.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**RESPONSE:** In response to the Prayer for Relief in the Complaint, Defendants deny that Plaintiffs are entitled to any relief.

**DEFENSES**

Without assuming the burden of proof as to any defense or issue that would otherwise rest on Plaintiffs or as to any element of Plaintiffs' claims, and reserving the right to amend this Answer to assert any additional defenses, cross-claims, and third-party claims not asserted herein when, and if, in the course of their investigation, discovery, preparation for trial, or otherwise it becomes appropriate to assert such defenses, cross-claims, and third-party claims, Defendants assert the following affirmative defenses:

**FIRST DEFENSE**

Plaintiffs lack standing to raise the claims asserted in the Complaint.

**SECOND DEFENSE**

Plaintiffs fail to state a claim upon which relief can be granted.[1]

---

[1] The Complaint fails to state a claim upon which relief can be granted because, among other reasons, it is premised on alleged violations of Regulation S-K, which are inactionable under § 10(b) of the Securities Exchange Act of 1934 or SEC Rule 10b-5.

## THIRD DEFENSE

The Complaint fails to plead fraud with particularity.

## FOURTH DEFENSE

The claims asserted in the Complaint are barred because Defendants did not have the level of scienter required to impose liability for the conduct alleged in the Complaint.

## FIFTH DEFENSE

The claims asserted in the Complaint are barred, in whole or in part, by the safe harbor provisions for forward-looking statements in the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-5, and under the "bespeaks caution" doctrine.

## SIXTH DEFENSE

The claims asserted in the Complaint are barred because the purported statements or actions attributed to Defendants in the Complaint were not false or misleading, and Defendants did not omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

## SEVENTH DEFENSE

The claims asserted in the Complaint are barred because some or all of the purported statements or actions attributed to Defendants in the Complaint were immaterial.

## EIGHTH DEFENSE

The alleged misstatements constitute inactionable puffery and/or inactionable statements of opinion.

## NINTH DEFENSE

The claims asserted in the Complaint are barred, in whole or in part, for lack of causation and reliance. Specifically, Plaintiffs have sustained no legally cognizable damage by virtue of any alleged misrepresentations or omissions because such alleged misrepresentations and omissions did not cause

141

the drop in the price or value of the securities at issue in this case, and did not cause any alleged inflation of the price or value of the securities at issue in this case.

## TENTH DEFENSE

The claims asserted in the Complaint are barred because, with respect to the statements and disclosures alleged to have been made by Defendants, Defendants had no reasonable ground to believe and did not believe, at the time such statements were made and at all relevant times, that the statements were untrue, or that there was an omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading.

## ELEVENTH DEFENSE

The claims asserted in the Complaint are barred because Defendants relied, in good faith, and were entitled to rely, on advice and information provided by professional advisors.

## TWELFTH DEFENSE

The claims asserted against Defendants are barred, in whole or in part, in that Plaintiffs did not rely upon the integrity of the market, and/or the integrity of the market did not depend on any of the alleged acts and/or omissions of Defendants.

## THIRTEENTH DEFENSE

Plaintiffs' claims are barred by the "truth on the market" corollary to the "fraud on the market" theory of reliance because the information allegedly misrepresented or omitted was known to the market, already in the public domain and/or reasonably available to shareholders.

## FOURTEENTH DEFENSE

Defendants are not liable because Plaintiffs knew or should have known of the allegedly omitted or misstated facts.

## FIFTEENTH DEFENSE

Plaintiffs have failed to mitigate their alleged damages.

## SIXTEENTH DEFENSE

Any recovery for damages allegedly incurred by Plaintiffs is subject to offset in the amount of any value gained through the investment (including tax benefits actually received) and is subject to the "90-day bounce-back" damages limitation, 15 U.S.C. § 78u-4(e).

## SEVENTEENTH DEFENSE

Plaintiffs' damages, if any, were caused solely by the conduct of others and are not the result of any conduct of Defendants.

## EIGHTEENTH DEFENSE

Plaintiffs' damages, if any, were not proximately caused by any conduct of Defendants, but were the result of superseding or intervening conduct for which Defendants cannot be held liable.

## NINETEENTH DEFENSE

Plaintiffs' action is not properly maintained as a class action because the requirements under federal law for class certification are not met.

## TWENTIETH DEFENSE

The claims asserted in the Complaint are barred because the conduct alleged in the Complaint was not intentional, was believed to be lawful, proper, and fair, and was the result of mistake of fact or mistake of law.

## TWENTY-FIRST DEFENSE

Plaintiffs' claims against Defendants are barred in whole or in part by laches, equitable estoppel, waiver, or other related equitable doctrines.

