# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

|  |  |  |
|---|---|---|
| TIMOTHY BOND, | ) | |
| | ) | |
| Lead Plaintiff | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JEAN-NICOLAS TREMBLAY | ) | Case No. 3:21-cv-00096 |
| | ) | |
| Named Plaintiff, | ) | Judge Aleta A. Trauger |
| | ) | |
| individually and on behalf of all others similarly situated, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, VIVEK GARIPALLI, ANDREW TOY, JOE WAGNER and CHAMATH PALIHAPITIYA, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II. STATEMENT OF FACTS .....................................................................................2

    A.  Summary of the Allegations ......................................................................2

    B.  The Proposed Class Representatives .......................................................5

III. ARGUMENT............................................................................................................6

    A.  The Proposed Class Satisfies the Requirements of Rule 23(a)..............7

        1.  The Class is sufficiently numerous. .............................................7

        2.  Questions of law and fact are common to the class. ..................9

        3.  The proposed Class Representatives' claims are typical. .........10

        4.  The proposed Class Representatives will adequately and fairly protect the interests of the class. ................................................11

    B.  The Proposed Class Satisfies the Requirements of Rule 23(b)(3). ........13

        1.  Common Factual and Legal Questions Predominate.................13

            i.  Plaintiffs are entitled to a presumption of reliance pursuant to basic ................................................................................ 14

      1.  The *Cammer* Factors............................................................................. 16

      2.  The *Krogman* Factors ......................................................................... 19

            ii.  Plaintiffs are Entitled to a Presumption of Reliance Pursuant to *Affiliated Ute* ............................................................................. 20

        2.  A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action..................................................22

IV. CONCLUSION.......................................................................................................23

i

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. U.S.*,
406 U.S. 128 (1972)..................................................................................................2, 21, 22

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997)..............................................................................................................13

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
568 U.S. 455 (2013)..................................................................................................14, 15, 21

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)....................................................................................................2, 6, 15

*Bond v. Clover Health Invs., Corp.*,
2022 WL 602432 (M.D. Tenn. Feb. 28, 2022)................................................................21, 22

*Bovee v. Coopers & Lybrand*,
216 F.R.D. 596 (S.D. Ohio 2003) ........................................................................................10

*Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*,
843 F.3d 1119 (6th Cir. 2016) .............................................................................................14

*Burges v. BancorpSouth, Inc.*,
2017 WL 2772122 (M.D. Tenn. June 26, 2017).......................................................7, 8, 10, 16

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) ...........................................................................15, 16, 18, 19

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ............................................................................................17

*Castillo v. Envoy Corp.*,
206 F.R.D. 464 (M.D. Tenn. 2002) ....................................................................................1, 6

*Cosby v. KPMG, LLP*,
2020 WL 3548379 (E.D. Tenn. June 29, 2020).....................................................................20

*Cosby v. KPMG, LLP*,
2021 WL 1828114 (E.D. Tenn. May 7, 2021).................................................................19, 20

*Dougherty v. Esperion Therapeutics, Inc.*,
2020 WL 6793326 (E.D. Mich. Nov. 19, 2020)....................................................................20

ii

*Freeman v. Laventhol & Horwath*,
   915 F.2d 193 (6th Cir. 1990) ...............................................................................16, 17

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
   2012 WL 1071281 (M.D. Tenn. Mar. 29, 2012) ........................................................7, 20, 22

*Grae v. Corr. Corp. of Am.*,
   330 F.R.D. 481 (M.D. Tenn. 2019) (Trauger, J.)..................................................................7

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)...........................................................................................15, 19, 21

*In re Accredo Health, Inc. Sec. Litig.*,
   2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006)..................................................................16

*In re Alstom SA Sec. Litig.*,
   253 F.R.D. 266 (S.D.N.Y. 2008) ...................................................................................17

*In re Direct Gen. Corp.*,
   2006 WL 2265472 (M.D. Tenn. Aug. 8, 2006) ..............................................................11, 12

*In re DVI Inc. Sec. Litig.*,
   249 F.R.D. 196 (E.D. Pa. 2008), *aff'd*, 639 F.3d 623 (3d Cir. 2011) ......................................17

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
   2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) ....................................................................10

*In re Petrobras Sec. Litig.*,
   104 F.Supp.3d 618 (S.D.N.Y. 2015)................................................................................13

*Kasper v. AAC Holdings, Inc.*,
   2017 WL 3008510 (M.D. Tenn. July 14, 2017) ...................................................................7

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ..............................................................................16, 19, 20

*Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*,
   332 F.R.D. 370 (N.D. Ga. 2019).....................................................................................19

*Plumbers & Pipefitters Nat'l Pension Fund v. Burns*,
   967 F. Supp. 2d 1143 (N.D. Ohio 2013).............................................................................16

*Powers v. Hamilton Cnty. Pub. Def. Comm'n*,
   501 F.3d 592 (6th Cir. 2007) .........................................................................................13

*Ross v. Abercrombie & Fitch Co.*,
   257 F.R.D. 435 (S.D. Ohio 2009).....................................................................................9, 10

iii

*Schuh v. HCA Holdings, Inc.*,
   2014 WL 4716231 (M.D. Tenn. Sept. 22, 2014) ...................................................................9

*Stein v. U.S. Xpress Enters., Inc.*,
   2021 WL 1410035 (E.D. Tenn. Feb. 12, 2021) ...............................................................11, 13

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008)..............................................................................................................21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007)................................................................................................................6

*Thorpe v. Walter Inv. Mgmt. Corp.*,
   2016 WL 10518902 (S.D. Fla. Oct. 17, 2016)......................................................................13

*Vervaecke v. Chiles, Heider & Co.*,
   578 F.2d 713 (8th Cir. 1978) ................................................................................................21

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
   325 F.R.D. 280 (D. Minn. 2018)...........................................................................................21

*Wal-Mart Stores, Inc. v. Dukes*,
   564 U.S. 338 (2011)................................................................................................................7

*Weiner v. Tivity Health, Inc.*,
   334 F.R.D. 123 (M.D. Tenn. 2020) ........................................................................................7

*Wilkof v. Caraco Pharm. Lab'ys, Ltd.*,
   280 F.R.D. 332 (E.D. Mich. 2012) .......................................................................................18

*Willis v. Big Lots, Inc.*,
   242 F. Supp. 3d 634 (S.D. Ohio 2017) .................................................................................18

