# EXHIBIT B

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**

| | |
|---|---|
| TIMOTHY BOND,<br><br>                         Lead Plaintiff<br><br>And<br><br>JEAN-NICOLAS TREMBLAY<br><br>                        Named Plaintiff<br><br>individually and on behalf of all others similarly situated,<br><br>               v.<br><br>CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, VIVEK GARIPALLI, ANDREW TOY, JOE WAGNER and CHAMATH PALIHAPITIYA,<br><br>                        Defendants. | **Case No. 3:21-cv-00096**<br><br><br>**<u>CLASS ACTION</u>** |

<br><br>

**EXPERT REPORT OF MATTHEW D. CAIN, PH.D.**

<br>

**July 1, 2022**

Table of Contents

1   Introduction ........................................................................................................ 4
   1.1   Qualifications and Compensation ................................................................ 4
2   Introduction and Summary of Opinions ........................................................... 5
3   Case Background ............................................................................................... 6
   3.1   Overview of the Company and Allegations ................................................. 6
   3.2   Bases for Opinions on Market Efficiency ................................................... 8
4   Evaluation of market efficiency factors for Clover common stock ................ 12
   4.1   *Cammer* Factor 1: Average Weekly Trading Volume ............................. 12
   4.2   *Cammer* Factor 2: Analyst Coverage ..................................................... 13
   4.3   *Cammer* Factor 3: Market Makers .......................................................... 16
   4.4   *Cammer* Factor 4: SEC Form S-3 Filing Eligibility ............................. 18
   4.5   *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices ........................................................................................................ 19
   4.6   Additional Factor 1: Market Capitalization ............................................. 25
   4.7   Additional Factor 2: Bid-Ask Spread ...................................................... 26
   4.8   Additional Factor 3: Public Float ............................................................ 27
   4.9   Additional Factor 4: Institutional Ownership .......................................... 28
   4.10   Additional Factor 5: Autocorrelation ..................................................... 29
   4.11   Additional Factor 6: Options Trading .................................................... 30
5   The Relevant Factors Used To Evaluate The Market Efficiency Of Clover Common Stock Applies To The Examination Of Whether Clover Warrants Traded In An Efficient Market ........ 31
   5.1   Overview of Warrants ............................................................................... 31
   5.2   Efficiency of the Market for Clover Warrants .......................................... 33
     5.2.1   Average Weekly Trading Volume ...................................................... 33
     5.2.2   Market Makers .................................................................................... 34
     5.2.3   Bid-Ask Spread .................................................................................. 34
     5.2.4   Cause and Effect Analysis ................................................................. 35
     Table 1: Stock and Warrant Prices for Large Stock Price Movements ................ 36
     Table 2: Stock and Warrant Prices on Key Announcement Dates .................... 36
6   Ability to Calculate Damages on a Class-Wide Basis ...................................... 37
   6.1   Clover Class A Common Stock ............................................................... 37
   6.2   Clover Warrant .......................................................................................... 39
7   Conclusion ........................................................................................................ 40
Appendix A ............................................................................................................. 42
Appendix B ............................................................................................................. 48
Exhibit 1 ................................................................................................................. 51
Exhibit 2 ................................................................................................................. 52
Exhibit 3 ................................................................................................................. 53
Exhibit 4 ................................................................................................................. 54
Exhibit 5 ................................................................................................................. 55
Exhibit 6 ................................................................................................................. 56
Exhibit 7 ................................................................................................................. 59

Exhibit 8........................................................................................................................ 60
Exhibit 9........................................................................................................................ 61
Exhibit 10...................................................................................................................... 62
Exhibit 10B ................................................................................................................... 63
Exhibit 11 ...................................................................................................................... 67
Exhibit 12...................................................................................................................... 68
Exhibit 13...................................................................................................................... 69

Case 3:21-cv-00096    Document 103-2    Filed 07/01/22    Page 4 of 70 PageID #: 2238

# 1 INTRODUCTION

## 1.1 Qualifications and Compensation

1.  I am a Ph.D. in Finance and a Senior Fellow at the Berkeley Center for Law and Business at the University of California, Berkeley. I teach courses, deliver guest lectures, participate in academic seminars, and conduct research in various topic areas related to finance, economics, accounting, law, and business. My research focuses on a variety of topics, including empirical corporate finance, corporate governance, board independence, mergers and acquisitions, hostile takeovers, shareholder lawsuits, negotiations, financial contracting, disclosures of financial information, and shareholder activism. I previously held a fellowship with the Harvard Law School Program on Corporate Governance, where I participated in research seminars and related activities.

2.  I worked at the U.S. Securities and Exchange Commission ("SEC") between 2014 and 2018 as a Financial Economist. During that time, I provided economic analysis and expert witness testimony on behalf of the SEC in a wide variety of enforcement investigations, settlement negotiations and litigation, including cases alleging accounting fraud, revenue recognition practices, and disclosure violations. I also served as an advisor to SEC Commissioner Robert J. Jackson, Jr., during which time I assisted with enforcement oversight and policymaking decisions, research, and speechwriting on a wide range of topics, including securities violations, revenue recognition practices, and corporate governance issues. Additionally, while employed at the SEC as a Financial Economist, I continued to work on and publish academic research, for which I was awarded the Chairman's Award for Economic Research.

3.  Prior to working at the SEC, I was an Assistant Professor of Finance at the University of Notre Dame. I taught courses in Mergers and Acquisitions to both undergraduate and graduate students, and I also conducted empirical research on various finance, legal, accounting, and economic topics. I have been engaged in academic research for over a decade and continue to publish in law reviews and peer-reviewed academic journals across these disciplines.

4.  Prior to working at Notre Dame, I received a Ph.D. in Finance from Purdue University in 2007. Prior to those studies, I worked as an analyst in Debt Capital Markets at National City Bank,

where I assisted companies in raising syndicated loans and private placements of debt and equity for use in funding mergers, acquisitions, and other general corporate purposes. I received a B.S. in Finance from Grove City College in 2001.

5.     In addition to teaching at UC Berkeley, Notre Dame and Purdue, I have delivered guest lectures to undergraduate and graduate students at Vanderbilt University, Arizona State University, Cornell University, and UC Berkeley School of Law. I have also presented my academic research at numerous academic, governmental, and professional institutions, as listed in my curriculum vitae, which is attached as **Appendix A**.

6.     I have published research in leading peer-reviewed finance, accounting, law, and economics journals, including the Journal of Financial Economics, Journal of Law and Economics, Journal of Accounting and Economics, Journal of Empirical Legal Studies, and Journal of Financial and Quantitative Analysis. My curriculum vitae, attached as **Appendix A**, further details my publications and previous testimony.

## 2    INTRODUCTION AND SUMMARY OF OPINIONS

7.     I have been asked by the Court-appointed Lead Plaintiff in this matter to determine whether the markets for Clover Health Investments, Corp. f/k/a Social Capital Hedosophia Holdings Corp. III (collectively, "SCH", "Clover" or the "Company") Class A common stock ("Common Stock") and Warrants were efficient during the period October 6, 2020 – February 3, 2021, inclusive (the "Class Period").[1]  In addition, I have been asked to opine on whether the calculation of damages on a class-wide basis in this matter is subject to a common methodology.

8.     The materials I have considered in forming my opinions are summarized in **Appendix B**. My time is billed at a rate of $850 per hour for my work on this matter. I am being assisted by staff at Fideres Partners LLP, who performed work under my direction. My compensation is in no way

---

[1] I understand the Lead Plaintiff to be Firas Jabri and the Named Plaintiff to be Jean-Nicolas Tremblay, and Defendants to comprise Clover Health Investments, Corp. f/k/a Social Capital Hedosophia Holdings Corp. III, Vivek Garipalli, Andrew Toy, Joe Wagner and Chamath Palihapitiya., collectively the "Defendants". Source: First Amended Complaint For Violation Of The Federal Securities Laws, Bond v. Clover Health Investments, Corp., et al., No. 3:21-cv-00096 (M.D. Tenn.), ECF No. 70 (the "Complaint").

contingent on the outcome of this case. My work is ongoing, and I reserve the right to update my analyses and opinions based upon new information, discovery, expert reports, or other information that comes to my attention. I have no financial or other interest in Fideres Partners' billings in this matter.

9. Based on my analysis to date and the evaluation of the factors described throughout this report, I have formed the opinion that the market for shares of Clover's Class A Common Stock and Warrants was efficient during the Class Period.

10. I have also formed the opinion that damages in this matter can be calculated on a class-wide basis subject to a common methodology.

11. The remainder of my report is organized as follows: **Section 3** describes the case background and the bases for the reliance requirement and the "fraud on the market" theory relating to market efficiency. **Section 4** presents my analyses of the market efficiency factors during the Class Period. **Section 5** examines how the market efficiency factors related to Clover's Class A Common Stock price applies to the Warrants, examines certain operational factors for the Warrants as well as examines the relationship between the prices of Clover Class A Common Stock and its Warrants, to demonstrate that the Warrants also traded in an efficient market. **Section 6** addresses how damages can be calculated on a class-wide basis subject to a common methodology. **Section 7** contains my conclusions.

## 3  CASE BACKGROUND

### 3.1  Overview of the Company and Allegations

12. SCH was a publicly traded blank check company, also known as a special purpose acquisition company ("SPAC"), formed for the purpose of effecting a merger, share exchange, asset acquisition, share purchase, reorganization, or similar business combination with one or more businesses. On October 6, 2020, SCH and a private health insurance company, Clover Health Investments, Corp. ("Legacy Clover"), issued a press release (the "Announcement Release") announcing their plan to bring Legacy Clover public via a merger between SCH and Legacy Clover

(the "Business Combination", which closed January 7, 2021). That press release described Clover[2] as "a next-generation Medicare Advantage insurance company offering best-in-class plans that combine wide access to healthcare and rich supplemental benefits with low out-of-pocket expenses[.]" It further stated that "Clover partners with primary care physicians using its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care." The Announcement Release continued, "Technology is at the core of Clover's business."[3]

13. Plaintiffs allege claims under the Exchange Act for fraud against Clover, certain of Clover's officers, and Chamath Palihapitiya, the "King of SPACS," who was the Company's CEO and Chairman at all relevant times prior to the Business Combination. Specifically, the Defendants allegedly made false and/or misleading statements and/or failed to disclose that (i) the Company had committed multiple legal and regulatory violations since January 1, 2018 and was under investigation by the DOJ for violations of the False Claims Act; (ii) the Company's growth and positive performance stemmed from illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the False Claims Act ("FCA"), and the Medicare Communications and Marketing Guidelines ("MCM Guidelines"), and unreported related party transactions; (iii) only a small fraction of the healthcare providers who had contracted with the Company were actually using the Company's Clover Assistant software platform; (iv) Clover's financial statements did not comply with GAAP because they failed to disclose material agreements and transactions with related parties; and (v) the Company's SEC filings failed to comply with Items 303 and 503 of Regulation S-K.[4]

14. The Complaint alleges that the relevant truth was revealed on February 4, 2021, when the truth about Defendants' false and misleading statements emerged through a report issued by the research firm Hindenburg Research ("Hindenburg") after the Business Combination had closed.[5] As a result of Clover's alleged wrongful acts and omissions, investors allegedly purchased Clover

---

[2] Unless otherwise indicated, all references to Clover are to Clover and Legacy Clover, the latter of which merged into SCH and became Clover when the Business Combination was completed.

[3] Complaint ¶2

[4] Complaint ¶3

[5] Complaint ¶3

Common Stock at artificially inflated prices during the Class Period.[6]

15.   **Exhibit 1** graphs the closing stock price and trading volume for Clover's Class A Common Stock shares throughout the Class Period.

## 3.2   Bases for Opinions on Market Efficiency

16.   I understand that Plaintiff asserts the "fraud-on-the-market" theory, which posits that shareholders rely on the alleged misrepresentations or omissions made by defendants through their effect on stock prices in an open and well-developed market. If a market is efficient, meaning that widely available public information is quickly incorporated into stock prices, then all purchasers of the stock are induced into reliance on any misrepresentations or omissions because those statements or omissions have distorted the value of each class member's purchase price. The fraud-on-the-market theory of reliance has been addressed by numerous courts over the years in relation to Section 10(b) claims, and was adopted by the U.S. Supreme Court in its Basic decision:

> [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[7]

17.   This theory was also reaffirmed by the Supreme Court in Halliburton II:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the

---

[6] Complaint ¶43

[7] Basic Inc. v. Levinson, 485 U.S. 224, 241-42 (1988).

prerequisites for invoking the presumption of reliance.[8]

18. As these cases indicate, stock prices quickly incorporate the valuation effects of public statements in an open, developed, and efficient market. In finance, "semi-strong-form" market efficiency refers to a market in which publicly available information is quickly reflected in a security's market price. Thus, if a company omits important information or provides misleading information to shareholders, the stock price will become distorted and either inflated or deflated relative to the price at which the stock would trade but-for the misleading or omitted information. Thus, in an efficient market, purchasers implicitly rely on a company's misrepresentations or omissions because they are impounded into the stock price at which trades are made.

19. Courts and practitioners have argued that markets with continuous public reporting of stock prices and trading volume, such as the New York Stock Exchange ("NYSE") and the Nasdaq Stock Market ("NASDAQ"), should be granted a presumption of efficiency for virtually all securities traded on them.[9] The continuous reporting of trading statistics, significant trading volumes, rapid information dissemination, and other exchange rules practically guarantee a liquid market for securities traded on these exchanges. The fact that Clover's Class A Common Stock and Warrants and, prior to the Business Combination, SCH's securities traded in such a well-developed market (under the trading symbols "CLOV" and "CLOVW" for Clover on the NASDAQ, and previously under the trading symbols "IPOC.U", "IPOC", and "IPOC WS" for SCH on the NYSE) leads to a strong presumption of market efficiency.[10]

20. Numerous academics have studied the pricing behavior of stock markets, and some have purported to identify anomalies that call into question the efficiency of markets. However, academics have generally concluded that these anomalies represent random patterns in the data, are often not scientifically reproducible or robust to different statistical modeling choices, and/or

---

[8] Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 283-84 (2014).

