# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

TIMOTHY BOND,

          Lead Plaintiff

and

JEAN-NICOLAS TREMBLAY,

          Named Plaintiff,

Individually and on Behalf of All Others Similarly Situated,

      v.

CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, VIVEK GARIPALLI, ANDREW TOY, JOE WAGNER, and CHAMATH PALIHAPITIYA,

          Defendants.

Case No. 3:21-cv-00096

Judge Aleta A. Trauger

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ................................................................................................................. 3

I.    Legal Standard ................................................................................................... 3

II.   The Proposed Class Representatives Are Inadequate ........................................... 5

    A.   The Court Should Deny Class Certification Because There Are Serious Concerns About Plaintiffs' Ability to Lead This Litigation ........................................... 5

    B.   Jabri Misrepresented His Losses to the Court and Lacked Candor at His Deposition . 6

    C.   Tremblay Similarly Lacks Credibility ........................................................... 9

    D.   Tremblay Lacks Even Basic Knowledge About the Claims and Facts at Issue in This Case, Rendering Him an Inadequate Class Representative ...................................... 11

III.  THE PROPOSED CLASS FAILS TO MEET THE REQUIREMENTS OF RULE 23(b) BECAUSE PLAINTIFFS CANNOT INVOKE THE FRAUD-ON-THE-MARKET PRESUMPTION .................................................................................................... 13

    A.   The Fraud-on-the-Market Presumption of Reliance Requires Plaintiffs to Show That Clover Securities Traded in an Efficient Market ........................................... 13

    B.   Plaintiffs Have Not Carried Their Burden of Showing a Cause-and-Effect Relationship Between Clover News and Movements in the Price of Clover Securities ......................................................................................................... 15

IV.  EVEN IF PLAINTIFFS CAN INVOKE THE FRAUD-ON-THE-MARKET PRESUMPTION, THAT PRESUMPTION IS REBUTTED BECAUSE THERE WAS NO "FRONT-END" PRICE IMPACT FROM ANY ALLEGED MISSTATEMENT ......................................................................................................... 17

CONCLUSION ............................................................................................................. 20

i

**Page(s)**

**Cases**

*In re AEP ERISA Litig.*,
    2008 WL 4210352 (S.D. Ohio Sept. 8, 2008) ..........................................................................12

*Affiliated Ute Citizens of Utah v. United States*,
    406 U.S. 128 (1972)...................................................................................................................13

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997).....................................................................................................................4

*Ballan v. Upjohn Co.*,
    159 F.R.D. 473 (W.D. Mich. 1994)...........................................................................................11

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988).........................................................................................................3, 14, 18

*Bell v. Ascendant Sols., Inc.*,
    422 F.3d 307 (5th Cir. 2005) .....................................................................................................14

*Berger v. Compaq Comput. Corp.*,
    257 F.3d 475 (5th Cir. 2001) .....................................................................................................11

*Burges v. Bancorpsouth, Inc.*,
    2017 WL 2772122 (M.D. Tenn. June 26, 2017)........................................................................18

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)...............................................................................................................3, 4, 5

*Cunha v. Hansen Nat. Corp.*,
    2013 WL 12124073 (C.D. Cal. June 20, 2013) .........................................................................15

*In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*,
    281 F.R.D. 174 (S.D.N.Y. 2012) .................................................................................14, 15, 16

*Finisar Corp. Sec. Litig.*,
    2017 WL 6026244 (N.D. Cal. Dec. 5, 2017)..............................................................................18

*Fishon v. Peloton Interactive, Inc.*,
    2022 WL 179771 (S.D.N.Y. Jan. 19, 2022) ..........................................................................9, 13

*Garcia De Leon v. N.Y. Univ.*,
    2022 WL 2237452 (S.D.N.Y. June 22, 2022) .......................................................................5, 11

Case 3:21-cv-00096    Document 108    Filed 09/30/22    Page 3 of 30 PageID #: 2466

*George v. China Auto. Sys., Inc.*,
   2013 WL 3357170 (S.D.N.Y. July 3, 2013) ...................................................................15, 16

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
   141 S. Ct. 1951 (2021)...................................................................................................3, 18

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014)........................................................................................... *passim*

*Harden v. Autovest, L.L.C.*,
   2016 WL 4408905 (W.D. Mich. Aug. 19, 2016)...................................................................9

*IBEW Local 90 Pension Fund v. Deutsche Bank, AG*,
   2013 WL 5815472 (S.D.N.Y. Oct. 29, 2013) ........................................................................1

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
   818 F.3d 775 (8th Cir. 2016) ...............................................................................18, 19, 20

*In re Initial Pub. Offering Sec. Litig.*,
   544 F. Supp. 2d 277 (S.D.N.Y. 2008)................................................................................14

*In re Initial Pub. Offerings Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006)...................................................................................................4

*Kline v. Wolf*,
   702 F.2d 400 (2d Cir. 1983)...............................................................................................11

*Koss v. Wackenhurt Corp.*,
   2009 WL 928087 (S.D.N.Y. Mar. 30, 2009) ......................................................................11

*Maywalt v. Parker & Parsley Petroleum Co.*,
   67 F.3d 1072 (2d Cir. 1995)...............................................................................................11

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   2018 WL 3861840 (N.D. Ohio Aug. 14, 2018)..............................................................16, 18

*In re PolyMedica Corp. Sec. Litig.*,
   453 F. Supp. 2d 260 (D. Mass. 2006) ................................................................................14

*Rocco v. Nam Tai Elecs., Inc.*,
   245 F.R.D. 131 (S.D.N.Y. 2007) ........................................................................................11

*Rowe v. Marietta Corp.*,
   172 F.3d 49 (6th Cir. 1999) .................................................................................................7

*Saumer v. Cliffs Nat. Res. Inc.*,
   853 F.3d 855 (6th Cir. 2017) .............................................................................................14

iii

*Savino v. Comput. Credit, Inc.*,
 164 F.3d 81 (2d Cir. 1998)........................................................................................1, 5

*Searcy v. eFunds Corp.*,
 2010 WL 1337684 (N.D. Ill. Mar. 31, 2010)........................................................5

