# Exhibit A

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF TENNESSEE

CASE NO. 3:21-CV--00096

_____

TIMOTHY BOND,

     Lead Plaintiff,

and

JEAN-NICOLAS TREMBLAY,

     Named Plaintiff,

Individually and on Behalf of All Others

Similarly Situated,

vs.

CLOVER HEALTH INVESTMENTS CORP. f/k/a SOCIAL CAPITAL

HEDOSOPHIA HOLDINGS CORP. III, VIVEK GARIPALLI,

ANDREW TOY, JOE WAGNER, and CHAMATH PALIHAPITIYA,

     Defendants.

_____

VIDEO DEPOSITION OF

JEAN-NICOLAS TREMBLAY

Conducted Remotely

Tuesday, August 30, 2022

8:42 a.m.  CDT

_____

Reported by:  Elisabeth A. Lorenz:  RMR, CRR

Job No. 216350

JEAN-NICOLAS TREMBLAY

and international taxation.

Q        Mr. Tremblay, can you describe for me your employment history, beginning with after you received your bachelor -- bachelor's in law?

A        Well, I did my internship for -- to complete my Québec bar, but then I did my -- I went straight to my master degree, so I haven't practiced yet like -- except for my -- for my internship, which was six months, except apart from that --

                (Stenographer requested clarification due to audio distortion/malfunction.)

                THE WITNESS:  I didn't practice yet. Like I just finished my master degree.

BY MR. SCHWARTZ:

Q        I should have asked this, but when did you receive your bachelor -- bachelor's degree?

A        In 2020.

Q        And your master's, was that also 2020?

A        No, it's been 2022 -- well, I -- I haven't received it yet.  I've completed my classes, but I am about to receive it.

Q        So as I understand it, you -- other than a six-month internship, you have not worked as a lawyer; is that correct?

JEAN-NICOLAS TREMBLAY

A    Yes.

Q    And you're not currently working, correct?

A    Exactly.

Q    I think I know the answer to this based on what you just said.

But have you ever had a job that involved the trading of securities?

A    No, I didn't.

Q    Do you have a job lined up that you're going to start in the near future?

A    Can you repeat your question?

Q    Do you have a job prospect that you're going to begin in the near future?

A    Yes.

Q    And where -- what company or firm will you be working for?

A    Well, as of now, it should be KPMG, which is an accounting firm, but I might start in a law firm. I'm in process for it.

Q    And what law firm?

A    I don't know yet.  I applied at like four or five, but I haven't received answers yet.  I applied just like last week so...

Q    Mr. Tremblay, have you done anything to

JEAN-NICOLAS TREMBLAY

prepare for your deposition today?

A     Not really.

Q     Did you have any in-person or video or telephonic meetings with anyone to prepare for your deposition today?

A     Yes.

Q     Who did you meet with -- well, sorry.

Was it -- can you tell me, was it a video or in-person or telephonic meeting?

A     I was --

MR. CALANDRA:  I caution -- Mr. Tremblay, hold on.  I'll just caution the witness not to reveal any communications with counsel.  Please go ahead.

BY MR. SCHWARTZ:

Q     So for right now, I'm just asking you the method of how this meeting took place.

What method -- by what method did the meeting take place?

A     Video.

Q     Was it one meeting or multiple meetings?

A     Only one.

Q     When did that happen?

A     Last week.  On Thursday, I think.

JEAN-NICOLAS TREMBLAY

Q        The 25th of August?

A        Yes.

Q        How long was this meeting?

A        About -- perhaps like 30 minutes.

Q        And without telling me anything that was discussed, who participated in this video meeting?

A        Well, myself and my counsel, my lawyers if you -- like Corey Holzer and Brian Calandra.

Q        And so was it just the three of you, or was there anybody else?

A        It was just the three of us.

Q        Did you review any documents while -- during this meeting?

A        Like verbally or I'm just, like, seeing the document?

Q        Either way.

A        Yes.

Q        Approximately how many documents did you see during this meeting?

A        Two.

Q        Do you recall what those were?

