## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| TIMOTHY BOND, | ) |
| | ) |
| Lead Plaintiff | ) |
| | ) |
| and | ) |
| | ) |
| JEAN-NICOLAS TREMBLAY | ) Case No. 3:21-cv-00096 |
| | ) |
| Named Plaintiff, | ) Judge Aleta A. Trauger |
| | ) |
| individually and on behalf of all others similarly situated, | ) |
| | ) |
| v. | ) |
| | ) |
| CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, VIVEK GARIPALLI, ANDREW TOY, JOE WAGNER and CHAMATH PALIHAPITIYA, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

# TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................................... 1

II.    ARGUMENT .............................................................................................................. 4

    A.    Defendants' Attacks On the Adequacy of Jabri and Tremblay as Class Representatives are Meritless .................................................................. 4

        1.    Jabri Has Not Made Any Misrepresentations to This Court ........................ 4

        2.    Tremblay's Certification Was Truthful and He Has Actively Participated in This Action .................................................................................................. 9

    B.    Plaintiffs Are Entitled to a Presumption of Reliance Under *Affiliated Ute* .......... 12

    C.    Defendants Fail To Refute Plaintiffs' Showing of An Efficient Market for Clover Securities ................................................................................................. 14

    D.    Defendants Fail To Prove By A Preponderance Of The Evidence That Their Fraud Had No Price Impact ............................................................................... 17

III.    CONCLUSION ........................................................................................................ 20

i

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah v. United States*,
　406 U.S. 128 (1972) ...................................................................................................3, 12, 13, 14

*Basic Inc. v. Levinson*,
　485 U.S. 224 (1988) ...................................................................................................1, 14, 17, 18

*Blitz v. AgFeed Indus., Inc.*,
　2012 WL 1192814 (M.D. Tenn. Apr. 10, 2012) ..............................................................................6

*Bond v. Clover Health Invs., Corp.*,
　587 F. Supp. 3d 641 (M.D. Tenn. 2022) ...................................................................13, 19, 20

*Burges v. BancorpSouth, Inc.*,
　2017 WL 2772122 (M.D. Tenn. June 26, 2017) ...........................................................................18

*Burgraff v. Green Bankshares, Inc.*,
　2011 U.S. Dist. LEXIS 14573 (E.D. Tenn. Feb. 11, 2011) .......................................................6

*Cammer v. Bloom*,
　711 F. Supp. 1264 (D.N.J. 1989) .................................................................................. *passim*

*Cosby v. KPMG, LLP*, 2020 WL 3548653 (E.D. Tenn. June 29, 2020),
　*objections overruled*, No. 3:16-CV-121-TAV-DCP,
　2021 WL 1845186 (E.D. Tenn. May 7, 2021) ........................................................................17

*Deutschman v. Beneficial Corp.*,
　132 F.R.D. 359 (D. Del. 1990) ................................................................................................11

*Dougherty v. Esperion Therapeutics, Inc.*,
　2020 WL 6793326 (E.D. Mich. Nov. 19, 2020) ....................................................................19

*FindWhat Investor Group v. FindWhat.com*,
　658 F.3d 1282 (11th Cir. 2011) ..............................................................................................16

*Glickenhaus & Co. v. Household International, Inc.*,
　787 F.3d 408 (7th Cir. 2015) ..............................................................................................7, 19

*Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*,
　141 S. Ct. 1951 (2021) .........................................................................................................3, 18

*Gooch v. Life Investors Ins. Co. of Am.*,
　672 F.3d 402 (6th Cir. 2012) ....................................................................................................4

*Grae v. Corr. Corp. of Am.*,
 330 F.R.D. 481 (M.D. Tenn. 2019) (Trauger, J.)....................................................................19

*Halliburton Co. v. Erica P. John Fund, Inc.*,
 573 U.S. 258 (2014)..............................................................................................................17

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
 818 F.3d 818 F.3d 775, 777 (8th Cir. 2016) .........................................................................19

*In re Accredo Health, Inc. Sec. Litig.*,
 2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006).....................................................................17

*In re BancorpSouth, Inc.*,
 2017 WL 4125647 (6th Cir. Sept. 18, 2017) .....................................................................13, 18

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
 2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) .......................................................................19

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
 288 F.R.D. 26 (S.D.N.Y. 2012) .............................................................................................10

*In re JPMorgan Chase & Co. Sec. Litig.*,
 2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015).....................................................................15

*In re Tivity Health, Inc.*,
 2020 WL 4218743 (6th Cir. July 23, 2020).............................................................................7

*In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*,
 45 F. Supp. 3d 706 (N.D. Ohio 2014)..................................................................................4, 14

*Jurkowski v. Molycorp, Inc.*,
 2014 WL 12792750 (S.D.N.Y. Apr. 2, 2014)..........................................................................6

*Krogman v. Sterritt*,
 202 F.R.D. 467 (N.D. Tex. 2001) ..................................................................................1, 3, 14

*Lewis v. Goldsmith*,
 95 F.R.D. 15 (D.N.J. 1982)......................................................................................................8

*Martinek v. AmTrust Fin. Servs., Inc.*,
 2022 WL 326320 (S.D.N.Y. Feb. 3, 2022)........................................................................15, 16

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
 332 F.R.D. 556 (M.D. Tenn.),
 *order clarified*, 334 F.R.D. 118 (M.D. Tenn. 2019) .............................................................11

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp. ("OPERS")*,
 2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) .....................................................................16

*Pio v. Gen. Motors Co.*,
   2014 WL 5421230 (E.D. Mich. Oct. 24, 2014) ...................................................................6, 7

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
   327 F.R.D. 38 (S.D.N.Y. 2018) ...........................................................................................18

*Plumbers & Pipefitters Nat. Pension Fund v. Burns*,
   292 F.R.D. 515 (N.D. Ohio 2013) ...........................................................................11, 12, 16

*Rikos v. Procter & Gamble Co.*,
   2014 WL 11370455 (S.D. Ohio June 19, 2014),
   *aff'd*, 799 F.3d 497 (6th Cir. 2015)......................................................................................5

*Ross v. Abercrombie & Fitch Co.*,
   257 F.R.D. 435 (S.D. Ohio 2009) ..................................................................................10, 11

*SEC v. National Securities*,
   393 U.S. 453 (1969).............................................................................................................5

*St. Clair Cnty. Employees' Ret. Sys. v. Acadia Healthcare Co., Inc.*,
   2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022) ................................................................13

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016) ...................................................................................15, 16

*Strougo v. Tivity Health, Inc.*,
   2022 WL 2037966 (M.D. Tenn. June 7, 2022).....................................................................18

