# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **TIMOTHY BOND,** | ) | |
| | ) | |
| **Lead Plaintiff** | ) | |
| | ) | |
| **and** | ) | **Case No. 3:21-cv-00096** |
| | ) | **Judge Aleta A. Trauger** |
| **JEAN-NICOLAS TREMBLAY,** | ) | |
| | ) | |
| **Named Plaintiff,** | ) | |
| | ) | |
| **Individually and on behalf of all others similarly situated,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, VIVEK GARIPALLI, ANDREW TOY, JOE WAGNER, and CHAMATH PALIHAPITIYA,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Firas Jabri and Jean-Nicholas Tremblay have filed a Motion for Class Certification (Doc. No. 101), to which defendants Clover Health Investments, Corp. f/k/a Social Capital Hedosophia Holdings Corp. III ("SCH"), Vivek Garipalli, Andrew Toy, Joe Wagner, and Chamath Palihapitiya have filed a Response (Doc. No. 108), and Jabri and Tremblay have filed a Reply (Doc. No. 110). For the reasons set out herein, the motion will be granted.

# I. BACKGROUND

## A. Medicare Advantage and the Problem of Risk Adjustment Fraud

In 1997, "Congress created 'Medicare Part C,' sometimes referred to as Medicare Advantage ['MA']. Under Part C, beneficiaries may choose to have the government pay their private insurance premiums rather than pay for their hospital care directly." *Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1809 (2019). The federal government funds MA plans on a "capitated" basis, meaning that the private company operating a plan "receive[s] in advance a monthly lump sum from CMS for every beneficiary that [it] enroll[s], without regard to the services that the beneficiaries will actually receive." *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 873 (D.C. Cir. 2021). The capitated monthly rate for each patient, however, is not necessarily the same. The Center for Medicare and Medicaid Services ("CMS") "uses a model—called the CMS Hierarchical Condition Category, or CMS-HCC, risk-adjustment model"—that assigns each Part C beneficiary a "risk assessment score" based on a formula considering various "demographic characteristics" that are "predictive of differing costs of care." *Id.* at 874 (citing 42 U.S.C. § 1395w-23(a)(1)(C)(i)). CMS's formula allows the agency to "determine prospectively, based on Medicare Advantage beneficiaries' actuarially relevant, known demographic and health characteristics, the per-capita payment rate that will fairly compensate th[e] Medicare Advantage insurer" for providing the beneficiary's coverage for that month. *Id.* at 873.

If capitation rates were based solely on general, verifiable demographic traits such as age and sex, CMS's job in setting the scores would be as simple as consulting its own enrollment data and applying a formula to the numbers it found. In order for the risk assessment formula to be as effective as possible, however, Congress has authorized CMS to consider any "such other factors as the Secretary determines to be appropriate, including adjustment for health status." 42 U.S.C. § 1395w-23(a)(1)(C)(1). The result is a somewhat more complex model that relies,

2

among other things, on data provided by beneficiaries' healthcare providers, including with regard to "individuals' medical diagnoses." *U.S. ex rel. Anita Silingo v. WellPoint, Inc.*, 904 F.3d 667, 672 (9th Cir. 2018) (citing Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 74 Fed. Reg. 54,634, 54,673 (Oct. 22, 2009)). While this additional data allows risk assessment scores to be more precise, it also introduces a vulnerability into the system. "With data for millions of people being submitted each year, CMS is unable to confirm diagnoses before calculating capitation rates." *Id.* As a result, capitated rates may be skewed upward or downward based on providers' misreporting (or non-reporting) of patient information. In order to mitigate that problem, "Medicare regulations require risk adjustment data to be produced according to certain best practices." *Id.* (citing Contract Year 2015 Policy and Technical Changes to the Medicare Advantage and the Medicare Prescription Drug Benefit Programs, 79 Fed. Reg. 1918, 2001 (Jan. 10, 2014)).

While those regulations may have had some success in combating data reporting errors—particularly inadvertent ones—they have not been able to wholly eradicate the practice of intentional overreporting of risk factors or, as it has come to be known, "risk adjustment fraud." Because risk factors are reported by healthcare providers, but the inflation of a patient's risk score benefits only the insurer, there is no inherent incentive to commit the fraud—at least as long as those parties are kept at an arm's length from each other. However, if a Part C plan operator can find a way to induce, encourage, or trick healthcare providers into over-reporting a beneficiary's risk factors without actually implementing a more expensive course of treatment, the insurer can receive a higher capitated payment for that beneficiary without actually having to pay for more services.

**B. Clover and the Clover Assistant**

Garipalli founded the original Clover[1] in 2013 for the purpose of providing Medicare Advantage plans. (*Id.* ¶ 56.) Historically, the Part C/MA market has been concentrated among a handful of large insurers with patient bases far larger than Clover's. Clover has publicly acknowledged its comparatively weak market position, but the company and its executives characterized the MA field as, in the words of one press release, "ripe for disruption" after having "seen little innovation" for years. (Doc. No. 70 ¶ 61.[2]) According to that press release, Clover was designed to provide that disruption with its "unique model," through which it "partner[ed] with primary care physicians using its software platform, the Clover Assistant, to deliver data-driven, personalized insights at the point of care." (*Id.* ¶ 63.)

