# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE

TIMOTHY BOND,

               Lead Plaintiff

and

JEAN-NICOLAS TREMBLAY,

               Named Plaintiff,

Individually and on Behalf of All Others Similarly Situated,

      v.

CLOVER HEALTH INVESTMENTS, CORP. f/k/a SOCIAL CAPITAL HEDOSOPHIA HOLDINGS CORP. III, VIVEK GARIPALLI, ANDREW TOY, JOE WAGNER, and CHAMATH PALIHAPITIYA,

               Defendants.

Case No. 3:21-cv-00096

Judge Aleta A. Trauger

## JOINT DISCOVERY DISPUTE STATEMENT

Defendants Clover Health Investments, Corp. ("Clover" or the "Company"), Vivek Garipalli, Andrew Toy, Joe Wagner, and Chamath Palihapitiya ("Individual Defendants" and with Clover, collectively, "Defendants"), and Lead Plaintiff Timothy Bond and Named Plaintiff Jean-Nicolas Tremblay (collectively, "Plaintiffs" and together with Defendants, the "Parties"), respectfully submit this Joint Discovery Dispute Statement pursuant to Local Rule 37.01(b) in the above-captioned action (the "Action"). This dispute arises from Plaintiffs' First Set of Requests for Production of Documents to Defendants (together "Plaintiffs' Requests" and each "Plaintiffs' Request"), and Clover and Individual Defendants' Responses and Objections to Plaintiffs' Requests (collectively, "Defendants' Responses and Objections"). As detailed below,

the Parties certify that their counsel met and conferred in good faith to attempt to resolve the issues, but have been unable to resolve their disagreements. The remaining issues are set forth below. Accordingly, the Parties respectfully request that the Court hold a telephonic discovery conference regarding these issues, on which they request leave to submit comprehensive briefing.[1]

## I. DISCOVERY IN DISPUTE

Pursuant to Local Rule 37.01(b)(2), Plaintiffs' Requests are attached hereto as Exhibit 1. Defendants' Responses and Objections are attached hereto as Exhibits 2 and 3.

### A. Disputed Issue No. 1: Definition of "Relevant Time Period"

This dispute concerns the definition of "Relevant Time Period." (Ex. 1 at 13; Ex. 2 at 11; Ex. 3 at 12.) The Parties disagree that the "Relevant Time Period" for purposes of discovery is January 1, 2018 through March 29, 2021 (as defined in Plaintiffs' Requests). Defendants have defined the "Relevant Time Period" as April 24, 2020, through February 4, 2021, both dates inclusive.

### B. Disputed Issue No. 2: Documents and Communications Produced in the Derivative Actions (Plaintiffs' Request No. 1)

This dispute concerns Plaintiffs' request for production of "[a]ll Documents and Communications produced, whether formally or informally, in the any [sic] Derivative Action."[2]

---

[1] The Parties provide herein an overview summary of their positions regarding the disputed issues, but respectfully request the opportunity to brief these issues, including burden, in depth prior to adjudication.

[2] Plaintiffs' Requests define "Derivative Actions" to mean *In re Clover Health Investments, Corp. Derivative Litigation*, No. 1:21-cv-00191-LPS (D. Del.); *Davies v. Garipalli*, No. 2021-1016-SG (Del. Ch.); *Sun v. Garipalli*, No. 3:21-cv-00311-AT (M.D. Tenn.); *Luthra v. Garipalli*, No. 3:21-cv-0320-AT (M.D. Tenn.), and/or any other action filed derivatively on behalf of Clover arising out of, related to, or asserting substantively similar allegations as those in the Complaint. (Ex. 1

(Ex. 1 at 13; Ex. 2 at 12; Ex. 3 at 12-13.)  The Parties disagree that Plaintiffs' Request No. 1 is objectionable on several grounds, including that it seeks improper "cloned discovery."

C.    **Disputed Issue No. 3: Documents and Communications Produced to the U.S. Department of Justice (Plaintiffs' Request No. 2)**

This dispute concerns Plaintiffs' request for production of "[a]ll Documents and Communications produced, without regard to the Relevant Time Period, whether formally or informally, to the DOJ, in response to, in connection with, or related to the DOJ Investigation."[3] (Ex. 1 at 13; Ex. 2 at 13; Ex. 3 at 13-14.)  The Parties disagree that Plaintiffs' Request No. 2 is objectionable on several grounds, including relevance and that it seeks improper "cloned discovery."

D.    **Disputed Issue No. 4: Documents and Communications Concerning the U.S. Securities and Exchange Commission Investigation (Plaintiffs' Request Nos. 9, 10, 11, and 12)**

This dispute concerns Plaintiffs' request for production of:  (i) "[a]ll Documents and Communications produced, without regard to the Relevant Time Period, whether formally or informally, to the SEC in response to, in connection with, or related to the SEC Investigation"[4];

---

at 4.)

[3] Plaintiffs' Requests define "DOJ Investigation" to mean the inquiry by the U.S. Attorney's Office for the Eastern District of Pennsylvania relating to, among other things, certain of Clover's arrangements with providers participating in its network and programs, and the Clover Assistant, and which was the subject of Clover's Current Report on Form 8-K filed with the SEC on February 5, 2021.  (Ex. 1 at 5-6.)  Defendants object to the definition of "DOJ Investigation" on several grounds, and interpret it as synonymous with "DOJ Inquiry."  (Ex. 2 at 8; Ex. 3 at 8.)

[4] Plaintiffs' Requests define "SEC Investigation" to mean the investigation by the SEC related to certain disclosures and aspects of Clover's business as well as certain matters described in the Hindenburg Report and/or the Hindenburg Response, Including subpoenas issued by the SEC in connection with its investigation, as alleged in Paragraph 333 of the Complaint.  (*See* Ex. 1 at 8; ECF No. 70 (the "Complaint" or "Compl.").)  Defendants object to the definition of "SEC Investigation" on several grounds, and interpret it to mean the investigation that Clover disclosed in its February 5, 2021 Form 8-K.  (Ex. 2 at 9-10; Ex. 3 at 10.)

3

(ii) "[a]ll Documents and Communications, without regard to the Relevant Time Period, concerning the SEC Investigation"; (iii) "[a]ll Communications to or from the Individual Defendants Concerning the SEC Investigation"; and (iv) "Documents sufficient to identify all Employees who have been contacted by or communicated with the SEC regarding the SEC Investigation." (Ex. 1 at 14; Ex. 2 at 16-18; Ex. 3 at 17-20.) The Parties disagree that Plaintiffs' Request Nos. 9, 10, 11, and 12 are objectionable on several grounds, including that those requests seek improper "cloned discovery."

      **E.**    **Disputed Issue No. 5: Whether Defendants Shall Search for Documents and Communications Concerning the Hindenburg Response[5] Throughout the Relevant Time Period (Plaintiffs' Request No. 17)**

This dispute concerns Plaintiffs' request for production of "[a]ll Documents and Communications Concerning the Hindenburg Response, Including All Documents and Communications created for, Concerning, prepared for or considered as part of the Hindenburg Response." (Ex. 1 at 15; Ex. 2 at 21; Ex. 3 at 23.) The Parties disagree that Plaintiffs' Request 17 is objectionable because it seeks Documents and Communications throughout the Relevant Time Period, as Plaintiffs define it, not merely Documents and Communications created on February 4, 2021.

      **F.**    **<u>Disputed Issue No. 6: Documents and Communications Concerning Clover's March 29, 2021 Form 8-K Filed with the SEC (Plaintiffs' Request No. 18)</u>**

This dispute concerns Plaintiffs' request for production of "[a]ll Documents and Communications Concerning the current report on Form 8-K filed on behalf of Clover on March

---

[5] Plaintiffs' Requests define "Hindenburg Response" to refer to Clover's response to the Hindenburg Report that was posted to Medium.com on February 5, 2021 and annexed as Exhibit 99.1 of Clover's Form 8-K filed on February 5, 2021, with the United States Securities and Exchange Commission ("<u>SEC</u>"). (*See* Ex. 1 at 6; Compl. ¶¶ 332-36.)

29, 2021, Including All Documents and Communications created for, Concerning, prepared for or considered as part of the March 29, 2021 8-K."[6] (Ex. 1 at 15; Ex. 2 at 21; Ex. 3 at 23.)  The Parties disagree that Plaintiffs' Request No. 18 is objectionable on several grounds, including relevance and proportionality.

### G. Disputed Issue No. 7: Custodians

This dispute concerns Plaintiffs' request that Defendants use fourteen (14) custodians, in addition to the nine (9) custodians the Parties have already agreed to, when collecting, searching, reviewing, and producing documents, communications, and electronically stored information ("ESI").  (Ex. 4 at 10-11 (Ltr. from B. Calandra to J. Schwartz, Jan. 11, 2023); Ex. 5 at 19 (Ltr. from J. Schwartz to B. Calandra, Jan. 30, 2023); Ex. 6 at 13-16 (Ltr. from B. Calandra to J. Schwartz, Feb. 6, 2023); Ex. 7 at 6 (Ltr. from J. Schwartz to B. Calandra, Feb. 17, 2023); Ex. 8 at 3 (Ltr. from B. Calandra to J. Schwartz, Feb. 21, 2023).)

### H. Disputed Issue No. 8: Word Limits for Certain ESI Searches (Plaintiffs' Request Nos. 19 and 20)

This dispute concerns Plaintiffs' request that Defendants apply searches for responsive documents using terms within forty (40) words of each other when searching, reviewing, and producing documents, communications, and ESI.  (Ex. 8 at 4-5 (Ltr. from B. Calandra to J. Schwartz, Feb. 21, 2023).)

## II. GOOD FAITH ATTEMPTS TO RESOLVE DISPUTED DISCOVERY ISSUES

On April 25, 2022, the Parties exchanged their Initial Disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1) and the Court's Initial Case Management Order (Doc. No. 97).

---

[6] "March 29 8-K" refers to the current report on Form 8-K filed on behalf of Clover on March 29, 2021.  (*See* Compl. ¶¶ 337-38.)

(Exs. 9, 10, 11.)  On May 2, 2022, Defendants served their First Requests for Production on Plaintiffs (together "Defendants' Requests" and each "Defendants' Request") (Ex. 12.), and by agreement of the Parties, Plaintiffs served their Requests on Defendants on May 9, 2022. Plaintiffs served their Responses and Objections to Defendants' Requests for Production ("Plaintiffs' Responses and Objections") on June 7, 2022.  By agreement of the Parties, Defendants and Individual Defendants served their respective Responses and Objections to Plaintiffs' Requests on June 22, 2022.

