# EXHIBIT 6



**Brian Calandra**

February 6, 2023

**VIA EMAIL**

Jed Schwartz, Esq.
Millbank LLP
55 Hudson Yards
New York, NY 10001-2163

     **Re:** ***Bond et al. v. Clover Health Investments Corp. et al.*, 3:21-cv-00096 (M.D. Tenn.)**

Dear Jed:

I write on behalf of Plaintiffs in response to your letter dated January 30, 2023 ("January 30 Letter") regarding the status of discovery in the above-referenced action (the "Action").[1] This letter serves to follow up on the open issues related to discovery in the Action raised in Plaintiffs' letter of January 11, 2023 ("January 11 Letter") or the January 30 Letter.

**Draft Protective Order, Document Production Protocol and Deposition Protocol**

The January 30 Letter stated that Defendants agreed to the document production protocol enclosed with the January 11 Letter. Plaintiffs enclose a signature copy of the document production protocol with this letter. Please sign the protocol and return to Plaintiffs, who will countersign.

Plaintiffs have reviewed Defendants' comments to the draft Protective Order enclosed with the January 30 Letter. Plaintiffs have accepted most of Defendants comments and enclosed a small number of edits in response to those comments. Please confirm whether these edits are acceptable.

Plaintiffs are disappointed that Defendants will not agree to a deposition protocol that seeks to, among other things, preclude frivolous objections and avoid time-consuming colloquies between counsel. Rather than risk further delays, Plaintiffs agree to move forward without a deposition protocol.

---

[1] No aspect of this letter serves as Plaintiffs' acceptance of any of Defendants' objections lodged in their discovery responses or the January 30 Letter and does not serve as a waiver of any of Plaintiffs' challenges to said objections. Plaintiffs reserve all rights to revisit all Requests for Production if, after review of any production documents, the production is insufficient. Capitalized terms not defined herein shall have the definitions assigned in the January 11 Letter or the Complaint.

**Open Issues Concerning Plaintiffs' First Set of Requests for Production of Documents**

*Definitions*

1.  Business Combination

The January 30 Letter states that Defendants intend to stand on their narrow definition of the term "Business Combination" to concern *only* "the series of transactions consummated on January 7, 2021, and contemplated by the Agreement and Plan of Merger, dated October 5, 2020 (as amended)." As stated in the January 11 Letter, Plaintiffs cannot agree to this definition because it appears to limit the "Business Combination" to the transactions effectuating the Business Combination *themselves*, and exclude the *conduct* attendant to those transactions, which include due diligence, public appearances, presentations, and more. *See* Jan. 11 Letter at 2. For example, Defendant Palihapitiya made public appearances on October 6, 2020 to promote the Business Combination. The statements he made referenced "diligence" that he performed and that investors were to understand were informing his public statements. Defendants' narrow definition of "Business Combination" would exclude documents Defendant Palihapitiya consulted and communications he made in preparation for making those statements because that information was used for his public statements, not for the transaction merging "Merger Sub . . . with and into Clover." Further, while Defendants note that Plaintiffs First Set of Requests for Production of Documents only refers to "Business Combination" twice, Plaintiffs expressly reserve the right to propound additional document requests, and thus believe that it is most efficient to agree to a definition of Business Combination now.

Plaintiffs are willing to agree to a definition of "Business Combination" that includes the conduct, communications, SEC filings, etc., attendant to the transactions effectuating the merger, as described in the January 11 Letter. Plaintiffs request a meet and confer to determine if the parties are at an impasse.

2.  "You, Your, Yours, and Clover"

The January 30 Letter states that Defendants agree to interpret "You, Your, Yours, and Clover" to include Clover Health Investments, Corp. (formerly known as Social Capital Hedosophia Holdings Corp. III ("SCH")) and Legacy Clover and all officers, directors, and Employees thereof," and are willing to consider "particular individuals or entities that Plaintiffs intended to be captured within this definition."

As set forth in the January 11 Letter, the Complaint's[2] allegations refer to conduct relevant to Plaintiffs' claims by direct employees and agents of Legacy Clover, SCH, and the Clover entity surviving the Business Combination, as well as other individuals or entities involved in the Business Combination. Accordingly, Plaintiffs identify the following entities (including their officers, directors, and Employees, in the Document Requests) intended to be captured within this definition:

---

[2] "Complaint" refers to the Amended Complaint filed June 28, 2021 in the Action. ECF No. 70. References to "¶__" are to Complaint paragraphs)

- Asclepius Merger Sub Inc.
- Chamath Palihapitiya
- Citigroup ("Citi")
- Clover Health Investments, Corp. (formerly known as Social Capital Hedosophia Holdings Corp. III ("SCH"))
- "Clover's outside counsel [and] Social Capital's outside counsel" whose "views" of the DOJ Investigation were consistent with Defendants' conclusion "that the fact of DOJ's request for information was not material and was not required to be specifically disclosed in [Clover's] SEC filings." *See* Hindenburg Response.
- "Clover's legal and financial advisors," referenced on page 131 of the of the definitive proxy for the Business Combination.[3]
- Credit Suisse Securities (USA) LLC ("Credit Suisse")
- J.P. Morgan ("JPM")
- KPMG LLP ("KPMG")
- Legacy Clover
- Orrick, Herrington & Sutcliffe LLP ("Orrick")
- SCH Sponsor III LLC
- "SCH's advisors." *See* Proxy at 129–41.
- Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden")
- Social Capital Hedosophia Holdings Corp. III
- Woodruff-Sawyer & Co.

Plaintiffs are willing to agree to a definition of "You, Your, Yours, and Clover" that includes the above entities. Plaintiffs request a meet and confer to determine if the parties are at an impasse.