## TWENTY-SECOND DEFENSE

This action is barred, in whole or in part, because the Court lacks jurisdiction of the claims of any members of the purported putative class who do not reside in Tennessee.

143

## TWENTY-THIRD DEFENSE

Defendants hereby adopt and incorporate by reference any and all other defenses asserted or to be asserted by any of the other Defendants to the extent that Defendants may share in such a defense.

Dated: April 11, 2022

Respectfully submitted,

**BASS, BERRY & SIMS PLC**

By: /s/ Britt K. Latham
Britt K. Latham (BPR #23149)
Joseph B. Crace, Jr. (BPR # 27753)
150 Third Ave., South, Suite 2800
Nashville, TN 37201
Tel. (615) 742-7762
Facsimile: (615) 742-2847
blatham@bassberry.com
jcrace@bassberry.com

**MILBANK LLP**

Scott A. Edelman (admitted *pro hac vice*)
Jed M. Schwartz (admitted *pro hac vice*)
Gary A. Crosby II (admitted *pro hac vice*)
55 Hudson Yards
New York, New York 10001
Tel. (212) 530-5000
sedelman@milbank.com
jschwartz@milbank.com
gcrosby@milbank.com

*Counsel for Defendants Clover Health Investments, Corp., Vivek Garipalli, Andrew Toy, Joseph Wagner, and Chamath Palihapitiya*

144

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the foregoing was filed electronically on April 11, 2022.  Notice of this filing will be sent to all electronically registered parties by operation of the Court's electronic filing system.  The names of the attorneys for other parties who are registered to receive notices of filings through the Court's system are:

Benjamin A. Gastel
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Fax: (615) 255-5419
Email: beng@bsjfirm.com

Jacob A. Walker
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: jake@blockleviton.com

James Gerard Stranch, IV
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Fax: (615) 255-5419
Email: gerards@bsjfirm.com

Jeffrey C. Block
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Email: jeff@blockleviton.com

Larry Russell Belk, Jr.
Sutherland & Belk, PLC
2505 21st Avenue South
Suite 400
Nashville, TN 37212
(615) 846-6200
Fax: (615) 208-2255
Email: russell@sbinjurylaw.com

James A. Holifield, Jr.
Holifield Janich Rachal & Associates, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
(865) 566-0115
Fax: (865) 566-0119
Email: aholifield@holifieldlaw.com

Brian Peter Calandra
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(646) 581-9958
Email: bcalandra@pomlaw.com

Brian Schall
Schall Law Firm
2049 Century Park East
Suite 2460
Los Angeles, CA 90067
(310) 301-3335
Email: brian@schallfirm.com

145

Stephen J. Teti
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: steti@blockleviton.com

Laurence M. Rosen
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: lrosen@rosenlegal.com

Phillip Kim
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: pkim@rosenlegal.com

Robert P. Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: robert@bramlettlawoffices.com

Jeremy A. Lieberman
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com

Paul Kent Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: pknashlaw@aol.com

Corey D. Holzer
Holzer & Holzer, LLC
1200 Ashwood Parkway
Suite 410
Atlanta, GA 30338
(770) 392-0090
Fax: (770) 392-0029
Email: cholzer@holzerlaw.com

J. Alexander Hood , II
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Fax: (212) 661-8665
Email: ahood@pomlaw.com

Tara L. Swafford
The Swafford Law Firm, PLLC
321 Billingsly Court
Suite 19
Franklin, TN 37067
(615) 599-8406
Fax: (615) 807-2355
Email: tara@swaffordlawfirm.com

Patrick V. Dahlstrom
Pomerantz LLP (Chicago Office)
10 S LaSalle Street, Suite 3505
Chicago, IL 60603
(312) 377-1181
Fax: (312) 377-1184
Email: pdahlstrom@pomlaw.com

146

Charles F. Barrett
Neal & Harwell, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
(615) 244-1713
Fax: (615) 726-0573
Email: cbarrett@nealharwell.com

John Tate Spragens
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
(615) 983-8900
Fax: (615) 682-8533
Email: john@spragenslaw.com

Saul C. Belz
Glankler Brown, PLLC
6000 Poplar Avenue, Suite 400
Memphis, TN 38119
(901) 576-1741
Fax: (901)576-2389
Email: sbelz@glankler.com

Rina Restaino
Schall Law Firm
2049 Century Park East
Suite 2460
Los Angeles, CA 90067
(424) 303-1964
Fax: (877) 590-0482
Email: rina@schallfirm.com

/s/ Britt K. Latham