*Yost v. First Horizon Nat'l Corp.*,
   2011 WL 2182262 (W.D. Tenn. June 3, 2011) .....................................................................10

*Young v. Nationwide Mut. Ins. Co.*,
   693 F.3d 532 (6th Cir. 2012) ................................................................................................11

*Zehentbauer Family Land, LP v. Chesapeake Expl., L.L.C.*,
   935 F.3d 496 (6th Cir. 2019) ..................................................................................................7

## **Statutes**

False Claims Act ...............................................................................................................................3

Securities Exchange Act of 1934 Sections 10(b) and 20(a) ......................................................2, 11

## Rules

Fed. R. Civ. P. 23 ........................................................................................................... *passim*

Fed. R. Civ. P. 26 ................................................................................................................12

v

Lead Plaintiff Firas Jabri and Named Plaintiff Jean-Nicolas Tremblay ("Plaintiffs), by and through their attorneys, respectfully submit this Memorandum of Law in Support of Plaintiffs' Motion for Class Certification and respectfully request that the Court: (1) certify this case as a class action; (2) appoint Plaintiffs as Class Representatives; and (3) appoint Pomerantz LLP ("Pomerantz ") as Class Counsel.

## I.    <u>INTRODUCTION</u>

Pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiffs seek certification of the following Class:

> All persons and entities who purchased or otherwise acquired securities of Clover Health Investments Corp. ("Clover" or the "Company") between October 6, 2020 and February 3, 2021, both dates inclusive (the "Class Period"). Excluded from the Class are Clover, Vivek Garipalli ("Garipalli"), Andrew Toy ("Toy"), Joe Wagner ("Wagner"), and Chamath Palihapitiya ("Palihapitiya," and, together with Clover, Garipalli, Toy, and Wagner "Defendants"), the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

Courts have consistently recognized that "class actions are the most favorable means of adjudicating federal securities fraud claims."[1] *E.g., Castillo v. Envoy Corp.*, 206 F.R.D. 464, 474 (M.D. Tenn. 2002). This case is no different as thousands of Clover investors (including the proposed Class Representatives) were damaged by Defendants' conduct in the same manner, and Plaintiffs satisfy the requirements of Rule 23(a) and (b)(3).

First, the four requisite elements of Rule 23(a) are readily established here:

- **Numerosity**: Thousands of investors acquired the millions of publicly traded shares of Clover stock as well as Clover warrants during the Class Period.

---

[1] All internal citations are omitted and emphasis is added unless otherwise indicated.

1

- **Commonality** and **Typicality**: Defendants engaged in the same scheme, issued the same false and misleading statements and omitted the same material facts when communicating to all investors.

- **Adequacy**: The proposed Class Representatives have participated in the litigation and are committed to prosecuting this action on behalf of the Class through experienced and competent counsel.

Second, this action meets the predominance and superiority requirements of Rule 23(b)(3). Predominance, as with commonality, is met because the core elements of Plaintiffs' §§10(b) and 20(a) claims are susceptible to common proof. Similarly, reliance can be presumed on a class-wide basis under the "fraud-on-the-market" presumption articulated by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), as Clover's common stock and warrants traded in an efficient market throughout the Class Period. Reliance can also be presumed on a class-wide basis under the test set forth in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972). Lastly, a class action promotes judicial economy and is undoubtedly the superior method of resolving the claims of the thousands of geographically dispersed investors that were similarly harmed by Defendants' fraudulent conduct.

For these reasons and the reasons further explained below, Lead Plaintiff's Motion for Class Certification should be granted.

## II.  STATEMENT OF FACTS

### A.  Summary of the Allegations

This is a securities fraud class action on behalf of investors in Clover, who assert violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") against Defendants. Plaintiffs seek to recover losses incurred from numerous allegedly false and misleading statements by Defendants in connection with Clover's January 2021 merger with the special purpose acquisition company or "SPAC" Social Capital Hedosophia

2

Holdings Corp. ("SCH"), which was operated by Defendant Palihapitiya (the "Business Combination").[2] ¶¶113–15.

Clover is a health insurance company whose revenues overwhelmingly come from Medicare Advantage ("MA") premiums paid by the U.S. government's Centers for Medicare and Medicaid Services ("CMS"). ¶¶50–52, 56.[3] According to Defendants, Clover is a technology company whose propriety software ("Clover Assistant") could "disrupt" the MA industry by using data entered by physicians during patient visits to recommend lower-cost treatments. ¶66. In reality, Clover Assistant is designed to generate "upward risk adjustments" so that Clover can receive larger MA premiums. ¶¶67, 69, 70–76. Since premiums for ostensibly riskier (*i.e.*, sicker) patients can be much larger, Clover pays HCPs *$200 per visit* to use the software, or *twice* the average MA reimbursement. ¶69.

Medicare is strictly regulated by federal laws, including the Anti-Kickback Statute ("AKS") and False Claims Act ("FCA"), as well as CMS's own regulations ("MCM Regulations"). ¶¶91–99, 106. These laws and regulations prohibit, among other things, giving items of value, like gift cards, to physicians or staff for referrals, and violators can be barred from offering MA plans or receiving premiums. *See id.*, ¶93.

Failure to comply with the AKS, FCA, and MCM Regulations presented an existential risk to Clover because *over 98%* of its revenues came directly from MA premiums paid by the U.S. government. ¶¶58–59. To reassure investors concerned about compliance risks,

---

[2] Although Clover was formally a different company prior to the Business Combination (*i.e.*, SCH), references herein to "Clover" are to both SCH and the surviving entity post-Business Combination unless otherwise indicated.

[3] Citations to "¶__" or "¶¶__" are to paragraphs of Plaintiffs' First Amended Complaint ("FAC"). *See* ECF No. 70.

Defendants stated categorically that "there are *no* pending or, to the knowledge of the Company, threatened . . . [material] investigations" into Clover and that "since January 1, 2018," Clover "has met and complied with, *all applicable Laws*." (¶¶233, 235, 237, 241, 243. These statements were false, however, as the DOJ was (and still is) investigating improper marketing practices at Clover, including payments and gift cards for physicians' staff (the "DOJ Investigation"). ¶¶139–45. In fact, according to former employees who spoke to Plaintiffs ("CWs")[4] and a research report by the investment firm Hindenburg Research ("Hindenburg Report"), there was widespread misconduct Clover in violation of laws and regulations governing Medicare. ¶¶129–36.