[9] See Cammer v. Bloom, 711 F. Supp. 1264, 1292 (D.N.J. 1989) ("Cammer"), citing Bromberg & Lowenfels: "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

[10] Complaint ¶31

are not persistent and have been quickly eliminated by arbitrage trading. For example, Nobel prize winner Eugene Fama summarizes market efficiency as follows:

> The recent finance literature seems to produce many long-term return anomalies. Subjected to scrutiny, however, the evidence does not suggest that market efficiency should be abandoned. Consistent with the market efficiency hypothesis that the anomalies are chance results, apparent overreaction of stock prices to information is about as common as underreaction. And post-event continuation of pre-event abnormal returns is about as frequent as post-event reversal. Most important, the long-term return anomalies are fragile. They tend to disappear with reasonable changes in the way they are measured.[11]

Similarly, Kewei Hou, Chen Xue, and Lu Zhang concluded that "[m]ost anomalies fail to replicate, falling short of the currently acceptable standards for empirical finance…In all, capital markets are more efficient than previously recognized."[12] Moreover, the existence of anomalies does not directly undermine the premise of market efficiency, as the key question at issue under the fraud-on-the-market theory of reliance pertains to whether alleged misstatements or omissions would be reflected in stock prices throughout a given class period.

21. Academic research thus provides a strong presumption for market efficiency. I understand that courts have also developed various tests that attempt to weigh in favor of or against the presumption of market efficiency. None of these tests are individually determinative of market efficiency, but when viewed as a whole they can be informative in supporting or rebutting a presumption of market efficiency in relation to the reliance element of the fraud-on-the-market theory. These factors include what courts have referred to as the Cammer and Krogman[13] factors, as well as other additional metrics.

22. In the following section, I discuss these factors and evaluate them in relation to Clover

---

[11] Eugene F. Fama, 1998, Market Efficiency, Long-Term Returns, and Behavioral Finance, Journal of Financial Economics 49, at 304.

[12] Kewei Hou, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, Review of Financial Studies 33, at 2071.

[13] Krogman v. Sterritt, 202 F.R.D. 467 (N.D. Tex. 2001). ("Krogman").

Class A Common Stock. In doing so, I compare the various factors for Clover's Class A Common Stock: (1) benchmarks established by courts; (2) scientific tests of statistical significance; and/or (3) findings from peer-reviewed published academic research.

23. One academic study that I use for comparison purposes was published by Simona Mola, P. Raghavendra Rau, and Ajay Khorana, which I refer to as the "MRK Study."[14] In this study, these authors examined two samples of firms. One sample included companies that lost all analyst coverage (the "MRK Sample" firms); these firms had smaller market capitalizations, less trading volume, larger bid-ask spreads, and lower institutional ownership relative to analyst-covered firms, both before and after losing analyst coverage. The second sample included the analyst-covered firms (the "MRK Covered" firms), and the differences between the two samples in average and median market capitalization, trading volume, bid-ask spread, and institutional ownership were all statistically significant at the 99% level.[15] The authors of the MRK Study summarize their findings as follows:

> This paper examines the value of sell-side analysts to covered firms by documenting the effects on firm performance and investor interest after a complete loss of analyst coverage for periods of at least one year. We find that analyst coverage adds value to a firm both because it reduces information asymmetries about the firm's future performance and because it maintains investor recognition for that firm's stock...Firms that lose all analyst coverage continue to suffer a significant deterioration in bid-ask spreads, trading volumes, and institutional presence but do not show a significant difference in subsequent performance relative to covered peers.[16]

24. The authors describe these variables as reflective of investor interest: after losing analyst coverage, "investor interest characteristics, such as market capitalization, trading volume, bid-ask spread, institutional holdings, and number of institutions, significantly worsen relative to

---

[14] Simona Mola, P. Raghavendra Rau, and Ajay Khorana, 2013, Is There Life After the Complete Loss of Analyst Coverage?, Accounting Review 88, at 667-705. ("MRK Study").

[15] MRK Study at 678, 681-682.

[16] MRK Study at 667.

[analyst-]covered peers."[17] Therefore, I interpret the sample of MRK Covered firms as those eliciting high investor interest and reflecting the common indicia of firms operating in efficient markets. I then compare several of Clover's market efficiency factors to the samples of firms in the MRK Study to assess whether Clover's characteristics are consistent with firms operating in efficient markets.

25. The following section presents my analyses and findings from the evaluation of various market efficiency factors for Clover Class A Common Stock during the Class Period.

## 4 EVALUATION OF MARKET EFFICIENCY FACTORS FOR CLOVER COMMON STOCK

### 4.1 *Cammer* Factor 1: Average Weekly Trading Volume

26. Trading volume refers to the number of shares of a security transacted between market participants. The greater the amount of buying and selling activity of a security, the more likely it is that new information will be quickly incorporated into the price of that security. Thus, trading volume is an indicator of how developed, liquid, and efficient the market is for a given stock. Thomas and Cotter have stated that "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[18]

27. Stock trading volume refers to the extent to which a firm's equity is traded among investors during a given time period. The first Cammer factor for stock trading volume has been defined by the Cammer court using average weekly trading volume relative to shares outstanding. In setting a threshold of trading volume for the presumption of market efficiency, the court stated:

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1%

---

[17] MRK Study at 681 (footnotes omitted).

[18] Randall S. Thomas and James F. Cotter, 2000, Measuring Securities Market Efficiency in the Regulatory Setting, Law and Contemporary Problems 63, at 108.

would justify a substantial presumption.[19]

28.  **Exhibit 2** graphs Clover's Class A Common Stock weekly trading volume as a fraction of shares outstanding throughout the Class Period.[20] The average weekly trading volume was 42.09% of Clover's common shares outstanding over the Class Period. This level of trading volume significantly exceeds both the 1% and 2% thresholds established by the Cammer court. As a result, Clover's level of stock trading volume throughout the Class Period supports the conclusion that Clover's Class A Common Stock traded in an efficient market throughout the Class Period.

29.  I also note that the average weekly trading volume of Clover's Class A Common Stock over the Class Period was 41.8 million shares. According to the authors in the MRK Study, the median weekly trading volume for the MRK Sample firms was 0.034 million shares while the median for the MRK Covered firms was 0.215 million shares weekly.[21] Clover's average weekly trading volume of 41.8 million shares during the Class Period significantly exceeds that of both the median MRK Sample firms and the MRK Covered firms. This further supports the conclusion that Clover's Class A Common Stock traded in an efficient market throughout the Class Period.

### 4.2  *Cammer* Factor 2: Analyst Coverage

30.  An analyst is someone, usually working for a financial institution such as a brokerage, bank, or investment bank, who studies financial information and trends for a specific company or an industry. Analysts typically participate in company conference calls, analyst-oriented meetings and presentations, and general industry conferences, publish reports in which they may assess recent company business developments, review historical financial performance and provide forecasts of future operating performance, or make investment recommendations, such as whether investors should buy, sell, or hold the company's stock. The content of analyst reports includes information that the analyst believes is important for investors. Analyst coverage can be indicative

---

[19] Cammer, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[20] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week.

[21] MRK Study at 678 (Table 3). The median annual trading volume for MRK sample firms was 1.75 million shares. 1.75 million divided by 52 weeks is approximately 0.034 million shares. The median annual trading volume for MRK covered firms was 11.19 million shares. 11.19 million divided by 52 weeks is approximately 0.215 million shares.

of market efficiency since research analysts ensure that new important company-specific information is disseminated to investors and thus impounded into stock prices quickly and efficiently. The Cammer court similarly stated:

> [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[22]

31. Coverage of a company's stock by research analysts is also reflected by analyst participation in company conference calls, company-hosted "analyst day" conferences and presentations, and general industry conferences. In my professional experience regarding SPACs, research analysts typically begin to provide investment recommendations and in-depth research reports following the closing of a business combination with a target company. However, analyst coverage often manifests prior to these formal recommendations via analysts' participation in the aforementioned calls and conferences.

32. In **Exhibit 3,** I report the analyst coverage of Clover over the Class Period.[23] Clover and SCH hosted an investor conference call on the first day of the Class Period, October 6, 2020, and participated in a fireside chat with Wolfe Research on November 19, 2020. Clover hosted an analyst day on November 20, 2020 and the transcript reflects participation and questioning by analysts from large and influential investment banking entities such as Citigroup, Credit Suisse, Cowen, Oppenheimer, Canaccord Genuity, BofA Merrill Lynch, Piper Sandler, Cantor Fitzgerald, and KeyBanc. The Company also participated in the globally-renowned JP Morgan Healthcare Conference on January 12, 2021. Analysts from JP Morgan and Citigroup initiated coverage of Clover at the beginning of February, 2021.[24] The analyst coverage of Clover by large and

---

[22] Cammer, 711 F. Supp. at 1286.

[23] I obtained analyst reports covering Clover from Investext and Factiva. These statistics represent a lower bound of the analyst coverage of Clover because many analyst reports are provided directly to investors but are not captured by third-party data vendors such as Investext.

[24] Additional analysts initiated coverage of Clover after the Class Period, including Credit Suisse, which initiated coverage with a 'Neutral' rating on March 9, 2021.

influential investment banks and professional research analysts served to disseminate important new publicly-available information to investors, including company news, financial performance, forecasts, and analyst commentary and recommendations during the Class Period.

33.  This degree of analyst coverage compares favorably to that documented by academic research. For example, the MRK Study noted that 19% of U.S. firms covered by I/B/E/S received no analyst coverage in a given year.[25] Charles M.C. Lee and Eric So documented that on average, firms were covered by between 0.765 and 7.614 analysts when ranking firms into deciles by the total number of analyst forecasts issued.[26] Clover's analyst coverage is consistent with the MRK Covered firms which elicited high investor interest. The analyst coverage of Clover during the Class Period supports the conclusion that Clover's Class A Common Stock traded in an efficient market throughout the Class Period.

34.  In addition to the analyst coverage documented above, investors could access information about Clover from a variety of other sources.[27] For example, I conducted a search of press and news articles about Clover using Factiva, a well-known provider of access to business news across a comprehensive set of publications. Factiva coverage includes Dow Jones Newswires, PR Newswires, The Wall Street Journal, Reuters, MarketWatch, Investor's Business Daily, and numerous other outlets. This search produced over 101 articles throughout the Class Period.[28] Moreover, Clover produced numerous filings containing Company information which were immediately disseminated to the public through the SEC's online database, EDGAR, during the Class Period. Individual and institutional investors thus had access to publicly available information about Clover from a variety of sources during the Class Period. As a result, the analyst coverage, number of analyst research reports produced, and substantial public dissemination of

---

[25] MRK Study at 668.

[26] Charles M.C. Lee and Eric C. So, 2017, Uncovering Expected Returns: Information in Analyst Coverage Proxies, Journal of Financial Economics 124, at 336 (see Table 1, Panel B – "COV").

[27] Investors can also receive information from online research forums, such as SeekingAlpha, which offers both free and subscription-based research reports. For example, there were three reports published during the Class Period on SeekingAlpha.

[28] The articles were identified through a Factiva search including Clover's company tag over all available sources.

news, SEC filings, and information about Clover supports the conclusion that Clover Common Stock traded in a well-developed and informationally efficient market during the Class Period.

### 4.3    *Cammer* Factor 3: Market Makers

35.   The third Cammer factor relates to securities trading outside of major exchanges, in over-the-counter markets without continuous reporting of trading volume. This factor examines market makers, which are firms that facilitate buying and selling – order flow – in a company's stock during trading hours.[29] Market makers can facilitate market efficiency in an over-the-counter market because they are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[30]

36.   In evaluating market efficiency by looking at market makers, the Cammer court held:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[31]

37.   The court thus stated that market makers can be an important indicator of market efficiency for stock trading in an over-the-counter market without continuous trading volume reporting. Clover had at least 68 market makers and brokers providing similar activity over the Class Period.[32] In addition, Clover's Class A Common Stock traded on the NASDAQ throughout the Class Period.

---

[29] A 'market maker' is a firm that stands ready to buy or sell a stock at publicly quoted prices." See https://www.investor.gov/introduction-investing/investing-basics/glossary/market-makers.

[30] Brad M. Barber, Paul A. Griffin, and Baruch Lev, 1994, The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, Journal of Corporate Law 19, at 291.

[31] Cammer, 711 F. Supp. at 1293.

[32] Bloomberg "RANK" function.

This type of large, national exchange reports volume, prices, bid-ask spreads, and other trading details which ensure that it remains well-developed, liquid, and efficient. The Cammer court thus stated:

> We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.[33]

38. I understand that courts view large, established stock exchanges with market makers (such as the NYSE and NASDAQ[34]) as being informationally efficient.[35] Moreover, I understand that courts view institutional investors as potentially providing similar benefits to market makers by

---

[33] Cammer, 711 F. Supp. at 1292.