*Senter v. Gen. Motors Corp.*,
 532 F.2d 511 (6th Cir. 1976) ...............................................................................11

*Shiring v. Tier Techs., Inc.*,
 244 F.R.D. 307 (E.D. Va. 2007) ..........................................................................11

*Smyth v. Carter*,
 168 F.R.D. 28 (W.D. Va. 1996).............................................................................5

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
 546 F.3d 196 (2d Cir. 2008).................................................................................15

*In re U.S. Foodservice, Inc. Pricing Litig.*,
 729 F.3d 108 (2d Cir. 2013)...................................................................................4

*Waggoner v. Barclays PLC*,
 875 F.3d 79 (2d Cir. 2017)..............................................................................13, 14

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 338 (2011).............................................................................................3, 4

**Other Authorities**

Fed. R. Civ. P. 23 .............................................................................................. *passim*

Case 3:21-cv-00096   Document 108   Filed 09/30/22   Page 5 of 30 PageID #: 2468

Defendants Clover Health Investments, Corp. ("Clover" or the "Company"), Vivek Garipalli, Andrew Toy, Joe Wagner, and Chamath Palihapitiya (the "Individual Defendants" and with Clover, collectively, "Defendants"), by and through their undersigned counsel, submit this Opposition to Plaintiffs' Motion for Class Certification (Doc. Nos. 101, 102, the "Motion").

## PRELIMINARY STATEMENT

Class certification is a "crucial inflection point in securities litigation" that requires a district court's "careful analysis" of the factors set forth in Federal Rule of Civil Procedure 23. *IBEW Local 90 Pension Fund v. Deutsche Bank, AG*, 2013 WL 5815472, at *22 (S.D.N.Y. Oct. 29, 2013). Among the factors that Plaintiffs must prove is that they will adequately represent the proposed Class. Here, Plaintiffs cannot make that showing.

First, Lead Plaintiff Firas Jabri's misleading representations to the Court are the type of conduct that "would create serious concerns as to his credibility at any trial," making him an inadequate class representative. *Savino v. Comput. Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (affirming denial of class certification because plaintiff's credibility was subject to attack).

Specifically, in support of his motion seeking to be appointed Lead Plaintiff, Jabri claimed to have the largest financial interest in this case because he claimed to have suffered losses of nearly $550,000. (*See* Doc. Nos. 40, 41.)[1] But that figure was wildly inflated and divorced from the recognized methodology used to measure damages in Section 10(b) cases. Even under Plaintiffs' view of the case, Jabri's purported losses likely were eclipsed by other lead plaintiff

---

[1] Page numbers for docket entries reflect the ECF pagination. Unless noted otherwise, all emphasis is added, and internal citations and quotation marks are omitted. "¶ __" refers to paragraphs in the First Amended Complaint for Violations of the Federal Securities Laws. (Doc. No. 70.) Unless otherwise specified, "Ex. __" refers to exhibits to the Declaration of Gary A. Crosby II, dated September 30, 2022, filed herewith.

1

applicants who held more shares than Jabri did, and thus might have had a larger financial interest. When the traditional method is applied, Jabri's claimed damages[2] are less than a third of that estimated figure. (*See* Ex. C, Jabri Dep. Tr. 96:12-14 (Schwartz: "[I]n the best case scenario, $1.92 times 80,000 shares is nowhere near $550,000").) ***Moreover, in reality, Jabri has no damages at all. Jabri failed to disclose that he actually profited more than $120,000 on his Clover investment in just six months' time.*** (Ex. E at CLOVER_PLAINTIFFS_000076 (showing that Jabri sold his entire holding of 80,025 shares of Clover stock on June 11, 2021 at approximately $17.75 to $17.79 per share).) When confronted with that fact at his deposition, Jabri repeatedly evaded and obfuscated before being forced to concede that he actually ***made*** money, further undermining his credibility. (*See* Ex. C, Jabri Dep. Tr. 69:21-72:24.)

Named Plaintiff Jean-Nicolas Tremblay is similarly inadequate. Tremblay submitted a misleading certification with his initial complaint on February 22, 2021, that indicated that the only transaction in Clover stock that Tremblay made on February 4, 2021—the date of the Hindenburg Report that led to the filing of this case—was to sell his entire holdings of 250 Clover shares. (*See* Ex. F, *Tremblay v. Clover Health Invs., Corp.*, No. 3:21-cv-00138 (M.D. Tenn. Feb. 22, 2021), Doc. No. 1-3 ("Summary of Purchases and Sales"); *see also* Pls.' Mem. of Law at 12, Doc. No. 102 (citing Tremblay's Summary of Purchases and Sales).) But discovery has shown that before Tremblay sold Clover stock on February 4, 2021, ***he first bought an additional 250 shares***—doubling his holdings. (*See* Ex. A, Tremblay Dep. Tr. 88:13-20; *see also* Ex. D at CLOVER_PLAINTIFFS_000017.) Tremblay testified that he did so because he believed that the market had "overreacted" to the news released on February 4, 2021. (Ex. A, Tremblay Dep. Tr. 89:22-25; 90:2-4, 19-24; 94:16-18, 23-24; 95:4-18.) Only later that day did Tremblay sell his

---

[2] Defendants do not concede that Jabri is entitled to any damages.

2

Case 3:21-cv-00096    Document 108    Filed 09/30/22    Page 7 of 30 PageID #: 2470

shares of Clover stock. (*See* Ex. D at CLOVER_PLAINTIFFS_000017.) Tremblay has conceded that this gave the "wrong impression" to the Court. (*See* Ex. A, Tremblay Dep. Tr. 104:24-25; 105:2-17.)

Even if Plaintiffs could overcome these fatal issues (they cannot), Plaintiffs cannot rely on the fraud-on-the-market presumption in this case, meaning that individual issues will predominate, and the class cannot be certified. Specifically, the evidence before the Court shows that there was no inflationary price impact from any of the alleged misstatements in this case. Absent price impact, a class may not be certified because Plaintiffs cannot invoke the presumption of *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), to prove reliance on a class-wide basis. *See Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1959 (2021) ("If a misrepresentation had no price impact, then *Basic*'s fundamental premise completely collapses, rendering class certification inappropriate.") Here, the majority of the allegedly false and misleading statements that are the subject of Plaintiffs' claims occurred when the business combination transaction was announced on October 6, 2020 ("Business Combination"). But Clover's stock price *decreased* on that day, showing that the alleged misstatements did not have any inflationary price impact on Clover's stock price when made. This lack of front-end price impact alone is sufficient to rebut the fraud-on-the-market presumption.