          MR. CALANDRA:  I object, and I -- I instruct the witness not to answer that question. The documents I showed Mr. Tremblay during that

JEAN-NICOLAS TREMBLAY

meeting are my work product.

BY MR. SCHWARTZ:

Q        Right.  So with -- without telling me what they are, do you recall, sitting here today, what those documents were?

A        Yes, I recall.

Q        Did either of those documents refresh your recollection as to the -- the events that they pertain to?

        (Stenographer requested clarification due to audio distortion/malfunction.)

        MR. SCHWARTZ:  The events.

        THE WITNESS:  Yes, they did.

BY MR. SCHWARTZ:

Q        How long did you spend reviewing those documents?

A        Well, about, perhaps, 20 minutes.

Q        Did you -- did you do anything else to -- withdrawn.

        Did you review any other documents in advance of your deposition today?

A        Like to prepare myself or...

Q        To prepare yourself or for any other reason, just any documents related to this case in advance

JEAN-NICOLAS TREMBLAY

of your deposition today.

A        What you meant -- can you be precise what you mean by reviewing?  Like to remember facts or to prepare myself or...

Q        Well, did you -- did you look at -- let's just start with that.

         Did you look at any other documents in advance of the deposition today?

A        Yes, I -- apart from the two documents that I had just mentioned or...

Q        Correct.

A        No.  No other documents.

Q        Did you speak to anyone other than counsel in advance of your deposition today about your deposition?

A        No.

Q        And did you speak to anyone other than counsel about the subject matter of this litigation in advance of your deposition today?

A        No.

Q        Mr. Tremblay, when did you begin to invest in securities?

A        I don't remember, but a long time ago.

Q        How old are you, sir?

JEAN-NICOLAS TREMBLAY

A        I am 25th.

Q        And so do you recall approximately how old you were when you started investing in securities?

A        I was perhaps 17 or something like that, like 16 or perhaps even younger.

         But do you mean by myself or...

Q        In any way.

A        Okay.  Yeah, well, about like six or seven years old.

Q        Six or seven years old?

A        Yeah, but it wasn't by myself.

Q        And how were you investing in securities at six or seven?

A        Well, my father was investing money for me.

Q        Were you involved in any decisions when you were six or seven years old that --

A        Of course not.

Q        When did you start making what I'll call investment decisions for yourself?

A        At like 17 or 18.

Q        How often do you make purchases or sales of securities in any given year?

A        Right now, less often.  But in 2020, more often.  It depends on, like, my schedule.  Right

JEAN-NICOLAS TREMBLAY

A      Yes.

Q      Who do you consult with?

A      My father.

Q      Is he some type of an investment professional?

A      No.

Q      Do you ever consult with investment professionals before making an investment?

A      Do you mean right now or at the time?

Q      Thanks for the -- the clarification.

       In the 2020 to 2021 timeframe, did you consult with any investment professionals before making investment decisions?

A      No.

Q      Do you retain anyone to monitor your portfolio of investments?

A      Are you always talking about the 2020-2021 period or...

Q      I'll try to be clearer.  I appreciate you clarifying.

       So I'll try to be clearer in my timeframe.

A      Okay.

Q      But -- so you don't -- you don't need to make an assumption.  You can always ask me for a

JEAN-NICOLAS TREMBLAY

clarification.

During the 2020 to 2021 timeframe, was anyone involved in monitoring your investments in securities?

A    Again, in 2021, yes, but not like halfway through the year now, no, and not in 2020 as well.

Q    And who began to monitor your investments in 2021?

A    A friend of mine who's acting as a court -- who's working for Investa, which is like a trader company through May or...

Q    Now, Mr. Holzer has joined us today in the deposition.

Is his firm involved in monitoring your investments in any way?

A    No.

Q    Now, Mr. Tremblay, you understand that the -- the litigation that this deposition is being taken in connection with relates to a company called Clover Health, correct?

A    Yes, correct.

Q    What is your current understanding of what Clover Health is?

A    Well, it's -- would be hard to describe, but

JEAN-NICOLAS TREMBLAY

you have the documents in your hand.