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
   546 F.3d 196 (2d Cir. 2008).................................................................................................16

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017)........................................................................................3, 17, 18

*Weinberg v. Insituform Techs., Inc.*,
   1995 WL 368002 (W.D. Tenn. Apr. 7, 1995).........................................................................7

*Weiner v. Tivity Health, Inc.*,
   334 F.R.D. 123 (M.D. Tenn. 2020) ...........................................................................7, 11, 14

*Zwick Partners, LP v. Quorum Health Corp.*,
   2019 WL 1450546 (M.D. Tenn. Mar. 29, 2019) .............................................................19, 20

## **Statutes**

15 U.S.C. § 78u-4 .......................................................................................................................5

Private Securities Litigation Reform Act.................................................................................5, 6, 7, 8

## Rules

Fed. R. Civ. P. 23.......................................................................................................1, 4, 10, 11

v

# I.     INTRODUCTION[1]

Defendants' Opposition effectively concedes that Plaintiffs' Motion satisfies virtually all of the requirements for class certification of Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, including that the proposed class members are sufficiently numerous and pose common questions of law and fact, as well as that damages can be established on a class-wide basis, this case is manageable as a class action, certifying this action provides the superior vehicle for resolving investors' claims, and Pomerantz LLP ("Pomerantz"), Plaintiffs' undersigned counsel, will provide adequate representation for the Class. Nor do Defendants dispute that Plaintiffs have demonstrated that four of the five factors promulgated in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), for assessing market efficiency, as well as all three market efficiency factors promulgated in *Krogman v. Sterritt*, 202 F.R.D. 467, 474, 478 (N.D. Tex. 2001), support holding that Clover Health Investments Inc.'s ("Clover" or the "Company") securities traded in an efficient market such that Plaintiffs can rely on the "fraud-on-the-market" presumption to prove class-wide reliance promulgated in *Basic Inc. v. Levinson*, 485 U.S. 224, 248-249 (1988).

Instead, Defendants attack the adequacy of Lead Plaintiff Firas Jabri ("Jabri") and Named Plaintiff Jean-Nicolas Tremblay ("Tremblay") to serve as class representatives, the sufficiency of the event study in the report authored by Plaintiffs' expert, Dr. Matthew D. Cain ("Dr. Cain" and "Cain Report") to demonstrate a cause-and-effect relationship between news about Clover and the price of the Company's securities, and whether the decline of Clover's share price the day after Defendants made multiple misrepresentations precludes a finding of price impact.

---

[1] References herein to "Opening Brief," "Motion," or "Mot." are to Plaintiffs' Opening Memorandum of Law in Support of Plaintiffs' Motion for Class Certification. ECF No. 102. References to "Opposition" or "Opp." are to Defendants' opposition to the Motion. ECF No. 108. In addition, all capitalized terms not defined herein have the meaning assigned to them in the Opening Brief. All internal citations are omitted and emphasis is added unless otherwise indicated.

Each of these attacks is easily rejected. *First*, Defendants incorrectly claim that Jabri is not an adequate class representative because his motion to be named lead plaintiff misrepresented his losses in Clover securities and he purportedly evaded questions during his deposition about profits he realized on sales of Clover securities months after the Class Period ended. Jabri's lead plaintiff motion detailed the conventional method by which Jabri calculated his losses and accurately applied that method in calculating his losses. Indeed, all *nine* competing lead plaintiff movants in this action used a substantively identical method for calculating their losses, and none of those movants—nor even Defendants—questioned Jabri's calculations during lead plaintiff briefing. In addition, even if Jabri's deposition testimony about his profits was evasive, which it was *not*, his responses do not warrant refusing to appoint him as a class representative because post-Class Period profits are irrelevant to whether Jabri was harmed by Defendants' misrepresentations.

*Second*, Defendants also incorrectly claim that the certification Tremblay filed with his initial complaint in this action was misleading—and thus his credibility is too impaired for him to serve as a class representative—because it omitted his purchases of Clover securities after Defendants' fraud was revealed in a short-seller report authored by Hindenburg Research at the end of the Class Period (the "Hindenburg Report"). Tremblay's certification only purported to describe his Clover transactions *during the Class Period*, however, and it is well-established that post-corrective disclosure purchases of a defendant company's stock is not a bar to acting as a class representative. Further, while Defendants claim that Tremblay lacks basic knowledge of this action, his testimony shows that he understood Clover's business and the subject matter of Defendants' misrepresentations. He has also reviewed filings in this action and participated in discovery, which is more than sufficient to demonstrate adequacy.

2

*Third*, although Defendants assert Plaintiffs may not rely on the presumption of reliance promulgated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because Plaintiffs' amended complaint ("Complaint") "point[s] to several affirmative statements that they allege were misleading," the Complaint identifies dozens of statements that are misleading for omitting material facts and thus Plaintiffs may rely on the *Affiliated Ute* presumption of reliance.

*Fourth*, the Cain Report's event study shows a cause-and-effect relationship between Clover-specific news and the price of Clover securities through an analysis of a total of 52 trading days throughout the Class Period (*i.e.*, over 60% of all trading days within the Class Period), which is more than sufficient to show that Clover's securities traded in an efficient market. Tellingly, Defendants offer no event study—or any other evidence—of their own indicating that the market for Clover's securities was *not* efficient. In any event, demonstration of cause-and-effect is not needed where, as here, the other *Cammer* and *Krogman* factors are met. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 97 (2d Cir. 2017).

*Fifth*, contrary to the Opposition, Defendants' misrepresentations had an impact on the price of Clover's securities because the price of those securities plummeted upon the revelation of Defendants' fraud in the Hindenburg Report. In addition, as the Supreme Court has expressly held, it is *Defendants'* burden to completely "seve[r] the link between a misrepresentation and the price paid by the plaintiff," and Defendants do not offer an event study or other expert evidence to rebut this evidence of price impact. *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1956 (2021). Finally, in the Sixth Circuit, and elsewhere, front-end price impact is not necessary for class certification. Accordingly, for these and the additional reasons set forth below, the Court should grant the Motion, certify the class, and name Plaintiffs class representatives.

## II.    ARGUMENT

### A.    Defendants' Attacks On the Adequacy of Jabri and Tremblay as Class Representatives are Meritless

The Opening Brief demonstrated how the proposed Class (*e.g.*, Mot. at 1) fulfills each of the four requisite elements for class certification established by Rule 23(a): (i) numerosity, (ii) commonality, (iii) typicality, and (iv) adequacy. *See id.* at 7-13. As Defendants only contest adequacy, they concede that Plaintiffs fulfill elements (i)-(iii). *See, e.g.*, *In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 45 F. Supp. 3d 706, 711 (N.D. Ohio 2014) (failure to address argument in opposition to a motion waives issue).