Clover described the Clover Assistant as its "flagship software platform . . . to provide America's seniors with PPO and HMO plans that are the obvious choice for Medicare-eligible consumers." (*Id.* ¶ 66.) According to Clover, the Assistant used "machine learning" to analyze "millions" of data points in order to provide "actionable and personalized insights at the point of care." (*Id.* ¶ 66.) The plaintiffs, however, claim that the purpose of the Clover Assistant was far simpler: it was "designed to identify opportunities to assign higher Medicare risk adjustments so that Clover [could] obtain larger reimbursements from Medicare." (*Id.* ¶ 67.) It did this by, among other things, guiding physicians' offices to record information that, based on the Medicare risk assessment formula, were likely to result in upward revisions of the patient's risk assessment score. Those upward revisions made Clover's deals with Medicare more profitable

[1] For the sake of concision, the court will use the name "Clover" broadly to refer to both SCH and so-called "Legacy Clover," which the court is describing here. Although the distinction between the entities is an important fact in the context of the case as a whole, that level of precision is mostly unnecessary in connection with the current motion.

[2] Although the assertions in the First Amended Complaint were, at the time of filing, mere allegations, the defendants have admitted many of the underlying details in their Answer. (*See* Doc. No. 94.) The court accordingly will cite to the First Amended Complaint for certain now-admitted background facts—such as quotes from publicly available documents—relevant to the current motion, as well as to summarize aspects of the plaintiffs' theory of the case.

4

by allowing Clover to receive higher capitated payments for individual patients. (*Id.* ¶¶ 57, 67–69.)

While there is nothing inherently wrong with encouraging physicians to report information likely to result in higher risk assessment scores, doing so through improper means or without sufficient guardrails to ensure accuracy risks crossing over the line into risk adjustment fraud. The court has previously detailed some of the mechanisms through which the Clover Assistant is alleged to have improperly driven inflated risk assessments—such as by nudging users to diagnose complex conditions and failing to recognize when old diagnoses should be removed. *See Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 651 (M.D. Tenn. 2022). Exacerbating that problem was the fact that physicians themselves allegedly did not appear to be very interested in using the Assistant. Rather, Clover had to pay physicians to use the software as a "loss leader," and many physicians who agreed to do so actually left the task to support staff, who should not have been permitted to diagnose patients and may have been particularly vulnerable to the Assistant's influence. *Id.* at 654–55.

## C. The Clover/SCH Merger and this Case

United States securities laws allow the public trading of so-called "special purpose acquisition companies"—also referred to as "SPACs" or "blank check companies." A SPAC typically has "no operating history, assets, revenue, or operations" of its own. Daniel S. Riemer, *Special Purpose Acquisition Companies: SPAC and Span, or Blank Check Redux?*, 85 Wash. U. L. Rev. 931, 933 (2007). Rather, a SPAC exists to become publicly traded itself and then "to buy a private company"—one that actually provides a good or service but is not yet publicly traded—thereby allowing investors to "effectively [take the acquired] company public while avoiding the tradition[al] initial public offering ['IPO'] process." *Phillips v. Churchill Cap. Corp. IV*, No.

1:21-CV-00539-ACA, 2021 WL 4220358, at *1 (N.D. Ala. Sept. 16, 2021). SCH was a SPAC, and, on October 6, 2020, it announced that it would be fulfilling its mission by acquiring Clover.

As the Clover/SCH merger moved forward, the companies and their executives made various public statements about the transaction and/or Clover's business model, either to the press or in filings to the SEC. According to the plaintiffs, many of those statements were false or misleading because they concealed or failed to disclose that:

(i)     the Company had committed multiple legal and regulatory violations since January 1, 2018 and was . . . under investigation by the DOJ for violations of the False Claims Act;

(ii)    the Company's growth and positive performance stemmed from illegal gifts and/or payments to healthcare practitioners and/or office staff in violation of the Anti-Kickback Statute, the [False Claims Act], and [CMS Guidelines], and unreported related party transactions;

(iii)   only a small fraction of the healthcare providers who had contracted with the Company were actually using the Company's Clover Assistant software platform;

(iv)    Clover's financial statements did not comply with [Generally Accepted Accounting Principles ("GAAP")] because they failed to disclose material agreements and transactions with related parties; and

(v)     the Company's SEC filings failed to comply with Items 303 and 503 of Regulation S-K.

(Doc. No. 70 ¶ 3 (formatting altered).)

On February 4, 2021—after the combination of SCH and the original Clover into a single business under the Clover name—a market research firm called Hindenburg Research released a report ("Hindenburg Report") that, according to the plaintiffs, brought the truth about Clover's flawed operations to light. (*Id.* ¶¶ 3, 20.) The plaintiffs have provided an expert report of economist Matthew D. Cain, Ph.D., explaining that, when news of the Hindenburg Report reached the market, the value of Clover stock fell by more than 13%, wiping out a substantial

amount of value held by investors who had purchased their shares at prices set by the pre-Hindenburg Report market. (Doc. No. 107-1 ¶ 57.)

On February 5, 2021, Timothy Bond filed a Complaint against Clover and some of its executives, stating claims under § 10(b) of the Exchange Act against all defendants and under § 20(a) of the Exchange Act against the individual defendants. (Doc. No. 1.) A few other plaintiffs filed similar cases, which were consolidated with the original. (Doc. No. 42.)

The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that, "[n]ot later than 20 days after the date on which [a private securities fraud class action complaint] is filed, the plaintiff or plaintiffs shall cause to be published . . . a notice" informing other potential class members of the complaint. 15 U.S.C. §78u-4(a)(3)(A)(i). Then,

> [n]ot later than 90 days after the date on which [the] notice is published . . . , the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members . . . .

15 U.S.C. §78u-4(a)(3)(B)(i). The court followed that procedure and, after considering a number of motions from aspiring lead plaintiffs, selected Firas Jabri for the role. (Doc. No. 58 at 9.) The court also approved Pomerantz LLP as lead counsel and Bramlett Law Firm as liaison counsel. (*Id.*) On June 28, 2021, Jabri—joined by Tremblay, who shares the same counsel—filed an Amended Complaint. (Doc. No. 70.) On August 27, 2021, the defendants filed a Motion to Dismiss (Doc. No. 74), which the court denied on February 28, 2022 (Doc. Nos. 87–88).