After the Parties served their respective responses and objections, Defendants followed up with a letter dated August 1, 2022, to address certain issues and make themselves available for a meet-and-confer session.  (Ex. 13 at 1-7.)  Thereafter, the Parties engaged in two telephonic meet-and-confer sessions on August 16, 2022, and August 18, 2022.  On August 16, 2022, the Parties discussed issues and information arising from their respective document requests and responses and objections pursuant to *In re: Default Standard for Discovery of Electronically Stored Information*, Administrative Order No. 174-1 (M.D. Tenn. Sept. 12, 2018).  This discussion included, among things, the Parties' respective proposed custodians for discovery. During the August 18, 2022 meet-and-confer session, Clover agreed to produce documents sufficient to show Clover's organizational structure and management hierarchy at or near the date of the Complaint (Doc. No. 70) (*i.e.*, Clover's organizational charts).  Plaintiffs stated that they would propose additional custodians after reviewing Clover's organizational charts.

On May 31, 2022, Clover produced to Plaintiffs the insurance contracts, policies, or agreements that may provide coverage for any Defendants in connection with this Action.  On September 16, 2022, Clover produced to Plaintiffs additional categories of responsive documents that consisted of:  (i) the Company's organizational charts; (ii) non-privileged final minutes for

Clover's Board of Directors meetings and the attachments thereto; and (iii) non-privileged final minutes for Social Capital Hedosophia Holdings Corp. III's ("SCH") Board of Directors meetings and the attachments thereto, for the September 6, 2020, September 24, 2020, and October 5, 2020 meetings in which SCH's Board of Directors discussed the relevant merger.

On January 11, 2023, Plaintiffs sent Defendants a letter regarding outstanding discovery issues ("Plaintiffs' January 11 Letter"). (Ex. 4.) On January 30, 2023, Defendants responded to Plaintiffs' January 11 Letter ("Defendants' January 30 Letter"). (Ex. 5.) The Parties continued to exchange correspondence on February 6, 2023, February 17, 2023, and February 21, 2023. (Exs. 6, 7, 8.) The Parties executed an Agreed Document Discovery Protocol for electronic discovery and agreed on the terms of a Protective Order. The Parties also participated in another meet-and-confer session on February 14, 2023 to further narrow certain of their disputes, and have exchanged additional e-mails on discovery issues.

Despite their good faith efforts, the Parties have been unable to agree on the eight discovery disputes outlined above. The Parties submit the following statements reflecting their respective positions.

III. **Parties' Positions**

A. **Disputed Issue No. 1: Definition of "Relevant Time Period"**

1. **Plaintiffs' Position**

While Plaintiffs allege a Class Period of October 6, 2020 through February 3, 2021, inclusive (Compl. ¶1), Plaintiffs' Requests defined the "Relevant Time Period," *i.e.*, the date range within which Defendants must search for documents responsive to Plaintiffs' Requests, as January 1, 2018 through March 29, 2021. Ex. 1 at 13. Defendants objected to this date range as "overbroad and unduly burdensome" and stated that they would define the "Relevant Time Period" as from

April 24, 2020 through February 4, 2021. Ex. 2 at 11; Ex. 5 at 3-4. The Court should adopt Plaintiffs' Relevant Time Period for the following reasons.

*First*, beginning the Relevant Time Period on January 1, 2018 and ending it on March 29, 2021 is appropriate because the evidence underlying the falsity of Defendants' misstatements and demonstrating Defendants' scienter arise out of conduct occurring during in period. As the Court is well aware, the scope of discovery under Rule 26 of the Federal Rules of Civil Procedure ("Rule 26") "extends to nonprivileged information that is relevant to any party's claim or defense, regardless of whether the information sought is admissible . . . [and] proportional to the needs of the case." *In re Envision Healthcare Corp. Sec. Litig.*, 2020 WL 6750397, at *2 (M.D. Tenn. Nov. 16, 2020). Proportionality depends on, among other things, the "importance of the issues at stake in the action," the "importance in discovery in resolving the issues," and "whether the burden or expense outweighs its likely benefit."

To succeed at trial Plaintiffs must prove, among other things, that Defendants knowingly or recklessly made false statements about whether (i) the Company committed legal and regulatory violations after January 1, 2018, (ii) the Company's growth stemmed from illegal conduct or unreported insider transactions with its Head of Sales, Hiram Bermudez ("Bermudez"), and (iii) the Company misrepresented to investors that the overwhelming majority of physicians used the Company's Clover Assistant application during patient visits.

The falsity of each of these types of statements depends on eliciting evidence of conduct from January 1, 2018 onward. For example, the Merger Agreement[7] for the Business Combination falsely represented that "Legacy Clover (and thus Clover) had not committed any material legal or

---

[7] Capitalized terms not defined herein shall have the definitions assigned to them in the Complaint.

regulatory violations *since January 1, 2018*,"[8] and the Complaint alleges specific illegal conduct beginning *in 2018*. Compl. ¶¶115, 129, 245-73. Further, Clover's SEC filings describing the Business Combination focused on the Company's growth from *2018* onward, including detailing Company performance for *2018, 2019, and 2020* and misattributing specific increases in membership and revenues *during that time* to the Company's Medicare Advantage plans and Clover Assistant. *Id.* at ¶¶59, 152. Indeed, during an analyst day presentation, Defendant Garipalli made the business case for the Company by referencing its growth *from 2018 onward*. *See id.* ¶65. Further, the Company admitted to making $1.36 million in undisclosed payments to Bermudez from *2017* to March 29, 2021, and a confidential witness described how Bermudez began discussing his role in Clover's growth starting in *2018*. *Id.* at ¶¶158-59, 170. A confidential witness also learned of physician and staff misuse of Clover Assistant beginning in 2018. *Id.* at ¶213.

Moreover, the above facts are in dispute because Defendants' Answer denies *every* allegation listed above and asserts affirmative defenses of lack of scienter, immateriality, lack of knowledge of falsity, misconduct by others, and belief that Defendants' conduct was legal. ECF No. 94 ("Ans.") at 22, 24-25, 47, 52, 60-61, 80, 92-102, 141-43. Accordingly, Documents and Communications created or sent between January 1, 2018 and October 6, 2020 are necessary to demonstrate the existence of misconduct, Bermudez's role in the Company's growth, and physician and staff misuse of Clover Assistant and resolve factual dispute as to all these allegations. Further, these Documents and Communications will provide evidence of Defendants' intentional misconduct and knowledge or reckless disregard of the truth, which Plaintiffs must do to prove Defendants' scienter and defeat affirmative defenses.

---

[8] All emphasis is added unless otherwise indicated.

Evidence from February 4, 2021 through March 29, 2021 is similarly relevant to proving misconduct and Defendants' knowledge. Defendants made false statements in the Hindenburg Response regarding Bermudez that they belatedly corrected in the March 29 8-K. *Id.* at ¶¶337-338. Further, the Answer denies the allegations in paragraphs 337 and 338, and raises affirmative defenses of a lack of scienter and had "no reasonable ground to believe" that their statements were false. Ans. at 141-43. Defendants' belated correction of the Hindenburg Response also evidences Defendants' intent or reckless disregard of deceiving investors (*i.e.*, their scienter) and thus is directly relevant.

*Second*, Plaintiffs properly seek Documents and Communications outside of the Class Period because it is well established that pre- and post-class period events are relevant to securities fraud claims, including, but not limited to, a defendant's scienter. *E.g., In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001) ("[p]re-class data is relevant" to establish falsity and scienter "at the start of the class period"); *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) ("post-period admissions" demonstrate "defendants privately knew" statements were false when made). Indeed, in denying Defendants' motion to dismiss, this Court observed that evidence from before the Class Period "can speak directly to the accuracy of backwards-looking statements from the Class Period" and "information about a company's immediate past may well be helpful in understanding its present." *Bond v. Clover Health Invs., Corp.*, 587 F. Supp. 3d 641, 667 (M.D. Tenn. 2022). In fact, courts consistently hold that documents and communications created before or after a class period are proper subjects of discovery where, as here, they bear on the important issues of falsity and scienter. *See, e.g., Burges v. BancorpSouth, Inc.*, 2017 WL 4640462, at *3 (M.D. Tenn. Oct. 12, 2017) (scienter is an element of "extreme importance" to a securities fraud claim, and thus pre-class period events "form an important part of the basis for which a finder of

10

fact could conclude that Defendants knew or should have known" truth); *In re Morgan Stanley Mortgage Pass-Through Certificates Litig.*, 2013 WL 4838796, at *2 (S.D.N.Y. Sept. 11, 2013), *on reconsideration in part*, 2013 WL 5745938 (S.D.N.Y. Oct. 23, 2013) (rejecting defendants' proposed search period ending on "the date the first complaint was filed" because "like other courts [have found]. . . the post-closing period can prove to be fertile ground for relevant discovery."

*Third*, none of the objections or justifications raised by Defendants to date undercut Plaintiffs' position. Defendants assert that a Relevant Time Period beginning on April 24, 2020, "is a logical starting point," because it is the date of the SCH's IPO. This overlooks, however, the copious allegations set forth above about conduct beginning in 2018 supporting multiple categories of false statements.

Likewise, Defendants assert – without authority – that ending the Relevant Time Period on February 5, 2021 is appropriate because "[i]t is standard for the parties in litigation to use the date a complaint was filed as the cut-off date for discovery" because "it is highly likely that any documents related to the particular allegations in the complaint will be privileged and/or subject to work product protections" and thus the burden of searching and producing the documents outweighs any benefit. *See* Ex. 5 at 4. Defendants are simply incorrect that it is "standard" for Courts not to allow post-Class Period discovery. *See, e.g.*, *Morgan Stanley Mortgage Pass-Through Certificates Litig.*, 2013 WL 4838796, at *2 (allowing post-Class Period discovery).

Further, Defendants' objection regarding the existence of privileged documents could be made in *every case*. Here, however, there is a special need for post-Class Period discovery because Defendants unilaterally decided to issue the Hindenburg Response to stem the decline Clover's share price (Compl. ¶¶331-32) and belatedly had to correct misstatements in that response (*id.* at ¶¶337-38). Internal Documents and Communications will reveal Defendants' prior knowledge of

the facts alleged in the Hindenburg Report, or reckless disregard of the truth resulting in a later correction of misstatements, and thus bear on falsity and scienter.