3. Employee

The January 30 Letter states that Defendants agree to interpret "Employee" to include only direct employees of Clover Health Investments, Corp. (formerly known as Social Capital Hedosophia Holdings Corp. III ("SCH")) and Legacy Clover. Defendants further state that they are willing to consider "particular individuals that Plaintiffs intended to be captured within this definition."

As set forth in the January 11 Letter, the Complaint's allegations refer to conduct relevant to Plaintiffs' claims by direct employees of agents of Legacy Clover, SCH, and the Clover entity that survived the Business Combination. In addition, Defendants emphasized in the Hindenburg Response and their Answer that they did not make any false or misleading statements with scienter because they were relying on the advice of advisors, *i.e.*, agents, counsel, financial advisors, etc. Accordingly, Plaintiffs request that Defendants interpret "Employee" to include direct employees, officers, and board members of the entities listed in Item 2, *supra*, as well as the following individuals:

---

[3] *See* Social Capital Hedosophia Holdings Corp. III, Proxy Statement Pursuant to Section 14(a) of the Securities Exchange Act of 1934 (Schedule 14A) at 129, Dec. 11, 2020 ("Proxy").

- The "certain of SCH's advisors" who "provided updates regarding the status of the potential business combination transaction with Clover, including with respect to the negotiation of definitive transaction documents, the due diligence review being conducted by SCH's advisors, the status of the PIPE Investment and other related matters" during "weekly meetings that were held from September 2020 through early October 2020." Proxy at 129.
- The representatives of Orrick who attended the June 23, 2020, August 13, 2020, or August 24, 2020 meetings of the Clover board of directors. *Id.* at 130.
- The representatives of Skadden, Orrick, and outside healthcare regulatory counsel to Clover who attended meetings "to discuss certain preliminary healthcare regulatory and compliance due diligence matters, given the regulated nature of Clover's business, from August 25, 2020 to August 28, 2020 (*id.* at 131), and/or who attended a meeting on August 29, 2020, "to further discuss the regulatory environment in which Clover operates and certain preliminary legal diligence matters" (*id.* at 132), and/or who attended a meeting on September 4, 2020 "to discuss certain process matters regarding the preparation of the definitive transaction documents, legal due diligence and related work streams, including the anticipated timeline discussed by the parties" (*id.* at 133), and/or who attended calls on September 14, 2020, September 15, 2020, September 16, 2020, September 22, 2020 or September 25, 2020 (*id.* at 134), and/or who attended due diligence calls on September 9, 2020 and September 10, 2020 (*id.*), and/or who met on October 4, 2020 and October 5, 2020 to discuss certain regulatory matters (*id.* at 140).
- The representatives of Skadden who on August 27, 2020, were provided with "access to a virtual data room of Clover and began conducting a preliminary legal due diligence review of Clover," as well as the "additional representatives of Skadden were provided with access to a virtual data room of Clover" on September 4, 2020 "and began conducting a legal due diligence review of certain of the materials contained therein." *Id.* at 131
- The representatives of Skadden who attended the September 6, 2020, SCH meeting where "[f]eedback from the SCH board of directors was solicited by SCH management who also responded to questions from members of SCH's board of directors during the subsequent discussion of the directors" and "[p]rocess matters relating to ongoing due diligence review of Clover and its business operations" were discussed. *Id.*
- The representatives of Credit Suisse and Orrick who attended a September 8, 2020 meeting with Mr. Garipalli and Mr. Toy, among others. *Id.* at 133.
- The representatives of KPMG and of Woodruff who were subsequently engaged by SCH to perform a financial due diligence review of Clover and its business operations. *Id.* at 134.
- The representatives of Skadden, KPMG, Woodruff and Orrick participating in "additional conversations and e-mail exchanges regarding follow-up questions and requests arising from matters discussed on the legal due diligence call and other matters arising over the course of Skadden's, KPMG's and Woodruff's respective review of Clover's written responses to their initial and supplemental due diligence requests and of the other due diligence materials . . . in the virtual data room." *Id.*

- The KPMG representatives who attended September 11, 2020 meetings to discuss certain financial, tax and compliance due diligence matters, and/or who attended "several meetings via teleconference to discuss certain financial and compliance due diligence matters" from September 17, 2020 to October 2, 2020. *Id.* at 135-36.
- The representatives of Skadden, KPMG and Credit Suisse who attended the September 24, 2020 meeting regarding, among other things, SCH's advisors' ongoing or completed due diligence review. *Id.* at 137.
- The "advisors" of SCH referenced in the September 24, 2020 meeting with The representatives of Skadden, KPMG and Credit Suisse. *Id.*
- The representatives of Orrick, Clover, Citi and JPM attending the September 29, 2020 Clover board meeting. *Id.* at 138.
- The "representatives of SCH, Clover, Credit Suisse and Citi" who participated in various virtual meetings with prospective participants in the PIPE Investment "[b]eginning on September 27, 2020 and throughout the week of September 28, 2020." *Id.* at 138.
- The representatives of Skadden, Orrick, and/or Citi who attended meetings concerning investor presentations, the status of virtual meetings with PIPE investors, the terms of the Merge Agreement and Registration Rights Agreement, from September 29 to October 6. *Id.* at 139-41.
- The representatives of "Clover's outside counsel [and] Social Capital's outside counsel" whose "views" of the DOJ Investigation were consistent with Defendants' conclusion "that the fact of DOJ's request for information was not material and was not required to be specifically disclosed in [Clover's] SEC filings." *See* Hindenburg Response.

Plaintiffs are willing to agree to a definition of "Employee" that includes the persons described in this Item 3. Plaintiffs request a meet and confer to determine if the parties are at an impasse.