Defendants also repeatedly misattributed Clover's growth to Clover Assistant and/or its MA "plan design," when, according to multiple CWs and the Hindenburg Report, the Company's growth was generated by the above illegal marketing practices and undisclosed insider transactions with insurance brokers owned by Clover's head of sales, Hiram Bermudez ("Bermudez"). ¶¶154–81, 245–73. Not only did Defendants misrepresent the reasons for Clover's growth, they also violated Generally Accepted Accounting Principles ("GAAP") by failing to disclose the related-party transactions with Bermudez's brokers. ¶¶175–80.

Clover's success also depended on HCPs using Clover Assistant at the "point of care." Defendant Garipalli, for example, touted that "what we believe is truly our differentiation [is that we] provide actionable data to physicians at the point of care to assist them *while they are seeing Clover members*." ¶189. To that end Defendants emphasized that "onboarded physicians are highly engaged, using the Clover Assistant for *92% of their member visits in 2019*." ¶¶279,

---

[4] Former employees who spoke to Plaintiffs are referred to herein and the in FAC as confidential witnesses or "CWs." CWs are assigned feminine pronouns to preserve their anonymity.

4

281, 293, 295, 299. According to CWs, however, Defendants knew this statement was false, including, for example, because the Company's own data showed that only a fraction of physicians used the software during patient visits. ¶¶205–07.

Investors learned the truth on February 4, 2021, after the merger had closed, when the Hindenburg Report disclosed, among other things, the DOJ Investigation, Clover's use of gift cards, undisclosed related-party transactions, and use of Clover Assistant by a small minority of HPCs. ¶¶320–27. Clover's stock price plummeted $1.72 per share, or 12.33%, on unusually high volume, a decline of *$700 million* in market capitalization. ¶331.

Desperate to stanch the bleeding, Defendants responded to the Hindenburg Report the next morning in an article *that confirmed the bulk of the report* (the "Response Article"). ¶¶332–34. For example, Defendants admitted they knew of the DOJ Investigation and *intentionally did not disclose it*. ¶¶145, 333. Defendants also denied illicit payments to doctors and nurses, but, tellingly, did not deny gift cards or payments to *staff*. ¶145. Defendants confirmed that at least 14% of Clover's members came from one Bermudez broker, but insisted that Bermudez had not received any compensation for those members. ¶335. This denial was false, however, as weeks later Defendants admitted that Bermudez had pocketed approximately $500,000 for those members. ¶¶338–39. Defendants even confirmed that only 22% of Clover's primary care physicians ("PCPs") (and only 4% of all Clover physicians) could use Clover Assistant *at all*, let alone in patient visits. ¶336. In the wake of the Hindenburg Report, the SEC has opened an investigation into Clover. ¶333.

## B. The Proposed Class Representatives

Named Plaintiff Jean-Nicolas Tremblay filed an action against Defendants on February 22, 2021, *Tremblay v. Clover Health Investments, Corp., et al. ("Tremblay Action")*, No. 3:21-cv-00138 (M.D. Tenn.). ECF No. 1. This Court consolidated the Tremblay Action with this

5

Action on April 8, 2021. ECF No. 42. On April 23, 2021, this Court appointed Firas Jabri as Lead Plaintiff. ECF No. 58. On June 28, 2021, Plaintiffs filed their Amended Complaint, identifying Jabri as Lead Plaintiff and Tremblay as Named Plaintiff. *See* ECF No. 70. Lead Plaintiff Jabri is an individual who purchased over 80,000 shares of Clover stock during the Class Period. ECF No. 41-3. Named Plaintiff Tremblay is an individual who purchased 250 shares of Clover stock during the Class Period. *See Tremblay Action*, ECF No. 1-3.

Lead Plaintiff Jabri and Named Plaintiff Tremblay, *i.e.*, the proposed Class Representatives, have expended significant time and effort prosecuting this action on behalf of the proposed Class, including by responding to discovery requests from Defendants and actively monitoring and reviewing the work of Lead Counsel Pomerantz LLP. *See* Ex. A, Declaration of Firas Jabri in Support of Plaintiffs' Motion for Class Certification ("Jabri Decl."). Court-appointed Lead Counsel Pomerantz, in turn, has conducted an extensive investigation into Defendants' alleged misconduct, has drafted a comprehensive amended complaint, has successfully opposed Defendants' motion to dismiss and is diligently pursuing the discovery necessary to prove the Class's claims.

### III.   <u>ARGUMENT</u>

Class actions are widely considered to be the most favorable means of adjudicating federal securities fraud claims. *See Castillo*, 206 F.R.D. at 474; *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313-14 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions . . . ."). Indeed, the Supreme Court and courts within the Sixth Circuit have overwhelmingly found that, in securities fraud actions, class treatment is an appropriate way to vindicate investors' rights. *E.g.*, *Basic*, 485 U.S. at 229-30, 249-50; *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 502 (M.D. Tenn. 2019) (Trauger,

6

J.); *Kasper v. AAC Holdings, Inc.*, 2017 WL 3008510, at *5 (M.D. Tenn. July 14, 2017); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2012 WL 1071281, at*39 (M.D. Tenn. Mar. 29, 2012).

A class action can be certified if this Court is satisfied that the prerequisites of Rule 23(a) have been met and that the action falls within one of the categories under Rule 23(b). *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Zehentbauer Family Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496, 503 (6th Cir. 2019). For the reasons set forth below, this case meets the requirements of Rule 23(a)-(b)(3) and this Court should certify the Class.

### A. The Proposed Class Satisfies the Requirements of Rule 23(a)

Rule 23(a) establishes four requisite elements for class certification:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 128 (M.D. Tenn. 2020) (citing Fed. R. Civ. P. 23(a)). The proposed Class meets each of these requirements.

#### 1. The Class is sufficiently numerous.

Rule 23(a)(1) requires that a proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Rather than a "strict numerical test, 'substantial' numbers usually satisfy the numerosity requirement." *Burges v. BancorpSouth, Inc.*, 2017 WL 2772122, at *2 (M.D. Tenn. June 26, 2017); *see also Grae*, 330 F.R.D. at 501 ("'[T]he exact number of class members need not be pleaded or proved' for a class to be certified, as long as the class representatives can show that joinder would be impracticable."). "Numerosity is generally assumed to have been met in class action suits involving nationally traded securities." *Burges*, 2017 WL 2772122, at *2.