[34] The NYSE Market Model, NYSE, available at: https://www.nyse.com/market-model: "The cornerstone of the NYSE market model is the Designated Market Maker (DMM). DMMs have obligations to maintain fair and orderly markets for their assigned securities. They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability. This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions. A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery." See also: http://www.nasdaqtrader.com/trader.aspx?id=marketmakerprocess: "NASDAQ is a unique market organization that provides a competitive trading environment and efficient, low-cost execution of orders. There are multiple market participants, including market makers, order-entry firms and electronic communications networks (ECNs) that utilize NASDAQ's trading services. Definition of a Market Maker: A market maker is a NASDAQ member firm that buys and sells securities at prices it displays in NASDAQ for its own account (principal trades) and for customer accounts (agency trades)."

[35] See, *e.g.,* Vinh Nguyen v. Radient Pharms. Corp., 287 F.R.D. 563, 572-73 (C.D. Ca. 2012) ("One defendant in Cammer contended that only stocks trading on the New York or American stock exchanges should be eligible for the presumption of reliance provided by the theory of fraud on the market. In rejecting that broad distinction, the court noted that 'the inquiry in an individual case remains the development of the market for that stock, and not the location where the stock trades.' But the trading location is still important, in one key sense: In an over the counter market, the number of market makers may be a particularly important measure of market efficiency…By contrast, Radient traded on the NYSE Amex during the Class Period which, as Plaintiffs' expert notes, means that it was assigned what that market now calls a Designated Market Maker" (citations omitted). See also Hayes v. MagnaChip Semiconductor Corp., Case No. 14-cv-01160-JST (N.D. Ca. 2016), at 6: "The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency."

supplying trading liquidity and informationally-efficient and informed trading.[36] Academic research has similarly found that institutional investors can facilitate trading liquidity. As I discuss further in **Section 4.9** below, Clover's Class A Common Stock was widely held by institutional investors by the end of the Class Period (see **Exhibit 10B**).[37]

39.  In sum, Clover easily satisfies the intent of this Cammer factor by virtue of the Class A Common Stock's highly liquid and well-developed trading venues, the presence of market makers, and the widespread holdings by sophisticated institutional investors, further supporting the efficiency of the market for Clover Class A Common Stock during the Class Period.

### 4.4   *Cammer* Factor 4: SEC Form S-3 Filing Eligibility

40.  The fourth Cammer factor cited by the court is SEC Form S-3 filing eligibility:

> [I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[38]

41.  Form S-3 filing eligibility allows companies to file a shortened form with the SEC in order to raise capital, by providing references to previous SEC filings as opposed to repeating a large quantity of information. This eligibility includes the following requirements: the registrant has a

---

[36] See, *e.g.,* In re Countrywide Financial Corp. Sec. Litig., 273 F.R.D. 586, 614 (C.D. Ca. 2009) ("Similarly, the presence of large institutional investors may be similar to the presence of market-makers and arbitrageurs: large investors, with more money at stake, may be more likely to inform themselves well before trading.") (citations omitted); In re HealthSouth Corp. Sec. Litig., 257 F.R.D. 260, 281 (N.D. Ala. 2009) ("[T]he majority of HealthSouth's shares were owned by large sophisticated institutions. These facts further demonstrate that HealthSouth's stock traded in an efficient market.")

[37] Clover Class A Common Stock was held by at least 163 institutional investors at some point during the Class Period (see **Exhibit 10** and **Exhibit 10B**). Institutional ownership fluctuated on a quarterly basis throughout the Class Period, from a minimum of 12.07% of shares outstanding on December 31, 2020, to a maximum of 41.28% of shares outstanding on February 3, 2021 according to data from S&P Capital IQ and Clover's SEC Filings. These figures represent a lower-bound estimate of institutional holdings as some institutions may not be reflected in S&P Capital IQ's coverage.

[38] Cammer, 711 F. Supp. at 1287.

class of securities subject to the Securities Exchange Act of 1934 ("Exchange Act"), the registrant has filed all necessary filings with the SEC in a timely manner for the past 12 months, the registrant has not failed to pay any dividend or sinking fund installment on preferred stock or defaulted on any material debts or leases, the registrant has a public float of $75 million.[39],[40] The logic and intuition behind this factor as discussed by the Cammer court is that a company which makes timely financial filings with regulators implies that investors have ready and ample access to publicly available information about the issuer.

42. Clover's public float far exceeded the required $75 million threshold during the Class Period ($836.9 million average during the Class Period). In addition, even though Clover was not a publicly traded firm subject to SEC filing requirements for 12 months prior to the start of the Class Period, to the best of my knowledge SCH and Clover made all required filings with the SEC in a timely manner during the Class Period. Moreover, Clover filed an S-3 after the end of the Class Period,[41] following the Company's earlier S-1 filings.[42] Thus, Clover satisfied the intention of this *Cammer* Factor during the Class Period. As a result, this factor supports the efficiency of the market for Clover Class A Common Stock during the Class Period.

### 4.5 *Cammer* Factor 5: Cause and Effect Relationship Between Company Information and Stock Prices

43. The fifth Cammer factor relates to whether a company's stock prices quickly respond to and incorporate new value-relevant information.

> The Cammer court held: … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between

---

[39] https://www.sec.gov/files/forms-3.pdf.

[40] SEC 1379, "Form S-3, Registration Statement under the Securities Act of 1933, General Instructions".

[41] Clover Health Investments, Corp, May 9, 2022, available at: https://www.sec.gov/Archives/edgar/data/0001801170/000162828022013357/0001628280-22-013357-index.htm (last visited Jun. 1, 2022).

[42] *See, e.g.*: Clover Health Investments, Corp., Jan. 13, 2021, available at: https://www.sec.gov/Archives/edgar/data/0001801170/000119312521007853/0001193125-21-007853-index.htm (last visited Jun. 1, 2022).

company disclosures and resulting movements in stock price.[43]

Subsequent courts have agreed that this factor represents a significant indication of market efficiency.[44] Nonetheless, courts have dispensed with the fifth *Cammer* factor when other factors support a finding of market efficiency.[45] Thus, failure to demonstrate *Cammer* Factor 5 alone is therefore not dispositive of market efficiency.

44. To assess the extent of a "cause and effect relationship between company disclosures and resulting movements in stock price," I analyzed key dates pertaining to communications made by SCH and/or Clover on the identification and status of the Business Combination. After completion of the Business Combination, I also considered an analysis of Clover's earnings announcements. These announcements represent a potential opportunity for the public release of new value-relevant company information to investors. However, Clover's first earnings announcement following the Business Combination occurred after the end of the Class Period. As a result, I focused on a small sample of "News Days" relating to the Business Combination. One would not expect every key date announcement to cause a significant stock price movement for a company since investors and analysts may anticipate the reported performance, or because the information may contain a mix of both positive and negative information. The mix of unanticipated results, forward guidance, executive statements, analyst interpretations of this information, and other company-specific news can cause company stock prices to move in an efficient market. I also considered the fact that other types of news or information could be more or less relevant for a given company during certain time periods.

45. I compared the stock returns and trading volume of Clover's Class A Common Stock on

---

[43] Cammer, 711 F. Supp. at 1291.

[44] *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 546 F.3d 196, 207 (2d Cir. 2008) (citation omitted) ("Evidence that unexpected corporate events or financial releases cause an immediate response in the price of a security has been considered 'the most important[] *Cammer* factor'").

[45] *Waggoner*, 875 F.3d at 97–99 (finding that, when other *Cammer* and *Krogman* factors weighed in favor of market efficiency, district court did not need to rely on evidence of price impact); *In re Allergan PLC Securities Litigation*, 2021 U.S. Dist. LEXIS 170310, at *29 (S.D.N.Y. 2021) (citation omitted) ([T]hese factors so strongly support a presumption of market efficiency, that it obviates the need to examine the empirical evidence necessary to evaluate the fifth *Cammer* factor.").

News Days versus those metrics on trading days that contained the least news during the Class Period (the "Least News Trading Days").[46] The Least News Trading Days provide a benchmark measurement of days in which relatively little company-specific information was provided to the market. If Clover's stock prices tend to move more significantly following News Days than on the Least News Trading Days, this would support a conclusion of market efficiency.

46. In order to study the stock price movements for Clover on different trading days, I performed an event study.[47] A generally accepted method for performing an event study is to create a regression model over a selected time period to observe the typical relationship between the price of the relevant security and market and industry indices. Through this regression model, an economist can model the predicted daily return of the relevant security, based on market and industry returns. By subtracting the predicted return from the actual return, an economist can calculate the "abnormal" return in the company's daily stock price movement, which represents the component of the daily stock price return that is not attributable to market-wide or industry-wide movements, but rather, is attributable to company-specific news. Finally, as part of an event study method, an economist tests whether the deviation from expected price movements (i.e., the abnormal return) is sufficiently large compared to the usual volatility in the Company stock price return such that simple random movement can be rejected as the cause.

47. Here, I performed an event study to evaluate whether Clover's Class A Common Stock responded to information disclosed on the News Days. To conduct the event study, I deployed the methodologies described above that are well-established in academic literature and routinely applied and accepted in the context of securities fraud litigation.

48. In an effort to isolate the impact of Company-specific news on Clover's stock price during

---

[46] Least News Trading Days were identified as dates with no Factiva headlines, earnings announcements, or SEC filings, during the Class Period. In addition, dates where SEC filings were reported with up to a one-week lag (i.e., Health & Medicine Week reports), as well as SEC form "Uploads" were included in the Least News Trading Days (the following days were added to Least News Trading Days: Nov 17, 2020, Nov 27, 2020, Dec 04, 2020, and Dec 08, 2020.)

[47] An event study is a standard method to analyze the impact of information on market prices that has been adopted in academic research and a wide variety of other applications. See A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, Journal of Economic Literature 13.

the Class Period, I performed regression analyses to measure the relationship between Clover's stock price returns and: (1) changes in market-wide factors that would be expected to impact all stocks; and (2) changes in industry-wide factors that would be expected to impact stocks in Clover's industry. By modeling how Clover's stock price returns moved relative to an overall market index and an industry index, I could also measure its response to Company-specific news.

49. Because Clover was simply a blank check company prior to the closing of the Business Combination, I use the period from October 6, 2020 (the start of the Class Period) to January 7, 2021 (the day of the Business Combination, and the day prior to Clover's listing on NASDAQ) as the Control Period to estimate a market model used to compute abnormal returns for days during this period (*i.e.*, I use an in-sample Control Period). From the date of the Business Combination through the end of the Class Period, I use a rolling period of 60 trading days before each date, to estimate a separate set of parameters or coefficients (namely $\alpha$, $\beta1$, and $\beta2$) used to calculate the abnormal return and the standard error for that date. For each trading day analyzed, I constructed a regression model using data from the prior 60 trading days (approximately three months). It is common practice to employ a 120-day estimation period where feasible, however, given the relatively short Class Period, a 60-day estimation period was used (the "Estimation Window").[48] To study the relationship between Clover's stock price returns and overall market factors, I used the S&P 1500 Composite Total Return Index (the "Market Index"). The Market Index is commonly used by economists as a representation of the overall market. To study the relationship between Clover's stock price returns and changes in industry-wide factors that would be expected to impact all stocks in Clover's particular industry, I used the NASDAQ Health Care Index (the "Industry Index"), which Clover compared its performance to in its 10-K SEC filings for the years ending

---

[48] *See, e.g.,* Mark L. Mitchell and Jeffry M. Netter, 1994, The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission, *The Business Lawyer* 49, at 568 ("The market model is estimated with regression analysis. The estimation period for this market model equation typically ranges from 100 to 300 trading days preceding the event under study."); A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, *Journal of Economic Literature* 35, at 15 ("Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, **when feasible**, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.")

during the Class Period. [49]

50. I established the relationship between the daily return of the Company stock, the daily return on the Market Index, and the daily return on the Industry Index over the Estimation Window.[50] As shown in **Exhibit 4**, the event study model revealed a generally positive relation between the Company's daily returns and those of the overall stock market throughout the Class Period. The coefficient on the Industry Index was negative during the Class Period (but turned positive following the end of the Class Period). In other words, movements of the Market Index and Industry Index help explain movements in Clover's stock price. This allowed me to predict the expected daily return of the Company on a date, once I controlled for that day's market and industry returns. I then subtracted the predicted return from the actual return to get the "abnormal" return, which represented the component of the return that is not attributable to market-wide or industry-wide movements.

51. Finally, I calculated the statistical significance of the abnormal return by comparing it to the usual volatility in the Company stock price return. An important statistic from a regression analysis is the standard deviation of the errors, which measures the degree of imprecision in the predictions from my regression model. In other words, the standard deviation of errors provides a metric for how much "randomness" remains in the price movement of Clover's Class A Common Stock, after controlling for the Market Index and the Industry Index. **Exhibit 5** plots the standard deviation of the regression errors, also known as Root Mean Squared Error, over the Class Period.

52. To test for statistical significance, I calculated the t-statistic, which is the test that economists use to determine whether randomness can be rejected as the explanation for an abnormal price movement. The t-statistic measures the number of standard deviations between the

---

[49] The NASDAQ Health Care Index included 897 constituents at the end of the Class Period.

[50] My use of this estimation model accounts for the relationship between the Company, market, and industry daily returns. This method has been accepted by academics in peer-reviewed literature. See A. Craig MacKinlay, 1997, Event Studies in Economics and Finance, Journal of Economic Literature 35, at 15 ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."); see also Phillip A. Braun, Daniel B. Nelson and Alain M. Sunier, 1995, Good News, Bad News, Volatility, and Betas, Journal of Finance 50, at 1597.

actual observation and the predicted movement. It is calculated by dividing the abnormal return by the standard deviation of the errors. Probability theory suggests that under the standard assumption that abnormal returns will be normally distributed with a mean of zero in the absence of new value-relevant company-specific news, based purely on randomness, using a 95% confidence level and a sufficiently large sample size, an abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) approximately 5% of the time in the absence of new company-specific information.[51] In other words, there is a 95% chance that, barring some non-random explanation, the actual observed return will fall within 1.96 standard deviations of the predicted return.