## ARGUMENT

## I. LEGAL STANDARD

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). Rule 23 of the Federal Rules of Civil Procedure, which governs certification of class actions, "does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Instead, to certify a class, a plaintiff "must actually ***prove***—not simply plead—that their proposed

3

class satisfies each requirement of Rule 23 . . . ." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) ("*Halliburton II*"). Thus, a plaintiff seeking to certify a class must prove that it satisfies the Rule 23(a) prerequisites of: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy. *Comcast*, 569 U.S. at 33; *see also Wal-Mart*, 564 U.S. at 350 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc.").

A plaintiff seeking class certification "must [also] show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). A party invoking Rule 23(b)(3)—as Plaintiffs do here—must show that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members," and that (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). If any element under Rule 23 is not satisfied, class certification must be denied. *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006).

In assessing whether Plaintiffs have carried their burden, this Court must conduct a "rigorous analysis" of the evidence presented. *Wal-Mart*, 564 U.S. at 351. Specifically, this Court must resolve material factual disputes relevant to each Rule 23 requirement and must find that each requirement is established by at least a preponderance of the evidence. *In re U.S. Foodservice, Inc. Pricing Litig.*, 729 F.3d 108, 117 (2d Cir. 2013) ("To certify a class, a district court must make a definitive assessment of Rule 23 requirements, notwithstanding their overlap with merits issues, must resolve material factual disputes relevant to each Rule 23 requirement, and must find that each requirement is established by at least a preponderance of the evidence.").

This "rigorous analysis" of Rule 23's requirements "will frequently entail overlap with the merits of the plaintiffs' underlying claim," but it is improper to "refus[e] to entertain arguments . . . simply because those arguments would also be pertinent to the merits determination." *Comcast*, 569 U.S. at 33-34.

## II.  THE PROPOSED CLASS REPRESENTATIVES ARE INADEQUATE

### A.  The Court Should Deny Class Certification Because There Are Serious Concerns About Plaintiffs' Ability to Lead This Litigation

Plaintiffs fail to demonstrate that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Under the adequacy inquiry, courts may consider the credibility, integrity, honesty, and trustworthiness of the proposed Class Representative because "an untrustworthy plaintiff could reduce the likelihood of prevailing on the class claims." *Searcy v. eFunds Corp.*, 2010 WL 1337684, at *4 (N.D. Ill. Mar. 31, 2010) (finding plaintiff to be an inadequate class representative due to credibility issues flowing from plaintiff's unsupported and misleading declaration in support of her class certification motion); *see also Smyth v. Carter*, 168 F.R.D. 28, 33 (W.D. Va. 1996) ("[I]f the named plaintiffs are evasive, untruthful, or lack credibility, this weighs heavily against them as adequate class representatives.").

Plaintiffs make a conclusory argument that Jabri and Tremblay satisfy Rule 23(a)'s adequacy requirement because they are proposed class members, purchased shares of Clover stock, and "demonstrated an ability to take an active role in the litigation to protect the interests of class members." (Doc. No. 102 at 18.) But discovery has revealed serious issues regarding the Plaintiffs' credibility, which render them inadequate to serve as Class Representatives. *See, e.g.*, *Savino*, 164 F.3d at 87; *Garcia De Leon v. N.Y. Univ.*, 2022 WL 2237452, at *14 (S.D.N.Y. June 22, 2022) (finding that plaintiff was inadequate because her inaccurate and conflicting deposition

testimony and lack of knowledge of the case called into question her honesty and trustworthiness and would create serious concerns as to her credibility at trial).

**B.     Jabri Misrepresented His Losses to the Court and Lacked Candor at His Deposition**

This Court appointed Jabri as Lead Plaintiff because he "claimed the largest monetary loss at issue in this case, $542,642." (Doc. No. 58 at 4.) But Jabri's "loss" was not close to $542,642. In claiming $542,642 in "losses," Jabri simply took the difference between the price at which he bought his Clover shares during the Class Period and the average trading price of Clover stock for the 61 days following the publication of the Hindenburg Report, which was $9.44. (Doc. No. 41-4.) Jabri purchased his shares at approximately $15.85 to $16.94 per share (a price higher than what other lead plaintiff candidates purportedly paid). (*See id*.) Thus, the difference between what he paid for them and the average trading price in the 61 days following the Hindenburg Report—approximately $6.78 per share—resulted in claimed "damages" higher than those claimed by other lead plaintiff candidates. But that is not how damages are calculated in Section 10(b) cases, which Jabri well knows, because the First Amended Complaint for Violations of the Federal Securities Laws (the "<u>Complaint</u>") that he authorized to have filed on his behalf uses a very different approach (the one actually supported by law and logic). (*See* Doc. No. 70.)

Specifically, Lead Plaintiff Jabri's entire theory of this case is that he and other proposed class members bought shares "at artificially inflated prices during the Class Period and [were] damaged upon the revelation of the alleged corrective events." (¶ 30.) According to Jabri, when the "alleged corrective events" occurred, Clover's stock price dropped by "$1.72 per share, or 12.33%, to close at $12.23 per share on February 4, 2021." (¶¶ 22, 331.) Dr. Matthew Cain, Plaintiffs' expert, asserts that the "abnormal" stock price decrease on February 4, 2021, was a little larger, 13.74%, which equates to a decline of approximately $1.92 per share. (*See* Corrected Cain

6

Report, Doc. No. 107-1 at 25 ¶ 57.) Although Defendants strenuously dispute the merits of Plaintiffs' claims and Dr. Cain's asserted price impact, this approach is at least consistent with applicable law, which measures losses under Section 10(b) using the "out-of-pocket" approach. Under that approach, damages are measured as the difference between what the investor actually paid for a security, and what they should have paid, i.e., the price absent the alleged artificial inflation. *See Rowe v. Marietta Corp.*, 172 F.3d 49 (6th Cir. 1999) (affirming that "the 'out-of-pocket' measure of damages was the most appropriate measure of damages" in a Section 10(b) case).