But, like, it did misrepresentation essential -- essentially, and it stated, like, lies that -- they concealed information about from the investors about their Clover Assistant about what it might do -- and what it can do, cannot do, and that they were, like, caring for the actual patients, when their purpose might have been elsewhere and that -- they stated that, like, practitioners were using quite a lot their app -- and doing patient revisits when it wasn't necessarily true and might -- I might describe like many other things.

But I don't know what you want by this question.

Q       Sure.  So my question was a little different.  I'm not asking what your understanding of this litigation is.

I'm asking, what is your understanding of what the company Clover Health is?

A       Well, it's perhaps like the same thing.  I'm not sure.  Like what they did in the litigation or what they did like -- what -- what else is their field of practice or --

Q       Yes.

JEAN-NICOLAS TREMBLAY

What did Clover Health do?

A     What -- it was an insurance company for patients regarding the Medicare Advantage plan, which they were -- they were having an app that was used by practitioner to register illness and strength of the illness or like a rank of illness. So they were, like, mainly like medical insurance, if you will.

Q     Did you ever purchase Clover securities?

A     Yes.

Q     And when did you do that?

A     February 4th, I think.  I should see the documents.

Q     Mr. Tremblay, are you looking at a document or something?

A     Well, just to refresh my memory.  But do you -- if you want a precise date, since it has been like two years -- it was two years ago, so I don't remember the exact date.

Q     What -- what document are you looking at to refresh your memory?

A     Well, right now I'm not looking at a document.

Q     I'll -- I'm just trying to get a general

JEAN-NICOLAS TREMBLAY

follow the merger.  Like, I got out before the

merger since I begin my "stage."  And sometimes the

merger might go very well, and sometimes it might go

very wrong.  So I didn't want to, like, follow it

closely, so I got out before the merger happened.

Q       So if I understand correctly, you purchased

ESSC stock while it was still the SPAC and before it

merged with a private company; is that accurate?

A       Yeah.

Q       And did you sell your shares of ESSC, or did

you choose to have them redeemed in connection with

the merger?

A       I sold them.

Q       Is that the only SPAC that you invested in

in the 2020 or 2021 timeframe?

A       Yes.

MR. CALANDRA:  Note my objection.

Go ahead.

BY MR. SCHWARTZ:

Q       Have you ever spoken with anyone at Clover

Health?

A       No.

Q       Mr. Tremblay, I'm going to switch topics

now, although I think we will come back to more

JEAN-NICOLAS TREMBLAY

questions on securities later.  For now I'd like to focus on your understanding of this litigation.

Okay?

A         Yes.

Q         Do you understand that you are a named plaintiff in this action which is brought against Clover and certain other defendants?

A         Yes.

Q         What is your understanding of what it means to be a named plaintiff?

A         Well, this is a good question.  But actually I'm, like, part of the class action, and I'm not the lead plaintiff, so I'm just like a class -- second role or, like, among the mass.

But I need to have, like, a similar interest as the other members of the class action and like the -- yeah, that's my understanding.

Q         Sorry.  Were you finished?

A         Yeah, yeah.

Q         Do you have any responsibilities with respect to this litigation?

A         What do you mean by responsibility?  Like other than represent, or...

Q         As far as you understand, do you have any

JEAN-NICOLAS TREMBLAY

responsibilities in connection with this case?

A    I don't have, like -- well, other than just state my case and what happens to me, I don't have necessarily, like, other, like, duties to another party.

Q    Do you believe you have any duties to the members of the putative class?

A    No, I don't have, like, duties towards them.

Q    Do you know if there are any other named plaintiffs in this case?

A    There is none.

Q    And do you know if there is any lead plaintiffs in the case?

A    Yeah, there is one.

Q    And who is that?

A    Jabri something.  I know there is one, but his exact name, I don't know.

Q    Have you ever spoken with this person?

A    No.

Q    Have you had any communications with the lead plaintiff at all?

A    No.

Q    Do you know who the defendants are in this case?

JEAN-NICOLAS TREMBLAY

A        Yes.

Q        Who are they?