Plaintiffs, however, also easily fulfill adequacy. *See* Mot. at 11-13. Jabri and Tremblay each purchased substantial amounts of Clover shares during the Class Period, which they held through the end of Class Period, and sustained damages from the same material misrepresentations and omissions as other class members. *See id.* They also retained Pomerantz, an experienced firm that regularly represents investors in securities litigations, and are actively participating in this action, including by reviewing filings and participating in discovery. *See id.*

The Opposition attempts to disqualify Plaintiffs by attacking their credibility, but these attacks cannot withstand the barest scrutiny.

### 1.    Jabri Has Not Made Any Misrepresentations to This Court

Defendants assert that Jabri is not capable of adequately representing the Class because he purportedly misrepresented his losses to the Court and lacked candor during his deposition. *See* Opp. 5-6. Neither contention is true, let alone reason to reject him as a class representative. It is well-established that "[o]nly when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate." *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 431 (6th Cir.

4

2012). Defendants' assertions fall woefully short of this demanding standard. *See Rikos v. Procter & Gamble Co.*, 2014 WL 11370455, at *9 (S.D. Ohio June 19, 2014), *aff'd*, 799 F.3d 497 (6th Cir. 2015) ("standard for finding a person inadequate because of a lack of credibility is a high one").

*First*, Jabri never misrepresented his losses. *See* Opp. at 6. The certification and damages analysis Jabri submitted with his lead plaintiff motion explain exactly how he calculated damages for the purposes of his motion, ECF No. 41-4 at 2, and Defendants do not assert that the descriptions were false or that the calculations were wrong, nor could they. *See* Opp. at 6-7. Jabri, based on the advice of Lead Counsel, approximated his damages using the method set forth by the Private Securities Litigation Reform Act ("PSLRA"). This method approximates a plaintiff's damages based on the difference between the cost of shares purchased during the class period (*i.e.*, "retained shares")[2] and the average value of the shares in the 90-day period following the corrective disclosure that reveals the fraud:

> in any private action arising under this chapter in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market.

15 U.S.C. § 78u-4(e).

---

[2] For Clover shares he acquired after Clover's merger with the SPAC "SCH," *i.e.*, after January 7, 2021, Jabri used the price he paid for the Clover shares as the "assessed cost." *See* ECF No. 41-4 at 2. Jabri also used the list price as the "assessed cost" for the shares of SCH he purchased prior to the merger, and which were converted into Clover shares in the merger. *See id.* This arguably *understates* Jabri's damages because the conversion of SCH shares into Clover shares is a sale of SCH securities and a purchase of Clover securities under the securities laws. *E.g., SEC v. National Securities*, 393 U.S. 453, 466 (1969) (exchange of shares from one company with shares of another in merger is "purchase" or "sale" under Section 10(b) of the Exchange Act and Rule 10b-5).

Using this method, Jabri disclosed that he had purchased 80,025 shares during the Class Period, and, multiplying by an average share price of $9.4377 for the 61 days[3] between the publication of the Hindenburg Report and Jabri's motion, damages of approximately $542,642. There is nothing novel about Jabri's use of the PSLRA damages calculation setting forth damages, as this is used by nearly ever lead plaintiff movant in PLSRA action and most courts in calculating a movant's losses. *E.g.*, *Pio v. Gen. Motors Co.*, 2014 WL 5421230, at *6 (E.D. Mich. Oct. 24, 2014); *Blitz v. AgFeed Indus., Inc.*, 2012 WL 1192814, at *2 (M.D. Tenn. Apr. 10, 2012); *Burgraff v. Green Bankshares, Inc.*, 2011 U.S. Dist. LEXIS 14573, at *9 (E.D. Tenn. Feb. 11, 2011).

In fact, every one of the *nine* lead plaintiff movants in this action calculated losses *the same way*, *i.e.*, by comparing the potential lead plaintiff's purchase price to an average price of the Clover securities in the months between the publication of the Hindenburg Report and the filing of the respective lead plaintiff motion and/or the actual price sold during that period, whichever was higher.[4] In such hotly contested motion practice, if any movant believed that Jabri (or any other prospective lead plaintiff) had misrepresented their losses, they would have raised the issue.[5] None did, because this damages calculation method tracks the PSLRA. Tellingly, even *Defendants*

---

[3] Jabri used the average price of Clover securities for the 61 days following the Hindenburg report, not 90 days, because only 61 days had elapsed when he moved to be lead plaintiff. *See* ECF No. 41-4 at 2; *Jurkowski v. Molycorp, Inc.*, 2014 WL 12792750, at *2 n.2 (S.D.N.Y. Apr. 2, 2014).

[4] *E.g.*, ECF Nos. 17-2 at 2 (Ahluwalia); 21-2 at 2 (Metcalf); 24-3 at 2 (Brennan); 30-2 at 2 (Clover Investor Group); 31-4 at 5 (Handal/Farzan) 32-3 at 2 (Bunton); 36-2 at 3, 5-7 (Investor Group); 39-3 at 2 (Meadows/Desai); 41-4 at 1 (Jabri).

[5] Defendants speculate that another lead plaintiff movant might have had larger losses if that movant used Defendants' proposed means of calculating damages. *See* Opp. 7 & n.4. But even if that were true, size of losses is only one of several factors courts use to appoint a lead plaintiff. *See Pio*, 2014 WL 5421230, at *4 ("[t]he Court declines the invitation to ignore all but the" size of losses in determining the lead plaintiff).

6

never objected to Jabri's calculations,[6] which undercuts their belated objection to those calculations now. *See Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 130–31 (M.D. Tenn. 2020), *leave to appeal denied sub nom. In re Tivity Health, Inc.*, 2020 WL 4218743 (6th Cir. July 23, 2020) (discounting damages argument at class certification that defendants failed to raise during lead plaintiff briefing). Further, in addition to having the largest losses as calculated pursuant to the PSLRA, *see* ECF No. 58 at 4, Jabri demonstrated that he was the proper lead plaintiff based on the other *Lax-Olsten* factors, having (1) purchased 80,025 shares of Clover stock, (2) expended $1,297,892 on his purchases, and (3) retained all 80,025 of his shares of Clover stock at the end of the Class Period. *See* ECF No. 55 at 8.