On July 1, 2022, Jabri and Tremblay filed a Motion for Class Certification, asking the court to certify the following class pursuant to Rule 23 of the Federal Rules of Civil Procedure:

> All persons and entities who purchased or otherwise acquired securities of Clover Health Investments Corp. ("Clover" or the "Company") between October 6, 2020 and February 3, 2021, both dates inclusive (the "Class Period"). Excluded from

7

the Class are Clover, Vivek Garipalli ("Garipalli"), Andrew Toy ("Toy"), Joe Wagner ("Wagner"), and Chamath Palihapitiya ("Palihapitiya," and, together with Clover, Garipalli, Toy, and Wagner "Defendants"), the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

(Doc. No. 102 at 1.) Jabri and Tremblay ask to be appointed as class representatives and ask the court to appoint Pomerantz LLP as class counsel. (*Id.*) The defendants oppose the motion. (Doc. No. 108.)

## II. LEGAL STANDARD

The principal purpose of class actions is to achieve efficiency and economy of litigation, both with respect to the parties and the courts. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 159 (1982). The Supreme Court has observed that, as an exception to the usual rule that litigation is conducted by and on behalf of individual named parties, "[c]lass relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Id.* at 155 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). The Court directs that, before certifying a class, district courts must conduct a "rigorous analysis" of the prerequisites of Rule 23 of the Federal Rules of Civil Procedure. *Id.* at 161. The Sixth Circuit has stated that district courts have broad discretion in deciding whether to certify a class, but that courts must exercise that discretion within the framework of Rule 23. *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

Although a court considering class certification should not inquire into the merits of the underlying claim, a class action may not be certified merely based on its designation as such in the pleadings. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *In re Am. Med. Sys.*, 75 F.3d at 1079. In evaluating whether class certification is appropriate, "it may be necessary for

8

the court to probe behind the pleadings," as the issues concerning whether it is appropriate to certify a class are often "enmeshed" within the legal and factual considerations raised by the litigation. *Falcon*, 457 U.S. at 160; *see also In re Am. Med. Sys.*, 75 F.3d at 1079; *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974). Moreover, the party seeking class certification bears the burden of establishing that the requisites are met. *See Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003); *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976). "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead— that their proposed class satisfies each requirement of Rule 23 . . . ." *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 275 (2014).

### III. ANALYSIS

#### A. Disputed Requirements

A class action will be certified only if, after thorough analysis of the evidence presented, the court is satisfied that the prerequisites of Fed. R. Civ. P. 23(a) have been met and that the action falls within one of the categories described in Fed. R. Civ. P. 23(b). *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016). Compliance with Rule 23(a) requires the proposed class to satisfy each of four requirements, typically referred to as (1) numerosity, (2) commonality, (3) typicality and (4) adequacy of representation. *Comcast v. Behrend*, 569 U.S. 27, 33 (2013). Then, if putative class representatives are able to meet all four of the requirements of Rule 23(a), they next must produce evidence sufficient to establish that their case falls within at least one of the three types of case listed as appropriate for class resolution in Rule 23(b). *Id.* at 34. In this instance, the plaintiffs seek to rely on Rule 23(b)(3), which allows for certification of a Rule 23(a)-compliant class if

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a

9

class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

As is often the case, not every one of the aforementioned requirements is actually contested in the context of the current motion. For example, the defendants have not produced any evidence or argument that would undermine the plaintiffs' showing of numerosity, as required by Rule 23(a)(1), based on the thousands of individuals and institutions that purchased Clover shares and warrants during the Class Period. (*See* Doc. No. 107-1 ¶¶ 28–29, 67.) Similarly, the defendants have not advanced any argument specifically refuting the proposition that the named plaintiffs' claims are substantively typical of those of the class, as required by Rule 23(a)(3). The defendants do dispute the adequacy of the named plaintiffs' representation of the class, but their grounds for doing so are personal to the individual plaintiffs themselves and therefore can be addressed in the context of Rule 23(a)(4).

Similarly, while the defendants do not outright concede that the plaintiffs have established commonality under Rule 23(a)(2), the court's analysis of that requirement can, as a practical matter, be subsumed into its consideration of Rule 23(b)(3). Rule 23(a)(2) considers only whether there is at least a "single common question" between the putative class members' cases, whereas Rule 23(b)(3) considers the significantly more demanding issue of whether the shared issues "predominate." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) (citation

10

and brackets omitted). Because shared issues cannot predominate unless shared issues *exist*, satisfying Rule 23(b)(3) would necessarily entail satisfying Rule 23(a)(2).

There are, then, ultimately two contested questions before the court: whether the named plaintiffs "will fairly and adequately protect the interests of the class," as required by Rule 23(a)(4); and whether "questions of law or fact common to class members predominate over any questions affecting only individual members," such that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy," as required by Rule 23(b)(3). The defendants argue that these plaintiffs cannot prevail on the first of those issues because the plaintiffs' behavior during and around this litigation shows that they would not be good stewards of the claims of other class members. The defendants argue that the plaintiffs cannot prevail on the second issue because they cannot show that the class members' fraud claims will primarily rise or fall together through a single theory of classwide fraud.