Moreover, Defendants are effectively asserting that *all* post-Class Period documents are privileged because the Class Period ends two days before the first Complaint was filed in the Action. Ex. 5 at 4. This is effectively a blanket assertion of privilege over all post-Class Period documents, and "[b]lanket assertions of protection under either the attorney-client privilege or work product protection are ineffective to preserve these protections." *Pravak v. Meyer Eye Grp., PLC*, 2009 WL 10664851, at *5 (W.D. Tenn. Oct. 22, 2009); *see Brown v. Tax Ease Lien Servicing, LLC*, 2017 WL 6939338, at *14 (W.D. Ky. Feb. 16, 2017) ("blanket claims of privilege made without the required support under the Rule are strongly disfavored"). In addition, Defendants asserted in the Hindenburg Response their alleged misstatements were made in reliance on counsel, and Defendants' Answer asserts an affirmative defense of advice of counsel (among other advisors). *See* Ans. at 142. Asserting this defense waives privilege over communications concerning the subject matter of that defense. *Barnard v. Powell Valley Elec. Coop.*, 2021 WL 6275267, at *7 (E.D. Tenn. Mar. 5, 2021) ("Litigants cannot hide behind the privilege if they are relying on privileged communications to make their case" or, more simply, cannot use the privilege as "a shield and a sword"). Importantly, not only is the work product privilege "not absolute," *United States v. Life Care Centers of Am., Inc.*, 2015 WL 10987030, at *3 (E.D. Tenn. Apr. 29, 2015), but the doctrine "is not a shield from discovery regarding facts that an attorney has learned, persons from whom the facts had been learned, or the existence of documents." *Cowan v. U S Fence, LLC*, 2008 WL 11452593, at *4 (E.D. Tenn. Feb. 20, 2008).

If anything, Defendants' objection to post-Class Period discovery appears to *acknowledge* that Defendants were communicating and creating documents in response to the Hindenburg

Report during the limited period of seven weeks between February 5, 2021 and March 29, 2021, and thus that such information is relevant. Accordingly, given the direct relevance of these documents and the many exemptions to the attorney-client privilege and work product doctrine, the benefit of the information produced during this short seven-week period plainly outweighs the minimal burden of requiring Defendants' counsel to review and log purportedly privileged documents so that Plaintiffs may challenge those designations.

### 2. Defendants' Position

At the outset, Plaintiffs would justify the disputed discovery by thematically summarizing the 382-paragraph, 139-page Complaint in this Action. A more rigorous inquiry is warranted. Much of the information Plaintiffs seek is not relevant. In those few instances where the disputed Plaintiffs' Requests concern information bearing upon the Action, responding thereto would impose upon Defendants a burden disproportionate to the needs of this Action. Plaintiffs' position underscores their attempt to expand their initial document requests and engage in an impermissible fishing expedition. *See Pictsweet Co. v. R.D. Offutt Co.*, No. 3:19-CV-0722, 2020 WL 12968432, at *2 (M.D. Tenn. Apr. 23, 2020) ("Although a party should not be denied access to information necessary to prove their contentions, neither should they be 'permitted to go fishing and a trial court retains discretion to determine that a discovery request is too broad and oppressive.'" (quoting *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 236 (6th Cir. 2016)).

Plaintiffs define the "Relevant Time Period" for each and every Request as January 1, 2018 through March 29, 2021. Defendants object to Plaintiffs' definition of "Relevant Time Period" on the grounds that it is overly broad and unduly burdensome. Defendants instead define the "Relevant Time Period" as April 24, 2020 through February 4, 2021, both dates inclusive.[9]

---

[9] Unless otherwise specified, all undefined capitalized terms used in the "Defendants' Position"

As to the start date, Defendants' proposed start date of April 24, 2020 is the date of SCH's initial public offering. It is nearly six months before any alleged misstatement that forms the basis of the Plaintiffs' claims.

Plaintiffs' purported justifications as to why an earlier start date would be necessary are unreasonable. Notwithstanding that the Class Period begins on October 6, 2020, and ends on February 3, 2021, Plaintiffs' position is that January 1, 2018 is somehow the proper starting point because, among other things, the Complaint alleges that Defendants misrepresented that they had not committed any material legal or regulatory violations "since January 1, 2018." But not all of Plaintiffs' Requests are seeking specific information about the challenged statements regarding Clover's regulatory or legal compliance. Starting the "Relevant Time Period" on January 1, 2018 would permit Plaintiffs to conduct a fishing expedition on irrelevant topics and unrelated events. *See Bentley v. Paul B. Hall Reg'l Med. Ctr.*, No. 7:15-CV-97-ART-EBA, 2016 WL 7976040, at *1 (E.D. Ky. Apr. 14, 2016) ("Discovery requests are not limitless, and parties must be prohibited from taking 'fishing expeditions' in hopes of developing meritorious claims.").[10]

Even if Plaintiffs' proposed start date of January 1, 2018 was appropriate for some of Plaintiffs' Requests (which it is not), it does not apply to all of Plaintiffs' Requests. During the meet-and-confer process, Defendants have explained this point to Plaintiffs several times. Plaintiffs, however, have refused to engage on this issue. Of the forty Plaintiffs' Requests, only a few of them—*e.g.*, Plaintiffs' Request Nos. 14, 19, and 20—arguably touch upon issues relevant

---

section of this joint statement shall have the meanings assigned to them in Defendants' Requests and Responses and Objections. (Exs. 2, 3, and 12.)

[10] Plaintiffs also defend their need for discovery dating back to January 1, 2018 based on their allegations that Clover: (1) failed to adequately disclose its relationship with Hiram Bermudez; and (2) misrepresented the extent of healthcare provider use of the Clover Assistant. But none of the disputed Requests relate to these theories, and the Relevant Time Period does not bear on Clover's agreement with Plaintiffs on the undisputed Requests that do relate to the theories.

to this Action that would implicate Plaintiffs' proposed start date of January 1, 2018. But even some of those requests seek discovery materials that are not proportional to the needs of this Action if interpreted as extending back to January 1, 2018. *See* Fed. R. Civ. P. 26(b)(1) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and **proportional to the needs of the case** . . . .") (emphasis added). As discussed during the meet-and-confer sessions, Defendants' position is that not all date ranges are relevant to all issues, and using search terms oriented towards only certain date-limited issues over a broader-than-necessary time period would impose an unnecessary and disproportionate burden on Defendants.

Regarding the end date, Plaintiffs' proposed date of March 29, 2021 imposes substantial burdens beyond what is proportional for the needs of the case. As the Court is aware, the initial complaint in this case was filed on February 5, 2021. It is standard for the parties in litigation to use the date a complaint was filed as the cut-off date for discovery, and with good reason. Following the filing of a complaint, it is highly likely that any documents related to the particular allegations in the complaint will be privileged and/or subject to work product protections, thus increasing the burden of reviewing any such documents, while providing negligible benefits, *i.e.*, the burdens are disproportional to the benefits and needs of the case. *See, e.g.*, *Donin v. Just Energy Grp. Inc.*, No. 17-CV-5787-WFK-SJB, 2019 WL 8165175, at *2 (E.D.N.Y. Dec. 18, 2019) (denying plaintiff's motion to compel production of documents produced after the complaint was filed); *U.S. ex rel. King v. Solvay S.A.*, No. CIV.A. H-06-2662, 2013 WL 820498, at *4 (S.D. Tex. Mar. 5, 2013) ("A few generalized allegations that conduct continued 'to the present' in a 267–page complaint containing more than 768 paragraphs does not justify the burden and expense associated with unfettered discovery 'to the present' in a case in which

discovery is already going to be incredibly expensive and time-consuming.").

The justification Plaintiffs provided in their January 11 Letter for why discovery should proceed past February 4, 2021 underscores this point. Plaintiffs claim that Defendants made false statements in the Hindenburg Response, and that Defendants' belated correction of those statements are evidence of Defendants' intent to deceive investors or reckless disregard of deceiving investors. But the Hindenburg Response was clearly done in anticipation of litigation—and, indeed, counsel for Defendants were involved in its preparation. Therefore, the benefit Plaintiffs would gain from this extended time period is minimal, as the majority of the Documents that Plaintiffs seek will be withheld on the basis of privilege or attorney work product. To the extent that Plaintiffs intend to argue that Defendants' "belated correction of those statements[] are evidence of Defendants' intent to deceive investors or reckless disregard of deceiving investors"—although Defendants strongly disagree—Plaintiffs will be able to introduce the very correction to which they point.

To the extent that Plaintiffs argue that Defendants are making a blanket assertion of privilege over all Documents after February 4, 2021, that assertion is incorrect. Defendants' position is not that all such Documents automatically will be privileged. Defendants are merely explaining that the percentage of Documents that will be privileged increases significantly once litigation has been filed; thus, the burden is much greater following that point.

Accordingly, Defendants hold that the "Relevant Time Period" should be defined as April 24, 2020 through February 4, 2021, both dates inclusive.

### B. Disputed Issue No. 2: Documents and Communications Produced in the Derivative Actions (Plaintiffs' Request No. 1)

#### 1. Plaintiffs' Position

Plaintiffs' Request 1 seeks all "Documents and Communications produced, whether formally or informally, in the any Derivative Action." Ex. 1 at 14. During the parties' negotiations, Defendants offered to produce all Documents and Communications produced in any Derivative Action through, January 30, 2023, but no documents after that date. *See* Ex. 5 at 8. Defendants' should be ordered to supplement all productions of Documents and Communications produced in Derivative Actions.

As an initial matter, Documents and Communications produced in the Derivative Actions are directly relevant to this action because the Derivative Actions arise out of a substantively identical factual predicate as the Complaint. For example, in *Sun* and *Luthra*, which have been consolidated before this Court, the plaintiffs allege that Clover made false and misleading statements regarding illegal payments to healthcare providers, the inflation of Clover's performance by undisclosed related party transactions with Bermudez, physician use of Clover Assistant, and the DOJ investigation, and that Defendants violated Items 303 and 503 of Regulation S-K. *Sun*, No. 3:21-cv-00311-AT (M.D. Tenn.), ECF No. 1 ("Sun Compl.") at ¶¶133-58, 159-71, 174-84, 185-90, 191-93; *Luthra*, No. 3:21-cv-0320-AT (M.D. Tenn.) ECF No. 1 ("Luthra Compl.") at ¶¶48-50, 56-58, 59-60, 61-63. Virtually identical allegations underly Plaintiffs' securities fraud claims in this Action. *See* Compl. ¶¶123-228.[11] In fact, *Sun*, *Luthra*, and the Complaint allege many of the exact same statements by Defendants are false and misleading, and for the same reasons. Compare Sun Compl. ¶¶96, 208, 209, 213, 214, 216, 224, 234, 236, 238,

---

[11] Although the Complaint alleges that Defendants violated Item 105 of Regulation S-K, Items 105 and 503 are substantively identical.

240, 273 and Luthra Compl. ¶¶67-70, 74, 75, 80, 83, 86, 88, 97, 108-10 *with* Compl. ¶¶233-37, 241-43, 248, 254, 262, 268, 281, 295. The *Sun* Complaint incorporates *dozens* of allegations from the Complaint. *E.g.*, Sun Compl. ¶¶111-25, 136-39, 145-57.