4. Relevant Time Period

Defendants are incorrect that Plaintiffs have conceded that the proposed start date for the Relevant Time Period is April 24, 2020. Among other things, the Complaint alleges that Defendants misrepresented that they had not committed any material legal or regulatory violations "since January 1, 2018" (¶¶115, 124, 227, 235), that Clover's Chief Development Officer Ethan Lipkind caused Clover to violate multiple laws and regulations by ordering Clover employees to distribute gift cards to physicians' staff in 2018 (¶129), that Defendants' descriptions of the Company's growth from "January 1, 2018" through 2020 were false and misleading (¶¶142, 152, 262, 283), that Hiram Bermudez was boasting about his activities with his insurance business in 2018 (¶159), that the Company admitted to making $1.36 million in undisclosed payments to Bermudez from 2017 to March 29, 2021 (¶170), and that evidence existed of physicians failing to use Clover Assistant known to the Company from 2018 onward (¶213). In light of these and other allegations, January 1, 2018 is the appropriate starting period for the Relevant Time Period, notwithstanding that the date predates the Class Period, as it is hornbook law that "facts from before the class period are relevant to establish that statements made during the class period were materially false" or made with scienter. *See Burges v. BancorpSouth, Inc.*, 2017 WL 4640462, at

*3 (M.D. Tenn. Oct. 12, 2017), citing *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir. 2001).

Defendants object in the January 30 Letter that Plaintiffs' proposed end date for the Relevant Time Period of March 29, 2021 "imposes substantial burdens beyond what is proportional for the needs of the case." The January 30 Letter states that "[i]t is standard for the parties in litigation to use the date a complaint was filed as the cut-off date for discovery" because "it is highly likely that any documents related to the particular allegations in the complaint will be privileged and/or subject to work product protections," and thus the burden of identifying privileged documents is disproportional to the needs of the case.

Leaving aside that Defendants cite no authority for the principal that the date a complaint is filed automatically cuts off the scope of discovery, Defendants' unilateral assertion that they should not be required to search for relevant documents because those documents may be privileged is plainly improper. Defendants are effectively making a blanket assertion of privilege over all documents after February 4, 2021, and "[b]lanket assertions of protection under either the attorney-client privilege or work product protection are ineffective to preserve these protections." *Pravak v. Meyer Eye Grp., PLC*, 2009 WL 10664851, at *5 (W.D. Tenn. Oct. 22, 2009). Further, the Hindenburg Response expressly stated that Defendants made certain statements in reliance on counsel, and Defendants' Answer asserts advice of counsel (among other advisors) as an affirmative defense. *See* Answer at 142. Once a party elects to assert such a defense, they waive their right to assert privilege over communications concerning the subject matter of that defense. *Barnard v. Powell Valley Elec. Coop.*, 2021 WL 6275267, at *7 (E.D. Tenn. Mar. 5, 2021) ("Litigants cannot hide behind the privilege if they are relying on privileged communications to make their case" or, more simply, cannot use the privilege as "a shield and a sword."). Further, not only is the work product privilege "not absolute," *United States v. Life Care Centers of Am., Inc.*, 2015 WL 10987030, at *3 (E.D. Tenn. Apr. 29, 2015), but the doctrine "is not a shield from discovery regarding facts that an attorney has learned, persons from whom the facts had been learned, or the existence of documents." *Cowan v. U S Fence, LLC*, 2008 WL 11452593, at *4 (E.D. Tenn. Feb. 20, 2008).

The January 30 Letter appears to acknowledge that Defendants were communicating and creating documents directly in response to the Hindenburg Report during the limited period of seven weeks between February 5, 2021 and March 29, 2021, and thus that those communications and documents are directly relevant to this action, but will not be produced because they are privileged. Accordingly, given the direct relevance of these documents and the many exemptions to the attorney-client privilege and work product doctrine, including those described above, the benefit of the information produced during this short period plainly outweighs the minimal burden of requiring Defendants' counsel to review and log purportedly privileged documents, so that Plaintiffs may challenge those designations.

As set forth above and in the January 11 Letter, Plaintiffs defined Relevant Time Period of January 1, 2018 to March 29, 2021 seeks information relevant to Plaintiffs' claims and Defendants' defenses and is proportional to the needs of the case. Plaintiffs do not accept Defendants unilateral definition of a more limited time period. Plaintiffs thus request a meet and confer to determine if the parties are at an impasse.

5. Other Definitions

Plaintiffs confirm that they accept the definitions of "Communication," "Document," and "DOJ Investigation," as discussed during the parties' meet and confer sessions in August 2022.

*"Undisputed" Requests*

Plaintiffs' understanding is that, based on "Defendants' R&Os," as defined in the January 30 Letter, and Defendants' statements on the August meet-and-confer calls, there are no disputes with respect to the production of Documents in response to Plaintiffs' Requests 26, 38, 39, and 40.

Plaintiffs accept Defendants' representation that, with regard to Plaintiffs' Request 26, Defendants will produce non-privileged, responsive Documents that are within their possession, if any, and that can be located following a reasonable search and agreed-upon custodians. Plaintiffs request that Defendants make this production immediately.

Plaintiffs agreed on the August 18 meet-and-confer call that Defendants have produced he Documents responsive to Plaintiffs' Request 38.

Plaintiffs accept Defendants' representation that, with regard to Plaintiffs' Request 39, Defendants have produced non-privileged Documents responsive to Plaintiffs' Request 39.

Plaintiffs accept Defendants' representation that Defendants will produce responsive, non-privileged Documents that Defendants intend to use to oppose or advance any claim or defense in the Action in advance of trial as requested in Plaintiffs' Request 40.

*Individual Requests*

1. Plaintiffs' Request No. 1

The January 30 Letter states that "Clover is willing to produce non-privileged Documents responsive to [Request No. 1] that have already been produced in the Derivative Actions (as defined in Plaintiffs' Requests) as of the date of this letter." Plaintiffs request that Defendants immediately produce these Documents.