7

Throughout the Class Period, Clover's securities traded on one of the largest stock exchanges in the world. *See* Ex. B, Expert Report of Matthew D. Cain, Ph.D. ("Cain Report"), ¶19 & n.9. Prior to the Business Combination, for example, SCH's securities traded on the New York Stock Exchange ("NYSE") under the trading symbols "IPOC.U," "IPOC," and "IPOC WS." *Id.* at ¶19. Similarly, after the Business Combination, Clover's Class A Common Stock and Warrants traded on the National Association of Securities Dealers Automated Quotations ("NASDAQ") under the trading symbols "CLOV" and "CLOVW," respectively. *Id.* Evidencing numerosity, the average weekly trading volume of Clover's Class A Common Stock was approximately 49.9 million shares, or 47.69% of the shares outstanding, *id.* ¶¶28–29, and the average weekly trading volume of Clover's Warrants was 15.80% of warrants outstanding.[5] ¶80. In addition, at least 84 major institutions owned Clover Class A Common Stock during the Class Period, further demonstrating the numerosity of the proposed Class. Cain Rpt. ¶¶65–66. These institutional investors, such as asset management and brokerage firms, often hold shares on behalf of numerous undisclosed beneficial holders (*i.e.*, individual investors).

Based on this volume of trading and the number of institutional shareholders, it is reasonable to conclude that many thousands of individuals owned Clover securities during the Class Period. In short, because "[t]his case involves the sale of millions of stock, and Plaintiff estimates that the number of purchasers is likely to be 'in the thousands' and that those

---

[5] Although the Cain Report also presents separate analyses demonstrating that Clover Warrants traded in an efficient market, courts consistently hold that a finding of market efficiency for common stock is sufficient to demonstrate that derivatives like warrants trade in an efficient market. See Cain Rept. ¶79 & n. 65–66 (citing cases).

purchasers reside in many states," numerosity is satisfied. *Schuh v. HCA Holdings, Inc.*, 2014 WL 4716231, at *13 (M.D. Tenn. Sept. 22, 2014).

### 2. Questions of law and fact are common to the class.

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The claims of the potential class members need not be factually identical," and "[t]he mere fact that questions peculiar to individual class members could remain does not necessarily defeat a finding of commonality." *Ross v. Abercrombie & Fitch Co.*, 257 F.R.D. 435, 442 (S.D. Ohio 2009). Instead, commonality exists if there is at least "one question common to the class." *Id.*

Plaintiffs' claims readily meet this standard as the allegations in the FAC raise numerous questions common to the Class. These include, inter alia, including whether: (1) Defendants were engaged in a scheme to defraud and/or made materially false or misleading statements or omissions to investors regarding Clover's compliance with all applicable laws since January 1, 2018 or involvement in any legal proceeding that could have a material adverse effect on the Company's business (¶¶230-44); (2) Defendants were engaged in a scheme to defraud and/or made materially false or misleading statements or omissions to investors regarding the reasons for Clover's growth and positive performance (¶¶245-73); (3) Defendants were engaged in a scheme to defraud and/or made materially false or misleading statements or omissions to investors regarding physician use of Clover Assistant (¶¶274-301), (4) Defendants were engaged in a scheme to defraud and/or made materially false or misleading statements or omissions to investors regarding the preparation of Clover's financial statements in accordance with GAAP (¶¶302-07); (5) Defendants were engaged in a scheme to defraud and/or made materially false or misleading statements or omissions to investors regarding Clover's compliance with Items 303 and 503 of Regulation S-K in its SEC

9

filings (¶¶308-19); (6) Defendants acted with scienter (¶¶341-358); (7) Defendants' misrepresentations caused the putative Class to suffer damages (¶¶320-40); and (8) Defendants were "controlling persons" within the meaning of §20(a) of the Exchange Act (¶¶29-43). Because all Class members' claims depend on the answers to these common questions, commonality is established. *See Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 609 (S.D. Ohio 2003) (explaining that questions bearing upon misrepresentations and materiality are "among the paradigmatic common question[s] of law in a securities fraud class action").

### 3. The proposed Class Representatives' claims are typical.

"A plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members and if its claims are based on the same legal theory." *Burges*, 2017 WL 2772122, at *4. "[A] plaintiff's burden to establish typicality is not onerous." *Yost v. First Horizon Nat'l Corp.*, 2011 WL 2182262, at *8 (W.D. Tenn. June 3, 2011).

Plaintiffs' claims are typical of the proposed Class as they arise out of the same course of conduct, *i.e.*, that Defendants artificially inflated the prices of Clover's Class A Common Stock and Warrants by engaging in a scheme to defraud and misrepresenting the Company's legal compliance, involvement in government investigations, reasons for its growth, Clover Assistant software, and compliance with GAAP and Items 303 and 503 of Regulation S-K. *See generally* FAC. As courts consistently recognize, trivial "[f]actual differences involving the date of acquisition, type of securities purchased and manner by which the investor acquired the securities will not destroy typicality if each class member was the victim of the same material misstatements and the same fraudulent course of conduct." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *10 (S.D.N.Y. Dec. 23, 2009); *Ross*, 257 F.R.D. at 456 ("'[i]ndividual differences regarding the purchasing and selling of stock during the proposed

class period [do] not destroy the typicality requirement'"). All of Plaintiffs' claims—i.e., the alleged violations of §§10(b) and 20(a) of the Exchange Act—will be proven by the same evidence on a class-wide basis. *See Stein v. U.S. Xpress Enters., Inc.*, 2021 WL 1410035, at \*6 (E.D. Tenn. Feb. 12, 2021) (proposed class representatives' claims were typical and "driven by the same factual underpinnings as the Securities Act claims of the proposed class because they derive from the same alleged misrepresentations and/or omissions").

Plaintiffs and the putative Class suffered losses from the same course of conduct and share identical interests in holding Defendants accountable and maximizing the Class's recovery. Accordingly, Plaintiffs' claims are typical.

### 4. The proposed Class Representatives will adequately and fairly protect the interests of the class.

The adequacy requirement of Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). To establish adequacy: (i) "'the representative must have common interests with unnamed members of the class'"; and (ii) "'it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 543 (6th Cir. 2012) (citing *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996)). The first adequacy factor overlaps with the commonality and typicality elements discussed above and seeks to ensure that the class representatives have interests aligned with, rather than antagonistic to, the interests of the unnamed class members. *See In re Direct Gen. Corp.*, 2006 WL 2265472, at \*4 (M.D. Tenn. Aug. 8, 2006). The second adequacy factor requires that the representatives have sufficient financial and personal involvement to encourage them to prosecute the action vigorously and adequate legal representation to meet the demands of maintaining the action. *Id*.