53. **Exhibit 6** reports the event study results of the three dates that met the criteria I established for the identification of News Days during the Class Period. The columns list the dates, closing stock price, log return, abnormal return from my event study, abnormal dollar change in stock price from my event study, the t-statistic, statistical significance of the stock movement, and a description of the news, headline, and/or SEC filing on each date. Overall, two out of three Clover news announcements caused stock price movements that were statistically significant at the 95% level. I compare this rate with that on the Least News Trading Days in the following exhibit.

54. **Exhibit 7** summarizes the statistical comparison of Clover's stock returns and trading volume following the three News Days versus these metrics as measured on the Least News Trading Days. As shown in the exhibit, 66.67% of the three news announcements caused stock movements that were statistically significant at the 95% level. This compares to 8.16% of the Least News Trading Days with statistically significant stock price movements. This provides strong evidence of a cause-and-effect relationship between information and Clover Common Stock price movements.

55. This exhibit also shows that the average of the absolute value of stock price movements following Clover's three News Days was 9.40%. This compares to an average of only 2.13% on

---

[51] David I. Tabak and Frederick C. Dunbar, Materiality and Magnitude: Event Studies in the Courtroom, Litigation Services Handbook, The Role of the Financial Expert, Ch. 19, (3rd ed. 2001). The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

the Least News Trading Days. This further supports a finding of a strong cause-and-effect relationship between information and Clover Common Stock price movements.

56. Finally, this exhibit reports an average daily trading volume of 25.08 million shares for Clover Class A Common Stock following News Days. This compares to an average daily trading volume of 7.10 million shares on the Least News Trading Days, providing further evidence of the cause-and-effect relationship between information and Clover's Class A Common Stock price movements.

57. Given the relatively small sample size of News Days, I also considered Clover's stock price reaction on February 4, 2021, following the alleged corrective disclosure (the publication of the Hindenburg report prior to market open).[52] Following this news, Clover's stock price closed on February 4 at $12.23 per share, down $1.72, or 13.16%, from the prior closing price of $13.95 per share. My event study revealed an abnormal stock return of -13.74%, with a p-value of 0.00, indicating statistical significance at greater than the 99% level. As a result, Clover's stock price reaction following the alleged corrective disclosure is consistent with the Common Stock trading in an efficient market.

58. In summary, relative to other trading days, Clover's key date announcements caused a greater proportion of statistically significant stock price movements, absolute levels of price changes, and increases in trading volume. This finding establishes a clear cause-and-effect relationship between new company-specific information and Clover Common Stock price movements. As a result, this price impact analysis supports the conclusion that Clover's Class A Common Stock traded in an efficient market during the Class Period.

## 4.6 Additional Factor 1: Market Capitalization

59. I have also considered several additional factors beyond the five Cammer factors, the first of which is the total value of stock outstanding, or market capitalization. The Cammer court acknowledged this factor as indicative of market efficiency, holding that "it is the number of shares

---

[52] Complaint, ¶¶41-49. I reviewed the Hindenburg report and other information released on the market-impact date and concluded that the news would be expected to generate a negative stock price reaction.

traded and value of shares outstanding that involve the facts which imply efficiency."[53] Moreover, the Krogman court stated "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[54] As stated previously, the MRK Study found that firms lacking analyst coverage had other indicators of trading in less developed and efficient markets, including smaller market capitalizations. The median market capitalization of the MRK Sample firms was $27.91 million.[55] By contrast, the MRK Covered firms had a median market capitalization of $243.97 million.[56] This study supports the view that firms with larger market capitalizations tend to trade in more efficient markets.

60.  **Exhibit 8** reports Clover's market capitalization throughout the Class Period. This market capitalization averaged $1.2 billion over the Class Period. Clover's market capitalization exceeded the MRK Sample firms on an inflation-adjusted basis, and the MRK Covered firms on an inflation-adjusted basis.[57]  Clover's number of shares outstanding ranged from 82.8 million shares to 143.5 million shares during the Class Period.[58] Given that Clover's market capitalization was higher than that of the MRK Sample firms and the MRK Covered firms on an inflation-adjusted basis, Clover's market capitalization on a stand-alone basis is strongly supportive of market efficiency. In addition, given Clover's shares outstanding available for trading, its sizeable float as discussed below, and the other factors analyzed herein, the market capitalization is consistent with the conclusion that the Class A Common Stock traded in an efficient market during the Class Period.

## 4.7    Additional Factor 2: Bid-Ask Spread

61.  The Krogman court considered the bid-ask spread as another factor that can indicate market

---

[53] Cammer, 711 F. Supp. at 1287.

[54] Krogman, 202 F.R.D. at 478.

[55] MRK Study at 678 (Table 3).

[56] MRK Study at 678 (Table 3).

[57] Source:  U.S.  Bureau  of  Labor  Statistics,  CPI  Inflation  Calculator,  available  at: https://www.bls.gov/data/inflation_calculator.htm (last visited June 2022). $27.91 million in December 1996 represented approximately $46.28 million in February 2021; $243.97 million in December 1996 represented approximately $404.59 million in February 2021.

[58] Shares outstanding obtained from Clover's SEC filings during the Class Period.

efficiency: "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[59] The bid-ask spread is the difference between the price at which an investor could purchase a stock (the ask) and the price at which an investor could sell the stock (the bid). This spread can be expressed as the difference between these prices in their quoted currency, or as a percentage – for example relative to the bid-ask midpoint. A narrow bid-ask spread indicates lower transaction costs to trade in a given stock and is indicative of a more informationally-efficient market. A wider bid-ask spread will cause investors to pay more money to buy and sell a given stock, and these higher transaction costs can discourage trading and price discovery, thus indicating a less liquid and less efficient market.

62. I analyzed the bid-ask spread of Clover's Class A Common Stock during the Class Period. **Exhibit 9** reports the monthly average bid-ask spread as a percentage of the bid-ask midpoint over this time period.[60] This spread fluctuated between 0.1% and 0.16% from October 2020 through February 2021.[61]

63. By way of comparison, the MRK Study found that the MRK Sample firms had a median bid-ask spread of 4.55% while the MRK Covered firms had a median bid-ask spread of 1.69%.[62] Clover's bid-ask spread was smaller than the MRK Covered firms' values, indicating that investors could trade Clover's Class A Common Stock at very low relative cost. As a result, Clover's bid-ask spread supports the conclusion that the Common Stock traded in an efficient market during the Class Period.

## 4.8 Additional Factor 3: Public Float

64. The Krogman court also considered the public float of a company in weighing market

---

[59] Krogman, 202 F.R.D. at 478.

[60] I calculated the percent bid-ask spread using daily closing bid and ask quotes. Kee H. Chung and Hao Zhang, *A Simple Approximation of Intraday Spreads Using Daily Data*, 17 J. Fin. Markets, 94, Table 2 (2014). This study compared data using end-of-day prices to intraday data and documented that the spreads were very similar.

[61] I also examined the dates from October 2020 and February 2021 that were part of the Class Period, and report them in Exhibit 9. The Class Period dates from October 2020 had an average bid-ask spread of 1.65% and the Class Period dates from February 2021 had an average bid-ask spread of 2.24%. I noted, however, that neither of these figures was computed using a full month of data.

[62] MRK Study at 678 (Table 3).

efficiency.[63] The public float represents the number of shares outstanding that are available for trading and not held by corporate insiders. Even if a company has a large market capitalization, if the majority of the equity is held by its CEO and/or other insiders, then investors may be unable to trade the stock without exerting undue pricing pressure resulting from a lack of liquidity and supply/demand imbalances.

65. **Exhibit 10** reports the shares outstanding, public float, and shares held by insiders for Clover Common Stock during the Class Period. As shown in the exhibit, Clover insiders held less than 37.08% of the Common Stock throughout the Class Period (average = 30.64%). Thus, approximately 69.36% of Clover's common shares were held by institutions and other outside investors. This large degree of public float for Clover's Class A Common Stock supports the conclusion that it traded in an efficient market during the Class Period.

## 4.9 Additional Factor 4: Institutional Ownership

66. Institutional investors are pension funds, endowments, mutual funds, investment banks, hedge funds, and other sophisticated investors who have significant resources to allocate to investing decisions. These investors can improve market efficiency by digesting new public information and making investment decisions over large block holdings of shares, thus causing the new information to be quickly impounded into stock prices. Thus, the presence of institutional shareholders can be an indicator of market efficiency.

67. I also report the total institutional ownership of Clover Common Stock in **Exhibit 10**, which shows that on average 108 institutions held the stock at some point during the Class Period (a full list of institutional ownership can be seen in **Exhibit 10B**). By comparison, the MRK Study found that the MRK Sample firms had a median of only nine institutional investors while the MRK Covered firms had a median of 40 institutional investors.[64] Clover's institutional ownership base exceeds both of these levels. Thus, the significant institutional ownership base for Clover Common

---

[63] In determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." Krogman, 202 F.R.D. at 478.

[64] MRK Study at 678 (Table 3).

Stock supports the conclusion that the Common Stock traded in an efficient market during the Class Period.

### 4.10  Additional Factor 5: Autocorrelation

68.  Autocorrelation refers to an anomaly by which stock returns over a given time period are able to predict future returns. The interval over which autocorrelation is examined tends to be on a daily basis. Thus, if the stock return today predicts tomorrow's stock return with a statistically significant correlation, the returns are said to be autocorrelated. A positive autocorrelation could give rise to "momentum" trading whereby an investor would purchase (sell or short sell) stock when returns are positive (negative) in order to generate profits as the returns continue over subsequent trading days. A negative autocorrelation could give rise to "reversal" trading whereby an investor would sell or short sell (purchase) stock when returns are positive (negative) in order to capture profits when the returns reverse. Autocorrelation may occur occasionally due to random patterns in aggregate stock return data or due to consecutive news days with different types of new information being publicly released. However, if statistically significant autocorrelation in stock returns persists over a sufficient time period such as several quarters and is large enough in magnitude that a trader could earn riskless profits after trading costs, this would imply market inefficiency because publicly available information about prior stock price movements would not be fully reflected in current stock prices.

69.  I use an established methodology, i.e., a regression analysis, to test for autocorrelation in Clover's Class A Common Stock returns.[65] This evaluates whether, from a statistical perspective, the stock return on a given day can predict the stock return on the following trading day.[66] After performing the regression to test for this pattern over the sample of trading days throughout the Class Period, if the regression produces a statistically significant result, then it becomes necessary to explore whether this pattern is sufficiently large in magnitude, consistent in direction, and

---

[65] I evaluate abnormal returns, the calculation of which was described in the Cammer factor five analysis section of this report (**4.5**).

[66] Doron Avramov, Tarun Chordia, and Amit Goyal, 2006, Liquidity and Autocorrelations in Individual Stock Returns, Journal of Finance 61, at 2367-68; Michael C. Jensen, 1978, Some Anomalous Evidence Regarding Market Efficiency, Journal of Financial Economics 6, at 95-101.

persistent over time such that a trading arbitrage opportunity exists. If, however, the regression does not indicate a statistically significant pattern in the stock returns, then no evidence exists of an autocorrelation anomaly.

70. **Exhibit 11** presents the results from the autocorrelation test for Clover's Class A Common Stock during the Class Period. The autocorrelation coefficient over the full Class Period is not statistically significant. Moreover, the quarterly autocorrelation coefficients alternate between positive and negative throughout the Class Period, indicating no consistent predictability in the Company's daily stock returns over time. The lack of a consistent and persistent autocorrelation pattern over time would thus not present an arbitrage opportunity for investors. This finding supports the conclusion that Clover's Class A Common Stock traded in an efficient market during the Class Period.

### 4.11  Additional Factor 6: Options Trading

71. Academic studies have shown that options written on company stock help to improve market depth and liquidity, investor interest, and overall market efficiency, as indicated by increases in trading volume, narrower bid-ask spreads, and improvements in transaction sizes and frequencies.[67] Thus, options trading on a company's stock can improve price discovery and support a finding of market efficiency, relative to a company without any options trading. According to Bloomberg, Clover Common Stock had 2,188,848 call option contracts and 319,764 put option contracts traded during the Class Period. The presence of options trading supports the conclusion that Clover's Class A Common Stock traded in an efficient market during the Class Period.

---

[67] Raman Kumar, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, Journal of Finance 53. See also: Stephen A. Ross, 1976, Options and Efficiency, Quarterly Journal of Economics 90.

# 5 THE RELEVANT FACTORS USED TO EVALUATE THE MARKET EFFICIENCY OF CLOVER COMMON STOCK APPLIES TO THE EXAMINATION OF WHETHER CLOVER WARRANTS TRADED IN AN EFFICIENT MARKET

## 5.1 Overview of Warrants

72. I have also been asked to determine whether the Clover Warrants traded in an efficient market. In the following paragraphs, I provide a general overview of warrants and I evaluate the efficiency of the market for the Clover Warrants.

73. A warrant is an option issued by a company or a financial institution. Warrants are frequently issued by companies on their own stock. A warrant is essentially a call option that gives the warrant holder the right to purchase a share of the company's stock at a pre-determined price ("strike price") on or before a fixed date ("expiration" or "maturity" date).

74. One major difference between call options and warrants is the exercise of a warrant requires the firm to issue a new share of stock, which increases the total shares outstanding. Exercise of a call option requires only that the writer of the call option deliver an existing share of stock to fulfill the obligation. Also, unlike call options, warrants result in a cash flow to the firm when the warrant holder pays the exercise price.