While Defendants maintain that no stock price decline on February 4, 2021, is recoverable, the point is that neither the $1.72 figure in the Complaint, nor the $1.92 figure in Dr. Cain's report, is even close to the $6.78 per share loss that Jabri claimed in asking this Court to appoint him as Lead Plaintiff, and is wholly inconsistent with applicable law.[3]

If Jabri had accurately described his potential losses of approximately $150,000 in his lead plaintiff application, certification, and accompanying exhibits, the Court might have appointed a different candidate as lead plaintiff in this action. There were other applicants who held more shares than Jabri did, and thus might have had a larger financial interest.[4]

Jabri's credibility issues do not end with the *losses* he claimed to have suffered; they

---

[3] Jabri cannot claim to be unaware of the way damages are calculated in Section 10(b) cases. He testified that before he sought to be appointed as Lead Plaintiff, he reviewed the initial complaint in this action, which, like the Complaint, only asserts one stock price drop on February 4, 2021, at $1.72. (*See* Ex. C, Jabri Dep. Tr. 39:22-25; 40:1-16; *see also* Doc. No. 1 at ¶ 7 ("On this news, shares of Clover common stock plummeted from their February 3, 2021 closing price of $13.95 per share to just $12.23 per share on February 4, 2021, representing a one day drop of approximately 12.3%.").)

[4] *See, e.g.*, Doc. No. 38 at 7 (asserting that "Meadows and Desai purchased 99,402 shares of Clover stock"); Doc. No. 29 at 8 (asserting that "Mr. Bunton incurred a substantial loss of approximately $526,924.97 on his class period transactions in Clover Health securities").

continued when he was questioned about the fact that he actually ***made a large profit on his Clover investment***.  Specifically, in discovery, Defendants learned that in June 2021, Jabri sold his entire holding of 80,025 shares of Clover stock at approximately $17.75 to $17.79 per share.  (Ex. E at CLOVER_PLAINTIFFS_000076.)  That resulted in a substantial profit of over $120,000 in just six months (for an annualized return of approximately 22.12%).  But when Defendants questioned Jabri about his profits during his deposition, he evaded the question multiple times.  The excerpt below is just one of the examples of Jabri's evasiveness:

> Q Now, understanding that, will you admit that you made money on the investments that are listed here on Exhibit 15 [showing Jabri's estimated loss of $542,642, retained shares of 80,025, and purchase dates, shares, prices, and amounts of Clover stock from December 28, 2020 through January 8, 2021]?
>
> A When I filed this lawsuit, I was very much at a loss. These -- yeah.
>
> Q So you, in doing your best to satisfy your duty of candor, that was the answer that you gave to my question? Do you want me to repeat the question?
>
> A No, I'm clear.
>
> Q Do you know how much profit you made on the investments on Exhibit 15?
>
> A I lost money. When I filed this case, I was very much at a loss. When I became Lead Plaintiff, I was very much at a loss. I lost more than half a million dollars.
>
> Q That's not what I asked. I'm going to – I'm going to read my question back. Do you know how much profit you made on the investments on Exhibit 15?
>
> A Do I know how much profit I made -- I -- again, when I filed this case, I was at a loss. What happened later is me getting lucky.
>
> Q I'm going to – I'm going to ask the question again because you're not answering it. Do you know how much profit you made on the investments listed on Exhibit 15?
>
> MR. CALANDRA: Objection to form. But go ahead.
>
> THE WITNESS: I think the question is invalid.

***

8

Q And when you reported to the IRS your transactions, are you telling me that you told the IRS you lost over half a million dollars?

A I filed the transactions as they occurred and if there was a gain, I paid -- you know, I -- if there was a gain, I paid taxes on that gain.

Q Okay. And what did you tell the IRS when you filed your taxes?

A I told them I sold the stock for the price that I sold it for, $17 and something.

Q So you do remember what you sold it for?

A Roughly speaking, yeah.

Q And it was higher than you bought it for?

A That was just me getting lucky.

Q I'm not asking about luck. I'm just asking about two numbers. Did you sell all of the stock listed on Exhibit 15 for more money than you paid for it?

A That was me getting lucky. Yes, I did, but that was me getting lucky.

(Ex. C, Jabri Dep. Tr. 69:21-72:24.)

Jabri's evasiveness during his deposition "significantly undermines his credibility, jeopardizes his claim[s], and impairs the interests of the proposed class." *Harden v. Autovest, L.L.C.*, 2016 WL 4408905, at *4-5 (W.D. Mich. Aug. 19, 2016) (denying class certification where plaintiff's deposition testimony that he was not party to a contract was directly at odds with documentary evidence that included an agreement bearing "his name and a signature 'similar' to his own"); *see also Fishon v. Peloton Interactive, Inc.*, 2022 WL 179771, at *12 (S.D.N.Y. Jan. 19, 2022) (denying certification where plaintiff's "evasive and inconsistent testimony at his deposition create[d] serious concerns as to his credibility at any trial").

### C. Tremblay Similarly Lacks Credibility

Tremblay, too, suffers from credibility issues and, thus, cannot be a Class Representative. Indeed, like Jabri, Tremblay also has not been forthright with the Court. On February 22, 2021,

9

in connection with the original complaint that he filed in this case, Tremblay represented to the Court that on February 4, 2021—the day the Hindenburg Report came out (pre-market), the only securities transaction he made was to sell his entire holdings of Clover stock. (*See* Ex. F, *Tremblay v. Clover Health Invs., Corp.*, No. 3:21-cv-00138 (M.D. Tenn. Feb. 22, 2021), Doc. No. 1-3 ("Summary of Purchases and Sales").)

### SUMMARY OF PURCHASES AND SALES

| DATE | PURCHASE OR SALE | NUMBER OF SHARES | PRICE PER SHARE |
|---|---|---|---|
| 01/29/2021 | Purchase | 250 | $13.95 |
| 02/04/2021 | Sale | 250 | $12.20 |

(Ex. F at 2.)