A        Well, Clover Health and -- and some -- some of the executive team of Clover Health.  I don't know their exact name, but they are named on the documents.

Q        But as you sit here today, you can't name them; is that correct?

A        Like, out of my memory, no.  But I have them in the documents, and I know who, like, they are, but...

Q        What do you mean, you know, who they are?

A        Well, I know their -- their job -- what is their job in Clover Health, in the company.

Q        Can you explain to me who these people are by -- by describing their job at Clover Health?

A        Like off of my memory, or...

Q        Yes.

A        No. I just said that I -- I cannot take them and their job out of my memory.

Q        Do you know how many people are named as defendants in this case?

A        Like, perhaps -- the exact number, no, but, like, perhaps, like, about four -- four or five.

JEAN-NICOLAS TREMBLAY

Q        Mr. Tremblay, are you aware that there's a -- there's been an amended class action complaint filed in this case?

A        I'm -- I'm aware, but not more than that. Like, I -- I fully trust my lawyers, so I'm not -- you know, it's a class action, so I don't make the -- my own documents, and I'm not the one, like, who's, like, making the documents for suing.  Like, it's my lawyers, and I trust them, so...

MR. SCHWARTZ:  Isabel, can we bring up Tab 6 and mark it as Exhibit 1, please.

MS. PITARO:  Yes.  Opening now.

(Marked Exhibit 1.)

BY MR. SCHWARTZ:

Q        Mr. Tremblay, we're going to be bringing up a document on the screen that you should be able to view in a moment or two.  My colleague is also going to give you control of the document, which should allow you to zoom in and also to page through it. It is a multipage document.

When that comes up, you can take all the time you need to review it.  But just so you know, my first question will be whether you've seen the document before.

JEAN-NICOLAS TREMBLAY

MR. SCHWARTZ: So, just for the record, we've now marked and shown the witness a document stamped for identification Defendant's Exhibit 1, and it's titled "First Amended Complaint for Violation of the Federal Securities Laws."

BY MR. SCHWARTZ:

Q        And as I said, Mr. Tremblay, my first question is, have you seen this document before?

A        Yes.

Q        When was the first time you saw this?

A        I don't remember.

Q        Did you -- if you look at the bottom of the first page, you'll see that there is a date stamped on it in blue writing that says June 28, '21.

Do you see that?

A        Yes.

Q        And I'll represent to you, that's the date this was filed with the court.

Did you review this document before it was filed with the court?

A        I don't remember.

Q        Is this one of the documents that you looked at to prepare for your deposition today?

MR. CALANDRA: I am going to instruct

JEAN-NICOLAS TREMBLAY

the witness not to answer that question if it would

reveal a communication with counsel.

BY MR. SCHWARTZ:

Q        And just so we have a clear record,

Mr. Tremblay, are you going to follow your counsel's

instruction?

A        Yes.

Q        And just -- just so we understand,

Mr. Tremblay, do you have any recollection of

reviewing the content of this document before it was

filed in June of 2021?

A        Can you repeat your question?

Q        Do you have any recollection of reviewing

the content of this document before it was filed in

June of 2021?

A        I don't have recollection.

Q        Did you do anything to satisfy yourself that

the statements in this complaint were accurate

before the complaint was filed?

A        Well, I think I took a glance of it.  But,

like I -- I trust my lawyers, and I don't have more

memory than that of the events since it has been,

like, a long time ago.

Q        And what do you mean by you took a glance at

JEAN-NICOLAS TREMBLAY

this?

A          Well, I checked the document.

Q          Like, how much time did you spend checking the document?

A          Well, I don't remember.

Q          Was it more than five minutes?

A          Perhaps more than five minutes, but I don't -- I don't remember.

Q          And are you sure that that was before the complaint was filed?

A          I don't know the exact date.

Q          So it could have been after the complaint was filed?

A          Well, it could have been after, but -- yeah, it could have been after.

Q          Mr. Tremblay, are you aware that this complaint references individuals that are referred to as confidential witnesses?

A          Yes.

Q          And how are you aware of that?

A          That this particular document referred to them, or...

Q          Correct.