At bottom, Defendants assert that at the lead plaintiff stage, Jabri should have limited his damages to those attributable to the corrective disclosure alleged in the initial complaint. *See* Opp. at 6-7. But Defendants cite no authority for this proposition. In fact, it would have been inappropriate to limit his damages this way given that investors may recover losses resulting from the gradual decline in a company's stock price that is not directly connected to any corrective disclosure, but which can be attributed indirectly to the unraveling of the underlying fraud. *See Glickenhaus & Co. v. Household International, Inc.*, 787 F.3d 408, 422 (7th Cir. 2015). Further, at the lead plaintiff stage, damages assessments are intended to be approximate because the resolution of competing motions for lead plaintiff appointment "is not the time for conducting a precise calculation of each movant's actual damages." *See Pio*, 2014 WL 5421230, at *6.

---

[6] Defendants appear to fault Mr. Jabri for testifying that he is not aware of how damages are calculated in securities fraud class actions. Opp. 7 n.3. Securities fraud damages, however, are vigorously litigated in a complicated "battles of the experts." *Pio*, 2014 WL 5421230, at *7. Complicated securities fraud damages are thus something a lay person can be expected to rely on counsel to understand. *See, e.g.*, *Weinberg v. Insituform Techs., Inc.*, 1995 WL 368002, at *6 (W.D. Tenn. Apr. 7, 1995) (generally, "in a complicated securities litigation action . . . a representative is expected to rely heavily on his attorneys").

In short, Jabri's claimed losses were clearly set forth in his Lead Plaintiff motion and used a methodology to calculate his financial interest which was virtually identical to all competing movants and movants in nearly every other securities class action under the PSLRA. Arguing that Jabri is somehow inadequate because he followed the explicit terms of the PSLRA damages calculation borders on frivolous.

*Second*, Defendants claim that Jabri cannot represent the Class because he "evaded" questions during his deposition about profits on his Clover investment from trades he made on June 11, 2021, *over four months* after the class period ended and *seven weeks* after he was named lead plaintiff. *Compare* Opp. 6-9 *with* ECF No. 109-5 at 3 (Jabri trading records) *and* ECF No. 58 (April 23, 2021 Order appointing Jabri Lead Plaintiff). But Defendants' own deposition excerpt shows that Jabri admitted to profiting from post-Class Period sales:

> Q: Did you sell all of the stock listed on Exhibit 15 for more money
> than you paid for it?
>
> A: That was me getting lucky. ***Yes, I did,*** but that was me getting lucky

Opp. at 9 (quoting Opp. Ex. C, Jabri Dep. Tr. 72:21-24). That Jabri considered and carefully responded to Defendants' questions does not disqualify him from being a class representative. *See, e.g., Lewis v. Goldsmith*, 95 F.R.D. 15, 22 (D.N.J. 1982) ("[the] plaintiff may have ***exercised a certain natural degree of caution in framing his responses*** . . . defendants succeeded with little difficulty in drawing out a full discussion of plaintiff's trading in the stock market").

In any event, even if the Court were to find Jabri's testimony less than candid—which it was *not*—his responses do not preclude him from serving as a class representative because, as the Second Circuit held in *Acticon*, that Clover's shares recovered their value *four months* after the Class Period ended is irrelevant to a claim for economic loss under Securities Exchange Act:

> [A] share of stock that has regained its value after a period of decline
> is not functionally equivalent to an inflated share that has never lost

8

> value . . . . [I]t is improper to ***offset gains that the plaintiff recovers after the fraud becomes known against losses caused by the revelation of the fraud if the stock recovers value for completely unrelated reasons. Such a holding would place the plaintiff in a worse position than he would have been absent the fraud***.[7]

*Acticon*, 692 F.3d 34, 40.

Tellingly, Defendants do not argue that Jabri's profits remove his incentive to vigorously represent the Class (*see* Opp. at 7), nor could they, which militates against denying the Motion.

### 2. Tremblay's Certification Was Truthful and He Has Actively Participated in This Action

Defendants also assert that Tremblay cannot be a class representative because (i) he falsely represented that on February 4, 2021, the day the Hindenburg Report revealed Defendants' fraud, "the only securities transaction he made was to sell his entire holdings of Clover stock," and (i) he lacks a basic understanding of this action.[8] Opp. at 10-13. Defendants are wrong.

*First*, Defendants are fabricating a misrepresentation by distorting the certification and supporting documentation Tremblay filed with his initial complaint in a separate action.[9] *See* Opp. at 9-11. Paragraph 5 of Tremblay's certification in *Tremblay v. Clover Health Invs., Corp.*, No. 3:21-cv-00138 (M.D. Tenn.) ("Tremblay Action") stated, "the attached sheet lists all of my transactions in Clover securities ***during the Class Period*** as specified in the Complaint." *See*

---

[7] For this reason, when Jabri testified that he had experienced losses "[f]or the purposes of the law," he was *correct*. *Compare* Opp. Ex. C at 7, Jabri Tr. 68:3-10 *with Acticon*, 692 F.3d at 41.

[8] Defendants also misleadingly claim that Tremblay has "deleted potentially relevant documents." Opp. at 11 n. 5. As Tremblay testified, the documents were communications with counsel. Calandra Decl. Ex. 2, Tremblay Deposition Tr. 111:21-112:5, 127:17-128:11. Counsel has all communications with Tremblay and will document those communications in a privilege log.

[9] Tremblay never moved to be lead plaintiff in this action and never represented to this Court that his purchases and damages exceeded that of any other movant for lead plaintiff.

Calandra Reply Decl. Ex. 1 at 3.[10] The summary Tremblay referenced ("Tremblay Summary") states he purchased 250 shares of Clover stock on January 29, 2021. The Class Period in this action ends on February 3, 2021 (*see* ECF No. 70 ¶1). Accordingly, his January 29, 2021 purchase of Clover shares was his ***only*** purchase of Clover shares during the Class Period. *See* Opp. Ex. D. at 3. While the Tremblay Summary also lists a February 4, 2021 sale of the 250 shares he purchased ***during the Class Period***, this was simply to disclose to the Court (although not required to do so) that he no longer held those shares when he filed his initial complaint in the Tremblay Action.

While Defendants state that the certification and summary "gave the wrong impression" of Tremblay's "trading decisions" on February 4, 2021, the documents were submitted only to show that Tremblay bought securities during the Class Period and sold them after Defendants' fraud was revealed: it never purported to detail Tremblay's trading ***after the Class Period ended***.

Nevertheless, Defendants assert that Tremblay's credibility is irreparably impaired because he did not disclose purchases of Clover shares on February 4, 2021, *i.e.*, after the Hindenburg Report had disclosed the truth about Defendants' fraud and the Class Period ended. *See* Mot. at 10-11. This omission is irrelevant, however, because "[c]ourts have consistently rejected the argument that post-disclosure purchases preclude a proposed class representative from meeting Rule 23(a) requirements." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 288 F.R.D. 26, 38–39 (S.D.N.Y. 2012) (citing cases). This is because "[l]egally, purchasing a stock after a corrective disclosure that deflates the stock price may not even be relevant to the typicality inquiry because a party may believe a stock to be a bargain after such deflation, and may believe that it is now trading at a price with defendants' fraud removed from it."[11] *Ross v. Abercrombie & Fitch Co.*,

---

[10] Calandra Reply Decl. is the declaration of Brian Calandra dated October 31, 2021 filed herewith.