## B. Adequacy of Representation

 "If the absent members [of a class] are to be conclusively bound by the result of an action prosecuted or defended by a party alleged to represent their interests, basic notions of fairness and justice demand that the representation they receive be adequate." 7A Wright & Miller, Fed. Prac. & Proc. Civ. § 1765 (4th ed.). The presence of an adequate class representative is therefore an indispensable prerequisite if a court is to permit a class action to proceed. At the same time, however, it is well-settled that "the named representative of a class . . . need not be the best of all possible plaintiffs"—merely an adequate one.[3] *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 482 (W.D. Mich. 1994) (citing *Ashe v. Bd. of Elections in City of New Yo*rk, 124 F.R.D. 45, 50 (E.D.N.Y. 1989)).

---

[3] Of course, the PSLRA lead plaintiff selection process complicates this general principle somewhat, as it does call on the court to select the best available plaintiff from among the options presented. That stage of these proceedings, however, is completed, leaving only Rule 23 at issue.

Many of the concerns that are routinely addressed under Rule 23(a)(4) involve looking at the objective facts surrounding the case to determine whether "the proposed class representatives' interests [are] antagonistic to those of other class members" and whether "their attorneys [are] qualified, experienced and able to conduct the litigation." *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. 38, 50 (S.D.N.Y. 2012); *see, e.g., Hansberry v. Lee*, 311 U.S. 32, 44 (1940) ("Because of the dual and potentially conflicting interests of those who are putative parties to the agreement in compelling or resisting its performance, it is impossible to say, solely because they are parties to it, that any two of them are of the same class."). The defendants in this case, however, have mostly stayed away from such arguments. Instead, they focus on a different set of considerations that, though important, can be difficult to assess: supposed defects in the representatives' personal fitness for the job and, in particular, their candor.

"To judge the adequacy of representation, courts may consider the honesty and trustworthiness of the named plaintiff." *Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 431 (6th Cir. 2012) (quoting *Savino v. Computer Credit Inc.*, 164 F.3d 81, 87 (2d Cir. 1998)). It is important to remember, however, that the point of such an inquiry is not to reach some general conclusion about the representative's character or the severity of any particular bad acts of which he has been accused. Rather, credibility and character are relevant only insofar as they bear on the core Rule23(a)(4) requirement of being able to fairly represent the absent members of the class. "Only when attacks on the credibility of the representative party are so sharp as to jeopardize the interests of absent class members should such attacks render a putative class representative inadequate." *Id.* at 431 (quoting *Pasternak v. Colonial Equities Corp./U.S.A.*, No. H–90–829 (JAC), 1993 WL 306526, at *5 (D. Conn. Feb. 10, 1993)).

The defendants argue that Jabri has demonstrated his unfitness to serve as class representative by relying on dishonest and misleading representations of his losses in order to be

12

named lead plaintiff in this litigation. They argue that Tremblay has similarly shown himself to be untrustworthy and unreliable by providing misleading information regarding the timing of his purchases of Brookdale stock. The defendants also argue that, even aside from those issues of honesty, Tremblay demonstrated himself, during his discovery deposition, to have a poor understanding of this case and the relevant law, such that allowing him to act as a purported representative would, in effect, amount to permitting his attorneys to prosecute the underlying claims unconstrained by oversight or accountability to any client.

### 1. Jabri

As the defendants point out, the primary reason why Jabri, as opposed to one of the other aspiring lead plaintiffs, finds himself in the position to make decisions about this litigation is that he claimed the largest personal losses from the alleged fraud and was therefore made lead plaintiff. (*See* Doc. No. 58 at 6–9 (naming Jabri as lead plaintiff).) The defendants argue, however, that those claims were misleading, if not outright false. Specifically, the defendants argue that, insofar as the claims against them have any merit, damages should be calculated "using the 'out-of-pocket' approach," pursuant to which "damages are measured as the difference between what the investor actually paid for a security, and what they should have paid, i.e., the price absent the alleged artificial inflation." (Doc. No. 108 at 7 (citing *Rowe v. Marietta Corp.*, 172 F.3d 49 (6th Cir. 1999)).) Jabri, in contrast, "took the difference between the price at which he bought his Clover shares during the Class Period and the average trading price of Clover stock for the 61 days following the publication of the Hindenburg Report," resulting in calculated losses far in excess of what he could have claimed under the out-of-pocket method. (*Id.* at 6.) The defendants also accuse Jabri of dishonestly concealing the fact that his Clover investments were, in fact, actually profitable in the aggregate, when one considers eventual sales outside the Class Period.

13

The court can easily dismiss the latter of those two arguments. There is no contradiction between Jabri's having been a victim of fraud related to Clover securities and the fact that he ultimately made a net profit off of those securities. Fraud requires only that the plaintiff was injured, not that he *never* enjoyed a benefit. There is, moreover, little, if any, evidence that Jabri actively concealed his profits, as opposed to simply failing to mention them because he (correctly) considered them irrelevant to the facts at issue. This aspect of the defendants' argument therefore presents no obstacle to satisfying Rule 23(a)(4).

The allegations regarding claimed losses are potentially more serious. If Jabri had, in fact, misstated his losses to the court, it would raise significant doubts about his ability to participate in litigation while honoring his obligation of candor to the court and to the many unnamed members of the proposed class. Jabri, however, disputes that his method of calculating damages was erroneous and argues that each of the other aspiring lead plaintiffs calculated damages in the same way. More importantly, Jabri points out that he was transparent about the methodology he was using and did nothing to hide or even obfuscate his calculations. A review of Jabri's submitted documentation confirms that this is true. Those materials expressly and prominently describe how his alleged damages were calculated, including his reliance on the "61-Day Mean Price" of the stock. (Doc. No. 41-4 at 1.) Any aspiring lead plaintiff could have disputed that calculation on the very grounds that the defendants now cite. At most, then, Jabri simply took a contestable legal position; he does not appear to have deceived, or made any effort to deceive, anybody about the underlying facts. Jabri's unconcealed reliance on an aggressive damages model does not create an issue of personal credibility sufficient to find that Jabri is incapable of adequately representing the class.[4]

---

[4] Accordingly, there is no need for the court to issue a substantive ruling, at this stage, regarding how damages, if any, should be calculated in this case.