Defendants' offer to produce Documents and Communications through January 30, 2023, but not to supplement that production with later-produced Documents and Communications, is patently insufficient. Not only do Plaintiffs' Requests instruct Defendants to supplement their productions as Defendants identify new responsive Documents and Communications (*see* Exhibit 1 at 10), but Defendants "have a continuing obligation under the Federal Rules to supplement their discovery responses." *Bluewater Music Servs. Corp. v. Spotify USA Inc.*, 2019 WL 6894516, at *3 (M.D. Tenn. Jan. 31, 2019).

Defendants have yet to explain why providing productions in the Derivative Actions through January 30 is not unduly burdensome, but copying Plaintiffs on subsequent productions in the Derivative Actions would be burdensome, likely because providing duplicate productions *reduces the burden and costs of discovery* since Defendants have already collected and reviewed those documents. *E.g., Melnick v. TAMKO Bldg. Prod. LLC*, 2022 WL 1211122, at *4 (D. Kan. Apr. 25, 2022) (Production not unduly burdensome nor disproportionate to the needs of the case where "data produced in this action is a reproduction of documents and data gathered before in other cases."); *Munoz v. PHH Corp.*, 2013 WL 684388, at *6 (E.D. Cal. Feb. 22, 2013) ("Defendants will suffer little if any burden by producing the documents as they are kept in their normal course of business because these documents have already been produced").

Further, while Defendants assert that Request 1 seeks improper "cloned discovery," Defendants overlook that Plaintiffs are seeking the documents because, as described above, Plaintiffs in this Action and the plaintiffs in the Derivative Actions need to prove that the *same*

18

*misconduct* occurred, Defendants knew or recklessly disregarded that misconduct, and that the *same statements* were false and misleading. Courts grant requests for so-called "cloned discovery" in these situations. *See, e.g.*, *Bishop v. Baldwin*, 2020 WL 7320932, at *6 (S.D. Fla. Dec. 10, 2020) (ordering production where a "comparison of the allegations in the state actions with those in the instant case confirms that the cases all involve the same alleged Ponzi scheme and is therefore highly relevant"); *Peterson v. Wright Med. Tech., Inc.*, 2013 WL 655527, at *5 (C.D. Ill. Feb. 21, 2013) ("in this case, the 'cloned' discovery seeks information that is relevant to plaintiff's claims and defendants' defenses and that it is reasonably calculated to lead to the discovery of admissible evidence on the questions of what Wright knew and when Wright learned what it knew about the defect alleged in the complaint and the failure that allegedly resulted from that defect.")

By contrast, the authorities cited by Defendants in their objections and responses to Request 1 are plainly distinguishable. Ex. 2 at 12. For example, *Pictsweet Co. v. R.D. Offutt Co.*, 2020 WL 12968432, at *5 (M.D. Tenn. Apr. 23, 2020), concerned a third-party subpoena for documents in a case arising out of a different factual predicate, not, as here, document requests to Defendant concerning the same misconduct. *See id.* In addition, the *Pictsweet* plaintiff could not carry its "burden of establishing relevancy because it does not even know what documents it has asked for." Here, Plaintiffs know that the produced documents concern the misconduct described above and Defendants' knowledge or reckless disregard of that misconduct, because that is what the Derivative Action plaintiffs seek to prove. Defendants' remaining authorities are similarly distinguishable because in those cases, unlike here, the plaintiffs could not demonstrate the relevance of the productions in unrelated actions to the action before the Court. *Cap. Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*, 2014 WL 1431124, at *2 (D. Mass. Apr. 14, 2014) ("[p]laintiff has not demonstrated how this action and all other cases and investigations into

19

defendants' RMBS practices are related or even similar"); *Austin v. Nestle USA, Inc.*, 2010 WL 4318815, at *4 (D.S.C. Oct. 26, 2010) ("there is no indication that such discovery is relevant to this case").

Since producing Documents and Communications produced in the Derivative Actions is directly relevant to Plaintiffs' claims and will *reduce* the burden on Defendants, not increase it, this Court should order Defendants to produce to Plaintiffs all Documents produced in Derivative Actions on an ongoing basis.

### 2. Defendants' Position

Plaintiffs' Request No. 1 seeks the production of "[a]ll Documents and Communications produced, whether formally or informally, in the any [sic] Derivative Action."  (Ex. 1 at 13.)  In their Responses and Objections to Plaintiffs' Requests, Defendants stated several objections to this Request, including on the basis that the Request is an improper request for "cloned discovery." (Ex. 2 at 12; Ex. 3 at 12-13.)

Courts routinely reject such requests seeking "cloned discovery" produced to other parties on the grounds that they are facially overbroad and seek irrelevant material.  *See, e.g.*, *Pictsweet Co.*, 2020 WL 12968432, at *5 (deeming plaintiff's "cloned" discovery request a "fishing expedition" and refusing to grant plaintiff a "discovery windfall" because "[a]sking for all documents produced in another matter is not generally proper. The propounding party cannot meet its burden to establish relevance, as the propounding party is not in a position to even know what they are actually asking for.") (cleaned up); *Austin v. Nestle USA*, *Inc.*, No. 7:09–cv–03320– JMC, 2010 WL 4318815, at *4 (D.S.C. Oct. 26, 2010) (agreeing that plaintiff should not have "unfettered access" to all of the discovery produced in a purportedly similar case, "as there [was] no indication that such discovery [was] relevant to th[e] case" before it); *Cap. Ventures Int'l v. J.P. Morgan Mortg. Acquisition Corp.*, No. 12–10085–RWZ, 2014 WL 1431124, at *2 (D. Mass.

Apr. 14, 2014) (denying request for "cloned discovery" as "overbroad and of speculative relevance"). Plaintiffs failed to challenge Defendants' cited cases or cite any authority to the contrary. Plaintiffs' attempt to distinguish Defendants' cases fail.

Notwithstanding its objections and in the interest of compromise, Clover agreed in its Responses and Objections to produce non-privileged Documents that have been produced in any Derivative Action (as defined in the Plaintiffs' Requests) as of the date of Defendants' Responses and Objections. (Ex. 2 at 12; Ex. 3 at 12-13.) Months later, in their January 11 Letter, Plaintiffs expressly rejected Clover's compromise. (Ex. 4 at 4.)

In their January 30 Letter, Defendants reiterated their position that Plaintiffs' Request No. 1 is objectionable because, among other things, it is a request for improper "cloned discovery." (Ex. 5 at 7-8.) In an attempt to resolve this issue, however, Clover agreed to extend the scope of their previous offer by agreeing to produce an additional seven months to include any non-privileged Documents responsive to the Request that have already been produced in the Derivative Actions (as defined in Plaintiffs' Requests) *as of the date of Defendants' January 30 Letter*. (Ex. 5 at 8.) Again, Plaintiffs rejected this second compromise. (*See* Ex. 7 at 3.)

As Defendants reiterated in the February 14, 2023 meet-and-confer session, there is no reason to impose on Defendants the burden of an ongoing obligation to produce Documents that have been produced in a Derivative Action after the Defendants' Responses and Objections, let alone Defendants' January 30 Letter, because such Documents would have no relevance to Plaintiffs' case. Regardless, Clover remains ready, willing, and able to produce these Documents as of the date of their Responses and Objections (*i.e.*, June 22, 2022).

As expressed in Defendant's January 30, 2023 letter, if Plaintiffs are concerned that the forty (40) Requests they already have issued do not sufficiently seek all the Documents they may

need, then Plaintiffs can request additional Documents from Defendants.

### C. Disputed Issue No. 3: Documents and Communications Produced to the U.S. Department of Justice (Plaintiffs' Request No. 2)

#### 1. Plaintiffs' Position

Plaintiffs' Request 2 seeks "All Documents and Communications produced, without regard to the Relevant Time Period, whether formally or informally, to the DOJ, in response to, in connection with, or related to the DOJ Investigation." Defendants propose to conduct custodial searches for responsive documents using search terms (*see, e.g.*, Ex. 5 at 8; Ex. 6 at 8). As with Plaintiffs' Request 1, all Documents and Communications produced to the DOJ are directly relevant to this action present a reduced burden on Defendants. *See* Section II.C.1 *supra*.

The Documents Defendants have produced to the DOJ are relevant to this Action because the DOJ is investigating the *same misconduct underlying Plaintiffs' claims*. For example, the Complaint alleges that Defendants sought to drive referrals of potential customers and use of Clover Assistant by making payments and/or providing gift cards to physicians or staff or improperly placing "Clover Ambassadors" in healthcare practitioners' offices (Compl. ¶¶127-136), and the DOJ was investigating allegations of that very conduct (*id.* at 143).

In addition, Defendants have consistently disputed the nature of the DOJ Investigation, downplaying it as a mere "inquiry" to investors (Compl. ¶145), denying allegations of the investigation in their Answer (*e.g.*, Ans. at 9 ("Defendants deny the allegations in the fifth sentence of Paragraph 16, except admit that an *inquiry* from the United States Department of Justice (the "*DOJ Inquiry*") was ongoing during the Class Period; disputing whether it was an investigation in their motion to dismiss (*e.g.*, ECF No. 75 at 3, 9); and insisting in their discovery responses that calling the DOJ's activities an investigation mischaracterized those activities (*see* Ex. 2 at 7; Ex 5 at 6). Defendants plainly seek to use their preferred nomenclature to bolster their position that the

investigation was not material. *See* ECF No. 75 at 15-18. Documents and Communications to the DOJ—whose Civil Investigative Demand stated that it was "in the course of a False Claims Act *investigation*" into Clover Health (Compl. ¶141)—are relevant to whether the DOJ's activities were an "investigation" or "inquiry," a distinction essential to Defendants' defenses in this action.

Moreover, to the extent that subject matter of the DOJ Investigation goes beyond payments to physicians and use of Clover Ambassadors, the Complaint alleges that the failure to disclose the existence of the investigation itself made statements by Defendants misleading. Compl. ¶¶230-44. Defendants have responded by raising a defense of immateriality (Ans. at 141) and asserting that the investigation was no different from routine regulatory activity (ECF No. 75 at 18-21). Plaintiffs allege that the investigation was material, however, because it threatened Clover's ability to offer Medicare Advantage plans, and thus its very existence. *See* Compl. ¶¶16, 144. Accordingly, Documents produced to the DOJ bear directly on the materiality of the investigation, which Plaintiffs need to prove for a substantial portion of their claims to succeed.

Finally, Request 2 is proportional to the needs of the case and not burdensome because they are easily produced and will reduce Defendants' discovery burden. *See* Section III.B.I *supra*; *Munoz*, 2013 WL 684388, at *6 ("Defendants will suffer little if any burden by producing the documents as they are kept in their normal course of business because these documents have already been produced"). Indeed, Defendants undoubtedly have all productions to the DOJ saved on a document production server and could produce them to Plaintiffs almost instantly by posting the production file(s) to an FTP site.