As stated on the August meet and confer calls, Defendants refusal to produce Documents produce in Derivative Actions *arising out of the same facts alleged in the Complaint*, simply because those documents were produced subsequent to the January 30 Letter, is improper. Quite simply, a request for Documents that Defendants have already reviewed and produced to a third party, and which are directly relevant to the allegations in this Action, is not only a proper subject of discovery and proportional to the needs of the case, but also more efficient for Defendants, who do not need to re-review documents for relevance or privilege.

Plaintiffs request a meet and confer to determine if the parties are at an impasse solely as to Plaintiffs' request for Documents produced in Derivative Actions after January 30, 2023. This request to meet and confer is no obstacle to Defendants producing Documents responsive to Request 1 that they have already agreed to produce.

2.  Plaintiffs' Request No. 2

Plaintiffs' Request 2 seeks "All Documents and Communications produced, without regard to the Relevant Time Period, whether formally or informally, to the DOJ, in response to, in connection with, or related to the DOJ Investigation." Although the January 30 Letter states that Plaintiffs had agreed to the use of searches to limit the scope of Request 2, this is not correct. Defendants had agreed to propose "parameters" for the search of Documents responsive to Request 2, which they still have not done.

Regardless, to the extent that Defendants assert that their proposed search terms are parameters for limiting the production of documents responsive to Request 2, this is rejected. Defendants undoubtedly have a production database storing documents that have been produced in production(s) to the DOJ. Those documents are also likely tagged for relevance to various DOJ requests for information. Defendants can produce these documents immediately without any need for additional review, given that the documents are not privileged, since they have been produced to the government, and are directly relevant to the allegations of the Complaint, which allege that the existence and subject matter of the investigation was material to investors.

Plaintiffs reassert Request 2 in its entirety. Plaintiffs further request a meet and confer to determine if the parties are at an impasse.

3.  Plaintiffs' Request Nos. 3, 4, 5, 13, 17, 19, 20, 27, and 28

The January 30 Letter states, "[f]or Clover's responses to Plaintiffs' proposed custodians and search terms for all ESI searches for Request Nos. 3, 4, 5, 13, 17, 19, 20, 27, and 28, please refer to Sections IV and V, *infra*." The January 30 Letter does not include a Section IV or a Section V. Plaintiffs will assume that references in the letter to "II. Custodians" and "III. Search Terms" are to "Sections IV and V, *infra*," and respond to Defendants' counterproposal of custodians and search terms below.

4.  Plaintiffs' Request No. 6

The January 30 Letter states that "Clover is willing to produce responsive, non-privileged Documents sufficient to identify any Clover Employee, other than counsel, who, to Clover's knowledge, has communicated with the DOJ regarding the DOJ Inquiry during the Relevant Time Period, to the extent such Documents are in Clover's possession, custody, and control and can be found after a reasonable search." Plaintiffs request that Defendants immediately commence this search and produce responsive Documents.

Plaintiffs do not agree, however, to Defendants' refusal to identify counsel who has communicated with the DOJ regarding the DOJ Investigation. Defendants do not provide any justification for refusing to disclose the identities of counsel, nor do they indicate whether they are referring to in-house counsel, external counsel, or both. To the extent that Defendants' unidentified rationale is based on privileged, communications with the DOJ are communications with a third party and thus not privileged. Further, the identities of the individuals who communicated with the DOJ are facts, not advice. Finally, given that Defendants' Answer asserts an advice-of-counsel defense and the Hindenburg Response references reliance on counsel, the

counsel who communicated with the DOJ are fact witnesses with information directly relevant to Plaintiffs' ability to prove, among other things, scienter and Defendants' affirmative defenses.

Plaintiffs request a meet and confer to determine if the parties are at an impasse solely as to Plaintiffs' request for Documents sufficient to show the identities of counsel who communicated with the DOJ regarding the DOJ Investigation. This request to meet and confer is no obstacle to Defendants producing Documents responsive to Request 6 as described in the January 30 Letter.

   5.   Plaintiffs' Requests Nos. 7 and 8

The January 30 Letter states that "Clover is willing to produce the following categories of non-privileged Documents: (i) closing binders from the Business Combination; (ii) financial projections included in the data room for the Business Combination; (iii) relevant public filings; and (iv) final investor presentations." Plaintiffs request that Defendants immediately produce these Documents.

Plaintiffs cannot agree, however, to retract their request for documents and communications reflecting follow up questions from and responses to Financial Advisors. As referenced repeatedly above, Defendants have raised the affirmative defense of relying on counsel and other advisors. Questions from Financial Advisors regarding the contents of the data room associated with the Business Combination and Defendants' responses to those questions, including information provided in response to those questions, go directly to Plaintiffs' claims that statements in SEC filings associated with the Business Combination were misleading.

Plaintiffs request a meet and confer to determine if the parties are at an impasse solely as to Plaintiffs' request for request for Documents and communications reflecting questions from and responses to Financial Advisors. This request to meet and confer is no obstacle producing the Documents stated in "A. Plaintiffs' Request Nos. 7 and 8." Jan. 30 Ltr. at 9.

   6.   Plaintiffs' Request Nos. 9, 10, 11, and 12

The January 30 Letter states that Defendants will not produce Documents concerning the SEC Investigation, as sought in Requests 9, 10 and 11 because the requests are "cloned discovery" and a "fishing expedition." Defendants' objection is meritless. Defendants have admitted in SEC filings that the SEC is investigating the allegations in the Hindenburg Report, *i.e.*, the identical nucleus of operative fact out of which Plaintiffs' claims arise. Far from a "fishing expedition," Documents can produce the majority of these documents immediately, since they have been previously produced and thus already reviewed for privilege and relevance, which will *reduce* the time and expense of discovery. Likewise, there can be no legitimate objection to identifying individuals who have communicated with the SEC regarding the SEC Investigation, since the fact and subject matter of the communications is not privileged and they almost certainly have facts relevant to whether Defendants made false and misleading statements with scienter as alleged in the Complaint.