Plaintiffs clearly satisfy both prongs of Rule 23(a)(4)'s adequacy test, and their interests are neither antagonistic to nor in conflict with the interests of the other Class members. To the contrary, Lead Plaintiff Jabri acquired over 80,000 shares of Clover Class A Common Stock during the Class Period and Named Plaintiff Tremblay acquired hundreds of shares of Clover Class A Common Stock during the Class Period as well. *See* ECF No. 41-3; *Tremblay Action*, ECF No. 1-3. Plaintiffs sustained damages as a result of the same alleged material misrepresentations and omissions as other class members. *See* Jabri Decl. ¶2.

In addition to its financial stakes, Plaintiffs have demonstrated an ability to take an active role in the litigation to protect the interests of class members. *See* Jabri Decl. ¶¶4-5. They have, among other things, filed a consolidated complaint with a comprehensive set of claims, defended those claims through motion-to-dismiss briefing and are in the process of proving those claims in discovery. *See* Jabri Decl. ¶4. Plaintiffs have also diligently complied with its own discovery obligations by filing Rule 26 Initial Disclosures and responding to Defendants' interrogatories and document requests. *See* Jabri Decl. ¶¶4-5. Further, as set forth in each of their respective declarations, Plaintiffs: (i) understand the requirements and responsibilities of serving as a class representative; (ii) have reviewed key pleadings in this action; (iii) intend to continue to monitor and review the progress of this litigation; and (iv) intend to work with counsel to maximize the recovery to the Class. *See* Jabri Decl. ¶¶4-5.

Plaintiffs also have demonstrated their adequacy by retaining attorneys with considerable experience in securities class actions. *See U.S. Xpress*, 2021 WL 1410035, at *8 ("[I]n determining whether the plaintiffs have established adequate representation, the Court considers whether the proposed class counsel are qualified, experienced and generally able to conduct the litigation."). Pomerantz regularly represents investors in nationwide securities

litigation, including within the Sixth Circuit and this District. *See* Ex. C. District courts throughout the country have noted Pomerantz's reputation for excellence. *See, e.g., Thorpe v. Walter Inv. Mgmt. Corp.*, 2016 WL 10518902, at *9 (S.D. Fla. Oct. 17, 2016) ("Class Counsel has developed a reputation for zealous advocacy in securities class actions"); *In re Petrobras Sec. Litig.*, 104 F.Supp.3d 618, 625 (S.D.N.Y. 2015) (appointing Pomerantz as sole lead counsel in multi-billion dollar securities class action and stating that "[t]he Court is familiar with the Pomerantz firm from previous matters, and finds that it is well qualified to serve as lead counsel"). In short, Pomerantz is qualified, experienced and able to prosecute this action.

**B. The Proposed Class Satisfies the Requirements of Rule 23(b)(3).**

This action also satisfies Rule 23(b)(3)'s requirements that: (1) common questions of law or fact predominate over individual questions; and (2) a class action is superior to alternative methods of resolving the dispute. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

**1. Common Factual and Legal Questions Predominate**

"Predominance is a test readily met in certain cases alleging . . . securities" law violations and exists where the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Id.* at 623, 625. Plaintiff meets the predominance requirement by establishing that at least one factual or legal question "is at the heart of the litigation." *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007). Importantly, Plaintiff "need not prove that each element of a claim can be established by classwide proof: What the rule does require is that common questions predominate over any questions affecting only individual [class] members." *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016). Nor does "Rule 23(b)(3) require[] a showing that questions common to the

class . . . will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).

As discussed above, the Class's claims are all premised on the same factual circumstances: Defendants' misrepresentations and course of conduct artificially inflating the prices of Clover's Class A Common Stock and Warrants by engaging in a scheme to defraud and misrepresenting the Company's legal compliance, involvement in government investigations, reasons for its growth, Clover Assistant software, and compliance with GAAP and Items 303 and 503 of Regulation S-K, and that Plaintiff and the Class were harmed when the price of Clover's securities declined when the true state of affairs was publicly disclosed.

Thus, the Class's claims will be proven through evidence common to the entire Class. With respect to the Class's §10(b) and Rule 10b-5 claims, the Supreme Court has held that questions of whether a defendant knowingly and/or recklessly made public material misstatements and/or omissions (*i.e.*, the scienter, falsity, and materiality elements) and whether the revelation(s) of the alleged fraud proximately caused that company's stock price to decline (*i.e.*, loss causation) are all common questions. *Amgen*, 568 U.S. at 467-70, 474-76. Moreover, as described in the Cain Rpt., damages in this case are capable of being measured on a class-wide basis, consistent with Plaintiffs' theory of the case. Cain Rpt., ¶¶90-101.

These questions of Defendants' class-wide liability predominate over any individualized issues and are fundamental to all class members' claims.

### i. Plaintiffs are entitled to a presumption of reliance pursuant to basic

Predominance is established with respect to reliance as Plaintiffs are entitled to rely on the fraud-on-the-market presumption articulated by the Supreme Court in *Basic*, 485 U.S. at 241; *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 263-64, 268-69 (2014) ("Halliburton II"); and *Amgen*, 568 U.S. at 460-62. The fraud on-the-market theory "holds that

14

the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations" and that whenever an "investor buys or sells stock at the market price, his reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action." *Halliburton II*, 573 U.S. at 268 (quoting Basic, 485 U.S. at 246-47).

To invoke the fraud-on-the-market presumption, a plaintiff must demonstrate: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* "[W]ith the exception of materiality" – which is a question of fact reserved for the jury – the elements of publicity, market efficiency and market timing "must be satisfied before class certification." *Id.* at 276. Here, there is no dispute that the alleged misrepresentations in this case were publicly issued (see ¶¶227-319) or that Plaintiffs traded in Clover securities between the misrepresentations and the ultimate revelation of the truth (*see* ECF No. 41-3 (Jabri's Certification); *Tremblay Action*, ECF No. 1-3 (Tremblay's Certification)). As described in the Cain Rpt., Clover's securities traded in an efficient market. Cain Rpt., §§4-5.