75. Like options, warrants are considered "derivative" securities because their value is derived primarily based on the value of the underlying asset. The value of a warrant is comprised of "intrinsic" and "time value." The intrinsic value of an option is its value if the holder had to immediately decide whether to exercise it or not. The intrinsic value is calculated as the current, or spot price of the stock ("$S$") minus the exercise, or strike ("$K$") price, when an option is in-the-money, or zero if the option is at or out-of-the-money, given by $\max(S - K, 0)$. The time value refers to the portion of an option's premium that is attributable to the amount of time remaining until option expiry. Time value arises from the possibility that the stock price will favorably increase or decrease by the expiration date.

76. Prices for warrants are affected by six factors:

- The current (or spot) stock price, $S_0$;
- The strike price, $K$;
- The time to expiration, $T$, also denoted as $T - t$ where $T$ is the expiration date and $t$ is the current date;
- The implied volatility of the underlying stock price, $\sigma$;
- The risk-free interest rate, $r$; and
- Expected dividends.

77. On any given date, the price of the Clover Warrants was primarily dependent on the magnitude of the difference between the fixed strike price of the warrant (or $11.50) and the variable price of the underlying Clover Class A Common Stock In other words, when the price of the underlying security rises (falls), all else constant, in an efficient market it is expected that the price of the warrant will rise (fall). However, in general the prices of warrants are not expected to move by the same per-share dollar or percentage amount as the underlying stock price.

78. To understand the price movements of Clover Warrants relative to the Clover Class A Common Stock, it is common to refer to the Warrant as being:

a) "in the money" ("ITM") if the $11.50 strike price of the Warrant is below the current Clover stock price (i.e., it has an intrinsic value greater than zero);

b) "at the money" ("ATM") if the $11.50 strike price of the Warrant is equal to the current Clover stock price; and

c) "out of the money" ("OTM") if the $11.50 strike price of the Warrant is above the current Clover stock price.

79. Clover Warrants were out of the money for much of the period from the beginning of the Class Period through mid-December 2020. Following December 18, 2020, the Clover Warrants were mostly in the money (see Exhibit 1). The more a warrant is in the money or closer to being in the money, the more similarly its price will reflect changes in the stock price. Conversely, as a warrant moves further out of the money, the less responsive the warrant price is to changes in the stock price. Similar to that of call options, warrant pricing is also influenced by volatility (+) and time to expiration (+).

## 5.2 Efficiency of the Market for Clover Warrants

80. Many courts have considered that for a finding of market efficiency for the common stock is sufficient to demonstrate that the derivative options also trade in an efficient market. [68] Nonetheless, I have still undertaken certain analyses below. Whether market participants are investors in Clover Class A Common Stock or Clover Warrants, they generally will have access to the same information from the same sources (*e.g.*, analysts, media, Company filings, etc.). Therefore, to the extent that the Clover Class A Common Stock share price reflects publicly available information about Clover, and the share price rapidly adjusts to account for new, economically material and unanticipated information, I would expect that prices for Clover Warrants would also reflect the same publicly available information about Clover. Should it be found that Clover Class A Common Stock traded in an efficient market, then that finding supports the conclusion that the Clover Warrants traded in an efficient market.[69]

### 5.2.1 Average Weekly Trading Volume

81. In addition to the importance of the information flowing freely to Warrant holders from the stock market, trading of the Clover Warrants was active during the Class Period. **Exhibit 12** graphs Clover Warrants weekly trading volume as a fraction of warrants outstanding throughout the Class

---

[68] *Enron*, 529 F. Supp. 2d at 754 ("The Court finds that Dr. Nye's evidence applying the *Cammer/Unger/Bell* factors to the stock, is sufficient to trigger the fraud-on-the-market presumption for Plaintiffs' § 10(b) claims based on the options."); *Marcus v. J.C. Penney Co., Inc.*, 2016 U.S. Dist. LEXIS 115795, at *30 (E.D. Tex. 2016) (relying on "[t]he Court in Enron [which] found that an experts' application of the *Cammer* factors to common stock was sufficient to trigger the presumption for options as well"), *report and recommendation adopted*, 2017 U.S. Dist. LEXIS 33257 (E.D. Tex. 2017).

This is also consistent with *Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al.*, No. 4:17-cv-02399, ECF Nos. 125, 131 (S.D. Tex. Nov. 13, 2019)., at 28 wherein the Court stated, "His statistical analysis [of the options] and the evaluation of eight [*Cammer/Krogman*] factors [for the common stock] support the conclusion that AOI options operated in an efficient market."

This view is also shared by the Second Circuit courts in *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433-34 (S.D.N.Y. 2014); as well as the Third Circuit in *In re Merck & Co., Sec. Derivative & ERISA Litig.*, No. 1658 (SRC), 2013 U.S. Dist. LEXIS 13511, at *60-61 (D.N.J. Jan. 30, 2013).

[69] It is also consistent with *Christakis Vrakas, et al. v. U.S. Steel Corp., et al.*, Memorandum Order (W.D. Pa., Dec. 31, 2019), Dkt. 215, at 13 n.11 (noting that "Plaintiffs also cite cases applying the same for options traded on the Chicago Board Options Exchange. [citation omitted]. The Court sees the analysis here as the same for both [common stock and the related options].").

Period.[70] The average weekly trading volume was 14.52% of Clover's Warrants outstanding over the Class Period. This level of trading volume significantly exceeds both the 1% and 2% common stock thresholds articulated by the *Cammer* court. As a result, Clover's level of Warrants trading volume throughout the Class Period supports the conclusion that Clover's Warrants traded in an efficient market throughout the Class Period.

### 5.2.2    Market Makers

82.  Throughout the Class Period, Clover Warrants were also listed on the NYSE under "CLOVW" and on the NASDAQ under "IPOC.WS". As discussed above, I understand that courts view large, established stock exchanges with market makers (such as the NYSE and NASDAQ) as being informationally efficient. The listing on the NYSE and NASDAQ thus supports the conclusion that the Clover Warrants traded in an efficient market.

83.  In addition, there were at least 22 market makers and brokers for the Clover Warrants during the Class Period.[71] Therefore, the fact that Clover Warrants were listed on the NYSE and NASDAQ and had at least 22 market makers and brokers executing investor orders, supports the conclusion that the Clover Warrants traded in an efficient market.

### 5.2.3    Bid-Ask Spread

84.  I also evaluated the bid-ask spreads for the Clover Warrants. Specifically, I estimated the spread (requiring the Warrant's ask price to be greater than the bid price) as the ask price less the bid price, and then divided by the midpoint of the bid and ask prices of Clover Class A Common Stock, which is the security for which the Warrant holder had the right to buy at a specified price through the expiration date. The average of this raw daily dollar spread for Clover Warrants was $0.04, and the average daily spread as a percent of the Common Stock midpoint was 0.36% over the Class Period. See **Exhibit 13**.

85.  Given the narrow spreads of the Clover Warrants, this finding supports the conclusion that

---

[70] In this analysis, a "trading week" consists of five consecutive trading days, which may not follow the calendar week. The average weekly number of warrants outstanding was 27.6 million.

[71] Bloomberg "RANK" function.

Clover Warrants traded in an efficient market.

### 5.2.4   Cause and Effect Analysis

86.  I test for a cause-and-effect relationship throughout the Class Period by examining whether the price changes in the Warrants are directionally consistent with what would typically be observed in an efficient market given Clover's stock price changes.[72] Specifically, holding all other Warrant pricing inputs constant, if the stock price increases by a large enough amount, Warrant prices typically are expected to increase (depending on the moneyness of the Warrant) and if the stock price declines by a large enough amount, Warrant prices typically are expected to decrease (depending on the moneyness of the Warrant). In order to avoid any potential bias introduced due to bid-ask bounce or due to non-synchronous trading between the Clover Class A Common Stock and Warrants, I use the mid-point of the bid and ask quotes as a proxy for price for both the Common Stock and the Warrants. I also indicate the moneyness of the Warrants on each trading day, defined as the ratio of the stock price to the Warrant strike price of $11.50.[73] In percentage terms, the range of moneyness for the Clover Warrants during Class Period ranged from 86.48% to 148.39%.

87.  In Table 1 below, during the Class Period, there were 18 dates when the absolute stock price returns (*i.e.*, magnitude of the stock price movement without regard to direction)[74] were greater than 3.5%. On each of these 18 (or 100%) dates, the stock and the Warrant prices changed in the same direction. Out of the money Warrant prices were also directionally consistent. This pattern is consistent with the expected price co-movements that tend to occur in efficient markets.

---

[72] This does not account for other variables that affect Warrant prices such as any changes in the implied volatility of Clover Class A Common Stock.

[73] The stock price is based on the midpoint of the stock quotes. For example, when the stock price is $10.00, the moneyness was 87% (= $10.00/$11.50); when the stock price is $12.00, the moneyness was 104% (= $12.00/$11.50).

[74] For this analysis, the stock and Warrant returns are calculated based on the midpoint of the bid and ask prices.

**Table 1: Stock and Warrant Prices for Large Stock Price Movements**

| Date | Stock Price | Stock Return | Warrant Price | Warrant Return | Moneyness | ITM/ATM/OTM |
|---|---|---|---|---|---|---|
| 06-Oct-20 | $ 10.99 | -14.19% | $ 2.57 | -39.83% | 95.57% | OTM |
| 07-Dec-20 | $ 10.95 | 4.10% | $ 2.15 | 16.16% | 95.17% | OTM |
| 18-Dec-20 | $ 12.05 | 8.98% | $ 3.36 | 18.77% | 104.78% | ITM |
| 21-Dec-20 | $ 13.25 | 9.46% | $ 3.73 | 10.45% | 115.17% | ITM |
| 23-Dec-20 | $ 14.02 | 4.08% | $ 4.06 | 10.78% | 121.87% | ITM |
| 24-Dec-20 | $ 14.73 | 4.94% | $ 4.24 | 4.22% | 128.04% | ITM |
| 28-Dec-20 | $ 17.07 | 14.75% | $ 4.66 | 9.46% | 148.39% | ITM |
| 29-Dec-20 | $ 16.23 | -5.02% | $ 4.01 | -15.04% | 141.13% | ITM |
| 31-Dec-20 | $ 16.79 | 4.88% | $ 3.98 | 2.29% | 145.96% | ITM |
| 04-Jan-21 | $ 15.67 | -6.91% | $ 3.51 | -12.44% | 136.22% | ITM |
| 06-Jan-21 | $ 14.52 | -4.25% | $ 3.33 | -1.94% | 126.22% | ITM |
| 07-Jan-21 | $ 15.97 | 9.55% | $ 3.77 | 12.43% | 138.87% | ITM |
| 11-Jan-21 | $ 14.92 | -5.64% | $ 3.47 | -3.68% | 129.74% | ITM |
| 13-Jan-21 | $ 14.01 | -4.23% | $ 3.35 | -0.74% | 121.78% | ITM |
| 15-Jan-21 | $ 13.26 | -5.43% | $ 3.25 | -3.92% | 115.30% | ITM |
| 19-Jan-21 | $ 13.79 | 3.88% | $ 3.43 | 5.24% | 119.87% | ITM |
| 26-Jan-21 | $ 15.79 | 12.47% | $ 4.39 | 12.22% | 137.26% | ITM |
| 27-Jan-21 | $ 14.30 | -9.92% | $ 3.69 | -17.51% | 124.30% | ITM |

88. I also examine in Table 2 below, the response of the Warrant prices on the Clover News Days. On each of the three dates, the price of the Warrant moved in the direction that typically would be observed and expected (given an increase/decrease in the stock price) in an efficient market where the Warrant prices reflect the same information as the common stock.

**Table 2: Stock and Warrant Prices on Key Announcement Dates**

| Date | Stock Price | Stock Return | Warrant Price | Warrant Return | Moneyness | ITM/ATM/OTM |
|---|---|---|---|---|---|---|
| 06-Oct-20 | $ 10.99 | -14.19% | $ 2.57 | -39.83% | 95.57% | OTM |
| 06-Jan-21 | $ 14.52 | -4.25% | $ 3.33 | -1.94% | 126.22% | ITM |
| 07-Jan-21 | $ 15.97 | 9.55% | $ 3.77 | 12.43% | 138.87% | ITM |

89. Tables 1 and 2 above provide evidence that, on average, the Warrants' prices co-moved with the Clover Class A Common Stock in a manner consistent with that expected in an efficient market.

90. My finding of market efficiency for the Clover Class A Common Stock, the commonly-held views by practitioners and courts regarding the efficiency of derivative securities flowing from the efficiency of common stock, and my additional analyses of the Clover Warrants above, all support the conclusion that the Clover Warrants traded in an efficient market throughout the Class Period.

# 6 ABILITY TO CALCULATE DAMAGES ON A CLASS-WIDE BASIS

## 6.1 Clover Class A Common Stock

91. I have been asked by Counsel to evaluate whether per-share damages can be assessed for all Class members under §10(b) of the Exchange Act based upon a methodology common to all class members and consistent with Lead Plaintiff's theory of liability. The "out- of-pocket" method of calculating damages represents a standard and well-accepted methodology under Section 10(b) of the Exchange Act. This approach calculates damages formulaically as the artificial inflation in the share price at the time of purchase minus the artificial inflation in the share price at the time of sale. If shares are not sold prior to the full revelation of the fraud, then the difference is relative to a 90-day lookback period under the Securities Litigation Reform Act of 1995 ("PSLRA").[75] This limit on damages can also be applied class-wide. I understand that this out-of-pocket methodology has been widely accepted for use across 10(b) matters.