But that is not true. In reality, before selling any shares on February 4, 2021, Tremblay **already had purchased an additional 250 shares**, doubling his investment in Clover. (*See* Ex. A, Tremblay Dep. Tr. 88:13-20; *see also* Ex. D at CLOVER_PLAINTIFFS_000017.) And Tremblay did so because, as he testified, he believed that the stock market had "overreacted" to the news on February 4, 2021. (*See* Ex. A, Tremblay Dep. Tr. 89:16-90:4; 90:19-24.) Tremblay then sold his position on February 4, 2021. (*See* Ex. D at CLOVER_PLAINTIFFS_000017.) Moreover, Tremblay's testimony conflicts with the Complaint's allegations that Clover's stock price dropped when the "truth" underlying the alleged misstatements emerged on February 4, 2021. (*See, e.g.*, ¶¶ 3, 20, 22, 229.)

Tremblay's decision to purchase more Clover stock on February 4, 2021, raises serious questions for cross-examination, as does his decision to conceal that information. Indeed,

10

Tremblay conceded that his certification gave the wrong impression of his trading decisions on February 4, 2021.[5] (*See* Ex. A, Tremblay Dep. Tr. 104:24-25; 105:2-17.)

**D.    Tremblay Lacks Even Basic Knowledge About the Claims and Facts at Issue in This Case, Rendering Him an Inadequate Class Representative**

Tremblay is also an inadequate Class Representative because he does "not have a firm grasp on [his] own case." *Garcia De Leon*, 2022 WL 2237452, at *15. To meet Rule 23's adequacy requirement, "an adequate plaintiff must be sufficiently interested in the case to ensure its vigorous prosecution." *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 486 (W.D. Mich. 1994) (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)). And "the participation of named plaintiffs must not be so minimal that they virtually have abdicated to their attorneys the conduct of the case." *Id*.

The adequacy requirement is not met if a plaintiff "displays a lack of credibility regarding the allegations being made or a lack of knowledge or understanding concerning what the suit is about." *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 315 (E.D. Va. 2007). "Any lingering uncertainty, with respect to the adequacy standard in securities fraud class actions, has been conclusively resolved by the PSLRA's requirement that securities class actions be managed by active, able class representatives who are informed and can demonstrate they are directing the litigation." *Berger v. Compaq Comput. Corp.*, 257 F.3d 475, 483 (5th Cir. 2001); *see also Maywalt*

---

[5] In addition, Tremblay testified that he has deleted potentially relevant documents (Ex. A, Tremblay Dep. Tr. 109:11-25; 110:2-3), which further undermines his ability to serve as a Class Representative. *See, e.g.*, *Kline v. Wolf*, 702 F.2d 400, 401-03 (2d Cir. 1983) (affirming denial of class certification based, *inter alia*, on lead plaintiff's failure to comply with discovery obligations); *Koss v. Wackenhurt Corp.*, 2009 WL 928087, at *7 (S.D.N.Y. Mar. 30, 2009) (finding that plaintiff was inadequate when "exhibit[ing] a disregard or inability to comply with discovery requests"); *Rocco v. Nam Tai Elecs., Inc.*, 245 F.R.D. 131, 136-37 (S.D.N.Y. 2007) (denying certification where plaintiff's discovery failures "could impact [lead plaintiff's] credibility if this information were brought before the jury at trial").

*v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1077-78 (2d Cir. 1995) ("[C]lass certification may properly be denied where the class representatives ha[ve] so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys.").

Tremblay did not "demonstrate a basic understanding of the facts and legal claims comprising [his] case." *In re AEP ERISA Litig.*, 2008 WL 4210352, at *2 (S.D. Ohio Sept. 8, 2008). During his deposition, Tremblay was unable to articulate the facts or claims underlying the putative class action, or the names, roles, or even number of Defendants. (*See, e.g.*, Ex. A, Tremblay Dep. Tr. 24:23-25 (noting that it would be "hard to describe" Clover); 25:2-15 (struggling to explain the claims underlying the litigation); 25:16-25; 38:24-25; 39:2-25 (demonstrating complete lack of knowledge as to the Individual Defendants); 40:2-10 (stating that he was aware of the existence of an amended class action complaint "but not more than that"); 41:20-22 (stating that he did not remember whether he reviewed the Complaint before it was filed); 42:10-17 (same).) Tremblay also could not explain Clover or its business, noting that the Company and the litigation are "perhaps like the same thing. I'm not sure." (*Id*. at 25:16-25.) Tremblay was unfamiliar with the role of a named plaintiff in a securities class action. (*See id*. at 37:10-18.) For instance, when asked if he has "any responsibilities in connection with this case," Tremblay responded, "I don't have . . . duties to another party." (*Id*. at 37:25; 38:2-6.) When asked more specifically if he has "any duties to the members of the putative class," Tremblay simply stated, "no." (*Id*. at 38:7-9.)

Furthermore, Tremblay admitted to "not really" preparing for his deposition. (*See id*. at 14:25; 15:2-3.) In fact, Tremblay testified that he spent only thirty minutes preparing for the deposition and reviewed only two documents during that time. (*See, e.g.*, *id*. at 15:22-23 (stating

12

that he attended one meeting with counsel for deposition preparation); 16:4-5 (stating that the single deposition preparation meeting with counsel lasted 30 minutes); 16:19-21 (stating that he reviewed two documents for deposition preparation); 18:8-13 (same).)

In short, Tremblay's deposition testimony seriously calls into question whether he "simply len[t] his name to a suit controlled entirely by the class attorney." *Fishon*, 2022 WL 179771, at *12.