A          No, not this particular document.  I know

JEAN-NICOLAS TREMBLAY

on January 29, 2021?

A        Well, it was after talking with my friend, which I named earlier, and looking at Clover Health's website.

Q        Were you aware that Clover had just gone public through a merger with a SPAC at the time?

A        Yes, I was.

Q        How did you become aware of that?

A        Well, I checked what happened with the company prior to being Clover Health, like the -- the SPAC merging with Clover.

Q        And then the next entry here, if you were to turn back to page -- there you go, is February 4, 2021, correct?

A        Yes.

Q        And it shows that you purchased an additional 250 shares of Clover stock at a price of $12.45, correct?

A        Yes.

Q        Why did you purchase Clover stock on February 4, 2021?

A        I don't remember.

Q        You were aware, on February 4th of 2021, of the Hindenburg report, right?

TSG Reporting - Worldwide   877-702-9580

JEAN-NICOLAS TREMBLAY

MR. CALANDRA:  Note my objection.

But go ahead, Mr. Tremblay.

THE WITNESS:  I think so.

BY MR. SCHWARTZ:

Q        Were you aware of the Hindenburg report when you decided to double your investment in Clover?

A        No.  This -- up until, like, February 8 or -- it was based on the market reaction, my investment.

Q        So is your testimony that you were unaware of the Hindenburg report when you made a purchase decision on February 4, 2021?

MR. CALANDRA:  Note my objection.

But go ahead, Mr. Tremblay.

THE WITNESS:  Well, stating that I was unaware isn't exactly true since I don't remember if I was or wasn't aware.

But stating that the buying and selling were pry -- were, firstly, based on -- well, for the buying, not necessarily the selling.

But the buying were based on the market overreaction to the news, this would be correct.

BY MR. SCHWARTZ:

Q        So you made a determination on February 4,

JEAN-NICOLAS TREMBLAY

2021 that the market had overreacted to certain news; is that correct?

A       Yes.

MR. CALANDRA:  Note my objection.

But go ahead, Mr. Tremblay.

BY MR. SCHWARTZ:

Q       And what was that determination based on?

A       Well, the movement of the stock quickly going up and down and...

Q       What else did you base your determination on that the market had been overreacting to some -- some news?

A       For the selling, I later based it on the Hindenburg report.

For the buying, it was the market reaction. If there are other motive than that, I don't remember, but there might have been.

Q       But as -- as far as you can recall, the only thing that made you purchase Clover stock on February 4th was that you had made a -- you had come to a view that the market had been overreacting to certain news; is that correct?

A       Yes.

Q       And then you said you sold stock on

JEAN-NICOLAS TREMBLAY

February 4, correct?

A       Yes.

Q       And you sold stock because of the Hindenburg report; is that correct?

A       I don't remember.

Q       So what made you sell stock in Clover Health on February 4, 2021?

A       Well, I don't remember.

        MR. CALANDRA:  Note my objection.

        But go ahead.

BY MR. SCHWARTZ:

Q       You don't remember?  Is that -- is that what you said?

A       Yes.

Q       Now, the next day, February 5, 2021, you purchased back all of the shares that you had sold, correct?

        MR. CALANDRA:  Note my objection.

        But go ahead.

        THE WITNESS:  Yes.

BY MR. SCHWARTZ:

Q       Why did you do that?

A       Probably because of the market reaction that -- that happened on February 4th, and movement

JEAN-NICOLAS TREMBLAY

A          No, no, I -- not -- not necessarily manipulation, but like a market -- abnormal movement of the market, if you prefer.

Q          I just want to make clear that when -- and maybe this is an issue of translation.

When you say "market manipulation," you aren't saying anyone was improperly trying to influence the price of the market, are you?

A          No, no, no.

Q          And so what about what you just described made you decide to purchase 500 shares of Clover stock on February 5, 2021?

A          Well, I don't remember, but probably the movement of the stock.

Q          Had you reached a conclusion that the market had overreacted on February 4, 2021?

A          Yes.

MR. CALANDRA:  Note my objection.

But go ahead, Mr. Tremblay.