[11] Although *Ross* analyzed post-disclosure purchases in the context of its analysis of typicality, the Opposition suggests that post-disclosure purchases present a defense that uniquely applies to

257 F.R.D. 435, 446 (S.D. Ohio 2009) (collecting cases); *Weiner*, 334 F.R.D. at 130 (same). Further, Tremblay did not move to be lead plaintiff in this action and promptly disclosed his post-disclosure trades during discovery, thus nothing suggests he sought to conceal his trades. *See, e.g., Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 375 (D. Del. 1990).

Defendants resort to mischaracterizing Tremblay's deposition testimony that he believed on February 4, 2021 that the market had "overreacted" to unspecified news. *See* Opp. at 10. Tremblay testified that he may not have been aware of the Hindenburg Report when he traded on February 4, but that later, when he determined that Hindenburg Report was likely accurate, he liquidated his entire position in Clover. Calandra Decl. Ex. 2, Tremblay Deposition Tr. 52:3-7, 88:24-90:15, 92:7-93:5, 95:4-97:16. These are the circumstances contemplated in *Ross*, in that Tremblay purchased Clover after the Class Period because he "believe[d] a stock to be a bargain," but then came to recognized that he had been defrauded, and thus do not provide any justification for disqualifying Tremblay and a class representative. *Compare id. with Ross*, 257 F.R.D. at 446.

*Second*, Tremblay's testimony demonstrated a familiarity with the action sufficient to serve as a class representative. Defendants do not dispute that Plaintiffs have retained adequate class counsel (*i.e.*, Pomerantz), and "not only is this strong evidence that plaintiffs seek fairly and adequately to represent the proposed class members but it, at least to some degree, insulates the representatives from claims that they have not sufficiently kept informed of the facts of the case." *Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 292 F.R.D. 515, 521 (N.D. Ohio 2013).

In addition, Tremblay accurately testified that Clover Health was a Medicare Advantage insurance plan provider that merged with a special purpose acquisition company, or "SPAC,"

---

Tremblay (Opp. 10), and "[a]s to unique defenses, the adequacy prong of Rule 23 overlaps with considerations of typicality." *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 332 F.R.D. 556, 568 (M.D. Tenn.), *order clarified*, 334 F.R.D. 118 (M.D. Tenn. 2019).

created by Defendant Palihapitiya, the "King of SPACs" (Calandra Decl. Ex. 2, Tremblay Dep. Tr. 26:3-9, 32:22-33:19), that the Company and certain of its executives were named as Defendants (*id.* 38:24-39:7), that Clover is being sued for making misrepresentations, including about legal compliance, distribution of gift cards, physician use of the "Clover Assistant" app (*id.* 25:3-15, 125:2-126:18), that the complaint uses confidential witnesses to support its allegations (*id.* 43:17-46-16), and that the Lead Plaintiff in this action is Jabri (id. 38:13-18). Tremblay also produced documents in response to Defendants' discovery requests and sat for an over four-hour deposition. *Id.* 7:4-6, 129:19-21; Mot. at 12.

This testimony clearly contradicts Defendants' baseless assertions that Tremblay could not describe Clover, the claims in this action, or any of the Defendants. *See* Opp. at 12. Further, Defendants ignore that Tremblay, who is not a native English speaker (Calandra Decl. Ex. 2, Tremblay Dep. Tr. 10:6-8), testified on cross examination that he *did* understand his responsibilities to Class Members and described those responsibilities in detail (*id.* 128:12-129:12). Tremblay thus is sufficiently involved in this proceeding to be an adequate class representative, even if he was unsure if he read the operative complaint before it was filed.[12] *See, e.g.*, *Burns*, 292 F.R.D. at 521 ("The fact that plaintiffs may not have reviewed the complaint that counsel eventually filed does not necessarily show they lack knowledge about the case").

**B.      Plaintiffs Are Entitled to a Presumption of Reliance Under *Affiliated Ute***

In a footnote, Defendants assert that Plaintiffs cannot invoke the presumption of reliance articulated in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) because Plaintiffs "point to several affirmative statements that they allege were misleading" and the

---

[12] Defendants also assert that Tremblay is not an adequate class representative because he did not sufficiently prepare for his deposition. Opp. at 12-13. Plaintiffs are unaware of *any* authority for a minimum amount of deposition preparation, nor do Defendants cite any.

Affiliated Ute presumption does not apply to "half-truths" or "misstatements whose only omission is the truth that the statement misrepresents. Opp. 13-14 n.6.

Paragraph after paragraph of the Complaint, however, alleges statements by Defendants that were false and misleading because Defendants ***failed to disclose material facts***, including the DOJ Investigation, Clover's use of illicit payments and gift cards to physicians and staff drove the Company's performance, related party transactions with Head of Sales Hiram Bermudez, physicians' failure to use Clover Assistant during patient visits, and risks and known trends in violation of Regulation S-K. *E.g.*, ¶¶234, 235, 237-38, 239, 241-44 (investigation); 246-73 (payments, gift cards, and related party transactions) 275-301 (physician use of Clover Assistant), 304-06 (related party transactions), 308-18 (risks and trends). Indeed, this Court identified multiple omissions on which Plaintiff rely, including that the DOJ Investigation "should have been disclosed" and that "kickbacks and Bermudez's undisclosed role as an ostensibly independent broker . . . were being concealed." *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 670-71 (M.D. Tenn. 2022).

These allegations are sufficient for the Court to find that non-disclosures "primarily" underly Plaintiffs' claims. *See In re BancorpSouth, Inc.*, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) ("incomplete and allegedly misleading voluntary disclosures [that] imputed upon [defendants] a duty to fully disclose material facts" entitled to *Affiliated Ute* presumption). Even if certain of Defendants' actionable statements are affirmative misstatements, "[c]ourts have acknowledged the applicability of the *Affiliated Ute* presumption where, as here, plaintiffs' claims are based on a combination of omissions and misstatements." *St. Clair Cnty. Employees' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2022 WL 4598044, at *8 (M.D. Tenn. Sept. 30, 2022).