14

The information that Jabri has submitted in support of satisfying Rule 23(a)(4) is, moreover, adequate. Jabri has hired experienced counsel who have demonstrated notable competence, including through their briefing in support of the pending certification motion. *See Plumbers & Pipefitters Nat. Pension Fund v. Burns*, 292 F.R.D. 515, 521 (N.D. Ohio 2013) (noting that hiring of competent counsel is "strong evidence that plaintiffs seek fairly and adequately to represent the proposed class members"). He does not appear to have any hidden conflicts of interest with the rest of the class. To the contrary, his interest appears to be the same as the unnamed members': prevailing in this case and being compensated for his alleged injuries. The plaintiffs can therefore satisfy Rule 23(a)(4) by relying on Jabri as class representative.

### 2. Tremblay

The defendants' aspersions on Tremblay's credibility are similarly unconvincing. They argue that he failed to disclose a post-Class Period purchase of Clover shares in one of the exhibits he filed in support of his original Complaint, but the offending chart was, at worst, confusing and unclear regarding its date range—a misstep in communication, perhaps, but not indicative of any attempt to deceive. (*See* Case No. 3:21-cv-00138, Doc. No. 1-3.) That lack of clarity, moreover, was on an issue immaterial to the actual substance of his claims or his ability to serve as a class representative. "Courts have consistently rejected the argument that post-disclosure purchases preclude a proposed class representative from meeting Rule 23(a) requirements in a fraud-on-the-market suit." *In re K-V Pharm. Co. Sec. Litig.*, No. 11CV01816 AGF, 2012 WL 1570118, at *6 (E.D. Mo. May 3, 2012) (*citing Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005); *In re Pfizer Inc. Sec. Litig.*, 282 F.R.D. at 47; *In re Connetics Corp. Sec. Litig.*, 257 F.R.D. 572, 577 (N.D. Cal. 2009)); *accord In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 288 F.R.D. 26, 38 (S.D.N.Y. 2012); *see also Ross v. Abercrombie & Fitch*

15

*Co.*, 257 F.R.D. 435, 446 (S.D. Ohio 2009) (collecting cases holding that post-disclosure share purchases did not undermine claims for pre-disclosure fraud).

The arguments regarding Tremblay's personal familiarity with this litigation are similarly unavailing. The defendants are correct that a proposed class representative's adequacy may be brought into question if his deposition testimony or some other action demonstrates a "lack of knowledge or understanding concerning what the suit is about." *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307, 315 (E.D. Va. 2007) (quoting 7A Wright & Miller, Federal Practice and Procedure § 1766 (2007)). At the same time, however, securities law is complex, and there is nothing problematic or even surprising about an individual lay party's being clumsy in his discussion of the details of his case during a discovery deposition. The defendants' briefing in support of this argument relies on selectively quoted snippets of testimony that do not, in the broader context of the deposition, fairly represent Tremblay's degree of familiarity with this case. In the plaintiffs' Reply, they direct the court to other portions of Tremblay's testimony that make it clear that he did, in fact, understand the basic, significant contours of this litigation to the degree ordinarily required of an active and involved plaintiff. (*See* Doc. No. 110 at 11–12 (discussing Doc. No. 111-2).) The court accordingly finds that Tremblay, like Jabri, can adequately serve as class representative and therefore satisfies Rule 23(a)(4).

## C. Common Questions of Law and Fact

"Investors can recover damages in a private securities fraud action only if they prove that they relied on the defendant's misrepresentation in deciding to buy or sell a company's stock." *Halliburton II*, 573 U.S. at 263. For example, in a conventional securities fraud case, an individual might show, via documentary or testimonial evidence, that he personally relied on a particular misrepresentation in making the decision to buy or sell at a specific price. *See Chelsea Assocs. v. Rapanos*, 527 F.2d 1266, 1271 (6th Cir. 1975) ("In the usual fraud case or case

16

brought for misrepresentation in violation of Rule 10b-5, proof of reliance upon the misstated or false fact is required.") (citing *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2nd Cir. 1974), *cert. denied*, 421 U.S. 976 (1975)). Although that approach may have been adequate for traditional, single-plaintiff securities fraud cases, proving individual reliance in such a manner for each member of a class that might number in the thousands would be impossibly complex. If reliance can be established categorically, however, then no such obstacle will exist.

The plaintiffs maintain that they can establish a classwide theory of reliance based on the fact that the defendants' alleged fraud directly affected the price of publicly traded Clover stock and therefore tainted every purchase of that stock during the Class Period. The defendants do not dispute that such a theory of reliance can, as a general matter, support recovery under the Exchange Act. They argue, however, that the plaintiffs have failed to make the showings that the Supreme Court has held to be necessary in order to rely on such a theory in the context of class certification.

### 1. The *Basic* Presumption

"[M]odern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases." *Basic Inc. v. Levinson*, 485 U.S. 224, 243–44 (1988). As the Supreme Court has explained:

> In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.