As with Request 1, Defendants again appear to object to Request 2 on the grounds that it is "cloned discovery," citing the same authorities. *Compare* Ex 2. at 14 *with* Section III.B.1 *supra*. Once again, Defendants overlook that the DOJ Investigation, as described above, concerns the

identical facts alleged in the Complaint, and directly implicates Plaintiffs' burden to prove materiality and Defendants' affirmative defense of immateriality. In such situations, courts order full productions of documents produced to the government, even where the discovery requests are purportedly "cloned." *See In re Altisource Portfolio Sols., S.A. Sec. Litig.*, 2016 WL 11783829, at *3 (S.D. Fla. July 27, 2016) (ordering discovery where "both agencies were investigating, among other things, Ocwen's related party transactions with Altisource, potentially making documents produced by Altisource in connection with those investigations relevant to the issues in this case.")

Finally, although Defendants have not raised the issue of privilege in any objection, letter, or meet and confer, should they assert that the Documents sought by Request 2 are privileged, that argument fails because documents produced to third parties, even governmental parties, are not privileged. *In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289, 302 (6th Cir. 2002) ("The attorney-client privilege was never designed to protect conversations between a client and the Government—i.e. , an adverse party—rather, it pertains only to conversations between the client and his or her attorney"). This is true even if the Documents were produced "to the DOJ pursuant to a Confidentiality and Non-Waiver Agreement." *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2012 WL 4764589, at *4 (D.N.J. Oct. 5, 2012), *aff'd sub nom. In re Merck & Co., Inc. Sec.*, 2012 WL 12904796 (D.N.J. Dec. 12, 2012) ("because Merck voluntarily disclosed these material to the government, it cannot establish that these documents are privileged").

### 2.    Defendants' Position

Plaintiffs' Request No. 2 seeks the production of "[a]ll Documents and Communications produced, without regard to the Relevant Time Period, whether formally or informally, to the DOJ, in response to, in connection with, or related to the DOJ Investigation."  In their Responses and Objections to Plaintiffs' Requests and during the August 18, 2022 meet-and-confer session,

Defendants objected to this Request, including on the basis that the Request is an improper request for "cloned discovery."  As previously discussed, courts routinely reject such requests seeking "cloned discovery" produced to other parties on the grounds that they are facially overbroad and seek irrelevant material.  *See In re Weatherford Int'l Sec. Litig.*, No. 11 Civ. 1646(LAK)(JCF), 2013 WL 5788687, at *1-2 (S.D.N.Y. Oct. 28, 2013).  Defendants also took issue with Plaintiffs' demand that Defendants produce all responsive Documents and Communications concerning the "DOJ Investigation" without restriction or temporal limitation.[12]

During the Parties' discussions in the August 18, 2022 meet-and-confer session, Plaintiffs clarified that they only seek Documents and Communications concerning the DOJ Inquiry as they relate to the allegations in the Complaint with respect to, for example, the alleged Clover Ambassador program, and the alleged provision of gift cards to physicians or office staff.  (*See* Ex. 5 at 8.)  Based on this clarification, the Parties agreed, as stated in Defendants' January 30 Letter, that rather than produce wholesale all Documents produced to the DOJ, the Parties would narrow the Request through discussions about proper custodians and search terms, which Plaintiffs had provided a draft of in their January 11 Letter.  (*Id*.)

However, in their February 6, 2023 letter, Plaintiffs changed their position, stating that

---

[12] *See, e.g.*, *In re Weatherford,* 2013 WL 5788687, at *1-2 ("[T]he appropriate scope of document discovery here is more limited than . . . plaintiff's request" for any documents "'concerning or produced in connection with the SEC and DOJ investigations.'"); *Alaska Elec. Pension Fund v. Bank of Am. Corp.*, No. 14-CV-7126 (JMF), 2016 WL 6779901, at *3 (S.D.N.Y. Nov. 16, 2016) ("Plaintiffs' entire relevancy argument hinges on a general contention that every communication and work product related to the regulatory investigations is 'likely' to contain additional relevant information. But that sort of conclusory claim is insufficient to support such an expansive discovery request."); *Fort Worth Emps. Ret. Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 110 (S.D.N.Y. 2013) ("They are not entitled to all documents relating to RMBS that the defendants have turned over to 'any government body or agency' pursuant to subpoena. While the scope of discoverable material may extend beyond the particular transactions in this case, that fact in and of itself does not mean that every document produced in response to any government subpoena related to RMBS is relevant.").

25

relying on search terms does not constitute permissible parameters for purposes of searching for Documents responsive to the Request.  (Ex. 6 at 8.)  Given Plaintiffs' position and rejection of Clover's proposal, Defendants reassert their objections in their Responses and Objections on the grounds that Plaintiffs are requesting improper "cloned discovery" with no restriction or temporal limitation.  (*See* Ex. 7 at 3.)

Finally, Plaintiffs cannot carry their burden of establishing relevancy in seeking Documents and Communications produced to the DOJ, in response to, in connection with, or related to the DOJ Inquiry.  As acknowledged by this Court, "the party seeking discovery ***must*** demonstrate that the requests are relevant." *Pictsweet Co.*, 2020 WL 12968432, at *4 (emphasis added).  "Simply because there may be overlap between the issues in the [DOJ Inquiry] and those in this case does not establish relevancy of all the documents that [Plaintiffs] seek[]."  *Id*. Relevant here, Clover received ***voluntary*** requests for information from the DOJ in November 2019 that have not resulted in any charges or adverse findings against Clover nearly ***three-and-a-half years later***, or any changes to Clover's business practices.  (*See* Defs.' Mem. of Law in Supp. of Defs.' Mot. to Dismiss, Doc. No. 75 at 16 n. 6, 24.)  Plaintiffs are simply requesting materials irrelevant to this Action, and the Court should not "give [Plaintiffs] that kind of a discovery windfall."  *Pictsweet Co.*, 2020 WL 12968432, at *4 (finding that the plaintiff's "request for wholesale duplicates of discovery and other documents produced or created in [a different proceeding was] improper as failing to make the requisite showing of relevance").

### D.  Disputed Issue No. 4: Documents and Communications Concerning the U.S. Securities and Exchange Commission Investigation (Plaintiffs' Request Nos. 9, 10, 11, and 12)

#### 1.  Plaintiffs' Position

Plaintiffs' Request 9 seeks all Documents and Communications produced to the SEC in connection with the SEC's investigation, Request 10 seeks all Documents and Communications

concerning the SEC investigation, Request 11 seeks all Communications to or from the Individual Defendants concerning the SEC Investigation, and Request 12 seeks documents sufficient to identify all employees who have been contacted by or communicated with the SEC regarding the SEC investigation. Ex. 1 at 14, Ex. 5 at 5. Defendants yet again refuse to produce *any* documents responsive to these Requests on the ground that they are "cloned discovery." *See* Ex. 5 at 9-10. Defendants are wrong.

As an initial matter, there can be no dispute that the SEC is investigating the identical securities fraud allegations underlying Plaintiffs' Complaint because Defendants themselves told investors that the SEC was conducting an "investigation and requesting document and data preservation for the period from January 1, 2020, to the present, *relating to certain matters that are referenced in the [Hindenburg report]*." Compl. ¶333. As the Court observed in denying Defendants' motion to dismiss, Plaintiffs' allegations rest on statements from confidential witnesses and the content of the Hindenburg Report, which detail Defendants' misconduct and scienter and are mutually corroborative. *See Bond*, 587 F. Supp. 3d at 666-68, 671, 678-79. Where, as here, a government investigation is into the very allegations underlying a complaint, discovery concerning that investigation, including documents produced to the government and communications regarding that investigation, are appropriate. *See U.S. ex rel. Luke v. Healthsouth Corp.*, 2018 WL 3186941, at *9 (D. Nev. June 28, 2018) ("Luke has not sought cloned discovery. He has requested information produced in this very case to the United States, which was investigating the allegations Luke made in his complaint. That information is plainly relevant to this case's subject matter"); *Altisource*, 2016 WL 11783829, at *3 (SEC investigation regarding same facts underlying complaint "potentially mak[e] documents produced by [Defendants] in connection with those investigations relevant to the issues in this case").

Again, as with Requests 1 and 2, Defendants object that Requests 9-12 seek "cloned discovery" and cite the same authorities. *Compare* Ex 2. at 17 *with* Section III.B.1-B.2 *supra*. Once again, Defendants overlook that the SEC Investigation, as described above, concerns the identical facts alleged in the Complaint. In addition, while Defendants assert that a production of SEC Investigation-related Documents and Communications is burdensome, as described above, Defendants have reviewed these documents and can produce them with the push of a button, thus there is minimal burden. *Munoz*, 2013 WL 684388, at *6.

Further, although Defendants have not raised the issue of privilege in any objection, letter, or meet and confer, should they assert that the Documents sought by Requests 9-12 are privileged, that argument fails for the reasons described in Section III.B.2 *supra*.

## 2. Defendants' Position

Plaintiffs' Request Nos. 9, 10, 11, and 12 seek the production of: (i) "[a]ll Documents and Communications produced, without regard to the Relevant Time Period, whether formally or informally, to the SEC in response to, in connection with, or related to the SEC Investigation"; (ii) "[a]ll Documents and Communications, without regard to the Relevant Time Period, concerning the SEC Investigation"; (iii) "[a]ll Communications to or from the Individual Defendants Concerning the SEC Investigation"; and (iv) "Documents sufficient to identify all Employees who have been contacted by or communicated with the SEC regarding the SEC Investigation."

Defendants object to these Requests as they are requests for improper "cloned discovery." Indeed, Defendants do not understand how Plaintiffs can even have a good-faith basis for making this type of request when Plaintiffs do not know the scope of the SEC Investigation. *See, e.g.*, *Pictsweet Co.*, 2020 WL 12968432, at *5 (rejecting plaintiff's "cloned" discovery request);

*Austin*, 2010 WL 4318815, at \*4 (agreeing that plaintiff should not have "unfettered access" to all of the discovery produced in a purportedly similar case, "as there [was] no indication that such discovery [was] relevant to th[e] case" before it); *Cap. Ventures Int'l*, 2014 WL 1431124, at \*2 (denying request for "cloned discovery" as "overbroad and of speculative relevance"); *In re Weatherford*, 2013 WL 5788687, at \*1-2 (finding that "the appropriate scope of document discovery here is more limited than . . . plaintiff's request" for any documents "concerning or produced in connection with the SEC and DOJ investigations"); *Pensacola Firefighters' Relief Pension Fund Bd. of Trustees v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 265 F.R.D. 589, 597 (N.D. Fla. 2010) (declining to order production of all documents produced to SEC because, "without a more particularized request," requiring production of all such documents "could potentially allow plaintiff to bypass the limitations on the scope of discovery established by the [Federal Rules of Civil Procedure]").