Plaintiffs request a meet and confer to determine if the parties are at an impasse as to Requests 9, 10, 11, and 12.

7.  Plaintiffs' Request No. 14

Plaintiffs agree with the approach to identifying responsive documents described in the January 30 Letter, but reserve all rights to modify or reassert Plaintiffs' Request No. 14 as well as to propagate additional document requests regarding the same or related subject matter.

8.  Plaintiffs' Request Nos. 15 and 16

The January 30 Letter states that Defendants will produce responsive, non-privileged Documents in their possession, if any, sufficient to show payments made by Clover to B & H Assurance, LLC that can be located after a reasonable search. Plaintiffs request that Defendants immediately commence this search and produce responsive Documents.

The January 30 Letter states that Defendants "are not presently aware that Mr. Bermudez held an ownership in any operating insurance brokerage companies aside from B & H Assurance, LLC during the Relevant Time Period." ¶¶152-60. As alleged in the Complaint, Mr. Bermudez owned multiple insurance brokers, and one confidential witness saw a colleague "pull[] up a portal where all the insurance licensures live—the business organizations . . . and it showed the difference between someone that was tied directly to Clover as a captive sales agent versus someone that was directly under a field marketing organization." ¶157. Plaintiffs accept Defendants' representation that they are not aware of any other broker owned by Mr. Bermudez, and reserve all rights should that representation prove to be inaccurate or knowingly false. Plaintiffs will identify any additional entities owned by Mr. Bermudez to Defendants as they become aware of them.

9.  Plaintiffs' Request No. 18

The January 30 Letter refuses to produce Documents in response to Request 18 and does not respond to the justification for the request proffered during the meet-and-confers or in the January 11 Letter. Plaintiffs request a meet and confer to determine if the parties are at an impasse regarding this Request.

10. Plaintiffs' Request Nos. 21, 22, 23, and 31

The January 30 Letter states that Clover will produce non-privileged Documents sufficient to show the factual bases and support for Clover's public statements in the Complaint regarding healthcare provider use of the Clover Assistant that are alleged to be misstatements." Plaintiffs request that Defendants immediately produce these Documents.

While Defendants' proposal responds in part to Requests 21 and 22, it appears to suggest that Defendants will not produce documents concerning "the entry of medical information . . . into the Clover Assistant by individuals other than physicians that may result in an upward risk adjustment," the entry of data into Clover Assistant by individuals other than physicians, complaints about inducements to physicians to accept Clover MA plans or use Clover Assistant, or the ability of Clover assistant to facilitate upward risk adjustments or upcoding. Plaintiffs request a meet and confer to determine if the parties are at an impasse as to these elements of Requests 21 and 22 and Requests 23 and 31. This request to meet-and-confer should present no obstacle to Defendants producing the Documents responsive to portions of Requests 21 and 22.

11. Plaintiffs' Request Nos. 24 and 25

January 30 Letter states that Clover "will produce responsive, non-privileged final minutes for Clover's Board of Directors meetings and any attachments thereto, for the period from April 24, 2020, through February 4, 2021" and "responsive, non-privileged final minutes for SCH's Board of Directors meetings and any attachments thereto, for the September 6, 2020, September 24, 2020, and October 5, 2020, meetings in which SCH's Board of Directors discussed the relevant merger." Plaintiffs request that Defendants immediately produce these Documents.

Plaintiffs further request that Defendants confirm that "attachments thereto" include will include "summaries, presentations . . . agendas, notes, and any Documents circulated in connection with such meetings."

Plaintiffs reiterate the Relevant Time Period for these requests is January 1, 2018 to March 29, 2021. Accordingly, minutes and attachments (assuming that the attachments contain what is described in the preceding paragraph) should be produced for the entire relevant time period, including, specifically for SCH, minutes and attachments for meetings between October 5, 2020 and the closing of the Business Combination. Plaintiffs request a meet and confer to determine if the parties are at an impasse as to the scope of attachments to meeting minutes and the time period for the request. This request to meet-and-confer should present no obstacle to Defendants producing the Documents they have agreed to produce.

12. Plaintiffs' Request No. 29

Plaintiffs hereby retract Request 29, provided, however, that Plaintiffs reserve all rights with regard to that request, including reasserting the request at a later date and moving to compel the production of Documents responsive to that request in accordance with the Federal Rules of Civil Procedure and the local rules for the Middle District of Tennessee.

13. Plaintiffs' Request No. 30

The January 30 Letter states that "Clover will agree to produce in response to Plaintiffs' Request No. 30 the non-privileged Documents that Clover has agreed to produce in response to Plaintiffs' Request Nos. 7 and 8, as discussed above." This is proposal is not sufficient for the reasons set forth in Item 5 *supra*. Further, Defendants claim that the length of the Complaint precludes a "workable" search for documents is belied by the fact that Defendants are asserting an affirmative defense of reliance on advisors to the entire Complaint, and thus must have determined that the defense has an application to each category of misstatements alleged in the Complaint. Moreover, Plaintiffs have proposed search terms for each category of claims in the Complaint, *see* January 11 Letter at 11-14.

Plaintiffs request a meet and confer with Defendants to determine whether the parties are at an impasse, whether Defendants will expand their production in response to Requests 7 & 8, and whether the application of search terms can resolve the dispute regarding this request.