Indeed, the market for Clover securities was open, active and efficient throughout the Class Period. *Id.* Courts in this Circuit and others rely principally on the five *Cammer* factors, described below, when assessing market efficiency. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); *see also Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990). Courts have also considered the *Krogman* factors, which look to: (1) the company's market capitalization; (2) the stock's bid-ask spread; and (3) the stock's float. *Krogman v. Sterritt*, 202 F.R.D. 467, 474, 478 (N.D. Tex. 2001); *see also Freeman*, 915 F.2d at 199. No

15

single factor is determinative, nor are the factors to be applied as a "checklist." *Burges*, 2017 WL 2772122, at *8 n.10; *In re Accredo Health, Inc. Sec. Litig.*, 2006 WL 1716910, at *10 (W.D. Tenn. Apr. 19, 2006). As set forth below, these factors establish that Clover's securities traded in an efficient market during the Class Period; thus, Plaintiff is entitled to rely on the fraud-on-the-market presumption.

### 1. The *Cammer* Factors

**Clover Securities Had a High Average Trading Volume**. An average weekly trading volume in excess of 2% is widely recognized as a sign of an efficient market.[6] On average during the Class Period, the average weekly trading volume of Clover's Class A Common Stock was approximately 49.9 million shares, or 47.69% of the shares outstanding (Cain Rpt. ¶¶28–29), and the average weekly trading volume of Clover's Warrants was 15.80% of warrants outstanding. (*id.* ¶80), which supports a strong presumption of an efficient market.

**A Substantial Number of Securities Analysts Followed Clover**. Analysts facilitate the flow and digestion of information in the market. *Id.* ¶30. Although research analysts typically begin to cover companies that become public via SPAC mergers, like Clover, after the closing of the merger, *e.g.*, the Business Combination (*id.* ¶31). Here, however, Clover hosted an "Analyst Day" on November 20, 2020, during which Defendants made multiple false and misleading statements that this Court has held were sufficiently alleged to be false and misleading and made with scienter. ¶¶272, 291, 293–95. The Analyst Day transcript indicates

---

[6] *See, e.g., Cammer*, 711 F. Supp. at 1286 ("Such interest . . . implies . . . investors are executing trades on the basis of newly available . . . information."); *Accredo*, 2006 WL 1716910, at *7 n.3 ("substantial presumption of an efficient market if the securities' average weekly trading volume is 1% or more of the total outstanding shares and an even greater presumption of market efficiency if the percentage is 2%"); *Plumbers & Pipefitters Nat'l Pension Fund v. Burns*, 967 F. Supp. 2d 1143, 1161 (N.D. Ohio 2013) (average weekly trading volume above 2% benchmark "warrant[s] a 'strong' presumption . . . [of] an efficient market").

that multiple analysts participated and questioned Defendants, including from Citigroup, Credit Suisse, Cowen, Oppenheimer, Canaccord Genuity, BofA Merrill Lynch, Piper Sandler, Cantor Fitzgerald, and KeyBanc. Cain Rpt. ¶32. In addition, analysts from JP Morgan and Citigroup initiated coverage of Clover at the beginning of February, 2021. This analyst coverage of Clover supports a finding of efficiency. *See id.* 33–34; *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 209-10 (E.D. Pa. 2008) (three analysts sufficient), aff'd, 639 F.3d 623 (3d Cir. 2011).

Moreover, over 101 media articles about Clover were published during the Class Period, enhancing the flow of publicly available information. Cain Rpt. ¶34. This media coverage of Clover further supports a finding of market efficiency. *See Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 92 (S.D.N.Y. 2015) (fact that "information concerning Barclays was widely disseminated throughout the Class Period through Bloomberg and other news services" supported a finding of market efficiency).[7]

**Clover Was Listed on the NASDAQ, and There Were Market Makers for Clover Securities**. Clover's listing on the NASDAQ throughout the Class Period provides further evidence that it traded in an efficient market. *Freeman*, 915 F.2d at 199 ("[S]ecurities traded in national secondary markets such as the New York Stock Exchange . . . are well suited for application of the fraud on the market theory."). SCH's stock and warrants listing on the NYSE and Clover's stock and warrants listing on the NASDAQ "ensures there are multiple market makers for each security" and indicate Clover had access to a highly developed network of market makers. Cain Rpt. ¶¶35-39, 81-82; *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 654

---

[7] . In addition, at least 84 major institutions owned Clover Class A Common Stock during the Class Period, further demonstrating the numerosity of the proposed Class. Cain Rpt. ¶¶65–66. Clover's considerable ownership by large institutions further supports a finding of market efficiency. *See In re Alstom SA Sec. Litig.*, 253 F.R.D. 266, 280 (S.D.N.Y. 2008).

(S.D. Ohio 2017) ("Transactions on the NYSE . . . go through a designated market maker . . . which has been found to satisfy this factor"). In addition, Clover had at least 68 market makers and brokers providing similar activity over the Class Period (Cain Rpt. ¶¶37-39) and there were at least 22 market makers and brokers for the Clover Warrants during the Class Period (Cain Rpt. ¶¶81-82). Therefore, the fact that Clover securities were listed on the NYSE and NASDAQ and had dozens of market makers and brokers executing investor orders, supports the conclusion that the Clover securities traded in an efficient market. *See* Cain Rpt. ¶¶37-39, 81-82; *Cammer*, 711 F.Supp. at 1283 n. 30 (finding this factor sufficient where stock at issue had eleven market makers); *Wilkof v. Caraco Pharm. Lab'ys, Ltd.*, 280 F.R.D. 332, 344 (E.D. Mich. 2012) (greater than 10 market makers supported a "substantial presumption" of efficient market).

**Clover Was Eligible to File Form S-3 Registration Statements**. Courts also consider eligibility to file a Form S-3 registration statement in assessing market efficiency. *Cammer*, 711 F. Supp. at 1284 (Form S-3 registration is "'predicated on the Commission's belief that the market operates efficiently for these companies'"). A company must meet certain float and other requirements to be eligible for Form S-3 registration. Cain Rpt., ¶¶40-42. Here, Clover was eligible for Form S-3 registration (*id.*, ¶42), supporting a finding that Clover stock traded in an efficient market.