92. The claims process produces information necessary for the calculation of damages for each Class member, including the purchase and sale information for the security. This information is available from brokerage statements and other documentation of securities transactions. Artificial inflation per share is quantified for each day of the Class period and then damages are calculated using the formula described above. As a result, the methodology for calculating damages in Section 10(b) matters such as this is well-established and formulaic across all Class members.

---

[75] The PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." See, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

93.     The quantification of artificial inflation per share is based upon a detailed loss causation analysis. I have not been asked to perform a loss causation analysis at this time, and I understand that such analysis often incorporates information produced during discovery. Nonetheless, the method employed to calculate artificial inflation can be applied class-wide.

94.     Event studies are widely employed to calculate artificial inflation. Event studies measure stock price reactions to corrective disclosures which revealed the relevant truth that was concealed by alleged material omissions and/or misrepresentations.[76] To the extent that reliable evidence is introduced to show that a material portion of the difference in the artificial inflation between the purchase and sale of the securities may be attributed to non-fraud related factors, the impact of such "confounding information" on the price of Clover securities can be determined on a common, class-wide basis using various accepted methodologies. The value of any confounding information can then be subtracted from the price impact of corrective disclosures in calculating inflation. This process may rely upon additional information learned during the discovery process, and will be based on the specific set of facts and circumstances in a given case.

95.     A loss causation analysis must also document how artificial inflation per share evolved throughout the Class Period. This determination depends on the specific set of facts and circumstances for a given case and also could incorporate information produced through discovery. One frequent method for modeling the evolution of inflation is to assume "constant dollar inflation." This assumes that per share inflation equaled a constant dollar amount above the correct share price over the Class Period. Alternatively, one can measure "constant percentage inflation," which assumes that each share price was inflated by a constant percentage amount above the correct stock price over the Class Period. In other instances, artificial inflation may have varied on a daily basis and could evolve throughout the Class Period based on the timing of specific information or statements. In any of these approaches, the calculation of artificial inflation is based on the specific set of facts and circumstances in a given case and can involve valuation techniques, event studies, published academic research studies, analyst research, or other case-specific

---

[76] In this report I conducted an event study to assist with the evaluation of market efficiency. My event study in this report was not intended to quantify artificial inflation.

documents. All of these loss causation calculations can be performed on a class-wide basis and are not dependent upon individual class member identities or circumstances.

96. To summarize, I have not been asked to calculate damages in this matter. Such loss causation analysis would depend on information produced in discovery and development of the case record. Based on my experience and qualifications and my understanding of the nature of claims in this matter, I conclude that damages in this case can, however, be calculated using a standard and well-established methodology, and can be applied on a class-wide basis.

## 6.2 Clover Warrant

97. I have also been asked by Counsel to evaluate whether damages can be calculated on a class-wide basis for Clover Warrants. As discussed in Section 5, like call options, a Clover Warrant gives the holder the right, but not the obligation to purchase shares of Clover Class A Common Stock. Among other factors discussed in paragraph 76, the prices of Warrants are determined by the share price of Clover Class A Common Stock. Holding all other factors constant, if the price of Clover Class A Common Stock is artificially inflated, the price of a Clover Warrant would likewise be artificially inflated.

98. The level of artificiality on the prices of Clover Warrants can be calculated as the difference between traded prices and prices but-for the misleading or omitted information. The but-for prices of Clover Warrants can be formulaically calculated using well-established and widely applied option pricing models.

99. For example, the Black Scholes model allows market participants to price a put or call option (or a warrant) with the following equation:

$$C = S_t N(d_1) - Ke^{-r(T-t)} N(d_2)$$

$$P = Ke^{-r(T-t)} N(-d_2) - S_t N(-d_1)$$

where:

$$d_1 = \frac{ln\frac{S_t}{K} + \left(r + \frac{\sigma^2}{2}\right)(T-t)}{\sigma\sqrt{T-t}}$$

$$d_2 = d_1 - \sigma\sqrt{T-t}$$

and:

$C, P$ = call/put option price
$S_t$ = underlying security market price at time t
T = option expiry
$t$ = current date
$K$ = strike price
$r$ = risk-free interest rate
$T - t$ = time to expiration
$N(\cdot)$ = cumulative normal distribution probability function
$\sigma$ = implied volatility of the underlying stock

100. This formula also readily offers considerable insight on the factors that influence the price of a warrant. As an example, keeping the other variables constant, an increase in strike price, and time to expiration tends to decrease the price of a Warrant, while an increase in the price of the asset or its volatility will cause the Warrant's price to increase. In the case of the strike price and underlying price, the logic behind these relationships is rather simple – an option to buy something for cheap is more valuable than an option to buy something at a higher price. As for the volatility, a higher standard deviation means that there is a higher chance of the stock increasing or decreasing by a large margin.

101. Examples of the relevant inputs in option pricing models such as the Black Scholes model above include but-for prices for Clover Class A Common Stock as well as implied volatilities but-for the misleading or omitted information.

102. Once the level of artificiality on the prices of Clover Warrants is determined, the same out-of-pocket method as described in paragraph 91 can be applied to calculate class-wide damages.

## 7   CONCLUSION

103. In conclusion, based on the market efficiency factors considered by courts and in academia, upon which I conducted my analyses, it is my opinion that Clover's Class A Common

Stock and Clover Warrants traded in an efficient market throughout the Class Period. Moreover, it is my opinion that damages in this matter can be calculated on a class-wide basis utilizing a common methodology.

I declare under penalty of perjury that the foregoing is true and correct.

***RESPECTFULLY SUBMITTED THIS July 1, 2022***

Matthew D. Cain, Ph.D.

APPENDIX A

## Matthew D. Cain, Ph.D. July 2022

E-mail: mdcain@outlook.com                                    Homepage
Mobile: 574-485-8065                                              SSRN

### Education

Ph.D., Finance, August 2007          Purdue University, West Lafayette, IN
B.S., Finance, May 2001                 Grove City College, Grove City, PA

### Professional and Academic Experience

*Senior Fellow*, Berkeley Center for Law and Business, 2019-Present

*Visiting Scholar*, Vanderbilt Law School, 2021-2022

*Senior Visiting Scholar*, Berkeley Law School, University of California, 2019-2021

*Visiting Research Fellow*, Harvard Law School Program on Corporate Governance, 2018-2019

*Advisor to Commissioner Robert J. Jackson, Jr.*, U.S. Securities and Exchange Commission, 2018

*Economic Fellow / Financial Economist*, Office of Litigation Economics, Division of Economic and Risk Analysis, U.S. Securities and Exchange Commission, 2014-2018

*Assistant Professor of Finance*, Mendoza College of Business, University of Notre Dame, Notre Dame, IN, 2008-2014

*Visiting Faculty*, Krannert School of Management, Purdue University, West Lafayette, IN, 2007-2008

*Analyst*, Debt Capital Markets, National City Bank, Cleveland, OH, 2001-2003

### Publications

Retail Shareholder Participation in the Proxy Process: Monitoring, Engagement and Voting (with Alon Brav and Jonathon Zytnick), *Journal of Financial Economics*, forthcoming.

Does *Revlon* Matter? An Empirical and Theoretical Study (with Sean J. Griffith, Robert J. Jackson, Jr., and Steven Davidoff Solomon), *California Law Review* 108, 1683-1731 (2020).

Intermediation in Private Equity: The Role of Placement Agents (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial and Quantitative Analysis* 55, 1095-1116 (2020).

Mootness Fees (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 72, 1777-1816 (2019).

The Myth of Morrison: Securities Fraud Litigation Against Foreign Issuers (with Robert Bartlett, Jill E. Fisch, and Steven Davidoff Solomon), *The Business Lawyer* 74, 967-1013 (2019).

The Shifting Tides of Merger Litigation (with Jill E. Fisch, Steven Davidoff Solomon, and Randall S. Thomas), *Vanderbilt Law Review* 71, 603-640 (2018).

Do Takeover Laws Matter? Evidence from Five Decades of Hostile Takeovers (with Stephen B. McKeon and Steven Davidoff Solomon), *Journal of Financial Economics* 124, 464-485 (2017).

CEO Personal Risk-Taking and Corporate Policies (with Stephen B. McKeon), *Journal of Financial and Quantitative Analysis* 51, 139-164 (2016).

How Corporate Governance Is Made: The Case of the Golden Leash (with Jill E. Fisch, Sean J. Griffith, and Steven Davidoff Solomon), *University of Pennsylvania Law Review* 164, 649-702 (2016).

A Great Game: The Dynamics of State Competition and Litigation (with Steven Davidoff Solomon), *Iowa Law Review* 100, 465-500 (2015).

Broken Promises: Private Equity Bidding Behavior and the Value of Reputation (with Antonio J. Macias and Steven Davidoff Solomon), *Journal of Corporation Law* 40, 565-598 (2015).

Information Production by Investment Banks: Evidence from Fairness Opinions (with David J. Denis), *Journal of Law and Economics* 56, 245-280 (2013).

Delaware's Competitive Reach (with Steven Davidoff Solomon), *Journal of Empirical Legal Studies* 9, 92128 (2012).

Form Over Substance? Management Buy-outs and the Value of Corporate Process (with Steven Davidoff Solomon), *Delaware Journal of Corporate Law* 36, 1-54 (2011).

Earnouts: A Study of Financial Contracting in Acquisition Agreements (with David J. Denis and Diane K. Denis), *Journal of Accounting and Economics* 51, 151-170 (2011).

## Presentations

Purdue University, 2021
Arizona State University College of Law, 2020
U.C. Berkeley School of Law, 2019; 2018
Vanderbilt University Law School, 2019
Berkeley Center for Law and Business, 2018
Cornerstone Research, 2018
Cornell University, 2016; 2015
Oxera, London, 2016
Institute for Law and Economics, University of Pennsylvania, 2015
U.C. Berkeley M&A Roundtable, New York, 2015
American Bar Association, Business Law, Private Equity M&A Subcommittee meeting, 2015
Virginia Commonwealth University, 2015
American Finance Association, annual meeting, 2015
Argentum Centre for Private Equity Symposium, Bergen, Norway, 2014
U.S. Securities and Exchange Commission, 2014
American Law and Economics Association, University of Chicago, 2014
The Brattle Group, 2013
U.S. Securities and Exchange Commission, 2013
Institute for Law and Economics, University of Pennsylvania, 2013
All Indiana Conference, 2013; 2010; 2009
American Law and Economics Association, Stanford Law School,
2012 George Washington University Law School, 2012
American Finance Association, annual meeting, 2012
Ohio State, 2011
Ohio University, 2011
Conference on Empirical Legal Studies, Yale Law School, 2010
Argentum Conference and Symposium on "Private Equity: The Road Ahead," Stockholm, Sweden, 2010
Purdue Alumni Conference, 2010
American Finance Association, annual meeting, 2008
Indiana University, 2008
Penn State, 2008
University of Arizona, 2008
University of Colorado, 2008
University of Florida, 2008
University of North Carolina at Chapel Hill, 2008
University of Notre Dame, 2008
University of Oregon, 2008
University of Pittsburgh, 2008
Virginia Tech, 2008
Financial Management Association, annual meeting, 2007
University of Georgia, 2007

University of Kentucky, 2007
Western Finance Association, annual meeting, 2006

**Journal Referee**:  *Review of Financial Studies*, *Journal of Financial and Quantitative Analysis*, *Journal of Corporate Finance*, *European Financial Management*, *Journal of Empirical Legal Studies, Financial Management, North American Journal of Economics and Finance, International Review of Law & Economics, Managerial and Decision Economics*, *Annals of Finance, Journal of Economics and Business*

**Teaching Experience**

UC Berkeley School of Law
> LAW 246.31:  Economic Expert Witnesses: Depositions and Testimony, Spring 2022
> LAW 251.52:  Economics of Corporate and Securities Litigation, Fall: 2020-2021

University of Notre Dame, Mendoza College of Business
> FIN 70400:  Corporate Restructuring, Mergers & Acquisitions (MBA Elective), Fall: 2008-2013
> FIN 40410:  Mergers and Acquisitions, Fall: 2008-2013

Purdue University, Krannert School of Management
> MGMT 412: Financial Markets and Institutions, Spring: 2006 & 2008
> MGMT 610: Financial Management I (MBA Core), Fall: 2007

**Expert Witness Experience**

- *In re: 2U, Inc. Securities Class Action*, Case Nos. 19-3455 and TDC-20-10006 (D. Md.). Report December 2021.

- *Zachary E. Gerut, v. Biospecifics Technologies Corp. and Endo International PLC*, Case No. 01-210002-2009 (Amer. Arb. Assoc.). Report December 2021. Arbitration March 2022.

- *In re: Under Armour Securities Litigation*, Case No. RDB-17-388 (D. Md.). Report November 2021. Deposition December 2021.

- *Bar Mandalevy, et al. v. BofI Holding, Inc., et al.*, Case No. 17-cv-00667-GPC-KSC (S.D. Ca). Report November 2021.

- *Securities and Exchange Commission v. Anatoly Hurgin, et al*., Case No. 1:19-cv-05705 (S.D. Ny). Report November 2021. Deposition December 2021.

PAGE 45

- *In re: Oracle Corporation Derivative Litigation*, Case No. 2017-0337-SG (Del. Chancery). Rebuttal Report October 2021. Deposition November 2021.

- *John Alberici, et al. v. Recro Pharma, Inc., et al.*, Case No. 2:18-cv-02279-MMB (E.D. Pa.). Report September 2021. Deposition October 2021. Report January 2022.

- *Securities and Exchange Commission v. Christopher Clark and William Wright*, Case No. 1:20-cv01529 (E.D. Va.). Report August 2021. Trial December 2021.