## III. THE PROPOSED CLASS FAILS TO MEET THE REQUIREMENTS OF RULE 23(B) BECAUSE PLAINTIFFS CANNOT INVOKE THE FRAUD-ON-THE-MARKET PRESUMPTION

### A. The Fraud-on-the-Market Presumption of Reliance Requires Plaintiffs to Show That Clover Securities Traded in an Efficient Market

Reliance is an element of each of the Plaintiffs' Section 10(b) claims. *Halliburton II*, 573 U.S. at 263 ("Investors can recover damages in a private securities fraud action only if they prove that they relied on the defendant's misrepresentation in deciding to buy or sell a company's stock."). However, Plaintiffs do not assert that they can prove actual reliance upon the alleged misstatements that form the basis of the Complaint. (*See, e.g.*, ¶¶ 364-66.) Instead, to satisfy the reliance element, Plaintiffs seek to invoke the so-called "fraud-on-the-market" ("FOTM") rebuttable presumption of reliance. (*See* ¶ 364; *see also* Doc. No. 102 at 20-21.) The FOTM presumption is not available here.[6]

---

[6] Plaintiffs assert that they can, in the alternative, invoke the presumption of reliance articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). (Doc. No. 102 at 26-27.) However, the *Affiliated Ute* presumption does not apply where, as here, "the Plaintiffs' complaint alleges numerous affirmative misstatements by the Defendants," "the Plaintiffs focus their claims on those affirmative misstatements," and "Plaintiffs are therefore not in a situation in which it is impossible for them to point to affirmative misstatements." *Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017). Here, Plaintiffs concede that the *Affiliated Ute* presumption is limited to claims "involving primarily failure to disclose." (Doc. No. 102 at 26 (quoting *Affiliated Ute*, 406 U.S. at 153).) Plaintiffs point to several affirmative statements that they allege were misleading. (*See, e.g.*, ¶¶ 227-319.) Accordingly, Plaintiffs are not entitled to the *Affiliated Ute* presumption

13

The FOTM presumption holds that "the market price of shares traded on well-developed markets reflects all publicly available information" and that "[a]n investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Basic*, 485 U.S. at 246-47. A securities plaintiff invoking the *Basic* presumption must establish: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 268. Without the FOTM presumption of reliance, this case cannot "proceed as a class action" because, in its absence, "[e]ach plaintiff would have to prove reliance individually." *Id.* at 281.

"The efficient market hypothesis posits that a stock price on an efficient market reflects all publicly available information" and "represents the market's most accurate estimate of the value of a particular security based on its risk profile and expected future earnings." *Saumer v. Cliffs Nat. Res. Inc.*, 853 F.3d 855, 859 (6th Cir. 2017). In an efficient market, the security "absorb[s] this information in a rational way in producing trading prices." *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 288 (S.D.N.Y. 2008).

The mere fact that Clover's common stock traded on the Nasdaq or NYSE during the Class Period is insufficient to demonstrate that those securities traded in an efficient market. *See, e.g.*, *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 178 (S.D.N.Y. 2012) ("*In re Freddie Mac*") (listing is just an indicator of efficiency; it is "not dispositive when efficiency is disputed"); *Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 313-14 (5th Cir. 2005) (plaintiffs failed to demonstrate that stock listed on Nasdaq was efficient); *In re PolyMedica Corp.*

---

because that "presumption does not apply to . . . what has been described as 'half-truths,' nor does it apply to misstatements whose only omission is the truth that the statement misrepresents." *Waggoner*, 875 F.3d at 96.

*Sec. Litig.*, 453 F. Supp. 2d 260, 273 (D. Mass. 2006) (denying class certification despite company's listing on the Nasdaq). Rather, Plaintiffs must affirmatively prove market efficiency.

**B.     Plaintiffs Have Not Carried Their Burden of Showing a Cause-and-Effect Relationship Between Clover News and Movements in the Price of Clover Securities**

In determining whether a company's securities traded in an efficient market, courts routinely examine the so-called *Cammer* and *Krogman* factors. *See Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 n.11 (2d Cir. 2008) ("The *Cammer* factors have been routinely applied by district courts considering the efficiency of equity markets."); *In re Freddie Mac*, 281 F.R.D. at 178 ("In addition, courts sometimes apply three additional *Krogman* factors . . . ."). "[T]he most important *Cammer* factor is the 'cause and effect' factor—evidence that unexpected corporate events or releases caused an immediate response in the price of a security." *In re Freddie Mac*, 281 F.R.D. at 178; *see also Bombardier*, 546 F.3d at 207. "This is 'the essence of an efficient market and the foundation for the fraud on the market theory.'" *In re Freddie Mac*, 281 F.R.D. at 178 (quoting *Bombardier*, 546 F.3d at 207). Indeed, "[w]ithout the demonstration of such a causal relationship, it is difficult to presume that the market will integrate the release of material information about a security into its price." *Bombardier*, 546 F.3d at 207-08.

This factor is so important that a plaintiff's failure to satisfy it can defeat class certification even if the other factors are satisfied. *See George v. China Auto. Sys., Inc.*, 2013 WL 3357170, at *9-13 (S.D.N.Y. July 3, 2013) (finding that plaintiffs had not carried their burden of proving an efficient market where the fifth *Cammer* factor was the only one contested, and acknowledging that the presence or absence of some of the other *Cammer* factors, "for instance, the average weekly trading volume and the eligibility to file a Form S-3," is not determinative of the efficiency analysis); *see Cunha v. Hansen Nat. Corp.*, 2013 WL 12124073 (C.D. Cal. June 20, 2013)

15

(tentative ruling on Mot. for Class Cert.), *confirmed by* Final Ruling on Mot. For Class Cert. (C.D. Cal. Jan. 17, 2014). Plaintiffs have not established the requisite cause-and-effect relationship with respect to the Clover securities at issue.

Plaintiffs have attempted to prove the required cause-and-effect relationship between unexpected Clover-specific news and the price of Clover's common stock through a singular "event study" performed by their retained expert Dr. Cain. (Corrected Cain Report, Doc. No. 107-1 at 21 ¶ 46.) The purpose of an event study is to test empirically whether the price of stock rapidly incorporates new value-relevant information. If it does, that is consistent with market efficiency.

Plaintiffs' proposed Class Period covers 83 trading days. But Dr. Cain's event study evaluated whether Clover's Class A common stock responded to information disclosed on a very small sample size of "News Days"—specifically, three "News Days" on October 6, 2020, January 6, 2021, and January 7, 2021.[7] (Corrected Cain Report, Doc. No. 107-1 at 56-57.) On just two of those days, Clover's stock price showed a statistically significant abnormal price movement. (*Id*.) One of those days is the very first day of the proposed Class Period—October 6, 2020. (*Id*.) The other is near the end, on January 7, 2021. (*Id*.) Solely on the basis of these two dates, Dr. Cain concludes that Clover's stock traded in an efficient market throughout the entirety of the Class Period. (*See id*. at 25 ¶ 58.)