THE WITNESS:  I said yes.

BY MR. SCHWARTZ:

Q          And what was the basis for your conclusion that the market had overreacted on February 4, 2021?

MR. CALANDRA:  Please note my

JEAN-NICOLAS TREMBLAY

objection.

But go ahead.

THE WITNESS: The investors that knew about the Hindenburg report and have either read them or skimmed through it knew that the allegations made by Hindenburg were substantial allegations.

But Clover Health might have felt, like, should have later -- not should but could have later said that the information in the report weren't exactly right or true, either on February 4th, 5th, or 6th or in the short timeframe following the Hindenburg report.

So investors might have -- some investors might have said that, like, some of the report is true, some of the report is partly true, false, or -- and do you know, should I -- should they sell their shares or not or...

BY MR. SCHWARTZ:

Q       And were -- were you aware on February 5, 2021, of any communication from Clover Health about the Hindenburg report?

A       I don't remember.

Q       Was any part of your decision to buy shares on February 5, 2021, influenced by any communication

TSG Reporting - Worldwide   877-702-9580

JEAN-NICOLAS TREMBLAY

of this is that the first thing you did when the Hindenburg report came out was to sell your shares in Clover stock?

(Overlapping speech.)

MR. CALANDRA:  Note my objection.

But go ahead.

THE WITNESS:  Yes, we could -- yeah, we could assume.

BY MR. SCHWARTZ:

Q       Right.  But that's not what happened, right?

A       I don't remember.

Q       Well, before you decided to sell any Clover shares on February 4th, you decided to buy Clover shares, right?

A       No, I -- I think I sold them before buying them but...

Q       Well, you sold 500 shares of Clover stock on February 4, 2021, correct?

A       Yeah -- yes, so I bought them before selling them.

Q       Right.  It doesn't say that here; it says you sold 250.

But you actually sold 500, right?

A       Yes.

TSG Reporting - Worldwide   877-702-9580

JEAN-NICOLAS TREMBLAY

Q   So don't you think when the court or someone else is looking at this, that they're left with the wrong impression of what you did, following the publication of the Hindenburg report?

A   Not -- not from my final -- no, not from my final decision to continue in the case and -- so perhaps on February 4th, it wasn't first based on the Hindenburg report.

But on February 8th, I think it was based -- my final selling was based on the Hindenburg report and Clover's reaction to it.

So it doesn't falsely lead the court.

Q   Well, but none of that what you just said, including your transactions on February 8th, are listed on this document, right?

A   Yes.

Q   The only one that's listed on this document is a purchase of 250 shares on January 29th and then a sale of 250 shares on February 4th, right?

A   Right, because the class period ended on February 3rd.  Of course, I could claim also my loss on the February 8th billing, but I'm not doing it.

Q   But you didn't sell 250 shares of Clover stock on February 4th, right; you sold 500?

JEAN-NICOLAS TREMBLAY

A        Yeah.

                MR. CALANDRA:  Note my objection.

                But go ahead.

BY MR. SCHWARTZ:

Q        So doesn't this give the incorrect impression that you -- your -- the only decision you made on February 4th was to sell Clover securities? It doesn't --

                MR. CALANDRA:  Note my --

BY MR. SCHWARTZ:

Q        It doesn't let the reader know that you actually desired to buy Clover securities first, correct?

                MR. CALANDRA:  Note my objection.

                But go ahead.

                THE WITNESS:  Yes.

                MR. SCHWARTZ:  All right.  Why don't we go off the record.

                THE VIDEOGRAPHER:  We're going off the record at 11:27 a.m.

                (Recess:  11:27 a.m. to 12:04 p.m.)

                THE VIDEOGRAPHER:  Back on the record at 12:04 p.m.

                MR. SCHWARTZ:  Isabel, can we bring

JEAN-NICOLAS TREMBLAY

back up Exhibit 7?

BY MR. SCHWARTZ:

Q     This is the Questrade account statement we've been looking at.

MR. SCHWARTZ:  And if we could go again to the 10th page of the document.

BY MR. SCHWARTZ:

Q     Are you there, Mr. Tremblay?