13

In any event, as set forth below and in the Opening Brief (*see* Mot. 20-22; Sections II.C-II.D *infra*), Plaintiffs sufficiently allege that the *Basic* presumption applies and thus this Court need not reach Plaintiffs' alternative argument that they are entitled to the *Affiliated Ute* presumption. *See Weiner*, 334 F.R.D. at 132 n.1.

### C. Defendants Fail To Refute Plaintiffs' Showing of An Efficient Market for Clover Securities

As set forth in the Opening Brief, Plaintiffs are entitled to invoke the fraud-on-the-market presumption of reliance because Defendants' misrepresentations were publicly known, the misrepresentations were material, Plaintiffs traded Clover stock between the time the misrepresentations were made and when the truth was revealed, and Clover's securities traded in an efficient market. Mot. at 14-20. Plaintiffs also demonstrated how Clover's securities met the requirements of the three *Krogman* factors—(1) the company's market capitalization; (2) the stock's bid-ask spread; and (3) the stock's float—as well as the five *Cammer* factors: (1) high average trading volume for Clover's securities; (2) a substantial number of analysts that follow Clover; (3) Clover's listing on the NASDAQ exchange and the existence of market makers for Clover securities; (4) Clover's ability to file SEC Form S-3 Registration Statements; and (5) a "cause and effect" relationship between news and movement in the price of Clover's securities.

Defendants do not dispute the sufficiency of Plaintiffs' showing of any of the *Krogman* factors or of the first four *Cammer* factors, and thus those factors should be deemed met. *See Whirlpool*, 45 F. Supp. 3d at 711. Defendants only dispute Plaintiffs' showing of the fifth *Cammer* factor ("*Cammer* 5"). Specifically, Defendants assert that Dr. Cain's "event study" does not prove the existent of an efficient market for Clover's securities because that study does not contain a sufficient number of "news days." *See* Opp. at 15-16. This assertion fails for several reasons.

*First*, Defendants have not proffered their own event study or expert testimony demonstrating that the market for Clover securities was inefficient, thus "the fifth *Cammer* factor can only weigh against Defendants or be neutral." *In re JPMorgan Chase & Co. Sec. Litig.*, 2015 WL 10433433, at *6 (S.D.N.Y. Sept. 29, 2015).

*Second*, Defendants misrepresent that Dr. Cain's event study only considered three "news days." Opp. at 16. As Dr. Cain expressed in his report and testified in his deposition, his event study evaluated *52 trading days*: three "News Days" and 49 "Least News Trading Days," which is easily sufficient to demonstrate market efficiency. Cain Rep. Ex. 7, ECF No. 107-1 at 59; Ex. Calandra Decl. Ex. 3, Cain Dep. Tr. 128:13-130:25; *see Martinek v. AmTrust Fin. Servs., Inc.*, 2022 WL 326320, at *16 n.9 (S.D.N.Y. Feb. 3, 2022) (rejecting assertion that event study only analyzed three event days because the study also analyzed non-news days).

Importantly, the number of event days Dr. Cain could analyze was limited by the relatively short length of the Class Period, which contained only 83 trading days (Opp. at 16), and during which little truly "new" information was released into the market because Defendants were largely repeating or rephrasing misrepresentations they made when they announced the merger on October 6, 2021. *Compare, e.g.,* ¶¶246-54 *with, e.g.,* ¶¶256-72; *see Strougo v. Barclays PLC*, 312 F.R.D. 307, 322 (S.D.N.Y. 2016)*, aff'd sub nom. Waggoner,* 875 F.3d 79 ("there may only be a few—or perhaps no—unexpected events in a given class period that can be tested . . . . [B]ecause of the short length of the class period"). In fact, Dr. Cain's event study analyzed 52 out of 83 trading days within the Class Period, or over 60% of available days for consideration. Since the purpose of an event study is to test whether a security is sensitive to new information, and Clover's stock price moved significantly on two of three "news days," Dr. Cain's study fulfills *Cammer* 5. Indeed,

where, as here, there are only a small number of news dates, it is inappropriate to rely on *Cammer* 5 at class certification. *E.g.*, *Strougo*, 312 F.R.D. at 322.

While Defendants suggest—without analyzing—November 19, 2021, November 20, 2021, and January 12, 2021 as potential additional event dates where Clover's share price did not react, the disclosures on those dates largely rephrased information previously disclosed about physician use of Clover Assistant (*see* ¶¶191, 194), thus it is not surprising that the price of Clover's securities did not move significantly. *See, e.g., FindWhat Investor Group v. FindWhat.com*, 658 F.3d 1282, 1310 (11th Cir. 2011) ("[a] corollary of the efficient market hypothesis is that disclosure of . . .information already known by the market . . . will not cause a change in the stock price.").

Moreover, the district court's recent rejection of similar arguments about the number of news dates in an event study in *Martinek* is instructive. *See* 2022 WL 326320, at \*16. In *Martinek*, the plaintiffs submitted an event study that, like Dr. Cain's, focused on three event days. *See id.* The *Martinek* defendants, like Defendants here, asserted that an event study containing three news or event dates was *per se* insufficient to demonstrate an efficient market. *See id.* The court rejected the assertion, however, because an event study" did not have to "evaluate a minimum number of dates to be reliable (or even probative)" and the study, like Dr. Cain's, considered three event dates as well as other non-news dates. *See id.* There was nothing unusual about the *Martinek* court's analysis, as courts grant class certification based on event studies considering similar numbers of "news dates" or "event dates."[13] *E.g., Burns*, 967 F. Supp. 2d at 1157 (certifying class based on event study analyzing two news days).

---

[13] The out-of-circuit cases on which Defendants rely are distinguishable. Opp. at 15-16 and n.7. For example, in *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp. ("OPERS")*, 2018 WL 3861840, at \*5 (N.D. Ohio Aug. 14, 2018), the event study at issue considered only one news date, not three. Further, "[w]hile the Second Circuit endorsed the use of the *Cammer* factors" in *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 204 n.11 (2d

*Fourth*, Defendants are incorrect that it is appropriate to deny class certification solely based on a challenge to *Cammer* 5. *See, e.g., Cosby*, 2021 WL 1828114, at *3–4 (the "weight of authority indicates that the fifth *Cammer* factor is not necessary"). Indeed, courts routinely grant class certification based on the first through fourth *Cammer* factors alone. *E.g., Waggoner*, 875 F.3d at 91, 97 (*Cammer* 5 not necessary where indirect factors "weigh[] so strongly in favor of a finding of market efficiency"); *In re Accredo Health, Inc. Sec. Litig.*, 2006 WL 1716910, at *10 (W.D. Tenn. Apr. 19, 2006) (when *Cammer* factors 1-4 are satisfied for a stock trading on "a national security market . . . for purposes of class certification, there is sufficient evidence to support a finding that the market for [the] stock was efficient during the class period").