*Id.* at 244 (quoting *In re LTV Secs. Litig.*, 88 F.R.D. 134, 143 (N.D. Tex. 1980)). If, for example, an executive of a company makes a false statement affecting the market price of the company's stock, and a buyer purchases the stock at that market price, the buyer has, as a practical matter, relied on the executive's false statement in deciding what price to pay for his shares—even if the buyer was personally unaware of the statement. This theory—known as the "fraud-on-the-market" theory of reliance—acknowledges that a modern investor, acting on an open and efficient securities exchange, is relying on the market itself to be his eyes and ears with regard to publicly available information. *Id.*

The Supreme Court has held that, pursuant to the fraud-on-the-market theory, there is a rebuttable presumption of reliance with regard to material statements made about a company whose stock was traded on an "efficient market"—in other words, a market that, through plentiful and relatively unencumbered transaction opportunities, was able to assimilate all material public information into a share's price. *Id.* at 253; *see Halliburton II*, 573 U.S. at 270–72 (discussing efficiency of capital markets). That fraud-on-the-market presumption of reliance is sometimes referred to as the "*Basic* presumption," after *Basic Inc. v. Levinson*. *See In re BancorpSouth, Inc.*, No. 17-0508, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) ("The *Basic* fraud-on-the-market presumption is based on the 'premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'") (quoting *Halliburton II*, 573 U.S. at 272)).

"[T]o invoke the *Basic* presumption, a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 277–78 (citing *Basic*, 485 U.S., at 248 n.27). Once a plaintiff makes an initial showing that he is entitled to the *Basic*

presumption, however, "a defendant may rebut it with 'evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock.'" *BancorpSouth*, 2017 WL 4125647, at *1 (quoting *Halliburton II*, 573 U.S. at 279–80). The issue of whether a misstatement or correction actually affected a stock's price is referred to as "price impact." *Id.* "In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse," because the "fundamental premise" of the fraud-on-the-market theory—that the alleged fraud was reflected in the price of the security—has been refuted. *Id.* at 278 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 813 (2011)).

On its face, the *Basic* presumption goes to the merits of a claim, not the appropriateness of class certification. *See In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 851 (6th Cir. 2013) ("[D]istrict courts . . . consider at the class certification stage only those matters relevant to deciding if the prerequisites of Rule 23 are satisfied."). As the court has already noted, however, the *Basi*c presumption is often relevant to a court's consideration of whether a putative class can satisfy Fed. R. Civ. P. 23(b)(3)'s requirement that questions of law or fact common to class members predominate. The fraud-on-the-market theory greatly simplifies the reliance inquiry in a securities fraud case by providing a factual and legal basis for reliance that can be applied easily to all investors. "[W]ithout the benefit of the *Basic* presumption," however, "investors would have to prove reliance on an individual basis, meaning that individual issues would predominate over common ones." *Halliburton II*, 573 U.S. at 265–66.

A plaintiff seeking to rely on the *Basic* presumption in support of class certification is not required to demonstrate that he will satisfy all of its prerequisites on the merits. Specifically, the Supreme Court has held that a party seeking class certification in a fraud-on-the-market case is

19

not required to provide proof of materiality, in and of itself, in order to satisfy Rule 23. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013). The plaintiff must, however, establish, at least, "[1] that the alleged misrepresentations were publicly known . . . , [2] that the stock traded in an efficient market, and [3] that the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.'" *Halliburton I*, 563 U.S. at 811 (quoting *Basic*, 485 U.S. at 248 n.27). The Supreme Court has also held that, once that initial showing is made by the plaintiff, a defendant is entitled, at the class certification stage, to offer price impact evidence in order to rebut the *Basic* presumption. *Halliburton II*, 573 U.S. at 283–84.

The defendants in this case argue that the plaintiffs cannot rely on the *Basic* presumption to establish commonality for two reasons: (1) they have not provided evidence sufficient to establish that Clover stock traded on an efficient market; and (2) price impact evidence shows no price impact of the relevant statements.

### 2. Presence of an Efficient Market

During the relevant period, Clover's stock was traded on the New York Stock Exchange and NASDAQ—the massive, extraordinarily active public securities markets that normally provide the setting for a finding of market efficiency in a U.S. fraud-on-the-market case. "Courts have . . . considered a stock's listing on a national exchange to be probative of efficiency, but . . . not dispositive when efficiency is disputed." *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 178 (S.D.N.Y. 2012) (collecting cases). The defendants argue that, despite Clover's publicly traded nature, the plaintiffs have failed to establish market efficiency based on the so-called *Cammer* factors, named for *Cammer v. Bloom*, 711 F. Supp. 1264, 1281 (D.N.J. 1989):

> Under *Cammer*, the [c]ourt should consider: first, whether the stock trades at a high weekly volume; second, whether securities analysts follow and report on the stock; third, whether the stock has market makers and arbitrageurs; fourth, whether the company is eligible to file U.S. Securities and Exchange Commission ("SEC") registration form S-3, as opposed to form S-1 or S-2; and fifth, whether there are empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV0160, 2018 WL 3861840, at *16 (N.D. Ohio Aug. 14, 2018). The plaintiffs argue that each of those factors favors a finding of an efficient market. The defendants do not dispute that argument with regard to the first four *Cammer* factors, and the plaintiffs have indeed produced evidence sufficient for the court to find in the plaintiffs' favor with regard to those factors. (*See* Doc. No. 107-1 ¶¶ 26–29 (trading volume), 30–34 (analyst coverage), 35–39 (market makers), 40–42 (Form S-3).)[5] The defendants focus instead on the fifth *Cammer* factor: whether empirical evidence shows that Clover's stock was actually responsive to events.

Some courts have suggested that "the fifth *Cammer* factor is not necessary" in order to find market efficiency, at least as long as the other factors do support a finding. *Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2021 WL 1828114, at *4 (E.D. Tenn. May 7, 2021). Whether or not one goes that far, the multi-pronged nature of the *Cammer* inquiry makes clear that an empirical showing of a stock price's responsiveness to new information is less important for a stock that, like Clover's, traded in large volume between numerous investors on high-profile institutional exchanges.