Moreover, Plaintiffs have not even asserted claims in the Complaint based on the SEC Investigation. Rather, Plaintiffs have asserted claims based on alleged conduct that Plaintiffs claim occurred before the SEC Investigation even existed.

### E. Disputed Issue No. 5: Whether Defendants Shall Search for Documents and Communications Concerning the Hindenburg Response Throughout the Relevant Time Period (Plaintiffs' Request No. 17)

#### 1. Plaintiffs' Position

Plaintiffs' Request 17 seeks "All Documents and Communications Concerning the Hindenburg Response, Including All Documents and Communications created for, Concerning, prepared for or considered as part of the Hindenburg Response." Ex. 1 at 15. Defendants propose to search for responsive Documents and Communications solely on February 4, 2021, the date of the Hindenburg Response. *See* Ex. 5 at 20 n.7; Ex. 7 at 7. Defendants' proposal is insufficient.

29

As an initial matter, the Hindenburg Response was published on *February 5, 2021*. Defendants proposal would eliminate Documents and Communications, including drafts of the Hindenburg Response, that were created shortly before the publication of the response. The released Hindenburg Response contained multiple admissions providing powerful evidence of Defendants' fraud, including that (i) they had known about the DOJ Investigation and *intentionally* not disclosed it, (ii) the Company had paid an insurance broker owned by Bermudez $160,000 for patient referrals without disclosing the related-party transactions, and (iii) that only *4%* of in-network physicians used Clover Assistant, when the Company's investment thesis hinged on Defendants' claim that "*92% of eligible member visits* utilize Clover Assistant." Compl. ¶¶193, 333-36. In addition, later in the afternoon of February 5, 2021, Defendant Palihapitiya posted a tweet clearly coordinated with the Hindenburg Response confirming his knowledge of the DOJ Investigation. *Id.* at ¶334. The Documents and Communications concerning drafts of Hindenburg Response and coordination with Defendant Palihapitiya from February 5, 2021, at a minimum will indicate to what extent Defendants knew about the wrongdoing described in the Hindenburg Report, as well as their intent when they published the Hindenburg Response, including, but not limited to, what they sought to admit to investors and what they hoped to conceal. Defendants emphasized in the Hindenburg Report, and asserted as an affirmative defense in their Answer, that their conduct was conducted on the advice of counsel (Compl. ¶333; Ans. 142 (Eleventh Affirmative Defense)), and thus any communications with counsel are likely not privileged. *E.g.*, *Barnard*, 2021 WL 6275267, at \*7 (E.D. Tenn. Mar. 5, 2021) ("Litigants cannot hide behind the privilege if they are relying on privileged communications to make their case").

Communications during the Relevant Time Period before and after the publication of the Hindenburg Response, are also directly relevant to Plaintiffs' claims and thus discoverable. On

March 29, 2021, Defendants filed the March 29 8-K, which admitted that multiple representations in the Hindenburg Response were incorrect. Compl. ¶¶337-38. Documents and Communications concerning the March 29 8-K will reflect whether Defendants knew, or recklessly disregarded the truth about Bermudez, and the Hindenburg Report as a whole, when they created the Hindenburg Response to prevent the collapse of Clover's share price. Compl. ¶¶331-38; Section III.A.1 *supra*, Section III.F.1 *infra*.

Likewise, Hindenburg spent four months researching Clover prior to the release of the Hindenburg Report on February 4, 2021, interviewing "more than a dozen . . . former employees, competitors, and industry experts," making "dozens of calls to doctor's offices," and reviewing "thousands of pages of government reports, insurance filings, regulatory filings, and company marketing materials."[13] *See* Compl. ¶¶20, 320. It simply would beggar belief to suggest that Defendants had no knowledge of the inquiry; indeed, the Hindenburg Response and Defendant Palihapitiya's tweet carefully state that Hindenburg never *contacted* Defendants and/or Defendants had no knowledge of the *report* itself, not that Defendants had no knowledge of the *investigation*. *See id.* at ¶334; Andrew Still-Baxter, In Response to Short Seller Firm's Questions, Feb. 5, 2021, https://medium.com/clover-off-the-charts/in-response-to-short-seller-firms-questions-47798b0b76da ("Importantly, the short seller firm did not contact Clover, and we had no knowledge of *the short seller report* prior to it being made publicly available"). Defendants' internal Document and Communications concerning the investigation by Hindenburg will reflect Defendants' knowledge of the questions Hindenburg was asking, Defendants' knowledge or

---

[13] The Hindenburg Report stated that "[o]ur investigation into Clover Health has spanned almost 4 months." Hindenburg Research, *Clover Health: How the "King of SPACs" Lured Retail Investors Into a Broken Business Facing an Active, Undisclosed DOJ Investigation*, Feb. 4, 2021, https://hindenburgresearch.com/clover/.

reckless disregard of the truth underlying potentially false statements investigated by Hindenburg, and Defendants' decision not to proactively update the market.

Finally, searching for these communications will not increase any burden on Defendants, as Defendants can use the search terms to which the parties' have already agreed to identify responsive Documents and Communications during the Relevant Time Period and tag that information "Responsive," instead of "non-responsive." *See* Ex. 6 at 17 (accepting Defendants' proposed search terms for Documents and Communications concerning Hindenburg).

### 2.    Defendants' Position

Plaintiffs' Request No. 17 seeks the production of "[a]ll Documents and Communications Concerning the Hindenburg Response, Including [a]ll Documents and Communications created for, Concerning, prepared for or considered as part of the Hindenburg Response."  For all of the reasons explained in Disputed Issue No. 1, *supra*, regarding the "Relevant Time Period," Defendants object to this Request on the grounds that it seeks Documents that are neither relevant to the subject matter involved in this Action, nor relevant to a claim or defense of any Party, nor reasonably calculated to lead to the discovery of admissible evidence.  Defendants further object to this Request to the extent it seeks information subject to the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection.

Notwithstanding its objections and in the interest of compromise, Clover agreed to meet and confer with Plaintiffs in an effort to narrow the scope of this Request.  Defendants note that the Parties have not adequately met and conferred on the scope of production as to Plaintiffs' Request No. 17.  Clover proposed certain search terms for Plaintiffs' Request Nos. 17, 27, and 28. (*See* Ex. 7 at 8.)  Plaintiffs accepted Clover's proposed search terms.  (*Id.*)  Yet, Plaintiffs rejected Clover's proposal because of the Parties' dispute as to the "Relevant Time Period," *supra*.  (Ex. 7 at 8; Ex. 8 at 4.)

**F. Disputed Issue No. 6: Documents and Communications Concerning Clover's March 29, 2021 Form 8-K Filed with the SEC (Plaintiffs' Request No. 18)**

### 1. Plaintiffs' Position

Plaintiffs' Request 18 seeks, in pertinent part, "All Documents and Communications Concerning the current report on Form 8-K filed on behalf of Clover on March 29, 2021." Ex. 1 at 16. Defendants have refused to produce any responsive Documents or Communications on the grounds that the "Documents are neither relevant, nor would their collection, review, and production be proportional to the needs of the case." Ex. 5 at 11.

Plaintiffs set forth their position as to the relevance and proportionality of the Documents and Communications sought by Request 18 in Section II.A.1 *supra*. In short, however, Defendants March 29 8-K corrected inaccuracies in the Hindenburg Response. Accordingly, evidence from February 4, 2021 through March 29, 2021 is relevant to proving, among other things, the existence of payments by Clover to insurance brokers owned and operated by Bermudez, as well as Defendants' knowledge or reckless disregard of those payments prior to the Hindenburg report and in creating the Hindenburg response. Section II.A.1 *supra*. Such Documents and Communications are likely not privileged, as Defendants are asserting an affirmative defense of reliance on the advice of advisors, e.g., the advice of counsel. *See id.*

### 2. Defendants' Position

Plaintiffs' Request No. 18 seeks the production of "[a]ll Documents and Communications Concerning the current report on Form 8-K filed on behalf of Clover on March 29, 2021, Including All Documents and Communications created for, Concerning, prepared for or considered as part of the March 29, 2021 8-K." Defendants object to this Request as unduly burdensome, overly broad, and disproportional to the needs of this Action. (Ex. 2 at 21; Ex. 3 at 23.) Defendants further object to this Request to the extent it seeks information subject to the

attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or protection.  For all of the reasons explained in Disputed Issue No. 1, *supra*, regarding the "Relevant Time Period," Documents and Communications concerning the Form 8-K filed with the SEC on March 29, 2021 are neither relevant to the subject matter involved in this Action, nor reasonably calculated to lead to the discovery of admissible evidence.  Plaintiffs fail to offer a reasonable justification for this Request.

## G.  Disputed Issue No. 7: Custodians

### 1.    Plaintiffs' Position

At Defendants' request, Plaintiffs have proposed custodians based on the Complaint's allegations who are most likely to have responsive information. As set forth in the January 11 Letter, these custodians are:

1. Chamath Palihapitiya, SCH Chairman and CEO
2. Vivek Garipalli, Clover Chief Executive Officer
3. Andrew Toy, Clover Chief Technology Officer
4. Joe Wagner, Clover Chief Financial Officer
5. Hiram Bermudez, Clover, Vice President, Sales
6. Ethan Lipkind, Clover, Chief Development Officer
7. Zoe Farrell, Clover, Director of Network Engagement
8. Livia Istrate, Clover, Senior Manager, Network Development and Management
9. Wendy Richey, Clover, Chief Medicare Compliance Officer
10. Andrew Robinson, Clover, VP of Communications
11. Joyce Mattson, Clover, Director, Provider Data Management
12. David Weathington, Clover, Senior Vice President, Plan Operations
13. Brian Field Senior Manager, Network Engagement
14. Michael Waters, Clover, Senior Manager of Partnerships and Development
15. Ankit Patel, Vice President of Provider Alignment and Network Engagement
16. Mark Spektor, Clover, Chief Medical Officer
17. Carl Rathjen, Clover, Vice President of Network Management and Operations
18. Jon-Michael Troche, Clover, Provider Engagement Manager
19. Rachel Jones Clover, Director, Provider Solutions Development
20. Joany Delgado, Clover, Sales Oversight, Senior Associate
21. Gabe Perez, Clover, Senior Director, Customer Success and Network Development,
22. Jackie Garrett Clover, Manager, Network Engagement Development, New Jersey
23. Ana Carolina Geiger, Clover, Manager, Strategic Initiatives

*See* Ex. 4 at 10-11.[14] Defendants have agreed to search the files of custodians 1-9 listed above, but have refused any further custodians without explanation or justification. *Compare* Ex. 6 at 14-16 *with* Ex. 7 at 6 & Ex. 8 at 3. Defendants should be ordered to search these custodians.