14. Plaintiffs' Request No. 32

The January 30 Letter states that "Clover will produce non-privileged Documents sufficient to identify any investigation of Clover other than the DOJ Inquiry and the SEC Investigation by any federal or state agency or stock exchange Concerning the facts alleged in the Complaint." Plaintiffs agree to this proposal, reserving all rights to expand or reassert the full document request or a substantively similar one at a later date, and request that Defendants produce responsive Documents immediately.

15. Plaintiffs' Request No. 33

The January 30 Letter states that "Clover is willing to produce non-privileged Documents sufficient to show Clover's document retention policies in force during the Relevant Time Period that can be found after a reasonable search." Plaintiffs request that Defendants immediately commence the search and produce such Documents.

Plaintiffs reiterate the Relevant Time Period for this request is January 1, 2018 to March 29, 2021. Accordingly, Defendants should search for document retention policies in force during this time. Plaintiffs request a meet and confer to determine if the parties are at an impasse as to the scope document retention policies Defendants will produce. This request to meet-and-confer should present no obstacle to Defendants producing the document retention policies they have agreed to produce.

16. Plaintiffs' Request Nos. 34 and 35

In the interests of moving this process forward, Plaintiffs withdraw Requests 34 and 35, reserving all rights to reassert those requests or propagate substantively similar requests in the Action.

17. Plaintiffs' Request Nos. 36 and 37

In the interests of moving this process forward, Plaintiffs withdraw Requests 34 and 35, reserving all rights to reassert those requests or propagate substantively similar requests in the Action.

**Defendants' First Requests for Production of Documents**

1. "Undisputed" Requests

Plaintiffs do not have an understanding different from Defendants' understanding regarding Defendants' Requests 6, 26, 27, 30, 31, and 32, nor do Plaintiffs have an understanding different from Defendants' understanding regarding Defendants' Requests 9, 10, 11, 12, 13, 14, 19, 24, 25, 28, and 29. Plaintiffs confirm that Defendants' understanding is correct as to Defendants' Requests 5, 12, 14, 19, 25, 30, 31, and 32.

2. Defendants' Request Nos. 1, 2, 3, 4, 7 and 8

Plaintiffs reiterate that the public filings, Tweets, news articles, and information on publicly available websites that they used in creating the Complaint are described in detail in the Complaint. Defendants can access that information by simply visiting those websites, including Twitter.com, SEC.gov, Medium.com, MedCity News, nbcnewyork.com, and NJ.com to obtain the information. Defendants likely already have this information in hand, which they obtained while briefing their motion to dismiss the Complaint.

Plaintiffs confirm that they will provide information responsive to Defendants' Request 2 after the Court endorses the protective order the parties submit to the Court.

Plaintiffs confirm that they are preparing a privilege log, which they will provide to Defendants in short order. The log will also list all communications with Named Plaintiff Jean-Nicolas Tremblay in counsel's possession, custody or control.

3. Defendants' Request Nos. 21, 22, and 23

Plaintiffs deny that they "revisited" any position regarding the production of tax returns during a call on August 16, 2022. In any event, as Defendants acknowledge, they have data showing the price at which Lead Plaintiff and Named Plaintiff purchased and sold shares. Indeed, Defendants questioned both Lead Plaintiff and Named Plaintiff *at length* during their depositions about the prices paid and sold for SCH or Clover shares, as well as any gains or losses associated with those shares. Whether case law considers a merger to be a purchase or sale of securities— which it plainly does—has nothing to do with the taxes paid by Lead Plaintiff or Named Plaintiff. Accordingly, any information to be gleaned from Lead Plaintiff or Named Plaintiff's tax returns is entirely duplicative of information already in Defendants' possession. Plaintiffs will stand on their objection and not produce either Lead Plaintiff or Named Plaintiff's tax returns.

In the interests of compromise, however, Plaintiffs are willing to provide the tax basis claimed in tax returns for purchases or sales of shares in Clover (for the avoidance of doubt, which includes SCH) by Lead Plaintiff and Named Plaintiff, to the extent that precise information is contained in the tax returns.

**Custodians**

The January 30 Letter states that Defendants agree to use the following custodians to search for electronically stored information ("ESI"):

- Chamath Palihapitiya
- Vivek Garipalli
- Andrew Toy
- Joseph Wagner
- Hiram Bermudez
- Ethan Lipkind
- Zoe Farrell
- Livia Istrate

Page 14

- Wendy Richey

Plaintiffs agree that these individuals are appropriate custodians and request that Defendants begin searching their ESI and producing responsive Documents immediately.

As to the remaining proposed custodians, they are relevant and proportionate to the needs of the case because:

- Andrew Robinson, Clover, VP of Communications. The Hindenburg Response was posted to Medium.com under Andrew Still-Baxter's byline. *See* Hindenburg Response. Andrew Still-Baxter reports directly to Mr. Robinson, and thus Mr. Robinson undoubtedly participated in the creation of the Hindenburg Response. Mr. Robinson's non-privileged communications—of which there should be many, given that Defendants have asserted an advice-of-counsel affirmative defense— responsive to Plaintiffs' Requests are thus directly relevant to the falsity of Defendants' alleged misstatements, Defendants' knowledge of that falsity and intent to deceive investors, and Defendants' defenses.

- Joyce Mattson, Clover, Director, Provider Data Management. As a Director, Provider Data Management, Ms. Mattson's was likely responsible for managing data of healthcare providers who saw patients using Clover insurance. Ms. Mattson thus would have worked with data concerning physician use of Clover Assistant.

- David Weathington, Clover, Senior Vice President, Plan Operations. The Chief Scientific Officer, Director of Clinical Programs and Clinical Improvement Sales Manager all reported directly to Mr. Weathington, who reported directly to Mr. Garipalli. Mr. Weathington thus would have communicated to his subordinates and Mr. Garipalli regarding physician use of Clover Assistant and incentives or inducements to physicians or front-office staff to use Clover Assistant or recommend Clover policies.