**The Price of Clover's Securities Reacted to New, Company-Specific Information**. The fifth *Cammer* factor focuses on whether Clover securities responded to new, Company-specific information. *Cammer*, 711 F. Supp. at 1287. In cases where it is undisputed that a company's shares trade on an open and developed exchange like NYSE or NASDAQ, conducting an event study to prove that Clover securities responded to new, Company-specific

18

information is superfluous. *Cosby v. KPMG, LLP*, 2021 WL 1828114, at \*4 (E.D. Tenn. May 7, 2021) ("The weight of authority indicates that the fifth Cammer factor is not necessary"); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 384 (N.D. Ga. 2019) (noting that the First, Second, Third, Fourth, Fifth and Eleventh Circuits had found that "the fifth *Cammer* factor is not a prerequisite to a finding of market efficiency").

Regardless, Plaintiffs' expert has proved that Clover stock and warrants responded to new, Company-specific information by performing an event study analyzing Clover stock and warrant price movements. Cain Rpt. ¶¶34–57, 85-89. An event study is "'a generally accepted technique for measuring how a security's price reacts to new, unexpected information about the issuing company.'" Willis, 2017 WL 1074048, at \*4 n.4 (quoting *Burns*, 967 F. Supp. 2d at 1151); see also Halliburton II, 573 U.S. at 280 (event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events"). As explained in the Cain Rpt., the event study identified a cause-and-effect relationship between the release of new, Clover-specific information and the movement in Clover's stock price, providing further evidence of an efficient market. Cain ¶¶34–57, 85-89.

### 2. The *Krogman* Factors

**Clover Had an Extremely Large Market Capitalization**. Courts have considered a large market capitalization to be indicative of market efficiency on the premise that investors have a greater incentive to invest in more highly capitalized corporations. *Krogman*, 202 F.R.D. at 478; *Psychiatric Sols.*, 2012 WL 1071281, at \*32 (capitalization between $600 million and $1.2 billion favored a determination of market efficiency). Here, Clover's market capitalization during the Class Period average $1.2 billion, further indicating that it traded in an efficient market. Cain Rpt. ¶¶58-59.

**Clover Securities Had a Narrow Bid-Ask Spread**. A narrow bid-ask spread – i.e., a small difference between the prices at which investors are willing to buy and current stockholders are willing to sell shares – indicates a more efficient market. *See Krogman*, 202 F.R.D. at 478. The bid-ask spread for Clover stock and warrants was extremely narrow during the Class Period. Specifically, the spread for Clover stock was between 0.1% and 0.16% from October 2020 through February 2021 (Cain Rpt. ¶¶61–62), and the spread for Clover Warrants was only $0.04 (*i.e.*, four cents), or 0.36% (*id.* ¶83). *See Cosby v. KPMG, LLP*, 2020 WL 3548379, at *19 (E.D. Tenn. June 29, 2020), report and recommendation adopted, No. 3:16-CV-121-TAV-DCP, 2021 WL 1828114 (E.D. Tenn. May 7, 2021); (average bid-ask spread of 0.8115% supports finding of efficiency); *Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *4 (E.D. Mich. Nov. 19, 2020) (average spread of "between 0.22% and 0.29%" supports finding of efficiency).

**Clover Had a Large Public Float**. Courts also consider public float – i.e., the percentage of shares held by the public, rather than insiders and affiliated entities – in assessing market efficiency. *Krogman*, 202 F.R.D. at 478. Clover public float was considerable, approximately between 88% of all shares outstanding throughout the Class Period. Cain Rpt. ¶¶63-64. This large public float provides further evidence that Clover securities traded in an efficient market.

### ii. Plaintiffs are Entitled to a Presumption of Reliance Pursuant to *Affiliated Ute*

With respect to reliance, predominance is also met because Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute*, 406 U.S. 128 (1972). The *Affiliated Ute* presumption applies to claims "involving primarily a failure to disclose." 406 U.S. at 153; *see, e.g., Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008); *W.*

*Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 288-90 (D. Minn. 2018) (certifying class and holding that plaintiffs could invoke the *Affiliated Ute* presumption for their claims). In such circumstances, "positive proof of reliance is not a prerequisite to recovery." *Affiliated Ute*, 406 U.S. at 153-54; *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 717 (8th Cir. 1978) (acknowledging "reliance has little rational role in cases of nondisclosure, largely because of the difficulty of proving reliance on the negative"). Instead, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of [their] decision." *Affiliated Ute*, 406 U.S. at 153-54. Moreover, because materiality itself is a common question, Plaintiff need not prove materiality at the class certification stage. *Amgen*, 568 U.S. at 467 ("[B]ecause '[t]he question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor,' materiality can be proved through evidence common to the class."); *Halliburton II*, 573 U.S. at 281-83 (same).

This Court has already found that Plaintiffs have alleged actionable omissions. For example, with regard to the DOJ investigation into Clover, the Court concluded that Plaintiffs "have sufficiently pleaded facts establishing that, in light of the full context provided in the Amended Complaint, this DOJ investigation was one that should have been disclosed." *See Bond v. Clover Health Invs., Corp.*, 2022 WL 602432, at *21 (M.D. Tenn. Feb. 28, 2022). Similarly, this Court also found that Plaintiffs had alleged the existence of undisclosed "real, more troubling causes of [Clover's] growth—that is, the kickbacks and Bermudez's undisclosed role as an ostensibly independent broker of Part C plans in New Jersey—[that] were being concealed." *Id.* at *20. Finally, this Court further held that Plaintiffs had

21

sufficiently alleged that Defendants had failed to disclose "material factors that ma[de] an investment in [Clover] speculative or risky" in violation of Regulation S-K. *Id.* at \*22.

Accordingly, since this Court has held that Plaintiffs have alleged actionable omissions, they are also entitled to rely on the *Affiliated Ute* presumption to establish reliance and Rule 23(b)(3) is satisfied.

### 2. A Class Action Is Superior to Other Available Methods for the Fair and Efficient Adjudication of This Action

Courts have uniformly recognized that a class action is superior to other available methods for the fair and efficient resolution of securities class actions. Under Rule 23(b)(3), consideration of the following factors determines whether the "superiority" requirement is met: (1) the class members' interests in individually controlling the prosecution of separate actions; (2) the extent and nature of any litigation concerning the controversy already begun by or against class members; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the likely difficulties in managing a class action. Here, each factor weighs strongly in favor of class certification.

Most class members' interests in individually prosecuting separate actions is minimal as the trouble and expense of doing so would be prohibitive when weighed against the potential recoveries.