- *Honey Baked Ham Inc. v. Honey Baked Ham Company, LLC and HBH Licensing, LLC*, Case No. 8:19-cv01528-JVS (DFMx) (C.D. Ca.). Rebuttal Report August 2021.

- *In re: Purdue Pharma L.P., et al., Debtors* (Chapter 11), Case No. 19-23649 (RDD) (U.S. Bankruptcy Court, S.D. Ny). Rebuttal Report July 2021. Confirmation Hearing August 2021.

- *Abu Dhabi Investment Authority v. Mylan N.V. and Mylan Inc.*, Case No. 1:20-cv-01342 (S.D. Ny). Report May 2021. Deposition August 2021.

- *International Brotherhood of Electrical Workers Local 98 Pension Fund, et al. v. Deloitte & Touche, LLP and Deloitte LLP*, Case No. 3:19-cv-3304 (D. Sc.). Report April 2021. Deposition September 2021.

- *Securities and Exchange Commission v. James Wallace Nall, III, et al.*, Case No. 2:19-cv-702-TFM-C (S.D. Al.). Report April 2021. Rebuttal Report June 2021. Deposition June 2021.

- *Mark Stoyas, et al., v. Toshiba Corporation*, Case No. 2:15-cv-04194-DDP(JCx) (C.D. Ca.). Report February 2021. Deposition May 2021. Rebuttal Report August 2021.

- *Plymouth County Retirement System, et al. v. Patterson Companies, Inc., et al.*, Case No. 0:18-cv00871-MJD-HB (D. Mn.). Report January 2021. Deposition March 2021.

- *In re Novo Nordisk Securities Litigation*, Case No. 3:17-cv-00209-BRM-LHG (D. Nj.). Rebuttal Report December 2020. Deposition February 2021.

- *In re Facebook, Inc. Securities Litigation*, Case No. 5:18-cv-01725-EJD (N.D. Ca). Declaration October 2020.

- *In re Qualcomm/Broadcom Merger Securities Litigation*, Case No. 3:18-cv-01208-CAB-AHG (S.D. Ca.). Declaration May 2020.

- *In re Banc of California Securities Litigation*, Case No. 8:17-cv-00118-AG-DFM (C.D. Ca.). Report April 2019.

- *Tharp v. Acacia Communications, Inc.*, Case No. 17-cv-11504 (D. Mass.). Declaration November 2018.

- *Securities and Exchange Commission v. Avent*, Case No. 1:16-cv-02459-WMR (N.D. Ga.). Report March 2017. Deposition May 2017. Jury Trial August 2019.

- *In the Matter of Lawrence I. Balter d/b/a Oracle Investment Research*, File No. 3-17614 (SEC Admin. Proc.). Report March 2017.

- *Securities and Exchange Commission v. Huang*, Case No. 2:15-cv-00269-MAK (E.D. Pa.). Report September 2015. Declaration October 2015. Jury Trial January 2016.

- *Securities and Exchange Commission v. Alyasin*, Case No. 4:15-cv-00566 (S.D. Tex.). Declaration March 2015.

## APPENDIX B

### Works Considered

**Court Documents:**

Basic Inc. v. Levinson, 485 U.S. 224, 241-42 (1988).

Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989).

Christakis Vrakas, et al. v. U.S. Steel Corp., et al., Memorandum Order (W.D. Pa., Dec. 31, 2019)

Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 283-84 (2014).

Hayes v. MagnaChip Semiconductor Corp., Case No. 14-cv-01160-JST (N.D. Ca. 2016)

In re Allergan PLC Securities Litigation, 2021 U.S. Dist. LEXIS 170310, (S.D.N.Y. 2021)

In re Countrywide Financial Corp. Sec. Litig., 273 F.R.D. 586, 614 (C.D. Ca. 2009)

In re HealthSouth Corp. Sec. Litig., 257 F.R.D. 260, 281 (N.D. Ala. 2009)

In re Merck & Co., Sec. Derivative & ERISA Litig., No. 1658 (SRC), 2013 U.S. Dist. LEXIS 13511, at *60-61 (D.N.J. Jan. 30, 2013)

Krogman v. Sterritt, 202 F.R.D. 467 (N.D. Tex. 2001).

Laurence Rougier, et al. v. Applied Optoelectronics, Inc., et al., No. 4:17-cv-02399, ECF Nos. 125, 131 (S.D. Tex. Nov. 13, 2019)

Marcus v. J.C. Penney Co., Inc., 2016 U.S. Dist. LEXIS 115795 (E.D. Tex. 2016)

McIntire v. China MediaExpress Holdings, Inc., 38 F. Supp. 3d 415, 433-34 (S.D.N.Y. 2014)

Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., 546 F.3d 196, 207 (2d Cir. 2008)

Vinh Nguyen v. Radient Pharms. Corp., 287 F.R.D. 563, 572-73 (C.D. Ca. 2012).

Waggoner, 875 F.3d at 97–99

## Academic Literature:

Avramov, Doron, Tarun Chordia and Amit Goyal. Liquidity and Autocorrelations in Individual Stock Returns. The Journal of finance 61.5 (2006): 2365-2394. Print.

Barber, Brad M., Paul A. Griffin and Baruch Lev. The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency. J.Corp.L. 19 (1993): 285. Print.

Braun, Phillip A., Daniel B. Nelson and Alain M. Sunier. Good News, Bad News, Volatility, and Betas. The Journal of Finance 50.5 (1995): 1575-1603. Print.

Chung, Kee H. and Hao Zhang. A Simple Approximation of Intraday Spreads using Daily Data. Journal of Financial Markets 17 (2014): 94-120. Print.

Fama, Eugene F. Market Efficiency, Long-Term Returns, and Behavioral Finance. Journal of Financial Economics 49.3 (1998): 283-306. Print.

Hou, Kewei, Chen Xue, and Lu Zhang, 2020, Replicating Anomalies, Review of Financial Studies 33, at 2071.

Jensen, Michael C. Some Anomalous Evidence regarding Market Efficiency. Journal of Financial Economics 6.2-3 (1978): 95-101. Print.

Kumar, Raman, Atulya Sarin, and Kuldeep Shastri, 1998, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, Journal of Finance 53.

Lee, Charles MC and Eric C. So. Uncovering Expected Returns: Information in Analyst Coverage Proxies. Journal of Financial Economics 124.2 (2017): 331-348. Print.

MacKinlay, A. Craig. Event Studies in Economics and Finance. Journal of economic literature 35.1 (1997): 13-39. Print.

Mitchell, Mark L. and Jeffry M. Netter. The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission. The Business Lawyer (1994): 545-590. Print.

Mola, Simona, P. Raghavendra Rau and Ajay Khorana. Is there Life After the Complete Loss of Analyst Coverage? The Accounting Review 88.2 (2013): 667-705. Print.

Stephen A. Ross, 1976, Options and Efficiency, Quarterly Journal of Economics 90.

Tabak, David and Frederick Dunbar. Materiality and Magnitude: Event Studies in the Courtroom. Litigation services handbook: The role of the financial expert (2001): 19.1-19.22. Print.

Thomas, Randall S. and James F. Cotter. Measuring Securities Market Efficiency in the Regulatory Setting. Law and contemporary problems 63.3 (2000): 105-122. Print.

**Data Sources:**

Bloomberg

Clover Press Releases

Factiva

Investext

SEC Edgar

S&P Capital IQ

# EXHIBIT 1



Data source: S&P Capital IQ

Case 3:21-cv-00096    Document 103-2    Filed 07/01/22    Page 52 of 70 PageID #: 2286

## EXHIBIT 2



Clover Health Common Stock Average Weekly Trading Volume as a Percentage of Shares Outstanding
10/06/2020 - 2/3/21

Data Sources: S&P Capital IQ and SEC Edgar

Case 3:21-cv-00096    Document 103-2    Filed 07/01/22    Page 53 of 70 PageID #: 2287

# EXHIBIT 3

**Summary of Research Analyst Coverage of Clover Health during the Class Period:**
**10/6/20 – 2/3/21**

|  | Date | Description |
|---|---|---|
| [1] | Oct. 6, 2020 | Clover Health and Social Capital Hedosophia Investor Conference Call |
| [2] | Nov. 19, 2020 | Wolfe Research Healthcare Conference |
| [3] | Nov. 20, 2020 | Clover Health Analyst Day. Participants including:*<br>• Donald Hooker (KeyBanc Capital Markets)<br>• Jailendra Singh (Credit Suisse)<br>• Ralph Giacobbe (Citigroup)<br>• Gary Taylor (Cowen)<br>• Jed Kelly (Oppenheimer)<br>• Richard Close (Canaccord Genuity)<br>• Steve Tanal (Anthem, Inc.)<br>• Kevin Fischbeck (BofA Merrill Lynch)<br>• Jeff Garro (Piper Sandler)<br>• Steven Halper (Cantor Fitzgerald) |
| [4] | Jan. 12, 2021 | JP Morgan Healthcare Conference |
| [5] | Feb. 1, 2021 | Gary Taylor (JP Morgan) initiating coverage at 'Neutral' |
| [6] | Feb. 2, 2021 | Ralph Giacobbe (Citigroup) initiating coverage at 'Buy' |

Data Sources: Clover Health Investor Relations, Investext; Factiva; Company SEC Filings;
https://investors.cloverhealth.com/stock-information/analyst-coverage (last visited Jun. 1, 2022);
https://investors.cloverhealth.com/news-and-events/investor-events-presentations (last visited Jun. 1, 2022).

Notes: [*] Social Capital Hedosophia Holdings Corp. III, SEC Form 425, Nov. 25, 2020, available at:
https://www.sec.gov/Archives/edgar/data/0001801170/000119312520302876/0001193125-20-302876-index.htm (last visited Jun. 1, 2022).

## EXHIBIT 4



Coefficients from Rolling Event Study Regression for Clover Health Common Stock
10/06/2020 - 3/31/2021

Data Source: S&P Capital IQ and Bloomberg

# EXHIBIT 5



Data Source: S&P Capital IQ and Bloomberg

Case 3:21-cv-00096    Document 103-2    Filed 07/01/22    Page 56 of 70 PageID #: 2290

# EXHIBIT 6

## Event Study Analysis of Clover News Dates

| Date | Closing Price | Log Return | Abnormal Return | Abnormal Dollar Change | t-Stat | Sig Level | Headline |
|------|--------------|-----------|-----------------|----------------------|--------|-----------|----------|
| 06-Oct-20 | $10.97 | -14.49% | -14.68% | -$1.77 | -4.671 | *** | 07:17 EDT Clover Health to become publicly traded via Social Capital Hedosophia... (Theflyonthewall.com - Factiva) |
| | | | | | | | Clover Health to Merge with Social Capital Hedosophia Holdings Corp III (SCH) (Ficial Deals Tracker - Factiva) |
| | | | | | | | Social Capital SPAC led by billionaire Chamath Palihapitiya will merge with Clover Health in $3.7 billion deal (Business Insider - Factiva) |
| | | | | | | | Clover Health Investments Corp To Become PubliclyTraded Via Merger With Social Capital Hedosophia Holdings Corp III M&A Call - Final (CQ FD Disclosure - Factiva) |
| | | | | | | | "Chamath Palihapitiyas SPAC unveils $3.7B deal to take Clover Health public (San Francisco Business Times - Factiva) " |
| | | | | | | | Clover Health, a Next-Generation Medicare Advantage Insurer, Announces Plans to Become Publicly-traded via Merger with Social Capital Hedosophia (Business Wire - Factiva) |
| | | | | | | | (SEC Filing, Form Type: 425) (SEC Filing, Form Type: 8-K) |
| | | | | | | | Deals of the day-Mergers and acquisitions (Reuters News - Factiva) |
| | | | | | | | News Story: Mergers & Acquisitions Medicare Advantage insurer Clover Health to go public, merge with SPAC The transaction is expected to close in the first quarter of 2021. (S&P Capital IQ) 10:40 AM ET |
| | | | | | | | "Chamath Palihapitiyas SPAC unveils $3.7B deal to take Clover Health public (Silicon Valley/San Jose Business Journal - Factiva) " |
| | | | | | | | Deal Diary: Skadden, Credit Suisse Guide Raft of Social Capital Deals (The Deal - Factiva) |
| | | | | | | | M&A Transaction | Clover Health Investments Corp. (The Deal - Factiva) |
| | | | | | | | 10:00 EDT Social Capital Hedosophia Holdings III falls -9.7% Social Capital... (Theflyonthewall.com - Factiva) |
| | | | | | | | Clover Health to Go Public in SPAC Merger (Dow Jones Institutional News - Factiva) |
| | | | | | | | Social Capital SPAC Picks Clover (The Deal - Factiva) |
| | | | | | | | Alphabet-backed Clover Health to list via $3.7 bln blank-check deal (Reuters News - Factiva) |
| | | | | | | | 09:47 EDT Social Capital Hedosophia Holdings III falls -11.9% Social Capital... (Theflyonthewall.com - Factiva) |
| | | | | | | | 12:00 EDT Social Capital Hedosophia Holdings III falls -11.8% Social Capital... (Theflyonthewall.com - Factiva) |