But there were numerous other days during the Class Period during which there was no

---

[7] *See, e.g.*, *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *5 (N.D. Ohio Aug. 14, 2018) (denying class certification where plaintiff's expert's test relied on an "insufficiently small sample" showing market reaction to news on four of 330 trading days); *George*, 2013 WL 3357170, at *12 (holding that "only seven out of sixteen days resulted in a market reaction [was] an insufficient foundation upon which to pronounce market efficiency"); *In re Freddie Mac*, 281 F.R.D. at 180 (finding that 16 of 57 news days were insufficient to establish market efficiency because "plaintiff must show that the market price responds to most new, material news").

statistically significant Clover stock price movement.  If value-relevant information about Clover

was released on those days and Clover's stock price did not react, that would be ***inconsistent*** with

an efficient market.  But Dr. Cain testified that he did not even attempt to determine whether any

"value relevant" information was communicated to the market on those days.  (*See* Ex. B, Cain

Dep. Tr. 129:22-25; 130:2-11; 131:2-25; 132:2; *see also* Corrected Cain Report, Doc. No. 107-1

at 19 ¶ 43.)[8]  In other words, even though Dr. Cain admits that the fifth *Cammer* factor is dependent

on determining whether "value-relevant" information was incorporated into the stock price, he did

not evaluate that issue.  As such, Plaintiffs fail to meet their burden.

## IV.    EVEN IF PLAINTIFFS CAN INVOKE THE FRAUD-ON-THE-MARKET PRESUMPTION, THAT PRESUMPTION IS REBUTTED BECAUSE THERE WAS NO "FRONT-END" PRICE IMPACT FROM ANY ALLEGED MISSTATEMENT

Defendants can rebut the FOTM presumption "in a number of ways," including by showing

that the alleged misstatements had no price impact.  *Halliburton II*, 573 U.S. at 263-64.  If the

"alleged misrepresentation had no price impact . . . the fraud-on-the-market theory does not apply

and common reliance thus cannot be presumed."  *Id*. at 281.  As the Supreme Court recently

emphasized, the price impact analysis is flexible and holistic, and "courts should be open to *all*

---

[8] For example, Dr. Cain did not evaluate whether any "value relevant" information was communicated to the market on November 19, 2020, and November 20, 2020.  Yet, on those two days, Clover's stock price barely moved despite the allegedly "material" misstatements (it increased $0.01 on November 19 following Clover's "Fireside Chat," and $0.05 on November 20 following Clover's Analyst Day Presentation).  (*Compare* Soc. Cap. Hedosophia Holdings Corp. III, Wolfe Healthcare Conference Fireside Chat Transcript, November 19, 2020 (Form 425) (Nov. 20, 2020), *and* Soc. Cap. Hedosophia Holdings Corp. III, Transcript: Analyst Day Presentation on November 20, 2020 (Form 425) (Nov. 25, 2020), *with* Nasdaq, CLOV Historical Data, https://www.nasdaq.com/market-activity/stocks/clov/historical.)  And, on January 12, 2021, following Clover's J.P. Morgan Healthcare Conference presentation, the stock price decreased by $0.36 despite the alleged misstatements made on that day.  (*Compare* Press Release, Clover, Clover Health to Present at the J.P. Morgan Healthcare Conference on January 12, 2021 (Jan. 7, 2021), *with* CLOV Historical Data, *supra*.)

probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman Sachs Grp.*, 141 S. Ct. at 1960.

A defendant rebuts the FOTM presumption with evidence that the alleged misstatements were not associated with positive stock-price returns when made ("front-end" price impact) or negative stock price returns when corrected ("back-end" price impact). *See, e.g.*, *Halliburton II*, 573 U.S. at 280 (holding that a defendant rebuts the presumption of price impact with "evidence that the asserted misrepresentation (*or* its correction) did not affect the market price of the defendant's stock"); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 2018 WL 3861840, at *18 (N.D. Ohio Aug. 14, 2018) (finding no price impact where "there was no evidence to suggest that the Company's disclosures were disclosures linked to the alleged misrepresentations and omissions in the" complaint). Lack of front-end price impact alone is sufficient to rebut the FOTM presumption of reliance. *See, e.g.*, *Basic*, 485 U.S. at 248 ("***Any showing*** that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, *will be sufficient* to rebut the presumption of reliance."); *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782-83 (8th Cir. 2016) (holding that "evidence of no 'front-end' price impact" is sufficient to "rebut[] the *Basic* presumption" because it "sever[s] any link between the alleged [] misrepresentations and the stock price at which plaintiffs purchased"); *Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *7-8 (N.D. Cal. Dec. 5, 2017) (holding that front-end evidence rebutted presumption).[9]

---

[9] Defendants anticipate that Plaintiffs might cite to *Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, at *9 (M.D. Tenn. June 26, 2017), for the proposition that lack of front-end price impact *and* back-end price impact is required to refute the FOTM presumption. But the holding in *Burges* is inapplicable here. The decision in *Burges* was based on the court's determination that the "price-maintenance theory," which some courts have adopted, applied in that case. The price-maintenance theory posits that some alleged misstatements do not cause a stock price to increase,

18

Here, the evidence shows that the alleged misstatements did not have any inflationary price impact on the price of Clover's stock. The majority of the allegedly false and misleading statements that are the subject of Plaintiffs' claims occurred on October 6, 2020, when Clover as a private company ("Legacy Clover") and Social Capital Hedosophia Holdings Corp. III ("SCH") announced the Business Combination. (*See, e.g.*, ¶¶ 2, 61, 117, 119, 124, 149, 193, 223, 231, 246, 248, 250, 254, 275.) But Clover's stock price *decreased* on that day, meaning there is no evidence of any inflation from the alleged misstatements on that day. (*See* Corrected Cain Report, Doc. No. 107-1 at 24 ¶ 53; *see also* Ex. B, Cain Dep. Tr. 147:3-21.) Nor is there any evidence of inflationary impact from any of the other alleged misstatements, as Dr. Cain admitted during his deposition that he did not conduct any price impact analysis on any of the dates on which an alleged misstatement was made. (*See* Ex. B, Cain Dep. Tr. 149:21-24; 150:3-9.)