A     Yes.

Q     Do you see it?

There are several sale transactions listed, on page 10 of Exhibit 7, correct?

A     Yes.

Q     When you sold your Clover stock, did you have to report the transactions to any U.S. or Canadian taxing authority?

A     No.

Q     You're not required to report any gains or losses on investments; is that correct?

A     No.  We usually have to report them, but it was in my -- well, you don't have an American equivalent.  But it's in my tax-free saving account.

Q     So did you have any occasion to record anywhere or report anywhere your basis in the Clover

JEAN-NICOLAS TREMBLAY

MR. SCHWARTZ: We can bring that down. Let's go back to Exhibit 2, please.

BY MR. SCHWARTZ:

Q       This is the legal representation agreement that you -- that we looked at earlier today.

Do you recall that?

A       Yes.

Q       And do you recall that you signed this on February 4, 2021?

A       Well, I signed it on that date, but I don't recall necessarily that I signed it on that date.

Q       But you're -- but you agree that you did sign it on that date?

A       Yes, sir.

Q       Did you sign this agreement before or after you purchased Clover stock on February 4, 2021?

A       I don't remember.

Q       Did you sign this before or after you sold Clover stock on February 4, 2021?

A       I don't remember.

Q       How did you -- how did you transmit the signed agreement to the Holzer firm?

A       Through DocuSign.

Q       Did you receive this agreement by email?

JEAN-NICOLAS TREMBLAY

A    Yes.

Q    And who sent that email to you?

A    I don't know.

Q    And did you send an executed version back by email?

A    I sent -- I sent it through DocuSign, so probably it's connected to my email.

Q    And would you have records -- records in your email showing when you signed this document?

A    No, I don't keep track of old emails.

Q    What's your practice with respect to keeping track of email?

A    I usually keep like the last two, two or three months, but not prior than that.

Q    And what do you do with the older emails? Do you delete them?

A    Yeah, I delete them.

Q    What -- what email service do you use? Do you use Gmail or something like that?

A    Gmail.

Q    What about with respect to emails you sent or received in connection with this case? Have you kept them or have you deleted them?

A    I have deleted most of them.

JEAN-NICOLAS TREMBLAY

Q    When did you delete them?

A    I don't remember the exact dates.

Q    Do you have -- withdrawn.

Do you recall earlier today you testified that a friend of yours had told you about Clover?

A    Yes.

Q    How did they communicate to you?  Was it in person or was it by email or text or something like that?

A    In person.

Q    And was there any follow-up communication you had with them about Clover?

A    No.

Q    Have you communicated with anyone -- before the date of the -- the complaint was filed, have you communicated with anyone about your investments in Clover?

A    Aside from my friend, no.

Q    And -- and this friend, you didn't communicate with them in writing or anything like that, right?  It was all face to face?

A    Exactly.

Q    And since the complaint was filed, have you communicated with anyone about Clover?

JEAN-NICOLAS TREMBLAY

A       No.  Well, except for my lawyers, no.

Q       And --

MR. CALANDRA:  I'll just remind Mr. Tremblay, it is appropriate to disclose the existence -- or the time of a communication but not the substance.

BY MR. SCHWARTZ:

Q       Do you -- do you have any notes regarding your decisions to purchase or sell Clover securities?

A       No.

Q       Is it your practice the take notes regarding your decisions?

A       No.

Q       Is it -- is it your practice to record your -- your -- the basis for your decisions in any way?

A       Not by writing.  I have good memory of the reason, usually.

Q       And just to clarify, before, when you said you had deleted emails related to this litigation, were those solely emails with your counsel?

A       Can you repeat the question?

Q       Yeah.  Earlier you had testified that you

JEAN-NICOLAS TREMBLAY

CERTIFICATE OF SHORTHAND REPORTER

I, ELISABETH A. LORENZ, Registered Merit Reporter and Certified Realtime Reporter, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing ^was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand this 12th day of September, 2022.

_____

ELISABETH A. LORENZ

NCRA Registered Merit Reporter

NCRA Certified Realtime Reporter