Accordingly, as Defendants effectively concede that Plaintiffs have fulfilled *Cammer* factors 1 through 4, this Court should hold that Plaintiffs have sufficiently demonstrated that Clover's securities traded in an efficient market and thus that Plaintiffs can rely on the fraud-on-the-market presumption. *See* Mot. at 15-20.

### D. Defendants Fail To Prove By A Preponderance Of The Evidence That Their Fraud Had No Price Impact

Defendants assert that Plaintiffs cannot rely on the fraud-on-the market presumption of reliance because Plaintiffs have not shown that the prices of Clover securities rose after Defendants made their alleged misrepresentations, *i.e.*, that there was no "front-end price impact." Opp. at 19-20. While Defendants can "defeat the [fraud-on-the-market] presumption at the class certification stage through evidence that the misrepresentation did not in fact affect the stock price," *i.e.*, lack of price impact, this is no easy task. *See Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 278, 281-82 (2014). As the Supreme Court held in *Basic*, Defendants must

---

Cir. 2008)," it has not required their use or held that any one of them is dispositive." *Cosby v. KPMG, LLP*, 2020 WL 3548653, at *12 (E.D. Tenn. June 29, 2020), *objections overruled*, No. 3:16-CV-121-TAV-DCP, 2021 WL 1845186 (E.D. Tenn. May 7, 2021).

completely "***sever[] the link*** between the alleged misrepresentation and [] the price received (or paid) by the plaintiff." *Basic*, 485 U.S. at 248-249. In addition, not only must Defendants prove the absence of *any* price impact "by a preponderance of the evidence," *Burges v. BancorpSouth, Inc.*, 2017 WL 2772122, at \*9 (M.D. Tenn. June 26, 2017), they must "do more than merely produce evidence that might result in a favorable outcome; they must demonstrate that the misrepresentations did not affect the stock's price." *Waggoner*, 875 F.3d at 101. In other words, to defeat class certification on the grounds of the absence of price impact, Defendants must prove that their alleged misrepresentations had *no effect whatsoever* on the price of Clover's securities. *Goldman*, 141 S. Ct. at 1956 ("The defendant must ***in fact*** seve[r] the link between a misrepresentation and the price paid by the plaintiff—and a defendant's mere production of some evidence relevant to price impact would rarely accomplish that feat"); *Strougo v. Tivity Health, Inc.*, 2022 WL 2037966, at \*7, 9 (M.D. Tenn. June 7, 2022) ("To sever the link in this case, Tivity must show a ***complete lack*** of price impact") (citing cases).

As with their attack on *Cammer* 5 (*see* Section II.C *supra*), Defendants do not proffer an expert report or testimony of a lack of price impact. *See* Opp. at 17-20. Instead, Defendants baldly assert that their misrepresentations had no price impact because the price of Clover's shares fell the day after the SPAC merger was announced on October 6, 2021. *See* Opp. at 19. This is woefully insufficient to completely sever the link between the misrepresentation and price paid by Plaintiffs.

As an initial matter, Defendants' failure to put forth any expert analysis or testimony of their own severely hampers their ability to contest price impact. *See Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018). In addition, Defendants' showing fails because Plaintiffs do not need to provide evidence of front-end price impact to rely on the fraud-on-the-market presumption. *E.g.*, *In re BancorpSouth, Inc.*, 2017 WL 4125647, at \*1 ("price

18

impact may be demonstrated *either* at the time that the alleged misrepresentations were made, *or* at the time of their correction"); *Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *5 (E.D. Mich. Nov. 19, 2020) (same). This is because "a lack of stock price increases correlated with [defendants'] statements [does] not necessarily establish a lack of price impact, because those statements might instead merely have perpetuated an already inflated valuation."[14] *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 496 (M.D. Tenn. 2019) (Trauger, J.). That Clover's share price declined the day after Defendants' October 6 misrepresentations, rather than remaining flat, is of no moment because "a stock can be inflated even if the price remains the same or declines after a false statement *because the price might have fallen even more*." *Glickenhaus*, 787 F.3d at 415.

Defendants assert in a footnote that Plaintiffs cannot argue that alleged misstatements maintained any inflation in the price of Clover securities because SCH, the SPAC that acquired Clover, spoke about Clover for the first time on October 6, 2021. See Mot. at 18-19 n.9. It is well-established, however, that only "[w]hen a misrepresentation presents entirely new information to the market that *it could not possibly have expected*" does information not maintain inflation in a stock price. *Zwick Partners, LP v. Quorum Health Corp.*, 2019 WL 1450546, at *14 (M.D. Tenn. Mar. 29, 2019); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *9 n.7 (S.D.N.Y. Mar. 23, 2020). Here, SCH was a SPAC created for the express and exclusive purpose of merging with another company. *Bond*, 587 F. Supp. 3d at 648 ("a SPAC exists to become

---

[14] Defendants cite *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 818 F.3d 775, 777 (8th Cir. 2016), as authority for their (incorrect) assertion that lack of front-end price impact *alone* was sufficient to deny class certification, but that case is easily distinguishable. *See* Mot. 19-20. Not only did the *Best Buy* defendants offer their own expert analysis, unlike Defendants, but the court relied heavily on plaintiffs' own expert, who *expressly disclaimed* front-end price impact in his testimony. Here, Defendants do not point to any deficiencies in Dr. Cain's analysis regarding price impact, but instead simply point to a generic decline following their misrepresentations, which is not sufficient to rebut Plaintiffs' inference of price impact. *See, e.g.*, *Glickenhaus*, 787 F.3d at 415.

publicly traded itself and then 'to buy a private company'"). Indeed, SCH had only two years to announce a merger otherwise it would need to return its capital to investors. *See* Daniel S. Riemer, *Special Purpose Acquisition Companies: SPAC and Span, or Blank Check Redux?*, 85 Wash. U. L. Rev. 931, 947 (2007). In short, investors were *expecting* the announcement of a merger.

Further, Dr. Cain testified why Clover's price decline the day after the merger announcement was unrelated to the fraud in that "investors looked at this as . . . potentially . . . not a good deal for the investors at the price that was—was being paid—relative to the value that they were receiving or the ownership stake," and that "based on my experience with M&A, it's – it's fairly common for the acquirer's stock prices -- and also in the context of SPACs, for SPAC prices to decline on the day of the announcement of these types of transactions." Calandra Decl. Ex. 3, Cain Dep. Tr. 148:25-149:13. Indeed, the tendency of SPACs to decline in the wake of merger announcements is a well-understood phenomenon. *Examining SPAC Performance Pre- & Post-Merger*, NASDAQ, Apr. 23, 2021, https://www.nasdaq.com/articles/examining-spac-performance-pre-post-merger-2021-04-23 (in a study of 72 SPAC announcements 38 (53%) declined after the merger announcement).