In any event, the plaintiffs have provided some such evidence, in the form of an event study by Dr. Cain, who previously worked as an economist for the SEC and is now a Senior Fellow at the Berkeley Center for Law and Business at the University of California, Berkeley.

---

[5] The same is true with regard to the supplemental factors set forth in *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001). (*See* Doc. No. 107-1 ¶¶ 49–65.)

21

(Doc. No. 107-1 ¶¶ 1–2, 43–58, 86-90.) Cain examined movements in Clover's stock price around three dates on which certain seemingly important pieces of information were released and concluded that, "relative to other trading days, Clover's key date announcements caused a greater proportion of statistically significant stock price movements, absolute levels of price changes, and increases in trading volume," which, he opined, "establishes a clear cause-and-effect relationship between new company-specific information and Clover Common Stock price movements." (*Id.* ¶ 58.)

The defendants' only meaningful critique of Cain's conclusion is that he relied "on a very small sample size of 'News Days.'" (Doc. No. 108 at 16.) That argument might carry some weight in a case in which the other factors capable of supporting a finding of market sufficiency pointed in a more equivocal direction. Here, though, Cain's analysis is sufficient in light of the abundance of other reasons to conclude that the market for Clover securities was, in fact, efficient.

That is particularly true given that the Class Period itself is quite short—covering a mere 83 trading days. There is no "authority holding that an event study must evaluate a minimum number of dates to be reliable," *Martinek v. AmTrust Fin. Servs., Inc.*, No. 19 CIV. 8030 (KPF), 2022 WL 326320, at *16 (S.D.N.Y. Feb. 3, 2022) (citation omitted), and the defendants have not identified any ground for concluding that there should have been more "News Days" over the course of the brief Class Period. Moreover, as the plaintiffs point out, characterizing Cain's analysis as involving only the three "News Days" understates the extent of Cain's review. To the contrary, Cain's analysis also looked at numerous days in which there was *not* significant news about Clover, in order to provide a benchmark for his consideration of the days on which such news did occur. His conclusion was not based solely on looking at the News Days, but on contrasting those days with the others. (Doc. No. 107-1 ¶¶ 45, 58.)

22

At most, then, the defendants have established that the fifth *Cammer* factor favors a finding of efficiency somewhat more weakly than it theoretically might, while the other factors favor a finding of market efficiency quite strongly. The court therefore finds that the plaintiffs have established market efficiency. Accordingly, and because the defendants have not disputed any of the other pre-rebuttal *Basic* factors that are appropriate for consideration in connection with class certification, the court must turn to the question of whether the presumption of reliance has been defeated by the defendants' evidence of a lack of price impact.

### 3. Price Impact

Once a plaintiff makes a *prima facie* showing under *Basic*, "the defendant bears the burden of persuasion to prove a lack of price impact." *Goldman Sachs Grp., Inc. v. Arkansas Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1963 (2021). The defendants argue that they have carried that burden by showing that the plaintiffs cannot establish so-called "front-end" price impact—that is, an initial inflation of the value of the company's shares that is directly temporally linked to the individual false statements at issue in this case. The defendants, however, do not rely on any expert economic analysis of the relevant prices—which already places their argument on shaky ground. *See Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018) ("Defendant did not conduct, or submit, their own event study to show the absence of price impact; instead, they rely on, and criticize, the event study conducted by Plaintiffs' expert . . . . That alone would arguably support rejection of Defendants' arguments at this stage of the proceedings.") (citation omitted); *cf. Goldman Sachs*, 141 S. Ct. at 1963 ("In most securities-fraud class actions, as in this one, the plaintiffs and defendants submit competing expert evidence on price impact.").

Instead, the defendants rely on the blunt assumption that price impact must necessarily take the form of a same-day net increase in a stock's value, which, they say, did not occur here.

23

Specifically, the defendants point out that "[t]he majority of the allegedly false and misleading statements" at issue "occurred on October 6, 2020, when [Clover and SCH] announced" that they would be merging, but that—in what the defendants treat as the equivalent of a smoking gun— "Clover's stock price *decreased* on that day." (Doc. No. 108 at 19 (emphasis in original).) If Clover's stock price experienced a net decrease on that day, the defendants argue, that decrease demonstrates that the allegedly false statements could not have inflated the price.

The limits of that reasoning are apparent on its face. The allegedly fraudulent statements at issue in this case were, to put it mildly, not the only things that affected the value of Clover stock on the day in question. Rather, October 6, 2020 was, by all accounts, the date of a massively important announcement about SCH/Clover's future. Cain has testified that it is "fairly common for . . . SPAC [share] prices to decline on the day of the announcement of these types of transactions," based on perceptions of whether the acquisition was a "good deal" in light of the situation as a whole. (Doc. No. 109-2 at 149.) To pretend that the net change in SCH's stock price on the day of the merger announcement is any kind of meaningful evidence of the specific impact of the particular statements alleged to have been fraudulent in this case requires one to ignore all of the other considerations that came into play when the market set the price of Clover's stock. But an efficient capital market is, by definition, one in which a share's price reflects *all* relevant information—not just the information at issue in a lawsuit. *See Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015) ("[A] stock can be inflated even if the price remains the same or declines after a false statement . . . . [T]he movement of a stock price immediately after a false statement often tells us very little about how much inflation the false statement caused.").