*First*, Plaintiffs' Complaint contains several distinct sets of misrepresentations. Compl. ¶¶227-28. Three of these types of misrepresentations require Plaintiffs to provide the existence of misconduct or facts separate and apart from acts by Defendants: (i) illegal conduct driving Clover's growth; (ii) unreported related party transactions driving Clover's growth; and (iii) physician misuse of Clover Assistant. Using statements from confidential witnesses and Defendants' organizational charts, Plaintiffs identified custodians 10-13 as likely having relevant information:

10. Andrew Robinson, Clover, VP of Communications ("Robinson"). The Hindenburg Response was posted to Medium.com under Andrew Still-Baxter's byline. *See* Compl. ¶145. Andrew Still-Baxter reports directly to Robinson, and thus Robinson undoubtedly participated in the creation of the Hindenburg Response. Robinson's non-privileged communications—of which there should be many, given that Defendants have asserted an advice-of-counsel affirmative defense—responsive to Plaintiffs' Requests are thus directly relevant to the falsity of Defendants' alleged misstatements, Defendants' knowledge of that falsity and intent to deceive investors, and Defendants' affirmative defenses, including of reliance on the advice of counsel and lack of materiality or scienter.

11. Joyce Mattson, Clover, Director, Provider Data Management ("Mattson"). As a Director, Provider Data Management, Mattson was likely responsible for managing data of healthcare providers who saw patients using Clover insurance. Mattson thus would have worked with data concerning physician use of Clover Assistant.

12. David Weathington, Clover, Senior Vice President, Plan Operations ("Weathington"). Clover's Chief Scientific Officer, Director of Clinical Programs and Clinical Improvement Sales Manager all reported to Weathington, who reported directly to Defendant Garipalli. Weathington thus would have communicated with his subordinates and Garipalli regarding physician use of Clover Assistant and inducements to physicians or front-office staff to use Clover Assistant or recommend Clover policies.

---

[14] The list of proposed custodians in the January 11 Letter has been re-ordered for the convenience of the Court.

13. Brian Field, Senior Manager, Network Management, Development, Total Network Engagement ("Field"). As a Senior Manager for network management, development, and engagement, in Pennsylvania, Field would have been familiar with efforts to incentivize or induce physicians to accept Clover insurance and use Clover Assistant. He also would have been familiar with the DOJ Investigation and complaints of improper inducements to physicians, which are alleged to have occurred in and around Pennsylvania. Compl. ¶¶139-40.

14. Michael Waters, Clover, Senior Manager of Partnerships and Development ("Waters"). As a Senior Manager of Partnerships and Development, Waters would have been managing vendors that with which Clover contracted to process claims and collect premiums, and would have been aware of Bermudez's role in driving increases in Clover Members and data concerning physician use of Clover Assistant.

15. Ankit Patel, Vice President of Provider Alignment and Network Engagement ("Patel"). As alleged in the Complaint, CW3 reported directly to Patel, who reported to Ethan Lipkind ("Lipkind"), whose files Defendants have agreed to search. ¶46. Patel allegedly attended meetings where CW3 raised concerns about physicians' failure to use Clover Assistant during patient visits. Compl. ¶216. As a direct report of Mr. Lipkind, who is alleged to have led efforts to illegally distribute gift cards to front office staff, Patel likely also knew of efforts to induce or incentivize physicians and/or staff to use Clover Assistant or recommend Clover plans.

16. Mark Spektor, Clover, Chief Medical Officer ("Spektor"). As alleged in the Complaint, Spektor told CW2 that as early as 2019 the Company had data showing that half the providers who used Clover Assistant were not using the tool during patient visits. Compl. ¶205. Mr. Spektor also made roadshow presentations to promote Clover Assistant, and thus knew of efforts to induce or incentivize physicians and/or staff to use Clover Assistant or recommend Clover plans.

17. Carl Rathjen, Clover, Vice President of Network Management and Operations ("Rathjen"). CW3 and CW4 reported to Rathjen (Compl. ¶¶46-47), who allegedly led meetings where CW3 raised concerns about physicians' failure to use Clover Assistant during patient visits, and received emails from CW3 regarding improper use of Clover Assistant (id. at ¶¶215-16).

18. Jon-Michael Troche, Clover, Provider Engagement Manager ("Troche"). As a provider engagement manager, Troche would have interacted directly with physicians accepting Clover insurance and using Clover Assistant. Those interactions would have exposed him to Bermudez's role in driving increases in Clover members, inducements or incentives used to drive physician use of Clover Assistant, and whether physicians were using Clover Assistant during patient visits.

19. Rachel Jones, Clover, Director, Provider Solutions Development ("Jones"). Jones reported directly to Rathjen. In her role as Director, Provider Solutions Development, Jones would have seen how physicians were using Clover Assistant, and whether they

36

were using Clover Assistant during patients visits, and would have overseen development of Clover Assistant in response to data concerning physician use of the software.

20. Joany Delgado, Clover, Sales Oversight, Senior Associate ("Delgado"). In her role in Compliance, Delgado would have received complaints regarding inducements or incentives for physicians to accept Clover insurance or use Clover Assistant. Delgado also would have access to complaints regarding improper use of Clover Assistant by physicians' office staff.

21. Gabe Perez, Clover, Senior Director, Customer Success and Network Development ("Perez"). Perez reported directly to Carl Rathjen. In his role overseeing Customer Success and Network Development, Perez would have seen how physicians were using Clover Assistant, and whether they were using Clover Assistant during patients visits, and would have overseen development of Clover Assistant in response to data concerning physician use of Clover Assistant. Perez also likely would have been aware of Bermudez's role in increasing Clover members.

22. Jackie Garrett, Clover, Manager, Network Engagement Development, New Jersey ("Garrett"). Garrett reported directly to Carl Rathjen. In her role at Clover, Garrett would have been aware of complaints concerning inducements and incentives for physicians to use Clover Assistant. Garrett also would have had access to data concerning physician use of Clover Assistant, as well as Mr. Bermudez's role in increasing the number of Clover members.

23. Ana Carolina Geiger, Clover, Manager, Strategic Initiatives ("Geiger"). Geiger reported directly to Defendant Garipalli. In her role at Clover, Geiger would have been aware of initiatives like the alleged Clover Ambassador program and the distribution of gift cards or payments to physicians and/or front office staff to increase use of Clover Assistant. She also would have known of Bermudez's role in increasing Clover members and of data concerning physician use of Clover Assistant.

*See* Ex. 4 at 11-12; Ex. 6 at 13-14; Ex. 8 at 3. Each of the above custodians thus is critical to the creation and transmittal of information at Clover regarding the Hindenburg Response, payments to healthcare practitioners and staff; transactions with Bermudez, or physician use of Clover Assistant, and is likely in possession of information evidencing misconduct, undisclosed related party transactions, limited or improper use of Clover Assistant and Defendants knowledge or reckless disregard of this information – *i.e.*, evidence directly related to falsity, materiality, scienter, and loss causation in this Action. Under these circumstances, Courts find custodians

relevant and proportional to the needs of a case. *E.g.*, *Envision*, 2020 WL 6750397, at \*3 (ordering searching of 24 additional custodians in securities fraud class action).

To date, Defendants have not asserted any reason why these individuals would not possess relevant information, nor have Defendants explained how gathering or searching data for these custodians would be burdensome. This alone is enough to order Defendants to include these custodians in their ESI searches. *See Anderson v. Dillard's, Inc.*, 251 F.R.D. 307, 311 (W.D. Tenn. 2008) ("a general statement that the discovery is overly broad and unduly burdensome ... by itself is insufficient to deny discovery"). Presumably, Defendants will argue that none of custodians 10-23 are alleged to have had a role in the alleged misstatements. Leaving aside that Patel, Spektor, and Rathjen are alleged in the Complaint to have a played a role in developing or overseeing the facts at issue, it is well-established that "it is not necessary for Plaintiffs to allege" involvement in making a misstatement "in order to establish that they may have relevant ESI." *Id.*

### 2. Defendants' Position

During the Parties' first meet-and-confer session on August 16, 2022, Clover proposed a list of eight custodians for Plaintiffs' consideration. Notably, these custodians included every Individual Defendant and certain individuals who had been referenced in the Complaint.

***Plaintiffs provided no response to Clover's proposal until January 11, 2023***. Based on Plaintiffs' silence, which Defendants reasonably construed as agreement to their proposed custodians, and to ensure the efficient progress of discovery, Clover collected and reviewed the Documents of the custodians they had proposed in August 2022. ***Now, five months later, Plaintiffs propose an additional thirteen custodians. At this stage of the discovery process, it would be impractical and unreasonable for Plaintiffs to be required to revert to square one to collect and review documents, merely because Clover failed to provide their counterproposal***

*in a timely manner*.

Specifically, in their January 11 Letter, Plaintiffs proposed twenty-three custodians whose electronic files should be searched for Documents responsive to Plaintiffs' Requests. (Ex. 4 at 10-11.) Clover agreed to use nine of these custodians in their January 30 Letter. These agreed-upon nine custodians include the four Individual Defendants, who are the most likely individuals to have relevant and discoverable ESI, as well as five other individuals who are likely to have discoverable ESI based on the allegations in the Complaint and who Clover agreed to in order to move discovery along. Specifically, these agreed-upon custodians are as follows:

1. Chamath Palihapitiya
2. Vivek Garipalli
3. Andrew Toy
4. Joseph Wagner
5. Hiram Bermudez
6. Ethan Lipkind
7. Zoe Farrell
8. Livia Istrate
9. Wendy Richey

In their January 30 Letter and February 17 Letter, Defendants also represented that they would consider using the unnamed "Confidential Witnesses" referenced in the Complaint as custodians once Plaintiffs identify them. (Ex. 5 at 19; Ex. 7 at 6.) As of the date of this joint submission, Plaintiffs have not identified the Confidential Witnesses. Plaintiffs offer no reasonable basis for adding the other custodians or any justification as to why they felt compelled to do so five months after Clover's original proposal.

## H. <u>Disputed Issue No. 8: Word Limits for Certain ESI Searches (Plaintiffs' Request Nos. 19 and 20)</u>

### 1. Plaintiffs' Position

Plaintiffs' Request 19 seeks, "All Documents and Communications Concerning payments or gifts of any kind by Employees to physicians," and Plaintiffs' Request 20 seeks, "All Documents and Communications Concerning any internal investigation at Clover into the provision of gift cards by Employees to physicians, Including the complaint and ensuing interviews referenced in ¶131 of the Complaint." While the parties have agreed on search terms to find documents responsive to Requests 19 and 20, Plaintiffs propose that Defendants run searches for terms within 40 words of each other, while Defendants propose to run searches for terms within 25 words of each other. *See* Ex. 8 at 4-5 (identifying terms and location parameters).

Requests 19 and 20 seek documents concerning illegal conduct by Defendants that make their statements regarding compliance with legal requirements the sources of their revenue false and misleading, which comprise approximately half of their claims. See Compl. ¶¶230–74. The average length of a sentence in English is estimated to be between 15-20 words. *E.g.*, The Acropolitan, *Sentence Length Has Declined 75% in the Past 500 Years*, Medium.com, Aug. 29, 2017. https://medium.com/@theacropolitan/sentence-length-has-declined-75-in-the-past-500-years-2e40f80f589f. Defendants' proposal would thus limit searches for responsive documents underlying a substantial portion of Plaintiffs' claims to documents where search terms were used within a single sentence. Plaintiffs' proposed terms use proper names and relatively uncommon words like "ambassador," "complaint," and "investigation," which will have the effect of reducing the number of documents Defendants need to review. Given this relatively lesser burden and the importance of the documents to Plaintiffs' claims, this Court should order Defendants to run searches for terms within 40 words of each other to avoid eliminating documents with highly relevant information.

### 2.    Defendants' Position

Plaintiffs fail to mention that this disagreement is over *three* search strings for Plaintiffs' Request Nos. 19 and 20.  Plaintiffs' proposal to run these three searches for terms within forty (40) words of each other will pull in irrelevant Documents and Communications, increasing Defendants' burden of review.  For example, one of Plaintiffs' proposed searches for Plaintiffs' Request No. 20 searches for "(investigat* OR report) w/40 compliance."  (Ex. 7 at 9; Ex. 8 at 5.) The word "compliance" is very likely to be used in the same email or Document as the words "investigate" or "report," and searching for Documents with these terms within forty (40) words, as opposed to within twenty-five (25) words, is more likely to pull in non-responsive Documents and Communications.  Indeed, when running the three searches at issue for Defendants' proposed "Relevant Time Period" (April 24, 2020 to February 4, 2021) on the Documents and Communications that Defendants have collected to date, Plaintiffs proposed limiter increased the number of hits by *25%* as compare to using a limiter of twenty-five (25) words.  When running the three searches at issue for Plaintiffs' proposed "Relevant Time Period" (January 1, 2018 to March 29, 2021) on Documents and Communications that Defendants have collected to date, Plaintiffs proposed limiter increased the number of hits by *30%*.  And there is no reason to believe that the additional documents are relevant.

Moreover, these are not the only searches that Defendants have agreed to run.  Defendants already have agreed to run a number of other searches that likely would return responsive information.  (E.g., Ex. 7 at 8-9; Ex. 8 at 4-5.).

Given the additional burden and the other broad searches designed to find relevant Documents, this Court should adopt Defendants' reasonable proposal and order Defendants to run searches for terms within twenty-five (25) words of each other.  Defendants' proposed searches

are proportional to the needs of the case, and their searches will avoid Defendants pulling in Documents and Communications likely to be irrelevant to any of the claims or defenses in this Action.

## IV. DISCOVERY CONFERENCE REQUEST

For the foregoing reasons, the Parties respectfully request a telephonic discovery conference regarding these issues, on which they request leave to submit comprehensive briefing.

Dated: March 7, 2023                                        Respectfully submitted,

**BRAMLETT LAW OFFICES**

By: */s/ Paul Kent Bramlett*
      Paul Kent Bramlett
      TN SUP CT #7387/MS SUP CT #4291
      Robert Preston Bramlett
      TN SUP CT #25895
      40 Burton Hills Blvd., Suite 200
      P.O. Box 150734
      Nashville, TN 37215
      Tel. 615.248.2828
      Facsimile: 866.816.4116
      pknashlaw@aol.com
      robert@bramlettlawoffices.com

      *Liaison Counsel*

**POMERANTZ LLP**

Jeremy A. Lieberman (admitted *pro hac vice*)
Brian P. Calandra (admitted *pro hac vice*)
600 Third Avenue
New York, New York 10016
Tel. (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
bcalandra@pomlaw.com

Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505

**BASS, BERRY & SIMS PLC**

By: */s/ Britt K. Latham*
      Britt K. Latham (BPR #23149)
      Joseph B. Crace, Jr. (BPR # 27753)
      150 Third Ave., South, Suite 2800
      Nashville, TN 37201
      Tel. (615) 742-7762
      Facsimile: (615) 742-2847
      blatham@bassberry.com
      jcrace@bassberry.com

**MILBANK LLP**

Scott A. Edelman (admitted *pro hac vice*)
Jed M. Schwartz (admitted *pro hac vice*)
Gary A. Crosby II (admitted *pro hac vice*)
55 Hudson Yards
New York, New York 10001
Tel. (212) 530-5000
sedelman@milbank.com
jschwartz@milbank.com
gcrosby@milbank.com

*Counsel for Defendants Clover Health Investments, Corp., Vivek Garipalli, Andrew Toy, Joseph Wagner, and Chamath Palihapitiya*

Chicago, Illinois 60603
Tel. (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Lead Counsel and Attorneys for Plaintiffs*

**THE SCHALL LAW FIRM**

Brian Schall (admitted *pro hac vice*)
Rina Restaino (admitted *pro hac vice*)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Tel. (424) 303-1964
Facsimile: (877) 590-0482
brian@schallfirm.com
rina@schallfirm.com

*Additional Counsel for Plaintiffs*

**HOLZER & HOLZER, LLC**

Corey D. Holzer
Marshall P. Dees
1200 Ashwood Parkway
Suite 410
Atlanta, GA 30338
Tel. (770) 392-0090
Facsimile: (770) 392-0029
cholzer@holzerlaw.com
mdees@holzerlaw.com

*Additional Counsel for Named Plaintiff*
*Jean-Nicolas Tremblay*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed electronically on March 7, 2023.  Notice of this filing will be sent to all electronically registered parties by operation of the Court's electronic filing system.  The names of the attorneys for other parties who are registered to receive notices are:

Benjamin A. Gastel
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Fax: (615) 255-5419
Email: beng@bsjfirm.com

Jacob A. Walker
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: jake@blockleviton.com

James Gerard Stranch, IV
Branstetter, Stranch & Jennings, PLLC
223 Rosa L. Parks Avenue
Suite 200
Nashville, TN 37203
(615) 254-8801
Fax: (615) 255-5419
Email: gerards@bsjfirm.com

Jeffrey C. Block
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: jeff@blockleviton.com

Stephen J. Teti
Block & Leviton LLP
260 Franklin Street
Suite 1860
Boston, MA 02110
(617) 398-5600
Fax: (617) 507-6020
Email: steti@blockleviton.com

Larry Russell Belk, Jr.
Sutherland & Belk, PLC
2505 21st Avenue South
Suite 400
Nashville, TN 37212
(615) 846-6200
Fax: (615) 208-2255
Email: russell@sbinjurylaw.com

James A. Holifield, Jr.
Holifield Janich Rachal & Associates, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
(865) 566-0115
Fax: (865) 566-0119
Email: aholifield@holifieldlaw.com

Brian Peter Calandra
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(646) 581-9958
Email: bcalandra@pomlaw.com

Brian Schall
Schall Law Firm
2049 Century Park East
Suite 2460
Los Angeles, CA 90067
(310) 301-3335
Email: brian@schallfirm.com

Paul Kent Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: pknashlaw@aol.com

Laurence M. Rosen
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: lrosen@rosenlegal.com

Phillip Kim
The Rosen Law Firm, P.A.
275 Madison Avenue
34th Floor
New York, NY 10016
(212) 686-1060
Email: pkim@rosenlegal.com

Robert P. Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
P O Box 150734
Nashville, TN 37215
(615) 248-2828
Fax: (615) 254-4116
Email: robert@bramlettlawoffices.com

Christopher M. Wood
Robbins Geller Rudman & Dowd LLP
(Nashville Office)
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2203
Fax: (615) 252-3798
Email: cwood@rgrdlaw.com

Jerry E. Martin
Barrett Johnston Martin & Garrison, LLC
414 Union Street
Suite 900
Nashville, TN 37219
(615) 244-2202
Fax: (615) 252-3798
Email: jmartin@barrettjohnston.com

Mark S. Reich
Robbins Geller Rudman & Dowd LLP (New
York Office)
58 S Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Email: mreich@rgrdlaw.com

Mary K. Blasy
Robbins Geller Rudman & Dowd LLP (New
York Office)
58 S Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Fax: (631) 367-1173
Email: mblasy@rgrdlaw.com

Samuel H. Rudman
Robbins Geller Rudman & Dowd LLP (New
York Office)
58 S Service Road
Suite 200
Melville, NY 11747
(631) 367-7100
Fax: (631) 367-1173
Email: srudman@rgrdlaw.com

Corey D. Holzer
Holzer & Holzer, LLC
1200 Ashwood Parkway
Suite 410
Atlanta, GA 30338
(770) 392-0090
Fax: (770) 392-0029
Email: cholzer@holzerlaw.com

J. Alexander Hood , II
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Fax: (212) 661-8665
Email: ahood@pomlaw.com

2

Jeremy A. Lieberman
Pomerantz LLP (NY Office)
600 Third Avenue
20th Floor
New York, NY 10016
(212) 661-1100
Email: jalieberman@pomlaw.com

Charles F. Barrett
Neal & Harwell, PLC
1201 Demonbreun Street, Suite 1000
Nashville, TN 37203
(615) 244-1713
Email: cbarrett@nealharwell.com

Patrick V. Dahlstrom
Pomerantz LLP (Chicago Office)
10 S LaSalle Street, Suite 3505
Chicago, IL 60603
(312) 377-1181
Email: pdahlstrom@pomlaw.com

John Tate Spragens
Spragens Law PLC
311 22nd Ave. N.
Nashville, TN 37203
(615) 983-8900
Email: john@spragenslaw.com

Saul C. Belz
Glankler Brown, PLLC
6000 Poplar Avenue, Suite 400
Memphis, TN 38119
(901) 576-1741
Email: sbelz@glankler.com

Tara L. Swafford
The Swafford Law Firm, PLLC
321 Billingsly Court
Suite 19
Franklin, TN 37067
(615) 599-8406
Fax: (615) 807-2355
Email: tara@swaffordlawfirm.com

Rina Restaino
Schall Law Firm
2049 Century Park East
Suite 2460
Los Angeles, CA 90067
(424) 303-1964
Email: rina@schallfirm.com

/s/ Britt K. Latham
Britt K. Latham