- Brian Field, Senior Manager, Network Management, Development, Total Network Engagement. As a Senior Manager for network management, development, and engagement, in Pennsylvania, Mr. Field would have been familiar with efforts to incentivize or induce physicians to accept Clover insurance and use Clover Assistant. He also would have been familiar with the DOJ Investigation and complaints of improper inducements to physicians, which are alleged to have occurred in and around Pennsylvania.

- Michael Waters, Clover, Senior Manager of Partnerships and Development. As a Senior Manager of Partnerships and Development, Mr. Waters would have been managing vendors that with which Clover contracted to process claims and collect premiums, and would have been aware of Hiram Bermudez's role in driving increases in Clover Members and data concerning physician use of Clover Assistant.

- Ankit Patel, Vice President of Provider Alignment and Network Engagement. As alleged in the Complaint, CW3 reported directly to Mr. Patel, who reported to Mr. Lipkind. ¶46. Mr. Patel allegedly attended meetings where CW3 raised concerns about physicians' failure to use Clover Assistant during patient visits. ¶216. As a direct report of Mr. Lipkind, Mr. Patel likely also knew of efforts to induce or incentivize physicians and/or staff to use Clover Assistant or recommend Clover plans.

- Mark Spektor, Clover, Chief Medical Officer. As alleged in the Complaint, Mr. Spektor told CW2 that as early as 2019 the Company had data showing that half the providers who used Clover Assistant were not using the tool during patient visits. ¶205. Mr. Spektor also made roadshow presentations to promote Clover Assistant, and thus would have been aware of efforts to induce or incentivize physicians and/or staff to use Clover Assistant or recommend Clover plans.

- Carl Rathjen, Clover, Vice President of Network Management and Operations. CW3 and CW4 reported to Mr. Rathjen. ¶¶46-47. Mr. Rathjen allegedly led meetings where CW3 raised concerns about physicians' failure to use Clover Assistant during patient visits, and received emails from CW3 regarding improper use of Clover Assistant. ¶¶215-16.

- Jon-Michael Troche, Clover, Provider Engagement Manager. As a provider engagement manager, Mr. Troche would have interacted directly with physicians accepting Clover insurance and using Clover Assistant. Those interactions would have exposed him to Hiram Bermudez's role in driving increases in Clover members, inducements or incentives used to drive physician use of Clover Assistant, and whether physicians were using Clover Assistant during patient visits.

- Rachel Jones, Clover, Director, Provider Solutions Development. Ms. Jones reported directly to Carl Rathjen. In her role as Director, Provider Solutions Development, Ms. Jones would have seen how physicians were using Clover Assistant, and whether they were using Clover Assistant during patients visits, and would have overseen development of Clover Assistant in response to data concerning physician use of Clover Assistant.

- Joany Delgado, Clover, Sales Oversight, Senior Associate. In her role in Compliance, Ms. Delgado would have received complaints regarding inducements or incentives for physicians to accept Clover insurance or use Clover Assistant. Ms. Delgado also would have access to complaints regarding improper use of Clover Assistant by physicians' office staff.

- Gabe Perez, Clover, Senior Director, Customer Success and Network Development. Mr. Davis reported directly to Carl Rathjen. In his role overseeing Customer Success and Network Development, Mr. Perez would have seen how physicians were using Clover Assistant, and whether they were using Clover Assistant during patients visits, and would have overseen development of Clover Assistant in response to data concerning physician use of Clover Assistant. Mr.

Perez also likely would have been aware of Hiram Bermudez's role in increasing Clover members.

- Jackie Garrett, Clover, Manager, Network Engagement Development, New Jersey. Ms. Garrett reported directly to Carl Rathjen. In her role at Clover, Ms. Garrett would have been aware of complaints concerning inducements and incentives for physicians to use Clover Assistant. Ms. Garrett also would have had access to data concerning physician use of Clover Assistant, as well as Mr. Bermudez's role in increasing the number of Clover members.

- Ana Carolina Geiger, Clover, Manager, Strategic Initiatives. Ms. Geiger reported directly to Defendant Garipalli. In her role at Clover, Ms. Geiger would have been aware of initiatives like the alleged Clover Ambassador program and the distribution of gift cards or payments to physicians and/or front office staff to increase use of Clover Assistant. She also would have known of Mr. Bermudez's role in increasing Clover members and of data concerning physician use of Clover Assistant.

**Search Terms**

Plaintiffs understand Defendants' limitation on proximity searches, but given that very few sentences have only ten words, Plaintiffs request that all /s proximity searches be run at w/50 and all paragraph searches be run at w/100.

Plaintiffs propose to revise Defendants' search terms as follows:

| Req. | Defendants' Proposal | Plaintiffs' Counterproposal |
|---|---|---|
| 2 | Covered by proposed terms for Requests 3, 4, and 5. | Plaintiffs reject Defendants' proposed terms. |
| 3,4,5 | (DOJ OR (Department w/2 Justice) OR demand\*) AND (investigat\* OR inquir\*OR "CID" OR subpoena)<br><br>Viveca AND Parker<br><br>Eastern w/2 District w/2 Pennsylvania<br><br>("E.D. Pa." OR "EDPA" OR "E.D.Pa.")<br><br>Pennsylvania w/5 (prosecut\* OR investigat\* OR inquir\* OR subpoena OR "CID") | (DOJ OR (Department w/2 Justice) OR demand\*) AND (investigat\* OR inquir\*OR "CID" OR subpoena OR regulat! or CMS or ambassador or "gift card" or prepaid or Chamath or Hindenburg)<br><br>Viveca AND Parker<br><br>Eastern w/2 District w/2 Pennsylvania<br><br>("E.D. Pa." OR "EDPA" OR "E.D.Pa.") |
| 7 | None | Request for meet and confer |

| | | |
|---|---|---|
| 9, 10, 11, 12 | None | Request for meet and confer |
| 13 | Same as 14 *infra*, but specifically run on custodians Palihapitiya, Garipalli, Toy, and Wagner. | Accepted |
| 14 | Covered in part by proposed terms for Requests 3, 4, and 5.<br><br>("Ambassador" w/ 5 (refer*) OR member*)) AND ("doctor" OR "physician" OR reception* OR "staff")<br><br>(gift W/2 card*) AND ((ethan OR Lipkind) AND (physician OR doctor OR (healthcare W/2 practitioner)) OR hcp) AND (FCA OR (false W/2 claims W/2 act) AND ((refer* W/2 patient) OR referral* OR recruit* OR (kick W/2 back) OR AKS)) | ("Ambassador" w/ 25~~5~~ (refer*) OR member*)) AND ("doctor" OR "physician" OR reception* OR "staff")<br><br>(gift W/2 card*) AND ((ethan OR Lipkind) AND (physician OR doctor OR (healthcare W/2 practitioner)) OR hcp) AND (FCA OR (false W/2 claims W/2 act) AND ((refer* W/2 patient) OR referral* OR recruit* OR (kick W/2 back) OR AKS)) |
| 16 | None | Reserving all rights, Plaintiffs accept Defendants' proposal regarding Request 16. |
| 17 | Hindenburg OR "short report" OR ((Nate OR Nathan) w/2 Anderson)<br><br>For Plaintiffs' Request No. 17, the relevant date searched will be February 4, 2021. | Plaintiffs cannot agree to limit the search to one day instead of the Relevant Time Period. Plaintiffs request to meet and confer regarding the scope of the documents sought.<br><br>Search terms are accepted. |
| 19 | ((ethan OR Lipkind) w/5 ((zoe OR farrell) AND (livia OR istrate))) AND (compliance OR complaint OR investigat* OR violat*)<br><br>((ethan AND Lipkind) w/5 ambassador) AND (reception*)<br><br>((((ethan AND Lipkind) AND (zoe OR farrell OR livia OR istrate)) AND "compliance") AND (((gift W/2 card*) OR prepaid) AND ("doctor" OR | ((ethan OR Lipkind) w/50~~5~~ ((zoe OR farrell~~) AND (~~ OR livia OR istrate))) ~~AND~~ w/100 (compliance OR complaint OR investigat* OR violat* OR report*)<br><br>((ethan AND Lipkind) w/50~~5~~ ambassador) ~~AND (reception*)~~<br><br>((((ethan ~~AND~~ OR Lipkind) ~~AND~~ OR (zoe OR farrell OR livia OR istrate)) AND "compliance") ~~AND~~ w/100 (((gift W/2 card*) OR prepaid) AND ("doctor" OR "physician" OR "hcp" OR reception* OR |

| | | |
|---|---|---|
| | "physician" OR "hcp" OR (healthcare W/2 practitioner)))<br><br>((gift W/2 card*) OR prepaid) AND ((ethan OR lipkind) AND (physician OR doctor OR (healthcare W/2 practitioner) OR hcp)) AND ((FCA OR (false W/2 claims W/2 act) OR (refer* W/2 patient) OR referral* OR recruit* OR (kick W/2 back) OR AKS)) | incentiv* OR motivat* or upcod* OR induc* OR (healthcare W/2 practitioner)))<br><br>((gift W/2 card*) OR prepaid) AND ((ethan OR lipkind) AND (physician OR doctor OR (healthcare W/2 practitioner) OR hcp)) AND ((FCA OR (false W/2 claims W/2 act) OR (refer* W/2 patient) OR referral* OR recruit* OR (kick W/2 back) OR AKS)) |
| 20 | (investigat* OR report) w/10 (Ethan OR Lipkind OR compliance OR zoe OR Farrell OR Istrate OR livia OR card* OR prepaid OR gift OR ambassador)<br><br>((gift W/2 card*) OR prepaid) AND ((ethan OR lipkind) AND (physician OR doctor OR (healthcare W/2 practitioner) OR hcp)) AND ((FCA OR (false W/2 claims W/2 act) OR (refer* W/2 patient) OR referral* OR recruit* OR (kick W/2 back) OR AKS)) | (investigat* OR report) w/5010 (Ethan OR Lipkind OR compliance OR zoe OR Farrell OR Istrate OR livia OR card* OR prepaid OR gift OR ambassador)<br><br>((gift W/2 card*) OR prepaid) AND ((ethan OR lipkind) AND (physician OR doctor OR (healthcare W/2 practitioner) OR hcp)) AND ((FCA OR (false W/2 claims W/2 act) OR (refer* W/2 patient) OR referral* OR recruit* OR (kick W/2 back) OR AKS)) |
| 21, 22, 23 | None | Request meet and confer |
| 27 | Covered by 17 | Plaintiffs cannot agree to limit the search to one day instead of the Relevant Time Period. Plaintiffs request to meet and confer regarding the scope of the documents sought.<br><br>Search terms are accepted. |
| 28 | Covered by 17 | Plaintiffs cannot agree to limit the search to one day instead of the Relevant Time Period. Plaintiffs request to meet and confer regarding the scope of the documents sought.<br><br>Search terms are accepted. |
| 31 | None | Request meet and confer |

Regards,

*/s/ Brian Calandra*
Brian Calandra

POMERANTZ LLP

CC:
**BASS, BERRY & SIMS PLC**
Britt K. Latham (BPR #23149)
Joseph B. Crace, Jr. (BPR # 27753)
150 Third Ave., South, Suite 2800
Nashville, TN 37201
Tel. (615) 742-7762
Facsimile: (615) 742-2847
blatham@bassberry.com
jcrace@bassberry.com

Enc.