Additionally, the maintenance of a class action in this District ensures an efficient expenditure of resources and consistent rulings on the Class's claims. *See Psychiatric Sols.*, 2012 WL 1071281, at \*39 ("[C]ertification of this action as a class action is a vastly superior method of adjudication because the common issues will only have to be heard and decided once, thereby promoting judicial efficiency."). This District is a desirable forum for this class action: individual class members are most likely located in geographically dispersed areas, and

22

Clover is headquartered in this District. Plaintiffs do not foresee any management difficulties that preclude this action from proceeding as a class action. Consistent with the requirements of Rule 23(b)(3), certification of this action as a class action would not only be superior to other available methods but appears to be the sole method for fairly and efficiently litigating the class members' claims.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs' Motion for Class Certification should be granted.

Dated: July 1, 2022

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Brian Calandra*
Jeremy A. Lieberman
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
            bcalandra@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
Email: pdahlstrom@pomlaw.com

***Lead Counsel and Attorneys for Plaintiffs***

**BRAMLETT LAW OFFICES**
Paul Kent Bramlett TN #7387/MS #4291
Robert Preston Bramlett TN #25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
Telephone: (615) 248-2828

23

Facsimile: (866) 816-4116
Email: PKNASHLAW@aol.com
Robert@BramlettLawOffices.com

*Liaison Counsel*

**THE SCHALL LAW FIRM**

Brian Schall (pro hac vice)
Rina Restaino (pro hac vice)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (424) 303-1964
Facsimile: (877) 590-0482
brian@schallfirm.com
rina@schallfirm.com

*Additional Counsel for Plaintiff Firas Jabri*

**HOLZER & HOLZER, LLC**
Corey D. Holzer
Marshall P. Dees
1200 Ashwood Parkway
Suite 410
Atlanta, Georgia 30338
Telephone: (770) 392-0090
Facsimile: (770) 392-0029
Email: cholzer@holzerlaw.com
mdees@holzerlaw.com

*Additional Counsel for Named Plaintiff Jean-Nicolas Tremblay*

24

## CERTIFICATE OF SERVICE

This is to certify that I have filed the above and foregoing Plaintiffs' Motion for Class Certification on the Court's CM/ECF filing system, which will serve all counsel of record as follows:

Benjamin A. Gastel
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Fax: (615) 255-5419
Email: beng@bsjfirm.com

Jacob A. Walker
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: jake@blockleviton.com

James Gerard Stranch , IV
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Fax: (615) 255-5419
Email: gerards@bsjfirm.com

Jeffrey C. Block
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: jeff@blockleviton.com

Stephen J. Teti
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110

25

(617) 398-5600
Fax: (617) 507-6020
Email: steti@blockleviton.com

Larry Russell Belk , Jr.
Sutherland & Belk, PLC
2505 21st Avenue South
Suite 400
Nashville, TN 37212
(615) 846-6200
Fax: (615) 208-2255
Email: russell@sbinjurylaw.com

James A. Holifield , Jr.
Holifield Janich Rachal & Associates, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
(865) 566-0115
Fax: (865) 566-0119
Email: aholifield@holifieldlaw.com

Brian Peter Calandra
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(646) 581-9958
Email: bcalandra@pomlaw.com

Brian Schall
Schall Law Firm
2049 Century Park East
Suite 2460
Los Angeles, CA 90067
(310) 301-3335
Email: brian@schallfirm.com

Paul Kent Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116

26

Email: pknashlaw@aol.com

Laurence M. Rosen
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: lrosen@rosenlegal.com

Phillip Kim
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: pkim@rosenlegal.com

Robert P. Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: robert@bramlettlawoffices.com

Christopher M. Wood
Robbins Geller Rudman & Dowd LLP (Nashville Office)
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2203
Fax: (615) 252-3798
Email: cwood@rgrdlaw.com

Jerry E. Martin
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2202
Fax: (615) 252-3798
Email: jmartin@barrettjohnston.com

27

Mark S. Reich
Robbins Geller Rudman & Dowd LLP (New York Office)
58 S Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Fax: (631) 367-1173
Email: mreich@rgrdlaw.com

Mary K. Blasy
Robbins Geller Rudman & Dowd LLP (New York Office)
58 S Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Fax: (631) 367-1173
Email: mblasy@rgrdlaw.com

Samuel H. Rudman
Robbins Geller Rudman & Dowd LLP (New York Office)
58 S Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Fax: (631) 367-1173
Email: srudman@rgrdlaw.com

Corey D. Holzer
Holzer & Holzer, LLC
1200 Ashwood Parkway
Suite 410
Atlanta, GA 30338
(770) 392-0090
Fax: (770) 392-0029
Email: cholzer@holzerlaw.com

J. Alexander Hood , II
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Fax: (212) 661-8665
Email: ahood@pomlaw.com

Jeremy A. Lieberman
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com

Patrick V. Dahlstrom
Pomerantz LLP (Chicago Office)
10 S LaSalle Street
Suite 3505
Chicago, IL 60603
(312) 377-1181
Fax: (312) 377-1184
Email: pdahlstrom@pomlaw.com

Britt K. Latham
Bass, Berry & Sims (Nashville Office)
150 Third Avenue South
Suite 2800
Nashville, TN 37201
(615) 742-6200
Email: blatham@bassberry.com

Jed M. Schwartz
Milbank LLP
53 Hudson Yards
New York, NY 10001
(212) 530-5000
Email: jschwartz@milbank.com

Scott A. Edelman
Milbank LLP
53 Hudson Yards
New York, NY 10001
(212) 530-5000
Email: sedelman@milbank.com

John Tate Spragens
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
(615) 983-8900
Fax: (615) 682-8533

Email: john@spragenslaw.com

Saul C. Belz
Glankler Brown, PLLC
6000 Poplar Avenue
Suite 400
Memphis, TN 38119
(901) 576-1741
Fax: (901) 576-2389
Email: sbelz@glankler.com

Tara L. Swafford
The Swafford Law Firm, PLLC
207 Third Avenue North
Franklin, TN 37064
(615) 599-8406
Fax: (615) 807-2355
Email: tara@swaffordlawfirm.com

Charles F. Barrett
Neal & Harwell, PLC
1201 Demonbreun Street
Suite 1000
Nashville, TN 37203
(615) 244-1713
Fax: (615) 726-0573
Email: cbarrett@nealharwell.com

SO CERTIFIED this 1st day of July 2022

/s/ ***Brian Calandra***
Brian Calandra