PAGE 56

| Date | Closing Price | Log Return | Abnormal Return | Abnormal Dollar Change | t-Stat | Sig Level | Headline |
|---|---|---|---|---|---|---|---|
| | | | | | | | BRIEF-Clover Health A NextGeneration Medicare Advantage Insurer Announces Plans To Become Publicly Traded Via Merger With Social Capital Hedosophia (Reuters News - Factiva)<br>"Clover Health to Merge With Social Capital Hedosophia in $1.2 Billion Deal (Bests Insurance News - Factiva) "<br>UPDATE 2-Clover Health to go public via $3.7 bln deal with Social Capital (Reuters News - Factiva)<br>Clover Health, a Next-Generation Medicare Advantage Insurer, Announces Plans to Become Publicly-traded via Merger with Social Capital Hedosophia (Contify Insurance News - Factiva)<br>What to know about Chamath Palihapitiya taking Clover Health public in a surprise merger (Fast Company - Factiva)<br>What to know about Chamath Palihapitiya taking Clover Health public in a surprise IPO (Fast Company - Factiva)<br>BREAKINGVIEWS-Clover Health takes knife to two sick systems (Reuters News - Factiva) |
| 06-Jan-21 | $14.53 | -3.78% | -4.39% | -$0.67 | -1.396 | | Social Cap Hedosophia III Files 8K - Director, Officer or Compensation Filing >IPOC (Dow Jones Institutional News - Factiva)<br>(SEC Filing, Form Type: 8-K)<br>Press Release: Social Capital Hedosophia III Shareholders Approve Business Combination with Clover Health (Dow Jones Institutional News - Factiva)<br>Social Capital Hedosophia III Shareholders Approve Business Combination with Clover Health (Contify Investment News - Factiva)<br>Clover Health SPAC Merger Vote: What To Know (Benzinga.com - Factiva)<br>Clover Health Merger Approved By Shareholders (Benzinga.com - Factiva)<br>Social Capital Hedosophia III Shareholders Approve Business Combination with Clover Health (Business Wire - Factiva)<br>14:03 EST Social Capital Hedosophia Holdings III shareholders approve Clover... (Theflyonthewall.com - Factiva) |
| 07-Jan-21 | $16.02 | 9.76% | 9.13% | $1.44 | 2.905 | *** | US Clover Health inches closer to wrapping up go-public deal (SeeNews Deals - Factiva)<br>Clover Health and Social Capital Hedosophia Holdings Corp. III Announce Closing of Business Combination (Business Wire - Factiva)<br>Press Release: Clover Health and Social Capital Hedosophia Holdings Corp. III Announce Closing of Business Combination (Dow Jones Institutional News - Factiva)<br>12:34 EST Social Capital Hedosophia Holdings III, Clover Health announce closing... (Theflyonthewall.com - Factiva)<br>Clover Health and Social Capital Hedosophia Holdings III Announce Closing of Business Combination (Contify Life Science News - Factiva) |

PAGE 57

| Date | Closing Price | Log Return | Abnormal Return | Abnormal Dollar Change | t-Stat | Sig Level | Headline |
|---|---|---|---|---|---|---|---|
| | | | | | | | (SEC Filing, Form Type: CERT)  (SEC Filing, Form Type: 8-A12B) (SEC Filing, Form Type: 25) Clover Health and Social Capital Hedosophia Holdings Corp. III Announce Closing of Business Combination (Contify Investment News - Factiva) |

Sources: S&P Capital IQ, Bloomberg & Factiva

Case 3:21-cv-00096   Document 103-2   Filed 07/01/22   Page 59 of 70 PageID #: 2293

**E**XHIBIT **7**

**Comparison of Statistical Significance and Abnormal Returns for Clover News Dates vs. Days with Least News During the Class Period**

| Statistic | Event Dates | Days with Least News |
|---|---|---|
| N | 3 | 49 |
| Significant Days at 95% Confidence Level | 2 | 4 |
| % Significant Days at 95% Confidence Level | 66.67% | 8.16% |
| Average Absolute Abnormal Return | 9.40% | 2.13% |
| Average Volume (Millions) | 25.08 | 7.10 |

Source: S&P Capital IQ, Factiva, Bloomberg

# EXHIBIT 8



Data Sources: SEC Filings and S&P Capital IQ

## EXHIBIT 9



Data Source: Bloomberg
Note: The percentage bid-ask spread was calculated as the a) the closing ask quote less the closing bid quote divided by b) the average of the bid and ask quotes.

Case 3:21-cv-00096    Document 103-2    Filed 07/01/22    Page 62 of 70 PageID #: 2296

**EXHIBIT 10**

## Clover Class A Common Stock Shares Outstanding, Insider Holdings and Institutional Holdings

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings as % of Shares Outstanding | Institutional Holdings (in 000s) | Institutional Holdings as % of Shares Outstanding | Institutional Holdings as % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 12/31/2020 | 82,800,000 | 61 | 30,700,000 | 4,321,069 | 56,421,069 | 37.08% | 9,996,781 | 12.07% | 17.72% |
| 03/31/2021 | 148,279,247 | 154 | 35,900,000 | 38,504,281 | 150,883,528 | 24.21% | 61,213,621 | 41.28% | 40.57% |

| Total Institutions over Class Period: | 163 | | Class Period Average: | 30.64% | | 26.68% | 29.14% |
|---|---|---|---|---|---|---|---|

Data Source: SEC Filings and S&P Capital IQ

**EXHIBIT 10B**

## Institutions that Held Clover Health Class A Common Stock at Some Point During the Class Period

| No. | Holder | No. | Holder |
|---|---|---|---|
| 1 | Millennium Management LLC | 26 | Baldwin Brothers LLC |
| 2 | Bank of America Corp. | 27 | Financial Architects Inc |
| 3 | Wells Fargo & Co. | 28 | TrustCore Financial Services LLC |
| 4 | The PNC Financial Services Group Inc. | 29 | Harbour Investments Inc. |
| 5 | Royal Bank of Canada | 30 | IFP Advisors LLC |
| 6 | Raymond James Financial, Inc. | 31 | Firestone Capital Management Inc |
| 7 | Morgan Stanley | 32 | Manchester Capital Management LLC |
| 8 | Invesco Ltd. | 33 | Securities America Advisors Inc. |
| 9 | Royal Alliance Associates Inc. | 34 | National Asset Management Inc. |
| 10 | Davenport & Co. LLC | 35 | The Goldman Sachs Group Inc. |
| 11 | Neuberger Berman Investment Advisers LLC | 36 | Citigroup Inc. |
| 12 | Vanguard Group Inc. | 37 | BlackRock Inc. |
| 13 | BMO Asset Management Corp. | 38 | Charles Schwab Investment Management Inc. |
| 14 | State Street Global Advisors Inc. | 39 | BIP GP LLC |
| 15 | Emerald Advisers LLC | 40 | Northwestern Mutual Wealth Management Co. |
| 16 | Deutsche Asset & Wealth Management | 41 | Brave Asset Management Inc. |
| 17 | Mercer Global Advisors Inc. | 42 | RBC Dominion Securities Inc. |
| 18 | Sandy Spring Bank | 43 | GAM Holding AG |
| 19 | FMR LLC | 44 | BNY Asset Management |
| 20 | Merrill Lynch Pierce Fenner & Smith Inc. | 45 | CSS LLC |
| 21 | California Public Employees' Retirement System | 46 | Security National Trust Co. |
| 22 | Commonwealth Equity Services LLC | 47 | Veritable LP |
| 23 | Rockefeller & Co. LLC | 48 | Wolverine Trading LLC |
| 24 | Amundi Asset Management SAS | 49 | SG Americas Securities LLC |
| 25 | Baillie Gifford & Co | 50 | Strategic Advisers LLC |

PAGE 63

| | | | |
|---|---|---|---|
| 51 | Cutler Group LP | 81 | Edge Wealth Management LLC |
| 52 | Parallax Fund LP | 82 | BerganKDV Wealth Management LLC |
| 53 | Susquehanna International Group LLP | 83 | Boston Partners Global Investors Inc. |
| 54 | Group One Trading L.P. | 84 | Alberta Investment Management Corp. |
| 55 | RBC Pvt. Counsel (USA) Inc. | 85 | Parallel Advisors LLC |
| 56 | Moisand Fitzgerald Tamayo LLC | 86 | Managed Account Advisors LLC |
| 57 | SignatureFD LLC | 87 | Lakewood Capital Management LP |
| 58 | Sowell Financial Services LLC | 88 | PrairieView Partners LLC |
| 59 | Creative Planning LLC | 89 | Allianz Asset Management GmbH |
| 60 | Cambridge Investment Research Advisors Inc. | 90 | Harel Insurance Investments & Financial Services Ltd. |
| 61 | Sigma Planning Corp. | 91 | Laurel Wealth Advisors LLC |
| 62 | Column Capital Advisors LLC | 92 | Tradewinds Capital Management LLC |
| 63 | Sugarloaf Wealth Management LLC | 93 | HighTower Advisors LLC |
| 64 | Focused Wealth Management Inc. | 94 | Senator Investment Group LP |
| 65 | United Asset Strategies Inc. | 95 | Visionary Asset Management Inc. |
| 66 | Charter Oak Capital Management LLC | 96 | Raymond James Financial Services Advisors Inc. |
| 67 | Geode Capital Management LLC | 97 | Capstone Investment Advisors LLC |
| 68 | SagePoint Financial Inc. | 98 | Citadel Advisors LLC |
| 69 | Balyasny Asset Management LP | 99 | Cetera Financial Holdings Inc. |
| 70 | Valeo Financial Advisors LLC | 100 | Two Sigma Securities LLC |
| 71 | Archer Investment Corp. | 101 | Clearstead Advisors LLC |
| 72 | Prime Capital Investment Advisors LLC | 102 | Cerity Partners LLC |
| 73 | GSA Capital Partners LLP | 103 | Northern Trust Global Investments |
| 74 | BBVA Asset Management S.A. S.G.I.I.C | 104 | Harbor Investment Advisory LLC |
| 75 | Perceptive Advisors LLC | 105 | NewSquare Capital LLC |
| 76 | Mediolanum Gestión SGIIC SA | 106 | Quantbot Technologies LP |
| 77 | PEAK6 Investments, L.P. | 107 | Simplex Trading LLC |
| 78 | Equitec Group LLC | 108 | Berman Capital Advisors LLC |
| 79 | FineMark National Bank & Trust | 109 | Advisory Services Network LLC |
| 80 | Park West Asset Management LLC | 110 | Westside Investment Management LLC |

PAGE 64

| | | | |
|---|---|---|---|
| 111 | LMR Partners LLP | 141 | Point72 Asset Management LP |
| 112 | Lindbrook Capital LLC | 142 | BDO Wealth Advisors LLC |
| 113 | Capula Management Ltd. | 143 | XTX Markets Ltd. |
| 114 | Wolff Wiese Magana LLC | 144 | Seasons of Advice Wealth Management LLC |
| 115 | Comprehensive Financial Management LLC | 145 | Centiva Capital LP |
| 116 | Summit Global Investments LLC | 146 | Global Wealth Management Investment Advisory Inc. |
| 117 | Arbor Point Advisors LLC | 147 | BB&T Trust |
| 118 | Performa Ltd. (US) LLC | 148 | Lombard Odier Darier Hentsch & Cie Asset Management |
| 119 | VISION2020 Wealth Management Corp. | 149 | Casdin Capital LLC |
| 120 | Tower Research Capital LLC | 150 | VISIO Asset Management |
| 121 | Gesiuris | 151 | Ikarian Capital LLC |
| 122 | Quilter Cheviot Limited | 152 | The MassMutual Trust Co. F.S.B.  Trust Investments |
| 123 | Virtu Financial Inc. | 153 | Bayesian Capital Management LP |
| 124 | Jane Street Group LLC | 154 | Pearl River Capital LLC |
| 125 | Graticule Asia Macro Advisors LLC | 155 | Arkadios Wealth Advisors LLC |
| 126 | Bowie Capital Management LLC | 156 | Caption Management LLC |
| 127 | NewEdge Advisors LLC | 157 | Qube Research And Technologies Ltd |
| 128 | Global Retirement Partners LLC | 158 | ExodusPoint Capital Management LP |
| 129 | Triad Hybrid Solutions LLC | 159 | FNY Investment Advisers LLC |
| 130 | Boothbay Fund Management LLC | 160 | Y-Intercept (Hong Kong) Ltd. |
| 131 | Engineers Gate Manager LP | 161 | AnBro Capital Investments (Pty) Ltd. |
| 132 | Penserra Capital Management LLC | 162 | Berry Street Capital Management LLP |
| 133 | Intellectus Partners LLC | 163 | Hexagon Capital Partners LLC |
| 134 | Squarepoint OPS LLC | | |
| 135 | William Blair Investment Management LLC | | |
| 136 | Marathon Trading Investment Management LLC | | |
| 137 | CapFinancial Partners LLC | | |
| 138 | Core Wealth Advisors Inc. | | |
| 139 | UBS Asset Management AG | | |
| 140 | Steward Partners Investment Advisory LLC | | |

PAGE 65

Data Source: S&P Capital IQ

Case 3:21-cv-00096    Document 103-2    Filed 07/01/22    Page 67 of 70 PageID #: 2301

## EXHIBIT 11

### Clover Class A Common Stock
### Test for Autocorrelation during the Class Period

| Quarter | Coefficient on Previous Day's Abnormal Return | T-Statistic | P-Values |
|---|---|---|---|
| **Q4 2020** | 0.30 | 2.84 | .006 |
| **Q1 2021** | -0.21 | -1.01 | .326 |
| | | | |
| **Class Period** | **0.09** | **0.89** | **.378** |

Note: For this calculation, I only considered days that are within the Class Period.

Data Source: S&P Capital IQ

## EXHIBIT 12



Data Sources: Bloomberg and SEC Edgar

## EXHIBIT 13

**Clover Health Warrants**
**Daily Bid-Ask Spread**
**10/6/2020 - 2/3/2021**

| | Spread ($) | Spread as a Percent of Class A Common Stock Bid/Ask Midpoint (%) |
|---|---|---|
| Average | $ 0.04 | 0.36% |
| Median | $ 0.03 | 0.29% |

Data Source: Bloomberg