*IBEW Local 98 Pension Fund v. Best Buy Co.* is illustrative. There, the plaintiffs challenged, *inter alia*, two oral statements made during a conference call. 818 F.3d at 777-78. At the class certification stage, the defendants showed, by reference to the plaintiff's own expert report, that there was no statistically significant price increase following the alleged misstatements. *Id*. Based on that showing, the Eighth Circuit held that the defendants had provided "strong evidence" in the form of "*the opinion of plaintiffs' own expert*" that "there [was] *no* link between the price of [Best Buy's] stock and any of the alleged misrepresentations because [those]

---

but rather are designed simply to **maintain the price of a stock**. For example, a plaintiff might allege that a misstatement about Company X's earnings was made so that Company X would not miss its previously reported earnings target, thus maintaining Company X's stock price, which otherwise would have fallen. But the price-maintenance theory cannot apply here because prior to October 6, 2020, there had been no public announcement of the Business Combination between SCH and Legacy Clover. Accordingly, prior to October 6, 2020, SCH's stock price could not possibly have been trading based on information relating to Legacy Clover. Thus, it is not possible for any alleged misstatements about Legacy Clover (which are disputed) to have maintained the prior trading price of SCH.

19

misrepresentations just reflected the 'status quo'" and the plaintiffs' own expert reached that conclusion. *Id*. at 782. This lack of "front-end" price impact rebutted the FOTM presumption. *Id.* As in *Best Buy Co.*, Plaintiffs' own expert report in this case shows that there was no statistically significant price impact from the alleged misstatements that form the core of Plaintiffs' case.

## <u>CONCLUSION</u>

For the reasons discussed herein, Defendants respectfully request that the Court deny the Motion.

20

Dated:    September 30, 2022                      Respectfully submitted,

**BASS, BERRY & SIMS PLC**

*/s/ Joseph B. Crace, Jr.*
Britt K. Latham (BPR #23149)
Joseph B. Crace, Jr. (BPR # 27753)
150 Third Ave., South, Suite 2800
Nashville, TN 37201
Tel. (615) 742-7762
Facsimile: (615) 742-2847
blatham@bassberry.com
jcrace@bassberry.com

**MILBANK LLP**

Scott A. Edelman (admitted *pro hac vice*)
Jed M. Schwartz (admitted *pro hac vice*)
Gary A. Crosby II (admitted *pro hac vice*)
55 Hudson Yards
New York, New York 10001
Tel. (212) 530-5000
sedelman@milbank.com
jschwartz@milbank.com
gcrosby@milbank.com

*Counsel for Defendants Clover Health*
*Investments, Corp., Vivek Garipalli,*
*Andrew Toy, Joseph Wagner, and*
*Chamath Palihapitiya*

21

## **CERTIFICATE OF SERVICE**

I hereby certify that the foregoing was filed electronically on September 30, 2022. Notice of this filing will be sent to all electronically registered parties by operation of the Court's electronic filing system. The names of the attorneys for other parties who are registered to receive notices of filings through the Court's system are:

22

Benjamin A. Gastel
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Fax: (615) 255-5419
Email: beng@bsjfirm.com

Jacob A. Walker
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: jake@blockleviton.com

James Gerard Stranch, IV
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Fax: (615) 255-5419
Email: gerards@bsjfirm.com

Jeffrey C. Block
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: jeff@blockleviton.com

Stephen J. Teti
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: steti@blockleviton.com

Larry Russell Belk, Jr.
Sutherland & Belk, PLC
2505 21st Avenue South
Suite 400
Nashville, TN 37212
(615) 846-6200
Fax: (615) 208-2255
Email: russell@sbinjurylaw.com

James A. Holifield, Jr.
Holifield Janich Rachal & Associates, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
(865) 566-0115
Fax: (865) 566-0119
Email: aholifield@holifieldlaw.com

Brian Peter Calandra
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(646) 581-9958
Email: bcalandra@pomlaw.com

Brian Schall
Schall Law Firm
2049 Century Park East
Suite 2460
Los Angeles, CA 90067
(310) 301-3335
Email: brian@schallfirm.com

Paul Kent Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: pknashlaw@aol.com

Laurence M. Rosen
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: lrosen@rosenlegal.com

Phillip Kim
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: pkim@rosenlegal.com

Robert P. Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: robert@bramlettlawoffices.com

Corey D. Holzer
Holzer & Holzer, LLC
1200 Ashwood Parkway
Suite 410
Atlanta, GA 30338
(770) 392-0090
Fax: (770) 392-0029
Email: cholzer@holzerlaw.com

J. Alexander Hood , II
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Fax: (212) 661-8665
Email: ahood@pomlaw.com

Jeremy A. Lieberman
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Email: jalieberman@pomlaw.com

Charles F. Barrett
Neal & Harwell, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
(615) 244-1713
Email: cbarrett@nealharwell.com

Patrick V. Dahlstrom
Pomerantz LLP (Chicago Office)
10 S LaSalle Street, Suite 3505
Chicago, IL 60603
(312) 377-1181
Email: pdahlstrom@pomlaw.com

John Tate Spragens
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
(615) 983-8900
Email: john@spragenslaw.com

Saul C. Belz
Glankler Brown, PLLC
6000 Poplar Avenue, Suite 400
Memphis, TN 38119
(901) 576-1741
Email: sbelz@glankler.com

Tara L. Swafford
The Swafford Law Firm, PLLC
321 Billingsly Court
Suite 19
Franklin, TN 37067
(615) 599-8406
Fax: (615) 807-2355
Email: tara@swaffordlawfirm.com

Rina Restaino
Schall Law Firm
2049 Century Park East
Suite 2460
Los Angeles, CA 90067
(424) 303-1964
Email: rina@schallfirm.com

*/s/ Joseph B. Crace, Jr.*
Joseph B. Crace, Jr.