Regardless, this Court has already found, and Defendants do not dispute, that Plaintiffs allege a statistically significant price decline immediately following the Hindenburg Report. *See* Opp. 6-7; *Bond*, 587 F. Supp. 3d at 680. This alone demonstrates price impact. *Zwick*, 2019 WL 1450546, at *14 (M.D. Tenn. Mar. 29, 2019) (granting class certification solely based on back-end price impact).

### III.    <u>CONCLUSION</u>

For the reasons stated herein and in the Opening Brief, Plaintiffs respectfully request that the Court grant the Motion in all respects.

Dated: October 31, 2022

Respectfully submitted,

**POMERANTZ LLP**

*/s/ Brian Calandra*
Jeremy A. Lieberman
Brian Calandra
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
         bcalandra@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

*Lead Counsel and Attorneys for Plaintiffs*

**BRAMLETT LAW OFFICES**
Paul Kent Bramlett TN #7387/MS #4291
Robert Preston Bramlett TN #25895
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
Telephone:  (615) 248-2828
Facsimile:  (866) 816-4116
Email: PKNASHLAW@aol.com
        Robert@BramlettLawOffices.com

*Liaison Counsel*

**THE SCHALL LAW FIRM**
Brian Schall, Esq.
Rina Restaino
1880 Century Park East, Suite 404
Los Angeles, CA 90067
Telephone: (424) 303-1964
Email: brian@schallfirm.com
        rina@schallfirm.com

21

*Attorneys for Lead Plaintiff Firas Jabri*

**HOLZER & HOLZER, LLC**
Corey D. Holzer
Marshall P. Dees
1200 Ashwood Parkway
Suite 410
Atlanta, Georgia 30338
Telephone:  (770) 392-0090
Facsimile:  (770) 392-0029
Email:  cholzer@holzerlaw.com
             mdees@holzerlaw.com

*Attorneys for Named Plaintiff Jean-Nicolas Tremblay*

22

# CERTIFICATE OF SERVICE

This is to certify that I have filed the above and foregoing Plaintiffs' Motion for Class Certification on the Court's CM/ECF filing system, which will serve all counsel of record as follows:

Benjamin A. Gastel
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Fax: (615) 255-5419
Email: beng@bsjfirm.com

Jacob A. Walker
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: jake@blockleviton.com

James Gerard Stranch , IV
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Fax: (615) 255-5419
Email: gerards@bsjfirm.com

Jeffrey C. Block
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: jeff@blockleviton.com

Stephen J. Teti
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110

23

(617) 398-5600
Fax: (617) 507-6020
Email: steti@blockleviton.com

Larry Russell Belk , Jr.
Sutherland & Belk, PLC
2505 21st Avenue South
Suite 400
Nashville, TN 37212
(615) 846-6200
Fax: (615) 208-2255
Email: russell@sbinjurylaw.com

James A. Holifield , Jr.
Holifield Janich Rachal & Associates, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
(865) 566-0115
Fax: (865) 566-0119
Email: aholifield@holifieldlaw.com

Brian Peter Calandra
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(646) 581-9958
Email: bcalandra@pomlaw.com

Brian Schall
Schall Law Firm
2049 Century Park East
Suite 2460
Los Angeles, CA 90067
(310) 301-3335
Email: brian@schallfirm.com

Paul Kent Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116

24

Email: pknashlaw@aol.com

Laurence M. Rosen
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: lrosen@rosenlegal.com

Phillip Kim
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: pkim@rosenlegal.com

Robert P. Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: robert@bramlettlawoffices.com

Christopher M. Wood
Robbins Geller Rudman & Dowd LLP (Nashville Office)
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2203
Fax: (615) 252-3798
Email: cwood@rgrdlaw.com

Jerry E. Martin
Barrett Johnston Martin & Garrison, LLC
Philips Plaza
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2202
Fax: (615) 252-3798
Email: jmartin@barrettjohnston.com

Mark S. Reich
Robbins Geller Rudman & Dowd LLP (New York Office)
58 S Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Fax: (631) 367-1173
Email: mreich@rgrdlaw.com

Mary K. Blasy
Robbins Geller Rudman & Dowd LLP (New York Office)
58 S Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Fax: (631) 367-1173
Email: mblasy@rgrdlaw.com

Samuel H. Rudman
Robbins Geller Rudman & Dowd LLP (New York Office)
58 S Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Fax: (631) 367-1173
Email: srudman@rgrdlaw.com

Corey D. Holzer
Holzer & Holzer, LLC
1200 Ashwood Parkway
Suite 410
Atlanta, GA 30338
(770) 392-0090
Fax: (770) 392-0029
Email: cholzer@holzerlaw.com

J. Alexander Hood , II
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Fax: (212) 661-8665
Email: ahood@pomlaw.com

Jeremy A. Lieberman
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com

Patrick V. Dahlstrom
Pomerantz LLP (Chicago Office)
10 S LaSalle Street
Suite 3505
Chicago, IL 60603
(312) 377-1181
Fax: (312) 377-1184
Email: pdahlstrom@pomlaw.com

Britt K. Latham
Bass, Berry & Sims (Nashville Office)
150 Third Avenue South
Suite 2800
Nashville, TN 37201
(615) 742-6200
Email: blatham@bassberry.com

Jed M. Schwartz
Milbank LLP
53 Hudson Yards
New York, NY 10001
(212) 530-5000
Email: jschwartz@milbank.com

Scott A. Edelman
Milbank LLP
53 Hudson Yards
New York, NY 10001
(212) 530-5000
Email: sedelman@milbank.com

John Tate Spragens
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
(615) 983-8900
Fax: (615) 682-8533

27

Email: john@spragenslaw.com

Saul C. Belz
Glankler Brown, PLLC
6000 Poplar Avenue
Suite 400
Memphis, TN 38119
(901) 576-1741
Fax: (901) 576-2389
Email: sbelz@glankler.com

Tara L. Swafford
The Swafford Law Firm, PLLC
207 Third Avenue North
Franklin, TN 37064
(615) 599-8406
Fax: (615) 807-2355
Email: tara@swaffordlawfirm.com

Charles F. Barrett
Neal & Harwell, PLC
1201 Demonbreun Street
Suite 1000
Nashville, TN 37203
(615) 244-1713
Fax: (615) 726-0573
Email: cbarrett@nealharwell.com

SO CERTIFIED this 31st day of October 2022

*/s/ Brian Calandra*