Indeed, courts routinely recognize that sharp, same-day changes in stock price are not the only way that price impact can occur—and that, in fact, in some situations such changes would

actually be inconsistent with a showing of price impact from fraud. For example, courts recognize the so-called "price maintenance" theory of securities fraud, which is premised on the common-sense—if not outright undeniable—fact that "a misrepresentation can have a price impact not only by raising a stock's price but also by maintaining a stock's already . . . inflated price . . . ." *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 656–57 (S.D. Ohio 2017). The Sixth Circuit has held, on more than one occasion, that price maintenance is a permissible theory of price impact in the securities fraud setting. *See In re CoreCivic, Inc.*, No. 19-0504, 2019 WL 4197586, at *1 (6th Cir. Aug. 23, 2019); *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 385 (6th Cir. 2016)). The caselaw of this circuit therefore acknowledges the complex reality that the defendants' argument denies.

Price maintenance is merely one example of how the impact of a statement on a stock's price can be hidden below the surface of the net changes that the market sees. Another type of fraud-induced price impact that would not coincide with an uptick in stock price is the fraudulent mitigation of an adverse event—such as an executive's saying, as in one hypothetical set forth by the Seventh Circuit, "'We only lost $100 million this year,' when actually losses were $200 million." *Glickenhaus*, 787 F.3d at 415. That company's stock price might still go down after the announcement of the understated loss, but that does not mean that no fraud occurred or that the price that the market finally settled on would be untainted by the executive's lie. The price impact in that situation would be that the price fell less than it should have, not that it rose.

It bears emphasizing that these theories of price impact are not clever legal contraptions invented by plaintiffs' attorneys to lower the bar for establishing securities fraud. Rather, each of these theories necessarily flows from the existence of an efficient market. A third hypothetical—this one closer to the facts at issue regarding Clover—should make that clear. Imagine, for the purposes of this example, that a company's CEO gave a speech with two pieces of price-relevant

25

information: (1) a false statement capable of inflating the company's value by ten cents per share and (2) a true admission capable of deflating that same value by twenty cents per share. An efficient market would react to *each* statement, not just the fraudulent one. Accordingly, the share price would both decline *and* reflect price inflation procured through fraud. The two facts are simply not mutually exclusive at all, because an efficient market, by definition, reacts to all material public information. When a defendant asks the court to ignore such possibilities in favor of a simplistic consideration of whether the stock price went up or down on a particular day, that defendant is, in effect, asking the court to throw out sound economics in favor of something easier but less true. Nothing in the law suggests that such an approach would be permissible.

In recognition of the complexities associated with isolating the effect of any specific statement on a stock's price, the Supreme Court has emphasized that "a court cannot conclude that Rule 23's requirements are satisfied without considering *all* evidence relevant to price impact." *Goldman Sachs*, 141 S. Ct. at 1961 (emphasis in original). That includes both "qualitative as well as quantitative" evidence regarding the statements made and their context. *Id.* at 1960. The evidence before the court provides ample reason to conclude that the environment in which the defendants' allegedly fraudulent statements were made was one in which simple up-or-down contemporary price fluctuations provided an unreliable proxy for determining the impact of those statements. Moreover, the significant drop in Clover's value following the Hindenburg Report strongly suggests that Clover's stock was, in fact, significantly overvalued due to the market's ignorance of the vulnerabilities that the allegedly fraudulent statements misrepresented and that the Report ultimately revealed. *See Willis*, 242 F. Supp. 3d at 657 (noting that price impact can be "demonstrated . . . through evidence that a stock's price . . . declined in a statistically significant manner after a corrective disclosure") (citing *Halliburton II*,

134 S. Ct. at 2414). The defendants have therefore failed to rebut the presumption of classwide reliance under *Basic*.[6]

### 4. Application of Rule 23(b)(3) and Remaining Considerations

"[P]laintiffs seeking class certification 'need not prove that each element of a claim can be established by classwide proof,'" only "'that common questions predominate over any questions affecting only individual [class] members.'" *Bridging Communities*, 843 F.3d at 1124 (quoting *In re Whirlpool Corp.*, 722 F.3d at 858). If the plaintiffs had not provided evidence sufficient to support a classwide finding of reliance, it would be effectively impossible to meet that standard. The plaintiffs' having made the necessary showing under *Basic*, however, their compliance with Rule 23(b)(3) falls neatly into place. The theories of materiality, falsity, reliance, and damages are all shared across the class, at least in their core respects, and there is no comparably important issue on which the class members' claims would need to be decided individually. Those shared issues and the large number of potential plaintiffs establish that Rule 23 provides a far superior method for resolving claims than any plausible alternative. *See Garden City Employees' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2012 WL 1071281, at *39 (M.D. Tenn. Mar. 29, 2012) (Haynes, J.) (discussing "superiority" requirement).

The plaintiffs have therefore satisfied Rule 23(b)(3)—in addition to satisfying Rule 23(a)— and have met the requirements for certification of their class. The court moreover finds, for the reasons previously discussed, that Jabri and Tremblay will be adequate class

---

[6] The plaintiffs have argued that, in addition to the *Basic* presumption, they are also entitled to a presumption of reliance based on *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972). The plaintiffs, however, have set forth that argument only as an alternative, if the court concludes that the *Basic* presumption does not apply. (Doc. No. 110 at 14.) The court accordingly will make no holding regarding the applicability of *Affiliated Ute* to this case. The court notes, however, that it discussed *Affiliated Ute* at length in *Grae v. Corr. Corp. of Am.*, 329 F.R.D. 570, 584 (M.D. Tenn.), *superseded on other grounds*, 330 F.R.D. 481 (M.D. Tenn. 2019), and concluded that the presumption should be construed as limited to a relatively small number of situations.

27

representatives and that Pomerantz LLP, which is an established and experienced firm with substantial securities-related expertise, will be adequate class counsel.

## IV. CONCLUSION

For the foregoing reasons, the plaintiffs' Motion for Class Certification (Doc. No. 101) will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge